**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| GETTY IMAGES HOLDINGS, INC., *et al.*,[1] | ) | Case No. 26-11643 (__) |
| Debtors. | ) | (Joint Administration Requested) |

**MOTION OF DEBTORS**
**FOR ENTRY OF INTERIM AND FINAL**
**ORDERS (I) AUTHORIZING THE DEBTORS TO**
**PAY OR HONOR PREPETITION CLAIMS AND OBLIGATIONS**
**OF CONTENT CONTRIBUTORS AND (II) GRANTING RELATED RELIEF**

The above-captioned debtors and debtors in possession (collectively, the "Debtors") state as follows in support of this motion (this "Motion"):[2]

**Relief Requested**

1. By this Motion, the Debtors seek entry of interim and final orders, substantially in the forms attached hereto as **Exhibit A** and **Exhibit B** (respectively, the "Interim Order" and the "Final Order") (a) authorizing, but not directing, the Debtors to pay prepetition amounts and obligations owed to Independent Contributors and Image Partners (each as defined herein and collectively, the "Content Contributors"), in the ordinary course of business, in an aggregate amount not to exceed $19.2 million on an interim basis, and (b) granting related relief. In addition,

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Getty Images Holdings, Inc. (4229); Griffey Midco (DE), LLC (7122); Abe Investment Holdings, Inc. (5107); Getty Images, Inc. (7556); Getty Images (US), Inc. (8819); Getty Images News Services (PRC), Inc. (1849); and Getty Images (Seattle), Inc. (6863). The location of the Debtors' service address for purposes of these chapter 11 cases is: 605 5th Ave. S. Suite 400, Seattle, WA 98104.

[2] A detailed description of the Debtors and their business, including the facts and circumstances giving rise to the Debtors' chapter 11 cases, is set forth in the *Declaration of Craig Peters, Chief Executive Officer of Getty Images Holdings, Inc. and Its Debtor Subsidiaries, in Support of the Debtors' Chapter 11 Petitions* (the "First Day Declaration"), filed contemporaneously herewith and incorporated by reference herein. Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the First Day Declaration.

the Debtors request that the Court schedule a final hearing approximately twenty-one (21) days from the Petition Date.

**Jurisdiction and Venue**

2. The United States District Court for the District of Delaware has jurisdiction over this matter pursuant to 28 U.S.C. § 1334, which was referred to the United States Bankruptcy Court for the District of Delaware (the "Court") under 28 U.S.C. § 157 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012. The Debtors confirm their consent, pursuant to rule 9013-1(f) of the Local Rules of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

3. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

4. The statutory bases for the relief requested herein are sections 105(a), 363(b), 507(a)(8), 1107(a), and 1108 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "Bankruptcy Code"), rules 2002, 6003(a), and 6004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Local Rules 2002-1 and 9013-1.

**Background**

5. On October 21, 2026 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. The Debtors are operating their business and managing their property as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. Concurrently with the filing of this Motion, the Debtors filed a motion requesting procedural consolidation and joint administration of these chapter 11 cases pursuant to Bankruptcy Rule 1015(b). No request for the appointment of a trustee or examiner has

been made in these chapter 11 cases, and no official committees have been appointed or designated.

**I. The Debtors' Content Contributors.**

6. The Debtors operate a leading platform for premium visual content, including photography, images, video, music, and other multimedia assets. The Debtors' library comprises over 662 million multimedia assets, serving approximately 636,000 global customers.

7. The Debtors' business model depends on a continuously refreshed supply of high-quality visual content from a network of over 600,000 contributors (the "Independent Contributors"), and over 360 premium content partners (the "Image Partners"), including some of the world's most prominent, sports leagues, entertainment studios, and media organizations. Together, these Content Contributors, over 84,000 of whom are exclusive to the Debtors, provide exclusive and non-exclusive content that serves as the centerpiece of the Debtors' content library.

8. Content Contributors are the lifeblood of the Debtors' business. The Debtors' ability to generate revenue depends on maintaining a vast, current, and differentiated library of visual content. Approximately 75 percent of the Debtors' revenue is generated from exclusive content that cannot be obtained from any competing platform, underscoring the critical importance of the Debtors' relationships with their Content Contributors. No single Content Contributor accounted for more than three percent of revenue in the 2025 fiscal year. Moreover, the Debtors offer annual subscription arrangements, which account for over 58 percent of the Debtors' total revenue and depend on the Debtors' ability to deliver a continuously expanding and refreshed content offering. Any disruption to the flow of content would erode the Debtors' competitive position, diminish the value of their offerings, and irreparably harm the Debtors' estates and stakeholders.

