**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| GETTY IMAGES HOLDINGS, INC., *et al.*,[1] | ) | Case No. 26-11643(___) |
| Debtors. | ) | (Joint Administration Requested) |

**MOTION OF DEBTORS FOR ENTRY OF INTERIM AND FINAL ORDERS (I) AUTHORIZING THE DEBTORS TO (A) CONTINUE TO OPERATE THE CASH MANAGEMENT SYSTEM, (B) HONOR CERTAIN PREPETITION OBLIGATIONS RELATED THERETO, (C) MAINTAIN EXISTING BUSINESS FORMS, AND (D) CONTINUE INTERCOMPANY TRANSACTIONS, (II) GRANTING ADMINISTRATIVE EXPENSE STATUS TO POSTPETITION INTERCOMPANY CLAIMS, AND (III) GRANTING RELATED RELIEF**

The above-captioned debtors and debtors in possession (collectively, the "Debtors") state as follows in support of this motion (this "Motion")[2]:

## Relief Requested

1. By this Motion, the Debtors seek entry of interim and final orders, substantially in the forms attached hereto as **Exhibit A** and **Exhibit B** (the "Interim Order" and the "Final Order," respectively, and together, the "Orders"): (a) authorizing, but not directing, the Debtors to (i) continue to operate their Cash Management System (as defined herein) and maintain their

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Getty Images Holdings, Inc. (4229); Griffey Midco (DE), LLC (7122); Abe Investment Holdings, Inc. (5107); Getty Images, Inc. (7556); Getty Images (US), Inc. (8819); Getty Images News Services (PRC), Inc. (1849); and Getty Images (Seattle), Inc. (6863). The location of the Debtors' service address for purposes of these chapter 11 cases is: 605 5th Ave. S., Suite 400, Seattle, WA 98104.

[2] A detailed description of the Debtors and their business, including the facts and circumstances giving rise to the Debtors' chapter 11 cases, is set forth in the *Declaration of Craig Peters, Chief Executive Officer of Getty Images Holdings, Inc. and Its Debtor Subsidiaries, in Support of the Debtors' Chapter 11 Petitions* (the "First Day Declaration"), filed contemporaneously herewith and incorporated by reference herein. Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the First Day Declaration.

existing Debtor Bank Accounts (as defined herein), (ii) honor certain prepetition and postpetition obligations related thereto, (iii) maintain existing Business Forms (as defined herein) in the ordinary course of business, and (iv) continue Intercompany Transactions (as defined herein); (b) granting administrative expense status to postpetition Intercompany Claims (as defined herein) that are among the Debtors; and (c) granting related relief. In addition, the Debtors request that the Court schedule a final hearing approximately twenty-one (21) days from the Petition Date.

**Jurisdiction and Venue**

2. The United States District Court for the District of Delaware has jurisdiction over this matter pursuant to 28 U.S.C. § 1334, which was referred to the United States Bankruptcy Court for the District of Delaware (the "Court") under 28 U.S.C. § 157 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012. The Debtors confirm their consent, pursuant to rule 9013-1(f) of the Local Rules of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

3. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

4. The statutory bases for the relief requested herein are sections 105, 345, 363, 364, and 503 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "Bankruptcy Code"), rules 2002, 6003, and 6004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Local Rules 2002-1, 2015-1, and 9013-1.

**Background**

5. On October 21, 2026 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. The Debtors are operating their

business and managing their property as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. Concurrently with the filing of this Motion, the Debtors filed a motion requesting procedural consolidation and joint administration of these chapter 11 cases pursuant to Bankruptcy Rule 1015(b). No request for the appointment of a trustee or examiner has been made in these chapter 11 cases, and no official committees have been appointed or designated.

## The Cash Management System

### I. Overview.

6. The Debtor entity Getty Images Holdings, Inc., along with its Debtor and non-Debtor subsidiaries (such non-Debtor entities, the "Non-Debtor Affiliates," and together with the Debtors, the "Company"),[3] maintains an integrated, centralized cash management system (the "Cash Management System") to facilitate the efficient operation of their business. The Cash Management System is comparable to cash management systems commonly employed by businesses similar in size and scale to the Debtors. A schematic of the Cash Management System is attached hereto as **Exhibit C**.

7. The Company operates a global enterprise in (a) North America, including the United States ("U.S.") and Canada, (b) Europe, the Middle East, and Africa ("EMEA"), (c) Asia-Pacific ("APAC"), and (d) Latin America ("LATAM," and all non-U.S. regions collectively, "ROW"), and maintains independent but interconnected cash management infrastructure for each region. The Company's cash management system in the U.S. is primarily operated by Debtor Getty Images, Inc. ("GII") and its Debtor subsidiaries Getty Images (US), Inc. ("GIUS") and Getty

[3] For the avoidance of doubt, the Non-Debtor Affiliates consist solely of the direct and indirect subsidiaries of Getty Images Holdings, Inc. ("GIH") that are not Debtors, and do not include any Plan Sponsor or any affiliate thereof (other than GIH and its subsidiaries), including Getty Investments L.L.C. ("Getty Investments").

Images (Seattle), Inc. ("GI Seattle"), and is primarily connected with the ROW cash management systems through Getty Images International Unlimited Company ("GI International"), an Irish unlimited company and a non-Debtor indirect subsidiary of GII.

8. In the ordinary course of business, the Company uses the Cash Management System to collect, transfer, and disburse funds generated from its operations and to facilitate cash monitoring and forecasting. The Debtors' treasury department maintains control and oversight of the Cash Management System through Kyriba, a treasury management platform, including in connection with the Intercompany Transactions. The Debtors' accounting department regularly reconciles the Debtors' books and records to ensure that cash movements are properly accounted for. All Debtors are U.S. entities, and the Debtors do not expect to make any Intercompany Transactions to fund their Non-Debtor Affiliates during the course of these chapter 11 cases.

9. The Cash Management System primarily comprises (a) the Main Depository Account that serves as the header concentration account of the Debtors' zero-balance account ("ZBA") system and the hub of the Debtors' operational cash, (b) a Subheader Operating Account that connects the Main Depository Account with the various ZBA Collection Accounts and Disbursement Accounts, and (c) multiple ZBA Collection Accounts and Disbursement Accounts that collect customer receipts and disburse operational expenses. At the end of each business day, balances in the ZBA Collection Accounts and Disbursement Accounts are swept into the Subheader Operating Account, whose balances are partially swept into the Main Depository Account overnight. Historically, excess funds in the Subheader Operating Account were transferred into the Money Market Account to generate interest income.

10. The Company's business and operations are highly integrated with and dependent on the Cash Management System. Any disruption to the Cash Management System will have an immediate and significant adverse effect on the Debtors' business and operations, to the detriment of their estates and all stakeholders. Accordingly, to minimize disruption and maximize the value of the Debtors' estates, the Debtors request authority to continue operating their existing Cash Management System and honor certain prepetition obligations related thereto in the ordinary course of business during these chapter 11 cases.

