**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| GETTY IMAGES HOLDINGS, INC., *et al.*,[1] | ) | Case No. 26-11643 (JKS) |
| Debtors. | ) | (Joint Administration Requested) |

**MOTION OF THE DEBTORS FOR ENTRY OF INTERIM AND FINAL ORDERS (I) AUTHORIZING THE DEBTORS TO USE CASH COLLATERAL AND OBTAIN POSTPETITION FINANCING; (II) GRANTING LIENS AND SUPERPRIORITY ADMINISTRATIVE EXPENSE CLAIMS; (III) PROVIDING ADEQUATE PROTECTION; (IV) MODIFYING THE AUTOMATIC STAY; (V) SCHEDULING A FINAL HEARING; AND (VI) GRANTING RELATED RELIEF**

The debtors and debtors in possession (collectively, the "Debtors") in the above-captioned cases (the "Chapter 11 Cases") hereby file this motion (this "Motion")[2] for entry of an interim order, substantially in the form attached hereto as **Exhibit A** (the "Interim Order"), and a final order (the "Final Order," and, together with the Interim Order, the "DIP Orders"), pursuant to sections 105, 361, 362, 363(b), 363(c)(2), 364(c)(1), 364(c)(2), 364(c)(3), 364(d), 364(e), 503, 506, 507 and 552 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "Bankruptcy Code"), rules 2002, 4001, 6004, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and local rules 2002-1(b), 4001-2, and 9013-1(m) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"). In support of this Motion, the Debtors submit the *Declaration of*

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Getty Images Holdings, Inc. (4229); Griffey Midco (DE), LLC (7122); Abe Investment Holdings, Inc. (5107); Getty Images, Inc. (7556); Getty Images (US), Inc. (8819); Getty Images News Services (PRC), Inc. (1849); and Getty Images (Seattle), Inc. (6863). The location of the Debtors' service address for purposes of these chapter 11 cases is: 605 5th Ave. S. Suite 400, Seattle, WA 98104.

[2] Capitalized terms used but not otherwise defined shall have the meanings ascribed to them in (a) the DIP Credit Agreement; (b) the Interim Order; (c) the Restructuring Support Agreement; or (d) the First Day Declaration, as applicable.

*Craig Peters, Chief Executive Officer of Getty Images Holdings, Inc. and Its Debtor Subsidiaries, in Support of the Debtors' Chapter 11 Petitions* (the "First Day Declaration"); *the Declaration of Cari Turner, Managing Director of Alvarez & Marsal North America, LLC, in Support of the Debtors' First Day Motions* (the "Turner Declaration"); the *Declaration of Mitchell (Chase) Brantley, Senior Director at Alvarez & Marsal North America, LLC, in Support of this Motion* (the "Brantley DIP Declaration") and the *Declaration of Adam Preiss, Senior Managing Director of Guggenheim Securities, LLC, in Support of this Motion* (the "Preiss DIP Declaration" and, together with the Brantley DIP Declaration, the "DIP Declarations"), filed contemporaneously herewith. In further support of this Motion, the Debtors respectfully represent as follows:

**RELIEF REQUESTED**

1. By this Motion, the Debtors seek entry of the DIP Orders granting the following relief:

(a) authorizing the Debtors to obtain a postpetition multi-draw credit facility (the "DIP Facility") (and to execute and deliver all final documentation in order to obtain such DIP Facility) in the aggregate principal amount of up to $143,000,000.00 (the "DIP Commitment") consisting of (i) $113,000,000.00 of DIP Loans of which (A) $85,000,000.00 of DIP Loans shall be made available upon entry of the Interim Order (the "Interim Initial DIP Loans") and (B) $28,000,000.00 of DIP Loans shall be made available upon entry of the Final Order (the "Final DIP Loans"); and (ii) $30,000,000.00 of delayed-draw commitments, which shall be made available upon entry of the Interim Order and subject to the draw conditions set forth in the DIP Documents (such commitments, the "Delayed-Draw DIP Commitments," and the loans thereunder, the "Delayed-Draw DIP Loans," and together with the Interim Initial DIP Loans, the "Interim DIP Loans" and, the Interim DIP Loans, collectively with the Final DIP Loans, the "DIP Loans") on the terms and conditions set forth in (1) the Interim Order, (2) the Final Order, and (3) that certain Debtor-in-Possession Credit Agreement by and among Getty Images Holdings, Inc. (the "Borrower"), each of the other Debtors as guarantors party thereto (such guarantors, the "DIP Guarantors" and together with the Borrower, the "DIP Obligors"), the lenders under the DIP Facility from time to time party thereto (collectively, the "DIP Lenders"), Cantor Fitzgerald Securities ("Cantor Fitzgerald"), as administrative agent (in such capacity, the "DIP Administrative Agent") and collateral agent (in such capacity, the "DIP Collateral Agent" and

together with the DIP Administrative Agent, the "DIP Agent"), substantially in the form attached hereto as **Exhibit B** (as amended, restated or otherwise modified from time to time in accordance with the terms thereof, the "DIP Credit Agreement", together with the DIP Orders and all other agreements (including the Segregated Account Control Agreement (as defined below)), documents, engagement and fee letters, schedules and instruments delivered or executed in connection with the DIP Credit Agreement, each as amended, restated or otherwise modified from time to time in accordance with the terms thereof, the "DIP Documents");

(b) approving the DIP Documents and authorizing the Debtors to execute and enter into, and be bound by and to perform under, the DIP Documents and to perform such other and further acts as may be required in connection with or to implement the DIP Documents;

(c) authorizing the DIP Obligors to use the proceeds of the DIP Facility in accordance with the DIP Documents;

(d) authorizing the DIP Guarantors to guarantee on a joint and several basis the DIP Obligations;

(e) granting to the DIP Lenders superpriority claims under section 364(c)(1) of the Bankruptcy Code in each case subject and junior only to the Carve Out and the Adequate Protection Claims, as set forth in the DIP Documents and the DIP Orders;

(f) granting the DIP Agent, for itself and for the benefit of the DIP Lenders (collectively, the "DIP Secured Parties"), and authorizing the Debtors to incur, valid, enforceable, non-avoidable, automatically and fully perfected liens on and security interests in all DIP Collateral, which liens and security interests shall be subject to the rankings and priorities set forth in the DIP Orders and in the other DIP Documents;

(g) granting to the DIP Secured Parties allowed superpriority administrative expense claims against each of the Debtors, on a joint and several basis, in respect of all DIP Obligations, which claims shall be subject to the rankings and priorities set forth in the DIP Orders and the other DIP Documents;

(h) approving and authorizing the Debtors' use of cash collateral within the meaning of section 363(a) of the Bankruptcy Code (the "Cash Collateral") in which the Prepetition Secured Parties have an interest pursuant to the Prepetition Secured Facilities Documents for the purposes and as permitted under the Interim Order and the other DIP Documents and the granting and provision of adequate protection as provided in the Interim Order in connection therewith, including, without limitation, the provision of the Adequate Protection Claims, the granting of the Adequate Protection Liens, and the payment of the Adequate Protection Payments, in each case on the

terms set forth in the Interim Order and in the other DIP Documents pursuant to sections 361 and 363 of the Bankruptcy Code;

(i) waiving the rights of the Debtors to surcharge the DIP Collateral and the Prepetition Collateral pursuant to section 506(c) of the Bankruptcy Code, in each case to the extent provided in the DIP Orders;

(j) waiving the equitable doctrine of "marshaling" and other similar doctrines as to the DIP Secured Parties and the Prepetition Secured Parties to the extent provided in the DIP Orders;

(k) upon entry of the Final Order, waiving any "equities of the case" exception under section 552(b) of the Bankruptcy Code;

(l) vacating and modifying the automatic stay imposed under section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of the DIP Documents and the DIP Orders, as applicable;

(m) scheduling a final hearing (the "Final Hearing") on [•], 2026 at [•] (prevailing Eastern Time) to approve the Motion on a final basis pursuant to Bankruptcy Rule 4001(c)(2);

(n) waiving any stay of the immediate effectiveness of the Interim Order imposed by the Bankruptcy Code or the Bankruptcy Rules, such that the Interim Order shall be immediately effective upon its entry on the docket of the above-captioned court (the "Court") with respect to the Chapter 11 Cases; and

(o) granting related relief.

## PRELIMINARY STATEMENT

2. As described in the First Day Declaration, the Debtors have faced significant financial challenges in the months leading up to the Petition Date and require immediate access to additional financing to continue operating in the ordinary course during these Chapter 11 Cases. The Debtors commenced these prepackaged Chapter 11 Cases to implement a consensual, comprehensive deleveraging transaction that will position them for long-term growth and success. The comprehensive restructuring is designed to significantly reduce total funded indebtedness and deleverage the balance sheet, while leaving trade and general unsecured creditors unimpaired. This deleveraging will enable the Debtors and their management team to focus on and invest in long-

term growth initiatives, without the overhang of an unsustainable capital structure and overly burdensome debt service requirements.

3. To facilitate the Debtors' implementation of the restructuring transactions outlined in the restructuring support agreement, dated October 12, 2026 (the "Restructuring Support Agreement"), the Debtors secured commitments from Koch Equity Development LLC ("KED") to provide (or cause its affiliates to provide) up to $143.0 million of secured debtor-in-possession financing (the "DIP Facility") on a fully consensual basis, consisting of (a) $85.0 million of Interim Initial DIP Loans available upon entry of the Interim Order, (b) $28.0 million of Final DIP Loans available upon entry of the Final Order, and (c) $30.0 million of Delayed-Draw DIP Commitments available upon entry of the Interim Order but subject to the delayed-draw conditions specified in the DIP Documents. The DIP Facility provides the Debtors with the liquidity necessary to maintain operations throughout these cases and to implement the deleveraging transactions set forth in the Restructuring Support Agreement and the Plan.[3]

4. As described in the Preiss DIP Declaration, the DIP Facility is the best postpetition financing presently available to the Debtors. Beginning in mid-September 2026, the Debtors' proposed investment banker, Guggenheim Securities, LLC ("Guggenheim Securities"), at the direction of the Debtors and the special committees of the board of directors of Getty Images Holdings, Inc. and of the other Debtors (collectively, the "Special Committees"), held discussions with certain stakeholders regarding potential debtor-in-possession financing. Both the Consenting Secured Lenders (as defined in the Restructuring Support Agreement) and the Plan Sponsors indicated that they would be unwilling to provide debtor-in-possession financing on a fully unsecured basis. On September 22, 2026, the Consenting Secured Lenders delivered a proposal

---

[3] "Plan" means that certain *Joint Prepackaged Chapter 11 Plan of Reorganization of Getty Images Holdings, Inc. and Its Debtor Subsidiaries* filed with the Court substantially contemporaneously with this Motion.

for a senior secured DIP that would have required that the DIP be repaid in cash unless the Consenting Secured Lenders agreed to alternate treatment. The Plan Sponsors then delivered a competing proposal with materially better economic terms, including on fees, rate, and subject to the terms of the ECL repayment, which, after further rounds of negotiations, was ultimately agreed to in the form of the DIP Facility. Beginning in October 2026, Guggenheim Securities also marketed debtor-in-possession financing to twelve potential third-party financing sources, including parties that regularly provide debtor-in-possession financing. Of those twelve parties, eight expressly passed because they did not believe they could provide terms competitive with those of the DIP Facility, two did not indicate any willingness to provide financing, and two expressed potential interest. One of those two parties indicated that it would provide a competitive proposal only if granted a first lien on all of the Debtors' assets, to which the advisors to the Consenting Secured Lenders indicated they would not consent, and the other has not provided a fulsome indication of its economic terms or a fully actionable proposal. In the end, no party offered terms as favorable to the Debtors as the DIP Facility. The DIP Facility is fully consensual among the Debtors' secured and unsecured funded debt creditors and does not prime the Prepetition Secured Parties' Prepetition Liens on the Prepetition Collateral or any Permitted Prior Liens, which avoids any priming or cash collateral litigation at the outset of these Chapter 11 Cases.

5. The terms of the DIP Facility, including the budget provisions and interest rate, were negotiated at arm's-length, are within or below market terms for comparable DIP loans, and are fair and reasonable under the circumstances. The DIP Facility does not prime the liens of the Prepetition Secured Parties on the Prepetition Collateral, and it does not include a roll up of any prepetition debt. It carries no commitment fee, no upfront fee, no backstop premium, no original issue discount and no call protection, and requires no amortization. Interest accrues at Term SOFR

plus 5.00% per annum, which is payable in kind (and capitalized to principal on each interest payment date) rather than in cash, preserving estate liquidity. The same interest rate applies to each tranche. The sole fee is a DIP Exit Fee equal to 2.0% of the outstanding DIP Loans, which is triggered only if the Restructuring Support Agreement is terminated under the "fiduciary out" provisions of the Restructuring Support Agreement. Most significantly, if the Plan is consummated, the DIP Loans will not be repaid in cash at emergence and the DIP Claims (as defined in the Restructuring Support Agreement) will be equitized on the effective date of the Plan (the "Restructuring Effective Date") in accordance with the Equity Commitment Letter, dated October 12, 2026 (the "ECL"), so the estates obtain the full benefit of the financing without any cash outlay at emergence.

6. Approval of the DIP Facility is an important step in a restructuring that the Debtors' principal economic stakeholders have already overwhelmingly agreed to support. The financing is critical: before the Petition Date, the Debtors' revolving credit facility was fully drawn and the Debtors' forecasts projected liquidity falling below the minimum level of liquidity the Debtors require to operate their business through the end of October 2026. Without immediate access to the DIP Facility, the Debtors would not be able to fund payroll, vendor and licensor payments, and the other ordinary-course costs of their business. Together with the other first-day relief the Debtors are requesting, the DIP Facility is designed to let the Debtors move through these cases without disruption or delay to their operations and their customer and contributor relationships.

