# Exhibit A

## Proposed Interim Order

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re | ) | Chapter 11 |
| GETTY IMAGES HOLDINGS, INC., *et al.*,[1] | ) | Case No. 26-11643 (JKS) |
| Debtors. | ) | (Joint Administration Requested) |

**INTERIM ORDER (I) AUTHORIZING THE DEBTORS TO USE CASH COLLATERAL AND OBTAIN POSTPETITION FINANCING; (II) GRANTING LIENS AND SUPERPRIORITY ADMINISTRATIVE EXPENSE CLAIMS; (III) PROVIDING ADEQUATE PROTECTION; (IV) MODIFYING THE AUTOMATIC STAY; (V) SCHEDULING A FINAL HEARING; AND (VI) GRANTING RELATED RELIEF**

Upon the *Motion of the Debtors for Interim and Final Orders (I) Authorizing the Debtors to Use Cash Collateral and Obtain Postpetition Financing; (II) Granting Liens and Superpriority Administrative Expense Claims; (III) Providing Adequate Protection; (IV) Modifying the Automatic Stay; (V) Scheduling a Final Hearing; and (VI) Granting Related Relief* (the "DIP Motion") of Getty Images Holdings, Inc. (the "Borrower") and its affiliated debtors and debtors in possession (collectively, the "Debtors") in the above-captioned cases (the "Chapter 11 Cases"), pursuant to sections 105, 361, 362, 363(b), 363(c)(2), 364(c)(1), 364(c)(2), 364(c)(3), 364(d), 364(e), 503, 506, 507 and 552 of title 11 of the United States Code (the "Bankruptcy Code"), and Rules 2002, 4001, 6004, 9014 and 9019 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), seeking, among other things, entry of an interim order (this "Interim Order"):

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Getty Images Holdings, Inc. (4229); Griffey Midco (DE), LLC (7122); Abe Investment Holdings, Inc. (5107); Getty Images, Inc. (7556); Getty Images (US), Inc. (8819); Getty Images News Services (PRC), Inc. (1849); and Getty Images (Seattle), Inc. (6863). The location of the Debtors' service address for purposes of these chapter 11 cases is: 605 5th Ave. S. Suite 400, Seattle, WA 98104.

a) authorizing the Debtors to obtain a postpetition multi-draw credit facility (the "DIP Facility") (and to execute and deliver all final documentation in order to obtain such DIP Facility) in the aggregate principal amount of up to $143,000,000.00 (the "DIP Commitment") consisting of (i) $113,000,000.00 of DIP Loans of which (a) $85,000,000.00 of DIP Loans shall be made available upon entry of this Interim Order (the "Interim Initial DIP Loans") and (b) $28,000,000.00 of DIP Loans shall be made available upon entry of the Final Order (as defined below) (the "Final DIP Loans"); and (ii) $30,000,000.00 of delayed-draw commitments, which shall be made available upon entry of the Interim Order and subject to the draw conditions set forth in the DIP Documents (such commitments, the "Delayed-Draw DIP Commitments," and the loans thereunder, the "Delayed-Draw DIP Loans," and together with the Interim Initial DIP Loans, the "Interim DIP Loans" and, the Interim DIP Loans, collectively with the Final DIP Loans, the "DIP Loans") on the terms and conditions set forth in (1) this Interim Order, (2) a final order approving the DIP Motion (the "Final Order"), and (3) that certain Debtor-in-Possession Credit Agreement by and among the Borrower, each of the other Debtors as guarantors party thereto (such guarantors, the "DIP Guarantors" and together with the Borrower, the "DIP Obligors"), the lenders under the DIP Facility from time to time party thereto (collectively, such entities in their capacities as lenders under the DIP Facility, the "DIP Lenders"), Cantor Fitzgerald Securities, as administrative agent (in such capacity, the "DIP Administrative Agent") and collateral agent (in such capacity, the "DIP Collateral Agent" and together with the DIP Administrative Agent, the "DIP Agent"), substantially in the form attached to the DIP Motion as Exhibit B (as amended, restated or otherwise modified from time to time in accordance with the terms hereof and thereof, the "DIP Credit Agreement", together with this Interim Order, the Final Order and all other agreements (including the Segregated Account Control Agreement (as defined herein)), documents, engagement and fee letters, schedules and instruments delivered or executed in connection with the DIP Credit Agreement, each as amended, restated or otherwise modified from time to time in accordance with the terms hereof and thereof, the "DIP Documents");

b) approving the DIP Documents and authorizing the Debtors to execute and enter into, and be bound by and to perform under, the DIP Documents and to perform all such other and further acts as may be required in connection with or to implement the DIP Documents;

c) authorizing the DIP Obligors to use the proceeds of the DIP Facility in accordance with the DIP Documents;

d) authorizing the DIP Guarantors to guarantee on a joint and several basis the DIP Obligations (as defined below);

e) granting the DIP Agent, for the benefit of itself and the DIP Lenders (collectively, in their capacities as such, the "DIP Secured Parties"), and authorizing the Debtors to incur, valid, enforceable, non-avoidable, automatically and fully perfected liens on and security interests in all DIP Collateral (as defined below), which liens and

security interests shall be subject to the rankings and priorities set forth herein and in the other DIP Documents;

f) granting to the DIP Secured Parties allowed superpriority administrative expense claims under section 364(c)(1) of the Bankruptcy Code against each of the Debtors, on a joint and several basis, in respect of all DIP Obligations, as set forth herein, which claims shall be subject to the rankings and priorities set forth herein and in the other DIP Documents;

g) approving and authorizing the Debtors' use of cash collateral within the meaning of section 363(a) of the Bankruptcy Code (the "Cash Collateral") in which the Prepetition Secured Parties (as defined below) have an interest pursuant to the Prepetition Secured Facilities Documents (as defined below) for the purposes and as permitted under this Interim Order and the granting and provision of adequate protection as provided in this Interim Order in connection therewith, including, without limitation, the provision of the Adequate Protection Claims (as defined below), the granting of the Adequate Protection Liens (as defined below), and the payment of the Adequate Protection Payments (as defined below), in each case on the terms set forth in this Interim Order pursuant to sections 361 and 363 of the Bankruptcy Code;

h) waiving the rights of the Debtors to surcharge the DIP Collateral and the Prepetition Collateral pursuant to section 506(c) of the Bankruptcy Code;

i) waiving the equitable doctrine of "marshaling" and other similar doctrines as to the DIP Secured Parties and the Prepetition Secured Parties to the extent provided herein;

j) subject to entry of the Final Order, waiving any "equities of the case" exception under section 552(b) of the Bankruptcy Code;

k) vacating and modifying the automatic stay imposed pursuant to section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms of the DIP Documents, including this Interim Order, and the other relief granted under this Interim Order;

l) scheduling a final hearing (the "Final Hearing") to consider the DIP Motion on a final basis pursuant to Bankruptcy Rule 4001(c)(2); and

m) waiving any stay of the immediate effectiveness of this Interim Order imposed by the Bankruptcy Code or the Bankruptcy Rules, such that this Interim Order shall be immediately effective upon its entry on the docket of the above-captioned court (the "Court") with respect to the Chapter 11 Cases.

The Court having considered the DIP Motion, the DIP Documents on file with the Court, the *Declaration of Craig Peters, Chief Executive Officer of Getty Images Holdings, Inc. and*

*Certain of its Affiliates, in Support of the Debtors' Chapter 11 Petitions* (the "First Day Declaration"), the *Declaration of Mitchell (Chase) Brantley, Senior Director at Alvarez & Marsal North America, LLC, in Support of this Motion* (the "Brantley DIP Declaration") and the *Declaration of Adam Preiss, Senior Managing Director of Guggenheim Securities, LLC, in Support of this Motion* (the "Preiss DIP Declaration" and, together with the Brantley DIP Declaration, the "DIP Declarations"), the pleadings filed with the Court, and the evidence proffered or adduced at the hearing held in respect of the DIP Motion on October ___, 2026 (the "Interim Hearing"); and notice of the Interim Hearing having been given in accordance with Bankruptcy Rules 2002, 4001, and 9014 and all applicable Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"); and all objections, if any, to the interim relief requested in the DIP Motion having been withdrawn, resolved, or overruled by the Court; and it appearing to the Court that the relief requested in the DIP Motion is fair and reasonable and in the best interests of the Debtors, their estates, and their creditors, represents a sound exercise of the Debtors' business judgment and is necessary for the continued operation of the Debtors' businesses; and upon the record of these Chapter 11 Cases; and after due deliberation and consideration, and for good and sufficient cause appearing therefor:

**IT IS HEREBY FOUND, DETERMINED, ORDERED AND ADJUDGED:**[2]

A. *Petition Date*. On October 21, 2026 (the "Petition Date"), the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code in the Court commencing these Chapter 11 Cases.

---

[2] Where appropriate in this Interim Order, findings of fact shall be construed and adopted as conclusions of law and vice versa pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014.

B. *Debtors in Possession*. The Debtors continue to manage and operate their businesses and properties as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code. No trustee or examiner has been appointed in any of the Chapter 11 Cases.

C. *No Committee Formation*. As of the date of the Interim Hearing, an official committee of unsecured creditors, as provided for under section 1102 of the Bankruptcy Code, had not been appointed in these Chapter 11 Cases.

D. *Jurisdiction and Venue*. The Court has core jurisdiction over the Chapter 11 Cases, the DIP Motion, and the parties and property affected hereby pursuant to 28 U.S.C. §§ 157(b) and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated as of February 29, 2012. Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409. The Court has authority to enter this Interim Order consistent with Article III of the United States Constitution. The statutory predicates for the relief sought herein are sections 105, 361, 362, 363, 364, 503, 506, 507, and 552 of the Bankruptcy Code, Bankruptcy Rules 2002, 4001, 6004, and 9014, and Rules 2002-1, 4001-2, and 9013-1 of the Local Rules.

E. *Notice*. The notice of the DIP Motion and the Interim Hearing was provided in accordance with sections 102(1) and 364(c) and (d) of the Bankruptcy Code, Bankruptcy Rules 2002 and 4001, and the Local Rules by the Debtors to certain parties-in-interest, including: (a) the Office of the United States Trustee for the District of Delaware (the "U.S. Trustee"); (b) the Debtors' 30 largest unsecured creditors on a consolidated basis, as identified in their chapter 11 petitions; (c) counsel to the DIP Lenders; (d) counsel to the DIP Agent; (e) the Prepetition Credit Agreement Agent (as defined below); (f) counsel to the Consenting Stakeholders (as defined in the

Restructuring Support Agreement[3]); (g) the Internal Revenue Service; (h) the United States Attorney for the District of Delaware; (i) the Securities and Exchange Commission; (j) secured parties who have filed UCC financing statements with respect to the Debtors or the Debtors' assets; and (k) any other party entitled to notice pursuant to Local Rule 9013-1(m) and Bankruptcy Rule 4001 (collectively, the "Notice Parties"). No other or further notice of the DIP Motion or entry of this Interim Order is required.

F. *Debtors' Stipulations*. In exchange for and as a material inducement to the Prepetition Secured Parties for their respective consent to the Debtors' use of Cash Collateral, the Debtors hereby admit, stipulate, acknowledge, and agree that:

i. *Senior Secured Notes*. Getty Images, Inc. ("Getty Images") issued 11.25% first-lien senior secured notes due 2030 (the "SSNs" and the noteholders thereof, the "Secured Noteholders") pursuant to that certain Indenture (the "Indenture"), dated May 5, 2025, by and among Getty Images, the guarantors party thereto (together with Getty Images, the "Prepetition SSN Obligors"), and U.S. Bank Trust Company, National Association, in its capacity as trustee (in such capacity, the "Prepetition SSN Trustee") and notes collateral agent (in such capacity, the "Prepetition SSN Collateral Agent" and together with the Prepetition SSN Trustee and the Secured Noteholders, the "Prepetition SSN Secured Parties").

ii. *SSN Collateral*. To secure the Prepetition SSN Obligations, the Prepetition SSN Obligors granted to the Prepetition SSN Collateral Agent pursuant to that certain Notes Security Agreement, dated as of May 5, 2025, by and among Getty Images, the other grantors party thereto, and the Prepetition SSN Collateral Agent (the "Prepetition SSN Security Agreement" and

[3] "Restructuring Support Agreement" means that certain Restructuring Support Agreement dated October 12, 2026 (as amended, amended and stated, or otherwise modified in accordance with its terms).

collectively with the Indenture and all other agreements, documents, instruments, and certificates executed or delivered in connection therewith, the "Prepetition SSN Documents"), for the benefit of itself and the Prepetition SSN Secured Parties, valid, binding, perfected and continuing liens, mortgages, and security interests (collectively, the "Prepetition SSN Liens") in the Collateral (as defined and further described in the Indenture and the Prepetition SSN Security Agreement, the "Prepetition SSN Collateral") constituting substantially all assets of the Prepetition SSN Obligors (including cash).

iii. *SSN Obligations*. As of the Petition Date, without defense, counterclaim, reduction, avoidance, recharacterization, or offset of any kind, the Prepetition SSN Obligors were jointly and severally indebted to the Secured Noteholders in the aggregate principal amount of $539,900,000.00, plus any other amounts incurred or accrued but unpaid prior to the Petition Date in accordance with the Prepetition SSN Documents, including, without limitation, principal, accrued and unpaid interest, premiums, any reimbursement obligations (contingent or otherwise), any fees, expenses and disbursements, indemnification obligations, any other charges, amounts and costs of whatever nature owing, whether or not contingent, whenever arising, accrued, accruing, due, owing or chargeable in respect thereof, in each case, to the extent provided in the Prepetition SSN Documents (collectively, the "Prepetition SSN Obligations").

iv. *Prepetition Credit Agreement*. Prior to the Petition Date, certain Debtors were parties to that certain Credit Agreement, dated as of February 19, 2019 (as amended, restated, amended and restated, supplemented, waived or otherwise modified prior to the Petition Date, the "Prepetition Credit Agreement"), among ABE Investment Holdings, Inc. and Getty Images as borrowers (together, the "Prepetition Credit Agreement Borrowers"), the other loan parties thereto (together with the Prepetition Credit Agreement Borrowers, the "Prepetition Credit Agreement

Obligors"), JPMorgan Chase Bank, N.A., in its capacity as administrative agent and collateral agent (in such capacity, the "Prepetition Credit Agreement Agent" and together with the Prepetition SSN Collateral Agent, the "Prepetition Agents"), and the lenders from time to time party thereto (collectively, the "Prepetition Credit Agreement Lenders" and, together with the Prepetition Credit Agreement Agent, the "Prepetition Credit Agreement Secured Parties"), pursuant to which the applicable Debtors incurred the obligations described below. The Prepetition Credit Agreement, together with all guarantees, security documents, intercreditor agreements and other agreements, documents and instruments executed or delivered in connection therewith, including that certain Security Agreement, dated as of February 19, 2019, by and among Griffey Midco (DE), LLC, as holdings, ABE Investment Holdings, Inc. and Getty Images, as borrowers, the subsidiary grantors party thereto, and the Prepetition Credit Agreement Agent, as collateral agent (the "Prepetition Credit Agreement Security Agreement"), each as amended, restated, supplemented, waived or otherwise modified prior to the Petition Date, are collectively the "Prepetition Credit Agreement Documents." The Prepetition Credit Agreement Secured Parties and the Prepetition SSN Secured Parties are collectively the "Prepetition Secured Parties." The Prepetition Credit Agreement Documents and the Prepetition SSN Documents are collectively the "Prepetition Secured Facilities Documents."

v. *Prepetition Credit Agreement Obligations*. As of the Petition Date, without defense, counterclaim, reduction, avoidance, recharacterization, or offset of any kind, the applicable Debtors were jointly and severally indebted to the Prepetition Credit Agreement Lenders in the aggregate principal amount of (a) $150,000,000.00 in senior secured RCF loans (such amounts outstanding thereunder, the "Prepetition RCF Claims"); (b) $40,100,000.00 in senior secured USD term loans; and (c) €407,000,000.00 in senior secured Euro term loans, plus

any other amounts incurred or accrued but unpaid prior to the Petition Date in accordance with the Prepetition Credit Agreement Documents, including, without limitation, principal, accrued and unpaid interest, premiums, any reimbursement obligations (contingent or otherwise), any fees, expenses and disbursements, indemnification obligations, any other charges, amounts and costs of whatever nature owing, whether or not contingent, whenever arising, accrued, accruing, due, owing or chargeable in respect thereof, in each case, to the extent provided in the Prepetition Credit Agreement Documents (collectively, the "Prepetition Credit Agreement Obligations" and together with the Prepetition SSN Obligations, the "Prepetition Secured Obligations").

vi. *Prepetition Credit Agreement Collateral*. To secure the Prepetition Credit Agreement Obligations, the Prepetition Credit Agreement Obligors granted to the Prepetition Credit Agreement Agent pursuant to the Prepetition Credit Agreement Security Agreement, for the benefit of itself and the Prepetition Credit Agreement Secured Parties, valid, binding, perfected and continuing liens, mortgages, and security interests (collectively, the "Prepetition Credit Agreement Liens" and together with the Prepetition SSN Liens, the "Prepetition Liens") in the Collateral (as defined and further described in the Prepetition Credit Agreement and the Prepetition Credit Agreement Security Agreement, the "Prepetition Credit Agreement Collateral" and together with the Prepetition SSN Collateral, the "Prepetition Collateral") constituting substantially all assets of the Prepetition Credit Agreement Obligors (including cash).

vii. *Validity, Perfection and Priority*. Subject to paragraph 34 and the rights expressly preserved herein, the Debtors acknowledge the validity, enforceability, priority and perfection of the Prepetition Secured Obligations and the Prepetition Liens, and acknowledge that the Prepetition Secured Obligations are first-priority, valid, and properly perfected secured obligations and the Prepetition Secured Parties are entitled to the rights and remedies provided in

the Prepetition Secured Facilities Documents, any applicable intercreditor agreement, applicable law and this Interim Order.

viii. *Cash Collateral and Releases*. The Debtors acknowledge that the Prepetition Secured Parties have valid, first-priority, properly perfected liens on, and interests in, Cash Collateral, including cash, deposit accounts, collection accounts and proceeds of Prepetition Collateral. Subject to this Interim Order, including the Adequate Protection Claims, the Adequate Protection Liens and Adequate Protection Payments authorized herein, the Prepetition Secured Parties consent to the Debtors' use of Cash Collateral to the extent expressly provided herein. The Debtors further acknowledge and agree to the releases, waivers and reservations of rights set forth in the Prepetition Secured Facilities Documents, that certain First Lien Intercreditor Agreement, dated as of May 5, 2025, among ABE Investment Holdings, Inc., Getty Images, the other grantors party thereto, JPMorgan Chase Bank, N.A., as the credit agreement collateral agent and credit agreement representative, U.S. Bank Trust Company, National Association, as the notes collateral agent and notes trustee and each additional agent from time to time party thereto (the "Prepetition Intercreditor Agreement"), and this Interim Order, including in paragraph 44 with respect to the Prepetition Secured Parties, subject to paragraph 34.

ix. *Challenge Period*. The stipulations, admissions, releases and waivers contained in this paragraph F are subject to paragraph 34 below.

