**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| GETTY IMAGES HOLDINGS, INC., *et al.*,[1] | ) | Case No. 26-11643 (JKS) |
| Debtors. | ) | (Joint Administration Requested) |

**DECLARATION OF CRAIG PETERS, CHIEF EXECUTIVE OFFICER OF GETTY IMAGES HOLDINGS, INC. AND ITS DEBTOR SUBSIDIARIES, IN SUPPORT OF THE DEBTORS' CHAPTER 11 PETITIONS**

I, Craig Peters, Chief Executive Officer ("CEO") of Getty Images Holdings, Inc. ("GIH"), a Delaware corporation, and its affiliated debtors and debtors in possession (collectively, the "Debtors" and, together with other direct and indirect subsidiaries of GIH, "Getty Images" or the "Company") in the above-captioned cases (the "Chapter 11 Cases"), pursuant to 28 U.S.C. § 1746, and under penalty of perjury, declare the following to the best of my knowledge, information, and belief:

## Introduction[2]

1. For more than three decades, Getty Images has been behind the photographs that memorialize the moments the world remembers. The comprehensive recapitalization embodied in the Restructuring Support Agreement (the "RSA") maximizes value and facilitates a broad consensual recapitalization and equity capital infusion ensuring that Getty Images will be able to continue to disseminate the world's iconic moments for decades to come.

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Getty Images Holdings, Inc. (4229); Griffey Midco (DE), LLC (7122); Abe Investment Holdings, Inc. (5107); Getty Images, Inc. (7556); Getty Images (US), Inc. (8819); Getty Images News Services (PRC), Inc. (1849); and Getty Images (Seattle), Inc. (6863). The location of the Debtors' service address for purposes of these chapter 11 cases is: 605 5th Ave. S. Suite 400, Seattle, WA 98104.

[2] Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Restructuring Support Agreement or the Plan of Reorganization.

2. Delivering award-winning imagery to customers in almost every country in the world, Getty Images brings the world's best content to media outlets, corporations, and small businesses. Getty Images' library contains over 662 million creative and editorial images and videos, and its analog archives of over 150 million historical photographs cover more than a century of popular culture, sports, entertainment, and world events. Today, the Company covers more than 160,000 news, sports, and entertainment events annually, and the Getty Images brand is among the most widely recognized names in media.

3. The demand for high-quality visual content has never been greater. Americans spend an average of 13 hours per day consuming digital media, and approximately 69% of the global population now uses social media. Approximately 60% of consumers look for visual content prior to purchasing a product. Getty Images provides much of that content.

4. The Company's core enterprise creative and editorial businesses continue to grow. The Company's platforms process over 2.1 billion searches annually and serve approximately 636,000 purchasing customers, including many of the world's largest corporations, media organizations, and advertising agencies. Content is sourced from over 600,000 contributors and more than 360 premium partners, including exclusive coverage of the Olympics, FIFA World Cup, Formula 1, the Academy Awards, and the Grammy Awards, among many more. For the twelve months ending June 30, 2026, the Company generated approximately $978 million in revenue and approximately $307 million in Adjusted EBITDA, and its Adjusted EBITDA margin has consistently exceeded 30%.

5. Even so, in the twenty-two months prior to October 21, 2026 (the "Petition Date"), the Company's liquidity fell by 80%, and as of the Petition Date is only slightly above the $50 million operational threshold required for the Company to promote worldwide operational

stability. That decline was not the outcome of operational mismanagement, as the Company continued to generate substantial revenue and strong margins throughout the period. Instead, the decline was caused by a combination of events outside the Company's control that occurred in rapid succession: litigation resulting in judgments of over $200 million and unasserted potential claims that could be as high as an estimated $275 million more, a very public failed merger following a lengthy and expensive process, and debt service on an over-levered capital structure not right-sized for the standalone Company.

6. The Company paid approximately $111 million to satisfy one set of judgments in litigation brought by former warrant holders. The Company next faced a judgment issued in favor of plaintiffs in New York State court of approximately $92 million (inclusive of interest). As of June 9, 2026, the date of the adverse ruling, the Company's obligation to pay the judgment was imminent, yet the Company's liquidity was too constrained to post a bond pending appeal.[3]

7. The Company also struggled following the failure of a merger that has cost it significant time and expense. On January 6, 2025, the Company agreed to merge with Shutterstock, Inc. ("Shutterstock"). In anticipation of closing, the Company spent over $100 million in fees and entered into a financing agreement required by the merger agreement designed as a temporary bridge to the combined entity, which increased the Company's ongoing debt service burden. After more than a year of regulatory review, the U.K. Competition and Markets Authority ("CMA") conditioned the merger on the divestiture of Shutterstock's entire editorial business, which constituted a "burdensome condition" under the Shutterstock Merger Agreement. With its liquidity already substantially depleted, the Board concluded that it was not in the best interests of

[3] The details of the warrant litigation are further described in Part II.A below.

the Company to waive the "burdensome condition" under the Shutterstock Merger Agreement and terminated the merger agreement pursuant to its terms on July 7, 2026.

8. Following termination of the merger, the Company was able to reduce its debt burden by terminating transaction financing and reducing transaction-related fees and expenses but still faced actual and potential liabilities from the warrant related litigation while continuing to carry approximately $154 million in annual interest expense, €22 million of required annual amortization and $60 million of mandatory debt redemptions. Additionally, low levels of liquidity were quickly declining, and an overleveraged capital structure persisted. S&P Global Ratings ("S&P") downgraded the Company, concluding that "[t]he terminated merger will strain Getty's liquidity and we now view its capital structure as unsustainable."

9. These conditions introduced substantial doubt about the Company's ability to continue as a going concern. As of the Petition Date, the Debtors have approximately $1,456.0 million of total funded debt outstanding, of which approximately $1,186.0 million is secured by substantially all of the assets of the applicable Debtors (subject to customary thresholds and limitations including 35% of the interests in foreign non-Debtor subsidiaries). And these events came at a particularly sensitive time for the Company. Significant customer renewals were approaching and are ongoing, and the trading prices of the Company's equity and debt were declining. The Company's focus shifted towards stabilizing the business, protecting its relationships with customers and contributors, and avoiding any action that would unnecessarily increase uncertainty or destroy value.

10. Recognizing the urgency of the situation, the Company acted promptly, yet deliberately and with great care. The Debtors formed independent Special Committees to oversee the evaluation of strategic alternatives, and engaged Guggenheim Securities, LLC ("Guggenheim

Securities") as its investment banker and Simpson Thacher & Bartlett LLP as legal counsel. Each special committee retained its own legal counsel.

11. Beginning in July 2026, the Company, alongside its advisors, engaged with each of its major stakeholders, including an ad hoc group of secured lenders (holders of its Term Loans and 11.25% Secured Notes) (the "Secured Ad Hoc Group"), an ad hoc group of unsecured noteholders (holders of its Unsecured Notes) (the "Unsecured Noteholders Ad Hoc Committee" and, together with the Secured Ad Hoc Group, the "Ad Hoc Groups"), and affiliates of the Getty Family and Koch Equity Development LLC ("KED"), its two largest shareholders (such affiliates together, the "Plan Sponsors"). Each Ad Hoc Group, represented by its own legal and financial advisors, agreed to enter a restricted period during which time the Company provided extensive information about its operations and finances, while negotiating the terms of potential transactions that would help address its financial distress. On August 25, 2026, affiliates of the Getty Family and KED each publicly disclosed in their Schedule 13D filings that they were exploring a potential investment in the Company.

12. As negotiations were ongoing, the Company took measures to preserve liquidity and extend the time available to negotiate a comprehensive, value-maximizing solution. To provide more time before enforcement of the $92 million judgment owed to the New York State warrant plaintiffs, the Company negotiated a standstill that stayed the enforcement of payment to October 26, 2026 in exchange for a partial payment of approximately $4.2 million. As another measure to preserve cash, the Company elected not to make the approximately $18.8 million bond interest payments due under the Unsecured Notes on September 1, 2026, and instead used the thirty-day grace period available under the applicable indentures.[4] Notwithstanding these efforts

[4] On November 2, 2026, $30,371,872 in interest would be due on the 11.25% Secured Notes.

to extend liquidity, the grace period on the interest payment ended on September 30, and the Company had no assurance that the plaintiffs in the NY State Actions would be willing to extend the October 26, 2026 standstill deadline. With these deadlines quickly approaching, the Company projected its liquidity would fall below the approximately $50 million needed for ordinary-course operations by the end of October, and the Company quickly advanced negotiations with its key stakeholders, anticipating the potential need for a chapter 11 filing.

13. From August 17, 2026 through September 30, 2026, the Company exchanged proposals with the key stakeholder groups. After multiple rounds of arm's-length negotiations, by early September the Company reached a deal in principle with the Secured Ad Hoc Group, consisting of holders of approximately $830 million of the Company's secured funded debt. That deal required the Plan Sponsors to provide a new cash equity investment of at least $280 million and to convert approximately $100 million of term loans held by certain of the Plan Sponsors into equity.