9. A significant portion of the Debtors' Content Contributors, the majority of whom are located outside of the United States, may be unfamiliar with the chapter 11 process, the protections the Debtors are afforded by the automatic stay, or the distinction between prepetition and postpetition obligations. Nonpayment of even a single prepetition obligation heightens the risk that Content Contributors, particularly those in foreign jurisdictions, stop providing content or demand removal of their existing content from the Debtors' platforms. Content Contributors located in foreign jurisdictions may erroneously believe they are not subject to the automatic stay and attempt to take precipitous actions such as initiating legal proceedings in foreign courts. Enforcing the Bankruptcy Code in foreign countries would be costly, time consuming, and distract key Debtor employees from the administration of these chapter 11 cases.

10. Accordingly, the relief requested herein is essential to preserve the going-concern value of the Debtors' business, maintain uninterrupted content flow, and enable the Debtors to serve their global customer base undisrupted during these chapter 11 cases.

**A. Overview.**

11. Nearly all Content Contributors contract with, and are paid by, Debtor Getty Images (US), Inc., regardless of whether the Content Contributor is based in a foreign jurisdiction or the United States. Content Contributors under contract with the Debtors typically receive royalties of 15–50 percent of the total license fee charged to customers, depending on the licensing model, exclusivity arrangement, and use of content. In the 2025 fiscal year, the Debtors paid over $220 million in royalties and other compensation to the Content Contributors in exchange for rights to license and distribute their content.

12. A significant portion of the Independent Contributors are based outside of the United States. For non-U.S. Independent Contributors, the Debtors are required to withhold 30 percent at source on royalties tied to U.S. clients, unless the Independent Contributor's home

country has a tax treaty with the United States that reduces or eliminates such withholding obligation.

**B. Independent Contributors.**[3]

13. The Debtors source a substantial portion of their content from Independent Contributors, comprised of photographers, videographers, and illustrators who fund their own production costs and retain copyright ownership of their content. Independent Contributors enter into contracts with Getty Images (US), Inc. granting global distribution and pricing rights, often on an exclusive basis. These content sourcing agreements also provide representations and warranties as to copyrights and other intellectual property rights.

14. Independent Contributors are compensated through royalties (the "Independent Contributor Royalties" and together with all obligations owed to Independent Contributors, "Independent Contributor Obligations") calculated as a percentage of the license fees the Debtors charge their customers, with rates typically ranging from 15–50 percent. Accrued Independent Contributor Obligations can range from $0.01 to thousands of dollars at any given time; as a general matter, once an Independent Contributor accrues approximately $100 in Independent Contributor Royalties, the Debtors ordinarily pay the Independent Contributor the following month for all accrued but unpaid Independent Contributor Royalties; provided, however, that the timing and amount of any such payment may vary based on, among other things, whether the

[3] This Motion does not seek approval of any payments to the Debtors' freelance workforce, staff photographers, videographers, or other employees. Such relief is being sought pursuant to the *Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Pay Prepetition Wages, Salaries, Other Compensation, and Reimbursable Expenses and (B) Continue Employee Benefits Programs, and (II) Granting Related Relief* (the "Wages Motion"), filed contemporaneously herewith. Further, this Motion does not seek approval of any payments to the Debtors' Generative AI partners. Any relief related to the Debtors' Generative AI partners is included in the *Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing Payment of All Trade Claims in the Ordinary Course of Business, (II) Confirming the Administrative Expense Priority of Outstanding Orders, and (III) Granting Related Relief* (the "All Trade Motion"), filed contemporaneously herewith.

Independent Contributor has submitted all required documentation and payment information and the Debtors' internal payment processing policies. In certain instances, Independent Contributors may receive payment at accrual thresholds below $100. Under applicable law, an Independent Contributor may demand removal of their content from the Debtors' platforms upon nonpayment.

15. If even a fraction of the Debtors' Independent Contributors were impacted and as a result demanded content removal, the Debtors' business would be irreparably harmed. The Debtors' downstream licensing obligations to their customers depend on the continued availability of their existing and new content.