## II. The Debtor Bank Accounts.

11. As of the Petition Date, the Cash Management System comprises 115 bank accounts (each, a "Bank Account" and, collectively, the "Bank Accounts") held at 17 financial institutions (the "Cash Management Banks"). Of the Bank Accounts, 20 are owned and controlled by the Debtors (the "Debtor Bank Accounts") at four (4) Cash Management Banks (the "Debtor Cash Management Banks"). The primary Debtor Cash Management Banks are U.S. Bank, N.A. ("US Bank"), which holds eight (8) Debtor Bank Accounts, and Bank of America, N.A. ("Bank of America"), which holds nine (9) Debtor Bank Accounts. All Debtor Bank Accounts are held at an authorized depository (each, an "Authorized Depository") that has agreed to comply with certain requirements set by the United States Trustee for the District of Delaware (the "U.S. Trustee"), except the Money Market Account, which has zero balance as of the Petition Date. A list of the Debtor Bank Accounts and Debtor Cash Management Banks is attached to the Orders as Exhibit 1.

12. As of the Petition Date, the Debtor Bank Accounts held total cash of approximately $21 million, of which approximately $18 million was available.

13. The following table provides an overview of the function of and the relationship between the Debtor Bank Accounts:

| Debtor Bank Accounts | Account Descriptions |
|---|---|
| **<u>Main Depository Account</u>**<br>GII<br>*US Bank*<br>*x6173* | The Main Depository Account is the Debtors' primary concentration account for all cash inflow and the hub of the Debtors' operational cash in the ordinary course of business. A majority of operational cash is disbursed from and collected into the Main Depository Account via the Subheader Operating Account each business day. |
| **<u>Subheader Operating Account</u>**<br>GII<br>*US Bank*<br>*x9040* | The Subheader Operating Account collects funds daily from the ZBA Collection Accounts and Disbursement Accounts underneath and transfers part of its balance daily to the Main Depository Account via an overnight sweep. It is also used as a disbursement account for the Debtors' federal tax obligations. Historically, excess cash from the Subheader Operating Account was transferred to the Money Market Account on an ad hoc basis. |
| **<u>Disbursement Accounts</u>**<br>GIUS<br>*US Bank*<br>*x6434*<br>*x1914*<br><br>*Bank of America*<br>*x8504*<br>*x3011*<br>*x9020*<br><br>GI Seattle<br>*US Bank*<br>*x6442*<br>*x9339* | The Disbursement Accounts process the Debtors' payments of ordinary course operational expenses. Disbursements from the Disbursement Accounts are generally on account of general and administrative expenses, accounts payable, royalties to photographers and content providers, payroll, and certain state and business tax obligations. Certain Disbursement Accounts also receive funds from Non-Debtor Affiliates on account of Intercompany Transactions.<br><br>Each business day, the Disbursement Accounts are funded by the Main Depository Account or the Subheader Operating Account to process the scheduled disbursements. Any remaining balance in the Disbursement Accounts at close of business is swept back to the Subheader Operating Account, except for x8504, whose balance is transferred manually.<br><br>The Debtors also maintain two Disbursement Accounts (x3011 and x9020) with Bank of America (the "<u>European Disbursement Accounts</u>") to make disbursements on account of accounts payable and royalties denominated in EUR and GBP and to service the Company's EUR term loan obligations, including principal and interest payments. Bank of America account x3011 processes EUR term loan principal and interest payments and certain royalty and accounts payable payments denominated in EUR. Bank of America account x9020 processes certain royalty and accounts payable payments denominated in GBP. The European Disbursement Accounts are mainly funded through the EMEA regional cash management infrastructure. |
| **<u>Collection Accounts</u>**<br>GIUS<br>*US Bank*<br>*x9065*<br>*x9057* | The Collection Accounts collect payments from customers via electronic receipts, including wires, ACH transfers, and credit card receipts (x9065), and physical checks (x9057). Balances in the Collection Accounts are swept into the Main Depository Account via the Subheader Operating Account each business day. |
| **<u>Debt Service Accounts</u>**<br>GII<br>*Bank of America*<br>*x2816* | The Debtors primarily use account x2816 (the "<u>Main Debt Service Account</u>") to process payments related to their USD-denominated debt obligations, including payment of amortization, interest, and the fees and expenses of the applicable administrative agents, collateral agents, and indenture trustees.<br><br>The Main Debt Service Account is primarily funded by the Debtors' treasury team via the Main Depository Account or the Money Market Account, in each case via the Subheader Operating Account, and certain intercompany transfers from GI International. |
| **<u>Money Market Account</u>**<br>GII<br>*State Street*<br>*x5111* | To generate additional income, the Debtors invested excess operational cash in money market funds via the Money Market Account at State Street. As of the Petition Date, the Money Market Account has zero balance, and the Debtors do not intend to transfer any funds to the Money Market Account during these chapter 11 cases. |

| Debtor Bank Accounts | Account Descriptions |
|---|---|
| **Restricted Cash Account**<br>GII<br>*Bank of America*<br>*x8813* | The Restricted Cash Account holds cash as collateral for the Company's Credit Card Obligations and a letter of credit relating to the Debtors' office lease.<br><br>Certain balances in the Restricted Cash Account also serve as collateral for certain overdraft fees, ACH fees, and foreign exchange transactions. |
| **DIP Accounts**[4]<br>GIH<br>*Western Alliance*<br>*TBD*<br><br>GII<br>*Bank of America*<br>*x0414*<br>*x0427*<br>*x0430* | After the Petition Date and pursuant to the Interim Order, the Debtors shall establish a segregated account (the "Segregated DIP Account") to hold proceeds of the DIP Facility in accordance with the Interim DIP Order. The Segregated DIP Account will be subject to a deposit account control agreement in favor of the DIP Agent (the "Segregated Account Control Agreement"). In accordance with the Interim DIP Order, on the closing date of the DIP Facility and every Monday thereafter, the Debtors may transfer funds from the Segregated DIP Account to other Debtor Bank Accounts in an amount not to exceed the amount needed for payments that are contemplated to be made during the two-week period following such Monday as expressly set forth in the then-applicable Approved Budget (plus an additional 20% of such contemplated payments) (such a withdrawal, an "Approved Budget Withdrawal"). The Debtors may also transfer funds from the Segregated DIP Account to the Funded Reserve Account (as defined below), subject to the Interim DIP Order (such withdrawal, a "Carve Out Withdrawal"). The Debtors are not permitted to withdraw cash from the Segregated DIP Account (other than an Approved Budget Withdrawal or a Carve Out Withdrawal) without the prior written consent of the DIP Lenders (such consent not to be unreasonably withheld so long as the Borrower is in compliance with the Minimum Liquidity Covenant (each as defined in the DIP Credit Agreement)).<br><br>In accordance with the "Carve Out" set forth in the Interim DIP Order, the Debtors also established account x0414 (the "Funded Reserve Account"), account x0427 (the "Pre-Carve Out Trigger Notice Reserve Account"), and account x0430 (the "Post-Carve Out Trigger Notice Reserve Account" and, together with the Pre-Carve Out Trigger Notice Reserve Account, the "Carve Out Reserve Accounts") to hold certain funds in trust to pay certain professional fees. |
| **Adequate Assurance Account**<br>GIUS<br>*Bank of America*<br>*x2513* | As further described in the Utilities Motion, the Debtors intend to use the Adequate Assurance Account to hold cash in an amount sufficient to establish adequate assurance of payment for utility providers. As of the Petition Date, the Adequate Assurance Account has $21,000. |
| **Holding Account**<br>GIH<br>*Western Alliance*<br>*x8077* | The Holding Account is dormant, serves no operational purpose, and is not integrated into the Debtors' Cash Management System. The Debtors do not anticipate using the Holding Account during these chapter 11 cases. |