## **JURISDICTION AND VENUE**

7. The United States District Court for the District of Delaware has jurisdiction over this matter pursuant to 28 U.S.C. § 1334, which was referred to the United States Bankruptcy Court for the District of Delaware under 28 U.S.C. § 157 and the *Amended Standing Order of*

*Reference* from the United States District Court for the District of Delaware, dated February 29, 2012. This is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).

8. The Debtors confirm their consent, pursuant to Rule 9013-1(f) of the Local Rules, to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

9. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

10. The statutory bases for the relief requested herein are sections 105, 361, 362(d), 363(b), 363(c)(2), 363(e), 364(c)(1), 364(c)(2), 364(c)(3), 364(d), 364(e), 503, 506, 507 and 552 of the Bankruptcy Code, Bankruptcy Rules 2002, 4001, 6004, and 9014, and Local Rules 2002-1(b), 4001-2, and 9013-1(m).

**BACKGROUND**

11. On October 21, 2026 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. The Debtors are operating their business and managing their property as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. Concurrently with the filing of this Motion, the Debtors filed a motion requesting procedural consolidation and joint administration of these Chapter 11 Cases pursuant to Bankruptcy Rule 1015(b). No request for the appointment of a trustee or examiner has been made in these Chapter 11 Cases, and no official committees have been appointed or designated.

12. Additional information regarding the Debtors' business, capital structure, and the circumstances leading to the filing of these Chapter 11 Cases is set forth in the First Day Declaration.

## PREPETITION INDEBTEDNESS AND NEED FOR DIP FINANCING

### A. Prepetition Capital Structure and Collateral Package

13. As of the Petition Date, and as further summarized below, the Debtors' total funded debt was approximately $1,456.0 million, consisting of approximately $1,186.0 million of secured funded indebtedness and approximately $270.0 million of unsecured funded indebtedness.

14. Prior to the Petition Date, certain Debtors entered into that certain Credit Agreement, dated as of February 19, 2019 (as amended by the First Amendment to Credit Agreement, dated as of February 3, 2023, the Incremental Commitment Amendment and Second Amendment to Credit Agreement, dated as of May 4, 2023, the Second Incremental Commitment Amendment and Third Amendment to Credit Agreement, dated as of February 21, 2025, and the Fourth Amendment to Credit Agreement, dated as of December 22, 2025 and as further amended, restated, amended and restated and otherwise modified from time to time, the "Prepetition Credit Agreement"), among Abe Investment Holdings, Inc. and Getty Images, Inc., as borrowers (together, the "Prepetition Credit Agreement Borrowers"), Griffey Midco (DE), LLC, as holdings, the other loan parties thereto (together with the Prepetition Credit Agreement Borrowers, the "Prepetition Credit Agreement Obligors"), JPMorgan Chase Bank, N.A., in its capacity as administrative agent and collateral agent (in such capacity, the "Prepetition Credit Agreement Agent" and, together with the Prepetition SSN Collateral Agent (as defined below), the "Prepetition Agents"), and the lenders from time to time party thereto (collectively, the "Prepetition Credit Agreement Lenders" and, together with the Prepetition Credit Agreement Agent, the "Prepetition Credit Agreement Secured Parties"). As of the Petition Date, the Prepetition Credit Agreement Obligors were jointly and severally indebted to the Prepetition Credit Agreement Lenders in the aggregate principal amount of (a) $150,000,000.00 in senior secured RCF loans (such amounts outstanding thereunder, the "Prepetition RCF Claims"); (b)

$40,100,000.00 in senior secured USD term loans; and (c) €407,000,000 in senior secured Euro term loans (collectively, the "Prepetition Credit Agreement Obligations" and, together with the Prepetition SSN Obligations (as defined below), the "Prepetition Secured Obligations"). The Prepetition Credit Agreement Secured Parties and the Prepetition SSN Secured Parties (as defined in the Interim Order) are collectively the "Prepetition Secured Parties," and the Prepetition Credit Agreement Documents and the Prepetition SSN Documents (each as defined in the Interim Order) are collectively the "Prepetition Secured Facilities Documents." The Prepetition Credit Agreement Obligations are secured by substantially all of the assets of the Prepetition Credit Agreement Obligors, subject to certain exclusions and limitations and the Prepetition Intercreditor Agreement (as defined below).

15. Prior to the Petition Date, Getty Images, Inc. ("Getty Images" or the "Issuer") issued 11.25% senior secured notes due 2030 (the "SSNs" and the noteholders thereof, the "Secured Noteholders") pursuant to that certain Indenture, dated as of May 5, 2025 (as amended, restated, amended and restated and otherwise modified from time to time, the "SSN Indenture"), by and among the Issuer, the guarantors party thereto (together with the Issuer, the "Prepetition SSN Obligors") and U.S. Bank Trust Company, National Association, in its capacity as trustee (in such capacity, the "Prepetition SSN Trustee") and notes collateral agent (in such capacity, the "Prepetition SSN Collateral Agent"). As of the Petition Date, under the SSNs, the Prepetition SSN Obligors were jointly and severally liable for an aggregate principal amount of approximately $539.9 million (together with all other "Note Obligations" under and as defined in the SSN Indenture, the "Prepetition SSN Obligations"). The Prepetition SSN Obligations are secured by substantially all of the assets of the Prepetition SSN Obligors, subject to certain exclusions and limitations and the Prepetition Intercreditor Agreement (as defined below).

16. Prior to the Petition Date, the Issuer issued 9.750% Senior Notes due 2027 (the "9.75% Notes") pursuant to that certain Indenture, dated as of February 19, 2019, as supplemented by that certain First Supplemental Indenture, dated as of February 19, 2019, that certain Second Supplemental Indenture, dated as of March 29, 2023, and that certain Third Supplemental Indenture, dated as of October 21, 2025 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "9.75% Notes Indenture"), by and among Getty Images, Inc., the guarantors party thereto from time to time, and Wilmington Trust, National Association, as notes collateral agent and trustee. Pursuant to the Third Supplemental Indenture, the guarantees of the 9.75% Notes were released. As of the Petition Date, the Issuer was liable for an aggregate principal amount of approximately $5.3 million under the 9.75% Notes (together with all other "Note Obligations" under and as defined in the 9.75% Notes Indenture, the "Prepetition 9.75% Note Obligations").

17. Prior to the Petition Date, the Issuer issued 14.000% Senior Notes due 2028 (the "14.00% Notes" and, collectively with the 9.75% Notes, the "Unsecured Notes") pursuant to that certain Indenture, dated as of October 21, 2025, as supplemented by that certain First Supplemental Indenture, dated as of October 21, 2025 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "14.00% Notes Indenture"), by and among the Issuer, the guarantors party thereto and Wilmington Trust, National Association, as notes collateral agent and trustee, and certain other Debtors have provided guarantees in respect of the obligations thereunder (the "14.00% Notes Guarantors" and, collectively with the Issuer, the "14.00% Note Obligors"). As of the Petition Date, under the 14.00% Notes, the 14.00% Note Obligors were jointly and severally liable for an aggregate principal amount of approximately

$264.7 million (together with all other "Obligations" under and as defined in the 14.00% Notes Indenture, the "Prepetition 14.00% Note Obligations").

18. Prior to the Petition Date, the Prepetition Credit Agreement Borrowers, the other grantors party thereto, the Prepetition Credit Agreement Agent, as collateral agent and administrative agent under the Prepetition Credit Agreement, and the Prepetition SSN Collateral Agent, entered into that certain First Lien Intercreditor Agreement, dated as of May 5, 2025 (as amended, restated, amended and restated, supplemented and otherwise modified from time to time, the "Prepetition Intercreditor Agreement"). The Prepetition Intercreditor Agreement governs the relative rights and priorities of the holders of the Prepetition Credit Agreement Obligations and the Prepetition SSN Obligations with respect to their shared collateral and provides, among other things, that (i) the liens securing such obligations are of equal priority, (ii) proceeds of the shared collateral are shared ratably among such holders after payment of amounts owing to the collateral agents and (iii) until the discharge of the Prepetition Credit Agreement Obligations, the Prepetition Credit Agreement Agent, as controlling collateral agent, has the exclusive right to exercise remedies with respect to the shared collateral, subject to certain exceptions.

19. A summary of the Debtors' prepetition funded indebtedness is set forth below:

| **Type of Debt** | **Maturity** | **Approx. Amount Outstanding ($ in millions)** |
|---|---|---|
| **Secured Debt** | | |
| $150MM Revolving Credit Facility | May 4, 2028 (with a springing maturity of 180 days prior to earliest maturity date of the USD Term Loans, EUR Term Loans, and the 11.25% Secured Notes) | $150.0 |
| Senior Secured USD Term Loan | February 21, 2030 | $40.0 |

| | | |
|---|---|---|
| Senior Secured EUR Term Loan | February 21, 2030 | $456.0 |
| 11.250% Senior Secured Notes | February 21, 2030 | $540.0 |
| **Total Secured Debt** | | **$1,186.0** |
| **Unsecured Debt** | | |
| 9.750% Senior Unsecured Notes | March 1, 2027 | $5.0 |
| 14.000% Senior Unsecured Notes | March 1, 2028 | $265.0 |
| **Total Unsecured Debt** | | **$270.0** |
| **Total** | | **$1,456.0** |

### B. Restructuring Support Agreement and Equity Investment[4]

20. The Restructuring Support Agreement, the Restructuring Term Sheet (as defined in the Restructuring Support Agreement), and the ECL provide for a new-money equity investment by affiliates of the Getty Family and KED (together, the "Plan Sponsors") in cash in an aggregate amount equal to approximately $433 million minus the principal amount of Interim Initial DIP Loans and Final DIP Loans outstanding as of the Restructuring Effective Date (the "New Equity Investment"), in exchange for new common equity interests in the reorganized Debtors, New Getty Images (the "New Interests"), as set forth in the ECL. On the Restructuring Effective Date, the Plan Sponsors (and/or their designated affiliates) will receive 100% of the New Interests issued under the Plan, subject only to dilution by the MIP Interests, and 100% of the New Preferred Interests (each as defined in the Restructuring Term Sheet), if any, issued under the Plan.

[4] The summaries and descriptions of the terms and conditions of the Restructuring Support Agreement and the ECL set forth in this motion are intended solely for informational purposes to provide the Court and parties in interest with an overview of significant terms thereof and should only be relied upon as such. This Motion is qualified in its entirety by reference to the provisions of the Restructuring Support Agreement and the ECL. In the event that there is a conflict between this Motion and the Restructuring Support Agreement and the ECL, the Restructuring Support Agreement and the ECL shall control in all respects (as applicable).

21. The DIP Facility is designed to be equitized rather than repaid in cash if the transactions set forth in the Restructuring Support Agreement are consummated and the Plan is effectuated. On the Restructuring Effective Date, and subject to the conditions described below, all DIP Claims held by the DIP Lenders, including accrued and unpaid interest through the Restructuring Effective Date (including on the Delayed-Draw DIP Loans), will be exchanged for (a) New Interests (subject to dilution by the MIP Interests) and (b) New Preferred Interests (if any). The terms of such equitization are set forth in greater detail in the ECL. No DIP Claim will be satisfied in cash under the Plan.[5]

22. Because the DIP Claims are superpriority administrative expense claims, section 1129(a)(9)(A) of the Bankruptcy Code would otherwise require payment in full in cash on the effective date of the Plan unless the holder of such a claim agrees to different treatment. The DIP Lenders have agreed to accept New Interests and New Preferred Interests, as further specified in the ECL, in satisfaction of those amounts.

23. The Restructuring Support Agreement and the DIP Credit Agreement each obligate the Debtors to comply with the Milestones set forth in the Restructuring Support Agreement. Failure to achieve a Milestone that has not been waived or extended by the requisite parties gives rise to a termination right for the Consenting Stakeholders under Section 12.01(b) of the Restructuring Support Agreement, and an uncured Event of Default under the DIP Orders or the DIP Documents is itself a Consenting Stakeholder termination event. No Milestone may be extended beyond the Termination Date (as defined below) without the prior written consent of the DIP Lenders in their sole discretion. The relief requested in this Motion is therefore necessary both

[5] For greater clarity, the DIP Claims will be equitized pursuant to the ECL only if the transactions set forth in the Restructuring Support Agreement are effectuated and the Plan goes effective. If the Restructuring Support Agreement transactions are not effectuated, and the Plan does not go effective, the Debtors will be obligated to repay the DIP Obligations in full in cash pursuant to the terms of the DIP Documents.

to fund the Debtors' operations and to preserve their ability to perform under the Restructuring Support Agreement within the agreed timeline.

### C. Debtors' Need for Postpetition Financing

24. The Debtors require immediate access to postpetition financing to fund operations, preserve going-concern value, and implement the restructuring contemplated by the Restructuring Support Agreement. Among other things, the Debtors must fund payroll and benefits for their employees, freelancers, and contingent workforce of approximately $15.0 million per month, royalty and other payments to their global contributors and content partners of approximately $20.0 million per month, and payments to licensors, technology and hosting providers, and other essential vendors of approximately $15.0 million per month. As set forth in the Initial Approved Budget, absent access to the DIP Facility, the Debtors project an ending cash deficit of approximately $63.5 million as of the week ending November 21, 2026. Taking into account the Debtors' minimum cash requirement of approximately $20.0 million,[6] the Debtors' liquidity need through that date is approximately $83.5 million. The Interim Initial DIP Loans of $85.0 million are sized to cover this need. The full interim amount is necessary because, among other things, the Final DIP Loans will not be available until entry of the Final Order, the date of which is not certain; the DIP Documents require the Debtors to maintain at least $15.0 million of liquidity at all times; and the commencement of these Chapter 11 Cases may cause certain customers, contributors, and vendors to delay payments or tighten trade terms. Moreover, because all DIP proceeds will be held in the Segregated DIP Account and may be withdrawn only to fund payments contemplated by the Approved Budget for the following two weeks (plus 20%) or to fund the Carve Out, drawing the

6 The approximately $50.0 million minimum liquidity requirement described in the First Day Declaration reflects the requirements of the Debtors and their non-Debtor affiliates on a consolidated basis; approximately $20.0 million of that amount is attributable to the Debtors and is the minimum cash requirement used in sizing the DIP Facility.

full interim amount does not give the Debtors access to cash beyond their budgeted needs. The balance of the $143.0 million DIP Commitment is made up of $28.0 million of Final DIP Loans and $30.0 million of Delayed-Draw DIP Commitments, which may only be used for the Delayed-Draw Payments (as defined below) or to replenish cash on hand used to make a Prepetition DDTL Payment (as defined below) or Delayed-Draw Payments on or after the Petition Date. Additional details regarding the Debtors' projected cash needs and the sizing of the DIP Facility are set forth in the Initial Approved Budget and the Brantley DIP Declaration.