G. *Findings Regarding Postpetition Financing*.

i. *Request for Postpetition Financing*. The Debtors have requested the DIP Facility from the DIP Secured Parties and the use of Cash Collateral upon the terms and conditions of the DIP Credit Agreement, this Interim Order, and the other DIP Documents.

ii. *Good Cause*. Good and sufficient cause has been shown for entry of this Interim Order and for authorization of the Debtors to use Cash Collateral and obtain financing pursuant to the DIP Documents as set forth in this Interim Order.

iii. *Need for Postpetition Financing and Use of Cash Collateral*. The Debtors' ability to use Cash Collateral and to obtain the credit available under the DIP Facility as provided for herein and in the other DIP Documents is necessary to avoid immediate and irreparable harm to the Debtors, their estates, their creditors, and other parties in interest, pending a Final Hearing, and is necessary to enable the Debtors to, among other things, fund the costs of these Chapter 11 Cases, make payroll, satisfy other working capital and general corporate purposes, and administer and preserve the value of their estates. The ability of the Debtors to finance their operations, maintain business relationships with their vendors and suppliers, and pay their employees requires the availability of working capital from the DIP Facility and the use of Cash Collateral. The Debtors' inability to access the financing under the DIP Facility and use Cash Collateral will harm the Debtors, their estates, their creditors, and the Debtors' chances to successfully reorganize. The Debtors do not have sufficient available sources of working capital and financing to operate their businesses or maintain their properties in the ordinary course of business without the DIP Facility and authorized use of Cash Collateral. The terms of the DIP Facility, this Interim Order, and the other DIP Documents are fair and reasonable, reflect the Debtors' exercise of sound business judgment, and are supported by reasonably equivalent value.

iv. *No Credit Available on More Favorable Terms*. As set forth in the DIP Declarations, the DIP Facility is the best source of debtor-in-possession financing available to the Debtors. Given their current financial condition, financing arrangements, and capital structure, the Debtors have been unable to obtain financing from sources other than the DIP Secured Parties

on terms more favorable than those provided under the DIP Facility and the DIP Documents. The Debtors have been unable to obtain sufficient unsecured credit allowable as an administrative expense under section 503(b)(1) of the Bankruptcy Code. The Debtors also have been unable to obtain sufficient credit (a) having a priority over administrative expenses of the kind specified in sections 503(b), 507(a), and 507(b) of the Bankruptcy Code, or (b) secured solely by a lien on property of the Debtors and their estates that is not otherwise subject to a lien. Postpetition financing is not otherwise available without granting the DIP Collateral Agent, for the benefit of itself and the other DIP Secured Parties: (1) the DIP Liens (as defined below) on all DIP Collateral as set forth herein; (2) the DIP Superpriority Claims (as defined below); and (3) the other protections set forth in this Interim Order, in each case, subject to the priorities set forth herein. After considering all alternatives, the Debtors have properly concluded, in the exercise of their sound business judgment, that the DIP Facility represents the best financing available to them at this time, and that entry into the DIP Facility is in the best interests of all of their stakeholders.

v. *Use of Proceeds of the DIP Facility and Cash Collateral*. As a condition to entry into the DIP Credit Agreement and the other DIP Documents, the extensions of credit under the DIP Facility, and the authorization to use Cash Collateral (including, without limitation, the proceeds of the DIP Facility), the DIP Secured Parties and Prepetition Secured Parties require, and the Debtors have agreed, that Cash Collateral and the proceeds of the DIP Facility shall be used only in a manner consistent with the terms and conditions of this Interim Order and the other DIP Documents and in accordance with the Approved Budget.

vi. *Willingness to Provide Financing*. The DIP Lenders have indicated a willingness to provide postpetition financing to the Debtors subject to, and in express reliance on, among other things: (a) the entry by the Court of this Interim Order; (b) the entry by the Court of

the Final Order; (c) approval by the Court of the terms and conditions of the DIP Facility and the DIP Documents; and (d) entry of findings by the Court that such financing is essential to the Debtors' estates, that the DIP Lenders are extending postpetition credit to the Debtors pursuant to the DIP Documents and this Interim Order in good faith, and that the DIP Secured Parties' claims, superpriority claims, security interests, liens, and other protections granted pursuant to this Interim Order and the other DIP Documents will have the protections provided in section 364(e) of the Bankruptcy Code and will not be affected by any subsequent reversal, modification, vacatur, amendment, reargument, or reconsideration of this Interim Order or any other order of the Court, or any provision hereof or thereof that is vacated, reversed, or modified, on appeal or otherwise.

vii. *Business Judgment and Good Faith Pursuant to Section 364(e)*. The terms and conditions of the DIP Facility, including the extensions of credit, the fees, and other amounts paid and to be paid thereunder, the refinancing, repayments and equity conversion rights and terms contemplated thereby (including in the DIP Documents), and the Cash Collateral arrangements described therein and herein: (a) are fair, just, and reasonable; (b) are the best available to the Debtors under the circumstances; (c) reflect each Debtor's exercise of prudent business judgment consistent with its fiduciary duties; (d) are appropriate for secured financings to a debtor in possession on behalf of its bankruptcy estate; (e) are supported by reasonably equivalent value and fair consideration; and (f) have been negotiated in good faith and at arm's length by and among the DIP Secured Parties, the Prepetition Secured Parties, and the Debtors; *provided*, nothing in this sentence shall limit the provisions of paragraph 37 of this Interim Order. The DIP Facility and the extension of credit under the terms of the DIP Documents are extended (and shall be deemed to have been extended) (x) in "good faith" by the DIP Agent and each DIP Lender, as that term is used in section 364(e) of the Bankruptcy Code, and in express reliance upon the protections offered

by section 364(e) of the Bankruptcy Code, and (y) for valid business purposes, and the DIP Secured Parties (a) are entitled to the full protections and benefits afforded under section 364(e) of the Bankruptcy Code and (b) will not be affected by any subsequent reversal, modification, vacatur, amendment, reargument, or reconsideration of this Interim Order or any other order of the Court, or any provision hereof or thereof that is vacated, reversed, or modified, on appeal or otherwise. The findings set forth in this paragraph G(vii) are effective on a final basis as of the entry of this Interim Order.

viii. *Adequate Protection*. The Prepetition Secured Parties are entitled to adequate protection of their interests in the Prepetition Collateral, including the Cash Collateral relating thereto, pursuant to section 361 of the Bankruptcy Code in connection with or as a consequence of the Debtors' use of the Cash Collateral as contemplated and authorized by this Interim Order. The adequate protection set forth in this Interim Order consisting of (a) the granting of the Adequate Protection Claims (as defined below), (b) the granting of the Adequate Protection Liens (as defined below), and (c) the payment of the Adequate Protection Payments (as defined below), each as provided and authorized by this Interim Order, are fair, reasonable, and appropriate under the circumstances and sufficient for purposes relating to the use of Cash Collateral pursuant to this Interim Order and the other DIP Documents, and any Diminution in Value (as defined below). "Diminution in Value" means the diminution in value of the Prepetition Secured Parties' (x) Cash Collateral, and (y) other Prepetition Collateral, in each case, from and after the Petition Date, including any diminution in value arising from (i) the sale, lease, or use by the Debtors of such Cash Collateral during these Chapter 11 Cases, (ii) the incurrence of the DIP Facility, and (iii) the imposition of the automatic stay pursuant to section 362 of the Bankruptcy Code.

ix. *Corporate Authority*. Each Debtor has the requisite corporate power and authority to execute and deliver the DIP Documents to which it is a party and to perform its obligations thereunder.

x. *No Control*. No DIP Secured Party or Prepetition Secured Party controls the Debtors, or is an insider or control person of the Debtors, solely on account of the DIP Facility, the DIP Documents, or any action taken under them. Nothing in this Interim Order determines any DIP Secured Party's status arising from its equity ownership, board representation, or prepetition claims, and all rights with respect to each such status are reserved. The DIP Secured Parties are not a "responsible person" or "owner or operator" under CERCLA or similar laws.

H. *Section 506(c); Marshaling*. As a material inducement to the DIP Lenders to agree to provide the DIP Facility, and to the Prepetition Secured Parties to consent to the use of their Cash Collateral to the extent set forth herein,. and in light of the DIP Secured Parties' agreement to subordinate their liens and superpriority claims to the Carve Out and the Prepetition Liens (on the Prepetition Collateral), as applicable, and as otherwise set forth herein, each solely to the extent set forth herein and in the DIP Documents, the DIP Secured Parties and the Prepetition Secured Parties are each entitled to receive a waiver of (a) the provisions of section 506(c) of the Bankruptcy Code; and (b) the application of the equitable doctrine of marshaling, which waivers are appropriate and shall be effective upon entry of this Interim Order.

I. *Relief Essential; Best Interests of the Debtors' Estates*. Absent entry of this Interim Order, the Debtors' businesses, properties, and estates will be immediately and irreparably harmed. The Court concludes that entry of this Interim Order is in the best interests of the Debtors' estates and creditors.

J. *Immediate Entry and Effectiveness*. Based upon the evidence presented in the First Day Declaration and the DIP Declarations and at the Interim Hearing, sufficient cause exists for immediate entry and effectiveness of this Interim Order pursuant to Bankruptcy Rule 4001(c)(2).

**NOW, THEREFORE**, based upon the foregoing findings and conclusions, the DIP Motion, the First Day Declaration, the DIP Declarations, and the record made before the Court with respect to the DIP Motion at the Interim Hearing and otherwise, and after due consideration, and good and sufficient cause appearing therefor,

**IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT:**

1. *Motion Approved*. The DIP Motion is hereby granted on an interim basis, on the terms and conditions set forth in this Interim Order and the other DIP Documents. All formal and informal objections to the relief sought in the DIP Motion or to the entry of this Interim Order, to the extent not withdrawn or resolved, and all reservations of rights included therein, are hereby overruled. This Interim Order shall become effective immediately upon its entry on the Court's docket with respect to these Chapter 11 Cases.

2. *Authorization of the DIP Facility*.

a) The DIP Facility is hereby approved on an interim basis. The Debtors are, on an interim basis, expressly and immediately authorized, empowered and directed to (a) establish the DIP Facility, (b) execute, deliver, and, on such execution and delivery, perform and comply under the DIP Documents, and to incur, guarantee (as applicable), perform, and pay the DIP Obligations and create and grant the DIP Liens on the DIP Collateral in favor of the DIP Collateral Agent for the benefit of the DIP Secured Parties in accordance with the terms of this Interim Order and the other DIP Documents, as applicable, (c) execute, deliver, and, on such execution and delivery, perform and comply under any and all other instruments, certificates, agreements

(including the Segregated Account Control Agreement), and documents which may be requested by the DIP Secured Parties, and (d) take any and all other actions that may be required, necessary, or prudent for the performance by the applicable Debtor under the DIP Facility, the DIP Documents, the creation and perfection of the DIP Liens, or to implement any of the transactions contemplated by the DIP Documents or this Interim Order. Without limiting the foregoing, by this Interim Order, the Debtors are authorized and directed to pay all DIP Obligations, which amounts are approved by this Interim Order, and shall not be subject to further approval of this Court and shall be non-refundable and not subject to challenge in any respect. Upon execution and delivery, the DIP Documents represent valid, binding, and non-avoidable obligations of the Debtors, enforceable against each of the Debtors and their estates, and the DIP Obligations shall be payable, in each case, in accordance with the terms of this Interim Order and the DIP Documents for all purposes during these Chapter 11 Cases, and any subsequently converted Chapter 11 Case of any Debtor under chapter 7 of the Bankruptcy Code, or after the dismissal of any Chapter 11 Case. The DIP Secured Parties shall be authorized to rely upon any such person's execution and delivery of any of the DIP Documents and any amendments thereto as having done so with all requisite power and authority to do so (subject to any necessary approvals of the Court), and the execution and delivery of any of the DIP Documents or any amendments thereto by any such person on behalf of such DIP Obligor shall be conclusively presumed to have been duly authorized by all necessary corporate, limited liability company, or other entity action (as applicable) of such DIP Obligor (subject to any necessary approvals of the Court).

b) The Debtors are authorized and empowered to borrow, jointly and severally, under the DIP Facility up to a maximum amount of (a) $85,000,000.00 of Interim Initial DIP Loans; and (b) $30,000,000.00 of Delayed-Draw DIP Loans (together, the "Interim DIP Loan

Commitment Amount”), in each case, subject to the terms of this Interim Order and the other DIP Documents, through and including the Final Hearing, and incur indebtedness and the DIP Obligations (as defined below) pursuant to the terms, covenants, and conditions of the DIP Documents, including this Interim Order.

c) The DIP Guarantors are hereby authorized and directed, on an interim basis, to unconditionally guarantee, on a joint and several basis, the repayment of the DIP Obligations.

d) The DIP Secured Parties shall have no obligation to make any loan or advance under the DIP Documents unless all of the conditions precedent to the making of such extensions of credit under the DIP Documents and this Interim Order have been satisfied in full or waived in accordance with the DIP Documents.

e) For purposes hereof, the term “DIP Obligations” means all obligations of the DIP Obligors under the DIP Documents and includes, without limitation, principal, interest (including payment in kind), fees (including the DIP Exit Fee (as defined below)), costs, premiums, equity conversion rights and terms, expenses, charges, prepayment premiums, or similar amounts, any obligations in respect of indemnity claims, whether contingent or absolute, or any other amounts that are or may become due under the DIP Documents, without the need to obtain further Court approval. This Interim Order and the other DIP Documents shall evidence the DIP Obligations, which shall, upon execution and delivery of the DIP Documents, as applicable, be valid, binding, non-avoidable, and enforceable against the Debtors, their estates, and any successors thereto, including, without limitation, any estate representative or trustee appointed in any of the Chapter 11 Cases, or any case under chapter 7 of the Bankruptcy Code upon the conversion of any of the Chapter 11 Cases, or in any other proceedings superseding or related to any of the foregoing (collectively, the “Successor Cases”), and/or upon the dismissal of any of the

Chapter 11 Cases or any such Successor Cases, and their creditors, shareholders, and other parties in interest, in each case, in accordance with the terms of this Interim Order and the applicable DIP Documents. All obligations incurred, rights granted, payments made, and transfers or grants of security and liens set forth in this Interim Order and/or the other DIP Documents by any Debtor are granted for fair consideration and reasonably equivalent value. Such obligations are granted contemporaneously with the making of the loans and/or commitments and other financial accommodations relating thereto. No obligation, payment, transfer, or grant of security or lien or other rights hereunder and/or under any other DIP Document (including any DIP Obligations or DIP Liens) shall be stayed, restrained, voidable, avoidable, or recoverable, under the Bankruptcy Code or under any other applicable law (including, without limitation, under sections 502(d), 544, and 547 to 550 of the Bankruptcy Code or under any applicable state Uniform Voidable Transfer Act, Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act, or similar statute or common law), or subject to any avoidance, reduction, setoff, recoupment, offset, recharacterization, subordination (whether equitable, contractual, or otherwise), counterclaim, cross-claim, defense, disallowance, or any other challenge under the Bankruptcy Code or any applicable law or regulation by any person or entity. Nothing in this paragraph 2(e) shall limit the provisions of paragraph 37 of this Interim Order

3. *Segregated DIP Account*.

a) All proceeds of the DIP Facility shall be deposited into a segregated account of the Borrower (the "Segregated DIP Account"), which will be subject to the DIP Liens on a first priority basis and subject to a deposit account control agreement in favor of the DIP Agent (the "Segregated Account Control Agreement"), which Segregated Account Control Agreement shall be in form and substance acceptable to the DIP Agent and DIP Lenders. The identity of the banking

or other financial institution with which the Debtors establish the Segregated DIP Account (the "Segregated Account Bank") shall be acceptable to the DIP Lenders.

b) On each borrowing date under the DIP Credit Agreement, the DIP Lenders will advance funds to the DIP Agent and the DIP Agent will deposit such funds into the Segregated DIP Account. The Borrower may withdraw amounts from the Segregated DIP Account, and deposit such amounts into other bank accounts maintained by the Debtors, on the Closing Date (as defined in the DIP Credit Agreement) and on each Monday following the Closing Date; *provided*, that the amounts so withdrawn by the Borrower shall not exceed the amount needed for payments that are contemplated to be made during the two-week period following the Closing Date or such Monday as expressly set forth in the Approved Budget (plus an additional 20% of such contemplated payments for such weeks) (such withdrawal, an "Approved Budget Withdrawal"). If an Approved Budget Withdrawal includes amounts in respect of any particular week, any subsequent Approved Budget Withdrawal shall not be permitted to include such amounts previously withdrawn. The Borrower may also withdraw amounts from the Segregated DIP Account for the Carve Out Reserves in accordance with this Interim Order, and deposit such amounts in the Funded Reserve Account (as defined below), subject to the terms of this Interim Order (such withdrawal, a "Carve Out Withdrawal"). The Borrower shall not be permitted to withdraw cash from the Segregated DIP Account (other than an Approved Budget Withdrawal or a Carve Out Withdrawal) without the prior written consent (including by email from the DIP Lenders or their counsel) of the DIP Lenders (such consent not to be unreasonably withheld so long as the Borrower is in compliance with the Minimum Liquidity Covenant (as defined in the DIP Credit Agreement)). Except with respect to an Approved Budget Withdrawal or a Carve Out Withdrawal, the proceeds of the DIP Facility shall not be transferred into any other account held

by any Debtor or any of its subsidiaries, or commingled with any other cash held by any Debtor or any of its subsidiaries. No less than one (1) Business Day prior to withdrawing funds from the Segregated DIP Account, the Debtors shall provide the DIP Agent, the DIP Lenders and the Consenting Shareholder Advisors with a written notice (email being sufficient) of their next-planned withdrawal (including the amounts the Debtors plan to withdraw).

c) The Borrower shall be permitted to use funds withdrawn from the Segregated DIP Account only to the extent such uses are consistent with the Approved Budget (subject to Permitted Variances) or the Carve Out (each as defined below). Once withdrawn from the Segregated DIP Account, the funds shall continue to be DIP Priority Collateral (as defined below) until such funds are first used by the Debtors; *provided*, that any such funds that are deposited in the Funded Reserve Account or the Carve Out Reserve (in each case, as defined below) in accordance with the Carve Out provisions of this Interim Order shall not constitute DIP Priority Collateral.

d) The Segregated Account Bank shall not be permitted to setoff, net or offset (or otherwise utilize) the funds deposited in the Segregated DIP Account except in respect of fees owed to the Segregated Account Bank relating to the Segregated DIP Account, or as otherwise agreed in writing by the DIP Agent (at the direction of the DIP Lenders).

e) If, at any time, the Segregated DIP Account is not subject to a Segregated Account Control Agreement, the terms of the Control Rider, attached hereto as Exhibit 2, shall apply in respect of the Segregated DIP Account and the Segregated Account Bank.

f) For the avoidance of doubt, the Segregated DIP Account, all cash deposited in it or withdrawn therefrom, and the DIP Priority Collateral (i) do not constitute, and shall be deemed not to be, Prepetition Collateral and (ii) are not subject to the Prepetition Liens. For the

avoidance of doubt, no Prepetition Liens, no Adequate Protection Liens and no other liens whatsoever shall attach to the Segregated DIP Account or any cash deposited therein or withdrawn therefrom. For the avoidance of doubt, the Segregated DIP Account and the cash deposited therein does not constitute the Prepetition Secured Parties' Cash Collateral.