14. At the same time, the Company's proposal to the Unsecured Noteholders Ad Hoc Committee, which consisted of a combination of a cash payment and a percentage of the Company's restructured equity in exchange for full extinguishment of the $270 million of Unsecured Notes, had been rejected. The Unsecured Noteholders Ad Hoc Committee indicated that the value offered was not adequate, and that it was considering a bid for the Company. The Company therefore began to discuss with the Secured Ad Hoc Group a transaction that would have included a marketing process. The Company also discussed with the Plan Sponsors whether they would serve as a stalking-horse bidder under the terms required by the Secured Ad Hoc Group, as a public marketing process with an uncertain outcome could pose very material risks to the Company's business.

15. While evaluating a sale process, the Company also continued arm's-length negotiations with the Plan Sponsors in an attempt to extract further value for the business and drive a consensual deal with the Unsecured Noteholders Ad Hoc Committee. Thanks to the significant efforts of the Company, overseen by the Special Committees, by late September the Plan Sponsors had agreed to increase their total cash equity commitment by approximately $153 million to up to $433 million. This represented a 55% increase over the $280 million included in the deal in principle reached with the Secured Ad Hoc Group. The new equity capital would be used to fund an all-cash recovery to holders of Unsecured Notes Claims of $170.2 million. In exchange, those holders would be required to fully extinguish the $270 million of Unsecured Notes principal outstanding, implying the holders of Unsecured Notes Claims were accepting a very material discount to par of approximately $100 million, or 37%.

16. On September 28, 2026, based on the material new equity commitment the Company extracted from the Plan Sponsors, the Company reached an agreement in principle with both the Secured Ad Hoc Group and the Unsecured Noteholders Ad Hoc Committee, which, in combination, represented 83% of the Unsecured Notes. The agreement would materially reduce the Company's interest expense, reduce leverage, extend maturities, and include a commitment by KED (one of the Plan Sponsors) to provide interim debtor-in-possession financing during the Chapter 11 Cases.[5] With confidence that the Company had a path to a sustainable capital structure and a means to obtain new financing, the Company was able to avoid a value-destructive free-fall

[5] I understand from the Company's investment banker Guggenheim Securities that the Company also engaged in discussions with twelve third parties regarding potential debtor-in-possession financing. I further understand from Guggenheim Securities that as of the Petition Date, each of these third parties ultimately declined to provide, otherwise participate in, or provide an actionable proposal to provide debtor-in-possession financing for the Debtors. *See Declaration of Adam Preiss, Senior Managing Director of Guggenheim Securities, LLC in Support of the Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Use Cash Collateral and Obtain Postpetition Financing; (II) Granting Liens and Superpriority Administrative Expense Claims; (III) Providing Adequate Protection; (IV) Modifying the Automatic Stay; (V) Scheduling a Final Hearing; and (VI) Granting Related Relief.*

bankruptcy and make its September 1 interest payment on the Unsecured Notes on September 30, 2026, within the grace period.

17. These efforts ultimately culminated in the execution of the RSA, dated as of October 12, 2026, by and among GIH and certain of its subsidiaries (collectively, the "Company Parties") and the Consenting Stakeholders, a copy of which is attached hereto as **Exhibit A** (together with all exhibits, annexes, and schedules thereto, including the restructuring term sheet annex thereto (the "Restructuring Term Sheet")). The RSA contemplates the restructuring and recapitalization transactions described therein (collectively, the "Restructuring Transactions"). Subject to the Court's approval, the Restructuring Transactions will be implemented through the Debtors' proposed joint prepackaged chapter 11 plan of reorganization (as may be amended, modified, or supplemented in accordance with its terms, the "Plan"), filed contemporaneously herewith. Solicitation was required to launch no later than October 21, 2026 under the terms of the RSA. Critically, the Company and the Plan Sponsors agreed on broad fiduciary protections in the RSA, which, when coupled with the fact that the Plan Sponsors are not receiving a court-approved break-up fee or court-approved expense reimbursement under the RSA[6], gives the Company a meaningful opportunity to consider and address any and all competing alternative transaction proposals.[7]

18. The RSA has the support of the vast majority of the Company's key stakeholders, holding a total of approximately $1.31 billion in aggregate principal amount of the Company's

[6] The RSA provides for a modest 2% exit fee in connection with the exercise of the fiduciary out and the repayment of the DIP Facility, payable on amounts outstanding under the DIP Facility. Separately, the ECL provides for the reimbursement of the Plan Sponsors' reasonable and documented fees and expenses, which is payable after the Restructuring Effective Date or, if the ECL terminates earlier, upon such termination.

[7] The Special Committee of GIH has been delegated full decision-making authority regarding the fiduciary provisions contained in the RSA with respect to that Debtor entity.

funded debt. Specifically, the Consenting Stakeholders hold, in the aggregate, approximately 90% of the outstanding principal amount of the Secured Funded Debt Claims, 100% of the outstanding principal amount of the Revolving Loans, and approximately 83% of the outstanding principal amount of the Unsecured Notes.

19. The RSA provides for a total investment by the Plan Sponsors of up to $533 million, inclusive of up to $113 million in DIP Loans, equitization of approximately $100 million of EUR Term Loans held by certain of the Plan Sponsors, and a new money cash investment on the effective date of the Plan (the "Restructuring Effective Date") of up to $433 million less amounts funded under the DIP Facility. In addition, the DIP Facility provides the Debtors an incremental $30 million of DIP Delayed-Draw Loans to fund certain expenses, if needed, which would increase the Plan Sponsors' investment to up to $563 million.

20. The Restructuring Transactions embodied in the RSA reflect an incredible outcome for the Company's stakeholders wherein secured creditors are getting 100% of their debt refinanced at par, the Company's banks have agreed to extend their revolving commitments, and holders of the Unsecured Notes have agreed to receive a significant impairment of approximately $100 million on their claims. This all paves the way for general unsecured creditors, including vendors, content contributors, employees and other contract and trade counterparties, to ride through unimpaired, minimizing any impacts to the business and its relationships as a result of the chapter 11 process.

21. During the period in which the Company negotiated with key stakeholders, it also evaluated and pursued reasonable alternatives. The goal was to ensure that the Company achieved the most value-maximizing transaction in the limited time it had available. For example, Guggenheim Securities held discussions with six parties about potential financing alternatives.

This included a mix of both solicited and unsolicited proposals. Of the six parties, one passed on the opportunity entirely. Others proposed transactions that fell broadly into two baskets: (a) highly structured transactions that would have required a reorganization of the Company's business while leaving the Company highly levered with incremental, very expensive indebtedness and that assumed a consensual exchange or settlement with unsecured noteholders and/or parties with litigation claims against the Company; or (b) an amount of capital that would not have been sufficient to refinance the Company's current capital structure and would have likely necessitated a bankruptcy to implement. The Company determined that, after considering, among other factors, the maturity extension, deleveraging and interest rate reductions in the deals reached with both Ad Hoc Groups, none of the proposals were as favorable as those available under the RSA.

22. The Company also made efforts to reach a settlement with the New York State court warrant plaintiffs. Prior to the Petition Date, the Company made a settlement proposal, which the warrant plaintiffs did not accept and chose not to counter. The Company hopes to maintain a constructive dialogue with the warrant holders and similarly situated equity holders throughout the course of these Chapter 11 Cases.

23. The RSA offers the Company an expedited, orderly process needed to preserve the most value for its stakeholders. Getty Images is, among other things, a world-class media marketplace where content providers and customers meet to buy, sell and leverage rights to iconic pictures and famous moments, and this marketplace relies on the confidence its customers and content providers have in that marketplace and both sides maintaining participation in that marketplace. An expedited process protects this business. By starting this chapter 11 process on solid footing, with all contracts assumed, general (non-litigation and non-subordinated) unsecured

creditors unimpaired, and a short, defined path to emergence, the Company sends a steadying signal to the marketplace on which it relies.

24. Prior to negotiation and execution of the RSA, the Company had just come out of an eighteen-month, more than $100 million, failed effort to combine with Shutterstock. Its Revolving Credit Facility is fully drawn, and its liquidity is projected to fall below the approximately $50 million needed for ordinary-course operations by the end of October. The warrant plaintiffs' enforcement standstill runs only to October 26, 2026. The Company lacks the time and liquidity to pursue a proposal that could further deplete its liquidity without providing an immediate solution.

25. Certain alternatives to the RSA, such as a sale process, would likely fail to provide the same expedited and orderly process offered through the RSA. Pursuing such a process would be lengthy and contingent on securing a stalking horse bid and the financing associated with that process. Any drawn-out public sale process would also have put at risk the customer and contributor relationships the marketplace depends on, just as significant customer renewals were approaching. Any erosion of those relationships would have diminished the very value a sale process would seek to capture.