16. As of the Petition Date, the Debtors estimate they owe approximately $59.3 million in accrued but unpaid Independent Contributor Obligations, of which approximately $12.3 million will become due and payable between entry of the Interim and Final Orders (the "Interim Period"). While the Debtors expect to continue to make payments on behalf of the accrued but unpaid Independent Contributor Obligations in the ordinary course, the Debtors do not anticipate all of the obligations coming due during the pendency of the case.

**C. Image Partners.**

17. Image Partners are third-parties that enter into agreements with the Debtors to supply content for distribution and licensing through the Debtors' platform. The Debtors generally act as the Image Partners' primary or exclusive distribution channel, enabling the Debtors to commercialize the Image Partners' creative or editorial coverage of news, entertainment, and sporting events. Getty Images serves as the distribution partner for over 360 content partner relationships, such as Sony Pictures Entertainment, Universal Studios, NBC News Archives, Warner Bros., Kyodo News, the NBA, ITN and BBC Studios. These partners rely on Getty Images as their primary distribution channel for commercializing their digital content. Others include

AFP, Bloomberg, Sky News, and Fairfax Media. Loss of these relationships would cause irreparable harm to the Company.

18. Image Partners typically receive royalties (the "Image Partner Royalties," and together with Independent Contributor Royalties, the "Content Contributor Royalties"), license fees, distribution payments, and, in certain cases, minimum guarantee payments (the "Minimum Guarantee Obligations") under their respective agreements (all amounts owed to Image Partners, the "Image Partner Obligations" and together with the Independent Contributor Obligations, the "Content Contributor Obligations"). The Minimum Guarantee Obligations are minimum payouts regardless of content performance and are paid out on various cadences, each depending on the respective agreement. The Minimum Guarantee Obligations represent fixed, accruing contractual obligations that cannot simply be deferred without triggering breach and potential termination of exclusive agreements.

19. As of the Petition Date, the Debtors estimate they owe approximately $30.7 million in accrued but unpaid Image Partner Obligations, of which approximately $6.9 million will become due and payable within the Interim Period. While the Debtors expect to continue to make payments on behalf of the accrued but unpaid Image Partner Obligations in the ordinary course, certain of these obligations may not come due during the pendency of the case.

20. Nonpayment of Image Partner Obligations and Independent Contributor Obligations risks the loss of exclusive and non-exclusive content licensing rights and editorial event access, which would immediately and materially harm the Debtors' estates, irreparably harm the Debtors' going concern value, and erode the Debtors' position as one of the world's premier content providers.

**D. Tax Withholding Obligations for Foreign Content Contributors.**

21. The Debtors source content from nearly every country in the world. All Content Contributor contracts, regardless of whether the Contributor is domiciled in a foreign jurisdiction or the United States, are administered and paid through Debtor Getty Images (US), Inc. As a result, the full universe of Content Contributor Royalties, including those owed to non-U.S. tax residents, flows through a centralized U.S. payment infrastructure.

22. Under sections 1441 and 1442 of the Internal Revenue Code (the "IRC"), Getty Images (US), Inc. is required, as the U.S. payor, to withhold federal income tax at a rate of 30 percent on the gross amount of Content Contributor Royalties attributable to U.S.-source income paid to any Content Contributor who is a non-U.S. tax resident (each, a "Foreign Content Contributor"). Royalties constitute "fixed or determinable annual or periodical" income subject to withholding under IRC § 1441(a), and the U.S.-source character of a royalty payment is generally determined by reference to the location of the licensee (i.e., the customer) rather than the location of the Contributor. Accordingly, where a Foreign Content Contributor's content is licensed by a U.S.-based customer, the resulting royalty payment is U.S.-source income subject to the statutory 30 percent withholding rate, regardless of the Contributor's domicile.[4]

23. The amounts withheld from Content Contributor Royalties owed to Foreign Content Contributors are not obligations owed to the Foreign Content Contributors themselves. Once withheld, such amounts constitute a trust fund tax obligation owed to the IRS. *See* IRC § 7501 (providing that withheld taxes are held in a "special fund in trust for the United States").