[4] Capitalized terms used but not defined in this row have the meaning ascribed to them in the *Interim Order (I) Authorizing the Debtors to Use Cash Collateral and Obtain Postpetition Financing; (II) Granting Liens and Superpriority Administrative Expense Claims; (III) Providing Adequate Protection; (IV) Scheduling a Final Hearing; and (V) Granting Related Relief* (the "Interim DIP Order").

## III. Ordinary Course Flow of Funds.

### A. Revenue Collection and Disbursements.

14. The majority of the Company's revenue is collected via electronic means. In the United States, electronic receipts (e.g., credit card receipts, ACH payments, and wires) and physical checks are deposited into two separate Collection Accounts. Balances in the Collection Accounts are swept into the Main Depository Account via the Subheader Operating Account every business day. GIUS collects revenue attributable to the U.S. and LATAM operations, while GI International receives income attributable to APAC, EMEA, and certain Canadian operations.

15. In the ordinary course of business, the Debtors' treasury team monitors the Debtors' disbursement needs and transfers funds from the Main Depository Account or the Subheader Operating Account, either automatically or manually, to the Disbursement Accounts as needed. Depending on the methods of disbursement (e.g., ACH electronic transfers for most vendors, ACH direct debit electronic transfers or checks for tax obligations, or checks for customer refunds and royalty payments to content providers), the Debtors utilize different Disbursement Accounts to process the payments. Most vendor payments are made via ACH.

16. As of the Petition Date, the Debtors had outstanding checks totaling approximately $269,000. These outstanding checks relate primarily to customer refund checks and accounts payable and royalty payments to photographers and content providers, issued from the Disbursement Account x6434.

### B. Intercompany Transactions.

17. The Debtors and Non-Debtor Affiliates form a single, integrated global enterprise under common management. As part of that enterprise and in the ordinary course of business, the Debtors engage in routine intercompany transactions with each other and their Non-Debtor Affiliates (the "<u>Intercompany Transactions</u>"), which may result in intercompany receivables and

payables (the "Intercompany Claims"). The Debtors closely track these transactions through their treasury and accounting systems and can ascertain, trace, and account for all related transfers.

18. The majority of Intercompany Transactions are on account of (a) certain cost-sharing arrangements between GIUS and GI International that govern the allocation of intellectual property development costs between the Company's operations in the U.S. and ROW, (b) certain cost-sharing arrangements among GIUS, GI International, and the iStock business in connection with platform management, content development, advertisement, and corporate management services, (c) certain transfer-pricing arrangements in connection with GIUS and GI Seattle's provision of corporate and administrative services to GI International and other ROW affiliates, such as corporate finance, legal, human resources, information technology, and global communication services, and (d) certain intercompany loans on account of prior acquisitions and internal restructuring.

19. In the ordinary course of business, cash generally flows from the Non-Debtor Affiliates to the Debtors as payment for intercompany receivables owed to the Debtors by Non-Debtor Affiliates arising from Intercompany Transactions. For the five months prior to the Petition Date and on a net basis, the Non-Debtor Affiliates transferred approximately $14.4 million per month to the Debtors on account of Intercompany Transactions. During these chapter 11 cases, the Debtors anticipate that the Non-Debtor Affiliates will not require funding from the Debtors' estates but will continue to transfer cash to the Debtors in the ordinary course pursuant to the Intercompany Transactions.

20. The Intercompany Transactions are an essential component of the Company's business operations and Cash Management System. Any interruption of the Intercompany Transactions would disrupt the Company's business and harm the Debtors' estates and, by

extension, their stakeholders. Without the ability to continue these transactions, the Debtors' business would be significantly damaged. Accordingly, the Debtors seek authority, but not direction, to continue the Intercompany Transactions in the ordinary course of business and consistent with past practice, subject to the limitations set forth in the Interim Order and the Final Order, and request, pursuant to sections 503(b)(1) and 364(b) of the Bankruptcy Code, that postpetition Intercompany Claims resulting from ordinary course Intercompany Transactions among the Debtors be accorded administrative priority.

**IV. The Credit Card Program.**

21. As part of the Cash Management System, in the ordinary course of business and in accordance with the terms of the existing agreements between the Debtors and Bank of America (the "Credit Card Company"), the Debtors provide certain employees with credit cards, including purchasing cards (the "P-Cards") and travel and entertainment cards (the "T&E Cards," and together with the P-Cards, the "Credit Cards") issued by the Credit Card Company under corporate credit card programs (the "Credit Card Program" and the Debtors' obligations thereunder, including balances on the Credit Cards, fees to maintain the Credit Card Program, and all other charges under the Credit Card Program, the "Credit Card Obligations"). The Credit Cards are used by eligible employees to cover approved Company expenditures such as departmental purchases (P-Cards) and travel expenses incurred while conducting Company business (T&E Cards). The Debtors reimburse the T&E Card holders in arrears for amounts they pay to the Credit Card Company and pay all balances on the P-Cards directly to the Credit Card Company from Disbursement Accounts.

22. As of the Petition Date, the Restricted Cash Account holds approximately $1.2 million as collateral for the Debtors' obligations under the Credit Card Program. As of the Petition Date, the Debtors have issued approximately 107 Credit Cards to employees and have

approximately $130,000 of outstanding Credit Card Obligations. On average in the last twelve months before the Petition Date, the Debtors incurred approximately $123,000 of Credit Card Obligations per month.