25. Without access to the DIP Facility and the continued use of Cash Collateral, the Debtors would suffer immediate and irreparable harm. They would lack sufficient funds to operate their enterprise, pay their debts as they come due, and cover the projected costs of these Chapter 11 Cases. They would also be unable to fund ongoing obligations, including payroll, payments to contributors, licensors and vendors, and other critical operating expenses. That shortfall would jeopardize the value of the Debtors' businesses and the restructuring transaction for the benefit of all stakeholders. Access to the DIP Facility will also send a clear message to the Debtors' customers, contributors, licensors, vendors, employees, and contract counterparties that operations are appropriately funded. Entry into the DIP Facility is not only a critical component of successful reorganization, but it is also a sound and prudent exercise of the Debtors' business judgment.

**D. Efforts to Obtain Postpetition Financing**

26. As discussed above and in the Preiss DIP Declaration, the Debtors, with the assistance of their advisors, solicited and evaluated postpetition financing proposals from the Consenting Secured Lenders, the Plan Sponsors, and twelve third-party financing sources. None of those proposals offered terms as favorable to the Debtors as those offered by Plan Sponsors. Because the Plan Sponsors hold existing equity interests in the Debtors, and because an affiliate of one of them is the proposed DIP Lender, the Debtors' evaluation and negotiation of the DIP

Facility was directed by the Special Committees. The Special Committees are each advised by their own counsel and negotiated the DIP Facility with the DIP Lenders and their advisors at arm's-length over the course of several weeks, during which the parties exchanged term sheets and mark-ups and participated in multiple negotiation calls, and approved the terms described in this Motion.

## THE DIP FACILITY

27. As required by Bankruptcy Rules 4001(b)(1)(B) and 4001(c)(1)(B) and Local Rule 4001-2, the Debtors submit the following concise statement of the material terms of the DIP Facility. This summary is intended solely to provide the Court and parties in interest with an overview of the significant terms of the DIP Facility and the DIP Orders and is qualified in its entirety by reference to the DIP Documents and the DIP Orders; in the event of any conflict between this summary and the DIP Documents or the DIP Orders, the DIP Documents and the DIP Orders shall govern.[7]

| **DIP Facility** | |
|---|---|
| **Parties to the Proposed DIP Facility**<br><br>*Bankruptcy Rule 4001(c)(1)(B); Local Rule 4001-2(a)(i)(J)* | **Borrower**: Getty Images Holdings, Inc.<br><br>**DIP Guarantors**: The obligations of the Borrower are unconditionally guaranteed, on a joint and several basis, by each Debtor other than the Borrower as of the date following entry of the Interim Order when the DIP Facility is closed pursuant to the definitive DIP Documents.<br><br>**DIP Lenders**: The lenders under the DIP Facility are Koch Equity Development LLC and/or its affiliates.<br><br>DIP Agent: Cantor Fitzgerald, as administrative agent and collateral agent for the DIP Lenders<br><br>*See* Interim Order, Preamble; Interim Order ¶ 2(c) |
| **DIP Facility**<br><br>*Bankruptcy Rule 4001(c)(1)(B); Local Rule 4001-2(a)(i)(A)* | The DIP Facility is a debtor-in-possession multi-draw financing facility in an aggregate principal amount of up to $143,000,000.00, consisting of (a) $113,000,000.00 of DIP Loans of which (i) $85,000,000.00 of DIP Loans will be made available upon entry of the Interim Order and (ii) $28,000,000.00 of DIP Loans will be made available upon entry of the Final Order; and (b) $30,000,000.00 of Delayed-Draw DIP Commitments, which will be made |

[7] The following items are set forth in more detail in the DIP Credit Agreement attached hereto as Exhibit B.

| DIP Facility | |
|---|---|
| | available upon entry of the Interim Order, subject to the draw conditions set forth in the DIP Documents. Pending the Final Hearing, the Debtors are authorized to borrow, jointly and severally, up to $85,000,000.00 of Interim Initial DIP Loans and $30,000,000.00 of Delayed-Draw DIP Loans (together, the "**Interim DIP Loan Commitment Amount**"), in each case subject to the terms of the Interim Order and the other DIP Documents.<br><br>*See*; Interim Order, Preamble; Interim Order ¶ 2(a)–(b) |
| **Segregated DIP Account**<br><br>*Bankruptcy Rule 4001(c)(1)(B)(i); Local Rule 4001-2(a)(i)(A), (E) and (G)* | All proceeds of the DIP Facility will be deposited into a segregated account of the Borrower (the "**Segregated DIP Account**") and will be subject to the DIP Liens (as defined below) on a first priority basis and subject to a deposit account control agreement in favor of the DIP Agent (the "**Segregated Account Control Agreement**"). On each funding date, the DIP Lenders will advance funds to the DIP Agent and the DIP Agent will deposit such funds into the Segregated DIP Account.<br><br>The Borrower may withdraw amounts from the Segregated DIP Account and deposit such amounts into other bank accounts maintained by the Debtors in accordance with the Approved Budget and any order of the Court approving the Cash Management Motion (as defined in the Interim Order) on the Closing Date and on each Monday following the Closing Date. Nothing in the Cash Management Order shall permit the Debtors to withdraw funds from the Segregated DIP Account, or use such funds, in a manner that is inconsistent with the restrictions on such activities set forth in the Interim Order. The amounts so withdrawn by the Borrower may not exceed the amount needed for payments that are contemplated to be made during the two-week period following the Closing Date or such Monday as expressly set forth in the Approved Budget (plus an additional 20% of such contemplated payments for such weeks) (such withdrawal, an "**Approved Budget Withdrawal**"). If an Approved Budget Withdrawal includes amounts in respect of any particular week, any subsequent Approved Budget Withdrawal may not include such amounts previously withdrawn.<br><br>The Borrower may also withdraw amounts from the Segregated DIP Account and deposit such amounts in the Funded Reserve Account (as defined in the Interim Order), in accordance with the DIP Orders (such withdrawal, a "**Carve Out Withdrawal**"). The Borrower is not permitted to withdraw cash from the Segregated DIP Account (other than an Approved Budget Withdrawal or a Carve Out Withdrawal) without the prior written consent of the DIP Lenders (such consent not to be unreasonably withheld so long as the Borrower is in compliance with the Minimum Liquidity Covenant).<br><br>Except with respect to an Approved Budget Withdrawal or a Carve Out Withdrawal, the proceeds of the DIP Facility cannot be transferred into any other account held by any Debtor or any of its subsidiaries, or commingled with any other cash held by any Debtor or any of its subsidiaries. The Borrower is permitted to use funds withdrawn from the Segregated DIP Account only to the extent such uses are consistent with the Approved Budget (subject to Permitted Variances) or the Carve Out. |

<table>
<tr><th colspan="2">DIP Facility</th></tr>
<tr><td></td><td>No less than one (1) Business Day prior to withdrawing funds from the Segregated DIP Account, the Debtors shall provide the DIP Agent, the DIP Lenders and the Consenting Shareholder Advisors (as defined in the Restructuring Support Agreement) with a written notice (email being sufficient) of their next-planned withdrawal (including the amounts the Debtors plan to withdraw).<br><br>Once withdrawn from the Segregated DIP Account, the funds will continue to be DIP Priority Collateral (as defined below) until such funds are first used by the Debtors. However, any such funds deposited in the Funded Reserve Account or the Carve Out Reserve (in each case, as defined in the Interim Order) in accordance with the Carve Out provisions of the DIP Orders do not constitute DIP Priority Collateral.<br><br>If, at any time, the Segregated DIP Account is not subject to a Segregated Account Control Agreement, the Control Rider attached to the Interim Order as Exhibit 2 applies.<br><br>See Interim Order ¶¶ 3, 17</td></tr>
<tr><td>DIP Collateral / Priority<br><br>Bankruptcy Rule 4001(c)(1)(B)(i); Local Rule 4001-2(a)(i)(F), (G), (J) and (P)</td><td>All obligations of the DIP Obligors under the DIP Documents, including, without limitation, principal, interest (including payment in kind), fees (including the DIP Exit Fee (as defined below)), costs, premiums, equity conversion rights and terms, expenses, charges, prepayment premiums, or similar amounts that are or may become due under the DIP Documents (collectively, the "<u>DIP Obligations</u>") will, in each case, be subject and subordinate to the Carve Out (as defined below), and will be secured by automatically perfected liens on, and security interests in (the "<u>DIP Liens</u>"):<br><br>a) (w) the thirty-five percent of the equity interests of foreign subsidiaries directly owned by a Debtor that is not included in the Prepetition Collateral (the "<u>Specified Foreign Equity</u>"), (x) the Previously Unencumbered Property (as defined below), (y) the Segregated DIP Account and all amounts deposited therein and withdrawn therefrom, and (z) subject to entry of the Final Order, proceeds of all Avoidance / Recovery Actions (as defined below), in each case, on a first priority basis senior to any other Lien or Claim (the property listed in these clauses (w) through (z), the "<u>DIP Priority Collateral</u>"); the DIP Liens on the DIP Priority Collateral rank senior to any Adequate Protection Liens on such property and there are no Adequate Protection Liens on the property listed in clause (y);<br><br>b) all property of the Debtors, whether existing on the Petition Date or thereafter acquired, that constitutes Prepetition Collateral (as defined in the Interim Order), on a junior basis to the Prepetition Liens securing the Prepetition Secured Obligations, the Adequate Protection Liens thereon and the Permitted Prior Liens but senior to any other Lien;<br><br>c) all property of the Debtors (other than Prepetition Collateral), whether existing on the Petition Date or thereafter acquired, that is subject to valid, perfected, and non-avoidable Liens in existence immediately prior to the Petition Date or valid and non-avoidable Liens perfected after the Petition Date to the extent permitted by section 546(b) of the Bankruptcy Code</td></tr>
</table>

| DIP Facility | |
|---|---|
| | (any such Liens, the "**Permitted Prior Liens**") on a junior basis to such Permitted Prior Liens but senior to any other Lien;<br><br>d) all property of the Debtors, whether existing on the Petition Date or thereafter acquired, that is not Prepetition Collateral or otherwise subject to (i) valid, perfected, and non-avoidable Liens in existence immediately prior to the Petition Date or (ii) valid and non-avoidable Liens perfected after the Petition Date to the extent permitted by section 546(b) of the Bankruptcy Code (the "**Previously Unencumbered Property**"), on a first priority ranking basis senior to any other Lien or Claim;<br><br>e) subject to entry of the Final Order, proceeds of any avoidance or recovery actions brought pursuant to sections 502(d), 506(c), 544, 545, 547, 548, 549, 550, 551, 553(b), or 724(a) of the Bankruptcy Code) ("**Avoidance / Recovery Actions**"), but the DIP Liens do not extend to the Avoidance / Recovery Actions themselves;<br><br>(collectively, the property and proceeds set forth in the foregoing clauses (a) through (e), the "**DIP Collateral**"). The DIP Collateral does not include any Excluded Assets (as defined in the DIP Credit Agreement). Any restrictions on the Prepetition Secured Parties' rights to exercise remedies in respect of the Trademark Option Agreement (as defined in the Restructuring Support Agreement) or the Trademarks (as defined in the Restructuring Support Agreement) that are set forth in the Prepetition Secured Facilities Documents or the Trademark Option Agreement shall apply *mutatis mutandis* to the DIP Secured Parties' rights to exercise remedies in respect of the Trademark Option Agreement and the Trademarks.<br><br>The DIP Facility benefits from joint and several allowed superpriority administrative expense claims against the Debtors (the "**DIP Superpriority Claims**") that are senior to all other administrative expenses or other Claims against the Debtors, but which are subject and subordinate to (i) the Carve Out and (ii) the Adequate Protection Claims.<br><br>All of the DIP Liens with respect to the DIP Collateral will be perfected by entry of the DIP Orders and will become effective immediately and automatically upon entry of the Interim Order, without the necessity of the execution of mortgages, security agreements, pledge agreements, financing statements, or any other agreements or the filing or recording of any other documents.<br><br>The Debtors are required to take any and all actions that may be reasonably necessary, or that the DIP Agent or the DIP Lenders may reasonably request, to maintain the validity, perfection, enforceability, and priority of the security interest and liens of the DIP Agent in the DIP Collateral, or to enable the DIP Agent and the DIP Lenders to protect, exercise, or enforce their rights thereunder, under the DIP Orders, and in respect of the DIP Collateral; however, the foregoing does not require any control agreements (other than the Segregated Account Control Agreement), intellectual property security agreements or mortgages, or any collateral documents or filings under any non-US jurisdiction. |