4. *DIP Liens*.

a) Subject to the Carve Out (as defined below), as security for the DIP Obligations, immediately upon and effective as of the date of this Interim Order, the DIP Collateral Agent, for the benefit of itself and each of the other DIP Secured Parties, is hereby granted continuing, valid, binding, enforceable, non-avoidable, and automatically and properly perfected security interests in and liens (collectively, the "DIP Liens") on all DIP Collateral (as defined below) as collateral security for the prompt and complete performance and payment when due (whether at the stated maturity, by acceleration, or otherwise) of all of the DIP Obligations. For the avoidance of doubt, whether or not any Event of Default (as defined in the DIP Credit Agreement) has occurred, the DIP Liens shall attach to all proceeds of DIP Collateral.

b) The term "DIP Collateral" means, without limitation, all assets and properties (whether tangible, intangible, real, personal or mixed) of the DIP Obligors, whether now owned by or owing to, or hereafter acquired by, or arising in favor of, the DIP Obligors (including under any trade names, styles, or derivations thereof), and whether owned or consigned by or to, or leased from or to, the DIP Obligors, and regardless of where located, including, without limitation, all of the DIP Obligors' rights, title and interest in: (i) monies, cash (including without limitation, promotional cash) and cash equivalents, (ii) lockbox accounts, commodities accounts, or other accounts owned by any DIP Obligors, (iii) all real estate, (iv) inventory (wherever located) and including without limitation inventory in transit, equipment and any accessions thereto, and

fixtures, (v) proceeds of leasehold interests, (vi) commercial tort claims, (vii) deposit and cash accounts, (viii) investment property, (ix) documents, (x) accounts, (xi) chattel paper (whether electronic or tangible), (xii) intercompany accounts, loans or obligations (however characterized or described by the DIP Obligors), (xiii) general intangibles (including patents, trademarks and other intellectual property), (xiv) instruments (including promissory notes), (xv) insurance, including without limitation business interruption insurance, (xvi) equity interests, including (without limitation) the Specified Foreign Equity (as defined below), (xvii) supporting obligations, (xviii) proceeds of all of the foregoing, and (xix) subject to the entry of the Final Order, proceeds of any avoidance or recovery actions, brought pursuant to sections 502(d), 506(c), 544, 545, 547, 548, 549, 550, 551, 553(b) or 724(a) of the Bankruptcy Code ("Avoidance / Recovery Actions"), and (xx) all collateral classified as "DIP Collateral" in the DIP Credit Agreement; *provided*, that the DIP Collateral shall not include any Excluded Assets (as defined in the DIP Credit Agreement); *provided*, *further*, that any restrictions on the Prepetition Secured Parties' rights to exercise remedies in respect of the Trademark Option Agreement (as defined in the Restructuring Support Agreement) or the Trademarks (as defined in the Restructuring Support Agreement) that are set forth in the Prepetition Secured Facilities Documents or the Trademark Option Agreement shall apply *mutatis mutandis* to the DIP Secured Parties' rights to exercise remedies in respect of the Trademark Option Agreement and the Trademarks, subject to the priorities set forth in this Interim Order.

c) To the fullest extent permitted by the Bankruptcy Code or applicable law, any provision of any lease, loan document, easement, use agreement, proffer, covenant, license, contract, organizational document, or other instrument or agreement that requires the consent or the payment of any fees or obligations to any domestic or foreign governmental or non-

governmental entity or the taking of any other actions in order for the DIP Obligors to pledge, grant, mortgage, sell, assign, or otherwise transfer any fee or leasehold interest or the proceeds thereof or other DIP Collateral, shall have no force or effect with respect to the grant, attachment, or perfection of DIP Liens on such fee or leasehold interests or the proceeds thereof or other applicable DIP Collateral in favor of the DIP Secured Parties in accordance with the terms of the applicable DIP Document and this Interim Order.

d) *Challenging Liens*. Other than with respect to the Prepetition Liens that secure the Prepetition Secured Obligations, and the Credit Card Company's (as defined in the Cash Management Motion)[4] Permitted Prior Lien (as defined below) on the collateral held in the Restricted Cash Account (as defined in the Cash Management Motion) for the Debtors' obligations under the Credit Card Program (as defined in the Cash Management Motion), the DIP Agent shall have the right to challenge the amount, validity, priority, and perfection of any lien or security interest filed against the DIP Collateral that purports to be senior to or *pari passu* with any DIP Lien, including, but not limited to, any lien or security interest that, if found to be valid, enforceable, non-avoidable, and perfected, would constitute a Permitted Prior Lien.

5. *Priority of DIP Liens*.

a) The DIP Liens shall have the following priorities:

i. Pursuant to section 364(d)(1) of the Bankruptcy Code (to the extent applicable) and section 364(c)(2) of the Bankruptcy Code, the DIP Liens shall be valid, enforceable, non-avoidable, continuing, and automatically and fully perfected first priority liens on and security

[4] "Cash Management Motion" means the *Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Continue to Operate the Cash Management System, (B) Honor Certain Prepetition Obligations Related Thereto, (C) Maintain Existing Business Forms, and (D) Continue Intercompany Transactions, (II) Granting Administrative Expense Status to Postpetition Intercompany Transactions, and (III) Granting Related Relief* [Docket. No. 13].

interests in (i) the thirty-five percent of the equity interests of foreign subsidiaries directly owned by each Debtor that is not included in the Prepetition Collateral (the "Specified Foreign Equity"); (ii) the Previously Unencumbered Property (as defined below); (iii) the Segregated DIP Account and all amounts deposited therein and withdrawn therefrom; and (iv) subject to the entry of the Final Order, proceeds of all Avoidance / Recovery Actions (collectively, the "DIP Priority Collateral"); *provided* that all such DIP Liens shall be subject to the Carve Out (as defined below). The term "Previously Unencumbered Property" means all property of the Debtors, whether existing on the Petition Date or thereafter acquired, that is not Prepetition Collateral or otherwise subject to (i) valid, perfected, and non-avoidable liens in existence immediately prior to the Petition Date or (ii) valid and non-avoidable liens perfected after the Petition Date to the extent permitted by section 546(b) of the Bankruptcy Code. The DIP Liens (x) shall rank first priority with respect to, and be senior to all other liens and security interests in, the DIP Priority Collateral, and (y) shall be granted pursuant to section 364(d)(1) of the Bankruptcy Code to the extent necessary to effectuate the foregoing clause (x). For the avoidance of doubt, the Debtors shall not be permitted to incur any lien or security interest on the DIP Priority Collateral that is senior to, or *pari passu* with, the DIP Liens on the DIP Priority Collateral or (other than the DIP Liens) senior to, or *pari passu* with, the Adequate Protection Liens on the applicable DIP Priority Collateral.

ii. Pursuant to section 364(d)(1) of the Bankruptcy Code (to the extent applicable) and section 364(c)(3) of the Bankruptcy Code, the DIP Liens shall be valid, enforceable, non-avoidable, continuing, and automatically and fully perfected junior liens on and security interests in: (i) all property of the Debtors, whether existing on the Petition Date or thereafter acquired, that constitutes Prepetition Collateral, *provided* that such DIP Liens shall be junior to any lien on property that constitutes Prepetition Collateral securing the Prepetition Secured

Obligations, any related Permitted Prior Liens, and any Adequate Protection Liens with respect thereto, but shall be senior to all other liens and claims; *provided*, *further*, that all such DIP Liens shall be subject to the Carve Out, and (ii) all property of the Debtors (other than Prepetition Collateral and DIP Priority Collateral), whether existing on the Petition Date or thereafter acquired, that is subject to (1) valid, perfected, and non-avoidable liens in existence immediately prior to the Petition Date or (2) valid and non-avoidable liens perfected after the Petition Date to the extent permitted by section 546(b) of the Bankruptcy Code (the liens in these clauses (1) and (2), collectively, the "Permitted Prior Liens"); *provided* that such DIP Liens shall be junior to any Permitted Prior Liens (if any), but shall be senior to all other liens and claims; *provided*, *further*, that all such DIP Liens shall be subject to the Carve Out.

b) Except as expressly set forth herein, and subject in all respects to the DIP Documents (and, for the avoidance of doubt, except with respect to the Prepetition Liens, Adequate Protection Claims, Adequate Protection Liens, and Permitted Prior Liens, in each case, with respect to the Prepetition Collateral), the DIP Liens and the DIP Superpriority Claims (as defined below): (i) shall not be made subject to or *pari passu* with (A) any lien, security interest, or claim heretofore or hereafter granted or otherwise incurred in any of the Chapter 11 Cases or any Successor Cases and shall be valid and enforceable against the Debtors, their estates, any trustee, or any other estate representative appointed or elected in the Chapter 11 Cases or any Successor Cases and/or upon the dismissal of any of the Chapter 11 Cases or any Successor Cases, (B) any lien that is avoided and preserved for the benefit of the Debtors and their estates under section 551 of the Bankruptcy Code or otherwise, and (C) any intercompany or affiliate lien or claim; and (ii) shall not be subject to sections 506(c), 510, 549, 550, or 551 of the Bankruptcy Code. No reclamation or return right, including under section 546(c) of the Bankruptcy Code, shall have priority over or equal to, or be

senior to or *pari passu* with, the DIP Liens or the DIP Superpriority Claims. For the avoidance of doubt, the DIP Liens shall be junior to the Prepetition Liens, the Adequate Protection Liens, and the Permitted Prior Liens with respect to the Prepetition Collateral.

c) Any proceeds or distributions of the DIP Collateral shall be distributed among the DIP Secured Parties in accordance with this Interim Order and the DIP Documents. Notwithstanding anything herein to the contrary, to the extent any DIP Secured Parties receive or retain any recovery on account of any Prepetition Collateral prior to payment in full of all Prepetition Secured Obligations and Adequate Protection Claims, the DIP Secured Parties shall hold such amounts in trust for the benefit of the Prepetition Secured Parties and, as soon as possible after receipt of such amounts, turn over such amounts to the Controlling Collateral Agent (as defined in the Prepetition Intercreditor Agreement). In the event of any dispute as to the amount of any recovery on account of Prepetition Collateral, the DIP Secured Parties and the Prepetition Secured Parties shall submit such dispute to the Court.

6. *DIP Superpriority Claims*

a) Effective as of the Petition Date, but subject to the Carve Out, immediately upon entry of this Interim Order, the DIP Collateral Agent, for itself and for the benefit of the other DIP Secured Parties, is hereby granted, pursuant to sections 364(c)(1) and 507(b) of the Bankruptcy Code, an allowed superpriority administrative expense claim in each of the Chapter 11 Cases or any Successor Cases (the "DIP Superpriority Claims"), on account of the DIP Obligations, (i) with priority over any and all administrative expense claims, unsecured claims, and all other claims against the Debtors or their estates in any of the Chapter 11 Cases or any Successor Cases, at any time existing or arising, of any kind or nature whatsoever, including, without limitation, administrative expenses, unsecured claims, or other claims of the kinds

specified in or ordered pursuant to sections 105, 326, 327, 328, 330, 331, 361, 364(c)(1), 365, 503(a), 503(b), 506(c), 507(a), 507(b), 546(c), 546(d), 726, 1113, and 1114 of the Bankruptcy Code (including adequate protection claims (other than the Adequate Protection Claims (as defined below) granted herein)), and any other provision of the Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy, or attachment, and (ii) which shall at all times be senior to the rights of the Debtors and/or their estates, and any trustee appointed in the Chapter 11 Cases or any Successor Cases to the extent permitted by law, and which DIP Superpriority Claims shall, for purposes of section 1129(a)(9)(A) of the Bankruptcy Code, be considered administrative expenses allowed under section 503(b) of the Bankruptcy Code, and shall be against each Debtor on a joint and several basis (without the need to file any proof of claim); *provided*, that the DIP Superpriority Claims shall rank immediately junior to the Adequate Protection Claims.

b) As among the DIP Secured Parties, any distributions or payments in respect of the DIP Superpriority Claims shall be governed by the terms of the DIP Documents. Notwithstanding anything herein to the contrary, to the extent any DIP Secured Parties receive or retain any recovery on account of any Prepetition Collateral prior to payment in full of all Prepetition Secured Obligations and Adequate Protection Claims, the DIP Secured Parties shall hold such amounts in trust for the benefit of the Prepetition Secured Parties and, as soon as possible after receipt of such amounts, turn over such amounts to the Controlling Collateral Agent (as defined in the Prepetition Intercreditor Agreement). In the event of any dispute as to the amount of any recovery on account of Prepetition Collateral, the DIP Secured Parties and the Prepetition Secured Parties shall submit such dispute to the Court.

7. *Use of DIP Facility Proceeds and Cash Collateral*.

a) From and after the Closing Date, the Debtors shall be permitted to use the proceeds of the Interim Initial DIP Loans and Cash Collateral for the following purposes, in each case, solely in accordance with and subject to this Interim Order, the Approved Budget (as defined below and subject to Permitted Variances), and the other DIP Documents: (i) working capital and general corporate purposes of the Debtors; (ii) bankruptcy-related costs and expenses in respect of the Chapter 11 Cases (including the Carve Out (as defined below)) and to pay the Adequate Protection Payments; (iii) costs and expenses related to the DIP Facility; and (iv) any other purposes set forth in the Approved Budget. The Delayed-Draw DIP Loans shall be used solely to make Delayed-Draw Payments or to replenish the Debtors' cash on hand that was used to make a Prepetition DDTL Payment or Delayed-Draw Payments on or after the Petition Date, consistent with the other restrictions in respect thereof set forth in this Interim Order. The Approved Budget shall not in any regard limit or test the payment of (i) any professional fees of the DIP Lenders, (ii) the fees and expenses of the DIP Lenders, or (iii) the Adequate Protection Payments.

b) The Delayed-Draw DIP Loans will be made available upon entry of this Interim Order, *provided* that the Delayed-Draw DIP Loans shall only be used, subject to the draw conditions set forth in the DIP Documents, (a) to make payments in respect of the delayed-draw eligible uses specified in the "Delayed Draw Uses" section of the Approved Budget (any such payments, the "Delayed-Draw Payments") or (b) as set forth in the next sentence. If the Debtors make a Delayed-Draw Payment on or after the Petition Date with cash on hand, and such cash on hand is not (and was not) proceeds of the Delayed-Draw DIP Loans, the Debtors may borrow Delayed-Draw DIP Loans to replenish the cash on hand that was actually used to make such Delayed-Draw Payment. In no event shall the Borrower be permitted to borrow more than the principal amount of the Delayed-Draw DIP Loans permitted by this Interim Order.

c) If, prior to the Petition Date, the Debtors use cash on hand to make a Delayed-Draw Payment that was otherwise budgeted to be made after the Petition Date in the "Delayed Draw Uses" row of the Approved Budget (each such payment (if any), a "Prepetition DDTL Payment"), the Debtors may borrow the Delayed-Draw DIP Loans, in an amount not to exceed such Prepetition DDTL Payment, to replenish the Debtors' cash on hand that was used to make such Prepetition DDTL Payment (each such borrowing (if any), a "Prepetition DDTL Borrowing"). For the avoidance of doubt, each borrowing of Delayed-Draw DIP Loans pursuant to a Prepetition DDTL Borrowing shall be considered outstanding Delayed-Draw DIP Loans.

d) With respect to the Delayed-Draw DIP Loans, in no event shall the Borrower be permitted to borrow more than the principal amount of the Delayed-Draw DIP Loans permitted to be borrowed by this Interim Order. All borrowings and withdrawals in respect of the Interim Initial DIP Loans and the Delayed-Draw DIP Loans shall be subject to the restrictions concerning the Segregated DIP Account, as set forth in the DIP Documents and this Interim Order.

8. *Authorization to Use Cash Collateral*. The Debtors are authorized to use Cash Collateral in accordance with and subject to the terms and conditions of this Interim Order and the other DIP Documents, including the Approved Budget. Nothing in this Interim Order shall authorize the disposition of any assets of the Debtors or their estates outside the ordinary course of business, or any of the Debtors' use of any Cash Collateral or other proceeds of the DIP Collateral, except as expressly permitted under this Interim Order and the other DIP Documents, and, in all events, all such use of Cash Collateral must be consistent with the Approved Budget.

9. *Prepayments*. The Debtors shall not be permitted to voluntarily repay any loans under the DIP Facility absent the prior written consent of the Prepetition Credit Agreement Agent and the Required Lenders (as defined in the Prepetition Credit Agreement), to the extent that any

Prepetition Secured Obligations are outstanding. The Debtors must repay the loans under the DIP Facility in whole upon the incurrence of any unpermitted indebtedness under the DIP Documents. No reduction of the DIP Commitment shall be permitted.

10. *DIP Collateral Rights*. Except as expressly provided in this Interim Order and the other DIP Documents, in the event that any person or entity holds a lien on or security interest in DIP Collateral that is junior or subordinate to the DIP Liens in such DIP Collateral (other than as an ordinary course debit, that is consistent with past practice, by a Cash Management Bank (as defined in the Cash Management Motion) authorized under the Court's order approving the Cash Management Motion), and such person or entity receives or is paid the proceeds of such DIP Collateral prior to payment in full of all DIP Obligations, such junior or subordinate lienholder shall be deemed to have received, and shall hold, such proceeds of DIP Collateral or other payment in trust for the applicable DIP Secured Parties, and shall immediately turn over such proceeds or payment to such DIP Secured Parties for application in accordance with this Interim Order and the other DIP Documents.

11. *Amendments*. The Debtors and the DIP Secured Parties are hereby authorized to enter into the DIP Documents and implement, in accordance with the terms of the DIP Documents, one or more amendments, waivers, consents, or other modifications to and under the DIP Documents in accordance with the terms thereof, and no further approval of the Court shall be required for amendments, waivers, consents, or other modifications to and under the DIP Documents (and any reasonable fees and expenses paid in connection therewith); *provided*, that (i) any amendments to any DIP Documents must be consistent with and are subject to the consent rights set forth in the Restructuring Support Agreement and (ii) any amendment, waiver, consent, or other modification to the DIP Documents relating to the use of Cash Collateral of the Prepetition

Secured Parties (which, for the avoidance of doubt, does not include any DIP Priority Collateral) or the adequate protection provided herein to the Prepetition Secured Parties shall require the prior written consent of the Required Consenting RCF Lenders and the Required Consenting Secured Lenders; *provided*, *however*, the Debtors shall file a notice of any material amendment or other modification under the DIP Documents with the Court, and serve such notice on the U.S. Trustee three (3) calendar days prior to the effective date thereof to the extent practicable. If no objections are timely filed (or if the U.S. Trustee communicates via electronic mail or otherwise that it has no objection) to a material amendment within three (3) calendar days from the date of filing of such notice, the Debtors may proceed to execute such amendment, which shall become effective immediately upon execution.