26. The Restructuring Transactions contemplated by the RSA, by contrast, preserve value for all of the Company's current non-litigation, non-subordinated, unsecured creditors: secured creditors are refinanced at par, holders of Unsecured Notes Claims receive a meaningful cash recovery, and general unsecured creditors, including vendors, content contributors, and employees, ride through unimpaired. At the same time, the expedited process does not foreclose other alternatives. The RSA expressly preserves the Debtors' ability, subject to certain notice and information-sharing obligations, to consider, respond to, and negotiate alternative restructuring

proposals, overseen by the Special Committees. Since the Debtors' announcement of their entry into the RSA on October 12, no third party has approached the Debtors regarding an alternative transaction.

27. The Company's financial condition leading up to the execution of the RSA, all negotiations between key stakeholders, and each interim event that expedited the need for a comprehensive resolution to the Company's financial difficulties have been publicly reported and well documented. In April 2026, Moody's Ratings downgraded the Company's credit rating, citing a heightened risk of a distressed exchange. In June and July 2026, the termination of the Shutterstock merger, the Company's engagement of restructuring advisors, and the formation of creditor groups were all publicly reported. In July 2026, the Company's Form 8-K disclosed that the Company had engaged Guggenheim Securities to evaluate strategic financing alternatives and balance sheet management initiatives and in August 2026, the Company's Form 10-Q disclosed that it had drawn the full amount available under its Revolving Credit Facility. In early October 2026, the Company's common stock was delisted from the New York Stock Exchange ("NYSE"), as disclosed in a Form 8-K, and now trades on the Pink Open Market. The trading prices of the Company's equity and debt continued to decline through the Petition Date.




Source: FINRA Trade Reporting and Compliance Engine (TRACE) for 14.000% Senior Unsecured Notes due 2028 and Bloomberg for all other instruments.
(1) Last traded price as of 10/08/2026.

28. The Company's debt was trading significantly below par in the lead up to the chapter 11 filing, reflecting the market's belief that there was inherent risk in the recovery available to debt holders. Meanwhile, the depressed equity trading prices clearly reflect only the option value embedded in the Company's equity, and not the value of the Debtors' business.

29. The Company has sought—and succeeded—to obtain the strongest restructuring option available for its stakeholders and in the last three months has made significant progress and enters these Chapter 11 Cases with a plan and pathway to ensure long-term growth and success.

30. Getty Images intends to proceed expeditiously through these Chapter 11 Cases with a prepackaged plan consistent with the RSA milestones set forth below. On October 20, 2026, the Company launched solicitation on the Plan. This restructuring is expected to have no impact on the Company's customers, content contributors and partners, product offerings, or editorial coverage operations, and will not disrupt the Company's business operations. The Company fully expects it will have the financial flexibility to continue investing in the content, technology, and relationships that have made Getty Images a leading source of visual content for more than three decades.

**Background and Qualifications**

31. I have been employed by Getty Images for almost twenty years and became CEO in January 2019. When I started working for Getty Images in 2007, my role was Vice President, Footage, Music and Multimedia, before being promoted to Senior Vice President, Business Development, Content and Product in March 2009. I served as Chief Operating Officer from 2016 to 2019, prior to my appointment as CEO.[8] Prior to joining Getty Images, I held key leadership roles in media and technology at both established and early-stage organizations, including

[8] In addition to serving as CEO, I sit on the boards of GIH; Grammy Merger Sub 2, LLC; Griffey Holdings, Inc.; Abe Investment Holdings, Inc.; and Getty Images, Inc.

WireImage (acquired by Getty Images), FOX Sports Interactive, the PGA TOUR, Homestead.com (acquired by Intuit), and positions with A.T. Kearney and Eastman Kodak Company. I hold a Bachelor of Science in Finance from The Ohio State University and a Master of Business Administration from The Wharton School of Business at the University of Pennsylvania.

32. On the Petition Date, each of the Debtors filed voluntary petitions for relief (collectively, the "Petitions") under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "Bankruptcy Code"), with the United States Bankruptcy Court for the District of Delaware (the "Court"). The Debtors will remain in possession of their assets and the management of their business as debtors in possession during the pendency of these Chapter 11 Cases. I submit this declaration (this "Declaration") to assist the Court and the parties-in-interest in understanding the circumstances that led to the commencement of these Chapter 11 Cases.

33. As CEO, I am familiar with the Debtors' day-to-day operations, business and financial affairs, and books and records. The statements set forth in this Declaration are based on: (a) my personal knowledge and experience; (b) my communications with employees of the Company under my supervision, the Company's senior management team, and the Company's professional advisors; and (c) my overall professional experience and knowledge of the Company's history, financial condition, and business operations and affairs.

34. I am above eighteen years of age and am authorized to submit this Declaration on behalf of the Debtors. If called to testify as a witness, I could and would testify to the matters and facts set forth herein.

35. To familiarize the Court with the Debtors, their business and the circumstances leading to these Chapter 11 Cases, this Declaration is organized as follows:

- **Part I** describes the Debtors' corporate history, business operations, and organizational and capital structure;

- **Part II** describes the key events leading to the commencement of these Chapter 11 Cases; and
- **Part III** provides an overview of the Debtors' prepetition restructuring efforts and proposed path forward in chapter 11.

## I. The Debtors' Background.

### A. Corporate History.

36. Getty Images has over thirty-one years of history in the global visual content industry. In March 1995, Mark Getty and Jonathan Klein co-founded Getty Communications—as the company was then known—in London, with a vision to transform the fragmented stock photography market into an aggregated, technology-driven platform where publishers and advertisers could find and license the world's best imagery.

37. In July 1996, Getty Communications listed on the Nasdaq National Market. Then, in September 1997, Getty Communications merged with PhotoDisc, Inc. and relocated its headquarters to Seattle, Washington.

38. Getty Images made a number of acquisitions throughout the years. Through these strategic acquisitions and its early embrace of digital distribution, Getty Images established itself as a global leader in the visual content industry.

39. In February 2008, Hellman & Friedman LLC acquired Getty Images in a leveraged buyout at $34 per share, taking the company private. In October 2012, Hellman & Friedman LLC sold a controlling stake in Getty Images to The Carlyle Group, with the Getty Family (through Getty Investments) rolling its ownership interests into the acquisition. In 2018, the Getty Family stockholders bought out all the equity held by The Carlyle Group, and Mark Getty resumed the role of Chair on a resumption of control of Getty Images. In November 2018, KED made a non-controlling investment in Getty Images.

40. Throughout its history, the Company has embraced innovation at each industry inflection point. From analog to digital, offline to e-commerce, stills to video, single-image purchasing to subscriptions, and pre-shot content to commercially safe artificial intelligence ("AI") generated imagery, Getty Images has continuously adapted its platform to serve existing customers better and reach new ones.

**B. Business Operations.**

41. Today, Getty Images remains a global visual content creator and marketplace that licenses photos, illustrations, videos, and music to businesses, media organizations, and individuals worldwide. The Company offers comprehensive content solutions, including à la carte and subscription access to pre-shot content and coverage, generative AI services, custom content assignments and coverage solutions, digital asset management tools, data insights, research, and print offerings.

42. Grounded in its history of innovation and trusted relationships with the world's leading media organizations, corporations, and creative professionals, the Company helps businesses of all types and sizes connect and compete in an increasingly digital and visual world. The Company's library contains over 662 million images and videos and approximately 11 million new assets are added each quarter. Customers conduct over 2.1 billion searches annually across the Company's platforms. As of the Petition Date, the Company serves over 635,000 purchasing customers and approximately 240,000 active annual subscribers through websites in 23 languages, reaching customers in almost every country in the world.

43. The Company's customer base includes corporations, media organizations, advertising agencies, and individual creators and prosumers. Headquartered in Seattle, Washington, the Company has approximately 1,600 employees across 32 countries. Annual subscriptions now comprise approximately 59% of total revenue, and over 70% of the Company's

booked revenues come from customers with a tenure of 10 years or more, reflecting high customer loyalty.

44. Getty Images employs over 115 staff photographers and videographers and distributes content of over 600,000 contributors and more than 360 premium content partners. Over 84,000 of those contributors are exclusive to Getty Images, meaning their content is not available through any other platform. The Company's editorial team of approximately 300 professionals averages over 14 years of industry experience. Collectively, Getty Images photographers have earned over 1,700 industry awards. In 2026 alone, Getty Images photographers earned 45 honors across the industry's leading photojournalism competitions, 13 of which were first-place wins.

45. The Company operates several brands, including, for example, Getty Images, iStock, Unsplash, and WireImage. Each targets a distinct customer segment and content type. *Getty Images* is the Company's flagship brand, serving large corporate and media customers with creative and editorial content (*e.g.*, stills, video, music, and generative AI services). iStock serves small-to-medium businesses with budget-conscious creative content (*e.g.*, stills, video, music, and generative AI services), capped indemnification (with the option for additional protection), and primarily e-commerce and online self-service delivery. Unsplash serves small-to-medium businesses, prosumers, and professional and semi-professional content creators with free and low-cost creative stills through a free (ad-supported), subscription, and paid API integration model. Across content, collections such as Allsport cover historic sports photography, while others including WireImage focus on celebrity imagery, red carpets, concerts, and live events.