[4] Where a Foreign Content Contributor's country of residence has an income tax treaty with the United States, the applicable withholding rate on royalties may be reduced, in many cases to 10 percent, 5 percent, or 0 percent, depending on the terms of the relevant treaty. To claim such a reduced rate, the Foreign Content Contributor must furnish the Debtors with a properly completed IRS Form W-8BEN or W-8BEN-E (or successor form) certifying the Content Contributor's eligibility for treaty benefits.

Accordingly, the withheld portion of any Foreign Content Contributor Royalty is not a prepetition unsecured claim of such Foreign Content Contributor; rather, it is a tax obligation of the Debtors that is collected and remitted as agent for the United States government. The relief sought in this Motion with respect to Content Contributor Royalties addresses the *net* amounts payable to Content Contributors (*i.e.*, the royalty less applicable withholding) and does not seek to modify or alter the Debtors' obligations to withhold and remit taxes to the IRS.[5]

## Basis for Relief

24. Failure to pay prepetition Content Contributor Obligations and to continue honoring Content Contributor Obligations as they come due in the ordinary course of business would likely result in material and irreparable harm to the Debtors' business. Nonpayment may result in, among other things: (a) a mass withdrawal of content by Content Contributors who retain copyright ownership and may demand removal of their content from the Debtors' platforms upon delay of payment or nonpayment; (b) termination of Image Partner relationships resulting in the loss of irreplaceable content; and (c) the cessation of content supply from Foreign Content Contributors who are unfamiliar with the chapter 11 process.

### I. The Court Should Grant the Relief Requested Pursuant to Sections 105(a), 363(b), 1107(a), and 1108 of the Bankruptcy Code.

25. Courts have recognized that it is appropriate to authorize the payment of prepetition obligations where necessary to protect and preserve the estate. *See, e.g.*, *In re Just for Feet, Inc.*, 242 B.R. 821, 825–26 (D. Del. 1999); *see also In re CoServ, L.L.C.*, 273 B.R. 487, 497 (Bankr. N.D. Tex. 2002); *In re Ionosphere Clubs, Inc.*, 98 B.R. 174, 175–76 (Bankr. S.D.N.Y. 1989);

---

[5] To the extent the Debtors owe accrued but unremitted withholding amounts to the IRS as of the Petition Date, such obligations are addressed separately in the Debtors' *Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing the Payment of Certain Prepetition and Postpetition Taxes and Fees and (II) Granting Related Relief*, filed contemporaneously herewith.

*Armstrong World Indus., Inc. v. James A. Phillips, Inc. (In re James A. Phillips, Inc.),* 29 B.R. 391, 398 (S.D.N.Y. 1983). In so doing, these courts acknowledge that several legal theories rooted in sections 105(a) and 363(b) of the Bankruptcy Code support the payment of prepetition claims.

26. Section 363(b) of the Bankruptcy Code permits a bankruptcy court, after notice and a hearing, to authorize a debtor to "use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). "In determining whether to authorize the use, sale or lease of property of the estate under this section, courts require the debtor to show that a sound business purpose justifies such actions." *Dai-Ichi Kangyo Bank, Ltd. v. Montgomery Ward Holding Corp.* (*In re Montgomery Ward Holding Corp.*), 242 B.R. 147, 153 (D. Del. 1999); *Ionosphere Clubs*, 98 B.R. at 175 (finding that a sound business justification existed to justify payment of certain prepetition wages); *In re Phx. Steel Corp.*, 82 B.R. 334, 335-36 (Bankr. D. Del. 1987) (requiring the debtor to show a "good business reason" for a proposed transaction under section 363(b) of the Bankruptcy Code).

27. Courts also authorize payment of prepetition claims in appropriate circumstances based on section 105(a) of the Bankruptcy Code, which codifies a bankruptcy court's inherent equitable powers to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a). Under section 105(a) of the Bankruptcy Code, courts may authorize pre-plan payments of prepetition obligations when essential to the continued operation of a debtor's businesses. *See Just for Feet*, 242 B.R. at 825–26. Specifically, a court may use its power under section 105(a) of the Bankruptcy Code to authorize payment of prepetition obligations pursuant to the "necessity of payment" rule (also referred to as the "doctrine of necessity"). *See, e.g., Ionosphere Clubs*, 98 B.R. at 176; *In re Lehigh & New England Ry. Co.*, 657 F.2d 570, 581 (3d Cir. 1981) (stating that courts may authorize payment of prepetition claims

when there "is the possibility that the creditor will employ an immediate economic sanction, failing such payment"); *see also In re Columbia Gas Sys., Inc.*, 171 B.R. 189, 191–92 (Bankr. D. Del. 1994) (noting that, in the Third Circuit, debtors may pay prepetition claims that are essential to the continued operation of the business). Here, the "immediate economic sanction" is concrete and severe, as Content Contributors who retain copyright ownership of the content on the Debtors' platforms may, upon nonpayment, demand removal of their content which the Debtors license to their customers, resulting in a potential downstream breach of customer agreements and threat to the Debtors' revenue streams.