23. The Credit Card Program is an integral part of the Debtors' Cash Management System. Employees' and the accounts payable department's continued use of the Credit Cards for procurement and travel purposes is essential to the continued operation of the Debtors' business. The Debtors seek authority to (i) continue issuing, using, or canceling Credit Cards and incurring Credit Card Obligations, and (ii) honor all Credit Card Obligations of the Debtors, including, without limitation, making timely payments on account of charges that were incurred under the Credit Card Program both prior to and after the Petition Date, in each case in the ordinary course of business and consistent with past practice.

**V. Bank Fees and Service Charges.**

24. In the ordinary course of their business, the Debtors incur, pay, honor, or allow to be deducted from the appropriate accounts certain service charges and other fees, costs, and expenses charged by the Cash Management Banks (collectively, the "Bank Fees").

25. During the past twelve months, the Debtors paid on average approximately $15,000 in aggregate Bank Fees each month, excluding interest. The Debtors estimate that approximately $15,000 in aggregate Bank Fees remain outstanding as of the Petition Date.

26. The Debtors seek authority to continue paying the Bank Fees, including any prepetition Bank Fees, in the ordinary course on a postpetition basis, consistent with historical practices.

## VI. Compliance with the Depository Requirements of the Bankruptcy Code and the U.S. Trustee Guidelines.

### A. Compliance with the U.S. Trustee Guidelines and Section 345 of the Bankruptcy Code.

27. Section 345(a) of the Bankruptcy Code governs a debtor's cash deposits during a chapter 11 case and authorizes deposits of money or investments that "will yield the maximum reasonable net return on such money, taking into account the safety of such deposit or investment." 11 U.S.C. § 345(a). To comply with section 345 of the Bankruptcy Code, the *Operating Guidelines and Reporting Requirements for Debtors in Possession and Trustees* (the "U.S. Trustee Guidelines") for the U.S. Trustee generally require chapter 11 debtors to, among other things, deposit all estate funds into accounts with the Authorized Depositories. Section 345(b) of the Bankruptcy Code requires a debtor's bank to post a bond unless a debtor's funds are "insured or guaranteed by the United States or by a department, agency, or instrumentality of the United States or backed by the full faith and credit of the United States." 11 U.S.C. § 345(b).

28. As of the Petition Date, all Debtor Bank Accounts, including the nine (9) accounts at Bank of America, the eight (8) accounts at US Bank, and the two (2) accounts at Western Alliance Bank, are held at an Authorized Depository, except the Money Market Account. As of the Petition Date, the Money Market Account has zero balance, and the Debtors do not intend to transfer any funds to the Money Market Account during these chapter 11 cases.

29. Accordingly, the Debtors comply with section 345(b) of the Bankruptcy Code.

### B. Compliance with U.S. Trustee Guidelines as to Business Forms and Books and Records.

30. As part of the Cash Management System, the Debtors utilize various business forms, (including checks, letterhead, correspondence forms, purchase orders, and invoices, as well as certain electronically generated business forms), in the ordinary course of their business

(collectively, and as they may be modified from time to time, the "Business Forms"). The Debtors also maintain books and records to document their financial results and a wide array of operating information (collectively, the "Books and Records"). To avoid material disruption to their business operations and to minimize administrative expenses to their estates, the Debtors request authorization, but not direction, to continue to use all Business Forms and Books and Records in substantially the form used immediately prior to the Petition Date, without reference to the Debtors' status as debtors in possession; *provided* that once existing supplies of checks have been exhausted, the Debtors will ensure that new checks bear the legend "Debtor in Possession" and the applicable case numbers.

## Basis for Relief

### I. The Court Should Authorize the Debtors to Continue Using the Cash Management System Because It is Essential to the Debtors' Ongoing Operations and Restructuring Efforts.

31. The U.S. Trustee Guidelines require a debtor in possession to, among other things: (a) establish one debtor-in-possession bank account for all estate monies required for the payment of taxes, including payroll taxes; (b) close all existing bank accounts and open new debtor-in-possession accounts; (c) maintain a separate debtor-in-possession account for cash collateral; and (d) obtain checks that bear the designation "debtor in possession" and reference the bankruptcy case number and type of account on such checks. These requirements are intended to provide a clear line of demarcation between prepetition and postpetition transactions, payments, and operations and help protect against the inadvertent payment of prepetition claims by preventing banks from honoring checks drawn before the Petition Date.

32. Considering the complexity of the Debtors' business and financial affairs and their need to collect, transfer, and disburse funds throughout the Cash Management System (which ties into the Debtors' existing corporate accounting and cash forecasting reporting), enforcing these

provisions of the U.S. Trustee Guidelines during these chapter 11 cases would severely disrupt the Debtors' business and their ability to efficiently administer these chapter 11 cases. Accordingly, the Debtors request that the Court allow them to operate each of the Debtor Bank Accounts listed on Exhibit 1 annexed to the Interim Order and the Final Order, as they were maintained in the ordinary course of business prior to the Petition Date.

33. The continuation of the Cash Management System should be permitted pursuant to section 363(c)(1) of the Bankruptcy Code, which authorizes the debtor in possession to "use property of the estate in the ordinary course of business without notice or a hearing." Bankruptcy courts routinely treat requests for authority to continue utilizing existing cash management systems as a relatively "simple matter . . . ." *In re Baldwin-United Corp.*, 79 B.R. 321, 327 (Bankr. S.D. Ohio 1987). In granting such relief, courts recognize that an integrated cash management system "allows efficient utilization of cash resources and recognizes the impracticalities of maintaining separate cash accounts for the many different purposes that require cash." *In re Columbia Gas Sys., Inc.*, 136 B.R. 930, 934 (Bankr. D. Del. 1992), *aff'd in part and rev'd in part*, 997 F.2d 1039 (3d Cir. 1993). The United States Court of Appeals for the Third Circuit emphasized that requiring a debtor to maintain separate accounts "would be a huge administrative burden and economically inefficient." *Columbia Gas*, 997 F.2d at 1061; *see also In re Southmark Corp.*, 49 F.3d 1111, 1114 (5th Cir. 1995) (noting that maintaining an existing cash management system allows a debtor "to administer more efficiently and effectively its financial operations and assets").

34. Here, continuation of the Cash Management System is particularly warranted given the complexity of the Company's multinational operations across more than 25 countries. Any interruption to the Cash Management System would significantly disrupt the Debtors' operations, impair the Debtors' ability to collect revenue and pay operating expenses, and potentially

jeopardize the Debtors' relationships with customers and content providers worldwide. Requiring the Debtors to adopt a new cash management system during these chapter 11 cases would be expensive, burdensome, and unnecessarily disruptive to the Debtors' operations. Importantly, the Cash Management System provides the Debtors with the ability to track and report the location and amount of funds, which, in turn, allows management to track and control such funds, ensure cash availability, and reduce administrative costs through a centralized method of coordinating the collection and movement of funds. In light of the size and complexity of the Debtors' operations, any disruption of the Cash Management System could have a severe adverse effect on the Debtors' restructuring efforts. By contrast, maintaining the current Cash Management System will facilitate the Debtors' smooth transition into chapter 11 by, among other things, minimizing delays in paying postpetition debts and eliminating administrative inefficiencies. Finally, maintaining the current Cash Management System will allow the Debtors' treasury and accounting employees to focus on their daily responsibilities as opposed to the non-accretive task of reconstructing the Cash Management System.