| **DIP Facility** | |
|---|---|
| | The DIP Liens on the Prepetition Collateral are junior to the Adequate Protection Liens (defined below) on the Prepetition Collateral provided for in the DIP Orders.<br><br>The Prepetition Collateral does not include the Segregated DIP Account, the cash deposited therein or the DIP Priority Collateral.<br><br>Priming of Prepetition Liens (Local Rule 4001-2(a)(i)(P)): The DIP Liens are senior liens on the DIP Priority Collateral (comprised of unencumbered assets as of the Petition Date). However, the DIP Liens do not prime the Prepetition Liens on the Prepetition Collateral and do not prime Permitted Prior Liens.<br><br>*See* Interim Order ¶¶ 3(f), 4, 5, 6, 14 |
| **Adequate Protection**<br><br>*Bankruptcy Rule 4001(c)(1)(B)(ii); Local Rule 4001-2(a)(i)(G), (K), (N), (O) and (U)* | As adequate protection for any diminution in value of the Prepetition Secured Parties' (x) Cash Collateral, and (y) other Prepetition Collateral, in each case, from and after the Petition Date ("**<u>Diminution in Value</u>**"), including any diminution arising from (i) the sale, lease, or use by the Debtors of such Cash Collateral during these Chapter 11 Cases, (ii) the incurrence of the DIP Facility, and (iii) the imposition of the automatic stay pursuant to section 362 of the Bankruptcy Code, the Prepetition Secured Parties are entitled to:<br><br>a) a superpriority administrative expense claim in the Chapter 11 Cases, solely to the extent of any Diminution in Value, with priority over all administrative expenses and claims of any kind or nature whatsoever, specified in or ordered pursuant to sections 105, 326, 327, 328, 330, 331, 361, 362, 363, 364, 365, 503, 506, 507(a), 507(b), 546, 552, 726, 1113 or 1114 or any other provisions of the Bankruptcy Code, subject and junior only to the Carve Out (the "**<u>Adequate Protection Claims</u>**");<br><br>b) To secure the Adequate Protection Claims, a perfected security interest in and lien (the "**<u>Adequate Protection Liens</u>**"), solely to the extent of any Diminution in Value, on: (i) all DIP Collateral that constitutes Prepetition Collateral, and (ii) all DIP Collateral that does not constitute Prepetition Collateral (other than the Segregated DIP Account and the cash deposited therein and withdrawn therefrom), and which Adequate Protection Liens shall have the following priority: (x) such Adequate Protection Liens on the DIP Collateral that constitutes Prepetition Collateral shall be subject to the Carve Out, but shall have priority over all other liens on such DIP Collateral (including the DIP Liens); and (y) such Adequate Protection Liens on the DIP Collateral that does not constitute Prepetition Collateral (including the DIP Priority Collateral) shall be subject to the Carve Out, and shall be junior to the DIP Liens on such DIP Collateral, but shall have priority over all other liens on such DIP Collateral (other than, for the avoidance of doubt, the DIP Liens). The Adequate Protection Liens shall not attach to the Segregated DIP Account or funds deposited therein or withdrawn therefrom<br><br>c) current payment of the Consenting Lender Fees and Expenses (as defined in the Interim Order); and |

| DIP Facility | |
|---|---|
| | d) current cash payment of (a) interest on the Prepetition Secured Obligations at the applicable non-default rate of interest, (b) required amortization payments, in each case, as provided under the applicable Prepetition Secured Facilities Documents, including, payment of cash interest and amortization on the Prepetition Secured Obligations held by the DIP Lenders and/or affiliates of the DIP Lenders, and (c) any fees payable (i) to the Prepetition Credit Agreement Agent for the administrative agency fee under the Prepetition Credit Agreement or related Loan Documents (as defined therein) or (ii) on account of any Letter of Credit (as defined in the Prepetition Credit Agreement) (such interest, amortization, and fee payments together with the Consenting Lender Fees and Expenses, the "**Adequate Protection Payments**"). Without limiting the requirement to pay all Adequate Protection Payments during the Chapter 11 Cases when due, payment of any outstanding Adequate Protection Payments shall occur no later than the effective date of any plan of reorganization in these Chapter 11 Cases.<br><br>On the Termination Date, any amounts owed in respect of the Adequate Protection Payments cease accruing. No amounts that would have accrued in respect of the Adequate Protection Payments after the Termination Date are payable as Adequate Protection Payments. All amounts owed in respect of the Adequate Protection Claims (including any amount attributable to any Diminution in Value (if any)) are calculated as of the Termination Date, and any amounts in respect of any Adequate Protection Payments that had actually accrued but were unpaid as of the Termination Date are due and payable on such Termination Date. Nothing in the Restructuring Support Agreement or the DIP Orders prevents any Prepetition Secured Party from, after the Termination Date, (i) seeking further adequate protection or (ii) seeking payment of any accrued and unpaid interest, amortization, or other payments under the applicable debt documents, including post-petition accrued and unpaid amounts, other than as Adequate Protection Payments under the DIP Orders; however, (x) no liens in respect of any such further adequate protection (1) attach to the Segregated DIP Account or the cash therein, or (2) attach to any other DIP Priority Collateral in a manner that ranks senior to the DIP Liens in the DIP Priority Collateral, and (y) no cash withdrawn from the Segregated DIP Account may be used to pay any amounts in respect of any such further adequate protection or the amounts or items set forth in the foregoing clause (ii).<br><br>The Adequate Protection Liens do not attach to the Segregated DIP Account or the cash set forth therein.<br><br>The Debtors will contemporaneously provide the Prepetition Agents and the Consenting Stakeholder Advisors (as defined in the Restructuring Support Agreement) with all reports, notices, documents and other information required to be delivered to the DIP Secured Parties under the DIP Credit Agreement or the DIP Orders (other than borrowing requests, interest election notices and other notices of an administrative or ministerial nature), including, but not limited to, any new Approved Budget or Variance Reports (each as defined herein).<br><br>*See* Interim Order ¶¶G(viii), 33 |

| DIP Facility | |
|---|---|
| **Voluntary & Mandatory Prepayments**<br><br>*Bankruptcy Rule 4001(c)(1)(B); Local Rule 4001-2(a)(i)(I)* | Voluntary Prepayments:<br><br>The Debtors may not voluntarily repay any loans under the DIP Facility absent the prior written consent of the Prepetition Credit Agreement Agent and the Required Lenders (as defined in the Prepetition Credit Agreement), to the extent that any Prepetition Secured Obligations are outstanding. The DIP Commitment may not be reduced.<br><br>Mandatory Prepayments:<br><br>The Debtors must repay the loans under the DIP Facility in whole upon the incurrence of any unpermitted indebtedness under the DIP Documents.<br><br>*See* Interim Order ¶ 9 |
| **Delayed-Draw DIP Loans**<br><br>*Bankruptcy Rule 4001(c)(1)(B); Local Rule 4001-2(a)(i)(A) and (E)* | The Delayed-Draw DIP Loans will be made available upon entry of the Interim Order and may only be used to make payments in respect of the delayed-draw eligible uses specified in the "Delayed Draw Uses" row of the Approved Budget (any such payments, the "**Delayed-Draw Payments**"). If the Debtors make a Delayed-Draw Payment on or after the Petition Date with cash on hand, and such cash on hand is not (and was not) proceeds of the Delayed-Draw DIP Loans, the Debtors may borrow Delayed-Draw DIP Loans to replenish the cash on hand that was actually used to make such Delayed-Draw Payment.<br><br>The Borrower may not borrow more than the principal amount of the Delayed-Draw DIP Loans permitted by the Interim Order.<br><br>All borrowings and withdrawals in respect of the Interim Initial DIP Loans and the Delayed-Draw DIP Loans will be subject to the restrictions concerning the Segregated DIP Account, as set forth in the DIP Documents and the DIP Orders.<br><br>*See* Interim Order ¶ 7(b)–(d) |
| **Interest Rate**<br><br>*Bankruptcy Rule 4001(c)(1)(B); Local Rule 4001-2(a)(i)(B) and (M)* | Interest on the DIP Loans is paid in kind (and capitalized to principal on each interest payment date) at a rate per annum equal to Term SOFR + 5.00% with interest periods of one month or three months, as may be elected by the Borrower from time to time.<br><br>Overdue amounts under the DIP Facility (including all DIP Obligations following an acceleration) bear interest, to the fullest extent permitted by law, at the interest rate then applicable plus 2.00% per annum (the "**Default Rate**"), which interest is payable in kind. Upon delivery of a Termination Notice (as defined below), the DIP Agent is authorized to charge interest at the default rate under the DIP Documents, which default-rate interest is payable in kind.<br><br>*See* DIP Credit Agreement §§ 1.01, 2.08; Interim Order ¶ 20(b) |
| **Amortization** | None. |

| **DIP Facility** | |
|---|---|
| *Bankruptcy Rule 4001(c)(1)(B); Local Rule 4001-2(a)(i)(B)* | |
| **Exit Fee**<br><br>*Bankruptcy Rule 4001(c)(1)(B); Local Rule 4001-2(a)(i)(B) and (I)* | If, at any time prior to the Restructuring Effective Date, the Restructuring Support Agreement is terminated pursuant to Sections 12.01(d) or 12.02(b) thereof, the Debtors become obligated to pay the DIP Lenders a fee in cash in the amount equal to 2.0% of the outstanding DIP Loans (including interest paid in kind and capitalized to principal) (such fee, the "**DIP Exit Fee**").<br><br>*See* Interim Order ¶ 36 |
| **Termination Date**<br><br>*Bankruptcy Rule 4001(c)(1)(B); Local Rule 4001-2(a)(i)(M)* | Each of the following constitutes a termination event under the DIP Orders (each, a "**Termination Event**," and the earliest date upon which such Termination Event occurs, the "**Termination Date**"), unless waived in writing by the DIP Agent in accordance with the terms of the DIP Credit Agreement: (i) the occurrence of the Maturity Date (as defined in the DIP Credit Agreement); (ii) the occurrence of the effective date of a chapter 11 plan; (iii) the DIP Loans becoming due and payable in full under the DIP Documents, whether by acceleration or otherwise; (iv) the entry by the Court of an order converting the Chapter 11 Case of any of the Debtors to a chapter 7 liquidation or the dismissal of the Chapter 11 Case of any Debtor; (v) the consummation of a sale of all or substantially all of the Debtors' assets; (vi) failure of the Debtors to perform under the terms of the Interim Order; (vii) the Debtors seek to amend, supplement, extend, or otherwise modify the Interim Order without the consent of the DIP Lenders and, to the extent any such amendment, supplement, extension, or modification relates to the Debtors' use of the Prepetition Secured Parties' Cash Collateral or the adequate protections provided to the Prepetition Secured Parties under the Interim Order, the Required Consenting RCF Lenders (as defined in the Restructuring Support Agreement) and the Required Consenting Secured Lenders (as defined in the Restructuring Support Agreement); (viii) other than the Carve Out, the Debtors seek to allow claims or liens that are *pari passu* with or senior to the DIP Obligations, the DIP Superpriority Claims, the DIP Liens, the Prepetition Secured Obligations, the Prepetition Liens, the Adequate Protection Claims, or the Adequate Protection Liens; (ix) the commencement by the Debtors, or the support by any Debtor of the commencement of an action by any other party in interest, to subordinate, recharacterize or avoid any DIP Obligations, the DIP Superpriority Claims, the DIP Liens, the Prepetition Secured Obligations, the Prepetition Liens, the Adequate Protection Claims, or the Adequate Protection Liens; (x) without the prior written consent of the DIP Lenders, the Required Consenting RCF Lenders and the Required Consenting Secured Lenders, the Court grants relief from the automatic stay to any party with respect to assets of the Debtors exceeding $1,000,000; (xi) the Debtors challenge the validity or binding nature of the Interim Order; or (xii) the Debtors fail to maintain all property, operational, and other insurance on the Prepetition Collateral and the DIP Collateral as required under the Interim Order, the DIP Documents and the Prepetition Credit Agreement.<br><br>*See* Interim Order ¶ 19 |

| **DIP Facility** | |
|---|---|
| **Use of DIP Facility and Cash Collateral**<br><br>*Bankruptcy Rule 4001(c)(1)(B)(ii) and 4001(c)(1)(B)(v); Local Rule 4001-2(a)(i)(E), (K), (L) and (O)* | Subject to Court approval, the Debtors will use Cash Collateral and the proceeds of the DIP Facility in a manner consistent with the DIP Orders and the Approved Budget (as defined below and subject to Permitted Variances). Cash Collateral, the Interim Initial DIP Loans, and Final DIP Loans may be used for (i) working capital and general corporate purposes of the Debtors, (ii) bankruptcy-related costs and expenses in respect of the Chapter 11 Cases (including the Carve Out (as defined below)) and to pay the Adequate Protection Payments, (iii) costs and expenses related to the DIP Facility and (iv) any other purposes set forth in the Approved Budget. The Delayed-Draw DIP Loans may be used solely to make Delayed-Draw Payments or to replenish the Debtors' cash on hand that was used to make a Prepetition DDTL Payment or Delayed-Draw Payments on or after the Petition Date, consistent with the other restrictions in respect thereof set forth in the DIP Orders. The Approved Budget does not limit or test the payment of (a) any professional fees of the DIP Lenders, (b) the fees and expenses of the DIP Lenders, or (c) the Adequate Protection Payments.<br><br><u>Use of Estate Funds to Investigate Liens</u>: No DIP Collateral, DIP Loans, Cash Collateral, proceeds thereof, or any portion of the Carve Out may be used to investigate, assert, or prosecute any claims or challenges against the DIP Secured Parties or the Prepetition Secured Parties. The Debtors may use Cash Collateral to contest whether a Termination Event or an Event of Default has occurred and to pay reasonable and documented counsel fees to prepare for and participate at any hearing regarding the exercise of rights or remedies. *See* Interim Order ¶ 26.<br><br>*See* Interim Order ¶¶ 7, 8, 26 |
| **Budget; Variance Reports**<br><br>*Bankruptcy Rule 4001(c)(1)(B); Local Rule 4001-2(a)(i)(E), (K) and (M)* | All Cash Collateral and proceeds of the DIP Loans must be used, subject to Permitted Variances, in accordance with and subject to a 13-week cash flow projection commencing on the date of initial funding under the DIP Facility, the initial version of which is attached to the DIP Credit Agreement as an exhibit thereto, and a summary version of which is attached to the Interim Order as Exhibit 1 (such initial projection, the "**<u>Initial Approved Budget</u>**"). The Initial Approved Budget is satisfactory to the DIP Lenders, the Required Consenting RCF Lenders and the Required Consenting Secured Lenders. The Initial Approved Budget will be updated by the Borrower by the end of every four-week period beginning on the fifth Friday after the Petition Date and reflect the 13-week period beginning with the current week (each, including the Initial Approved Budget, an "**<u>Approved Budget</u>**"). Each Approved Budget is subject to the consent of the DIP Lenders, the Required Consenting RCF Lenders and the Required Consenting Secured Lenders (which may be in the form of e-mail provided by the financial advisor to the DIP Lenders, and which consent of the Required Consenting RCF Lenders and the Required Consenting Secured Lenders shall not be unreasonably withheld, conditioned or delayed). An updated budget automatically becomes an Approved Budget if none of the DIP Lenders, the Required Consenting RCF Lenders or the Required Consenting Secured Lenders has objected to the updated budget in writing within five (5) business days of receipt of the updated budget. If the DIP Lenders object to an updated budget, the Approved Budget for the prior period remains the Approved Budget until such time as an updated budget is approved. Every Approved Budget (including the Initial Approved Budget) must be in form and substance (including the detail and |