12. *Budget and Variance Reports*.

a) All Cash Collateral and proceeds of the DIP Loans shall be used, subject to Permitted Variances, in accordance with and subject to a 13-week cash flow projection commencing on the date of initial funding under the DIP Facility, the initial version of which is attached to the DIP Credit Agreement as an exhibit thereto (such initial projection, the "Initial Approved Budget"), and a summary version of which is attached hereto as Exhibit 1. The Initial Approved Budget is satisfactory to the DIP Lenders, the Required Consenting RCF Lenders and the Required Consenting Secured Lenders (as such terms are defined in the Restructuring Support Agreement). The Initial Approved Budget shall be updated by the Borrower by the end of every four-week period beginning on the fifth Friday after the Petition Date and reflect the 13-week period beginning with the current week (each, including the Initial Approved Budget, an "Approved Budget"); *provided* that such Approved Budget shall be subject to the consent of the DIP Lenders, the Required Consenting RCF Lenders and the Required Consenting Secured

Lenders (which may be in the form of e-mail provided by the financial advisor to the DIP Lenders, and which consent of the Required Consenting RCF Lenders and the Required Consenting Secured Lenders shall not be unreasonably withheld, conditioned or delayed); *provided further*, that any such updated budget shall automatically become an Approved Budget if none of the DIP Lenders, the Required Consenting RCF Lenders or the Required Consenting Secured Lenders has objected to the updated budget in writing within five (5) business days of receipt of the updated budget; *provided further,* that if such DIP Lenders, Required Consenting RCF Lenders or Required Consenting Secured Lenders object to any updated budget, the Approved Budget for the prior period shall be the Approved Budget until such time as an updated budget is approved. Every Approved Budget (including the Initial Approved Budget) shall be in form and substance (including the detail and specificity set forth therein concerning receipts and disbursements) satisfactory to the DIP Lenders.

b) Commencing with the third Friday after the Petition Date, and every Friday of every second calendar week thereafter, the Borrower shall deliver to the DIP Agent and the advisors to the Prepetition Credit Agreement Agent and the Consenting Secured Lenders a variance report in form reasonably acceptable to the DIP Lenders (each, a "<u>Variance Report</u>") setting forth (i) the Debtors' aggregate "disbursements" and aggregate "receipts", in each case, for the immediately preceding two-week period ending on Saturday compared to the projected aggregate receipts and disbursements set forth in the Approved Budget for such Variance Testing Period (as defined below) and (ii) the variance in dollar amounts of the actual aggregate amount of receipts and disbursements (excluding all fees due and payable pursuant to 28 U.S.C. § 1930(a) plus any interest due and payable under 31 U.S.C. § 3717) for each period ending on Saturday from those reflected for the corresponding period in the Approved Budget (such comparison, the "<u>Variance</u>").

c) "Permitted Variance" means an aggregate unfavorable disbursement Variance that is not more than 20% during any Variance Testing Period against the projected amount in the Approved Budget for such Variance Testing Period; *provided* that (i) professional fee and expense disbursements, including amounts funded to the Funded Reserve Account and the Carve Out Reserves; (ii) United States Trustee fee disbursements; and (iii) the DIP Secured Party fees and expenses and Adequate Protection Payments shall not be subject to variance testing; *provided*, *further*, that no Approved Budget shall include a budgeted payment of Delayed-Draw Payments in excess of the undrawn Delayed-Draw DIP Commitment; *provided*, *further*, that there shall be no unfavorable disbursement Variance in respect of any Delayed-Draw Payment unless such Delayed-Draw Payment is made from funds other than Delayed-Draw DIP Loans.

d) "Variance Testing Period" means, starting the third Friday following the Petition Date, the two-week period ending on the Saturday immediately preceding such Friday and, every other week thereafter, the preceding two-week period ending on the applicable Saturday. During any Variance Testing Period, the Variance from the then-current Approved Budget shall not exceed the Permitted Variance.

13. *Modification of Automatic Stay*. The automatic stay imposed by section 362(a) of the Bankruptcy Code is hereby modified as necessary to permit: (a) the Debtors to grant the DIP Liens and the DIP Superpriority Claims, and to perform such additional acts as the DIP Collateral Agent may request (acting pursuant to the DIP Credit Agreement) to assure the perfection and priority of the DIP Liens; (b) the Debtors to incur all liabilities and obligations, including all the DIP Obligations, to the DIP Secured Parties as contemplated under this Interim Order and/or the other DIP Documents; (c) the Debtors to pay all amounts referred to, required under, in accordance with, and subject to this Interim Order and the other DIP Documents; (d) the DIP Secured Parties

to retain and apply payments made in accordance with this Interim Order and/or the other DIP Documents; (e) the DIP Agent and the DIP Lenders to accelerate, upon the occurrence and during the continuance of an Event of Default (as defined in the DIP Credit Agreement), all DIP Obligations; (f) the DIP Collateral Agent to exercise, upon the occurrence and during the continuance of an Event of Default, subject to the Remedies Notice Period (as defined below), all rights and remedies provided for in the DIP Documents and take any or all actions provided therein, subject to the priorities set forth in this Interim Order; (g) the Prepetition Secured Parties to exercise, following the occurrence of a Termination Event, subject to the Remedies Notice Period, all rights and remedies provided for in this Interim Order, subject to the priorities set forth in this Interim Order; (h) the Debtors to perform under the DIP Documents and any and all other instruments, certificates, agreements, and documents which may be required, necessary, or prudent for the performance by the applicable Debtors under the DIP Documents and any transactions contemplated therein or in this Interim Order; and (i) the implementation of all of the terms, rights, benefits, privileges, remedies, and provisions of this Interim Order and the other DIP Documents, in each case, without further notice, motion, or application to, or order of, or hearing before, this Court, subject to the terms of this Interim Order.

14. *Perfection of DIP Liens and Adequate Protection Liens*. This Interim Order shall be sufficient and conclusive evidence of the validity, perfection, and priority of all security interests and liens granted herein, including, without limitation, the DIP Liens and the Adequate Protection Liens, without the necessity of executing, filing, or recording any financing statement, mortgage, notice, or other instrument or document that may otherwise be required under the law or regulation of any jurisdiction or the taking of any other action (including, for the avoidance of doubt, entering into any securities or deposit account control agreement or taking possession of any possessory

collateral) to validate or perfect (in accordance with applicable law) such liens, or to entitle the DIP Secured Parties or the Prepetition Secured Parties to the priorities granted herein. Notwithstanding the foregoing, the DIP Collateral Agent and the Prepetition Credit Agreement Agent, without any further consent of any party, are authorized to execute, file, or record, and the DIP Collateral Agent (at the direction of the DIP Lenders) and the Prepetition Credit Agreement Agent, as applicable, may require the execution, filing, or recording, as each, in its sole discretion deems necessary or appropriate, of such financing statements, mortgages, notices of lien, and other similar documents to enable the DIP Collateral Agent and the Prepetition Credit Agreement Agent, as applicable, to further validate, perfect, preserve, and enforce the DIP Liens and the Adequate Protection Liens, as applicable, in accordance with applicable law or to otherwise evidence the DIP Liens and the Adequate Protection Liens, as applicable, and all such financing statements, mortgages, notices, and other documents shall be deemed to have been executed, filed, or recorded as of the Petition Date; *provided*, *however*, that no such execution, filing, or recordation shall be necessary or required in order to create or perfect the DIP Liens or the Adequate Protection Liens. The Debtors are authorized and directed to execute and deliver promptly upon demand to the DIP Collateral Agent or the Prepetition Credit Agreement Agent, as applicable, all such financing statements, notices, and other documents as the DIP Collateral Agent (at the direction of the DIP Lenders) or the Prepetition Credit Agreement Agent may reasonably request. For the avoidance of doubt, the Debtors and the DIP Secured Parties shall consult in good faith with the advisors to the Consenting Secured Lenders and the Prepetition Credit Agreement Agent prior to making any such requests to the Prepetition Credit Agreement Agent or Prepetition SSN Collateral Agent. The DIP Collateral Agent or the Prepetition Credit Agreement Agent, in its discretion, may file a photocopy of this Interim Order as a financing statement with any filing or recording office or with

any registry of deeds or similar office, in addition to or in lieu of such financing statements, notices of lien, or similar instruments, and in such event, the filing or recording office shall be authorized to file or record such photocopy of this Interim Order. All non-bankruptcy law (including non-U.S. law) that conflicts with the grant and perfection of the DIP Liens or the Adequate Protection Liens as set forth herein is expressly preempted. All DIP Liens and Adequate Protection Liens shall be effective and automatically perfected as set forth herein regardless of any defective perfection attempt under applicable non-bankruptcy law (including non-U.S. law), and the DIP Liens and Adequate Protection Liens shall be and remain perfected as set forth herein regardless of any such defective perfection attempt.

15. *Bailee / Agent*. To the extent any Prepetition Secured Party has possession of any DIP Priority Collateral or has control with respect to any DIP Priority Collateral or has been noted as a secured party on any certificate of title for a titled good constituting DIP Priority Collateral, then such Prepetition Secured Party, as applicable, shall be deemed to maintain such possession or notation or exercise such control as a gratuitous bailee and/or gratuitous agent for perfection for the benefit of the DIP Collateral Agent. Additionally, subject to the Carve Out, the DIP Priority Collateral shall be free and clear of all liens, claims, and encumbrances, except for the Adequate Protection Liens that attach to the DIP Priority Collateral (other than the Segregated DIP Account and the funds deposited therein) immediately junior the DIP Liens as set forth in this Interim Order.

16. *Proceeds of Subsequent Financing*. If the Debtors, any trustee, any examiner with enlarged powers or any responsible officer subsequently appointed in any of the Chapter 11 Cases or any Successor Cases shall obtain credit or incur debt pursuant to sections 364(b), (c), or (d) of the Bankruptcy Code or otherwise in violation of this Interim Order or the other DIP Documents or at any time prior to the indefeasible repayment in full in cash of all of the DIP Obligations, the

satisfaction of the DIP Superpriority Claims, and the termination of the DIP Secured Parties' obligations to extend credit under the DIP Facility and this Interim Order, including subsequent to the confirmation of any plan with respect to any or all of the Debtors and the Debtors' estates, then, unless otherwise agreed by the DIP Secured Parties, all of the cash proceeds derived from such credit or debt shall immediately be turned over to the DIP Agent to be applied in accordance with the DIP Documents until the DIP Obligations are repaid in full.

17. *Maintenance of DIP Collateral*. Until the indefeasible payment in full of all DIP Obligations, the Debtors shall continue to maintain all property, operational, and other insurance as required and as specified in the DIP Documents, the Prepetition Credit Agreement, and the Indenture. The Debtors shall provide the DIP Collateral Agent with commercially reasonable evidence of such insurance upon a request to counsel for the Debtors. In accordance with the DIP Documents, with respect to DIP Collateral, the DIP Obligors shall (a) ensure that general property insurance and general liability insurance policies are endorsed to the DIP Collateral Agent's reasonable satisfaction (at the direction of the DIP Lenders) for the benefit of the DIP Collateral Agent, and (b) ensure that such endorsements shall state that such insurance policies shall not be cancelled or materially adversely changed without at least thirty (30) days' prior written notice thereof. Upon entry of this Interim Order and to the fullest extent provided by applicable law, the DIP Collateral Agent shall be, and shall be deemed to be, without any further action or notice, named as additional insureds and lender's loss payees on each insurance policy maintained by the Debtors that in any way relates to the DIP Collateral. The Debtors shall also maintain and use the cash management system in effect as of the Petition Date, as modified by this Interim Order (including with respect to the Segregated DIP Account) and as permitted by the Cash Management

Order[5]; *provided*, for the avoidance of doubt, nothing in the Cash Management Order shall permit the Debtors to withdraw funds from the Segregated DIP Account, or use such funds, in a manner that is inconsistent with the restrictions on such activities set forth in this Interim Order.

18. *Disposition of DIP Collateral*. The Debtors shall not sell, transfer, lease, encumber, or otherwise dispose of any portion of the DIP Collateral (or enter into any agreement to do so) other than in the ordinary course of business or otherwise consistent with the Approved Budget (including Permitted Variances) or to fund the Carve Out Reserves in accordance with this Interim Order; *provided*, that nothing herein shall be deemed to limit or waive any party's rights under the Restructuring Support Agreement with respect to any such disposition.

19. *Termination Date*. Each of the following shall constitute a termination event under this Interim Order (each a "Termination Event," and the earliest date upon which such Termination Event occurs, the "Termination Date"), unless waived in writing (delivery by email or other electronic means being sufficient) by the DIP Agent in accordance with the terms of the DIP Credit Agreement: (a) the occurrence of the Maturity Date (as defined in the DIP Credit Agreement); (b) the occurrence of the effective date of a chapter 11 plan; (c) the DIP Loans becoming due and payable in full under the DIP Documents, whether by acceleration or otherwise; (d) the entry by the Court of an order converting the Chapter 11 Case of any of the Debtors to a chapter 7 liquidation or the dismissal of the Chapter 11 Case of any Debtor; (e) the consummation of a sale of all or substantially all of the Debtors' assets; (f) failure of the Debtors to perform under the terms of this Interim Order; (g) the Debtors seek to amend, supplement, extend, or otherwise modify this Interim Order without the consent of the DIP Lenders, and, to the extent any such

[5] "Cash Management Order" means interim or final order, as applicable, granting the relief sought in the Cash Management Motion.

amendment, supplement, extension, or modification relates to the Debtors' use of the Prepetition Secured Parties' Cash Collateral or the adequate protection provided herein to the Prepetition Secured Parties, the Required Consenting RCF Lenders and the Required Consenting Secured Lenders; (h) other than the Carve Out, the Debtors seek to allow claims or liens that are *pari passu* with or senior to the DIP Obligations, the DIP Superpriority Claims, the DIP Liens, the Prepetition Secured Obligations, the Prepetition Liens, the Adequate Protection Claims, or the Adequate Protection Liens; (i) the commencement by the Debtors, or the support by any Debtor of the commencement of an action by any other party-in-interest, to subordinate, recharacterize or avoid any DIP Obligations, the DIP Superpriority Claims, DIP Liens, Prepetition Secured Obligations, Prepetition Liens, the Adequate Protection Claims, or Adequate Protection Liens; (j) without the prior written consent of the DIP Lenders, the Required Consenting RCF Lenders and the Required Consenting Secured Lenders, the Court grants relief from the automatic stay to any party with respect to assets of the Debtors exceeding $1,000,000; (k) the Debtors challenge the validity or binding nature of this Interim Order; or (l) the Debtors fail to maintain all property, operational, and other insurance on Prepetition Collateral and DIP Collateral as required under this Interim Order, the DIP Documents and the Prepetition Credit Agreement.

20. *Rights and Remedies Upon Termination Event*.

a) Upon the occurrence and during the continuation of a Termination Event, subject to the terms of the DIP Documents, the DIP Agent may file with the Court and deliver a written notice (a "Termination Notice"), which may be by email, to (i) Simpson Thacher & Bartlett LLP (as proposed counsel to the Debtors) (Attn: Brian Schartz, Esq. (brian.schartz@stblaw.com) and Elisha Graff, Esq. (egraff@stblaw.com)); (ii) Cole Schotz P.C. (as proposed Delaware co-counsel to the Debtors) (Attn: Seth Van Aalten, Esq. (svanaalten@coleschotz.com) and Justin R.

Alberto, Esq. (jalberto@coleschotz.com)); (iii) Gibson, Dunn & Crutcher LLP (as counsel to the Consenting Secured Lenders) (Attn: Scott J. Greenberg, Esq. (sgreenberg@gibsondunn.com)); (iv) Milbank LLP (as counsel to the Prepetition Credit Agreement Agent (as defined in the Restructuring Support Agreement)) (Attn: Evan Fleck, Esq. (efleck@milbank.com), Lauren Doyle, Esq. (ldoyle@milbank.com), Arden Ham, Esq (aham@milbank.com), and Abigail Debold, Esq. (adebold@milbank.com)); (v) Paul, Weiss, Rifkind, Wharton & Garrison LLP (as counsel to certain Plan Sponsors) (Attn: John Weber, Esq. (jweber@paulweiss.com) and Robert Britton, Esq. (rbritton@paulweiss.com)); and (vi) the U.S. Trustee (Attn: Benjamin A. Hackman (benjamin.a.hackman@usdoj.gov)). Upon the earlier of (x) five (5) business days after the Termination Notice is delivered (which delivery may be by email) as set forth in the prior sentence, and (y) the conclusion of a Remedies Hearing (as defined below) where the Court finds that a Termination Event exists and is continuing (the "Remedies Notice Period"), the automatic stay shall be automatically terminated, and the DIP Agent and the DIP Secured Parties shall be deemed to have received relief from the automatic stay imposed by section 362(a) of the Bankruptcy Code and shall be authorized, without further notice to the Debtors or any other interested party, but subject to and in accordance with the terms of the DIP Documents, to immediately terminate and/or revoke the Debtors' right under this Interim Order and any other DIP Documents, as applicable, to use any Cash Collateral or proceeds of the DIP Facility (except for the Carve Out or toward satisfaction of the DIP Obligations as provided in this Interim Order and the DIP Documents); *provided*, that the automatic stay shall not be so terminated if the Court determines at a Remedies Hearing that no Termination Event exists or continues to exist; *provided*, *further*, that the Remedies Notice Period may only be extended (A) with the written consent of the Debtors and the DIP Agent (acting at the direction of the DIP Lenders) or (B) if the Court *sua sponte*, and without request of

any Debtor, schedules the Remedies Hearing after such five (5) business day period. Notwithstanding the foregoing, and for the avoidance of doubt, upon the delivery of a Termination Notice (which may be by email) to the parties set forth in the first sentence of this paragraph 20(a), the DIP Agent may immediately, and without any filing with the Court or further Court approval, accelerate the DIP Obligations and terminate the DIP Commitment.

b) Upon delivery of such Termination Notice by the DIP Agent, without further notice or order of the Court but subject to and in accordance with the terms of the DIP Documents: (i) the DIP Agent may terminate the DIP Facility and the commitments thereunder, including all commitments of the DIP Lenders to provide any extensions of credit in accordance with the DIP Documents, upon which the Debtors' ability to incur additional DIP Obligations will automatically terminate and the DIP Secured Parties will have no obligation to provide any DIP Loans or make any other financial accommodations; (ii) the DIP Agent may declare all DIP Obligations to be immediately due and payable; and (iii) the DIP Agent shall be authorized to charge interest at the default rate under the DIP Documents, which default-rate interest shall be payable in kind.

c) During the Remedies Notice Period, the Debtors and any other party in interest (including the Plan Sponsors) shall be entitled to seek an emergency hearing within the Remedies Notice Period with the Court (such hearing, a "Remedies Hearing"). In any Remedies Hearing, the only issue that may be raised by a Debtor is whether, in fact, a Termination Event has occurred and is continuing, and each Debtor hereby waives the right to and shall not be entitled to seek relief (including, without limitation, under section 105 of the Bankruptcy Code) to the extent such relief would impair or restrict the rights and remedies of the DIP Secured Parties as set forth in this Interim Order or in any of the DIP Documents.