46. The Company distributes content and services through three primary product categories: (a) Creative content, (b) Editorial content, and (c) other products and services. Each is

summarized below.

***a. Creative Products.***

47. The Company's "Creative" offering represents approximately 56% of total revenue and provides customers with a comprehensive library of royalty-free photos, illustrations, vectors, videos, and commercially safe generative AI services covering a wide variety of subjects including lifestyle, business, science, health, wellness, beauty, sports, transportation, and travel. This content is available for immediate use by a wide range of customers with a depth, breadth, and quality that allows them to produce impactful websites, digital media, social media, marketing campaigns, corporate collateral, and online video content relevant to their target audiences.

48. The Company primarily sources Creative content from a broad network of professional, semi-professional, and amateur creators, many of whom are exclusive to Getty Images, supported by a global creative insights team dedicated to providing briefing and art direction to the exclusive contributor community. The Company's Creative offering also includes Generative AI by Getty Images and iStock, which are tools trained exclusively on permissioned content that provide customers with indemnification and perpetual, worldwide usage rights, enabling commercially safe text-to-image generation and modification that addresses growing enterprise demand for responsible AI solutions.

***b. Editorial Products.***

49. The Editorial offering provides photo and video coverage of the world of entertainment, sports, and news. The Company covers more than 160,000 events each year, including almost 70,000 entertainment events and more than 50,000 sporting events, delivering content in near-real-time from events ranging from the Olympics and FIFA World Cup to the Super Bowl, the Oscars, and breaking news worldwide.

50. Getty Images also maintains one of the largest privately owned analog photographic archives in the world and exclusively represents and maintains storied archival collections, including the Bettmann Archive, Sygma and Gamma collections, and Hulton Archive. These historically significant collections contain over 150 million images dating back to the beginning of photography, spanning popular culture, sports, entertainment, and world events across more than 100 years.

51. Relating to the Company's Creative and Editorial categories, the rapid emergence of artificial intelligence presents both challenges and opportunities for Getty Images. While generative AI tools have put pressure on the budget-conscious microstock image market—which constitutes only a small portion of Getty Images' overall business—the Company's curated library of over 662 million images and videos is an increasingly valuable asset in an environment where the provenance and authenticity of content matter more than ever. The Company has invested in content authenticity technology, including C2PA and watermarking, that aligns with the emerging EU AI Act and is particularly desirable for enterprise customers in regulated industries. At the same time, Getty Images has licensed images, video, and metadata to AI technology companies for use in training foundation models, powers AI-driven search and discovery tools (such as those offered by Perplexity and OpenAI/ChatGPT), and maintains traditional search licensing agreements with conventional web search engines, providing Getty Images with a growing new revenue stream.

***c. Other Products.***

52. The Company also offers a range of additional products and services, including data access and AI licensing, music licensing, digital asset management, distribution services, and print sales.

***d. Foreign Operations.***

53. The Company derived approximately 44% of its revenue from operations outside of the United States in recent periods. The Company has non-Debtor subsidiaries that operate in numerous foreign jurisdictions, including the United Kingdom, Ireland, Canada, Australia, Japan, India, Singapore, Hong Kong, Sweden, Germany, France, and Brazil, among others. None of the corporate entities that comprise the Company's foreign operations are Chapter 11 Debtors.

**C. Corporate Structure.**

54. The Debtors (other than GIH) are all subsidiaries of lead Debtor GIH, a corporation incorporated in the state of Delaware. The board of directors of GIH (the "Board") is currently composed of: (a) Mark Getty, Chair of the Board; (b) Michael Harris; (c) Tracy Knox; (d) Patrick V. Maxwell; (e) Jeffrey Titterton; (f) Brett D. Watson; (g) Elizabeth Abrams; (h) Thomas Walper; and (i) myself. Each Debtor subsidiary has its own board of directors as well.

55. The Company benefits from a management team with extraordinary depth of tenure, whose key leaders collectively bring over 100 years of institutional experience to the Company. This institutional knowledge and stability are critical assets that the Company will carry through these Chapter 11 Cases and beyond.

56. The Company's current organizational structure is reflected in **Exhibit B** to this Declaration. None of the Company's foreign subsidiaries are Debtors in these cases, and such entities will continue to operate in the ordinary course of business during the pendency of these Chapter 11 Cases.

**D. Prepetition Capital Structure.**

57. As of the Petition Date, the Debtors have an aggregate principal amount of approximately $1.46 billion in funded debt obligations. As described further in Part II.C below, the Company's elevated interest expense of approximately $154 million annually has consumed a

substantial portion of the Company's free cash flow. The Debtors' prepetition funded debt obligations are summarized in the table below:

| Governing Document | Facility/ Note | Borrower/ Issuer | Guarantors | Maturity | Outstanding Principal Amount[9] |
|---|---|---|---|---|---|
| | | | ***Secured Debt*** | | |
| Credit Agreement | Revolving Loans | Getty Images, Inc.; Abe Investment Holdings, Inc. | Griffey Midco (DE), LLC; Getty Images (Seattle), Inc.; Getty Images News Services (PRC), Inc.; Getty Images (US), Inc. | May 4, 2028 | $150 million |
| Credit Agreement | USD Term Loans | Getty Images, Inc.; Abe Investment Holdings, Inc. | Griffey Midco (DE), LLC; Getty Images (Seattle), Inc.; Getty Images News Services (PRC), Inc.; Getty Images (US), Inc. | February 21, 2030 | $40 million |
| Credit Agreement | EUR Term Loans | Getty Images, Inc.; Abe Investment Holdings, Inc. | Griffey Midco (DE), LLC; Getty Images (Seattle), Inc.; Getty Images News Services (PRC), Inc.; Getty Images (US), Inc. | February 21, 2030 | $456 million |
| 11.25% Secured Notes Indenture | 11.25% Secured Notes | Getty Images, Inc. | Abe Investment Holdings, Inc.; Griffey Midco (DE), LLC; Getty Images (Seattle), Inc.; Getty Images News Services (PRC), Inc.; Getty Images (US), Inc. | February 21, 2030 | $540 million |

[9] With respect to the EUR Term Loans, the amount shown is the U.S. Dollar equivalent of the outstanding Euro principal as of October 21, 2026. Consistent with GIH's reported financial statements, it was converted from Euros into U.S. Dollars at the currency exchange rate in effect on that date. Because the EUR Term Loans are denominated in Euros, their U.S. Dollar equivalent will change as the EUR/USD exchange rate moves.

| | | | | | |
|---|---|---|---|---|---|
| ***Unsecured Debt*** | | | | | |
| 9.75% Notes Indenture | 9.75% Notes | Getty Images, Inc. | Getty Images Holdings, Inc.; Getty Images (Seattle), Inc.; Getty Images News Services (PRC), Inc.; Getty Images (US), Inc. | March 1, 2027 | $5 million |
| 14.00% Notes Indenture | 14.00% Notes | Getty Images, Inc. | Getty Images Holdings, Inc.; Getty Images (Seattle), Inc.; Getty Images News Services (PRC), Inc.; Getty Images (US), Inc. | March 1, 2028 | $265 million |
| | | | | | **Total Debtor Funded Debt: $1.46 billion** |

***a. Credit Facility.***

58. On February 19, 2019, Getty Images, Inc. and Abe Investment Holdings, Inc. entered into a senior secured credit agreement (as amended, the "Credit Agreement" and the credit facilities thereunder, the "Credit Facility") with JPMorgan Chase Bank, N.A., as administrative agent. As originally constituted, the Credit Facility consisted of three components: (a) a $1.040 billion term loan facility denominated in U.S. Dollars, (b) a €450 million term loan facility denominated in Euros, and (c) an $80 million revolving credit facility which committed a line of credit under which Getty Images, Inc. and Abe Investment Holdings, Inc. could draw, repay, and re-draw funds on a revolving basis (the "Revolving Credit Facility"). The obligations under the Credit Agreement are secured by a first priority lien on substantially all of the loan parties' assets. The guarantors under the Credit Agreement are all Debtors.

59. On May 4, 2023, Getty Images, Inc. and Abe Investment Holdings, Inc. amended the Credit Facility to (a) increase total revolving commitments from $80 million to $150 million and (b) extend the maturity of the Revolving Credit Facility to May 4, 2028. The Revolving Credit Facility is also subject to a "springing maturity"—a provision that accelerates the maturity date to

180 days prior to the maturity of any outstanding term loans with aggregate principal exceeding $100 million, if such term loans mature earlier than the revolving facility's stated maturity. The Revolving Credit Facility bears interest at Adjusted Term SOFR plus 4.00% per annum (subject to two leverage-based step downs of 0.25% each). On April 22, 2026, the Company drew $120.0 million from the Revolving Credit Facility, with proceeds used in part to pay the judgment and associated interest related to the warrant litigation described in Part II below. In July 2026, the Company drew the remaining $30.0 million available under the Revolving Credit Facility. As of the Petition Date, the Revolving Credit Facility is fully drawn at $150 million.