28. A bankruptcy court's use of its equitable powers to "authorize the payment of prepetition debt when such payment is needed to facilitate the rehabilitation of the debtor is not a novel concept." *Ionosphere Clubs*, 98 B.R. at 175–76 (citing *Miltenberger v. Logansport, C. & S.W. Ry. Co.*, 106 U.S. 286 (1882)). Courts in this district have granted similar relief. *See In re LBI Media, Inc.*, No. 18-12655 (CSS) (Bankr. D. Del. Dec. 12, 2018) (authorizing payment of prepetition claims to on-air talent and certain vendors) (citing *In re Just for Feet, Inc.*, 242 B.R. 821, 824–25 (D. Del. 1999); *In re Columbia Gas Sys., Inc.*, 171 B.R. 189, 191–92 (Bankr. D. Del. 1994) (citation modified)). Further, at least one court has recognized that there are instances when a debtor's fiduciary duty can "only be fulfilled by the preplan satisfaction of a prepetition claim." *CoServ*, 273 B.R. at 497. Here, preserving the value of the Debtors' estates requires the Debtors to maintain their relationships with the Content Contributors because the Content Contributors' product is the lifeblood of the Debtors' business.

29. The relief requested herein represents a sound exercise of the Debtors' business judgment and is appropriate and warranted under the circumstances. The authority to pay the Content Contributors in the initial days of these chapter 11 cases will preserve the Debtors' ability

to continue providing customers with their content. Content is not ancillary to the Debtors' operations; it is the cornerstone of their product offering. Put simply, there is no business without the Content Contributors. The risk to the Debtors' business if Content Contributors are not paid prepetition amounts owed to them is not merely that Content Contributors will stop providing new content; it is that they will demand removal of existing content from the Debtors' platforms. Content Contributors retain copyright ownership of their works, and nonpayment may trigger a right to withdraw content that is currently available for license. Mass content removal would immediately and irreparably harm the Debtors' principal revenue stream, breach downstream licensing agreements, and erode the value of the Debtors' subscription offerings, which account for over 58 percent of the Debtors' total revenue.

30. The risk of nonpayment is especially acute with respect to the significant portion of the Debtors' Content Contributors who are based outside the United States. Many Foreign Content Contributors, particularly the hundreds of thousands of individual creators who are not sophisticated commercial entities, may not understand the chapter 11 process, the protections afforded by the automatic stay, or the distinction between prepetition and postpetition obligations. Foreign Content Contributors may react precipitously to the Debtors' chapter 11 filing by demanding removal of their content from the Debtors' platform or refusing to supply new content, unless and until they receive payment on account of their prepetition claims. Failure to maintain longstanding Content Contributor relationships and a continuous supply of content will destroy value that would otherwise inure to the benefit of the Debtors' estates and all stakeholders. The Debtors' exclusive content partnerships and editorial event access would also be jeopardized. If the Debtors fail to honor their obligations to Image Partners, the Debtors risk destroying critical relationships and offerings that took years to build and that differentiate the Debtors from their

competitors. The resulting harm to the Debtors' estates from the loss of content and Content Contributor relationships would far outweigh the cost of paying the prepetition Content Contributor Obligations, and the Debtors submit that such payment is necessary to avoid immediate and irreparable harm.