35. Parties in interest will not be harmed by the Debtors' maintenance of the Cash Management System, including maintenance of the Debtor Bank Accounts and the Intercompany Transactions, because the Debtors have implemented appropriate mechanisms to ensure that unauthorized payments will not be made on account of obligations incurred before the Petition Date. Specifically, with the assistance of their advisors, the Debtors have implemented internal control procedures that prohibit payments on account of prepetition debts without the prior approval of the Debtors' accounting and treasury departments. In light of such protective measures, maintaining the Cash Management System is in the best interests of the Debtors' estates and stakeholders.

36. Courts in this district have regularly allowed debtors in large chapter 11 cases to maintain their existing cash management systems and such relief generally is non-controversial. *See, e.g.*, *In re Finch Therapeutics Group, Inc.*, Case No. 26-10409 (LSS) (Bankr. D. Del. Apr. 20, 2026) (authorizing the debtors to continue using the cash management system maintained by the debtors prepetition); *In re WW International, Inc.*, Case No. 25-10547 (TMH) (Bankr. D. Del. May 28, 2025) (same); *In re Liberated Brands LLC*, No. 25-10168 (JKS) (Bankr. D. Del. Feb. 28, 2025) (same); *In re JOANN Inc.*, No. 25-10068 (CTG) (Bankr. D. Del. Feb. 10, 2025) (same); *In re Accuride Corp.*, No. 24-12289 (JKS) (Bankr. D. Del. Nov. 19, 2024) (same).

37. Accordingly, the Debtors request that the Court authorize, but not direct, the continued use of the existing Cash Management System to facilitate the Debtors' transition into chapter 11. Specifically, the Debtors request that the Court authorize the Cash Management Banks to continue to maintain, service, and administer the Debtor Bank Accounts as accounts of the Debtors as debtors in possession, without interruption and in the ordinary course of business.

38. As part of the requested relief, the Debtors also seek a waiver of the requirement under the U.S. Trustee Guidelines to establish specific bank accounts for tax payments, including payroll taxes. The Debtors' tax obligations can be paid out of the Debtor Bank Accounts as they are in the ordinary course of business, and the U.S. Trustee can adequately monitor the flow of funds into, among, and out of the accounts, as set forth in the required reporting. Moreover, the creation of a new debtor-in-possession account designated solely for tax obligations would be unnecessary and inefficient.

## II. The Court Should Authorize the Debtors to Continue Using Wire, Credit Card, and ACH Payments and to Continue Processing Checks.

39. The Debtors request that the Court grant further relief from the U.S. Trustee Guidelines to the extent such guidelines require the Debtors to make all disbursements by check.

In particular, the U.S. Trustee Guidelines require that all receipts and all disbursements of estate funds be made by check with a notation representing the reason for the disbursement. As discussed above, in the ordinary course of business, the Debtors conduct transactions through wires, ACH transfers, direct deposits, and other similar methods. If the Debtors' ability to conduct transactions by these methods—including their ability to pay associated fees—is impaired, the Debtors may be unable to perform under certain contracts, their business operations may be unnecessarily disrupted, and their estates will incur additional costs.

40. In addition, the Debtors request relief to continue processing checks and electronic fund transfers. As of the Petition Date, the Debtors had outstanding checks totaling approximately $269,000. These outstanding checks relate primarily to customer refund checks and accounts payable and royalty payments to photographers and content providers, issued from US Bank account x6434 (accounts payable and royalty checks). If the Debtors' ability to conduct transactions by these methods is impaired, the Debtors may be unable to perform under certain contracts, and payments to vendors could be delayed, resulting in unnecessary disruption to their business operations and additional costs to their estates. Therefore, the Debtors request authority, but not direction, to authorize all applicable financial institutions, when requested by the Debtors, to receive, process, honor, and pay any and all checks or wire transfer requests in respect of the relief requested in this Motion.

41. Notwithstanding the foregoing, any check, draft, or other notification that the Debtors advise the Cash Management Banks to have drawn, issued, or otherwise presented before the Petition Date may be honored by the Cash Management Banks only to the extent authorized by order of the Court.

42. The Debtors also request relief to continue operating the Credit Card Program postpetition and satisfying the Credit Card Obligations in the ordinary course of business. As of the Petition Date, the Debtors have approximately $130,000 of outstanding Credit Card Obligations. As previously described, the Credit Cards allow eligible employees to cover approved Company expenditures such as departmental purchases and travel expenses incurred while conducting Company business, and continuing to operate the Credit Card Program is critical to maintaining the ordinary course operation of the Debtors' business.

43. Because all General Unsecured Claims are unimpaired under the Joint Prepackaged Chapter 11 Plan of Reorganization of Getty Images Holdings, Inc. and Its Debtor Subsidiaries (the "Plan"), the relief requested in this Motion seeks to alter only the timing of payments, not whether such payments will ultimately be made to the Credit Card Company. Moreover, by paying the Credit Card Obligations when they become due rather than upon emergence, the relief requested herein avoids unnecessary disruption and harm to the Debtors' business and facilitates a timely restructuring process, a key goal of these prepackaged chapter 11 cases.

44. Courts in this district have regularly allowed debtors in large chapter 11 cases to continue making disbursements in the ordinary course of business using existing means. *See, e.g.*, *In re Finch Therapeutics Group, Inc.*, Case No. 26-10409 (LSS) (Bankr. D. Del. Apr. 20, 2026) (authorizing the debtors' cash management banks to continue to receive, process, honor, and pay, to the extent of available funds, any and all checks, drafts, wires, credit card payments, and ACH transfers); *In re WW International, Inc.*, Case No. 25-10547 (TMH) (Bankr. D. Del. May 28, 2025) (same); *In re Liberated Brands LLC*, No. 25-10168 (JKS) (Bankr. D. Del. Feb. 28, 2025) (same); *In re JOANN Inc.*, No. 25-10068 (CTG) (Bankr. D. Del. Feb. 10, 2025) (same); *In re Accuride Corp.*, No. 24-12289 (JKS) (Bankr. D. Del. Nov. 19, 2024) (same).

### III. The Court Should Authorize the Debtors to Continue Conducting Intercompany Transactions in the Ordinary Course and Grant Administrative Priority Status to Postpetition Intercompany Claims Among the Debtors.