| DIP Facility | |
|---|---|
| | specificity set forth therein concerning receipts and disbursements) satisfactory to the DIP Lenders.<br><br>Commencing with the third Friday after the Petition Date, and every Friday of every second calendar week thereafter, the Borrower will deliver to the DIP Agent and the advisors to the Prepetition Credit Agreement Agent and the Consenting Secured Lenders a variance report in form reasonably acceptable to the DIP Lenders (each, a "**Variance Report**") setting forth (i) the Debtors' aggregate "disbursements" and aggregate "receipts", in each case, for the immediately preceding two-week period ending on Saturday compared to the projected aggregate receipts and disbursements set forth in the Approved Budget for such Variance Testing Period (as defined below) and (ii) the variance in dollar amounts of the actual aggregate amount of receipts and disbursements (excluding all fees due and payable pursuant to 28 U.S.C. § 1930(a) plus any interest due and payable under 31 U.S.C. § 3717) for each period ending on Saturday from those reflected for the corresponding period in the Approved Budget (such comparison, the "**Variance**").<br><br>"**Permitted Variance**" means an aggregate unfavorable disbursement Variance that is not more than 20% during any Variance Testing Period against the projected amount in the Approved Budget for such Variance Testing Period, except that (i) professional fee and expense disbursements, including amounts funded to the Funded Reserve Account and the Carve Out Reserves (as defined in the Interim Order); (ii) United States Trustee fee disbursements; and (iii) the DIP Secured Party fees and expenses and Adequate Protection Payments are not subject to variance testing. In addition, no Approved Budget may include a budgeted payment of Delayed-Draw Payments in excess of the undrawn Delayed-Draw DIP Commitments, and there shall be no unfavorable disbursement Variance in respect of any Delayed-Draw Payment unless such Delayed-Draw Payment is made from funds other than Delayed-Draw DIP Loans.<br><br>"**Variance Testing Period**" means, starting the third Friday following the Petition Date, the two-week period ending on the Saturday immediately preceding such Friday and, every other week thereafter, the preceding two-week period ending on the applicable Saturday.<br><br>During any Variance Testing Period, the Variance from the then-current Approved Budget may not exceed the Permitted Variance.<br><br>Other reporting is as set forth in the DIP Credit Agreement, including customary monthly financial reporting. The Debtors will contemporaneously provide the Prepetition Agents and the Consenting Stakeholder Advisors (as defined in the Restructuring Support Agreement) with all reports, notices, documents and other information required to be delivered to the DIP Secured Parties under the DIP Credit Agreement or this Interim Order (other than borrowing requests, interest election notices and other notices of an administrative or ministerial nature), including, but not limited to, any new Approved Budget or Variance Reports.<br><br>*See* Interim Order ¶¶ 12, 33(a)(v) |

| DIP Facility | |
|---|---|
| **Conditions Precedent to Effectiveness**<br><br>*Bankruptcy Rule 4001(c)(1)(B); Local Rule 4001-2(a)(i)(E)* | The conditions precedent to effectiveness of the DIP Facility on the closing date thereof (the "**Closing Date**") are limited to those usual and customary for debtor-in-possession financings of this type, including, among others: (a) execution and delivery of the DIP Documents; (b) entry of the Interim Order; (c) delivery of the Initial Approved Budget; (d) the Restructuring Support Agreement being in full force and effect; (e) entry of the first day orders; (f) compliance with the Milestones; (g) no Material Adverse Effect having occurred; and (h) no trustee or examiner having been appointed in the Chapter 11 Cases.<br><br>*See* DIP Credit Agreement § 4.01; Interim Order ¶ 2(d) |
| **Conditions Precedent to DIP Loans**<br><br>*Bankruptcy Rule 4001(c)(1)(B); Local Rule 4001-2(a)(i)(E)* | Usual and customary conditions precedent for all extensions of credit for debtor-in-possession credit facilities of this size, type, and purpose, which must be reasonably acceptable to the DIP Agent and the DIP Lenders, including that each such borrowing be in accordance with the Approved Budget as then in effect, that the representations and warranties be true and correct in all material respects, that no Default or Event of Default has occurred and is continuing, and delivery of a borrowing request. Each borrowing of Delayed-Draw DIP Loans is further conditioned on, among other things, the requested Delayed-Draw DIP Loans being permitted under the most recently delivered Approved Budget (subject to Permitted Variances) and compliance with the Milestones. The final draw is further conditioned on, among other things, entry of the Final Order (including the waivers described below), no pending motion adverse to the DIP Lenders, delivery of an updated budget, and compliance with the Milestones.<br><br>*See* DIP Credit Agreement §4.02–4.04; Interim Order ¶¶ 2(d), 7(b) |
| **Representations and Warranties**<br><br>*Bankruptcy Rule 4001(c)(1)(B); Local Rule 4001-2(a)(i)* | The DIP Credit Agreement contains representations and warranties (applicable to such Borrower and DIP Guarantors and/or their respective subsidiaries, as applicable) customary for debtor-in-possession financings of this type and as modified as necessary to reflect the commencement of the Chapter 11 Cases and otherwise subject to the terms of the DIP Orders.<br><br>*See* DIP Credit Agreement §§ 5.01–5.25 |
| **Covenants**<br><br>*Bankruptcy Rule 4001(c)(1)(B); Local Rule 4001-2(a)(i)(E) and (M)* | The Debtors must maintain a minimum of $15,000,000.00 of liquidity (comprised of cash on hand and amounts deposited in the Segregated DIP Account) at all times (the "**Minimum Liquidity Covenant**").<br><br>The DIP Credit Agreement contains additional covenants that are customary for debtor-in-possession financings of this type, in each case subject to customary materiality qualifiers, baskets, and exceptions set forth in the DIP Documents, including, among others: (a) periodic calls with the DIP Lenders and their advisors (no more than once every other week, unless otherwise agreed by the Borrower and the Required Lenders) to review the most recent variance reports, the Debtors' financial and operational performance, and the progress of the Chapter 11 Cases; (b) compliance with the Milestones; (c) customary bankruptcy-related covenants; (d) a disbursement variance test under which actual aggregate disbursements may not exceed 120% of budgeted disbursements for the applicable Variance Testing Period; (e) maintenance of the Segregated DIP |

| DIP Facility | |
|---|---|
| | Account; and (f) maintenance of all property, operational, and other insurance, maintenance of the Debtors' existing cash management system (as modified by the Interim Order), and no sale, transfer, lease, encumbrance or other disposition of DIP Collateral other than in the ordinary course of business or otherwise consistent with the Approved Budget.<br><br>*See* Interim Order ¶¶ 3, 12, 17, 18. |
| **Events of Default**<br><br>*Bankruptcy Rule 4001(c)(1)(B); Local Rule 4001-2(a)(i)(M), (C), (S) and (T)* | The DIP Credit Agreement contains events of default and remedies (each, an "**Event of Default**") consistent with those usual and customary for debtor-in-possession financings of this type (which will be applicable to the Borrower, the DIP Guarantors, and their respective subsidiaries), in each case, acceptable to the DIP Lenders and the Borrower and subject to customary grace periods, cure rights, and materiality thresholds, including, among others: (a) failure to pay principal when due, or interest or other amounts within two (2) Business Days after the due date; (b) breach of specified covenants, including the Milestones, without any cure period; (c) breach of any other covenant that remains uncured for five (5) days; (d) cross-default to postpetition indebtedness in excess of $5,000,000 (excluding prepetition indebtedness); and (e) customary bankruptcy-related defaults, including the Restructuring Support Agreement ceasing to be in full force and effect, termination or modification of the Debtors' exclusive periods, and any DIP Obligor commencing or supporting a Challenge (as defined in the Interim Order).<br><br>*See* DIP Credit Agreement §§ 8.01, 8.02; Interim Order ¶¶ 13, 19, 20 |
| **Carve Out**<br><br>*Bankruptcy Rule 4001(c)(1)(B); Local Rule 4001-2(a)(i)(F)* | The DIP Liens, the DIP Superpriority Claims, the Adequate Protection Liens, the Adequate Protection Claims, and the Prepetition Liens are subject to the Carve Out. The "**Carve Out**" means the sum of: (i) all fees required to be paid to the Clerk of the Court and to the Office of the U.S. Trustee under section 1930(a) of title 28 of the United States Code plus interest at the statutory rate (without regard to the notice set forth in clause (iii) below); (ii) all reasonable fees and expenses up to $50,000 incurred by a chapter 7 trustee under Bankruptcy Code section 726(b) (without regard to the notice set forth in clause (iii) below); (iii) to the extent allowed at any time, whether by interim order, procedural order, or otherwise, all unpaid fees and expenses incurred at any time before or on the first Business Day following delivery by the DIP Agent or the Prepetition Secured Parties of a Carve Out Trigger Notice (as defined below), by persons or firms retained by the Debtors pursuant to section 327, 328, or 363 of the Bankruptcy Code or section 156(c) of title 28 of the United States Code (the "**Debtor Professionals**" or the "**Professional Persons,**" and the fees and expenses incurred thereby, the "**Allowed Professional Fees**"), whether allowed by the Court prior to or after delivery of a Carve Out Trigger Notice; and (iv) Allowed Professional Fees of Professional Persons in an aggregate amount not to exceed $2,500,000 incurred after the first Business Day following delivery by the DIP Agent or the Prepetition Secured Parties of the Carve Out Trigger Notice, to the extent allowed at any time, whether by interim order, procedural order, or otherwise (the amounts set forth in this clause (iv) being the "**Post-Carve Out Trigger Notice Cap**"). Any payment or reimbursement made to any Professional Person on or after the delivery of the Carve Out Trigger Notice shall permanently reduce the Post-Carve Out Trigger Notice Cap on a dollar-for-dollar basis. "**Carve Out Trigger Notice**" |

| DIP Facility | |
|---|---|
| | means a written notice delivered by email (or other electronic means) by the DIP Agent or Prepetition Secured Parties to the Debtors, their lead restructuring counsel, counsel to the Plan Sponsors, and the U.S. Trustee, which notice may be delivered following the occurrence and during the continuation of an Event of Default (as defined in the DIP Credit Agreement), acceleration of the DIP Loans and DIP Obligations under the DIP Facility, or termination of the Debtors' right to use Cash Collateral, as applicable, stating that the Post-Carve Out Trigger Notice Cap has been invoked. The Debtors will fund the Funded Reserve Account weekly, first from amounts in the Segregated DIP Account, and, upon delivery of a Carve Out Trigger Notice, will fund the Pre-Carve Out Trigger Notice Reserve and the Post-Carve Out Trigger Notice Reserve (each as defined in the Interim Order), in each case as set forth in the Interim Order. *See* Interim Order ¶ 25(a)–(c).<br><br>Any funding of the Carve Out is added to, and made a part of, the DIP Obligations secured by the DIP Collateral. *See* Interim Order ¶ 25(e). The Carve Out is senior to all liens and claims securing the DIP Obligations and the Prepetition Secured Obligations, and the Approved Budget, the Carve Out, the Post-Carve Out Trigger Notice Cap, or the Carve Out Reserves is not a cap or limitation on the amount of Allowed Professional Fees due and payable by the Debtors. *See* Interim Order ¶ 25(d). |
| **DIP Milestones**<br><br>*Bankruptcy Rule 4001(c)(1)(B); Local Rule 4001-2(a)(i)(H)* | The Debtors must comply with the following milestones (the "**<u>Milestones</u>**"), which are consistent with those in the Restructuring Support Agreement:<br><br>(a) no later than October 21, 2026, the Debtors shall have commenced solicitation of the Plan and the Petition Date shall have occurred;<br><br>(b) no later than three (3) business days after the Petition Date, the Court shall have entered the Interim Order;<br><br>(c) no later than thirty-five (35) days after the Petition Date, the Court shall have entered the Final Order;<br><br>(d) no later than fifty-five (55) days after the Petition Date, the Court shall have entered the Confirmation Order (as defined in the Restructuring Support Agreement); and<br><br>(e) no later than seventy-five (75) days after the Petition Date, the Restructuring Effective Date shall have occurred.<br><br>The Restructuring Effective Date Milestone is subject to a thirty (30)-day extension as set forth in the Restructuring Support Agreement; provided that no Milestone may be extended beyond the Termination Date without the consent of the DIP Lenders.<br><br>*See* DIP Credit Agreement § 6.20. |
| **Cash Collateral Termination Events**<br><br>*Bankruptcy Rule 4001(c)(1)(B); Local* | Upon the occurrence and during the continuation of a Termination Event, the DIP Agent may file with the Court and deliver a written notice (which may be by email) (a "**<u>Termination Notice</u>**") to the Debtors' counsel, counsel to the Consenting Secured Lenders, counsel to the Prepetition Credit Agreement Agent, counsel to certain Plan Sponsors, and the U.S. Trustee, and, upon such delivery, the DIP Agent may immediately, without further Court approval, accelerate the DIP Obligations and terminate the DIP Commitments. The Debtors' authority to |