d) During the Remedies Notice Period, the Debtors may use DIP Loans (including, without limitation, amounts in the Segregated DIP Account in accordance with the terms herein, but subject to the last sentence in this paragraph 20(d)) and Cash Collateral solely to (x) pay payroll and other bona fide expenses incurred and that became (or become) due for payment by the Debtors in the ordinary course of business prior to or during the Remedies Notice Period and that the Debtors determine in good faith are critical to the preservation of the Debtors' estates; *provided*, that all such payments under this clause (x) shall not exceed $1,000,000.00 without the express written consent of the DIP Lenders and, to the extent such payments in excess of $1,000,000.00 would use cash that constitutes Cash Collateral of the Prepetition Secured Parties, the Required Consenting RCF Lenders and Required Consenting Secured Lenders (such consent to not be unreasonably withheld, conditioned or delayed), and (y) fund the Carve Out Reserves, in each case as set forth in this Interim Order (such uses in clauses (x) and (y), the "Remedies Notice Period Uses"). For the avoidance of doubt, the Debtors shall not be permitted to borrow any additional funds under the DIP Facility during the Remedies Notice Period.

e) Upon the effectiveness of any relief from the automatic stay granted or deemed to have been granted pursuant to this paragraph (including in connection with the expiration of the Remedies Notice Period), the DIP Collateral Agent (subject to the terms of the DIP Documents) may in its discretion enforce the DIP Liens (and act under all applicable powers of attorney without further order of the Court) in accordance with the DIP Documents, including (without limitation) to (i) freeze monies or balances in the Debtors' accounts; (ii) immediately set-off any and all amounts in accounts maintained by the Debtors with the DIP Agent or any other DIP Secured Parties against the DIP Obligations; (iii) enforce any and all rights against the DIP Collateral, including, without limitation, foreclosure on all or any portion of the DIP Collateral,

collection of accounts receivable, occupying the Debtors' premises, sale or disposition of the DIP Collateral; and (iv) take any other actions or exercise any other rights or remedies permitted under this Interim Order; *provided*, that such enforcement of DIP Liens against any DIP Collateral that is Prepetition Collateral shall be subject to the DIP Standstill (as defined below) and the priorities set forth in this Interim Order with respect to the DIP Collateral and the Prepetition Collateral. The rights and remedies of the DIP Secured Parties specified herein are cumulative and not exclusive of any rights or remedies that the DIP Secured Parties have under the DIP Documents or otherwise. Upon the expiration of the Remedies Notice Period, the Debtors (i) shall cooperate with the DIP Secured Parties in their efforts to enforce their security interest in the DIP Collateral, (ii) shall not take or direct any entity to take any action designed, intended, or likely to hinder, delay, or restrict in any respect such DIP Secured Parties from enforcing their security interests in the DIP Collateral and (iii) shall have waived any right to contest any such action by the DIP Agent or DIP Secured Parties pursuant to section 105(a) or otherwise. To the extent the exercise of any rights and remedies permitted in this Interim Order, including the right to set-off, would be limited or prohibited by any order of this Court entered prior to the date of this Interim Order, the terms of this Interim Order shall control and such limitation or prohibition shall be deemed inapplicable.

f) Following the occurrence of a Termination Event, subject to funding the Carve Out and the expiration of the Remedies Notice Period, the automatic stay of section 362 of the Bankruptcy Code shall automatically be modified to the extent necessary to permit the Prepetition Secured Parties to exercise all rights and remedies available under the Prepetition Secured Facilities Documents, this Interim Order, and applicable law with respect to Prepetition Collateral, including to terminate consent to the Debtors' use of Cash Collateral. If at any time the DIP Facility has been indefeasibly paid in full in cash (or otherwise deemed satisfied pursuant to

the written consent of the DIP Lenders), but the Prepetition Credit Agreement Obligations remain outstanding, then subject to the Prepetition Intercreditor Agreement, the Prepetition Credit Agreement Agent shall control remedies with respect to the DIP Collateral to the same extent set forth herein with respect to the DIP Agent.

21. *Standstill; Turnover*.

a) *Prepetition Secured Party Standstill*. Notwithstanding anything to the contrary in this Interim Order, but subject to paragraph 20(f), the Prepetition Secured Facilities Documents, or the Prepetition Intercreditor Agreement, until the expiration of the Prepetition Standstill Period (as defined below), none of the Prepetition Agents or any other Prepetition Secured Party (solely in their capacities as such) shall, whether on account of the Prepetition Liens, the Prepetition Secured Obligations, the Adequate Protection Liens, the Adequate Protection Claims, or otherwise, (i) exercise or seek to exercise any rights or remedies (including any right of setoff, recoupment, foreclosure, collection, sale, or other disposition) with respect to any DIP Priority Collateral, (ii) institute or join in any action or proceeding with respect to such rights or remedies against any DIP Priority Collateral, or (iii) seek relief from the automatic stay imposed by section 362(a) of the Bankruptcy Code or any other stay or injunction in order to take any of the foregoing actions with respect to any DIP Priority Collateral (the foregoing restrictions, the "Prepetition Standstill"). "Prepetition Standstill Period" means the period commencing on the date of entry of this Interim Order and ending on the earliest of (x) the date of indefeasible payment in full in cash of all DIP Obligations (other than contingent indemnification obligations for which no claim has been asserted) and the termination of all commitments under the DIP Facility ("DIP Payment in Full"), and (y) the date on which the DIP Agent consents in writing (at the direction of the DIP Lenders) to the termination of the Prepetition Standstill.

b) *DIP Standstill*. Notwithstanding anything to the contrary in this Interim Order or the other DIP Documents, until the expiration of the DIP Standstill Period (as defined below), none of the DIP Agent, the DIP Collateral Agent, or any other DIP Secured Party (solely in their capacities as such) shall, whether on account of the DIP Liens, the DIP Superpriority Claims, or otherwise, (i) exercise or seek to exercise any rights or remedies (including any right of setoff, recoupment, foreclosure, collection, sale, or other disposition) with respect to any DIP Collateral that constitutes Prepetition Collateral ("Shared Collateral", *provided*, for the avoidance of doubt, the term "Shared Collateral" shall not include any DIP Priority Collateral), (ii) institute or join in any action or proceeding with respect to such rights or remedies against any such Shared Collateral, or (iii) seek relief from the automatic stay imposed by section 362(a) of the Bankruptcy Code or any other stay or injunction in order to take any of the foregoing actions with respect to any such Shared Collateral (the foregoing restrictions, the "DIP Standstill" and, together with the Prepetition Standstill, the "Standstills"). "DIP Standstill Period" means the period commencing on the date of entry of this Interim Order and ending on the earliest of (x) the date of indefeasible payment in full in cash of all Prepetition Secured Obligations (other than contingent indemnification obligations for which no claim has been asserted) and the Adequate Protection Claims ("Prepetition Payment in Full"), and (y) the date on which the applicable Prepetition Agents (acting at the direction of the requisite Prepetition Secured Parties under the applicable Prepetition Secured Facilities Documents) consent in writing to the termination of the DIP Standstill. For the avoidance of doubt, nothing in the DIP Standstill shall restrict the DIP Collateral Agent from (A) terminating the Debtors' use of the proceeds of the DIP Facility or accelerating the DIP Obligations in accordance with paragraphs 20(a) and (b), or (B) exercising any rights or remedies with respect

to the DIP Priority Collateral (including the Segregated DIP Account and all amounts deposited therein or withdrawn therefrom).

c) *Standstill Provisions Generally*. Notwithstanding the Standstills, any DIP Secured Party or Prepetition Secured Party (each, in its capacity as a party subject to a Standstill with respect to the applicable collateral, a "Standstill Party") may, with respect to the collateral subject to the applicable Standstill (the "Standstill Collateral"), file a proof of claim or statement of interest in the Chapter 11 Cases or any Successor Cases. No Standstill Party (solely in its capacity as such) shall, during the applicable Standstill Period, object to, contest, hinder, or delay the exercise by the applicable senior secured parties on such Standstill Collateral as set forth herein (the "Senior Parties") of such Senior Parties' rights and remedies with respect to the applicable Standstill Collateral in accordance with this Interim Order, including any disposition of such Standstill Collateral free and clear of the junior liens thereon (with such junior liens attaching to the proceeds thereof in the same priority set forth herein). Any proceeds of Standstill Collateral received by any Standstill Party in contravention of this paragraph shall be held in trust for, and promptly turned over to, the applicable Senior Parties for application in accordance with this Interim Order. For the avoidance of doubt: (i) if any Prepetition Secured Party receives property that constitutes DIP Priority Collateral (or any proceeds thereof) prior to the DIP Payment in Full, such Prepetition Secured Party shall hold such property and proceeds in trust for, and promptly turn such property and proceeds over to, the DIP Agent for distribution in respect of the DIP Obligations and (ii) if any DIP Secured Party receives property that constitutes Prepetition Collateral (or any proceeds thereof) prior to the Prepetition Payment in Full, such DIP Secured Party shall hold such property and proceeds in trust for, and promptly turn such property and proceeds over to, the Controlling Collateral Agent (as defined in the Prepetition Intercreditor

Agreement) for distribution in respect of the Prepetition Secured Obligations. The Standstills are for the sole benefit of the DIP Secured Parties and the Prepetition Secured Parties, as applicable, and shall not confer any rights on the Debtors or any other party in interest. Notwithstanding anything to the contrary in this Interim Order, the Standstills and any turnover provisions with respect to Standstill Collateral shall not apply to any ordinary course debit (or proceeds thereof), that is consistent with past practice, by a Cash Management Bank authorized under the Court's order approving the Cash Management Motion.

d) With respect to all Prepetition Collateral, the Prepetition Secured Parties shall, in good faith consultation with the DIP Secured Parties and in accordance with the Prepetition Intercreditor Agreement, control the time, manner, and place of enforcement of all security interests in the Prepetition Collateral (subject to the application of proceeds and ranking of liens set forth herein). Should the Prepetition Secured Parties and the DIP Secured Parties be unable to agree to the application of proceeds of any Prepetition Collateral, such dispute shall be submitted to the Court.

e) Subject to paragraph 21(f), with respect to all DIP Priority Collateral, the DIP Secured Parties shall, in good faith consultation with the Prepetition Secured Parties, control the time, manner, and place of enforcement of all security interests in the DIP Priority Collateral (subject to the application of proceeds and ranking of liens set forth herein). Should the Prepetition Secured Parties and the DIP Secured Parties be unable to agree to the application of proceeds of any DIP Priority Collateral, such dispute shall be submitted to the Court.

f) With respect to the Specified Foreign Equity, the Prepetition Secured Parties shall, in good faith consultation with the DIP Secured Parties and in accordance with the Prepetition Intercreditor Agreement, control the time, manner, and place of enforcement of all

security interests in the Specified Foreign Equity (subject to the application of proceeds and ranking of liens set forth herein) (the "Specified Foreign Equity Control Right"); *provided*, that the Specified Foreign Equity Control Right shall expire on the date that is one-hundred twenty (120) days after the earlier of (x) the expiration of the Remedies Notice Period or (y) the date that the automatic stay is otherwise lifted to permit the enforcement of such security interests (such date, the "Control Expiration Date"), such that the DIP Agent (on behalf of the DIP Lenders) shall be permitted, on and after the Control Expiration Date, to control the time, manner, and place of enforcement of all security interests in Specified Foreign Equity. Should the Prepetition Secured Parties and the DIP Secured Parties be unable to agree to the application of proceeds of any Specified Foreign Equity, such dispute shall be submitted to the Court.

g) Notwithstanding anything herein to the contrary, to the extent any Prepetition Secured Party receives or retains any recovery on account of any DIP Priority Collateral prior to payment in full of all DIP Obligations and DIP Superpriority Claims, such Prepetition Secured Party shall hold such recovery in trust for the benefit of the DIP Secured Parties and, as soon as possible after receipt of such amounts, turn over such amounts to the DIP Agent. In the event of any dispute as to the amount of any recovery on account of DIP Priority Collateral, the DIP Secured Parties and the Prepetition Secured Parties shall submit such dispute to the Court.

22. *Good Faith under Section 363(m) and Section 364(e) of the Bankruptcy Code; No Modification or Stay of this Interim Order*. The DIP Secured Parties have acted in good faith in connection with the DIP Facility, the DIP Documents, the financing provided by the DIP Facility, and with this Interim Order, and their reliance on this Interim Order is in good faith. Based on the findings set forth in this Interim Order and the record made during these Chapter 11 Cases, and in

accordance with sections 363(m) and 364(e) of the Bankruptcy Code, in the event any or all of the provisions of this Interim Order are hereafter modified, reversed, amended, or vacated by a subsequent order of the Court or any other court, the DIP Secured Parties are entitled to the benefits and protections provided in sections 363(m) and 364(e) of the Bankruptcy Code (in the DIP Secured Parties' capacities as lenders, and as parties submitting any credit bid in respect of the DIP Obligations or otherwise in connection with the DIP Documents). Any such modification, reversal, amendment, or vacatur shall not affect the validity and enforceability of any advances previously made or made hereunder, or lien, claim, or priority authorized or created hereby. Any security interests, liens, rights, remedies, or claims granted to the DIP Secured Parties arising prior to the effective date of any such modification, reversal, amendment, or vacatur of this Interim Order shall be governed in all respects by the original provisions of this Interim Order, including entitlement to all rights, remedies, privileges, and benefits granted herein.

23. *DIP and Other Expenses*. The Debtors are authorized and directed to pay, in cash and on a current basis, the reasonable and documented fees, costs, disbursements, and expenses of the DIP Agent and the DIP Lenders to the extent provided by the DIP Documents and this Interim Order (unless the payment of such fees and expenses is covered by the ECL, in which case, the terms and timing for payment of such fees and expenses shall be governed by the ECL and the Debtors shall not be required to make any payments in respect of such fees and expenses unless and until required under the ECL), whether or not the transactions contemplated hereby are consummated, including, without limitation, legal, accounting, collateral examination, monitoring and appraisal fees and expenses, agency fees, financial advisory fees and expenses, fees and expenses of other consultants and indemnification and reimbursement of fees and expenses, including, without limitation, the reasonable and documented prepetition and postpetition fees,

costs, and expenses of (i) Jones Day, as counsel to the DIP Lenders, (ii) Richards, Layton & Finger, P.A., as counsel to the DIP Lenders ("RLF"), and (iii) Shipman & Goodwin LLP, as counsel to the DIP Agent (collectively, the "DIP Secured Party Advisors"). The Debtors are further authorized to pay, in cash and on a current basis, all Consenting Lender Fees and Expenses. The invoices for the DIP Secured Party Advisor fees and expenses and for the Consenting Lender Fees and Expenses shall not be required to comply with the U.S. Trustee guidelines, may be in summary form only (and may contain redactions of privileged, confidential, or otherwise sensitive information), and shall not be subject to application, review, or allowance by the Court. Such fees and expenses shall not be subject to any offset, defense, claim, counterclaim, or diminution of any type, kind, or nature whatsoever. The fees and expenses incurred by the DIP Agent prior to the Closing Date (including during the period prior to the Petition Date) to be paid pursuant to this paragraph, and for which the DIP Agent delivers an invoice to the Debtors on or prior to the Closing Date, shall be paid by the Debtors on the Closing Date, and such fees and expenses shall not otherwise be subject to the notice and objection procedures set forth in this paragraph 23. The invoices for fees and expenses to be paid pursuant to this paragraph shall be provided to the Debtors and the U.S. Trustee (the "Fee Notice Parties"). Following ten (10) calendar days after delivery of such invoices (the "Fee Objection Period"), without further order of, or application to, the Court or notice to any other party, such fees and expenses shall be paid within three (3) business days by the Debtors. If an objection (solely as to reasonableness) is made by any of the Fee Notice Parties within the Fee Objection Period to payment of the requested fees and expenses, then only the disputed portion of such fees and expenses shall not be paid until the objection is resolved by the applicable parties in good faith or by order of the Court, and the undisputed portion shall be paid within three (3) business days by the Debtors. Notwithstanding the foregoing, the DIP

Secured Party Advisors in respect of the DIP Lenders may elect to have any fees and expenses not paid pursuant to this paragraph 23 (whether incurred before or after the Petition Date or before or after the Closing Date) paid after the Effective Date in accordance with the ECL (which amounts to be paid under the ECL shall not be subject to the procedures of this paragraph 23). Notwithstanding anything to the contrary in this paragraph 23, after the occurrence of an Event of Default (as defined in the DIP Credit Agreement), any fees or expenses of Jones Day or RLF that are not paid pursuant this paragraph 23 or the ECL may (at the election of the DIP Lenders) be capitalized into, and made part of, the DIP Superpriority Claims.

24. *Indemnification*. The Debtors shall jointly and severally indemnify and hold harmless the DIP Agent, each other DIP Secured Party, each DIP Secured Party Advisor, each Prepetition Credit Agreement Secured Party, and each of their respective officers, partners, members, directors, managers, trustees, advisors, employees, agents, sub-agents, and affiliates, and each other party entitled to an indemnity in accordance with and subject to the terms and conditions set forth in the DIP Documents and the Prepetition Credit Agreement Documents, as applicable.