***b. Term Loans and Senior Secured Notes.***

60. On February 21, 2025, Getty Images, Inc. and Abe Investment Holdings, Inc. entered into the Second Incremental Commitment Amendment and Third Amendment to Credit Agreement (the "Refinancing Amendment"), which amended the existing Credit Agreement. The Refinancing Amendment provided for two new tranches of senior secured term loans, the proceeds of which were used to refinance in full all outstanding term loans under the prior credit facility. The first tranche consists of Dollar Fixed Rate Term B-1 Loans (the "USD Term Loans") in an aggregate principal amount of $580 million, due and payable in full at maturity on February 21, 2030. The second tranche consists of Euro Term B-1 Loans (the "EUR Term Loans" and, together with the USD Term Loans, the "Term Loans") in an aggregate principal amount of €440 million with a maturity date also on February 21, 2030, but subject to a springing maturity.

61. As of October 21, 2026, the principal amount outstanding under the USD Term Loans is approximately $40 million and the principal amount outstanding under the EUR Term Loans is approximately $456 million (€407 million).

62. During 2025, the Company completed a permitted exchange of a portion of the USD Term Loans for $539.9 million aggregate principal amount of 11.250% Senior Secured Notes

due 2030 (the "11.25% Secured Notes"). The 11.25% Secured Notes are secured on a pari passu basis with the Term Loans. In October 2025, in connection with financing for the proposed merger with Shutterstock, Getty Images, Inc. issued $628.4 million aggregate principal amount of 10.500% Senior Secured Notes (the "10.500% Senior Secured Notes") pursuant to an indenture dated October 21, 2025. The gross proceeds of the 10.500% Senior Secured Notes were deposited into an escrow account pending satisfaction of specified conditions related to the proposed merger. As discussed below in Part II.B, on July 7, 2026, the 10.500% Senior Secured Notes were redeemed at par following termination of the Shutterstock merger, with the redemption funded by amounts released from escrow. As of October 21, 2026, no 10.500% Senior Secured Notes remain outstanding.

***c. Unsecured Notes.***

63. Getty Images has two series of senior unsecured notes outstanding on which GIH is an obligor. In February 2019, the Company issued 9.750% Senior Notes in $300.0 million aggregate principal amount (the "9.75% Notes"). They bear interest at a fixed rate of 9.750% per annum, payable semi-annually on March 1 and September 1 of each year, and mature on March 1, 2027. The Company may redeem the 9.75% Notes prior to maturity, subject to prepayment premiums. During 2025, the Company issued its second series of unsecured notes, exchanging a substantial portion of the outstanding 9.75% Notes for new 14.000% Senior Notes due 2028 (the "14.00% Notes" and, together with the 9.75% Notes, the "Unsecured Notes").

64. As of the Petition Date, approximately $5 million of the 9.75% Notes and approximately $265 million of the 14.00% Notes remain outstanding. During the six months ending June 30, 2026, the Company repaid approximately $30 million of the 14.00% Notes.

***d. Other Unsecured Claims.***

65. In addition to the Unsecured Notes, Getty Images carries several other categories of unsecured obligations, including a litigation reserve of approximately $99.5 million related to pending warrant litigation (as described further in Part II.A below); accounts payable of approximately $105.3 million owed to vendors, content contributors, and other counterparties in the ordinary course of business; accrued expenses of approximately $67.0 million (comprising accrued compensation, interest payable, professional fees, current lease liabilities, and other items); deferred revenue of approximately $179.0 million representing prepaid amounts received from customers for content subscriptions and other services not yet delivered; long-term operating lease liabilities of approximately $20.9 million; and certain other liabilities.

***e. Existing Equity.***

66. GIH has one class of common stock outstanding, Class A common stock, par value $0.0001 per share, and was previously listed on the NYSE under the symbol "GETY." The last reported closing price of the Class A common stock on the Pink Open Market on October 20, 2026 was $0.02 per share. GIH was formally delisted from the NYSE on October 12, 2026. As of October 21, 2026, there were approximately 421.0 million shares of Class A common stock issued and outstanding. The Company's equity is set to receive no recovery under the Plan.

***f. Section 510(b) Claims.***

67. I understand from counsel that claims on account of, arising from, or in connection with the 20,700,000 public warrants under the Warrant Agreement dated August 4, 2020, including claims for the Company's alleged breach of that agreement, are subject to subordination under section 510(b) of the Bankruptcy Code. As described in the RSA, on the Restructuring Effective Date each holder of a Section 510(b) Claim, including any Warrant Claim, will have its Claim

cancelled, released, discharged, and extinguished and will receive no distribution on account of that Claim.

## II. Events Leading to the Commencement of These Chapter 11 Cases.

68. The Company's core businesses remain strong and show steady growth; however, the Debtors' current financial condition results from non-operational events that depleted the Company's liquidity over an eighteen-month period: large adverse warrant litigation judgments, the extension and ultimate collapse of a merger process due to an adverse foreign regulatory determination, and an unsustainable debt service burden on a capital structure that is too highly levered for the Company's current business.

### A. The Warrant Litigation.

69. The Company has been required to expend significant resources in connection with litigation brought by warrant holders and has suffered adverse judgments that have resulted, and could further result, in large cash payments.

70. Getty Images previously assumed 20,700,000 public warrants in connection with its August 2020 initial public offering. Each public warrant entitled the warrant holder to purchase one share of common stock at an exercise price of $11.50. The warrants were governed by the Warrant Agreement, dated August 4, 2020 (the "Warrant Agreement"), under which Getty Images assumed all rights, liabilities, and obligations thereunder on July 22, 2022.

71. The Warrant Agreement provided that the warrants would become exercisable thirty days after the closing of the business combination (July 22, 2022), subject to two conditions: (a) an effective registration statement under the Securities Act with respect to the common stock underlying the warrants, and (b) a current prospectus relating thereto.

72. Following Getty Images' public listing, due to high redemption rates on the special purpose acquisition company shares prior to closing the business combination, lock-up provisions

on insiders and their significant equity ownership positions in the Company, the Company's float, the shares available to trade on the market, were less than 0.2% of total shares issued. This contributed to the Company's share price volatility, including spiking from less than $10 per share to over $32 per share in less than a week after listing.

73. Certain warrant holders inquired about and/or claim to have sought to exercise their warrants. The Company took the position that the conditions for exercise of the warrants had not been satisfied because a separate registration statement was not yet effective. The Company subsequently permitted exercise of the warrants beginning on September 16, 2022, the day after the registration statement was declared effective. By this time, the stock price had fallen below the exercise price. In October 2022, the Company redeemed the remaining outstanding warrants.

74. Beginning in late 2022, certain former warrant holders commenced lawsuits against the Company alleging breach of the Warrant Agreement. The Company has vigorously contested these claims at every stage.

75. On October 26, 2023, the United States District Court for the Southern District of New York issued a decision in lawsuits brought by Alta Partners, LLC ("Alta") and CRCM Institutional Master Fund (BVI), LTD ("CRCM") (together, the "Initial Warrant Litigation"), granting summary judgment to plaintiffs on their breach of contract claims and entering judgment awarding damages in the amount of $36.9 million to Alta with respect to 2,066,371 public warrants and $51.0 million to CRCM with respect to 3,010,764 public warrants, plus pre-judgment interest of 9% per annum. Following an appeal by the Company, on January 15, 2026, the United States Court of Appeals for the Second Circuit affirmed the district court's judgment, and on April 16, 2026, the Second Circuit denied the Company's petition for rehearing. The Company was required to pay $110.9 million in judgments and associated interest on April 23, 2026.