31. Courts routinely allow payment of prepetition amounts owed on account of content programming in media company bankruptcies. *See In re LBI Media, Inc.*, No. 18-12655 (CSS) (Bankr. D. Del. Nov. 27, 2018) (granting relief to pay prepetition obligations owing to on-air talent and other necessary creditors essential to programming operations); *In re Cumulus Media Inc.*, No. 26-90346 (ARP) (Bankr. S.D. Tex. Mar. 5, 2026) (granting relief to pay up to approximately $60 million in prepetition obligations to on-air talent, content programming vendors, and other trade creditors on an interim basis); *In re iHeartMedia, Inc.*, No. 18-31274 (MI) (Bankr. S.D. Tex. Mar. 15, 2018) (granting relief to pay approximately $55 million in prepetition obligations owing to on-air talent, station affiliates, and copyright owners on an interim basis). The Content Contributors supply essential inputs for the Debtors' operations. In the visual media industry, content is the equivalent of inventory; without it, the Debtors cannot generate revenue.

32. Courts in this district and others also routinely grant authorization for debtors to pay claims owing to foreign entities against which the automatic stay cannot be enforced readily and as to which it would be unduly time-consuming and expensive to seek enforcement of an order of the bankruptcy court in the creditor's home country. *See, e.g.*, *In re At Home Grp. Inc.*, No. 25-11120 (JKS) (Bankr. D. Del. June 17, 2025) (authorizing payment of foreign vendor claims where vendors were unfamiliar with the chapter 11 process); *In re Vice Grp. Holding Inc.*, No. 23-10738 (JPM) (Bankr. S.D.N.Y. May 18, 2023) (same); *In re Philippine Airlines, Inc.*, No. 21-11569 (SCC) (Bankr. S.D.N.Y. Sept. 30, 2021) (same); *In re Avianca Holdings S.A.*, No. 20-11133 (MG)

(Bankr. S.D.N.Y. Jan. 27, 2021) (same); *see also In re Aerovias Nacionales de Colombia S.A. Avianca*, 303 B.R. 1, 6 (Bankr. S.D.N.Y. 2003) (finding that the rationale for separate motions specifically calling out foreign creditors is the uncertain extraterritorial reach of the automatic stay).

33. The Debtors have determined, in the exercise of their sound business judgment, that payment of prepetition amounts owed to Content Contributors is essential to preserve the going-concern value of the Debtors' estates. The harm from nonpayment—content withdrawal, cessation of content supply, loss of critical partnerships, and erosion of competitive position—would be grossly disproportionate to the amounts of the prepetition claims that would have to be paid.

## II. No Party Will Be Prejudiced by the Relief Requested in this Motion.

34. No party in interest will be prejudiced by the relief requested by this Motion because the Content Contributor Obligations are unimpaired under the Plan and will be paid in full. Thus, the relief requested herein seeks to alter only the timing, not the amount or priority, of such payments. Moreover, authority to pay the Content Contributor Obligations in the ordinary course of business is necessary to avoid the risk of key partners withholding content and services.

## III. The Court Should Authorize Relief to Maintain the Debtors' Tax Withholding and Payment Infrastructure for Foreign Content Contributors.

35. As set forth above, Getty Images (US), Inc. is required under sections 1441 and 1442 of the IRC to withhold federal income tax at a rate of 30 percent on the gross amount of U.S.-source royalties paid to Foreign Content Contributors, subject to reduction under applicable income tax treaties. Once withheld, under section 7501 of the IRC, such amounts are held in a "special fund in trust for the United States." Withheld taxes are not obligations owed to the Foreign Content Contributors themselves; they are trust fund obligations owed to the IRS. Accordingly, the withheld portion of any Content Contributor Royalties owed to Foreign Content Contributors

does not constitute a prepetition unsecured claim of the Foreign Content Contributor, and the relief sought in this Motion with respect to Content Contributor Royalties owed to Foreign Content Contributors addresses only the net amounts payable to Content Contributors (*i.e.*, the gross royalty less applicable withholdings).

36. The Debtors' withholding calculations, royalty payments, and IRS remittances are processed through a single integrated payment system operated by Getty Images (US), Inc. Any disruption to the ordinary-course royalty payment process, including a suspension of prepetition Content Contributor Royalties owed to Foreign Content Contributors, would simultaneously disrupt the Debtors' ability to calculate and process withholdings, generate appropriate filings for Foreign Content Contributors, and remit withheld amounts to the IRS on a timely basis. For the reasons set forth above, authorization to pay prepetition Content Contributor Royalties owed to Foreign Content Contributors as contemplated by this Motion is necessary to preserve the integrity of the Debtors' tax compliance infrastructure, which constitutes a critical component of the Debtors' operating systems.