45. In the ordinary course of business, the Debtors engage in and record Intercompany Transactions with each other and Non-Debtor Affiliates.[5] At any given time, as a result of the Intercompany Transactions, there may be intercompany receivables and payables (including Intercompany Claims) owing by one Debtor or Non-Debtor Affiliate to another Debtor or Non-Debtor Affiliate in connection with the receipt and disbursement of funds. The Debtors have historically reflected intercompany balances as journal entry receivables and payables, as applicable, in the respective Debtor's accounting system. The Debtors closely track all fund transfers in their accounting systems and can ascertain, trace, and account for all Intercompany Transactions previously described. The Debtors, moreover, will continue to maintain records of such Intercompany Transactions.

46. Because certain of the Intercompany Transactions represent extensions of intercompany credit made in the ordinary course of business that are an essential component of the Cash Management System, the Debtors request the authority, but not direction, to continue engaging in such transactions postpetition in the ordinary course of business (subject to the limitations and consent requirements set forth in the Interim Order or the Final Order, as applicable) without need for further Court order. The Debtors further request that pursuant to

---

[5] Because the Debtors engage in Intercompany Transactions on a regular basis and such transactions are common among enterprises like that of the Debtors, the Intercompany Transactions are ordinary course transactions within the meaning of section 363(c)(1) of the Bankruptcy Code and, thus, do not require this Court's approval. Nonetheless, out of an abundance of caution, the Debtors are seeking express authority to engage in such transactions on a postpetition basis. Moreover, the continued performance of the ordinary course Intercompany Transactions is integral to ensuring the Debtors' ability to operate their business as debtors in possession. Notwithstanding the foregoing, the Debtors' authority to engage in Intercompany Transactions shall be subject to the limitations set forth in the Orders, and the Debtors shall not rely on section 363(c)(1) of the Bankruptcy Code to take any action restricted thereby.

sections 503(b)(1) and 364(b) of the Bankruptcy Code, all postpetition payments on account of postpetition Intercompany Transactions between or among the Debtors that give rise to an Intercompany Claim be accorded administrative expense status, which would result in an administrative expense claim in favor of the applicable Debtor payor. For the avoidance of doubt, the relief requested herein with respect to the postpetition Intercompany Transactions and the Intercompany Claims resulting therefrom shall not constitute an admission of the Debtors or any other party as to the validity, priority, or status of any prepetition Intercompany Claim or the Intercompany Transaction(s) from which such Intercompany Claim may have arisen.

47. Continuation of the Intercompany Transactions on a postpetition basis is a necessary component of the Debtors' ordinary course business operations. The Intercompany Transactions are integral to the Company's global revenue model and have been conducted on arm's-length terms consistent with the Company's transfer pricing policies. The relief requested herein should be approved as it fairly balances the Debtors' need to facilitate the ordinary course operation of their business, minimize disruption, and preserve value, on the one hand, with maintaining the substantive interests of their stakeholders and the general Bankruptcy Code interest in transparency, on the other hand.

48. Similar relief has been granted in other comparable chapter 11 cases in this district. *See*, e.g., *In re WW International, Inc.*, Case No. 25-10547 (TMH) (Bankr. D. Del. May 28, 2025) (authorizing the continuation of intercompany transactions in the ordinary course of business and according administrative expense status to intercompany claims related thereto); *In re Liberated Brands LLC*, No. 25-10168 (JKS) (Bankr. D. Del. Feb. 28, 2025) (same); *In re JOANN Inc.*, No. 25-10068 (CTG) (Bankr. D. Del. Feb. 10, 2025) (same); *In re Accuride Corp.*, No. 24-12289 (JKS) (Bankr. D. Del. Nov. 19, 2024) (same).

## IV. The Court Should Authorize the Cash Management Banks to Continue to Maintain, Service, and Administer the Debtor Bank Accounts in the Ordinary Course of Business.

49. As discussed above, implementing the U.S. Trustee Guidelines would needlessly interrupt the Debtors' operations and impair the Debtors' efforts to preserve the value of their estates and restructure in an efficient manner. Thus, the Debtors request that the Court authorize, but not direct, the continued use of the existing Cash Management System to facilitate the Debtors' transition into chapter 11. Specifically, the Debtors request that the Court authorize the Cash Management Banks to continue to maintain, service, and administer the Debtor Bank Accounts as accounts of the Debtors as debtors in possession, without interruption and in the ordinary course of business. In this regard, the Cash Management Banks should be authorized to receive, process, honor, and pay any and all checks, ACH transfers and other instructions, and drafts payable through, drawn, or directed on such Debtor Bank Accounts after the Petition Date by holders, makers, or other parties entitled to issue instructions with respect thereto. If the Debtors' ability to conduct transactions by these methods is impaired, the Debtors may be unable to perform under certain contracts, and payments to vendors could be delayed, resulting in unnecessary disruption to their business operations and additional costs to their estates.

50. The Debtors further request that the Court authorize the Cash Management Banks to accept, rely upon, and honor all representations from the Debtors, without any duty to inquire otherwise, as to which checks, drafts, wires, or ACH transfers should be honored consistent with any order of the Court and governing law, whether such checks, drafts, wires, or ACH transfers are dated before or after the Petition Date. The Debtors also request that, to the extent a Cash Management Bank honors a prepetition check or other item drawn on any account either: (a) at the direction of the Debtors; (b) in the good-faith belief that the Court has authorized such prepetition check or item to be honored; or (c) as a result of a mistake made despite implementation

of reasonably customary item handling procedures, such bank will not be deemed to be liable, nor shall it be held liable to the Debtors, their estates, or any other party on account of such prepetition check or other item honored postpetition. Such relief is reasonable and appropriate because the Cash Management Banks are not in a position to independently verify or audit whether a particular item may be paid in accordance with a Court order or otherwise.

51. Moreover, the Debtors request that the Court authorize the Cash Management Banks to: (a) continue to charge the Debtors the Bank Fees, as applicable; and (b) charge back returned items to the Debtor Bank Accounts, including returned items that result from ACH transactions, wire transfers, or other electronic transfers of any kind, regardless of whether such returned items were deposited or transferred prepetition or postpetition and regardless of whether the returned items relate to prepetition or postpetition items or transfers in the ordinary course of business.

52. Courts in this district often waive the U.S. Trustee Guidelines' requirements that debtors establish new postpetition bank accounts, recognizing that they may harm a debtor's postpetition business operations and restructuring efforts to an extent that is out of proportion to the benefit, if any, the requirements afford the debtor's estate or parties in interest. *See, e.g.*, *In re Finch Therapeutics Group, Inc.*, Case No. 26-10409 (LSS) (Bankr. D. Del. Apr. 20, 2026) (authorizing the debtors to continue using their existing cash management system); *In re WW International, Inc.*, Case No. 25-10547 (TMH) (Bankr. D. Del. May 28, 2025) (same); *In re Liberated Brands LLC*, No. 25-10168 (JKS) (Bankr. D. Del. Feb. 28, 2025) (same); *In re JOANN Inc.*, No. 25-10068 (CTG) (Bankr. D. Del. Feb. 10, 2025) (same); *In re Accuride Corp.*, No. 24-12289 (JKS) (Bankr. D. Del. Nov. 19, 2024) (same).