| DIP Facility | |
|---|---|
| *Rule 4001-2(a)(i)(M) and (S)* | use Cash Collateral and the proceeds of the DIP Facility may be terminated following the earlier of (x) five (5) business days after delivery of the Termination Notice and (y) the conclusion of a Remedies Hearing (as defined below) at which the Court finds that a Termination Event exists and is continuing (the "**Remedies Notice Period**"), subject to the other notice and hearing protections set forth in the DIP Orders. During the Remedies Notice Period, the Debtors and any other party in interest (including the Plan Sponsors) may seek an emergency hearing (a "**Remedies Hearing**"), and the Debtors may use DIP Loans and Cash Collateral solely to (x) pay payroll and other bona fide ordinary course expenses that the Debtors determine in good faith are critical to the preservation of their estates (not to exceed $1,000,000.00 without the consent of the DIP Lenders and, to the extent such payments would use Cash Collateral of the Prepetition Secured Parties, the Required Consenting RCF Lenders and the Required Consenting Secured Lenders) and (y) fund the Carve Out Reserves, but may not borrow any additional funds under the DIP Facility.<br><br>*See* Interim Order ¶¶ 13, 19, 20. |
| **Stipulations / Challenge**<br><br>*Bankruptcy Rule 4001(c)(1)(B); Local Rule 4001-2(a)(i)(L) and (Q)* | The Debtors' stipulations are binding on the Debtors immediately upon entry of the Interim Order. The stipulations are binding on all other parties in interest, unless such party (i) files a motion seeking requisite standing, describing the Challenge and attaching a draft complaint, and obtains standing by order of the Court, (ii) commences a Challenge Proceeding (as defined in the Interim Order), in each case by one business day before the date of the Final Hearing (the "**Challenge Deadline**"), and (iii) obtains a final non-appealable order sustaining the Challenge. If no timely Challenge is brought or sustained, the Prepetition Secured Obligations are allowed claims, the Prepetition Liens are deemed valid and perfected, and all challenges against the Prepetition Secured Parties are deemed waived and barred. The Interim Order does not confer standing on any party. *See* Interim Order ¶¶ F, 34.<br><br>Subject to the Challenge Deadline, the Debtors stipulate to the validity, enforceability, priority, perfection, and amount of the Prepetition Credit Agreement Obligations and the Prepetition SSN Obligations, in each case plus accrued and unpaid interest, fees, and other amounts. *See* Interim Order ¶ F. |
| **Amendment and Waiver**<br><br>*Bankruptcy Rule 4001(c)(1)(B); Local Rule 4001-2(a)(i)(C) and (R)* | The Debtors and the DIP Secured Parties may enter into amendments, waivers, consents, or other modifications to the DIP Documents in accordance with their terms without further approval of the Court; provided that (i) any amendments to the DIP Documents must be consistent with and are subject to the consent rights set forth in the Restructuring Support Agreement, (ii) any amendment, waiver, consent, or other modification to the DIP Documents relating to the use of Cash Collateral of the Prepetition Secured Parties (which does not include any DIP Priority Collateral) or the adequate protection provided to the Prepetition Secured Parties under the DIP Orders requires the prior written consent of the Required Consenting RCF Lenders and the Required Consenting Secured Lenders, and (iii) the Debtors shall file a notice of any material amendment or other modification with the Court, and serve such notice on the U.S. Trustee three (3) calendar days prior to the effective date thereof to the extent practicable, and if no objection is timely filed (or if the U.S. Trustee indicates that it has no objection) within three (3) calendar days from the date of filing of such notice, the Debtors may proceed |

| DIP Facility | |
|---|---|
| | to execute such amendment, which becomes effective immediately upon execution. See Interim Order ¶ 11. The Debtors irrevocably waive any right to seek any amendment, vacatur, stay, modification, or extension of the Interim Order without the prior written consent of the DIP Agent (at the direction of the DIP Lenders), and no DIP Collateral, DIP Loans, Cash Collateral, or Carve Out may be used by any party, including any Committee, to seek any modification of the Interim Order not approved by the DIP Lenders and the Prepetition Secured Parties. See Interim Order ¶¶ 26(f), 41. The Interim Order also approves the DIP Documents and directs payment of all DIP Obligations, which are not subject to further approval of the Court and are non-refundable and not subject to challenge. See Interim Order ¶ 2. |
| **Indemnification and Releases**<br><br>*Bankruptcy Rule 4001(c)(1)(B)(ix); Local Rule 4001-2(a)(i)(Q)* | Customary for transactions of this type and otherwise reasonably satisfactory to the DIP Lenders and the Debtors. Any indemnification or release of the DIP Lenders or the DIP Agent is solely in such capacities as a DIP Lender and DIP Agent, respectively, and no indemnified person is indemnified for any losses, claims, damages, liabilities, or expenses to the extent (a) resulting from such indemnified person's (or its related parties') gross negligence, bad faith, willful misconduct, or material breach of its obligations under the DIP Documents, in each case as determined by a final, non-appealable judgment of a court of competent jurisdiction or (b) arising from disputes solely among persons not involving any act or omission of the Debtors. *See* DIP Credit Agreement § 10.05.<br><br>The Debtors jointly and severally indemnify and hold harmless the DIP Agent, each other DIP Secured Party, each DIP Secured Party Advisor, each Prepetition Credit Agreement Secured Party, and each of their respective officers, partners, members, directors, managers, trustees, advisors, employees, agents, sub-agents, and affiliates, and each other party entitled to an indemnity in accordance with and subject to the DIP Documents and the Prepetition Credit Agreement Documents, as applicable. See Interim Order ¶ 24. The Interim Order provides that the Debtors forever and irrevocably release the DIP Secured Parties and the Prepetition Secured Parties, and their respective affiliates and representatives, solely in their capacities as such, from all claims relating to the Prepetition Secured Facilities Documents, the Prepetition Secured Obligations, the DIP Loans, the DIP Documents, and the DIP Facility, including lender liability, equitable subordination, and recharacterization claims, and waive all defenses as to the DIP Obligations and the Prepetition Secured Obligations. See Interim Order ¶ 44. |
| **Waivers**<br><br>*Bankruptcy Rule 4001(c)(1)(B)(vii) and (x); Local Rule 4001-2(a)(i)(V), (W) and (X)* | In exchange for the Carve Out and other consideration and value provided by the DIP Lenders, (a) effective upon entry of the Interim Order, each Debtor waives (i) its rights to surcharge the DIP Collateral and the Prepetition Collateral pursuant to sections 105(a) and/or 506(c) of the Bankruptcy Code or otherwise and (ii) any right to apply the equitable doctrine of marshaling as to the DIP Collateral and the Prepetition Collateral, and (b) subject to entry of the Final Order, the "equities of the case" exception under section 552(b) of the Bankruptcy Code will not apply to the Prepetition Secured Parties with respect to the Prepetition Collateral.<br><br>*See* Interim Order ¶¶ H, 28, 29, 31 |

| DIP Facility | |
|---|---|
| **Expenses**<br><br>*Bankruptcy Rule 4001(c)(1)(B); Local Rule 4001-2(a)(i)(B), (J) and (K)* | The Debtors are jointly and severally obligated to pay all reasonable and documented out-of-pocket prepetition and postpetition accrued and unpaid fees, costs, disbursements, and expenses of the DIP Agent and the DIP Lenders, whether or not the transactions contemplated by the DIP Orders are consummated, incurred solely in connection with (a) the discussion, negotiation, preparation, execution, and delivery of any documents in connection with the proposed financing contemplated by the DIP Orders, including the DIP Documents, and the funding of all DIP Loans under the DIP Facility, the administration of the DIP Facility and any amendment, modification, or waiver of any provision of the DIP Documents or (b) the interpretation, enforcement, or protection of any of their rights and remedies under the DIP Documents, in each case, solely to the extent invoiced in accordance with the fee review procedures set forth in the DIP Orders (in each case, to the extent the ECL provides different terms for the payment of such fees and expenses, the ECL governs). However, (i) neither the DIP Documents nor the DIP Orders obligate the Debtors to pay any fees, costs, disbursements, or expenses incurred by or on behalf of any DIP Lender (or any of their respective advisors or professionals) in connection with any matter other than the DIP Facility and the DIP Documents, including, without limitation, any matter in which any DIP Lender, or any of their respective advisors or professionals act or are engaged in any other capacity in connection with the Chapter 11 Cases (including in its capacity as a holder of any prepetition claims or interests) (collectively, the "**Other Fees and Expenses**"); and (ii) the Debtors may request, and the DIP Lenders will promptly provide (or cause their respective advisors and professionals to provide), a summary invoice from the DIP Lenders in order to distinguish between fees, costs, disbursements, and expenses incurred in connection with the DIP Facility and the DIP Documents and those incurred in connection with any other matter, which may be redacted to the extent necessary to protect privileged or confidential information. Invoices for the fees and expenses of the DIP Secured Party Advisors and for the Consenting Lender Fees and Expenses are provided to the Debtors and the U.S. Trustee and, following the ten (10) calendar day objection period (solely as to reasonableness), are paid by the Debtors within three (3) business days, with only any disputed portion withheld pending resolution; the invoices are not required to comply with the U.S. Trustee guidelines, may be in summary form, and are not subject to application, review, or allowance by the Court, and such fees and expenses are not subject to any offset, defense, claim, counterclaim, or diminution. *See* Interim Order ¶ 23. Prepetition fees and expenses of the Prepetition Credit Agreement Agent and the Consenting Secured Lenders are paid currently without regard to the fee review procedures, *see* Interim Order ¶ 33(a)(iii), and fees and expenses of the DIP Agent and the DIP Lenders incurred prior to the Closing Date are paid on the Closing Date to the extent invoiced at least one Business Day prior thereto. *See* DIP Credit Agreement §§ 4.01(f), 10.04.<br><br>The Debtors and/or Reorganized Debtors (as applicable) will pay the Other Fees and Expenses as set forth in, and in accordance with, the ECL. The DIP Secured Party Advisors may also elect to have any fees and expenses not paid pursuant to the Interim Order (whether incurred before or after the Petition Date or before or after the Closing Date) paid after the Restructuring Effective Date in accordance with the ECL, without regard to the fee review procedures in the Interim Order. |

| DIP Facility | |
|---|---|
| **Governing Law and Jurisdiction**<br><br>*Bankruptcy Rule 4001(c)(1)(B); Local Rule 4001-2(a)(i)* | The laws of the State of New York (except as governed by the Bankruptcy Code) govern the DIP Facility. The Debtors and DIP Lenders submit to the exclusive jurisdiction of the Court and waive (to the extent permitted by applicable law) any right to trial by jury. The Court retains exclusive jurisdiction to hear, determine, and enforce all matters arising from or related to the DIP Facility and the Interim Order.<br><br>*See* DIP Credit Agreement §§ 10.16, 10.17; Interim Order ¶ 51. |

28. Local Rule 4001-2(a)(i) requires a debtor, for provisions implicating subsections (N) through (X) of such rule, to explain why each provision is justified under the circumstances. The Debtors identify the following provisions of the proposed DIP Orders and DIP Documents implicating such subsections and explain why each is justified:

- *Cross-Collateralization and Liens on Postpetition Assets (Local Rule 4001-2(a)(i)(N)).* The DIP Orders do not provide for cross-collateralization or elevate any prepetition debt to administrative or higher priority status. However, the Adequate Protection Liens, solely to the extent of any Diminution in Value, attach to (i) all DIP Collateral that constitutes Prepetition Collateral, with priority over all other liens on such collateral (including the DIP Liens), subject to the Carve Out, and (ii) all DIP Collateral that does not constitute Prepetition Collateral, including postpetition assets and the DIP Priority Collateral, junior to the DIP Liens, subject to the Carve Out; the Adequate Protection Liens do not attach to the Segregated DIP Account or cash deposited therein or withdrawn therefrom. *See* Interim Order ¶ 33(a)(ii). These replacement liens are the customary form of adequate protection under sections 361 and 363(e) of the Bankruptcy Code, are limited to any Diminution in Value, are provided in connection with the Prepetition Secured Parties' consent to the use of Cash Collateral, and are justified under the circumstances.

- *Provisions Authorizing "Roll-Up" or Repayment of Prepetition Debt (Local Rule 4001-2(a)(i)(O)).* The DIP Facility does not roll up or refinance any prepetition debt. However, Cash Collateral and proceeds of the Interim Initial DIP Loans may be used to fund the Adequate Protection Payments, which consist of cash payment of interest at the applicable non-default rate and required amortization on the Prepetition Secured Obligations, including on the Prepetition Secured Obligations held by the DIP Lenders and/or their affiliates. *See* Interim Order ¶¶ 7(a), 33(a)(iv). These payments compensate the Prepetition Secured Parties for the use of their collateral during these prepackaged cases and are justified under the circumstances.

- *Findings of Fact, Stipulations, and Releases (Local Rule 4001-2(a)(i)(Q)).* The Debtors stipulate to the validity, enforceability, priority, and perfection of the Prepetition Secured Obligations and the Prepetition Liens. *See* Interim Order ¶ F. The stipulations are binding on the Debtors upon entry of the Interim Order and on all other parties in interest, including any Committee, unless such party obtains standing and commences a Challenge by the Challenge Deadline, which is one business day before the Final Hearing. *See* Interim Order ¶ 34. The Debtors also release the DIP Secured Parties and the Prepetition Secured Parties, and their respective affiliates and representatives, from all claims relating to the Prepetition Secured Facilities Documents, the Prepetition Secured Obligations, and the DIP Facility, including lender liability, equitable subordination, and recharacterization claims. *See* Interim Order ¶ 44.