25. *Carve Out*.

a) The "Carve Out" means the sum of: (i) all fees required to be paid to the Clerk of the Bankruptcy Court and to the Office of the U.S. Trustee under section 1930(a) of title 28 of the United States Code plus interest at the statutory rate (without regard to the notice set forth in clause (iii) below); (ii) all reasonable fees and expenses up to $50,000 incurred by a Trustee under Bankruptcy Code section 726(b) (without regard to the notice set forth in clause (iii) below); (iii) to the extent allowed at any time, whether by interim order, procedural order, or otherwise, all unpaid fees and expenses incurred at any time before or on the first Business Day following

delivery by the DIP Agent or the Prepetition Secured Parties of a Carve Out Trigger Notice (as defined herein), by persons or firms retained by the Debtors pursuant to section 327, 328, or 363 of the Bankruptcy Code or section 156(c) of title 28 of the United States Code (the "Debtor Professionals" or the "Professional Persons", and the fees and expenses incurred thereby, the "Allowed Professional Fees"), whether allowed by the Bankruptcy Court prior to or after delivery of a Carve Out Trigger Notice; and (iv) Allowed Professional Fees of Professional Persons in an aggregate amount not to exceed $2,500,000 incurred after the first Business Day following delivery by the DIP Agent or the Prepetition Secured Parties of the Carve Out Trigger Notice, to the extent allowed at any time, whether by interim order, procedural order, or otherwise (the amounts set forth in this clause (iv) being the "Post-Carve Out Trigger Notice Cap"). Any payment or reimbursement made to any Professional Person on or after the delivery of the Carve Out Trigger Notice shall permanently reduce the Post-Carve Out Trigger Notice Cap on a dollar-for-dollar basis. For purposes of the foregoing, "Carve Out Trigger Notice" shall mean a written notice delivered by email (or other electronic means) by the DIP Agent or Prepetition Secured Parties to the Debtors, their lead restructuring counsel, the U.S. Trustee, and counsel to the Plan Sponsors, which notice may be delivered following the occurrence and during the continuation of an Event of Default (as defined in the DIP Credit Agreement), acceleration of the DIP Loans and DIP Obligations under the DIP Facility, or termination of the Debtors' right to use Cash Collateral, as applicable, stating that the Post-Carve Out Trigger Notice Cap has been invoked.

b) Delivery of Weekly Fee Statements. Not later than 7:00 p.m. New York time on the third Business Day of each week starting with the first full calendar week following the Petition Date, each Professional Person shall deliver to the Debtors a statement setting forth a good-faith estimate of the amount of fees and expenses (collectively, "Estimated Fees and

Expenses”) incurred during the preceding week by such Professional Person (through Saturday of such week, the “Calculation Date”), along with a good-faith estimate of the cumulative total amount of unreimbursed fees and expenses incurred through the applicable Calculation Date and a statement of the amount of such fees and expenses that have been paid to date by the Debtors (each such statement, a “Weekly Statement”); provided that within one Business Day of the occurrence of the Termination Declaration Date (as defined herein), each Professional Person shall deliver one additional statement (the “Final Statement”) setting forth a good-faith estimate of the amount of fees and expenses incurred during the period commencing on the calendar day after the most recent Calculation Date for which a Weekly Statement has been delivered and concluding on the Termination Declaration Date (and the Debtors shall cause such Weekly Statement and Final Statement to be delivered promptly to the DIP Agent). If any Professional Person fails to deliver a Weekly Statement within three (3) calendar days after such Weekly Statement is due, such Professional Person’s entitlement (if any) to any funds in the Pre-Carve Out Trigger Notice Reserve (as defined herein) with respect to the aggregate unpaid amount of Allowed Professional Fees for the applicable period(s) for which such Professional Person failed to deliver a Weekly Statement covering such period shall be limited to the aggregate unpaid amount of Allowed Professional Fees included in the Approved Budget for such period for such Professional Person.

c) *Carve Out Reserves.*

i. Commencing with the week ended October 31, 2026, and on or before the Thursday of each week thereafter, the Debtors shall utilize (i) first, any amounts in the Segregated DIP Account, and (ii) second, to the extent the amounts in the foregoing clause (i) are insufficient, all cash on hand as of such date, to the extent insufficient, and any available cash thereafter held by any Debtor, to fund a reserve in an amount equal to the sum of (a) the greater of

(x) the aggregate unpaid amount of all Estimated Fees and Expenses reflected in the Weekly Statements delivered on the immediately prior Wednesday to the Debtors and the DIP Agent and (y) the aggregate amount of unpaid Allowed Professional Fees contemplated to be incurred in the Approved Budget during such week, *plus* (b) the Post-Carve Out Trigger Notice Cap, *plus* (c) an amount equal to the amount of Allowed Professional Fees set forth in the Approved Budget for the two weeks occurring after the most recent Calculation Date. The Debtors shall deposit and hold such amounts in a segregated account maintained by the Debtors in trust (the "Funded Reserve Account") to pay such Allowed Professional Fees (the "Funded Reserves") prior to any and all other claims, and all payments of Allowed Professional Fees incurred prior to the Termination Declaration Date shall be paid first from the Funded Reserve Account.

ii. On the day on which a Carve Out Trigger Notice is given by the DIP Agent or the Prepetition Secured Parties to the Debtors with a copy to counsel to the Plan Sponsors (the "Termination Declaration Date"), the Carve Out Trigger Notice shall constitute a demand to the Debtors to utilize, and the Debtors shall utilize (i) first, cash in the Funded Reserve Account, (ii) second, to the extent the foregoing clause (i) is insufficient, any amounts in the Segregated DIP Account and (iii) third, to the extent the amounts in the foregoing clauses (i) and (ii) are insufficient, all cash on hand and any available cash thereafter held by any Debtor, to fund a reserve in an amount equal to the then unpaid amounts of the Allowed Professional Fees. The Debtors shall deposit and hold such amounts in a segregated account maintained by the Debtors in trust to pay such then unpaid Allowed Professional Fees (the "Pre-Carve Out Trigger Notice Reserve") prior to any and all other claims. On the Termination Declaration Date, the Carve Out Trigger Notice shall also constitute a demand to the Debtors to utilize (i) first, cash in the Funded Reserve Account after funding the Pre-Carve Out Trigger Notice Reserve, (ii) second, to the extent the amounts in

the foregoing clause (i) are insufficient, any amounts in the Segregated DIP Account, and (iii) third, to the extent the amounts in the foregoing clauses (i) and (ii) are insufficient, all cash on hand and any available cash thereafter held by any Debtor, to fund a reserve in an amount equal to the Post-Carve Out Trigger Notice Cap. The Debtors shall deposit and hold such amounts in a segregated account maintained by the Debtors in trust to pay such Allowed Professional Fees benefiting from the Post-Carve Out Trigger Notice Cap (the "Post-Carve Out Trigger Notice Reserve" and, together with the Pre-Carve Out Trigger Notice Reserve, the "Carve Out Reserves") prior to any and all other claims.

d) *Application of Carve Out Reserves.*

i. All funds in the Pre-Carve Out Trigger Notice Reserve shall be used first to pay the obligations set forth in clauses (i) through (iii) of the definition of Carve Out set forth above (the "Pre-Carve Out Amounts"), but not, for the avoidance of doubt, the Post-Carve Out Trigger Notice Cap, until the Pre-Carve Out Amounts are indefeasibly paid in full. If the Pre-Carve Out Trigger Notice Reserve has not been reduced to zero after payment of all amounts constituting the Carve Out, all remaining funds shall be distributed, (x) to the extent of the Pre-Carve Out Trigger Notice Reserve funded by cash constituting DIP Priority Collateral, first to the DIP Agent on account of the DIP Obligations until the DIP Obligations have been paid in full, and thereafter to the Prepetition Secured Parties until the Prepetition Secured Obligations have been paid in full, in accordance with their rights and priorities as of the Petition Date and as otherwise set forth in this Interim Order, and (y) to the extent of the Pre-Carve Out Trigger Notice Reserve funded by cash constituting Prepetition Collateral, first to the Prepetition Secured Parties until the Prepetition Secured Obligations have been paid in full, in accordance with their rights and

priorities as of the Petition Date and as otherwise set forth in this Interim Order, and thereafter to the DIP Agent on account of the DIP Obligations.

ii. All funds in the Post-Carve Out Trigger Notice Reserve shall be used first to pay the obligations set forth in clause (iv) of the definition of Carve Out set forth above (the "Post-Carve Out Amounts"), and then, to the extent the Post-Carve Out Trigger Notice Reserve has not been reduced to zero, all remaining funds shall be distributed (x) to the extent of the Post-Carve Out Trigger Notice Reserve funded by cash constituting DIP Priority Collateral, first to the DIP Agent on account of the DIP Obligations until the DIP Obligations have been paid in full, and thereafter to the Prepetition Secured Parties until the Prepetition Secured Obligations have been paid in full, in accordance with their rights and priorities as of the Petition Date and as otherwise set forth in this Interim Order, and (y) to the extent of the Post-Carve Out Trigger Notice Reserve funded by cash constituting Prepetition Collateral, first to the Prepetition Secured Parties until the Prepetition Secured Obligations have been paid in full, in accordance with their rights and priorities as of the Petition Date and as otherwise set forth in this Interim Order, and thereafter to the DIP Agent on account of the DIP Obligations.

iii. Notwithstanding anything to the contrary in the DIP Documents or this Interim Order, if either of the Carve Out Reserves is not funded in full in the amounts set forth in paragraph 25(c), then, any excess funds in one of the Carve Out Reserves following the payment of the Pre-Carve Out Amounts and Post-Carve Out Amounts, respectively (subject to the limits contained in the Post-Carve Out Trigger Notice Cap), shall be used to fund the other Carve Out Reserve, up to the applicable amount set forth in paragraph 25(c), prior to making any payments to the DIP Agent or the Prepetition Secured Parties, each as applicable.

iv. Notwithstanding anything to the contrary in the DIP Documents, this Interim Order, or the Prepetition Secured Facilities Documents, following delivery of a Carve Out Trigger Notice, the DIP Agent and the Prepetition Secured Parties shall not sweep or foreclose on cash (including cash received as a result of the sale or other disposition of any assets) of the Debtors until the Carve Out Reserves have been fully funded.

v. Further, notwithstanding anything to the contrary in this Interim Order, (i) disbursements by the Debtors from the Carve Out Reserves shall not constitute DIP Loans or increase or reduce the DIP Obligations, (ii) the failure of the Carve Out Reserves to satisfy in full the Allowed Professional Fees shall not affect the priority of the Carve Out with respect to any shortfall, and (iii) in no way shall the Initial Approved Budget, any subsequent Approved Budget, the Carve Out, the Post-Carve Out Trigger Notice Cap, or the Carve Out Reserves, or any of the foregoing, be construed as a cap or limitation on the amount of the Allowed Professional Fees due and payable by the Debtors. For the avoidance of doubt and notwithstanding anything to the contrary in this Interim Order or the DIP Documents, the Carve Out shall be senior to all liens and claims securing the DIP Obligations, the Adequate Protection Liens, the Prepetition Secured Obligations, the DIP Superpriority Claims, and any and all other forms of adequate protection, liens, or claims securing the DIP Obligations and the Prepetition Secured Obligations. The DIP Agent and Prepetition Secured Parties shall have no lien or interest in the Carve Out Reserves, but (i) the DIP Agent, on behalf of the DIP Secured Parties, shall have (x) a first-priority lien and automatically perfected security interest in any residual interest in the Carve Out Reserves, to the extent of the Carve Out Reserves funded with cash constituting DIP Priority Collateral, and (y) a second-priority lien and automatically perfected security interest in any residual interest in the Carve Out Reserves, to the extent of the Carve Out Reserves funded with cash constituting

Prepetition Collateral, and (ii) the Prepetition Secured Parties, shall have (x) a first-priority lien and automatically perfected security interest in any residual interest in the Carve Out Reserves, to the extent of the Carve Out Reserves funded with cash constituting Prepetition Collateral, and (y) a second-priority lien and automatically perfected security interest in any residual interest in the Carve Out Reserves, to the extent of the Carve Out Reserves funded with cash constituting DIP Priority Collateral.

e) *Payment of Allowed Professional Fees on or After the Termination Declaration Date*. Following the delivery of the Carve Out Trigger Notice, all Allowed Professional Fees to the extent granted or allowed shall be paid from the applicable Carve Out Reserve, and no Professional Person shall seek payment of any Allowed Professional Fees from any other source until the applicable Carve Out Reserve has been exhausted. Any payment or reimbursement made on or after the occurrence of the Termination Declaration Date in respect of any Allowed Professional Fees shall permanently reduce the Carve Out on a dollar-for-dollar basis. Any funding of the Carve Out shall be added to, and made a part of, the DIP Obligations secured by the DIP Collateral and shall be otherwise entitled to the protections granted under this Interim Order, the DIP Documents, the Bankruptcy Code, and applicable law.

f) *Limitation on Responsibility of Secured Parties*. None of the DIP Secured Parties or the Prepetition Secured Parties shall be responsible for the payment or reimbursement of any fees or disbursements of any Professional Person incurred in connection with the Chapter 11 Cases or any Successor Cases. Nothing in this Interim Order or otherwise shall be construed to obligate any of the DIP Secured Parties or the Prepetition Secured Parties to pay compensation to, or to reimburse expenses of, any Professional Person or to guarantee that the Debtors have sufficient funds to pay such compensation or reimbursement. Nothing herein shall be construed as

consent to the allowance of any professional fees or expenses of any of the Debtors or of any other person or entity, or shall affect the right of any party to object to the allowance and payment of any such fees and expenses. Notwithstanding anything in this paragraph 25 to the contrary, (i) nothing in this paragraph 25 shall require any DIP Lender to fund cash or loans in excess of its DIP Commitment and (ii) the payment of Allowed Professional Fees shall not reduce the DIP Obligations or affect the DIP Liens.

26. *Limitations on the DIP Facility, the DIP Collateral, the Cash Collateral, and the Carve Out*. No DIP Collateral, DIP Loans, Cash Collateral, proceeds of any of the foregoing, any portion of the Carve Out, or any other amounts may be used, directly or indirectly, by any of the Debtors or any trustee or other estate representative appointed in the Chapter 11 Cases or any Successor Cases or any other person or entity (or to pay any professional fees, disbursements, costs or expenses incurred in connection therewith): (a) to object to, contest, prevent, hinder, or delay the DIP Secured Parties' or Prepetition Secured Parties' enforcement of any of their respective rights or realization upon any of the DIP Collateral (subject to the other provisions of this Interim Order and the DIP Documents); (b) for any purpose that is prohibited under this Interim Order or the DIP Documents; (c) to use or seek to use the Segregated DIP Account or the cash deposited therein or withdrawn therefrom other than as expressly provided pursuant to this Interim Order and the other DIP Documents; (d) to use or seek to use Cash Collateral other than as expressly provided pursuant to this Interim Order and the other DIP Documents; (e) to seek authorization to grant or obtain liens, security interests or claims that are senior to, or *pari passu* with, the DIP Liens, the DIP Superpriority Claims, the Prepetition Liens, the Prepetition Secured Obligations, the Adequate Protection Liens, and/or the Adequate Protection Claims; (f) to request or seek any modification of this Interim Order in any manner not approved by (i) the DIP Lenders and (ii) the

Prepetition Secured Parties; (g) to seek to subordinate, recharacterize, disallow, or avoid the DIP Liens, the DIP Superpriority Claims, the Prepetition Liens, the Prepetition Secured Obligations, the Adequate Protection Liens, and/or the Adequate Protection Claims; or (h) to investigate (including by way of examinations or formal or informal discovery proceedings), prepare, assert, join, commence, support, or prosecute any challenge (including any litigation or other action) for any claim, counterclaim, action, proceeding, application, motion, objection, defense, or other contested matter seeking any order, judgment, determination, or similar relief against, or adverse to, any or all of (x) the DIP Secured Parties, (y) the Prepetition Secured Parties, or (z) their respective affiliates, assigns, or successors and the respective officers, directors, employees, agents, attorneys, representatives, and other advisors of the foregoing, in each case, with respect to any transaction, occurrence, omission, action, or other matter (including formal or informal discovery proceedings in anticipation thereof) with respect to (A) any claims or causes of action arising under chapter 5 of the Bankruptcy Code, section 724(a) of the Bankruptcy Code, or any other avoidance actions under the Bankruptcy Code or applicable state law equivalents, (B) any so-called "lender liability" claims and causes of action, (C) any action with respect to the amount, validity, enforceability, priority, and extent of, or asserting any defense, counterclaim, or offset to, the DIP Obligations, the DIP Superpriority Claims, the DIP Liens, the DIP Documents, the Adequate Protection Claims, the Adequate Protection Liens, the Prepetition Secured Obligations, or the Prepetition Liens, (D) any action seeking to challenge, invalidate, modify, set aside, avoid, marshal, recharacterize, or subordinate, in whole or in part, the DIP Obligations, the DIP Liens, the DIP Superpriority Claims, the DIP Collateral, the Adequate Protection Claims, the Adequate Protection Liens, the Prepetition Secured Obligations, the Prepetition Liens, or the Prepetition Collateral, (E) any action seeking to modify any of the rights, remedies, priorities, privileges, protections, and

benefits granted to (x) the DIP Secured Parties and/or (y) the Prepetition Secured Parties hereunder or under any of the other DIP Documents (in each case, including, without limitation, claims, proceedings, or actions that might prevent, hinder, or delay any of the DIP Secured Parties' or Prepetition Secured Parties' assertions, enforcements, realizations, or remedies on or against the DIP Collateral in accordance with the applicable DIP Documents and this Interim Order), or (F) objecting to, contesting, or interfering with, in any way, the DIP Secured Parties' or Prepetition Secured Parties' enforcement or realization upon any of the DIP Collateral once an Event of Default (as defined in the DIP Credit Agreement) has occurred, subject to the provisions of this Interim Order. For the avoidance of doubt, nothing in this paragraph shall impact the Carve Out or limit the Debtors' right to use Cash Collateral to (a) contest that a Termination Event or an Event of Default (under the DIP Credit Agreement) has occurred, and/or (b) pay reasonable and documented counsel fees to prepare for and participate at any hearing held by the Court regarding any exercise of rights or remedies under the DIP Documents or otherwise.

27. *No Third-Party Rights*. Except as explicitly provided for herein, this Interim Order does not create any rights for the benefit of any third party, creditor, equity holder, or any direct, indirect, or incidental beneficiary.

28. *Waiver of Section 506(c)*. Effective upon entry of the Interim Order, in partial consideration for, among other things, the Carve Out and the payments made to administer the Chapter 11 Cases with the use of DIP Loans and Cash Collateral, no costs or expenses of administration which have been or may be incurred in the Chapter 11 Cases or any further proceeding that may result therefrom, including liquidation, bankruptcy, or other proceedings under the Bankruptcy Code, at any time, including costs and expenses incurred in connection with the preservation, protection, or enhancement of realization by the DIP Secured Parties or the

Prepetition Secured Parties, shall be charged against the DIP Secured Parties or the Prepetition Secured Parties, any of the DIP Obligations, any of the DIP Collateral, any of the Prepetition Secured Obligations, or any of the Prepetition Collateral pursuant to section 105 or 506(c) of the Bankruptcy Code, any similar principle of law, or otherwise without the prior express written consent of the DIP Agent (on behalf of the DIP Lenders) or the Prepetition Secured Parties, as applicable. For the avoidance of doubt, consent to the Carve Out or the approval of any budget hereunder shall not be deemed as consent under this paragraph. Nothing contained in this Interim Order shall be deemed as consent by the DIP Agent, the DIP Secured Parties or the Prepetition Secured Parties to any charge, lien, assessment, or claim against any DIP Collateral or Prepetition Collateral, as applicable, under section 506(c) of the Bankruptcy Code or otherwise.

29. *Waiver of Marshaling*. Effective upon entry of the Interim Order, and notwithstanding anything to the contrary herein, (a) the DIP Secured Parties and the Prepetition Secured Parties shall not be subject to the equitable doctrine of "marshaling" or any similar doctrine with respect to any of the DIP Collateral or Prepetition Collateral, as applicable, and (b) the DIP Superpriority Claims, Prepetition Secured Obligations, and Adequate Protection Claims shall be payable from and have recourse to all prepetition and postpetition property of the DIP Obligors and all proceeds thereof in accordance with the terms of this Interim Order, subject to the priorities set forth in this Interim Order; *provided*, that nothing in this paragraph 29 shall (i) limit any mandatory or optional prepayment or scheduled debt service payment (which payments can be made from any available sources) under the DIP Documents, (ii) be deemed to limit or prohibit the DIP Secured Parties or the Prepetition Secured Parties from exercising all rights and remedies against any DIP Collateral or Prepetition Collateral, as applicable, subject to the DIP Standstill, Prepetition Standstill, and the priorities set forth in this Interim Order, (iii) limit the

ability of the DIP Secured Parties or the Prepetition Secured Parties to acquire any DIP Collateral or Prepetition Collateral, as applicable, through a "credit bid" as provided in paragraph 30 of this Interim Order, subject to the DIP Standstill, the Prepetition Standstill and the priorities set forth in this Interim Order, or (iv) limit the application of proceeds of any DIP Collateral or Prepetition Collateral to satisfy amounts owed to the DIP Secured Parties or Prepetition Secured Parties, as applicable, on account of any DIP Obligations or Prepetition Secured Obligations, as applicable, subject to the DIP Standstill, the Prepetition Standstill and the priorities set forth in this Interim Order.