76. Additional lawsuits by warrant holders followed. The Company has been named as a defendant in two additional suits in the United States District Court for the Southern District of New York, *Berner v. Getty Images Holdings, Inc.*, No. 1:24-cv-04483-JSR (S.D.N.Y. filed June 11, 2024), and *Lapp v. Getty Images Holdings, Inc.*, No. 1:24-cv-05129-JSR (S.D.N.Y. filed July 5, 2024) (the "Berner/Lapp Actions"). On August 7, 2025, the court in the Berner/Lapp Actions granted summary judgment against Getty Images and in favor of plaintiffs Berner and Lapp in the amounts of $4.7 million (Berner) and $1.5 million (Lapp), citing, among other things, collateral estoppel based on the prior ruling in the Initial Warrant Litigation. Twelve additional suits were filed in the New York State Supreme Court, New York County (subsequently consolidated into the action captioned *Funicular Funds LP v. Getty Images Holdings, Inc.*, Index No. 653410/2024 (filed July 5, 2024) (the "NY State Actions")).[10] On June 9, 2026, the court granted the plaintiffs' motion for summary judgment, and on July 27, 2026, the court directed the Clerk to enter judgment against the Company in amounts totaling $67.8 million, plus 9% pre-judgment interest from August 22, 2022 until judgment was entered on September 25, 2026 in the NY State Actions. The Company has appealed the courts' decisions in both the Berner/Lapp Actions and the NY State Actions and, to the extent any of these lawsuits were to continue, intends to defend itself vigorously

[10] The NY State Actions are *CSS, LLC v. Getty Images Holdings, Inc.*, Index No. 653527/2024 (filed July 12, 2024); *Walleye Manager Opportunities LLC et al. v. Getty Images Holdings, Inc.*, Index No. 653528/2024 (filed July 12, 2024); *Funicular Funds LP v. Getty Images Holdings, Inc.*, Index No. 653410/2024 (filed July 5, 2024); *MPF Broadway Convexity Fund I, LP et al. v. Getty Images Holdings, Inc.*, Index No. 653411/2024 (filed July 5, 2024); *LMR Multi-Strategy Master Fund Limited et al. v. Getty Images Holdings, Inc.*, Index No. 654963/2024 (filed September 20, 2024); *Flannery v. Getty Images Holdings, Inc.*, Index No. 654961/2024 (filed September 20, 2024); *Bi-Directional Disequilibrium Fund, L.P. et al. v. Getty Images Holdings, Inc.*, Index No. 654960/2024 (filed September 20, 2024); *Holland v. Getty Images Holdings, Inc.*, Index No. 655746/2024 (filed October 29, 2024); *Hunsicker v. Getty Images Holdings, Inc.*, Index No. 655911/2024 (filed November 7, 2024); *Dasher et al. v. Getty Images Holdings, Inc.*, Index No. 655913/2024 (filed November 7, 2024); *Parker v. Getty Images Holdings, Inc.*, Index No. 659240/2024 (filed November 22, 2024); and *Highbridge Tactical Credit Master Fund L.P. et al. v. Getty Images Holdings, Inc.*, Index No. 650402/2025 (filed January 21, 2025). The NY State Actions have since been consolidated under the caption *Funicular Funds LP v. Getty Images Holdings, Inc.*, Index No. 653410/2024.

in all pending and future actions. As of June 30, 2026, the Company carried a litigation reserve of approximately $99.5 million with respect to these matters.

77. The Company was deprived of the $11.50 exercise price proceeds that exercising holders would have paid to the Company, which would have provided meaningful equity capital, and instead was left with litigation liability that has depleted the Company's liquidity.

78. The aggregate financial impact of the warrant litigation on the Company has been significant. Satisfying the Initial Warrant Litigation judgment alone required the Company to draw $120 million from its Revolving Credit Facility, supplemented by subsequent insurance recoveries.

79. In total, the warrant litigation has resulted in over $200 million in adverse judgments and associated interest and $35 million in legal fees and expenses defending against these claims across multiple courts and appeals over approximately four years.

80. The warrant litigation has imposed a substantial financial burden on the Company. I understand from counsel that any existing or future warrant claims, as claims arising from the purchase or sale of the warrants, a security of the Company, are subject to subordination pursuant to section 510(b) of the Bankruptcy Code. Under the Plan, such claims will be classified as Section 510(b) Claims and, like equity in GIH, will be cancelled, released, discharged, and extinguished without any distribution. The Plan therefore seeks to resolve approximately $99.5 million in remaining pending judgments and associated interest in the Berner/Lapp Actions and the NY State Actions, which would otherwise continue to expose the Company to the enforcement risk described in paragraph 94 below, as well as potential exposure of an estimated over $275 million in additional unasserted warrant claims.

**B. The Shutterstock Merger and its Termination.**

81. On January 6, 2025, Getty Images entered into an Agreement and Plan of Merger (the "Shutterstock Merger Agreement") to combine in a merger transaction with Shutterstock. The

combined company would have had an enterprise value of approximately $3.7 billion at the time the merger was to have closed, with existing equity holders of Getty Images retaining approximately 54.7% of the equity in the combined company. The proposed transaction was intended to create a combined visual content platform with the scale and resources to accelerate investment in technology, content, and services for customers worldwide.

82. The proposed merger was subject to customary closing conditions, including receipt of required regulatory approvals from, among others, the U.S. Department of Justice ("DOJ") and the CMA. The regulatory approval process for the proposed merger required continuous engagement with regulators across multiple jurisdictions over a period that ended up taking approximately eighteen months.

83. On February 23, 2026, the DOJ concluded its review of the proposed merger with no objections.

84. Beginning in April 2025, the CMA conducted a Phase 1 investigation involving multiple rounds of submissions, information requests, and meetings over approximately five months. On October 20, 2025, the CMA issued its Phase 1 conclusion that the proposed merger may result in a substantial lessening of competition for both creative and editorial content. In respect of creative content, the CMA did not credit the competition created by generative AI, bundled solutions, and other providers. In respect of editorial, the CMA's concerns focused narrowly on the editorial content market in the United Kingdom, a market that represented less than 1% of Shutterstock's global revenues and in which Shutterstock's core editorial business was small, declining, and unprofitable. Both the Company and Shutterstock strongly disputed the CMA's analysis, which the parties believed fundamentally misunderstood the competitive landscape by overstating the parties' market shares, understating competitive constraints in both

creative and editorial and ignoring alternative providers. On October 27, 2025, the parties submitted proposed remedies to address the CMA's concerns, including the divestiture of certain businesses. Despite this proposal, the CMA referred the merger to a Phase 2 investigation on November 3, 2025.

85. The Phase 2 investigation was initially intended to span an additional six months but was extended by the CMA and involved more intensive engagement with the CMA. The Company submitted detailed written challenges to the CMA's findings, participated in a Phase 2 Initial Substantive Meeting, responded to numerous rounds of information requests, submitted proposed remedies, and attended a full-day hearing before the CMA panel. The Company devoted substantial management time and financial resources to the CMA process and presented extensive evidence that the CMA's analysis was incorrect. On February 19, 2026, the CMA issued its Phase 2 provisional finding that the proposed merger would result in a substantial lessening of competition for editorial content in the United Kingdom, a conclusion that the Company continued to dispute in subsequent remedy proposals and responses. On April 16, 2026, the CMA issued a provisional decision that would have required full divestiture of Shutterstock's editorial business, rejecting the Company's proposed partial remedy as insufficient. On May 15, 2026, the CMA issued its Final Report confirming its provisional finding and requiring divestiture of Shutterstock's entire editorial business to one or more CMA-approved purchasers as a condition for the proposed merger to proceed.

86. The divestiture of Shutterstock's editorial business was a "burdensome condition" the Company was not required to accept under the terms of the Shutterstock Merger Agreement. Nevertheless, the Company continued to explore alternative solutions to preserve the merger. In May and June 2026, the Company and Shutterstock attempted to implement the CMA's condition

by identifying potential buyers for Shutterstock's editorial business and facilitating bidder diligence.

87. On June 30, 2026, almost eighteen months after signing the Shutterstock Merger Agreement and after significant engagement with the CMA, the Board unanimously decided not to proceed with a sale of Shutterstock's editorial business under the supervision of the CMA and to terminate the Shutterstock Merger Agreement "assuming no material change in . . . circumstances prior to July 7, 2026." The decision was made based, in part, upon a determination that the cost, time, and ongoing obligations associated with divesting Shutterstock's editorial business under CMA supervision would outweigh the benefits of completing the merger, at a time when the Company's liquidity had been substantially depleted by the warrant judgments and further eroded by the costs of the transaction. Given warrant litigation exposure, there was also the very real potential that after completing the merger, the Company would still face insolvency, only expanding the impact to additional shareholders and stakeholders. On July 7, 2026, Getty Images delivered a formal written notice to Shutterstock terminating the Shutterstock Merger Agreement, effective upon delivery.

88. On June 30, 2026, the Board's decision to terminate the Shutterstock Merger Agreement was publicly announced in a Getty Images Form 8-K. Getty Images' debt and equity traded down sharply in the days that followed, and the Company's share price fell from $0.94 to $0.48 by July 22, 2026.

89. Following termination, the $628.4 million of 10.500% Senior Secured Notes issued in connection with refinancing for the proposed merger were redeemed at par in accordance with a special mandatory redemption provision. The termination of the merger also left Getty Images on a standalone path, requiring resolution of the outstanding and potential warrant liabilities given

an otherwise unsustainable capital structure in light of impending maturities and annual interest expense.

90. The market understood that the Company faced a standalone path with a capital structure that required adjustments to proceed on a standalone basis. Yet in the months between the public termination of the merger and the Petition Date, no third party approached the Company with a superior proposal to acquire the Company, refinance its indebtedness, or provide new capital on terms superior to those ultimately embodied in the RSA.