37. Sections 1107(a) and 1108 of the Bankruptcy Code authorize the Debtors to operate their business and manage their property as debtors in possession. Implicit in these provisions is the obligation to comply with applicable nonbankruptcy law in the operation of the Debtors' business. The Debtors will continue to withhold, deposit, and report applicable taxes on royalty payments made to Foreign Content Contributors postpetition in the ordinary course. Authorization to pay prepetition Content Contributor Royalties owed to Foreign Content Contributors will enable the Debtors to maintain the timely generation of IRS reports for Foreign Content Contributors, and to continue making timely deposits of withheld amounts under the applicable Treasury Regulations.

38. Failure to maintain the Debtors' withholding and payment infrastructure would expose the Debtors' estates to possible penalties under the IRC, and such penalties and liabilities would constitute additional administrative costs to the Debtors' estates at a time when the Debtors should be focused on preserving going-concern value and maximizing recoveries for all stakeholders. *See Bank of Am. Nat'l Trust & Savs. Ass'n v. 203 N. LaSalle St. P'Ship*, 526 U.S. 434, 453 (1999) (identifying "preserving going concerns and maximizing property available to satisfy creditors" as the "two recognized policies" of chapter 11).

39. Because the Debtors' royalty calculation and withholding functions are integrated into a single automated payment system, a breakdown in the royalty payment process would cascade into a breakdown in the Debtors' ability to comply with their federal tax obligations, creating a compounding administrative burden at precisely the moment the Debtors can least afford it. The costs of reconstructing withholding calculations, reprocessing information returns, and resolving disputes with the IRS and Foreign Content Contributors after the fact would far exceed the costs of authorizing the relief requested herein. The harm from failing to maintain the withholding infrastructure would be grossly disproportionate to the amounts of the prepetition claims that would have to be paid.

**Processing of Checks and Electronic Fund Transfers Should Be Authorized**

40. The Debtors have sufficient funds to pay the amounts described in this Motion in the ordinary course of business by virtue of access to cash on hand and anticipated access to cash collateral and debtor-in-possession financing. In addition, under the Debtors' existing cash management system, the Debtors can readily identify checks or wire transfer requests as relating to any authorized payment in respect of the relief requested herein. Accordingly, the Debtors do not believe that checks or wire transfer requests, other than those relating to authorized payments, will be inadvertently honored. Therefore, the Debtors request authority, but not direction, to

authorize all applicable financial institutions, when requested by the Debtors, to receive, process, honor, and pay any and all checks or wire transfer requests in respect of the relief requested in this Motion.

**<u>The Requirements of Bankruptcy Rule 6003(a) Are Satisfied</u>**

41. Bankruptcy Rule 6003(a) empowers a court to grant certain relief within the first twenty-one (21) days after the Petition Date only to the extent that "relief is needed to avoid immediate and irreparable harm." Fed. R. Bankr. P. 6003(a). For the reasons discussed above, an immediate and orderly transition into chapter 11 is critical to the viability of the Debtors' operations. Failure to receive the requested relief during the first twenty-one (21) days of these chapter 11 cases would severely disrupt the Debtors' operations at this critical juncture and cause immediate and irreparable harm. The requested relief is necessary for the Debtors to operate their business in the ordinary course, preserve the ongoing value of their operations, and maximize the value of their estates for the benefit of all stakeholders. The Debtors have demonstrated that the requested relief is "needed to avoid immediate and irreparable harm," as contemplated by Bankruptcy Rule 6003(a), and request that the Court grant the requested relief.

**<u>Reservation of Rights</u>**

42. Notwithstanding anything to the contrary herein, nothing contained in this Motion or any actions taken pursuant to any order granting the relief requested by this Motion (including any payment made in accordance with any such order), is intended as or shall be construed or deemed to be: (a) an implication or admission as to the amount of, basis for, or validity of any particular claim against the Debtors under the Bankruptcy Code or other applicable non-bankruptcy law; (b) a waiver of the Debtors' or any other party in interest's rights to dispute any particular claim on any grounds; (c) a promise or requirement to pay any particular claim; (d) an implication, admission, or finding that any particular claim is an administrative expense