**V. The Court Should Authorize Payment of Fees and Prepetition Obligations Related to the Debtor Bank Accounts.**

53. The relief requested herein is essential to the Debtors' continuation of ordinary-course operations and, as such, is warranted under sections 105(a) and 363 of the Bankruptcy Code. Courts have recognized that it is appropriate to authorize the payment of prepetition obligations where necessary to protect and preserve the estate, including an operating business's going-concern value. *See, e.g.*, *In re Just for Feet, Inc.*, 242 B.R. 821, 825–26 (D. Del. 1999); *see also In re CoServ, L.L.C.*, 273 B.R. 487, 497 (Bankr. N.D. Tex. 2002); *In re Ionosphere Clubs, Inc.*, 98 B.R. 174, 175–76 (Bankr. S.D.N.Y. 1989); *In re James A. Phillips, Inc.*, 29 B.R. 391, 398 (S.D.N.Y. 1983). In so doing, these courts acknowledge that several legal theories rooted in sections 105(a) and 363(b) of the Bankruptcy Code support the payment of prepetition claims.

54. Section 363(b) of the Bankruptcy Code permits a bankruptcy court, after notice and a hearing, to authorize a debtor to "use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). "In determining whether to authorize the use, sale or lease of property of the estate under this section, courts require the debtor to show that a sound business purpose justifies such actions." *In re Montgomery Ward Holding Corp.*, 242 B.R. 147, 153 (D. Del. 1999); *see also James A. Phillips*, 29 B.R. at 397 (relying on section 363 of the Bankruptcy Code to allow a contractor to pay prepetition claims of suppliers who were potential lien claimants because the payments were necessary for general contractors to release the funds owed to the debtors); *Ionosphere Clubs*, 98 B.R. at 175 (finding that a sound business justification existed to justify payment of certain prepetition wages); *In re Phx. Steel Corp.*, 82 B.R. 334, 335–36 (Bankr. D. Del. 1987) (requiring the debtor to show a "good business reason" for a proposed transaction under section 363(b) of the Bankruptcy Code).

55. Courts also authorize payment of prepetition claims in appropriate circumstances based on section 105(a) of the Bankruptcy Code, which codifies a bankruptcy court's inherent equitable powers to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a). Under section 105(a) of the Bankruptcy Code, courts may authorize pre-plan payments of prepetition obligations when essential to the continued operation of a debtor's business. *See Just for Feet*, 242 B.R. at 825–26. Specifically, a court may use its power under section 105(a) of the Bankruptcy Code to authorize payment of prepetition obligations pursuant to the "necessity of payment" rule (also referred to as the "doctrine of necessity"). *See, e.g., Ionosphere Clubs*, 98 B.R. at 176; *In re Lehigh & New England Ry. Co.*, 657 F.2d 570, 581 (3d Cir. 1981) (stating that courts may authorize payment of prepetition claims when there "is the possibility that the creditor will employ an immediate economic sanction, failing such payment"); *see also In re Columbia Gas Sys., Inc.*, 171 B.R. 189, 191–92 (Bankr. D. Del. 1994) (noting that, in the Third Circuit, debtors may pay prepetition claims that are essential to the continued operation of the business). A bankruptcy court's use of its equitable powers to "authorize the payment of prepetition debt when such payment is needed to facilitate the rehabilitation of the debtor is not a novel concept." *Ionosphere Clubs*, 98 B.R. at 175–76 (citing *Miltenberger v. Logansport, C. & S.W. Ry. Co.*, 106 U.S. 286 (1882)). Indeed, at least one court has recognized that there are instances when a debtor's fiduciary duty can "only be fulfilled by the preplan satisfaction of a prepetition claim." *CoServ*, 273 B.R. at 497.

56. These standards are satisfied here because the payment of Bank Fees is necessary to maintain the Cash Management System and avoid any disruption in the administration of the Debtor Bank Accounts. Because all General Unsecured Claims are unimpaired under the Plan, the relief requested in this Motion seeks to alter only the timing of payments, not whether such

payments will ultimately be made to the Cash Management Banks. Moreover, by paying the Bank Fees when they become due that otherwise would be paid upon emergence, the relief requested herein avoids unnecessary disruption and harm to the Debtors' business and facilitates a timely restructuring process, a key goal of these prepackaged chapter 11 cases.

57. The Debtors request authority, but not direction, to continue to pay the Bank Fees, including any prepetition amounts related thereto, in the ordinary course of business, in light of the material benefit of maintaining the Cash Management System. The relief requested represents a sound exercise of the Debtors' business judgment, is necessary to avoid immediate and irreparable harm to the Debtors' estates, and is therefore justified under sections 105(a) and 363(b) of the Bankruptcy Code and Bankruptcy Rule 6003.

## VI. The Court Should Authorize the Debtors to Continue Using Their Existing Business Forms.

58. To the extent the Debtors have any preprinted checks, and to avoid disruption of the Cash Management System and unnecessary expense, pursuant to Local Rule 2015-1(a), the Debtors request that they be authorized to continue to use such checks and other Business Forms substantially in the form existing immediately before the Petition Date, without reference to their status as debtors in possession. Parties in interest will not be prejudiced by this relief. Parties doing business with the Debtors undoubtedly will be aware of their status as debtors in possession and, thus, changing preprinted business forms is unnecessary and would be unduly burdensome. Nonetheless, and in accordance with Local Rule 2015-1(a), with respect to any checks that are generated electronically, or following the depletion of the Debtors' preprinted check stock during the pendency of these chapter 11 cases, if any, the Debtors shall ensure that such electronic checks and new check stock reflect their status as debtors in possession and the corresponding bankruptcy case number.

59. In other large chapter 11 cases, courts in this district have allowed debtors to use their prepetition Business Forms without the "debtor in possession" label. *See, e.g.*, *In re Finch Therapeutics Group, Inc.*, Case No. 26-10409 (LSS) (Bankr. D. Del. Apr. 20, 2026) (authorizing the debtors' continued use of preprinted business forms without a "Debtor in Possession" marking); *In re WW International, Inc.*, Case No. 25-10547 (TMH) (Bankr. D. Del. May 28, 2025) (same); *In re Liberated Brands LLC*, No. 25-10168 (JKS) (Bankr. D. Del. Feb. 28, 2025) (same); *In re JOANN Inc.*, No. 25-10068 (CTG) (Bankr. D. Del. Feb. 10, 2025) (same); *In re Accuride Corp.*, No. 24-12289 (JKS) (Bankr. D. Del. Nov. 19, 2024) (same).