- *Approval of Loan Agreement Terms (Local Rule 4001-2(a)(i)(R)).* The Interim Order approves the DIP Documents and authorizes and directs the Debtors to pay all DIP Obligations, which amounts are approved by the Interim Order, are not subject to further approval of the Court, and are non-refundable and not subject to challenge in any respect. *See* Interim Order ¶ 2.

- *Automatic Stay Modification and Emergency Default Hearing (Local Rule 4001-2(a)(i)(S) and (T)).* The automatic stay terminates upon the earlier of five (5) business days after delivery of a Termination Notice (as defined in the Interim Order) to the Debtors' counsel, counsel to the Consenting Secured Lenders, counsel to the Prepetition Credit Agreement Agent, counsel to certain Plan Sponsors, and the U.S. Trustee, and the conclusion of a Remedies Hearing (as defined in the Interim Order) at which the Court finds that a Termination Event exists and is continuing. Upon delivery of a Termination Notice, the DIP Agent may immediately, without further Court approval, accelerate the DIP Obligations and terminate the DIP Commitments, and the Debtors may not borrow additional funds under the DIP Facility during the Remedies Notice Period. During the Remedies Notice Period, the Debtors and any other party in interest (including the Plan Sponsors) may seek a Remedies Hearing, at which the only issue that may be raised by a Debtor is whether a Termination Event has occurred and is continuing. *See* Interim Order ¶ 20. This limitation is reasonable under the circumstances because the DIP Lenders are extending new money with the expectation that the DIP Claims will be equitized rather than repaid in cash, and the Debtors may continue to fund payroll and other critical expenses (up to $1,000,000 absent consent) and the Carve Out Reserves during the Remedies Notice Period.

- *Liens on Avoidance Action Proceeds (Local Rule 4001-2(a)(i)(U)).* Subject to entry of the Final Order, the proceeds of Avoidance / Recovery Actions constitute DIP Priority Collateral subject to first-priority DIP Liens, and the Adequate Protection Liens attach to such proceeds junior to the DIP Liens; neither the DIP Liens nor the Adequate Protection Liens extend to the Avoidance / Recovery Actions themselves. *See* Interim Order ¶¶ 4(b), 5(a)(i),

33(a)(ii). Because this provision is requested only in the Final Order, parties in interest will have notice of and an opportunity to object to it.

- *Section 506(c) Waiver (Local Rule 4001-2(a)(i)(V)).* In exchange for the Carve Out and other consideration and value provided by the DIP Lenders, the Debtors waive their rights to surcharge the DIP Collateral and the Prepetition Collateral under sections 105(a) and 506(c) of the Bankruptcy Code. *See* Interim Order ¶ 28.

- *Section 552(b) Waiver (Local Rule 4001-2(a)(i)(W)).*Subject to entry of the Final Order, in exchange for the Carve Out and other consideration and value provided by the DIP Lenders, the "equities of the case" exception under section 552(b) of the Bankruptcy Code will not apply to the Prepetition Secured Parties with respect to the Prepetition Collateral. *See* Interim Order ¶ 31. Because it is requested only in the Final Order, parties in interest will have notice of and an opportunity to object to it.

- *Marshaling (Local Rule 4001-2(a)(i)(X)).* In exchange for the Carve Out and other consideration and value provided by the DIP Lenders, neither the DIP Secured Parties nor the Prepetition Secured Parties will be subject to the equitable doctrine of marshaling with respect to the DIP Collateral or the Prepetition Collateral, as applicable. *See* Interim Order ¶ 29.

Other than as set forth above and in the chart preceding this paragraph, the DIP Orders and the DIP Documents do not contain any provision of the type described in Local Rule 4001-2(a)(i).

## BASIS FOR RELIEF REQUESTED

### A. Entry into the DIP Facility Is a Sound Exercise of the Debtors' Business Judgment.

29. Section 364 of the Bankruptcy Code authorizes a debtor to obtain secured or superpriority financing under certain circumstances discussed below. Courts grant a debtor in possession considerable deference to act in accordance with its business judgment in obtaining postpetition secured credit, so long as the agreement to obtain such credit does not run afoul of the provisions of, and policies underlying, the Bankruptcy Code. Indeed, "courts will almost always defer to the business judgment of a debtor in the selection of the lender." *See, e.g., In re L.A. Dodgers LLC*, 457 B.R. 308, 313 (Bankr. D. Del. 2011) ("[C]ourts will almost always defer to the

business judgment of a debtor in the selection of the lender."); *In re Trans World Airlines, Inc.*, 163 B.R. 964, 974 (Bankr. D. Del. 1994) (approving a postpetition loan and receivables facility because such facility "reflect[ed] sound and prudent business judgment").

30. To determine whether the business judgment standard is met, the Court need only "examine whether a reasonable business person would make a similar decision under similar circumstances." *In re Exide Techs.*, 340 B.R. 222, 239 (Bankr. D. Del. 2006); *see also In re Curlew Valley Assocs.*, 14 B.R. 506, 513-14 (Bankr. D. Utah 1981) (noting that courts should not second guess a debtor's business decision when that decision involves "a business judgment made in good faith, upon a reasonable basis, and within the scope of [the debtor's] authority under the [Bankruptcy] Code"). Bankruptcy courts will not generally second-guess a debtor's business decisions when those decisions involve "a business judgment made in good faith, upon a reasonable basis, and within the scope of [its] authority under the [Bankruptcy] Code." *In re Curlew Valley Assocs.*, 14 B.R. 506, 513 (Bankr. D. Utah 1981); see also *In re Dura Auto. Sys. Inc.*, Case No. 06-11202 (KJC), 2007 Bankr. LEXIS 2764, at *272 (Bankr. D. Del. Aug. 15, 2007) (citation omitted). The Court should evaluate the soundness of a debtor's business judgment, "in context, and considering the relative circumstances of the parties." *Farmland Indus.*, 294 B.R. at 886 ("Viewed in isolation, several of the terms of the [postpetition financing] might appear to be extreme or even unreasonable. Certainly, many of them favor the DIP Lenders. But, taken in context, and considering the relative circumstances of the parties, the Court does not believe that the terms are unreasonable."); *see also Unsecured Creditors' Comm. Mobil Oil Corp. v. First Nat'l Bank & Trust Co. (In re Elingsen McLean Oil Co., Inc.)*, 65 B.R. 358, 365 n.7 (W.D. Mich. 1986) (recognizing that a debtor may have to enter into "hard bargains" to acquire funds for its reorganization).

31. The Debtors' decision to enter into the DIP Facility reflects sound business judgment following arm's-length negotiations and a careful evaluation of available alternatives. No parties were willing to provide financing on more favorable terms. The facility provides an aggregate DIP Commitment of up to $143.0 million, including $30.0 million of Delayed-Draw DIP Loans, with no commitment fee, no upfront fee, no backstop premium, no original issue discount, no call protection, and no amortization. Interest accrues in kind at Term SOFR plus 5.00%, with a default rate of the then-applicable rate plus 2.00% per annum also payable in kind, preserving cash for operations. The only fee is the DIP Exit Fee equal to 2.0% of the outstanding DIP Loans, payable solely upon a termination of the Restructuring Support Agreement under Section 12.01(d) or Section 12.02(b) thereof. The facility does not prime the Prepetition Secured Parties' Prepetition Liens on the Prepetition Collateral, and does not contain any roll-up. No alternative financing was available on the required timeline on terms more favorable to the estates.

32. Accordingly, the Debtors submit that entry into the DIP Facility is in the best interests of the Debtors' estates, necessary to preserve the value of those estates, and a reasonable exercise of the Debtors' business judgment.

**B. <u>The Debtors Should Be Authorized to Grant the DIP Liens and DIP Superpriority Claims.</u>**

33. The Debtors propose to grant the DIP Lenders valid, binding, enforceable, non-avoidable, and automatically perfected DIP Liens on the DIP Collateral, together with DIP Superpriority Claims under sections 364(c)(1) and 364(d) (to the extent applicable) of the Bankruptcy Code, in each case subject to the Carve Out and to the Adequate Protection Claims and, other than with respect to the DIP Priority Collateral, Adequate Protection Liens and on the priorities set out in the summary of terms above. No DIP Lien displaces any properly perfected and valid prepetition lien: the first-priority liens granted under section 364(c)(2) (and section

364(d)(1), to the extent applicable) attach only to the DIP Priority Collateral (consisting of the Specified Foreign Equity, the Previously Unencumbered Property, the Segregated DIP Account and, subject to entry of the Final Order, proceeds of Avoidance / Recovery Actions), and the liens on the Prepetition Collateral and on property subject to Permitted Prior Liens are junior liens granted under section 364(c)(3). The DIP Liens will be granted as senior liens solely to the extent of (a) any other liens on the DIP Priority Collateral and (b) in respect of the other DIP Collateral, only in respect of liens that are not valid or were not properly perfected. *See* Interim Order ¶¶ 5, 6.

34. Section 364(c) of the Bankruptcy Code authorizes a court to grant a debtor's postpetition lender (i) superpriority administrative expense claim status under section 364(c)(1), (ii) a lien on unencumbered property under section 364(c)(2), and (iii) a junior lien on encumbered property under section 364(c)(3), provided that the debtor is unable to obtain unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code as an administrative expense. Courts apply a three-part test, asking whether:

(a) the debtor is unable to obtain unsecured credit under section 364(b) of the Bankruptcy Code—i.e., by allowing a lender only an administrative claim;

(b) the credit transaction is necessary to preserve the assets of the estate; and

(c) the terms of the transaction are fair, reasonable, and adequate, given the circumstances of the debtor-borrower and proposed lenders.

*In re Crouse Grp., Inc.*, 71 B.R. 544, 549 (Bankr. E.D. Pa. 1987); *see also L.A. Dodgers*, 457 B.R. at 312–13; *In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 37–40 (Bankr. S.D.N.Y. 1990); *In re Aqua Assocs.*, 123 B.R. 192, 195–96 (Bankr. E.D. Pa. 1991); *In re St. Mary Hosp.*, 86 B.R. 393, 401–02 (Bankr. E.D. Pa. 1988).

35. The Debtors are unable to obtain unsecured credit allowable as an administrative expense. Substantially all of their assets are encumbered, approximately $1.46 billion of funded debt is outstanding, and, as described in the Preiss DIP Declaration, both the Consenting Secured

Lenders and the Plan Sponsors indicated that they would be unwilling to provide debtor-in-possession financing on a fully unsecured basis, and no third party contacted by Guggenheim Securities offered financing on terms as favorable to the Debtors as the DIP Facility. A debtor need only demonstrate "by a good faith effort that credit was not available" to the debtor on an unsecured or administrative expense basis. *Bray v. Shenandoah Fed. Savs. & Loan Ass'n (In re Snowshoe Co.)*, 789 F.2d 1085, 1088 (4th Cir. 1986) ("The statute imposes no duty to seek credit from every possible lender before concluding that such credit is unavailable."); *see also Pearl-Phil GMT (Far East) Ltd. v. Caldor Corp.*, 266 B.R. 575, 584 (S.D.N.Y. 2001) (superpriority administrative expenses authorized where debtor could not obtain credit as an administrative expense). The DIP Facility was negotiated in good faith and at arm's-length by the Special Committees, the Debtors' advisors, the DIP Lenders, and their respective advisors.

36. The DIP Facility is necessary to preserve the value of the Debtors' estates. As set forth in the DIP Declarations and the Initial Approved Budget, the Debtors require access to the facility to fund operations, meet payroll, pay vendors, administer these Chapter 11 Cases, and implement the restructuring contemplated by the Restructuring Support Agreement. The terms are fair, reasonable, and adequate for the reasons described above.

**C. <u>The DIP Facility's Treatment at Emergence Is Appropriate.</u>**

37. On the Restructuring Effective Date, pursuant to the Plan and in accordance with the ECL, the obligations under the DIP Loans will be equitized, and the Plan likewise provides that each holder of an allowed DIP Claim receives its pro rata share of the New Interests and the New Preferred Interests (if any), as set forth in greater detail in the Plan and the ECL. This is not a repay-or-convert structure. If the Plan goes effective, the estates will receive the benefit of up to $143 million of new money without any cash outlay at emergence, a material benefit compared with a facility that must be refinanced or repaid in cash on the effective date.

38. The equitization is permissible and appropriate. Section 1129(a)(9)(A) of the Bankruptcy Code requires that the holder of an allowed administrative expense claim receive cash equal to the allowed amount of the claim on the effective date of a plan unless the holder agrees to different treatment. The DIP Lenders have agreed to different treatment, and the ECL binds them to accept New Interests and New Preferred Interests in satisfaction of their DIP Claims. The Plan and the Confirmation Order will reflect that consent.

39. Any Delayed-Draw DIP Loans outstanding on the Restructuring Effective Date are treated separately. Their principal amount converts into 100% of the New Preferred Interests, which the Reorganized Company Parties (as defined in the Restructuring Support Agreement) may redeem after emergence, subject to new board approval, at an amount equal to the Delayed-Draw DIP Amount, as more fully described in the Restructuring Support Agreement and Plan.

## **CASH COLLATERAL AND ADEQUATE PROTECTION**

### **A. The Debtors Should Be Authorized to Continue Use of Cash Collateral.**

40. Section 363(c)(2) of the Bankruptcy Code permits a debtor to use Cash Collateral if each entity with an interest consents or the Court authorizes such use after notice and a hearing. The Prepetition Secured Parties have consented to the Debtors' use of Cash Collateral on the terms set forth in the DIP Orders and the Approved Budget, satisfying section 363(c)(2)(A). Any such use is supported by the adequate protection package described below.