30. ***Right to Credit Bid***. Pursuant to section 363(k) of the Bankruptcy Code, (i) the DIP Collateral Agent (on behalf of the DIP Secured Parties) shall have the right to "credit bid" for the benefit of the DIP Secured Parties (without the need to submit a deposit) up to the full amount of the DIP Obligations (the exercise of which right shall be subject to the terms of the DIP Documents and any direction that may be required thereunder) and (ii) the Prepetition Secured Parties shall have the right to "credit bid" up to the full amount of the Prepetition Secured Obligations, in each case, in connection with any sale or other disposition of all or any portion of the DIP Collateral or the Prepetition Collateral, as applicable and subject to the priorities set forth herein, including, without limitation, sales occurring pursuant to section 363 of the Bankruptcy Code or included as part of any restructuring or liquidation plan subject to confirmation under section 1129(b)(2)(A)(iii) of the Bankruptcy Code, or any sale or disposition by a chapter 7 trustee for any Debtor, and shall automatically be deemed a "qualified bidder" with respect to any such sale or disposition of DIP Collateral. For the avoidance of doubt, nothing herein shall be deemed to waive, limit or alter any rights afforded to the DIP Secured Parties or the Prepetition Secured Parties pursuant to section 363(k) of the Bankruptcy Code. Notwithstanding the foregoing, the DIP Secured Parties shall not

be permitted to credit bid the DIP Obligations in respect of any Prepetition Collateral unless the Prepetition Payment in Full has occurred prior to (or would occur contemporaneously with) the effectuation of such credit bid. The Prepetition Secured Parties shall not be permitted to credit bid any Prepetition Secured Obligations, Adequate Protection Claims or any right to receive Adequate Protection Payments in respect of any DIP Priority Collateral unless the DIP Payment in Full has occurred prior to (or would occur contemporaneously with) the effectuation of such credit bid.

31. *Section 552(b) and Equities of the Case*. Subject to entry of the Final Order, (a) the Prepetition Secured Parties shall each be entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code, (b) the "equities of the case" exception thereunder shall not apply to any of them, and (c) in no event shall the "equities of the case" exception in section 552(b) of the Bankruptcy Code apply to the Prepetition Collateral.

32. *Joint and Several Liability*. The Debtors shall be jointly and severally liable for the obligations hereunder and all DIP Obligations in accordance with the terms hereof and of the DIP Documents.

33. *Adequate Protection Provisions*.

a) Pursuant to sections 361 and 363(e) of the Bankruptcy Code, as adequate protection for the respective interests of the Prepetition Secured Parties in the Prepetition Collateral (including the Cash Collateral), and as a condition for the use of their respective Prepetition Collateral, including any Cash Collateral, each of the Prepetition Secured Parties, as applicable, is hereby granted the following, effective as of the Petition Date:

i. *Adequate Protection Claims*. A superpriority administrative expense claim (the "Adequate Protection Claims") in the Chapter 11 Cases, to the extent of any Diminution in Value, with priority over all administrative expenses and claims of any kind or

nature whatsoever, specified in or ordered pursuant to sections 105, 326, 327, 328, 330, 331, 361, 362, 363, 364, 365, 503, 506, 507(a), 507(b), 546, 552, 726, 1113 or 1114 or any other provisions of the Bankruptcy Code, subject and junior only to the Carve Out;

ii. *Adequate Protection Liens*. To secure the Adequate Protection Claims, a perfected security interest in and lien (the "Adequate Protection Liens"), solely to the extent of any Diminution in Value, on: (i) all DIP Collateral that constitutes Prepetition Collateral, and (ii) all DIP Collateral that does not constitute Prepetition Collateral (other than the Segregated DIP Account and the cash deposited therein and withdrawn therefrom), and which Adequate Protection Liens shall have the following priority: (x) such Adequate Protection Liens on the DIP Collateral that constitutes Prepetition Collateral shall be subject to the Carve Out, but shall have priority over all other liens on such DIP Collateral (including the DIP Liens); and (y) such Adequate Protection Liens on the DIP Collateral that does not constitute Prepetition Collateral (including the DIP Priority Collateral) shall be subject to the Carve Out, and shall be junior to the DIP Liens on such DIP Collateral, but shall have priority over all other liens on such DIP Collateral (other than, for the avoidance of doubt, the DIP Liens); *provided*, for the avoidance of doubt, the Adequate Protection Liens shall not attach to the Segregated DIP Account or funds deposited therein or withdrawn therefrom;

iii. *Payment of Fees*. As further adequate protection, the DIP Obligors shall provide the Prepetition Credit Agreement Agent and the Consenting Secured Lenders current cash payments of the reasonable and documented prepetition and, subject to the review procedures set forth in paragraph 23 of this Interim Order, postpetition fees and expenses of the Prepetition Credit Agreement Agent and the Consenting Secured Lenders, including, but not limited to, the reasonable and documented fees and out-of-pocket expenses of (i) Milbank LLP (solely in its

capacity as counsel to the Prepetition Credit Agreement Agent), and one local counsel to the Prepetition Credit Agreement Agent (the "Prepetition Credit Agreement Agent Fees and Expenses"), and (ii) Gibson Dunn & Crutcher LLP (solely in its capacity as counsel to the Consenting Secured Lenders), and one local counsel to the Consenting Secured Lenders (the "Consenting Secured Lender Fees and Expenses" and, together with the Prepetition Credit Agreement Agent Fees and Expenses, the "Consenting Lender Fees and Expenses"); and

iv. *Adequate Protection Payments*. Cash payment on a current basis as provided under the Prepetition Secured Facilities Documents of (a) interest on the Prepetition Secured Obligations at the applicable non-default rate of interest, (b) required amortization payments, in each case, as provided under the applicable Prepetition Secured Facilities Documents, including, for the avoidance of doubt, payment of cash interest and amortization on the Prepetition Secured Obligations held by the DIP Lenders and/or affiliates of the DIP Lenders and (c) any fees payable (i) to the Prepetition Credit Agreement Agent for the administrative agency fee under the Prepetition Credit Agreement or related Loan Documents (as defined in the Prepetition Credit Agreement) or (ii) on account of any Letter of Credit (as defined in the Prepetition Credit Agreement) (such interest, amortization, and fee payments together with the Consenting Lender Fees and Expenses, the "Adequate Protection Payments"). Without limiting the requirement to pay all Adequate Protection Payments during the Chapter 11 Cases, when due, payment of any outstanding Adequate Protection Payments shall occur no later than the effective date of any plan of reorganization in these Chapter 11 Cases.

v. *Reporting*. The Debtors shall contemporaneously provide the Prepetition Agents and the Consenting Stakeholder Advisors (as defined in the Restructuring Support Agreement) with all reports, notices, documents and other information required to be

delivered to the DIP Secured Parties under the DIP Credit Agreement or this Interim Order (other than borrowing requests, interest election notices and other notices of an administrative or ministerial nature), including, but not limited to, any new Approved Budget or Variance Reports (each as defined herein).

vi. On the Termination Date, any amounts owed in respect of the Adequate Protection Payments shall cease accruing. For the avoidance of doubt, no amounts that would have accrued in respect of the Adequate Protection Payments after the Termination Date shall be payable as Adequate Protection Payments. All amounts owed in respect of the Adequate Protection Claims (including any amount attributable to any Diminution in Value (if any)) shall be calculated as of the Termination Date, and any amounts in respect of any Adequate Protection Payments that had actually accrued but were unpaid as of the Termination Date shall be due and payable on such Termination Date. Notwithstanding the foregoing, nothing in this Interim Order shall prevent any Prepetition Secured Party from, after the Termination Date, (i) seeking further adequate protection or (ii) seeking payment of any accrued and unpaid interest, amortization, or other payments under the applicable debt documents, including postpetition accrued and unpaid amounts, other than as Adequate Protection Payments under this Interim Order; *provided*, for the avoidance of doubt (x) no liens in respect of any such further adequate protection shall (1) attach to the Segregated DIP Account or the cash therein, or (2) attach to any other DIP Priority Collateral in a manner that ranks senior to the DIP Liens in the DIP Priority Collateral, and (y) no cash withdrawn from the Segregated DIP Account may be used to pay any amounts in respect of any such further adequate protection or the amounts or items set forth in the foregoing clause (ii) of this sub-paragraph (vi).

34. *Effect of Stipulations*.

a) The Debtors' stipulations in this Interim Order, including those in paragraph F, shall be binding upon the Debtors and their respective successors, representatives, and assigns in all circumstances and immediately upon entry of this Interim Order. The Debtors' stipulations contained in this Interim Order shall be binding also upon all other parties in interest, including, without limitation, any person or entity seeking to act on behalf of the Debtors' estates (including any chapter 7 or chapter 11 trustee or examiner appointed or elected for any of the Debtors in the Chapter 11 Cases or Successor Cases), for all purposes unless and to the extent any such other party in interest (i) files a motion seeking the requisite standing and authority to bring the Challenge (as defined below) (if and to the extent standing is required under applicable law) prior to the Challenge Deadline (as defined below), which motion shall describe the specific nature and basis of the Challenge and attach a draft complaint (the "Standing Motion"), and such standing is obtained pursuant to an order of the Court one business day before the date of the Final Hearing (the "Challenge Deadline"), (ii) timely and properly commences and serves an adversary proceeding or contested matter (subject to the limitations contained herein) (each, a "Challenge Proceeding") by no later than the Challenge Deadline, asserting a challenge with respect to the amount, validity, perfection, enforceability, priority, scope, or extent of the Prepetition Secured Obligations, the Prepetition Liens, the Prepetition Collateral, or the Prepetition Secured Facilities Documents, or otherwise challenging any of the Debtors' stipulations (each a "Challenge"), and (iii) obtains a final non-appealable order by a court of competent jurisdiction in favor of the plaintiff sustaining any such Challenge.

b) If no such Standing Motion (to the extent required) is timely and properly filed by the Challenge Deadline, or if the Court does not rule in favor of the plaintiff in any such timely and properly filed Challenge Proceeding, then, without application to or further order of the

Court, (i) each of the Debtors' stipulations shall be binding on all parties in interest, (ii) the Prepetition Secured Obligations shall constitute allowed claims against each of the Debtors in the Chapter 11 Cases, and the Prepetition Liens shall forever be deemed to be legal, valid, binding, continuing, perfected, first-priority on the Prepetition Collateral, and enforceable, as of the Petition Date, against each of the Debtors in the Chapter 11 Cases, (iii) the Prepetition Secured Obligations and the Prepetition Liens shall not be subject to any other or further challenge by any person or entity, and (iv) any and all challenges, of any kind or nature whatsoever, whether under the Bankruptcy Code, applicable non-bankruptcy law or otherwise, against any of the Prepetition Secured Parties shall be deemed forever waived, released and barred.

c) Nothing in this Interim Order vests or confers on any person or entity, including, without limitation, any party in interest, standing or authority to pursue any challenge belonging to the Debtors or their estates, and all rights to object to any request for such standing are expressly reserved.

35. ***Rights Preserved***. Notwithstanding anything herein to the contrary, the entry of this Interim Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly: (a) the rights of the DIP Secured Parties to seek any other or supplemental relief in respect of the Debtors or other DIP Obligors, or in the Chapter 11 Cases or any Successor Cases; (b) the rights of the DIP Secured Parties under the DIP Documents, the Bankruptcy Code, or applicable non-bankruptcy law, including, without limitation, the right to (i) request modification of the automatic stay of section 362 of the Bankruptcy Code, (ii) request dismissal of any of the Chapter 11 Cases, conversion of any or all of the Chapter 11 Cases to a case under chapter 7, or appointment of a chapter 11 trustee or examiner with expanded powers, or (iii) propose, subject to the provisions of section 1121 of the Bankruptcy Code, a chapter 11 plan or plans; or (c) any other rights, claims, or

privileges (whether legal, equitable, or otherwise) of the DIP Secured Parties. Notwithstanding anything herein to the contrary, the entry of this Interim Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly, the Debtors' or any party in interest's right to oppose any of the relief requested in accordance with the immediately preceding sentence, except as expressly set forth in this Interim Order or the DIP Documents.

36. *DIP Exit Fee*. The Debtors shall be obligated to pay a fee (such fee, the "DIP Exit Fee") to the DIP Lenders in the amount of 2.0% of the outstanding DIP Loans if the Restructuring Support Agreement is terminated pursuant to Sections 12.01(d) or 12.02(b) thereof.

37. *DIP Equitization*. Notwithstanding anything herein or in the DIP Documents to the contrary, and for the avoidance of doubt, the equitization of the applicable DIP Superpriority Claims into DIP New Interests (as defined in the Restructuring Term Sheet (as defined in the Restructuring Support Agreement)) in connection with the Equitization Commitment (as defined in the Restructuring Support Agreement) shall be subject to the Court's approval at the confirmation hearing for any chapter 11 plan as well as the standards set forth in section 1129 of the Bankruptcy Code; *provided*, for the avoidance of doubt, neither the DIP Obligations nor the DIP Superpriority Claims shall be subject to recharacterization as equity for any other reason.

38. *Proofs of Claim*. The acknowledgment herein of the Debtors of the DIP Obligations and the DIP Liens and the Prepetition Secured Obligations and the Prepetition Liens and such other rights, priorities, and protections granted to the DIP Agent on behalf of and for the benefit of itself and the DIP Lenders pursuant to the DIP Documents and the Prepetition Secured Parties subject to the applicable Prepetition Documents shall constitute a timely filed proof of claim on behalf of the DIP Agent, the DIP Lenders, and the Prepetition Secured Parties in the Chapter 11 Cases under Bankruptcy Rule 3001 and none of the DIP Agent, any DIP Lender, the Prepetition Credit

Agreement Agent, the Prepetition Trustee, or any Prepetition Secured Party shall be required to file any other or additional proofs of claim with respect to the DIP Obligations, the DIP Liens or the Prepetition Secured Obligations. Any order entered by the Court in relation to the establishment of a bar date in any of the Chapter 11 Cases or Successor Cases shall not apply to the DIP Secured Parties or the Prepetition Secured Parties with respect to any of the DIP Obligations or the Prepetition Secured Obligations, respectively; *provided*, *however*, that, notwithstanding any order entered by the Court establishing a bar date in any of the Chapter 11 Cases or any Successor Cases to the contrary, the Prepetition Credit Agreement Agent (on behalf of itself and the Prepetition Credit Agreement Secured Parties), in its discretion, may (but is not required to) file (and amend and/or supplement) a proof of claim and/or aggregate proofs of claim in each of the Chapter 11 Cases or any Successor Cases, and any such proof of claim may (but is not required to be) filed as one consolidated master proof of claim in the Debtors' lead Chapter 11 Case against all of the Debtors, which shall be deemed to have been filed against each and every Debtor. Such consolidated or master proofs of claim shall not be required to attach any instruments, agreements or other documents evidencing the obligations owing by each of the Debtors to the applicable party, which instruments, agreements or other documents will be provided upon reasonable written request to the Prepetition Credit Agreement Agent. Any proof of claim filed by or on behalf of any of the Prepetition Credit Agreement Secured Parties shall be deemed to be in addition to (and not in lieu of) any other proof of claim that may be filed by any such persons. The provisions set forth in this paragraph are intended solely for the purpose of administrative convenience and shall not affect the substantive rights of any party-in-interest or their respective successors-in-interest.

39. *No Waiver by Failure to Seek Relief*. The failure, at any time or times hereafter, of the DIP Secured Parties or the Prepetition Secured Parties to require strict performance by the Debtors of any provision of this Interim Order shall not waive, affect, or diminish any right of such parties thereafter to demand strict compliance and performance therewith. No delay on the part of any party in the exercise of any right or remedy under this Interim Order shall preclude any other or further exercise of any such right or remedy. No consents by any of the DIP Secured Parties or the Prepetition Secured Parties shall be implied by any inaction or acquiescence by any such party.

40. *Binding Effect of this Interim Order*. Immediately upon, and effective as of, entry by the Court, the provisions of this Interim Order, including all findings and conclusions herein, shall inure to the benefit of the Debtors, the DIP Secured Parties, and the Prepetition Secured Parties and their respective successors and assigns, and shall become valid and binding upon the Debtors, the DIP Secured Parties, and the Prepetition Secured Parties and any and all other creditors of the Debtors, and any and all other parties in interest and their respective successors and assigns, including any trustee or other fiduciary hereafter appointed as legal representative of any of the Debtors in any of the Chapter 11 Cases or any Successor Cases, or upon dismissal of any of the Chapter 11 Cases. Further, upon entry of this Interim Order, the DIP Obligations and the Adequate Protection Claims shall become allowed administrative expenses for all purposes in each of the Chapter 11 Cases.

41. *No Modification to Interim Order*. Until and unless the DIP Obligations have been indefeasibly paid in full in cash, the Debtors irrevocably waive the right to seek and shall not seek or consent to, directly or indirectly, without the prior written consent of the DIP Agent (at the direction of the DIP Lenders) and the Prepetition Secured Parties: (a) a priority claim for any administrative expense or unsecured claim against the Debtors (now existing or hereafter arising

of any kind or nature whatsoever, including, without limitation any administrative expense of the kind specified in sections 503(b), 506(c), 507(a) or 507(b) of the Bankruptcy Code) in the Chapter 11 Cases, equal or superior to the DIP Superpriority Claims, other than the Carve Out; (b) any order authorizing the use of Cash Collateral that is inconsistent with this Interim Order or the DIP Documents; or (c) any lien on any of the DIP Collateral with priority equal or superior to the DIP Liens, except as specifically provided in this Interim Order and/or the other DIP Documents. The Debtors irrevocably waive any right to seek any amendment, vacatur, stay, modification, or extension of this Interim Order without the prior written consent of the DIP Agent (at the direction of the DIP Lenders). No amendment, modification, or extension of this Interim Order, or any other order of the Court, shall have the effect of amending or modifying the DIP Credit Agreement or other DIP Documents without the prior written consent of the parties that would be required to effectuate any such amendment or modification pursuant to the DIP Credit Agreement (including the DIP Agent on behalf of the DIP Lenders) or this Interim Order.

42. *Order Controls*. In the event of any inconsistency between the terms and conditions of this Interim Order and of the DIP Documents, any other document, or any other order of the Court, the provisions of this Interim Order shall govern and control, unless and until the Final Order is entered.

43. *Limits on Lender Liability*. Nothing in this Interim Order or in any of the DIP Documents or any other documents related to this transaction shall in any way be construed or interpreted to impose or allow the imposition upon the DIP Secured Parties or Prepetition Secured Parties of any liability for any claims arising from any and all activities by the Debtors in the operation of their business in connection with the Debtors' postpetition restructuring efforts.