91. Over the eighteen-month process between signing and termination of the Shutterstock Merger Agreement, the Company spent more than $100 million in fees pursuing the merger, approximately $10 million in expedited Sarbanes-Oxley Act compliance, and approximately $43.6 million in net interest expense and financing fees for the 10.500% Senior Secured Notes. These costs yielded no lasting benefits and only burdened the Company's cash flows.

**C. Liquidity Crisis and Going Concern.**

92. The cumulative effect of the non-operational events described above has placed significant pressure on the Company's liquidity. As of the Petition Date, the Company had cash and cash equivalents of approximately $54 million, a significant decline from $90.2 million as of December 31, 2025. As noted above, to satisfy the $110.9 million judgment and associated interest in the Initial Warrant Litigation, the Company drew $120 million from its $150 million Revolving Credit Facility on April 22, 2026. In July 2026, the Company drew the remaining $30 million available, leaving the Revolving Credit Facility fully drawn with no remaining borrowing capacity. The draw was necessary because its cash and cash equivalents at the time were insufficient to satisfy the Initial Warrant Litigation judgment and maintain adequate minimum liquidity for ongoing operations, debt service, and other ordinary-course obligations. In sum, within a period

of approximately three months, the Company exhausted its entire revolving credit line, a facility that had been undrawn as recently as March 31, 2026, to fund litigation judgments and support ongoing operations.

93. The Company's debt service burden has been compounded by higher interest rates and fixed repayment obligations from the 2025 refinancing transactions and, during the pendency of the proposed merger, by the incremental debt raised in anticipation of the terminated merger. For the six months ending on June 30, 2026, the Company recognized interest expense of $111.5 million, compared to $69.2 million for the same period in 2025, an increase of 61.1%. The escalation in 2026 was driven principally by a higher level of outstanding debt, namely the 10.500% Senior Secured Notes issued to finance the proposed merger, and by the higher rates established in the 2025 refinancing transactions, including those on the 11.25% Secured Notes and the 14.00% Notes (which exchanged a substantial portion of the outstanding 9.75% Notes). On the 10.500% Senior Secured Notes, since their issuance in October 2025 and through June 30, 2026, the Company incurred approximately $30.1 million of net interest expense (net of interest earned on the escrowed funds), along with $13.5 million in associated financing fees. These costs yielded no lasting benefit once the merger was terminated. Following the termination of the Shutterstock Merger Agreement on July 7, 2026, the 10.500% Senior Secured Notes were redeemed in full through a special mandatory redemption funded by the escrowed proceeds. As a result, they do not form part of the Company's ongoing debt service obligations. Excluding those notes, the Company's annualized debt service obligation as of the Petition Date was approximately $239 million, consisting of approximately $154 million of interest on the Company's funded debt, €22 million of scheduled EUR Term Loan amortization, and the $60 million required annual repayment on the 14.00% Notes. Combined with other pressures facing the Company, including

the warrant litigation and the costs of the terminated merger, that obligation exceeds the cash the Company has been able to generate from operations and leaves insufficient liquidity to service the Company's ongoing obligations.[11]

94. Following the June 9, 2026 decision in the NY State Actions granting plaintiffs' motion for summary judgment and the July 27, 2026 order directing entry of judgment against the Company, the Company appealed and sought to post a bond to stay enforcement of the judgment pending appeal. Given its constrained liquidity position, however, the Company was unable to obtain a bond. The Revolving Credit Facility was fully drawn and cash reserves were limited, leaving the judgment unsatisfied and exposing the Company to potential enforcement, further straining its financial position. Unable to stay the judgment through a bond, the Company was

[11] The Company's deteriorating financial position was reflected in a series of credit rating downgrades. On April 21, 2026, Moody's Ratings downgraded Getty's credit rating by two notches to Caa1 from B2, citing merger uncertainty, weakened liquidity, very high interest burden, and a "heightened risk of a distressed exchange." *Moody's Ratings downgrades Getty Images' CFR to Caa1 on weakened liquidity, uncertainty about merger prospects; outlook negative*, MOODY'S (Apr. 21, 2026), https://www.moodys.com/research/Moodys-Ratings-downgrades-Getty-Images-CFR-to-Caa1-on-weakened--PR_522744. On May 19, 2026, S&P Global Ratings downgraded the Company's issuer credit rating to B from B+ and placed the ratings on CreditWatch, citing weaker cash flow and merger uncertainty. *Getty Images Inc. Downgraded To 'B'; Ratings Put On CreditWatch Negative Due To Weaker Cash Flow And Merger Uncertainty*, S&P GLOBAL (May 19, 2026), https://www.spglobal.com/ratings/en/regulatory/article/-/view/sourceId/101686513. The rating downgrades followed the Company's payment of the $110.9 million warrant litigation judgment funded in part through a previously unused revolving credit facility, coinciding with the CMA's provisional conclusion regarding the Shutterstock merger. Following the termination of the Shutterstock Merger Agreement, on July 2, 2026, S&P Global Ratings further downgraded the Company to CCC+, stating that "[t]he terminated merger will strain Getty's liquidity and we now view its capital structure as unsustainable." *Getty Images Inc. Downgraded to 'CCC+' On Shutterstock Merger Termination And Liquidity Concerns; Outlook Negative*, S&P GLOBAL (Jul. 2, 2026), https://www.spglobal.com/ratings/en/regulatory/article/-/view/sourceId/101694603. On September 2, 2026, Moody's further downgraded the Company's Corporate Family Rating to Caa3 from Caa1 following the Company's announcement that it would not make the September 1, 2026 interest payments on its 14.00% Notes and 9.75% Notes as it evaluated balance sheet management initiatives. *Moody's Ratings downgrades Getty Images' CFR to Caa3 on delayed note interest payments, weakened liquidity; outlook negative*, MOODY'S (Sep. 2, 2026), https://www.moodys.com/research/Moodys-Ratings-downgrades-Getty-Images-CFR-to-Caa3-on-delayed--PR_529175. The next day, S&P Global Ratings downgraded the Company's rating to CCC from CCC+ and placed all ratings on CreditWatch with negative implications, citing thinning liquidity, the missed interest payment on the Company's senior unsecured notes, and an increased risk that the Company would enter into a restructuring. *Getty Images Inc. Rating Lowered To 'CCC', Ratings Placed On CreditWatch Negative On Missed Interest Payment*, S&P GLOBAL (Sep. 3, 2026), https://www.spglobal.com/ratings/en/regulatory/article/-/view/sourceId/101705199.

forced into negotiations both with the NY State Actions plaintiffs to negotiate a standstill and generally with stakeholders to address its liquidity issues.

95. In July 2026, the Company's forecasts showed total liquidity (consisting of cash and available borrowing capacity) falling below its $50 million minimum operating requirement by the fourth quarter of 2026 and projected negative liquidity by June 2027. Those projections were prepared before accounting for any payments to warrant holders or restructuring-related fees.

96. Against this backdrop, management concluded that the magnitude and timing of the Company's current accrued and future obligations, together with its limited available liquidity, gave rise to substantial doubt about the Company's ability to continue as a going concern. The termination of the Shutterstock merger and the adverse judgments in the warrant litigation were the catalysts that underscored the urgency of a comprehensive balance sheet restructuring.

97. Absent a comprehensive restructuring before the Petition Date, the Company's liquidity position offered little runway.

**D. Broader Industry Headwinds.**

98. The Company, like other companies in the visual content industry, has experienced structural shifts, including the emergence of generative AI and changes in media consumption and marketing strategies. These shifts have been felt principally in the Company's iStock brand, which serves small-to-medium businesses through e-commerce and online self-service delivery, and among its agency customers. The Company's purchasing customer and subscriber metrics are driven predominantly by these customer groups. Within these areas, total purchasing customers decreased from approximately 835,000 for the last twelve months ending December 31, 2022, to approximately 799,000 for the last twelve months ending December 31, 2023, then to approximately 717,000 for the last twelve months ending December 31, 2024, further to approximately 675,000 for the last twelve months ending March 31, 2026, and most recently to

approximately 636,000 for the last twelve months ending June 30, 2026. This represents a decline of approximately 24% between 2022 and 2026. Total active annual subscribers decreased from 321,000 for the last twelve months ending June 30, 2025, to 240,000 for the last twelve months ending June 30, 2026. These metrics reflect conditions specific to the iStock and agency customer groups and are not indicative of trends in the Company's other brands or its enterprise customer relationships.

99. Outside of iStock and agency, the Company's business has remained resilient. The Company generated approximately $978 million in revenue and approximately $307 million in Adjusted EBITDA for the twelve-month period ending with the second quarter of 2026, and saw consistent annual growth in total revenue generated from business lines other than iStock and agency from 2021 through 2025. This reflects the durability of its enterprise customer relationships and increasing revenue per customer. These trends affecting iStock and agency customers, while requiring ongoing strategic attention, are manageable and would not alone have necessitated the commencement of these Chapter 11 Cases. Instead, the filing of these Chapter 11 Cases was primarily driven by three non-operational events: (a) the warrant litigation and resulting judgments and defense costs; (b) the fees and debt incurred in pursuit of the proposed Shutterstock merger; and (c) the unsustainable debt service burden and cost of the Company's capital structure.