claim, other priority claim, or otherwise of a type specified or defined in this Motion or any order granting the relief requested by this Motion; (e) a request or authorization to assume, adopt, or reject any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code; (f) an admission as to the validity, priority, enforceability, or perfection of any lien on, security interest in, or other encumbrance on property of the Debtors' estates; (g) a waiver or limitation of the Debtors' or any other party in interest's claims, causes of action, or other rights under the Bankruptcy Code or any other applicable law; (h) an approval, assumption, adoption, or rejection of any agreement, contract, lease, program, or policy under section 365 of the Bankruptcy Code; (i) a concession by the Debtors that any liens (contractual, common law, statutory, or otherwise) that may be satisfied pursuant to the relief requested in this Motion are valid, and the rights of all parties in interest are expressly reserved to contest the extent, validity, or perfection or seek avoidance of all such liens; (j) a waiver of the obligation of any party in interest to file a proof of claim; (k) otherwise affecting the Debtors' rights under section 365 of the Bankruptcy Code to assume or reject any executory contract or unexpired lease; or (l) a waiver, modification, or limitation of any right of any party under the Restructuring Support Agreement. If the Court grants the relief sought herein, any payment made pursuant to the Court's order is not intended and should not be construed as an admission as to the validity, priority, or amount of any particular claim or a waiver of the Debtors' or any other party in interest's rights to subsequently dispute such claim.

**Waiver of Bankruptcy Rules 6004(a) and 6004(h)**

43. To implement the foregoing successfully, the Debtors seek a waiver of the notice requirements under Bankruptcy Rule 6004(a) and the fourteen (14)-day stay of an order authorizing the use, sale, or lease of property under Bankruptcy Rule 6004(h) for the reasons set forth herein.

## **Notice**

44. The Debtors will provide notice of this Motion to the following parties or their respective counsel: (a) the Office of the United States Trustee for the District of Delaware; (b) the holders of the 30 largest unsecured claims against the Debtors (on a consolidated basis); (c) the office of the attorney general for each of the states in which the Debtors operate; (d) the United States Attorney's Office for the District of Delaware; (e) the Internal Revenue Service; (f) the Credit Agreement Agent; (g) counsel to the Credit Agreement Agent; (h) counsel to the Plan Sponsors; (i) counsel to the Unsecured Noteholders Ad Hoc Committee; (j) counsel to the Consenting Secured Lenders; and (k) any party that is entitled to notice pursuant to Bankruptcy Rule 2002 (collectively, the "Notice Parties"). As this Motion is seeking "first day" relief, the Debtors will serve copies of this Motion and any order entered in respect of this Motion as required by Local Rule 9013-1(m). The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

[*Remainder of page intentionally left blank*]

WHEREFORE, the Debtors request entry of the Interim Order and Final Order, substantially in the forms attached hereto as **Exhibit A** and **Exhibit B**, (a) granting the relief requested herein and (b) granting such other relief as the Court deems appropriate under the circumstances.

Dated: October 21, 2026
Wilmington, Delaware

*/s/ Justin R. Alberto*
**COLE SCHOTZ P.C.**
Seth Van Aalten (*pro hac vice* pending)
Justin R. Alberto (DE Bar No. 5126)
Patrick J. Reilley (DE Bar No. 4451)
Sarah A. Carnes (*pro hac vice* pending)
Jack M. Dougherty (DE Bar No. 6784)
500 Delaware Avenue, Suite 600
Wilmington, Delaware 19801
Telephone: (302) 652-3131
Facsimile: (302) 652-3117
Email: svanaalten@coleschotz.com
jalberto@coleschotz.com
preilley@coleschotz.com
scarnes@coleschotz.com
jdougherty@coleschotz.com

*Proposed Co-Counsel for the Debtors and Debtors in Possession*

**SIMPSON THACHER & BARTLETT LLP**
Brian E. Schartz (*pro hac vice* pending)
Elisha D. Graff (*pro hac vice* pending)
Rachael L. Foust (*pro hac vice* pending)
Dov Gottlieb (*pro hac vice* pending)
Olivia F. Acuña (*pro hac vice* pending)
425 Lexington Avenue
New York, New York 10017
Telephone: (212) 455-3702
Facsimile: (212) 455-2502
Email: brian.schartz@stblaw.com
egraff@stblaw.com
rachael.foust@stblaw.com
dov.gottlieb@stblaw.com
olivia.acuna@stblaw.com

*Proposed Co-Counsel for the Debtors and Debtors in Possession*