**Processing of Checks and Electronic Fund Transfers Should Be Authorized**

60. The Debtors have sufficient funds to pay the amounts described in this Motion in the ordinary course of business by virtue of access to cash on hand and anticipated access to cash collateral and debtor-in-possession financing. In addition, under the Cash Management System, the Debtors can readily identify checks or wire transfer requests as relating to any authorized payment in respect of the relief requested herein. Accordingly, the Debtors do not believe that checks or wire transfer requests, other than those relating to authorized payments, will be inadvertently honored. Therefore, the Debtors request authority, but not direction, to authorize all applicable financial institutions, when requested by the Debtors, to receive, process, honor, and pay any and all checks or wire transfer requests in respect of the relief requested in this Motion.

**The Requirements of Bankruptcy Rule 6003(a) Are Satisfied**

61. Bankruptcy Rule 6003(a) empowers a court to grant certain relief within the first twenty-one (21) days after the Petition Date only to the extent that "relief is needed to avoid immediate and irreparable harm." Fed. R. Bankr. P. 6003(a). For the reasons discussed above, an immediate and orderly transition into chapter 11 is critical to the viability of the Debtors' operations. Failure to receive the requested relief during the first twenty-one (21) days of these

chapter 11 cases would severely disrupt the Debtors' operations at this critical juncture and cause immediate and irreparable harm. The requested relief is necessary for the Debtors to operate their business in the ordinary course, preserve the ongoing value of their operations, and maximize the value of their estates for the benefit of all stakeholders. The Debtors have demonstrated that the requested relief is "needed to avoid immediate and irreparable harm," as contemplated by Bankruptcy Rule 6003(a), and request that the Court grant the requested relief.

**Reservation of Rights**

62. Notwithstanding anything to the contrary herein, nothing contained in this Motion or any actions taken pursuant to any order granting the relief requested by this Motion (including any payment made in accordance with any such order) is intended as or shall be construed or deemed to be: (a) an implication or admission as to the amount of, basis for, or validity of any particular claim against the Debtors under the Bankruptcy Code or other applicable non-bankruptcy law; (b) a waiver of the Debtors' or any other party in interest's rights to dispute any particular claim on any grounds; (c) a promise or requirement to pay any particular claim; (d) an implication, admission, or finding that any particular claim is an administrative expense claim, other priority claim, or otherwise of a type specified or defined in this Motion or any order granting the relief requested by this Motion; (e) a request or authorization to assume, adopt, or reject any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code; (f) an admission as to the validity, priority, enforceability, or perfection of any lien on, security interest in, or other encumbrance on property of the Debtors' estates; (g) a waiver or limitation of the Debtors' or any other party in interest's claims, causes of action, or other rights under the Bankruptcy Code or any other applicable law; (h) an approval, assumption, adoption, or rejection of any agreement, contract, lease, program, or policy under section 365 of the Bankruptcy Code; (i) a concession by the Debtors that any liens (contractual, common law, statutory, or otherwise) that may be satisfied

pursuant to the relief requested in this Motion are valid, and the rights of all parties in interest are expressly reserved to contest the extent, validity, or perfection or seek avoidance of all such liens; (j) a waiver of the obligation of any party in interest to file a proof of claim; (k) otherwise affecting the Debtors' rights under section 365 of the Bankruptcy Code to assume or reject any executory contract or unexpired lease; or (l) a waiver, modification, or limitation of any right of any party under the Restructuring Support Agreement. If the Court grants the relief sought herein, any payment made pursuant to the Court's order is not intended and should not be construed as an admission as to the validity, priority, or amount of any particular claim or a waiver of the Debtors' or any other party in interest's rights to subsequently dispute such claim.

**Waiver of Bankruptcy Rule 6004(a) and 6004(h)**

63. To implement the foregoing successfully, the Debtors seek a waiver of the notice requirements under Bankruptcy Rule 6004(a) and the fourteen-day stay of an order authorizing the use, sale, or lease of property under Bankruptcy Rule 6004(h) for the reasons set forth herein.

**Notice**

64. The Debtors will provide notice of this Motion to the following parties or their respective counsel: (a) the Office of the United States Trustee for the District of Delaware; (b) the holders of the 30 largest unsecured claims against the Debtors (on a consolidated basis); (c) the office of the attorney general for each of the states in which the Debtors operate; (d) the United States Attorney's Office for the District of Delaware; (e) the Internal Revenue Service; (f) the Debtor Cash Management Banks; (g) the United States Securities and Exchange Commission; (h) the Credit Agreement Agent; (i) counsel to the Credit Agreement Agent; (j) counsel to the Plan Sponsors; (k) counsel to the Unsecured Noteholders Ad Hoc Committee; (l) counsel to the Consenting Secured Lenders; and (m) any party that is entitled to notice pursuant to Bankruptcy Rule 2002 (collectively, the "Notice Parties"). As this Motion is seeking "first day" relief, the

Debtors will serve copies of this Motion and any order entered in respect of this Motion as required by Local Rule 9013-1(m). The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

[*Remainder of page intentionally left blank*]

WHEREFORE, the Debtors request entry of the Interim Order and Final Order, substantially in the forms attached hereto as **Exhibit A** and **Exhibit B**, (a) granting the relief requested herein and (b) granting such other relief as the Court deems appropriate under the circumstances.

Dated: October 21, 2026
Wilmington, Delaware

*/s/ Justin R. Alberto*
**COLE SCHOTZ P.C.**
Seth Van Aalten (*pro hac vice* pending)
Justin R. Alberto (DE Bar No. 5126)
Patrick J. Reilley (DE Bar No. 4451)
Sarah A. Carnes (*pro hac vice* pending)
Jack M. Dougherty (DE Bar No. 6784)
500 Delaware Avenue, Suite 600
Wilmington, Delaware 19801
Telephone: (302) 652-3131
Facsimile: (302) 652-3117
Email: svanaalten@coleschotz.com
jalberto@coleschotz.com
preilley@coleschotz.com
scarnes@coleschotz.com
jdougherty@coleschotz.com

*Proposed Co-Counsel for the Debtors and Debtors in Possession*

**SIMPSON THACHER & BARTLETT LLP**
Brian E. Schartz (*pro hac vice* pending)
Elisha D. Graff (*pro hac vice* pending)
Rachael L. Foust (*pro hac vice* pending)
Dov Gottlieb (*pro hac vice* pending)
Olivia F. Acuña (*pro hac vice* pending)
425 Lexington Avenue
New York, New York 10017
Telephone: (212) 455-3702
Facsimile: (212) 455-2502
Email: brian.schartz@stblaw.com
egraff@stblaw.com
rachael.foust@stblaw.com
dov.gottlieb@stblaw.com
olivia.acuna@stblaw.com

*Proposed Co-Counsel for the Debtors and Debtors in Possession*