41. The Prepetition Secured Parties receive cash payment of postpetition interest at the applicable non-default rate and required amortization, the Prepetition Credit Agreement administrative agency fee and any letter of credit fees, current payment of the Consenting Lender Fees and Expenses, and, solely to the extent of any Diminution in Value, Adequate Protection Liens and allowed superpriority administrative expense claims under section 507(b) of the Bankruptcy Code, which Adequate Protection Liens and Adequate Protection Claims are subject

to the Carve Out (and, in the case of Adequate Protection Liens on DIP Collateral that does not constitute Prepetition Collateral, junior to the DIP Liens). That package is adequate here: the DIP Facility does not prime any valid and properly perfected liens, the DIP Liens on the Prepetition Collateral rank behind both the Prepetition Secured Parties' prepetition liens and the Adequate Protection Liens, and up to $143 million of new money is added to the Debtors' balance sheet.

42. Continued access to Cash Collateral, together with the DIP Facility, is necessary to preserve the Debtors' going-concern value for the benefit of all stakeholders, including the Prepetition Secured Parties. The Debtors therefore request approval of the consensual use of Cash Collateral, subject to the DIP Orders and the adequate protection package.

## **ADDITIONAL BASES FOR RELIEF**

### **A. The Scope of the Carve Out Is Appropriate.**

43. The DIP Orders provide that the DIP Liens, the DIP Superpriority Claims, the Prepetition Liens, the Adequate Protection Liens, and the Adequate Protection Claims are each subject and subordinate to the Carve Out, and that neither the Approved Budget nor the Post-Carve Out Trigger Notice Cap operates as a cap on the Allowed Professional Fees payable by the Debtors. Estimated professional fees for these Chapter 11 Cases are set forth in the Initial Approved Budget and described in the DIP Declarations.

44. The Carve Out is necessary to ensure that the Debtors and other parties in interest are not deprived of their rights and that estate professionals are compensated for the services they provide in these Chapter 11 Cases. *See In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) (observing that courts insist on carve-outs for professionals representing parties in interest because "[a]bsent such protection, the collective rights and expectations of all parties-in-interest are sorely prejudiced"). Additionally, the Carve Out ensures that assets will be available for the payment of fees of the Clerk of the Court or the Office of the United States Trustee for the

District of Delaware. Accordingly, the Carve Out is necessary and appropriate, and should be approved.

**B. <u>The DIP Lenders Should Be Deemed Good-Faith Lenders.</u>**

45. Section 364(e) of the Bankruptcy Code protects a good-faith lender's rights, including the rights to collect on loans extended to a debtor and its rights in any liens securing those loans, even if the authority of the debtor to obtain such loans or grant such liens is later reversed or modified on appeal. As explained in this Motion and the DIP Declarations, the terms of the DIP Facility are the result of (a) the Debtors' reasonable and informed determination that the DIP Lenders' proposal offered the most favorable terms on which to obtain vital postpetition financing, and (b) arm's-length, good-faith negotiations between the Debtors, the Special Committees and the DIP Lenders and their respective advisors.

46. A good-faith finding matters here because the DIP Lenders are extending new money against a limited collateral package on the expectation that their claims will be satisfied in equity rather than in cash. The terms and conditions of the DIP Facility are reasonable and appropriate under the circumstances and proceeds of the DIP Loans will be used only for purposes permitted by the DIP Orders and the Approved Budget. The Debtors therefore request that the Court find that the DIP Lenders extended credit in good faith within the meaning of section 364(e) of the Bankruptcy Code and are entitled to all of the protections afforded thereunder.

**C. <u>Modification of the Automatic Stay Is Warranted.</u>**

47. This Motion contemplates a modification of the automatic stay to permit (a) the Debtors to grant the security interests, liens, and superpriority claims described above and to perform such acts as may be requested to assure the perfection and priority of those security interests and liens; (b) upon the occurrence and during the continuance of an Event of Default (as defined in the DIP Documents), the DIP Secured Parties to accelerate all DIP Loans and terminate

the DIP Commitment; (c) upon the occurrence and during the continuance of an Event of Default, and subject to the Remedies Notice Period, the DIP Lenders to exercise any other remedies available to them; (d) following the occurrence of a Termination Event, and subject to the Remedies Notice Period, the Prepetition Secured Parties to exercise their rights and remedies under the DIP Orders, subject to the priorities set forth in the DIP Orders; and (e) the Debtors to implement the terms of the DIP Orders, including payment of all amounts referred to in the DIP Documents. In the Debtors' business judgment, this relief is reasonable and fair under the circumstances.

48. Stay modification provisions of this kind are ordinary and standard terms of postpetition use of collateral by debtors in possession, and, in the Debtors' business judgment, are reasonable and necessary under the present circumstances. *See, e.g., In re BioXcel Therapeutics, Inc.*, No. 26-11360 (TMH) (Bankr. D. Del. Aug. 31, 2026) (modifying the automatic stay as necessary to effectuate the terms of the DIP order and DIP loan documents); *In re Freedom Forever LLC*, Case No. 26-10522 (BLS) (Bankr. D. Del. June 1, 2026) (modifying the automatic stay as necessary to effectuate the terms of the DIP order); *In re Impac Mortgage Holdings, Inc.*, Case No. 26-10593 (CTG) (Bankr. D. Del. May 20, 2026) (modifying automatic stay as necessary to effectuate the terms of the DIP order and following occurrence of an event of default); *In re Avenger Flight Group, LLC*, Case No. 26-10183-MFW (Bankr. D. Del. Mar. 11, 2026) (same); *In re SiO2 Medical Prods., Inc.*, No. 23-10366 (JTD) (Bankr. D. Del. Apr. 26, 2023) (same); *In re Enjoy Tech., Inc.*, Case No. 22-10580 (JKS) (Bankr. D. Del. July 26, 2022) (terminating automatic stay after occurrence of event of default and applicable notice).

49. Accordingly, the Debtors respectfully request that the Court authorize the modification of the automatic stay in accordance with the terms set forth in the DIP Orders.

**D. Interim Approval of the DIP Facility Is Warranted.**

50. Bankruptcy Rules 4001(b) and (c) provide that a final hearing on a motion to use cash collateral pursuant to Bankruptcy Code section 363 or to obtain credit under Bankruptcy Code section 364 may not be commenced earlier than 14 days after the service of such motion. Upon request, however, a court is empowered to conduct a preliminary expedited hearing on the motion and to authorize the use of cash collateral and the obtaining of credit to the extent necessary to avoid immediate and irreparable harm to a debtor's estate.

51. As described above and in the First Day Declaration and the Brantley DIP Declaration, absent immediate access to the DIP Facility, the Debtors have no meaningful source of incremental liquidity. The Initial Approved Budget therefore contemplates immediate access to the DIP Facility. Consistent with Bankruptcy Rules 4001(b)(2) and 4001(c)(2) and Local Rule 4001-2(b), the Debtors have limited their interim request to the amount necessary to avoid immediate and irreparable harm between entry of the Interim Order and the Final Hearing and will draw the $28 million of Final DIP Loans only following entry of the Final Order.

## IMMEDIATE RELIEF IS NECESSARY AND THE REQUIREMENTS OF BANKRUPTCY RULE 6003(A) ARE SATISFIED

52. Bankruptcy Rule 6003(a) empowers a court to grant certain relief within the first twenty-one (21) days after the petition date only to the extent that "relief is needed to avoid immediate and irreparable harm." Fed. R. Bankr. P. 6003(a). For the reasons discussed above, an immediate and orderly transition into chapter 11 is critical to the viability of the Debtors' operations. Failure to receive the requested relief during the first twenty-one (21) days of these chapter 11 cases would severely disrupt the Debtors' operations at this critical juncture and cause immediate and irreparable harm. The requested relief is necessary for the Debtors to operate their business in the ordinary course, preserve the ongoing value of their operations, and maximize value

of their estates for the benefit of all stakeholders. The Debtors have demonstrated that the requested relief is "needed to avoid immediate and irreparable harm," as contemplated by Bankruptcy Rule 6003(a), and request that the Court grant the requested relief.

## DEBTORS' STATEMENT PURSUANT TO LOCAL RULE 4001-2(a)(iii)

53. The Debtors believe that the Initial Approved Budget is adequate to pay all administrative expenses due or accruing during the period covered by the Initial Approved Budget.

## RESERVATION OF RIGHTS

54. Unless specifically articulated herein or in the DIP Orders, nothing contained in this Motion or any actions taken pursuant to any order granting the relief requested by this Motion (including any payment made in accordance with any such order), is intended as or shall be construed or deemed to be: (a) an implication or admission as to the amount of, basis for, or validity of any particular claim against the Debtors under the Bankruptcy Code or other applicable non-bankruptcy law; (b) a waiver of the Debtors' or any other party in interest's rights to dispute any particular claim on any grounds; (c) a promise or requirement to pay any particular claim; (d) an implication, admission, or finding that any particular claim is an administrative expense claim, other priority claim, or otherwise of a type specified or defined in this Motion or any order granting the relief requested by this Motion; (e) a request or authorization to assume, adopt, or reject any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code; (f) an admission as to the validity, priority, enforceability, or perfection of any lien on, security interest in, or other encumbrance on property of the Debtors' estates; (g) a waiver or limitation of the Debtors' or any other party in interest's claims, causes of action, or other rights under the Bankruptcy Code or any other applicable law; (h) an approval, assumption, adoption, or rejection of any agreement, contract, lease, program, or policy under section 365 of the Bankruptcy Code; (i) a concession by the Debtors that any liens (contractual, common law, statutory, or otherwise)

that may be satisfied pursuant to the relief requested in this Motion are valid, and the rights of all parties in interest are expressly reserved to contest the extent, validity, or perfection or seek avoidance of all such liens; (j) a waiver of the obligation of any party in interest to file a proof of claim; (k) otherwise affecting the Debtors' rights under section 365 of the Bankruptcy Code to assume or reject any executory contract or unexpired lease; or (l) a waiver, modification, or limitation of any right of any party under the Restructuring Support Agreement. If the Court grants the relief sought herein, any payment made pursuant to the Court's order is not intended and should not be construed as an admission as to the validity, priority, or amount of any particular claim or a waiver of the Debtors' or any other party in interest's rights to subsequently dispute such claim.

**REQUEST FOR A FINAL HEARING**

55. Pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2), the Debtors request that the Court set a date for the Final Hearing that is as soon as practicable and, in any event, sufficiently in advance of the Milestone requiring entry of the Final Order no later than thirty-five (35) calendar days after the Petition Date, and fix the date and time prior to the Final Hearing for parties to file objections to the relief requested by this Motion. The Debtors also request authority to serve a copy of the signed Interim Order, which fixes the time and date for the filing of objections, if any, to entry of the Final Order, by first class mail upon the notice parties listed below, and further request that the Court deem service thereof sufficient notice of the hearing on the Final Order under Bankruptcy Rule 4001(c)(2).

**WAIVER OF BANKRUPTCY RULES 6004(A) AND 6004(H)**

56. To implement the foregoing successfully, the Debtors seek a waiver of the notice requirements under Bankruptcy Rule 6004(a) and the fourteen (14) day stay of an order authorizing the use, sale, or lease of property under Bankruptcy Rule 6004(h) for the reasons set forth herein.

## NOTICE

57. The Debtors will provide notice of this Motion to the following parties or their respective counsel: (a) the Office of the United States Trustee for the District of Delaware; (b) the holders of the 30 largest unsecured claims against the Debtors (on a consolidated basis); (c) the office of the attorney general for each of the states in which the Debtors operate; (d) the United States Attorney's Office for the District of Delaware; (e) the Internal Revenue Service; (f) counsel to the DIP Lenders; (g) counsel to the DIP Agent; (h) the Prepetition Credit Agreement Agent; (i) counsel to the Credit Agreement Agent; (j) counsel to the Consenting Secured Lenders; (k) counsel to the Plan Sponsors; (l) counsel to the Unsecured Noteholders Ad Hoc Committee; (m) the Securities and Exchange Commission; (n) secured parties who have filed UCC financing statements with respect to the Debtors or the Debtors' assets; and (o) any party that is entitled to notice pursuant to Bankruptcy Rule 2002 (collectively, the "Notice Parties"). As this Motion is seeking "first day" relief, the Debtors will serve copies of this Motion and any order entered in respect to this Motion as required by Local Rule 9013-1(m). The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

## NO PRIOR REQUEST

58. No prior request for the relief sought in this Motion has been made to this or any other court.

[*Remainder of page intentionally left blank*]

**WHEREFORE**, the Debtors request entry of the DIP Orders (a) granting the relief requested herein and (b) granting such other relief as the Court deems appropriate under the circumstances.

Dated: October 21, 2026
Wilmington, Delaware

*/s/ Justin R. Alberto*
**COLE SCHOTZ P.C.**
Seth Van Aalten (*pro hac vice* pending)
Justin R. Alberto (DE Bar No. 5126)
Patrick J. Reilley (DE Bar No. 4451)
Sarah A. Carnes (*pro hac vice* pending)
Jack M. Dougherty (DE Bar No. 6784)
500 Delaware Avenue, Suite 600
Wilmington, Delaware 19801
Telephone: (302) 652-3131
Facsimile: (302) 652-3117
Email: svanaalten@coleschotz.com
jalberto@coleschotz.com
preilley@coleschotz.com
scarnes@coleschotz.com
jdougherty@coleschotz.com

*Proposed Co-Counsel for the Debtors and Debtors in Possession*

**SIMPSON THACHER & BARTLETT LLP**
Brian E. Schartz (*pro hac vice* pending)
Elisha D. Graff (*pro hac vice* pending)
Rachael L. Foust (*pro hac vice* pending)
Dov Gottlieb (*pro hac vice* pending)
Olivia F. Acuña (*pro hac vice* pending)
425 Lexington Avenue
New York, New York 10017
Telephone: (212) 455-3702
Facsimile: (212) 455-2502
Email: brian.schartz@stblaw.com
egraff@stblaw.com
rachael.foust@stblaw.com
dov.gottlieb@stblaw.com
olivia.acuna@stblaw.com

*Proposed Co-Counsel for the Debtors and Debtors in Possession*