44. *Release*. The Debtors forever and irrevocably (a) release, discharge, and acquit the DIP Secured Parties and the Prepetition Secured Parties, and each of their respective former and current officers, employees, directors, agents, representatives, arrangers, owners, members, partners, financial advisors, legal advisors, shareholders, managers, consultants, accountants, attorneys, affiliates, assigns, or successors, and predecessors in interest, in each case, solely in their respective capacities as such (collectively, the "Secured Party Releasees") of and from any and all claims, demands, liabilities, responsibilities, disputes, remedies, causes of action, indebtedness, and obligations, of every type, that the Debtors at any time had, now have or may have relating to any aspect of the relationship between the Secured Party Releasees, solely in their capacity as Secured Party Releasees, and the Debtors, including any lender liability, equitable subordination, or recharacterization claims or defenses, with respect to or relating to the Prepetition Secured Facilities Documents, the Prepetition Secured Obligations, DIP Loans, the DIP Documents, the DIP Facility, the Debtors' attempts to structure the DIP Loans, and the transactions contemplated thereunder and hereunder, consent to the terms of this Interim Order, and any and all claims regarding the amount, enforceability, validity, priority, perfection, or avoidability of the liens or secured claims of the DIP Secured Parties or consenting Prepetition Secured Parties; and (b) waive and release any and all defenses (including, without limitation, offsets and counterclaims of any nature or kind) as to the amount, validity, perfection, priority, enforceability, and non-avoidability of the DIP Obligations and the Prepetition Secured Obligations. Nothing in this Interim Order shall in any way be construed or interpreted to impose or allow the imposition upon the Secured Party Releasees any liability for any claims arising from any and all activities by the Debtors or any of their subsidiaries or affiliates in the operation of their businesses or in connection with their

restructuring efforts; *provided*, that, the provisions of this paragraph 44 in respect of the Prepetition Secured Parties shall be subject to paragraph 34.

45. *Treatment of DIP Claims*. On the Maturity Date (as defined in the DIP Credit Agreement), the Borrower shall pay the then unpaid and outstanding amount of the DIP Obligations pursuant to the provisions of the DIP Documents; *provided*, that, subject to paragraph 37 hereof, if the Plan (as defined in the Restructuring Support Agreement) is confirmed and the Restructuring Effective Date (as defined in the Restructuring Support Agreement) of the Plan occurs, the DIP Obligations shall be equitized in accordance with the ECL (as defined in the Restructuring Support Agreement). For the avoidance of doubt, nothing in this Interim Order or the DIP Documents shall impose any obligation on any party to the ECL other than as expressly set forth in the ECL.

46. *Section 1141(d)*. The DIP Obligations, the DIP Liens and the DIP Superpriority Claims may not be discharged under section 1141(d) of the Bankruptcy Code unless (a) the DIP Obligations are indefeasibly paid in full in cash, (b) the DIP Obligations are equitized in accordance with the ECL, or (c) the DIP Lenders consent in writing. The Adequate Protection Liens and the Adequate Protection Claims may not be discharged under section 1141(d) of the Bankruptcy Code unless (i) the Adequate Protection Claims are indefeasibly paid in full in cash, (ii) the Adequate Protection Claims and Adequate Protection Liens are discharged pursuant to a Plan (as defined in the Restructuring Support Agreement) consummated in accordance with the terms of the Restructuring Support Agreement, or (iii) the applicable Prepetition Secured Parties consent in writing.

47. *Survival*. The provisions of this Interim Order and any actions taken pursuant hereto shall survive, and shall not be modified, impaired, or discharged by, entry of any order that

may be entered (a) confirming any plan in any of the Chapter 11 Cases, (b) converting any or all of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code, (c) dismissing any or all of the Chapter 11 Cases, or (d) pursuant to which the Court abstains from hearing any of the Chapter 11 Cases. The terms and provisions of this Interim Order, including the claims, liens, security interests, and other protections (as applicable) granted to the DIP Secured Parties pursuant to this Interim Order, notwithstanding the entry of any such order, shall continue in any of the Chapter 11 Cases, following dismissal of any of the Chapter 11 Cases, or any Successor Cases, and shall maintain their priority as provided by this Interim Order. The DIP Protections (as defined below), as well as the terms and provisions concerning the reimbursement and indemnification of the DIP Secured Parties, shall continue in any of the Chapter 11 Cases following dismissal of any of the Chapter 11 Cases, termination of the provisions of this Interim Order, and/or the indefeasible repayment in full of the DIP Obligations.

48. *Dismissal*. If any order dismissing any of the Chapter 11 Cases under section 1112 of the Bankruptcy Code or otherwise is at any time entered, such order shall provide (in accordance with sections 105 and 349 of the Bankruptcy Code) that (a) (x) the rights, privileges, benefits and protections afforded herein and in the DIP Documents to the DIP Secured Parties, including the DIP Liens and the DIP Superpriority Claims (collectively, the "DIP Protections"), and (y) the rights, privileges, benefits, and protections afforded herein to the Prepetition Secured Parties, including the Adequate Protection Liens and the Adequate Protection Claims, in each case, shall continue in full force and effect and shall maintain their priorities as provided in this Interim Order until all DIP Obligations and Prepetition Secured Obligations, as applicable, have been paid in full (and that all DIP Protections and adequate protection provisions set forth herein shall, notwithstanding such dismissal, remain binding on all parties in interest), and (b) this Court shall retain jurisdiction,

notwithstanding such dismissal, for the purposes of enforcing such DIP Protections and the adequate protection provisions set forth herein.

49. *Entry of this Interim Order/Waiver of Applicable Stay*. This Interim Order shall be effective upon its entry and not subject to any stay (all of which are hereby waived), notwithstanding anything to the contrary contained in Bankruptcy Rule 4001(a)(3).

50. *Effect of this Interim Order*. This Interim Order shall constitute findings of fact and conclusions of law in accordance with Bankruptcy Rule 7052 and shall take effect and be fully enforceable immediately upon entry hereof. Notwithstanding Bankruptcy Rules 4001(a)(3), 6004(h), 6006(d), 7062, and 9024 or any other Bankruptcy Rule, or Rule 62(a) of the Federal Rules of Civil Procedure, this Interim Order shall be immediately effective and enforceable upon its entry and there shall be no stay of execution or effectiveness of this Interim Order.

51. *Retention of Jurisdiction*. The Court shall retain exclusive jurisdiction to hear, determine, and, if applicable, enforce the terms of, any and all matters arising from or related to the DIP Facility and/or this Interim Order.

52. *Final Hearing*. The Final Hearing to consider the relief requested in the DIP Motion on a final basis shall be held on [______], 2026, at [_____], a.m./p.m. (prevailing Eastern Time). Any objection to entry of the Final Order shall be filed with the Court by [______] at 4:00 p.m. (prevailing Eastern Time) and served so as to be received by: (a) proposed counsel to the Debtors, Simpson Thacher & Bartlett LLP, 425 Lexington Avenue, New York, New York 10017 (Attn: Brian Schartz, Esq. (brian.schartz@stblaw.com), Elisha Graff, Esq. (egraff@stblaw.com), Rachael Foust, Esq. (rachael.foust@stblaw.com), Dov Gottlieb, Esq. (dov.gottlieb@stblaw.com), and Alex Xuan, Esq. (alex.xuan@stblaw.com)) and proposed Delaware co-counsel to the Debtors, Cole Schotz P.C., 500 Delaware Avenue, Suite 600, Wilmington, Delaware 19801 (Attn: Seth Van

Aalten, Esq. (svanaalten@coleschotz.com), Justin R. Alberto, Esq. (jalberto@coleschotz.com), Sarah A. Carnes, Esq. (scarnes@coleschotz.com), and Jack M. Dougherty, Esq. (jdougherty@coleschotz.com)); (b) counsel to the DIP Agent, Shipman & Goodwin LLP, One Constitution Plaza, Hartford CT 06103 (Attn: Nathan Z. Plotkin, Esq. (NPlotkin@goodwin.com)); (c) counsel to the DIP Lenders, Jones Day, (i) 901 Lakeside Avenue, Cleveland, Ohio 44114 (Attn: Carl Black, Esq. (ceblack@jonesday.com)), and (ii) 250 Vesey Street, New York, New York 10281 (Attn: Nicholas Morin, Esq. (nmorin@jonesday.com) and Nicholas Buchta, Esq. (nbuchta@jonesday.com)); (d) the Prepetition Credit Agreement Agent; (e) counsel to the Prepetition Credit Agreement Agent, Milbank LLP, 55 Hudson Yards, New York, New York 10001 (Attn: Evan Fleck, Esq. (efleck@milbank.com), Lauren Doyle, Esq. (ldoyle@milbank.com), Arden Ham, Esq. (aham@milbank.com), and Abigail Debold, Esq. (adebold@milbank.com)); (f) counsel to the Consenting Secured Lenders, Gibson, Dunn & Crutcher LLP, 200 Park Avenue, New York, New York 10166 (Attn: Scott J. Greenberg, Esq. (sgreenberg@gibsondunn.com), Matt M. Roose, Esq. (mroose@gibsondunn.com), and Rob E. Fitzgerald, Esq. (rfitzgerald@gibsondunn.com)); (g) counsel to certain Plan Sponsors, (i) Paul, Weiss, Rifkind, Wharton & Garrison LLP, 1285 Avenue of the Americas, New York, New York 10019 (Attn: John Weber, Esq. (jweber@paulweiss.com) and Robert Britton, Esq. (rbritton@paulweiss.com)) and (ii) Richards, Layton & Finger P.A., 920 N. King Street, Wilmington, DE 19801 (Attn: Zachary I. Shapiro, Esq. (Shapiro@rlf.com) and David T. Queroli (queroli@rlf.com)); and (h) the U.S. Trustee. In the event no objections to entry of the Final Order are timely filed and served, the Court may enter the Final Order without need for the Final Hearing. The Final Order shall be substantially in the form of this Interim Order, with such modifications as are acceptable to the DIP Lenders, and subject to the consent rights set forth in the Restructuring Support Agreement.

53. *Service of Interim Order*. The Debtors shall promptly serve copies of this Interim Order (which shall constitute adequate notice of the Final Hearing) on the parties having been given notice of the Interim Hearing and to any party that has filed with the Court a request for notices in these Chapter 11 Cases.

# <u>Exhibit 1</u>

**Initial Approved Budget**

**(Summary Version)**

[Attached]

**Project Oscar**
**DIP Motion Exhibit: Debtors Cash Flow**
*$MM, USD*

| **Forecast Period:** | **1** | **2** | **3** | **4** | **5** | **6** | **7** | **8** | **9** | **10** | **11** | **12** | **13** | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Week End:** | **10/24/2026** | **10/31/2026** | **11/7/2026** | **11/14/2026** | **11/21/2026** | **11/28/2026** | **12/5/2026** | **12/12/2026** | **12/19/2026** | **12/26/2026** | **1/2/2027** | **1/9/2027** | **1/16/2027** | **Total** |
| **RECEIPTS** | | | | | | | | | | | | | | |
| Total Cash Receipts | $ 10.3 | $ 8.7 | $ 10.2 | $ 7.8 | $ 8.4 | $ 9.2 | $ 8.8 | $ 8.4 | $ 8.6 | $ 8.1 | $ 12.6 | $ 10.1 | $ 10.3 | $ 121.7 |
| Total Operating Disbursements | (26.2) | (8.1) | (9.1) | (7.0) | (27.9) | (3.5) | (7.6) | (2.6) | (20.1) | (3.2) | (3.5) | (7.3) | (3.0) | (129.2) |
| **Cash Flow from Operations** | **$ (15.9)** | **$ 0.6** | **$ 1.1** | **$ 0.9** | **$ (19.4)** | **$ 5.7** | **$ 1.2** | **$ 5.8** | **$ (11.6)** | **$ 4.9** | **$ 9.1** | **$ 2.8** | **$ 7.3** | **$ (7.5)** |
| Ch. 11 Expenses | (4.1) | - | (1.8) | - | (1.1) | - | (0.4) | - | (0.6) | - | (52.3) | - | - | (60.2) |
| Debt Service | (2.9) | - | (30.4) | - | - | - | - | - | - | - | (30.3) | - | - | (63.6) |
| Delayed Draw Uses | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Non-Operating Disbursements** | **$ (7.0)** | **$ -** | **$ (32.2)** | **$ -** | **$ (1.1)** | **$ -** | **$ (0.4)** | **$ -** | **$ (0.6)** | **$ -** | **$ (82.6)** | **$ -** | **$ -** | **$ (123.8)** |
| Net Intercompany[1] | 0.7 | 0.9 | 0.1 | 0.1 | 0.1 | 0.9 | 0.1 | 0.1 | 0.1 | 0.9 | 16.8 | 0.1 | 0.1 | 21.1 |
| Interim Initial & Final DIP Loans[2] | 85.0 | - | - | - | 28.0 | - | - | - | - | - | - | - | - | 113.0 |
| **Net Cash Flow** | **$ 62.8** | **$ 1.5** | **$ (31.0)** | **$ 1.0** | **$ 7.6** | **$ 6.6** | **$ 0.9** | **$ 5.9** | **$ (12.0)** | **$ 5.8** | **$ (56.6)** | **$ 2.9** | **$ 7.4** | **$ 10.2** |
| **Beginning Cash** | **$ 23.6** | **$ 86.5** | **$ 88.0** | **$ 57.0** | **$ 58.0** | **$ 65.6** | **$ 72.2** | **$ 73.1** | **$ 79.0** | **$ 67.0** | **$ 72.8** | **$ 16.1** | **$ 19.0** | **$ 23.6** |
| Net Cash Flow | 62.8 | 1.5 | (31.0) | 1.0 | 7.6 | 6.6 | 0.9 | 5.9 | (12.0) | 5.8 | (56.6) | 2.9 | 7.4 | 2.8 |
| **Ending Cash[3]** | **$ 86.5** | **$ 88.0** | **$ 57.0** | **$ 58.0** | **$ 65.6** | **$ 72.2** | **$ 73.1** | **$ 79.0** | **$ 67.0** | **$ 72.8** | **$ 16.1** | **$ 19.0** | **$ 26.4** | **$ 26.4** |
| Memo: Funded Reserve Account | - | 8.0 | 10.7 | 13.4 | 16.1 | 18.2 | 20.3 | 22.4 | 24.5 | 26.6 | - | - | - | - |
| *Interim Initial & Final DIP Loans (Funded)* | *85.0* | *85.0* | *85.0* | *85.0* | *113.0* | *113.0* | *113.0* | *113.0* | *113.0* | *113.0* | *113.0* | *113.0* | *113.0* | *113.0* |
| *Delayed Draw DIP Commitment (Unfunded)* | *30.0* | *30.0* | *30.0* | *30.0* | *30.0* | *30.0* | *30.0* | *30.0* | *30.0* | *30.0* | *30.0* | *30.0* | *30.0* | *30.0* |
| ***Total DIP Facility*** | ***$ 115.0*** | ***$ 115.0*** | ***$ 115.0*** | ***$ 115.0*** | ***$ 143.0*** | ***$ 143.0*** | ***$ 143.0*** | ***$ 143.0*** | ***$ 143.0*** | ***$ 143.0*** | ***$ 143.0*** | ***$ 143.0*** | ***$ 143.0*** | ***$ 143.0*** |

1. During the forecast period there are no assumed transfers of cash from Debtors to non-Debtors
2. All proceeds of the DIP Loans will be deposited into the Segregated DIP Account and may be withdrawn only in accordance with the Approved Budget, subject to Permitted Variances, or to fund the Carve Out.
3. Ending cash includes amounts deposited in the Funded Reserve Account

## Exhibit 2

## Control Rider

**1. Control of the Deposit Accounts.**

(a) Upon receipt by the Segregated Account Bank of a written notice from the DIP Agent stating that it is a "Notice of Exclusive Control", the Segregated Account Bank will (i) comply with instructions originated by the DIP Agent directing disposition of the funds in the Segregated DIP Account without further consent by Borrower and (ii) cease complying with instructions originated by Borrower. For the avoidance of doubt, prior to receipt of a Notice of Exclusive Control from the DIP Agent, the Segregated Account Bank may comply with instructions received from Borrower and shall have no obligation to comply with instructions originated by the DIP Agent (other than a Notice of Exclusive Control).

(b) The Segregated Account Bank is fully entitled to rely on instructions from the DIP Agent and is under no obligation to inquire or determine whether Borrower's obligations to the DIP Secured Parties are in default or whether the DIP Agent is entitled, under any separate agreement between Borrower and the DIP Agent, to give any instructions. The Segregated Account Bank may rely on notices and instructions received hereunder which the Segregated Account Bank believes in good faith come from the appropriate party.

(c) The Debtors shall not assign or grant a security interest in the Segregated DIP Account, except to the DIP Agent in respect of the DIP Obligations, and the Debtors shall not permit the Segregated DIP Account to become subject to any other pledge, assignment, lien, charge or encumbrance of any kind, other than the DIP Liens and the Segregated Account Bank's rights and recourse to the Segregated DIP Account referred to herein.

(d) Notwithstanding anything in this Control Rider to the contrary, the Segregated Account Bank will not be liable to any party for (x) complying with any instructions or (y) completing any transactions, in each case, involving the Segregated DIP Account that the Segregated Account Bank or an affiliate thereof has received from the DIP Agent.

**2. Segregated Account Bank's Recourse to Segregated DIP Account.** The Segregated Account Bank waives any right of setoff and subordinates any security interest (except as to any security interest under UCC Section 4-210) it may now have or hereafter acquire against the Segregated DIP Account, except with respect to (a) the amount of each Unpaid Item (hereinafter defined), (b) the Segregated Account Bank's customary service charges and fees, account maintenance fees, transfer fees and out-of-pocket expenses (including, without limitation, the Segregated Account Bank's attorneys' fees) incurred by the Segregated Account Bank directly related to the Segregated DIP Account (collectively, "**Fees and Charges**"), or (c) adjustments or corrections of posting or encoding errors (each, an "**Adjustment**") ((a), (b) and (c) above being hereinafter collectively referred to as "**Permitted Debits**"). The Borrower shall pay the charges in effect from time to time of the Segregated Account Bank for the performance of the services relating to the Segregated DIP Account. If there are insufficient funds in the Segregated DIP Account for any Unpaid Items, other Permitted Debits or any other charge related to the Segregated

DIP Account, or if the Segregated Account Bank fails to receive final settlement of an Item for any reason whatsoever, then the Segregated Account Bank shall have the right to receive reimbursement therefor, without setoff, directly from Borrower, and, in the case of any Unpaid Items or Adjustments, immediately upon demand. As used herein, "**Item**" means a check, draft, money order, instrument, wire transfer of funds, automated clearing house entry, credit from a merchant card transaction, other electronic transfer of funds or other item, in each instance, deposited in or credited to the Segregated DIP Account. As used herein, "**Unpaid Item**" means the amount of an Item (i) deposited in or credited to the Segregated DIP Account, and returned unpaid or otherwise uncollected or subject to an adjustment entry, whether for insufficient funds or for any other reason, and without regard to the timeliness of the return or adjustment or the occurrence or timeliness of any other person's notice of nonpayment or adjustment, (ii) subject to a claim against the Segregated Account Bank of breach of transfer, presentment, encoding, retention or other warranty under Federal Reserve Regulations or Operating Circulars, clearing house rules, the UCC or other applicable law, or (iii) for a merchant card transaction, against which a contractual demand for chargeback has been made.