## III. The Chapter 11 Cases.

### A. The Proposed Restructuring Transactions.

100. As a result of good faith, arm's-length negotiations between the Company and its key stakeholders, on October 12, 2026, the Company Parties entered into the RSA with certain of their key stakeholders. Specifically, the RSA is supported by each of the Company's major financial stakeholder groups, including members of the Secured Ad Hoc Group (the "Consenting Secured Lenders"), all holders of Revolving Loan Claims (the "Consenting RCF Lenders"),

members of the Unsecured Noteholders Ad Hoc Committee (the "Consenting Unsecured Noteholders"), and the Plan Sponsors (in their capacity as "Consenting Shareholders" under the RSA and, collectively with the Consenting Secured Lenders, the Consenting RCF Lenders, and the Consenting Unsecured Noteholders, in each case to the extent party to the RSA, the "Consenting Stakeholders").

101. The Company's negotiations with its key stakeholders produced real and meaningful improvements for the Debtors' creditors. After the Unsecured Noteholders Ad Hoc Committee rejected the initial deal reached with the Secured Ad Hoc Group, the Company successfully negotiated with the Plan Sponsors to increase their committed cash equity investment from approximately $280 million to up to $433 million. The increased investment will fund an all-cash recovery to holders of Unsecured Notes Claims of their pro rata share of $170.2 million. The Consenting Unsecured Noteholders have accepted this agreement in full satisfaction of their claims.

102. The terms of the Restructuring Transactions are the product of extensive, hard-fought negotiations and meaningful compromise among the Debtors and their key stakeholders. The Company would have preferred an outcome that could have achieved a meaningful recovery to existing equity. Unfortunately, there was no option on the table that provided that recovery and dealt with the immediate financial distress the Company faced prior to the Petition Date. The Restructuring Transactions' terms are fully supported by a valuation prepared by Guggenheim Securities. That analysis indicates that the recoveries provided under the Plan are consistent with the Debtors' estimated enterprise value. Notably, any additional recoveries are unlikely to reach classes not otherwise approving of the Plan (*i.e.*, existing equity) in light of the compromise of claims already embodied in the Plan:

| **Claim and Estimated Amount** | **Proposed Plan Recovery** |
|---|---|
| (1) DIP Facility (up to $143 million)[12] | Interim and Final DIP Loans: Fully equitized; DIP Delayed-Draw Loans: Converted into New Preferred Interests |
| (2) Make-whole under 11.25% Secured Notes, USD and EUR Term Loans (approximately $50 million) | Zero recovery |
| (3) €87.6 million in EUR Term Loans held by certain of the Plan Sponsors | Fully equitized |
| (4) Approximately $100 million in compromised Unsecured Notes | Zero recovery |

In short, in addition to assuming all contracts, including with employees and trade counterparties, and leaving general unsecured creditors unimpaired, any competing deal needs to clear up to an additional approximately $391 million in value before existing equity and Section 510(b) Claims could see any recovery.

103. Upon emergence, the Plan Sponsors will hold 100% of the New Interests, subject only to dilution by the MIP, which will consist of up to 10% of the New Interests on a fully diluted basis as decided by the New Board. The Reorganized Debtors will also incur the New Notes, the New Term Loans, and the New RCF (collectively, the "Exit Facilities") on the terms set forth in the Exit Term Sheet. The Plan Sponsors will designate the New Board, all contracts and licenses will be assumed and unimpaired, unless specifically scheduled for or subject to a motion for rejection, and the Trademark Option Agreement will be assumed on an "as is" basis.

104. Under the RSA, the Company will realize approximately $65 million in annual interest savings and reduce its annual debt service by approximately $133 million.[13] Additionally, the Company will have about $75 million in cash on its balance sheet at emergence and the full

[12] This amount is subject to Court approval and does not account for the 2% DIP Exit Fee.

[13] Interest and debt service savings assume: (1) pro forma annualized interest immediately post-Restructuring Transactions; (2) an undrawn New RCF; (3) amortization of the New EUR Term Loans based on their principal balance post-Restructuring Transactions; and (4) elimination of the pre-Restructuring Transactions $60 million mandatory repayment of the 14.00% Unsecured Notes.

$150 million of undrawn availability under the New RCF.[14] Moreover, the warrant claims will be cancelled without distribution. The RSA and the Plan contemplate that, upon emergence from chapter 11, the Debtors will have reduced their funded indebtedness by over $500 million.

105. The involvement and contributions of all key stakeholders to this deal, as memorialized through the RSA, present the best option available to the Debtors. Yet if a superior deal is offered, the Company will have full ability to pursue such a deal. The RSA preserves the Debtors' ability to consider alternative restructuring proposals. Subject to certain notice and information-sharing obligations, the Company Parties may consider, respond to, and negotiate such proposals. The Company Parties may terminate the RSA if the board of directors or similar governing body of any Company Party determines, after consulting with external counsel, that proceeding with the Restructuring Transactions would be inconsistent with its fiduciary duties or applicable law, or determines to pursue an Alternative Restructuring Proposal. The Debtors will continue to consider in good faith any alternative proposal received during these Chapter 11 Cases.

106. The transactions contemplated by the RSA and the Plan maximize value for the benefit of all of the Debtors' stakeholders, are the best available alternative under the circumstances, and allow the Company to emerge with minimal disruption to its business.

107. On October 12, 2026, following the recommendation of the Special Committees of GIH and each of the other Debtor subsidiaries, all unconflicted members of the Board and of each subsidiary board approved the Company's entry into the RSA.

---

[14] The approximately $75 million in cash does not take into account any cash payments at or around emergence, if any, pursuant to the Equity Commitment Letter which outlines the terms of the Plan Sponsors' equity investment.

108. On October 20, 2026, following the recommendation of the Special Committees of GIH and each of the other Debtor subsidiaries, all unconflicted members of the Board and of each subsidiary board approved the commencement of these Chapter 11 Cases.

***a. Special Committees.***

109. To ensure a thorough and fair process, the Debtors' restructuring was overseen by independent and disinterested directors serving on special committees appointed by several Debtor entities (collectively, the "Special Committees").

110. On August 6, 2026, the Board of Debtor GIH established its own special committee and appointed independent and disinterested directors Elizabeth Abrams and Thomas Walper as its members. Separately, Debtor subsidiaries Getty Images, Inc., Getty Images (Seattle), Inc., Abe Investment Holdings, Inc., Getty Images (US), Inc., Getty Images News Services (PRC), Inc., and Griffey Midco (DE), LLC each established a special committee and appointed Neal Goldman, an independent and disinterested director, as its sole member.

111. The Special Committees were delegated the authority to review, evaluate, and analyze potential transactions and conflict matters on behalf of their respective boards of directors, and to submit non-binding recommendations to the full boards for their consideration, including with respect to any matters in which a conflict of interest exists or is reasonably likely to exist between the applicable Debtor entity and any of its related parties, including other entities within the Getty Images corporate group. Prior to the Company's entry into the RSA, the delegation of the Special Committee of GIH was expanded in scope to give the Special Committee full authority in respect of the fiduciary-related provisions in the RSA.

112. Each of the Special Committees retained independent counsel and, during restructuring negotiations, began an investigation into potential intercompany claims and each entity's potential ownership interest in certain legal claims. Over the course of the investigation,

the Special Committees have periodically met with their advisors and the Company's management team on numerous occasions. The investigation remains ongoing.

**B. The RSA Milestones.**

113. Subject to this Court's orders and directions, the Debtors intend to move quickly through these Chapter 11 Cases. The RSA sets forth certain milestones requiring, among other things, that the Debtors obtain entry of the Interim DIP Order no later than three business days after the Petition Date, obtain entry of the Final DIP Order no later than 35 calendar days after the Petition Date, obtain entry of the Confirmation Order no later than 55 calendar days after the Petition Date and emerge from chapter 11 by no later than 75 calendar days after the Petition Date (subject to a potential extension of up to an additional 30 calendar days in certain circumstances). These milestones reflect the Debtors' commitment to a swift restructuring process that minimizes disruption to the Company's business operations, employees, customers, and content contributors. The Debtors believe that the go-forward business plan supports the Company's ability to emerge from chapter 11 as a stronger, more competitive enterprise, positioned to invest in its core businesses and capitalize on opportunities in the evolving visual content market.

**Conclusion**

114. For the reasons stated herein, I respectfully request that the relief requested in each First Day Pleading be granted in its entirety, along with such other and further relief as the Court deems just and proper.

115. Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge, information, and belief.

Dated: October 21, 2026
New York, New York

*/s/ Craig Peters*
Craig Peters
Chief Executive Officer
Getty Images Holdings, Inc.