| GENERAL PROVISIONS REGARDING THE RESTRUCTURING TRANSACTIONS | |
|---|---|
| | preparation, dissemination, filing or consummation of any Restructuring Transactions, any Definitive Documents, or any contract, instrument, release, or other agreement or document created or entered into in connection with the RSA, the Restructuring Transactions, or the Definitive Documents, the pursuit of confirmation, consummation, administration, and implementation of the Plan, including the issuance or distribution of securities pursuant to the Plan and the distribution of property under the Plan or any other related agreement, the solicitation of votes on the Plan, or upon any other act, or omission, transaction, agreement, event, or other occurrence taking place between the Petition Date and the Restructuring Effective Date related or relating to the foregoing, except for claims related to any act or omission that is determined in a final order of a court of competent jurisdiction to have constituted actual fraud or gross negligence, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan. The Exculpated Parties have, and upon confirmation of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of votes and distribution of consideration pursuant to the Plan, including the issuance of securities thereunder, and, therefore, are not, and on account of such solicitation, distributions, or issuance shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan, or such distributions made pursuant to the Plan, including the issuance of securities thereunder.<br><br>This exculpation shall be in addition to, and not in limitation of, all other releases, indemnities, exculpations, and any other applicable laws, rules, or regulations protecting such Exculpated Parties from liability. Notwithstanding anything to the contrary in the foregoing, the exculpation set forth in the Plan shall not be construed as exculpating any party or Entity from its post-Restructuring Effective Date obligations under the Plan, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan. |
| **Injunction** | The Plan will contain the following provisions regarding injunction:<br><br>Except as otherwise expressly provided in the Plan or the Confirmation Order, or for obligations issued or required to be paid pursuant to the Plan or the Confirmation Order, all Entities who have held, hold, or may hold Claims, Interests, or Causes of Action that have been extinguished, released, discharged, or are subject to exculpation (in each case, as set forth in the above Discharge, Release, Third-Party Release, and Exculpation sections of this Restructuring Term Sheet), whether or not such Entities vote in favor of, against or abstain from voting on the Plan or are presumed to have accepted or deemed to have rejected the Plan, and other parties in interest, along with their respective present or former employees, agents, officers, directors, principals, affiliates, and Related Parties, are permanently enjoined, from and after the Restructuring Effective Date, from taking any of the following actions against, as applicable, the Debtors, the Reorganized Debtors, the Exculpated Parties, or the Released Parties: (a) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such claims, interests, or Causes of Action; (b) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such claims, interests, or Causes of Action; (c) creating, perfecting, or enforcing any lien or encumbrance of any kind against such |

| GENERAL PROVISIONS REGARDING THE RESTRUCTURING TRANSACTIONS | |
|---|---|
| | Entities or the property or the estates of such Entities on account of or in connection with or with respect to any such claims, interests, or Causes of Action; (d) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property of such Entities on account of or in connection with or with respect to any such claims, interests, or Causes of Action unless such holder has timely filed a motion with the Bankruptcy Court expressly requesting the right to perform such setoff, subrogation or recoupment on or before the Restructuring Effective Date, and notwithstanding an indication of a claim or interest or otherwise that such holder asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise; and (e) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such claims, interests, or Causes of Action released or settled pursuant to the Plan.<br><br>By accepting distributions pursuant to the Plan, each holder of an Allowed Claim or Interest extinguished, discharged, or released pursuant to the Plan will be deemed to have affirmatively and specifically consented to be bound by the Plan, including, without limitation, the injunctions set forth above.<br><br>The injunctions set forth above shall extend to any successors of the Debtors, the Reorganized Debtors, the Released Parties, and the Exculpated Parties and their respective property and interests in property.<br><br>Notwithstanding anything to the contrary in the foregoing, the injunction set forth above does not enjoin the enforcement of any post-Restructuring Effective Date obligations of any Person or Entity under the Plan, any post- Restructuring Effective Date transaction contemplated by the Restructuring Transactions or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan. |
| **Certain Definitions** | The following definitions shall be applicable to the foregoing release and exculpation provisions:<br><br>"*Causes of Action*" means any and all actions, Claims, interests, remedies, causes of action, controversies, demands, proceedings, agreements, rights, Liens, indemnities, contributions, guaranties, suits, obligations, liabilities, damages, judgments, accounts, defenses, offsets, powers, privileges, licenses, and franchises of any kind or character whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, contingent or noncontingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, assertable directly or derivatively, whether arising before, on, or after the Petition Date, in contract or in tort, in law or in equity, or pursuant to any other theory of law. Causes of Action also include: (a) any and all rights of setoff, counterclaim, or recoupment, and Claims for breach of contract or for breach of duties imposed by law or in equity; (b) any and all rights to dispute, object to, compromise, or seek to recharacterize, reclassify, subordinate, or disallow Claims against or Interests in the Debtors; (c) any and all Claims pursuant to section 362 or chapter 5 of the Bankruptcy Code; (d) any and all Claims or defenses, including fraud, mistake, duress, and usury, and any other defenses set forth in section 558 of the Bankruptcy Code; and (e) any and all state or foreign law fraudulent transfer or similar Claims.<br><br>"*Released Parties*" means collectively, and in each case in its capacity as such: (a) each of the Debtors; (b) each of the Reorganized Debtors; (c) each Consenting Stakeholder; (d) each of the Agents/Trustees; (e) each DIP Lender; (f) each New Equity Investor; |

| GENERAL PROVISIONS REGARDING THE RESTRUCTURING TRANSACTIONS | |
|---|---|
| | (g) each Releasing Party; (h) each current and former Affiliate of each Entity in clause (a) through the following clause (g); and (i) each Related Party of each Entity in clause (a) through this clause (h); *provided* that, in each case, an Entity (other than the Debtors, the Reorganized Debtors, the Consenting Shareholders, and their respective Related Parties) shall not be a Released Party if it (x) was provided with an opportunity to (i) opt out of the releases in the Plan and affirmatively opts out; or (ii) opt into the releases in the Plan by returning an "opt in" form and does not affirmatively opt in; or (y) timely objects to the releases contained in the Plan and such objection is not resolved before the Confirmation Order is entered.<br><br>"*Releasing Parties*" means, collectively, and in each case in its capacity as such: (a) each of the Debtors; (b) each of the Reorganized Debtors; (c) each Consenting Stakeholder; (d) each of the Agents/Trustees; (e) each DIP Lender; (f) each New Equity Investor; (g) each Holder of Claims or Interests that votes to accept the Plan; (h) each Holder of Claims or Interests that (I) abstains from voting on the Plan, (II) is deemed to accept or reject the Plan, or (III) votes to reject the Plan and, in each case, affirmatively opts in to the releases provided for in the Plan; (i) each current and former Affiliate of each Entity in clause (a) through clause (h) for which such Entity is legally entitled to bind such Affiliate to the releases contained in the Plan under applicable law; and (j) each Related Party of each Entity in clause (a) through clause (i) for which such Entity is legally entitled to bind such Related Party to the releases contained in the Plan under applicable law.<br><br>"*Exculpated Parties*" means, collectively, each of the following in their capacity as such: (a) the Debtors; (b) the Reorganized Debtors; (c) members of the Special Committee; and (d) with respect to each of the foregoing Entities in clauses (a) through (c), (i) their respective current officers, their current and former directors, and limited liability company managers, who served in such capacity at any time between the Petition Date and the Restructuring Effective Date, and (ii) each of their attorneys, financial advisors, consultants, and other professionals or advisors whose retentions were approved by the Bankruptcy Court pursuant to an order approving such professional's retention application, as applicable.<br><br>"*Related Party*" means, with respect to (a) any Entity, (b) such Entity's predecessors, successors and assigns, parents, subsidiaries, affiliates, affiliated investment funds or investment vehicles, managed or advised accounts, funds, or other entities, and investment advisors, subadvisors, or managers, (c) with respect to each Consenting Shareholder, its associated trusts (and its holding vehicles who are direct holders of interests in the applicable Consenting Shareholder, its affiliated investment funds or investment vehicles, managed or advised accounts, funds, or other entities, and investment advisors, subadvisors, or managers) that are holders of Interests in Holdings, (d) with respect to each of the foregoing in clauses (a)–(c), such Entity's respective current and former officers, directors, principals, equity holders (regardless of whether such interests are held directly or indirectly and any fund managers, fiduciaries, or other agents with any involvement related to the Debtors), members, partners, employees, agents, trustees, advisory board members, financial advisors, attorneys, accountants, actuaries, investment bankers, consultants, representatives, management companies, fund advisors and other professionals; and (e) with respect to each of the foregoing in clauses (a)–(d), such Entity's respective heirs, executors, estates, servants, and nominees. |

| OTHER MATERIAL PROVISIONS REGARDING THE RESTRUCTURING | |
|---|---|
| **Governance** | The corporate governance for the Reorganized Company Parties, including charters, bylaws, operating agreements, or other organization documents, as applicable, including the composition of the board of New Getty Images (the "New Board"), shall be determined by the Consenting Shareholders, in consultation with the Company Parties.<br><br>The New Board shall be designated by the Consenting Shareholders and disclosed as part of the Plan Supplement. |
| **Management Incentive Plan** | The Reorganized Company Parties shall establish a management incentive plan ("MIP") consisting of up to 10% of New Interests on a fully diluted basis (the "MIP Interests"), to be implemented on the form, terms, allocation, and vesting mechanism to be determined by the New Board in its sole discretion following the Restructuring Effective Date; *provided* that such "up to 10%" amount of New Interests shall be calculated excluding the existence of the New Preferred Interests. |
| **Exemption from SEC Registration** | The issuance of all securities under the Plan, including pursuant to the ECL, will be exempt from SEC registration under applicable law. |
| **Employment Obligations** | The Debtors shall (a) assume all existing employment agreements, indemnification agreements, or other employment-related agreements entered into with current and former employees or (b) enter into new agreements with such employees on terms and conditions acceptable to the Debtor and such employee in the ordinary course of business. Any amendment to, or entry into any new employment, severance, or similar retention agreement with any officer or other insider of the Company Parties shall be subject to the consent of the Consenting Shareholders. Notwithstanding anything to the contrary herein, the consummation of the Restructuring Transactions (including the Consenting Shareholders' acquisition of New Interests) shall not constitute a "change in control," "change of control," or similar event under any employment agreement or compensation or benefit plan, program, or policy of the Company Parties. |
| **Indemnification Obligations** | Consistent with applicable law, all indemnification provisions in place as of the Petition Date (whether in the by-laws, certificates of incorporation or formation, limited liability company agreements, other organizational documents, board resolutions, indemnification agreements, employment contracts, or otherwise) for current and former directors, officers, managers, employees, attorneys, accountants, investment bankers, and other professionals of the Company Parties (such indemnification provisions, the "Indemnification Provisions"), as applicable, shall be reinstated and remain intact, irrevocable, and shall survive the effectiveness of the Restructuring Transactions on terms no less favorable to such current and former directors, officers, managers, employees, attorneys, accountants, investment bankers, and other professionals of the Company Parties than the indemnification provisions in place immediately prior to the Petition Date. The Governance Documents shall contain Indemnification Provisions in favor of such parties no less favorable than the Indemnification Provisions in favor of such parties in place immediately prior to the Petition Date. |

| OTHER MATERIAL PROVISIONS REGARDING THE RESTRUCTURING | |
|---|---|
| **Retained Causes of Action** | On the Restructuring Effective Date, the Company Parties shall retain all rights to commence and pursue any Causes of Action set forth in the Schedule of Retained Causes of Action, which shall be determined by the Special Committee and shall be a Plan Supplement. No Claim or Cause of Action against any Released Party (including the Consenting Stakeholders and their respective Related Parties) shall be retained, and the Schedule of Retained Causes of Action shall be acceptable to the Consenting Shareholders. |
| **Consenting Shareholder Fees and Expenses; Expense Reimbursement** | The Plan and the Confirmation Order shall provide that the Reorganized Company Parties shall pay (i) the Consenting Shareholder Fees and Expenses that remain unpaid as of, or are incurred after, the Restructuring Effective Date, including in connection with the implementation and consummation of the Plan and the Restructuring Transactions, in accordance with the ECL and (ii) without duplication with the prior clause (i), any Expense Reimbursement under the ECL in accordance with the ECL. |
| **Conditions Precedent to Restructuring Effective Date** | The Restructuring Effective Date will be subject to the satisfaction of customary conditions, including the following, as applicable (collectively, the "Conditions Precedent"):<br>(a) the RSA shall be in full force and effect;<br>(b) there shall be no breach by the Debtors or the Consenting Stakeholders of the RSA or the DIP Credit Agreement which has not been waived or, if subject to cure, cured within the applicable time period;<br>(c) the form and substance of the Definitive Documents shall be acceptable in accordance with the consent rights set forth in Section 3 of the RSA;<br>(d) the Bankruptcy Court shall have entered the Final DIP Order, which order shall be in full force and effect, and no stay thereof shall be in effect;<br>(e) no default, event of default, or other breach shall have occurred and be continuing under any of the DIP Documents;<br>(f) the Bankruptcy Court shall have entered the Disclosure Statement Order, which order shall be in full force and effect, and no stay thereof shall be in effect and the same shall not be subject to an appeal;<br>(g) the Bankruptcy Court shall have entered the Confirmation Order, which order shall be in full force and effect, and no stay thereof shall be in effect and the same shall not be subject to an appeal;<br>(h) the Company Parties shall have obtained all regulatory authorizations, consents, approvals, rulings, or documents that are necessary to implement and effectuate the Restructuring Transactions and all applicable waiting periods (including under the HSR Act and any applicable foreign antitrust or foreign direct investment laws) shall have expired or been terminated, as determined in good faith by the Debtors in consultation with the Required Consenting Stakeholders;<br>(i) the New Credit Agreement (including any perfection certificates, opinions, certificates, and collateral documents reasonably acceptable to the Required Consenting Secured Lenders and the Required Consenting RCF Lenders) shall have been executed and delivered by each party thereto, and any conditions |

| OTHER MATERIAL PROVISIONS REGARDING THE RESTRUCTURING | |
|---|---|
| | precedent related thereto, other than the occurrence of the Restructuring Effective Date, shall have been satisfied or waived;<br>(j) the New Notes Indenture (including any perfection certificates, opinions, certificates, and collateral documents reasonably acceptable to the Required Consenting Secured Lenders) shall have been executed and delivered by each party thereto, and any conditions precedent related thereto, other than the occurrence of the Restructuring Effective Date, shall have been satisfied or waived;<br>(k) the New Equity Investment and the Equitization Commitment shall have been consummated;<br>(l) all organizational documents and bylaws for New Getty Images shall have been adopted;<br>(m) the Unsecured Notes Recovery shall have been paid in full in cash to holders of allowed Unsecured Notes Claims or deposited to the applicable Trustees for distribution to such holders substantially concurrently with the occurrence of the Restructuring Effective Date;<br>(n) all transaction expenses, including the Consenting Creditor Fees and Expenses but excluding the Consenting Shareholder Fees and Expenses (which shall be paid in accordance with the RSA and the ECL, as applicable), shall have been paid in full in cash; and<br>(o) all professional fees and expenses of retained Professionals that require the approval of the Bankruptcy Court shall have been paid in full or amounts sufficient to pay such fees and expenses after the Restructuring Effective Date shall have been placed in a Professional Fee Escrow Account[6] pending the approval of such fees and expenses by the Bankruptcy Court. |
| **Waiver of Conditions Precedent** | The Conditions Precedent may be waived, in whole or in part, with the written consent of the Company Parties and the Consenting Shareholders; *provided* that any waiver of a Condition Precedent that would materially and adversely affect the treatment of the Consenting Secured Lenders, the Consenting RCF Lenders, or the Consenting Unsecured Noteholders under the Plan shall also require the consent of the Required Consenting Secured Lenders, the Required Consenting RCF Lenders, or the Required Consenting Unsecured Noteholders, as applicable; *provided*, *further*, that any waiver, in whole or in part, of the Condition Precedent set forth in clause (l) above shall also require the written consent of the Required Consenting Secured Lenders, the Required |

[6] "Professional Fee Escrow Account" means an interest-bearing account funded by the Debtors with cash on the Restructuring Effective Date in an amount equal to the aggregate amount of Professional Fee Claims and other unpaid fees and expenses that the Professionals estimate they have incurred or will incur in rendering services to the Debtors prior to the Effective Date.

"Professional Fee Claims" means a Claim by a Professional seeking an award by the Bankruptcy Court of compensation for services rendered or reimbursement of expenses incurred through and including the Confirmation Date under sections 330, 331, 503(b)(2), 503(b)(3), 503(b)(4), or 503(b)(5) of the Bankruptcy Code.

"Professional" means an entity (a) employed pursuant to a Bankruptcy Court order in accordance with sections 327, 363, or 1103 of the Bankruptcy Code and to be compensated for services rendered prior to or on the Confirmation Date, pursuant to sections 327, 328, 329, 330, 331, and 363 of the Bankruptcy Code; or (b) awarded compensation and reimbursement by the Bankruptcy Court pursuant to section 503(b)(4) of the Bankruptcy Code.

| OTHER MATERIAL PROVISIONS REGARDING THE RESTRUCTURING | |
|---|---|
| | Consenting RCF Lenders, and the Required Consenting Unsecured Noteholders solely with respect to Consenting Creditor Fees and Expenses incurred by their respective advisors. |
| **Amendments** | This Restructuring Term Sheet may be amended only as permitted pursuant to the RSA. |

**Exhibit B**

**DIP Term Sheet**

*Execution Version*

**THIS DIP TERM SHEET IS NOT AN OFFER WITH RESPECT TO ANY SECURITIES OR A SOLICITATION OF ACCEPTANCES OF A CHAPTER 11 PLAN WITHIN THE MEANING OF SECTION 1125 OF THE BANKRUPTCY CODE. ANY SUCH OFFER OR SOLICITATION WILL COMPLY WITH ALL APPLICABLE SECURITIES LAWS AND/OR PROVISIONS OF THE BANKRUPTCY CODE. NOTHING CONTAINED IN THIS DIP TERM SHEET SHALL BE AN ADMISSION OF FACT OR LIABILITY OR, UNTIL THE OCCURRENCE OF THE AGREEMENT EFFECTIVE DATE OF THE RESTRUCTURING SUPPORT AGREEMENT ON THE TERMS DESCRIBED HEREIN AND IN THE RESTRUCTURING SUPPORT AGREEMENT, DEEMED BINDING ON ANY OF THE PARTIES HERETO.**

**Getty Images Holdings, Inc.**

**DIP TERM SHEET**

This DIP Term Sheet (including all exhibits hereto, as may be amended, restated, amended and restated, supplemented, or otherwise modified from time to time, this "**DIP Term Sheet**") describes the principal terms and conditions of the debtor-in-possession financing facility (the "**DIP Facility**") to be provided by the DIP Lenders (as defined below) to Getty Images Holdings, Inc. (the "**Borrower**"), in connection with the Chapter 11 cases (such cases, the "**Chapter 11 Cases**") to be filed by the Borrower and certain of its subsidiaries (collectively, the "**Debtors**") pursuant to title 11 of the United States Code, 11 U.S.C. §§ 101-1532, as amended (the "**Bankruptcy Code**") in the Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**"). This DIP Term Sheet and the Restructuring Support Agreement to which this DIP Term Sheet is attached (including all amendments, restatements, modifications, exhibits, and supplements thereto, the "**Restructuring Support Agreement**"), upon the execution thereof, shall constitute legal, valid, and binding obligations of each party hereto, and shall be enforceable against each party hereto and thereto in accordance with their terms, except as such enforceability may be limited by any debtor relief law and by general principles of equity. Capitalized terms used but not defined herein have the meanings assigned to them in the Restructuring Support Agreement.

| **DIP Facility** | |
|---|---|
| **Borrower** | Getty Images Holdings, Inc. |
| **Guarantors** | The obligations of the Borrower shall be unconditionally guaranteed, on a joint and several basis, by each Debtor other than the Borrower (collectively, the "**Guarantors**") as of the date following entry of the Interim DIP Order when the DIP Facility is closed pursuant to the definitive DIP Documents (as defined below). |
| **DIP Facility** | The DIP Facility is a debtor-in-possession multi-draw financing facility in an aggregate principal amount of up to $143,000,000.00 (the "**DIP Commitment**"), consisting of (a) $113,000,000.00 of DIP Loans where (i) $85,000,000.00 of DIP Loans shall be made available upon entry of the Interim DIP Order (the "**Interim Initial DIP Loans**") and (ii) $28,000,000.00 of DIP Loans shall be made available upon entry of the |

| DIP Facility | |
|---|---|
| | Final DIP Order (the "**<u>Final DIP Loans</u>**"); and (b) $30,000,000.00 of Delayed-Draw DIP Commitments, which shall be made available upon entry of the Interim DIP Order (such commitments, the "**<u>Delayed-Draw DIP Commitments</u>**", and the loans thereunder, "**<u>Delayed-Draw DIP Loans</u>**" and, together with the Interim Initial DIP Loans, the "**<u>Interim DIP Loans</u>**" and, the Interim DIP Loans, collectively with the Final DIP Loans, the "**<u>DIP Loans</u>**"). |
| **Segregated DIP Account** | All proceeds of the DIP Facility shall be deposited into a segregated account of the Borrower (the "**<u>Segregated DIP Account</u>**"), which will be subject to the DIP Liens (as defined below) on a first priority basis and subject to a deposit account control agreement in favor of the DIP Agent (the "**<u>Segregated Account Control Agreement</u>**"), which Segregated Account Control Agreement shall be in form and substance acceptable to the DIP Lenders. On each funding date, the DIP Lenders will advance funds to the DIP Agent and the DIP Agent will deposit such funds into the Segregated DIP Account.<br><br>The Borrower may withdraw amounts from the Segregated DIP Account and deposit such amounts into other bank accounts maintained by the Debtors on the Closing Date and on each Monday following the Closing Date; *provided*, that the amounts so withdrawn by the Borrower shall not exceed the amount needed for payments that are contemplated to be made during the two-week period following such Monday as expressly set forth in the Approved Budget (plus an additional 20% of such contemplated payments for such weeks) (such withdrawal, an "**<u>Approved Budget Withdrawal</u>**"); *provided*, *further*, for the avoidance of doubt, if an Approved Budget Withdrawal includes amounts in respect of any particular week, any subsequent Approved Budget Withdrawal shall not be permitted to include such amounts. The Borrower may also withdraw amounts from the Segregated DIP Account and deposit such amounts in the Funded Reserve Account (as defined on Annex A hereto), subject to the DIP Orders (such withdrawal, a "**<u>Carve Out Withdrawal</u>**"). The Borrower shall not be permitted to withdraw cash from the Segregated DIP Account (other than an Approved Budget Withdrawal or a Carve Out Withdrawal) without the prior written consent of the DIP Lenders (such consent not to be unreasonably withheld so long as the Borrower is in compliance with the Minimum Liquidity Covenant).<br><br>Except with respect to an Approved Budget Withdrawal or a Carve Out Withdrawal, the proceeds of the DIP Facility shall not be transferred into any other account held by any Debtor or any of its subsidiaries, or commingled with any other cash held by any Debtor or any of its subsidiaries. For the avoidance of doubt, the Borrower shall be permitted to use funds withdrawn from the Segregated DIP Account |

| DIP Facility | |
|---|---|
| | only to the extent such uses are consistent with the Approved Budget (subject to Permitted Variances) or the Carve Out.<br><br>Once withdrawn from the Segregated DIP Account, the funds shall continue to be DIP Priority Collateral (as defined below) until such funds are first used by the Debtors; *provided*, *further*, that any such funds that are deposited in the Funded Reserve Account or the Carve Out Reserve (in each case, as defined on Annex A hereto) in accordance with the Carve Out provisions of the DIP Orders shall not constitute DIP Priority Collateral. |
| **DIP Lenders** | The lenders under the DIP Facility (the "**DIP Lenders**") shall be Koch Equity Development LLC and/or its affiliates. |
| **DIP Agent** | An agent mutually acceptable to the DIP Lenders and the Borrower shall be appointed as administrative agent and collateral agent for the DIP Lenders and will perform the duties customarily associated with such roles (together with its successors and permitted assigns, in such capacities, the "**DIP Agent**" and, together with the DIP Lenders, the "**DIP Secured Parties**"). |
| **DIP Collateral / Priority** | The DIP Facility and all DIP Loans and other liabilities and obligations owed thereunder to the DIP Lenders under or in connection with the DIP Documents (collectively, the "**DIP Obligations**") shall, in each case, be subject and subordinate to the Carve Out (as defined below), and shall be secured by automatically perfected liens on, and security interests in (the "**DIP Liens**"):<br><br>a) (x) thirty-five percent of the unencumbered equity interests of foreign subsidiaries directly owned by a Debtor not included in the Prepetition Collateral, and (y) the Segregated DIP Account and all amounts deposited therein and withdrawn therefrom, in each case, on a first priority basis senior to any other Lien or Claim (the property listed in these clauses (x) and (y), the "**DIP Priority Collateral**"); *provided*, for the avoidance of doubt, the DIP Liens on the property listed in clause (x) will rank senior to any Adequate Protection Liens on such property;<br><br>b) all property of the Debtors, whether existing on the date on which the Debtors file the Chapter 11 Cases (the "**Petition Date**") or thereafter acquired, that is subject to a Lien securing the Secured Funded Debt Claims and/or the Revolving Loan Claims (each, as defined in the Restructuring Support Agreement) (such property, the "**Prepetition Collateral**"), on a junior basis to the Liens securing the Secured Funded Debt Claims, the Revolving Loan |

| DIP Facility | |
|---|---|
| | Claims, and the Permitted Prior Liens (as defined below) (if any) but senior to any other Lien;<br><br>c) all property of the Debtors, whether existing on the Petition Date or thereafter acquired, that is subject to valid, perfected, and non-avoidable Liens in existence immediately prior to the Petition Date or valid and non-avoidable Liens perfected after the Petition Date to the extent permitted by section 546(b) of the Bankruptcy Code (any such Liens, the "**<u>Permitted Prior Liens</u>**") on a junior basis to such Permitted Prior Liens but senior to any other Lien;<br><br>d) all property of the Debtors, whether existing on the Petition Date or thereafter acquired, that is not subject to valid, perfected, and non-avoidable Liens in existence immediately prior to the Petition Date or valid and non-avoidable Liens perfected after the Petition Date to the extent permitted by section 546(b) of the Bankruptcy Code (the "**<u>Previously Unencumbered Property</u>**"), on a first priority ranking basis senior to any other Lien or Claim;<br><br>e) subject to entry of the Final DIP Order, the proceeds of any Claims or causes of action arising under or pursuant to chapter 5 of the Bankruptcy Code, section 724(a) of the Bankruptcy Code, or any other similar provisions of applicable state, federal, or foreign law (including any other avoidance actions under the Bankruptcy Code) (collectively, the "**<u>Avoidance Actions</u>**"), but in no event shall the DIP Liens extend to Avoidance Actions; and<br><br>f) subject to entry of the Final DIP Order, the proceeds of any exercise of the Debtors' rights under sections 506(c) and 550 of the Bankruptcy Code (the "**<u>Recovery Actions</u>**"), but in no event shall the DIP Liens extend to the Recovery Actions;<br><br>(collectively, the property and proceeds set forth in the foregoing clauses (a) through (f), the "**<u>DIP Collateral</u>**"); *provided* that the DIP Collateral shall not include "Excluded Assets" (to be defined in the applicable DIP Document in a manner that is usual and customary for debtor-in-possession financings).<br><br>The DIP Facility shall also benefit from joint and several superpriority administrative expense claims against the Debtors that are senior to all other administrative expenses or other Claims against the Debtors, but which shall be subject and subordinate to (i) the Carve Out and (ii) the Adequate Protection Claims held by the holders of Secured Funded Debt Claims and the Adequate Protection Claims held by the holders of Revolving Loan Claims. |

| DIP Facility | |
|---|---|
| | All of the DIP Liens with respect to the DIP Collateral shall be perfected by entry of the DIP Orders, and shall become effective immediately and automatically upon the closing of the DIP Facility on the Closing Date, without the necessity of the execution of mortgages, security agreements, pledge agreements, financing statements, or any other agreements or the filing or recording of any other documents. Notwithstanding the foregoing, the Debtors shall take any and all actions that may be reasonably necessary, or that the DIP Agent or the DIP Lenders may reasonably request, to maintain the validity, perfection, enforceability, and priority of the security interest and liens of the DIP Agent in the DIP Collateral, or to enable the DIP Agent and the DIP Lenders to protect, exercise, or enforce their rights thereunder, under the DIP Orders, and in respect of the DIP Collateral; *provided* that in no event shall the foregoing require any control agreements (other than the Segregated Account Control Agreement), intellectual property security agreements or mortgages, or any collateral documents or filings under any non-US jurisdiction.<br><br>Any intercreditor terms or arrangements shall be documented pursuant to the DIP Orders.<br><br>For the avoidance of doubt, the DIP Liens on the Prepetition Collateral shall be junior to the Adequate Protection Liens (defined below) of the holders of Secured Funded Debt Claims and the Adequate Protection Liens of the holders of Revolving Loan Claims provided for in the DIP Orders.<br><br>For the avoidance of doubt, the Prepetition Collateral shall not include the Segregated DIP Account, the cash deposited therein or the DIP Priority Collateral.<br><br>For the avoidance of doubt, the DIP Liens shall attach to the DIP Priority Collateral on a first priority basis senior to any other Lien or Claim. |
| **Adequate Protection** | As adequate protection for any diminution in value of (x) the Secured Funded Debt Claim holders' cash collateral, (y) the Revolving Loan Claims holders' cash collateral and (z) any other Prepetition Collateral, in each case, as of the Petition Date ("**Diminution in Value**"), including any diminution arising from (i) the sale, lease, or use by the Debtors of cash collateral subject to prepetition liens and security interests, (ii) the incurrence of the DIP Facility, and (iii) the imposition of the automatic stay pursuant to section 362 of the Bankruptcy Code, the holders of the Secured Funded Debt Claims and the holders of the Revolving Loan Claims shall be entitled to: |

| DIP Facility | |
|---|---|
| | a) a superpriority administrative expense claim in the Chapter 11 Cases, solely to the extent of any Diminution in Value, with priority over all administrative expenses and claims of any kind or nature whatsoever, specified in or ordered pursuant to sections 105, 326, 327, 328, 330, 331, 361, 362, 363, 364, 365, 503, 506, 507(a), 507(b), 546, 552, 726, 1113 or 1114 or any other provisions of the Bankruptcy Code, subject and junior only to the Carve Out (the "**Adequate Protection Claims**");<br><br>b) to secure the Adequate Protection Claims, (i) a perfected security interest in and Lien on all Prepetition Collateral, solely to the extent of any Diminution in Value, which shall be subject to and immediately junior in priority to the Carve Out, but with priority over all other Liens on the Prepetition Collateral, and (ii) a perfected security interest in and Lien on all DIP Collateral (other than the Segregated DIP Account and the cash therein), solely to the extent of any Diminution in Value, which, other than with respect to any such DIP Collateral that constitutes Prepetition Collateral, shall be subject to and junior in priority to the Carve Out and the DIP Liens, but with priority (except as set forth in the following proviso) over all other Liens on such DIP Collateral ((i) and (ii) collectively, the "**Adequate Protection Liens**"); *provided*, that any Adequate Protection Liens attaching to the DIP Priority Collateral shall rank junior in priority to the DIP Liens attaching to the DIP Priority Collateral;<br><br>c) current payment of the reasonable and documented prepetition and postpetition legal and other professional fees and expenses of the Consenting Secured Lender Advisors and the Consenting RCF Lender Advisors; and<br><br>d) current cash payment of (a) interest on the Secured Funded Debt Claims and the Revolving Loan Claims, as applicable, at the applicable non-default rate of interest, (b) required amortization payments, in each case, as provided under their respective debt document, including, for the avoidance of doubt, payment of cash interest and amortization on the EUR Term Loan Claims held by Koch Equity Development LLC and its Related Parties and (c) any fees payable (i) to the Credit Agreement Agent for the administrative agency fee under the Credit Agreement or related Loan Documents (as defined in the Credit Agreement) or (ii) on account of any Letter of Credit (as defined in the Credit Agreement) (the "**Adequate Protection Payments**"). Without limiting the requirement to pay all Adequate Protection Payments during the Chapter 11 Cases, when due, payment of |

| DIP Facility | |
|---|---|
| | any outstanding Adequate Protection Payments shall occur no later than the Restructuring Effective Date.<br><br>On the Termination Date, any amounts owed in respect of the Adequate Protection Payments shall cease accruing. For the avoidance of doubt, no amounts that would have accrued in respect of the Adequate Protection Payments after the Termination Date shall be payable as Adequate Protection Payments. All amounts owed in respect of the Adequate Protection Claims (including any amount attributable to any Diminution in Value (if any)) shall be calculated as of the Termination Date, and any amounts in respect of any Adequate Protection Payments that had actually accrued but were unpaid as of the Termination Date shall be due and payable on such Termination Date. Notwithstanding the foregoing, nothing in the Restructuring Support Agreement or the DIP Orders shall prevent any Secured Funded Debt Claim or Revolving Loan Claim holder from, after the Termination Date, (i) seeking further adequate protection or (ii) seeking payment of any accrued and unpaid interest, amortization, or other payments under the applicable debt documents, including post-petition accrued and unpaid amounts, other than as Adequate Protection Payments under the DIP Orders; *provided*, for the avoidance of doubt (x) no liens in respect of any such further adequate protection shall (1) attach to the Segregated DIP Account or the cash therein, or (2) attach to any other DIP Priority Collateral in a manner that ranks senior to the DIP Liens in the DIP Priority Collateral, and (y) no cash withdrawn from the Segregated DIP Account may be used to pay any amounts in respect of any such further adequate protection or the amounts or items set forth in the foregoing clause (ii).<br><br>For the avoidance of doubt, the Adequate Protection Liens shall not attach to the Segregated DIP Account or the cash set forth therein.<br><br>The Debtors shall contemporaneously provide the Credit Agreement Agent, counsel to the Consenting RCF Lenders, and counsel to the Consenting Secured Lenders with all reports, notices, documents and other information required to be delivered to the DIP Secured Parties under the DIP Credit Agreement or the DIP Orders (other than borrowing requests, interest election notices and other notices of an administrative or ministerial nature), including, but not limited to, any new Approved Budget or Variance Reports (each as defined herein). |
| **Voluntary & Mandatory Prepayments** | <u>Voluntary Prepayments</u>:<br><br>The Debtors may, at any time, repay the loans under the DIP Facility in whole or in part. No reduction of the DIP Commitments shall be permitted. The DIP Orders shall provide that the Debtors shall not be permitted to voluntarily repay any loans under the DIP Facility absent |

| DIP Facility | |
|---|---|
| | the prior written consent of the Credit Agreement Agent and the Required Lenders under the Credit Agreement, to the extent that any Revolving Loan Claims or Secured Funded Debt Claims are outstanding.<br><br>Mandatory Prepayments:<br><br>Required upon incurrence of unpermitted indebtedness. |
| **Delayed-Draw DIP Loans** | The Delayed-Draw DIP Loans will be made available upon entry of the Interim DIP Order, *provided* that the Delayed-Draw DIP Loans shall only be used (a) to make payments in respect of the delayed-draw eligible uses specified in the "Delayed Draw Uses" row of the Approved Budget (any such payments, the "**Delayed-Draw Payments**") or (b) as set forth in the next sentence. If the Debtors make a Delayed-Draw Payment on or after the Petition Date with cash on hand, and such cash on hand is not (and was not) proceeds of the Delayed-Draw DIP Loans, the Debtors may borrow Delayed-Draw DIP Loans to replenish the cash on hand that was actually used to make such Delayed-Draw Payment.<br><br>If, prior to the Petition Date, the Debtors use cash on hand to make a Delayed-Draw Payment that was otherwise budgeted to be made after the Petition Date in the "Delayed Draw Uses" row of the Approved Budget (each such payment (if any), a "**Prepetition DDTL Payment**"), the Debtors may borrow the Delayed-Draw DIP Loans, in an amount not to exceed such Prepetition DDTL Payment, to replenish the Debtors' cash on hand that was used to make such Prepetition DDTL Payment (each such borrowing (if any), a "**Prepetition DDTL Borrowing**"). For the avoidance of doubt, each borrowing of Delayed-Draw DIP Loans pursuant to a Prepetition DDTL Borrowing shall be considered outstanding Delayed-Draw DIP Loans.<br><br>For the avoidance of doubt, in no event shall the Borrower be permitted to borrow more than the principal amount of the Delayed-Draw DIP Loans permitted by the Interim DIP Order.<br><br>For the avoidance of doubt, all borrowings in respect of the Delayed-Draw DIP Loans shall be subject to the restrictions concerning the Segregated DIP Account, as otherwise set forth in this DIP Term Sheet. |
| **Interest Rate** | Interest on the DIP Loans shall be paid in kind (and capitalized to principal on each interest payment date) at a rate per annum equal to Term SOFR + 5.00% with interest periods of one month or three months, as may be elected by the Borrower from time to time. |

| DIP Facility | |
|---|---|
| | After an Event of Default under the DIP Facility has occurred and is continuing, all outstanding amounts under the DIP Facility shall bear interest, to the fullest extent permitted by law, at the interest rate then applicable plus 2.00% per annum (the "**Default Rate**"). Interest on overdue amounts under the DIP Facility shall also accrue at the Default Rate and shall be payable in kind. |
| **Amortization** | None. |
| **Exit Fee** | If the Restructuring Support Agreement is terminated pursuant to Sections 12.01(d) or 12.02(b) thereof, the Debtors shall become obligated to pay the DIP Lenders a fee in the amount equal to 2.0% of the outstanding DIP Loans (such fee, the "**DIP Exit Fee**"). |
| **Equity Conversion** | On the Restructuring Effective Date, pursuant to the Plan, the obligations under the DIP Loans shall be equitized in accordance with the ECL. |
| **Termination Date** | The DIP Facility shall terminate, all DIP Loans shall be due and payable in full and in cash and the Debtors' ability to use cash collateral shall terminate on the date of the earliest to occur of (such earliest date, the "**Termination Date**"): (i) January 31, 2027; (ii) the effective date of a chapter 11 plan; (iii) the date the DIP Loans become due and payable in full under the DIP Documents, whether by acceleration or otherwise; (iv) the date a United States Bankruptcy Court orders the conversion of the bankruptcy case of any of the Debtors to a Chapter 7 liquidation or the dismissal of the bankruptcy case of any Debtor; and (v) the date that the sale of all or substantially all of the Debtors' assets is consummated. |
| **Documentation Principles** | "**Documentation Principles**" means that the DIP Facility will be documented in a credit agreement (the "**DIP Credit Agreement**") and other guarantee and relevant documentation (collectively, the "**DIP Documents**"), which shall be negotiated in good faith by the Borrower and the DIP Lenders, to reflect the terms of this DIP Term Sheet and to be based (in the case of the DIP Credit Agreement) on the Credit Agreement (as defined in the Restructuring Support Agreement) and applicable documents related thereto (subject to customary restrictions and limitations to reflect its status as a DIP Facility and the Chapter 11 Cases, and such other modifications as are mutually agreed upon in good faith by the Borrower and the DIP Lenders), and through the terms of the DIP Orders reflecting the terms and provisions set forth in this DIP Term Sheet, in each case, subject to the consent rights set forth in the Restructuring Support Agreement. To the extent of any conflict or inconsistency between this DIP Term Sheet and the Documentation Principles, the terms of this DIP Term Sheet shall govern. |

| DIP Facility | |
|---|---|
| **Use of Proceeds** | Subject to Bankruptcy Court approval, the Debtors shall use cash collateral and the proceeds of the DIP Facility in a manner consistent with this DIP Term Sheet, the DIP Orders, and the Approved Budget (as defined below and subject to Permitted Variances). Cash collateral, the Interim Initial DIP Loans, and Final DIP Loans shall be used for (i) working capital and general corporate purposes of the Debtors, (ii) bankruptcy-related costs and expenses in respect of the Chapter 11 Cases (including the Carve Out (as defined below)) and to pay adequate protection payments as authorized by the Bankruptcy Court in the Interim DIP Order and the Final DIP Order, (iii) costs and expenses related to the DIP Facility and (iv) any other purposes set forth in the Approved Budget. The Delayed-Draw DIP Loans shall be used solely to make Delayed-Draw Payments or to replenish the Debtors' cash on hand that was used to make a Prepetition DDTL Payment or Delayed-Draw Payments on or after the Petition Date, consistent with the other restrictions in respect thereof set forth in this DIP Term Sheet. Notwithstanding anything herein to the contrary, the Approved Budget shall not in any regard limit or test the payment of (a) any professional fees of the DIP Lenders, the Consenting Secured Lenders or the Consenting RCF Lenders, (b) the fees and expenses of the DIP Lenders, or (c) the Adequate Protection Payments. |
| **Budget; Variance Reports** | All cash collateral and proceeds of the DIP Loans shall be used in accordance with and subject to a 13-week cash flow projection commencing on the date of initial funding under the DIP Facility, which initial 13-week cash flow projection shall be satisfactory to the DIP Lenders, and reasonably satisfactory to the Required Consenting RCF Lenders and the Required Consenting Secured Lenders (the "**Initial Approved Budget**"), and shall be updated by the Borrower by the end of every four-week period beginning on the fifth Friday after the Petition Date and reflect the 13-week period beginning with the current week (each, including the Initial Approved Budget, an "**Approved Budget**"); *provided* that such Approved Budget shall be subject to the consent of the DIP Lenders, the Required Consenting RCF Lenders and the Required Consenting Secured Lenders (which may be in the form of e-mail provided by the financial advisor to the DIP Lenders, and which consent of the Required Consenting RCF Lenders and the Required Consenting Secured Lenders shall not be unreasonably withheld, conditioned or delayed); *provided further*, that any such updated budget shall automatically become an Approved Budget if none of the DIP Lenders, the Required Consenting RCF Lenders or the Required Consenting Secured Lenders has objected to the updated budget in writing within five (5) business days of receipt of the updated budget; *provided further,* that if such DIP Lenders object to any updated budget, the Approved Budget for the prior period shall be the Approved Budget until such times as an updated budget is approved. Every |

| DIP Facility | |
|---|---|
| | Approved Budget (including the Initial Approved Budget) shall be in form and substance (including the detail and specificity set forth therein concerning receipts and disbursements) satisfactory to the DIP Lenders.<br><br>Commencing with the third Friday after the Petition Date, and every Friday of every second calendar week thereafter, the Borrower shall deliver to the DIP Agent a variance report in form reasonably acceptable to the DIP Lenders (each, a "**Variance Report**") setting forth (i) the Debtors' aggregate "disbursements" and aggregate "receipts", in each case, for the immediately preceding two-week period ending on Saturday compared to the projected aggregate receipts and disbursements set forth in the Approved Budget for such Variance Testing Period (as defined below) and (ii) the variance in dollar amounts of the actual aggregate amount of receipts and disbursements (excluding all fees due and payable pursuant to 28 U.S.C. § 1930(a) plus any interest due and payable under 31 U.S.C. § 3717) for each period ending on Saturday from those reflected for the corresponding period in the Approved Budget (such comparison, the "**Variance**").<br><br>"**Permitted Variance**" means an aggregate unfavorable disbursement Variance that is not more than 20% during any Variance Testing Period against the projected amount in the Approved Budget for such Variance Testing Period; *provided* that (i) professional fee and expense disbursements (including, without limitation, disbursements in respect of fees and expenses of the Consenting RCF Lender Advisors), including amounts funded to the Funded Reserve Account and the Carve Out Reserves; (ii) United States Trustee fee disbursements; and (iii) the DIP Lender fees and expenses and Adequate Protection Payments shall not be subject to variance testing; *provided*, *further*, that no Approved Budget shall include a budgeted payment of Delayed-Draw Payments in excess of the undrawn Delayed-Draw DIP Commitments; *provided*, *further*, that there shall be no unfavorable disbursement Variance in respect of any Delayed-Draw Payment unless such Delayed-Draw Payment is made from funds other than Delayed-Draw DIP Loans.<br><br>"**Variance Testing Period**" means, starting the third Friday following the Petition Date, the two-week period immediately preceding such Friday and, every other week thereafter, the preceding two-week period ending on the applicable Friday.<br><br>During any Variance Testing Period, the Variance from the then-current Approved Budget shall not exceed the Permitted Variance. |

| DIP Facility | |
|---|---|
| | Reporting to be otherwise subject to the Documentation Principles but will include customary monthly financial reporting. |
| **Conditions Precedent to Effectiveness** | The conditions precedent to effectiveness of the DIP Facility on the closing date thereof (the "**Closing Date**") shall be limited to those usual and customary for debtor-in-possession financings of this type. |
| **Conditions Precedent to DIP Loans** | Usual and customary conditions precedent for all extensions of credit for debtor-in-possession credit facilities of this size, type, and purpose, which shall be reasonably acceptable to the DIP Agent and the DIP Lenders, including that each such borrowing shall be in accordance with the Approved Budget as then in effect. |
| **Representations and Warranties** | The Borrower and the Guarantors under the DIP Facility will make representations and warranties (applicable to such Borrower and Guarantors and/or their respective subsidiaries, as applicable) consistent with the Documentation Principles and customary for debtor-in-possession financings of this type and as modified as necessary to reflect the commencement of the Chapter 11 Cases and otherwise subject to the terms of the DIP Orders. |
| **Covenants** | The Debtors must maintain a minimum of $15,000,000.00 of liquidity (comprised of cash on hand and amounts deposited in the Segregated DIP Account) at all times (the "**Minimum Liquidity Covenant**").<br><br>Additional covenants consistent with the Documentation Principles and customary for debtor-in-possession financings of this type, in each case subject to customary materiality qualifiers, baskets, and exceptions to be agreed in the DIP Documents. |
| **Events of Default** | The DIP Credit Agreement will contain events of default and remedies (each, an "**Event of Default**") consistent with the Documentation Principles and usual and customary for debtor-in-possession financings of this type (which will be applicable to the Borrower, the Guarantors, and their respective subsidiaries), in each case, acceptable to the DIP Lenders and the Borrower and subject to customary grace periods, cure rights, and materiality thresholds. Prior to exercising any remedies against the DIP Collateral, the DIP Agent shall deliver written notice to the Debtors, their counsel, counsel to any Creditors' Committee, the Consenting RCF Lender Advisors, and the U.S. Trustee, and the exercise of such remedies shall be subject to a remedies notice period of not less than five (5) business days (the "**Remedies Notice Period**"), during which the Debtors and any other party in interest shall be entitled to seek an emergency hearing before the Bankruptcy Court for the sole purpose of contesting whether an Event of Default has occurred or is continuing (and the Debtors may not directly or indirectly raise any |

| DIP Facility | |
|---|---|
| | other issues whatsoever at such hearing), and the Debtors may continue to use DIP Loans (including, without limitation, amounts in the Segregated DIP Account in accordance with the terms herein but subject to the last sentence in this section) and cash collateral solely to (x) pay payroll and other bona fide expenses incurred and that became (or become) due for payment by the Debtors in the ordinary course of business prior to or during the Remedies Notice Period and that the Debtors determine in good faith are critical to the preservation of the Debtors' estates; *provided*, that all such payments under this clause (x) shall not exceed $1,000,000.00 without the express written consent of the DIP Lenders (such consent to not be unreasonably withheld, conditioned or delayed), and (y) fund the Carve Out Reserves, in each case as set forth in the DIP Orders (such uses in clauses (x) and (y), the "**Remedies Notice Period Uses**"). For the avoidance of doubt, the Debtors shall not be permitted to borrow any funds under the DIP Facility during the Remedies Notice Period. |
| **Carve Out** | Carve-Out language in DIP Orders to be substantially in the form and substance attached hereto as Annex A. |
| **DIP Milestones** | The DIP milestones shall be consistent with those in the Restructuring Support Agreement in all respects. |
| **Cash Collateral Termination Events** | Customary cash collateral termination events to be included and agreed to by the Company Parties, Required Consenting RCF Lenders and the Required Consenting Secured Lenders, subject to the Remedies Notice Period and the other notice and hearing protections set forth in the DIP Orders. |
| **Stipulations / Challenge** | Customary stipulations and challenge period to be included. |
| **DIP Orders Govern** | To the extent of any conflict or inconsistency between this DIP Term Sheet and any applicable DIP Order, such DIP Order shall govern. |
| **Amendment and Waiver** | Except as otherwise expressly provided herein or therein, no provision of the DIP Facility, any DIP Document or any DIP Order may be amended other than by an instrument in writing signed by (i) the DIP Lenders holding at least a majority of the outstanding principal amount of the DIP Facility (or the DIP Agent with the consent of the DIP Lenders holding at least a majority of the outstanding principal amount of the DIP Facility) and (ii) the Borrower, with exceptions for customary "sacred" rights; *provided* that any amendment or modification of any DIP Order shall be subject to approval of the Bankruptcy Court to the extent required by the Interim DIP Order and Final DIP Order (as applicable); *provided further* that, notwithstanding |

| DIP Facility | |
|---|---|
| | anything to the contrary herein, any amendment, modification or waiver of any provision of the DIP Documents or any DIP Order relating to the use of cash collateral (other than cash collateral constituting DIP Priority Collateral) or the adequate protection provided herein to the holders of the Secured Funded Debt Claims and the Revolving Loan Claims (including the Adequate Protection Payments) shall also require the prior written consent of the Required Consenting Secured Lenders and the Required Consenting RCF Lenders. Nothing herein or in the DIP Orders shall modify or alter the consent rights set forth for Consenting Stakeholders in the Restructuring Support Agreement. |
| **Indemnification and Releases** | Customary for transactions of this type and otherwise reasonably satisfactory to the DIP Lenders and the Debtors; *provided*, that any indemnification or release of the DIP Lenders or the DIP Agent shall be solely in such capacities as a DIP Lender and DIP Agent, respectively; *provided further,* that no indemnified person shall be indemnified for any losses, claims, damages, liabilities, or expenses to the extent (a) resulting from such indemnified person's (or its related parties') gross negligence, bad faith, willful misconduct, or material breach of its obligations under the DIP Documents, in each case as determined by a final, non-appealable judgment of a court of competent jurisdiction or (b) arising from disputes solely among persons not involving any act or omission of the Debtors.<br><br>The DIP Orders shall include customary releases and indemnification provisions with respect to the holders of prepetition Secured Funded Debt Claims and Revolving Loan Claims to be agreed by the Required Consenting Secured Lenders and the Required Consenting RCF Lenders (in each case, as defined in the Restructuring Support Agreement). |
| **Waivers** | In exchange for the Carve Out and other consideration and value provided by the DIP Lenders, upon entry of the Final DIP Order, each Debtor shall waive, (a) as to the DIP Secured Parties, its rights to surcharge the DIP Collateral pursuant to sections 105(a) and/or 506(c) of the Bankruptcy Code and any right to apply the equitable doctrine of marshaling as to the DIP Collateral, and (b) as to the holders of the Secured Funded Debt Claims and holders of the Revolving Loan Claims, its rights to surcharge the Prepetition Collateral pursuant to sections 105(a) and/or 506(c) of the Bankruptcy Code or otherwise, any "equities of the case exception" under section 552(b) of the Bankruptcy Code, and any right to apply the equitable doctrine of marshaling as to the Prepetition Collateral. |
| **Expenses** | Each Debtor shall jointly and severally be obligated to pay all reasonable and documented out-of-pocket prepetition and postpetition |

| **DIP Facility** | |
|---|---|
| | accrued and unpaid fees, costs, disbursements, and expenses of the DIP Agent and the DIP Lenders incurred solely in connection with (a) the discussion, negotiation, preparation, execution, and delivery of any documents in connection with the proposed financing contemplated by this DIP Term Sheet, including the DIP Documents, and the funding of all DIP Loans under the DIP Facility, the administration of the DIP Facility and any amendment, modification, or waiver of any provision of the DIP Documents or (b) the interpretation, enforcement, or protection of any of their rights and remedies under the DIP Documents, in each case, solely to the extent invoiced in accordance with the fee review procedures set forth in the DIP Orders; *provided*, that notwithstanding anything to the contrary herein or in the DIP Documents, (i) neither the DIP Documents nor the DIP Orders shall obligate the Debtors to pay any fees, costs, disbursements, or expenses incurred by or on behalf of any DIP Lender (or any of their respective advisors or professionals) in connection with any matter other than the DIP Facility and the DIP Documents, including, without limitation, any matter in which any DIP Lender, or any of their respective advisors or professionals act or are engaged in any other capacity in connection with the Chapter 11 Cases (including in its capacity as a holder of any prepetition claims or interests) (collectively, the "**Other Fees and Expenses**"); and (ii) the Debtors shall have the right to request, and the DIP Lenders shall promptly provide (or cause their respective advisors and professionals to provide), a summary invoice from the DIP Lenders in order to distinguish between fees, costs, disbursements, and expenses incurred in connection with the DIP Facility and the DIP Documents and those incurred in connection with any other matter; *provided*, *further*, that any such summary invoice may be redacted to the extent necessary to protect privileged or confidential information; *provided*, *further*, that the Debtors and/or Reorganized Debtors (as applicable) shall pay the Other Fees and Expenses as set forth in, and in accordance with, the ECL. |
| **Governing Law and Jurisdiction** | The laws of the State of New York (except as governed by the Bankruptcy Code) shall govern this DIP Term Sheet. The Debtors and DIP Lenders submit to the exclusive jurisdiction of the Bankruptcy Court and waive (to the extent permitted by applicable law) any right to trial by jury. |

**Annex A**

Carve-Out Language

Defined Terms.

"Committee" means the Creditors' Committee.

"Creditors' Committee" means any official committee of unsecured creditors appointed by the U.S. Trustee pursuant to Bankruptcy Code section 1102.

"DIP Obligations" means the Obligations (as defined in the DIP Credit Agreement).

"DIP Secured Parties" means, collectively, the DIP Agent and the DIP Lenders.

"Prepetition Intercreditor Agreement" means that certain First Lien Intercreditor Agreement, dated as of May 5, 2025, among Abe Investment Holdings, Inc., Getty Images, Inc., the other grantors party thereto, JPMorgan Chase Bank, N.A., as the credit agreement collateral agent and credit agreement representative, U.S. Bank Trust Company, National Association, as the notes collateral agent and notes trustee and each additional agent from time to time party thereto.

"Prepetition Secured Facilities Documents" means, collectively, the Prepetition Loan Documents and the Prepetition SSN Documents.

"Prepetition Loan Documents" means, collectively, the Credit Agreement, the Prepetition Intercreditor Agreement, the security agreements, pledge agreements, and other security documents executed by any of the Debtor that are obligors thereunder in favor of the Secured Parties (as defined in the Credit Agreement), and the other Loan Documents (as defined in the Credit Agreement)

"Prepetition SSN Documents" means, collectively, the 11.25% Secured Notes Indenture, each 11.25% Secured Note, the Prepetition Intercreditor Agreement, the security agreements, pledge agreements, and other security documents executed by any of the Debtor that are obligors thereunder in favor of the 11.25% Secured Notes Trustee and the holders of the 11.25% Secured Notes, as applicable, and the other Note Documents (as defined in the 11.25% Secured Notes Indenture)

"Prepetition Secured Obligations" means, collectively, the Obligations (as defined in the Credit Agreement) and the Notes Obligations (as defined in the 11.25% Secured Notes Indenture).

"Prepetition Secured Parties" means, collectively, the Secured Parties (as defined in the Credit Agreement), the 11.25% Secured Notes Trustee, and the holders of the 11.25% Secured Notes.

"Successor Cases" means any case under chapter 7 of the Bankruptcy Code upon the conversion of any of the Chapter 11 Cases, or any other proceedings superseding or related to any of the foregoing.

"Trustee" means any chapter 7 or chapter 11 trustee.

"U.S. Trustee" means the United States Trustee for the [__________].

*Carve Out*.

(a) The "Carve Out" means the sum of: (i) all fees required to be paid to the Clerk of the Bankruptcy Court and to the Office of the U.S. Trustee under section 1930(a) of title 28 of the United States Code plus interest at the statutory rate (without regard to the notice set forth in clause (iii) below); (ii) all reasonable fees and expenses up to $50,000 incurred by a Trustee under Bankruptcy Code section 726(b) (without regard to the notice set forth in clause (iii) below); (iii) to the extent allowed at any time, whether by interim order, procedural order, or otherwise, all unpaid fees and expenses incurred at any time before or on the first Business Day following delivery by the DIP Agent or the Prepetition Secured Parties of a Carve Out Trigger Notice (as defined herein), by persons or firms retained by the Debtors pursuant to section 327, 328, or 363 of the Bankruptcy Code or section 156(c) of title 28 of the United States Code (the "Debtor Professionals") and the Committee (if any) pursuant to section 328 or 1103 of the Bankruptcy Code (the "Committee Professionals" and, together with the Debtor Professionals, the "Professional Persons" and the fees and expenses incurred thereby, the "Allowed Professional Fees"), whether allowed by the Bankruptcy Court prior to or after delivery of a Carve Out Trigger Notice; and (iv) Allowed Professional Fees of Professional Persons in an aggregate amount not to exceed $2,500,000 incurred after the first Business Day following delivery by the DIP Agent or the Prepetition Secured Parties of the Carve Out Trigger Notice, to the extent allowed at any time, whether by interim order, procedural order, or otherwise (the amounts set forth in this clause (iv) being the "Post-Carve Out Trigger Notice Cap"). Any payment or reimbursement made to any Professional Person on or after the delivery of the Carve Out Trigger Notice shall permanently reduce the Post-Carve Out Trigger Notice Cap on a dollar-for-dollar basis. For purposes of the foregoing, "Carve Out Trigger Notice" shall mean a written notice delivered by email (or other electronic means) by the DIP Agent or Prepetition Secured Parties to the Debtors, their lead restructuring counsel, the U.S. Trustee, and counsel to the Committee (if any), which notice may be delivered following the occurrence and during the continuation of an Event of Default (as defined in the DIP Credit Agreement), acceleration of the DIP Term Loans and DIP Obligations under the DIP Facility, or termination of the Debtors' right to use Cash Collateral, as applicable, stating that the Post-Carve Out Trigger Notice Cap has been invoked.

(b) Delivery of Weekly Fee Statements. Not later than 7:00 p.m. New York time on the third Business Day of each week starting with the first full calendar week following the Petition Date, each Professional Person shall deliver to the Debtors a statement setting forth a good-faith estimate of the amount of fees and expenses (collectively, "Estimated Fees and Expenses") incurred during the preceding week by such Professional Person (through Saturday of such week, the "Calculation Date"), along with a good-faith estimate of the cumulative total amount of unreimbursed fees and expenses incurred through the applicable Calculation Date and a statement of the amount of such fees and expenses that have been paid to date by the Debtors (each such statement, a "Weekly Statement"); provided that within one Business Day of the occurrence of the Termination Declaration Date (as defined herein), each Professional Person shall deliver one additional statement (the "Final Statement") setting forth a good-faith estimate of the amount of fees and expenses incurred during the period commencing on the calendar day after the most recent Calculation Date for which a Weekly Statement has been delivered and concluding on the Termination Declaration Date (and the Debtors shall cause such Weekly Statement and Final Statement to be delivered promptly to the DIP Agent). If any Professional Person fails to deliver a Weekly Statement within three (3) calendar days after such Weekly Statement is due, such Professional Person's entitlement (if any) to any funds in the Pre-Carve Out Trigger Notice Reserve (as defined herein) with respect to the aggregate unpaid amount of Allowed Professional Fees for the applicable period(s) for which such Professional Person failed to deliver a Weekly Statement covering such period shall be limited to the aggregate unpaid amount of Allowed Professional Fees included in the Approved Budget for such period for such Professional Person.

(c) *Carve Out Reserves.*

(i) Commencing with the week ended [__], 2026, and on or before the Thursday of each week thereafter, the Debtors shall utilize (i) first, any amounts in the Segregated DIP Account, and (ii) second, to the extent the amounts in the foregoing clause (i) are insufficient, all cash on hand as of such date, to the extent insufficient, and any available cash thereafter held by any Debtor, to fund a reserve in an amount equal to the sum of (a) the greater of (x) the aggregate unpaid amount of all Estimated Fees and Expenses reflected in the Weekly Statements delivered on the immediately prior Wednesday to the Debtors

and the DIP Agent and (y) the aggregate amount of unpaid Allowed Professional Fees contemplated to be incurred in the Approved Budget during such week, *plus* (b) the Post-Carve Out Trigger Notice Cap, *plus* (c) an amount equal to the amount of Allowed Professional Fees set forth in the Approved Budget for the two weeks occurring after the most recent Calculation Date. The Debtors shall deposit and hold such amounts in a segregated account maintained by the Debtors in trust (the "Funded Reserve Account") to pay such Allowed Professional Fees (the "Funded Reserves") prior to any and all other claims, and all payments of Allowed Professional Fees incurred prior to the Termination Declaration Date shall be paid first from the Funded Reserve Account.

(ii) On the day on which a Carve Out Trigger Notice is given by the DIP Agent or the Prepetition Secured Parties to the Debtors with a copy to counsel to the Committee (if any) (the "Termination Declaration Date"), the Carve Out Trigger Notice shall constitute a demand to the Debtors to utilize, and the Debtors shall utilize (i) first, cash in the Funded Reserve Account, (ii) second, to the extent the foregoing clause (i) is insufficient, any amounts in the Segregated DIP Account and (iii) third, to the extent the amounts in the foregoing clauses (i) and (ii) are insufficient, all cash on hand and any available cash thereafter held by any Debtor, to fund a reserve in an amount equal to the then unpaid amounts of the Allowed Professional Fees. The Debtors shall deposit and hold such amounts in a segregated account maintained by the Debtors in trust to pay such then unpaid Allowed Professional Fees (the "Pre-Carve Out Trigger Notice Reserve") prior to any and all other claims. On the Termination Declaration Date, the Carve Out Trigger Notice shall also constitute a demand to the Debtors to utilize (i) first, cash in the Funded Reserve Account after funding the Pre-Carve Out Trigger Notice Reserve, (ii) second, to the extent the amounts in the foregoing clause (i) are insufficient, any amounts in the Segregated DIP Account, and (iii) third, to the extent the amounts in the foregoing clauses (i) and (ii) are insufficient, all cash on hand and any available cash thereafter held by any Debtor, to fund a reserve in an amount equal to the Post-Carve Out Trigger Notice Cap. The Debtors shall deposit and hold such amounts in a segregated account maintained by the Debtors in trust to pay such Allowed Professional Fees benefiting from the Post-Carve

Out Trigger Notice Cap (the "Post-Carve Out Trigger Notice Reserve" and, together with the Pre-Carve Out Trigger Notice Reserve, the "Carve Out Reserves") prior to any and all other claims.

(d) *Application of Carve Out Reserves*.

(i) All funds in the Pre-Carve Out Trigger Notice Reserve shall be used first to pay the obligations set forth in clauses (i) through (iii) of the definition of Carve Out set forth above (the "Pre-Carve Out Amounts"), but not, for the avoidance of doubt, the Post-Carve Out Trigger Notice Cap, until the Pre-Carve Out Amounts are indefeasibly paid in full. If the Pre-Carve Out Trigger Notice Reserve has not been reduced to zero after payment of all amounts constituting the Carve Out, all remaining funds shall be distributed, (x) to the extent of the Pre-Carve Out Trigger Notice Reserve funded by cash constituting DIP Priority Collateral, first to the DIP Agent on account of the DIP Obligations until the DIP Obligations have been paid in full, and thereafter to the Prepetition Secured Parties until the Prepetition Secured Obligations have been paid in full, in accordance with their rights and priorities as of the Petition Date and as otherwise set forth in this [Interim DIP Order]/[Final DIP Order], and (y) to the extent of the Pre-Carve Out Trigger Notice Reserve funded by cash constituting Prepetition Collateral, first to the Prepetition Secured Parties until the Prepetition Secured Obligations have been paid in full, in accordance with their rights and priorities as of the Petition Date and as otherwise set forth in this [Interim DIP Order]/[Final DIP Order], and thereafter to the DIP Agent on account of the DIP Obligations.

(ii) All funds in the Post-Carve Out Trigger Notice Reserve shall be used first to pay the obligations set forth in clause (iv) of the definition of Carve Out set forth above (the "Post-Carve Out Amounts"), and then, to the extent the Post-Carve Out Trigger Notice Reserve has not been reduced to zero, all remaining funds shall be distributed (x) to the extent of the Post-Carve Out Trigger Notice Reserve funded by cash constituting DIP Priority Collateral, first to the DIP Agent on account of the DIP Obligations until the DIP Obligations have been paid in full, and thereafter to the Prepetition Secured Parties until the Prepetition Secured Obligations have been paid in full, in accordance with their rights and priorities as of the Petition Date and as otherwise set forth in this [Interim DIP Order]/[Final DIP Order], and (y) to the extent of the Post-Carve Out Trigger Notice Reserve funded by cash constituting Prepetition Collateral,

first to the Prepetition Secured Parties until the Prepetition Secured Obligations have been paid in full, in accordance with their rights and priorities as of the Petition Date and as otherwise set forth in this [Interim DIP Order]/[Final DIP Order], and thereafter to the DIP Agent on account of the DIP Obligations.

(iii) Notwithstanding anything to the contrary in the DIP Documents or this [Interim DIP Order]/[Final DIP Order], if either of the Carve Out Reserves is not funded in full in the amounts set forth in paragraph [[ ](c)], then, any excess funds in one of the Carve Out Reserves following the payment of the Pre-Carve Out Amounts and Post-Carve Out Amounts, respectively (subject to the limits contained in the Post-Carve Out Trigger Notice Cap), shall be used to fund the other Carve Out Reserve, up to the applicable amount set forth in paragraph [[ ](c)], prior to making any payments to the DIP Agent or the Prepetition Secured Parties, each as applicable.

(iv) Notwithstanding anything to the contrary in the DIP Documents, this [Interim DIP Order]/[Final DIP Order], or the Prepetition Secured Facilities Documents, following delivery of a Carve Out Trigger Notice, the DIP Agent and the Prepetition Secured Parties shall not sweep or foreclose on cash (including cash received as a result of the sale or other disposition of any assets) of the Debtors until the Carve Out Reserves have been fully funded.

(v) Further, notwithstanding anything to the contrary in this [Interim DIP Order]/[Final DIP Order], (i) disbursements by the Debtors from the Carve Out Reserves shall not constitute DIP Term Loans or increase or reduce the DIP Obligations, (ii) the failure of the Carve Out Reserves to satisfy in full the Allowed Professional Fees shall not affect the priority of the Carve Out with respect to any shortfall, and (iii) in no way shall the Initial Approved Budget, any subsequent Approved Budget, the Carve Out, the Post-Carve Out Trigger Notice Cap, or the Carve Out Reserves, or any of the foregoing, be construed as a cap or limitation on the amount of the Allowed Professional Fees due and payable by the Debtors. For the avoidance of doubt and notwithstanding anything to the contrary in this [Interim DIP Order]/[Final DIP Order] or the DIP Documents, the Carve Out shall be senior to all liens and claims securing the DIP Obligations, the Adequate Protection Liens, the Prepetition Secured Obligations, the [DIP Superpriority Claims], and any and all other forms of adequate protection, liens, or claims securing the DIP Obligations

and the Prepetition Secured Obligations. The DIP Agent and Prepetition Secured Parties shall have no lien or interest in the Carve Out Reserves, but (i) the DIP Agent, on behalf of the DIP Secured Parties, shall have (x) a first-priority lien and automatically perfected security interest in any residual interest in the Carve Out Reserves, to the extent of the Carve Out Reserves funded with cash constituting DIP Priority Collateral, and (y) a second-priority lien and automatically perfected security interest in any residual interest in the Carve Out Reserves, to the extent of the Carve Out Reserves funded with cash constituting Prepetition Collateral, and (ii) the Prepetition Secured Parties, shall have (x) a first-priority lien and automatically perfected security interest in any residual interest in the Carve Out Reserves, to the extent of the Carve Out Reserves funded with cash constituting Prepetition Collateral, and (y) a second-priority lien and automatically perfected security interest in any residual interest in the Carve Out Reserves, to the extent of the Carve Out Reserves funded with cash constituting DIP Priority Collateral.

(e) *Payment of Allowed Professional Fees on or After the Termination Declaration Date.* Following the delivery of the Carve Out Trigger Notice, all Professional Fees to the extent granted or allowed shall be paid from the applicable Carve Out Reserve, and no Professional Person shall seek payment of any Allowed Professional Fees from any other source until the applicable Carve Out Reserve has been exhausted. Any payment or reimbursement made on or after the occurrence of the Termination Declaration Date in respect of any Allowed Professional Fees shall permanently reduce the Carve Out on a dollar-for-dollar basis. Any funding of the Carve Out shall be added to, and made a part of, the DIP Obligations secured by the [DIP Collateral] and shall be otherwise entitled to the protections granted under this [Interim DIP Order]/[Final DIP Order], the DIP Documents, the Bankruptcy Code, and applicable law.

(f) *Limitation on Responsibility of Secured Parties*. None of the DIP Secured Parties or the Prepetition Secured Parties shall be responsible for the payment or reimbursement of any fees or disbursements of any Professional Person incurred in connection with the Chapter 11 Cases or any Successor Cases. Nothing in this [Interim DIP Order]/[Final DIP Order] or otherwise shall be construed to obligate any of the DIP Secured Parties or the Prepetition Secured Parties to pay compensation to, or to reimburse expenses of, any Professional Person or to guarantee that the Debtors have sufficient funds to

pay such compensation or reimbursement. Nothing herein shall be construed as consent to the allowance of any professional fees or expenses of any of the Debtors, the Committee (if any), any other official or unofficial committee in the Chapter 11 Cases or any Successor Cases, or of any other person or entity, or shall affect the right of any party to object to the allowance and payment of any such fees and expenses.

**Exhibit C**

**Equity Commitment Letter**

***Execution Version***

October 12, 2026

KED Icon Holdings, LLC
Wichita, KS 67201-2256
Attention: Adam Schaeffer, General Counsel
Mike Harris, Managing Director
Mitchell Hanson, Director

- and -

Cheyne Walk Trust
5390 Kietzke Lane, Suite 202
Reno, Nevada 89511
Attention: Jeremiah Sullivan, General Counsel

- and -

Getty Images Holdings, Inc.
605 5th Avenue S. Suite 400
Seattle, Washington 98104
Attention: Kjelti Kellough, General Counsel

**CONFIDENTIAL**

Equity Commitment Letter

Ladies and Gentlemen:

KED Icon Holdings, LLC ("**KED**"), and Cheyne Walk Master Fund, Cheyne Walk Master Fund 2 LP, Cheyne Walk Trust, and Mark Getty (collectively, the "**Getty Family Entities**" or "**GFE**," and together with KED, the "**Investors**," or the "**Plan Sponsors**") understand that Getty Images Holdings, Inc., a Delaware corporation ("**GIH**" or the "**Company**") and certain of its subsidiaries (together with GIH, the "**Company Parties**," or the "**Debtors**") anticipate filing voluntary petitions to commence cases (the "**Chapter 11 Cases**") under Title 11 of the United States Code (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**") in order to implement a comprehensive corporate restructuring (collectively, the "**Transactions**").

Substantially contemporaneous with the execution of this equity commitment letter (this "**Letter**"), the Company Parties entered into that certain Restructuring Support Agreement with the holders of first lien secured and unsecured debt party thereto, and the Plan Sponsors (as amended, restated, amended and restated, supplemented or otherwise modified from time to time in accordance with its terms, the "**RSA**") to support and implement the Transactions. Capitalized terms used but not defined in this Letter shall have the meanings given to them in the RSA or in the restructuring term sheet attached as Exhibit A thereto (the "**Restructuring Term Sheet**"), as applicable.

1. (a) This Letter is delivered in connection with the Transactions described in the RSA, and constitutes the "**ECL**" referred to therein, pursuant to which, among other things, on the Restructuring Effective Date: (i) the Investors will make a new equity investment in cash in an aggregate amount consistent with Section 1(b) and Section 2 of this Letter in exchange for a portion of the new common equity interests in the new parent entity of the reorganized Debtors or other such entity as agreed among the Investors and the Debtors ("**New Getty Images,**" and such interests, the "**New Interests**"), (ii) KED will contribute, exchange, surrender, equitize and discharge the DIP Claims held by it and its Affiliates into a portion of the New Interests and New Preferred Interests (as defined in the Restructuring Term Sheet) (as applicable), and (iii) KED will contribute, exchange, surrender, equitize, and discharge the EUR Term Loan Claims held by it and its Affiliates into a portion of the New Interests.

(b) The percentages of New Interests that the Investors will receive, in exchange for the contribution of the consideration described in clauses (i) through (iii) of Section 1(a) hereof, are set forth, on a pro forma basis, on Schedule 1 hereto, based on the assumptions set forth on Schedule 1. The parties acknowledge and agree that certain of the inputs used to calculate such percentages cannot be determined as of the date of this Letter and will not be finally determinable until on or about the Restructuring Effective Date. Accordingly, the percentages set forth on Schedule 1 are preliminary and illustrative (and based entirely on the assumptions set forth on Schedule 1), and the actual percentages of New Interests issued to each Investor shall be the percentages determined in accordance with Section 2(e) hereof based on the Investors' actual Contribution Amounts (as defined below), as reflected on an updated Schedule 1 prepared in accordance with Section 2(e) hereof and delivered no later than three (3) Business Days prior to the anticipated Restructuring Effective Date (such updated Schedule 1, the "**Final Allocation Schedule**"); *provided* that no such adjustment shall increase any Investor's funding obligation above its respective Cap Amount (as defined below). The New Interests received by the Investors as described in this Section 1 hereof shall be subject to dilution by the MIP Interests and any subsequent issuances of New Interests that are validly issued pursuant to the Governance Documents following the Restructuring Effective Date.

2. Commitments.

(a) New Equity Investment. Subject to the terms and conditions set forth in this Letter, each Investor commits, severally (and not jointly and severally), that, on the Restructuring Effective Date, it shall purchase, or shall cause the purchase of, that percentage of the New Interests that will be set forth opposite its name under the heading "New Equity Investment Interests Percentage" on the Final Allocation Schedule, for the purchase price that will be set forth opposite its name under the heading "New Equity Investment Commitment" on the Final Allocation Schedule (as to each Investor, its "**New Equity Investment Commitment**"), which New Equity Investment Commitments shall, in the aggregate, equal to $433,212,922.50 minus the principal amount[1] of Interim Initial DIP Loans (as defined in the DIP Term Sheet) and Final DIP Loans (as defined in the DIP Term Sheet) outstanding as of the Restructuring Effective Date (such aggregate amount, as it may be reduced pursuant to

[1] For purposes of this calculation, the principal amount of Interim Initial DIP Loans and Final DIP Loans shall not include any interest (including capitalized interest), fees, expenses, or other obligations under the DIP Facility.

Section 2(f) hereof or increased or reduced by mutual written agreement of the Company Parties and the Investors, the "**New Equity Investment**"); *provided*, for the avoidance of doubt, in calculating the New Equity Investment, the $433,212,922.50 amount shall not be reduced by the Delayed-Draw DIP Loans (as defined in the DIP Term Sheet) outstanding as of the Restructuring Effective Date.

(b) Equitization Commitment.

(i) Subject to the terms and conditions set forth in this Letter, KED further commits that, on the Restructuring Effective Date, it shall (and shall cause its Affiliates to) contribute, exchange, surrender, equitize, and discharge (x) all EUR Term Loan Claims held by it and its Affiliates, in the aggregate amount that will be set forth opposite its name under the heading "Equitized EUR Term Loan Claims" on the Final Allocation Schedule, pursuant to and in accordance with the Plan and the treatment of Class 4 Secured Funded Debt Claims set forth in the Restructuring Term Sheet, and (y) all DIP Claims (other than the principal amount of the Delayed-Draw DIP Loans outstanding on the Restructuring Effective Date (such principal amount, the "**DDTL Principal DIP Claim**")) held by it and its Affiliates, in the aggregate amount (including all accrued and unpaid interest thereon through the Restructuring Effective Date, including in respect of the Delayed-Draw DIP Loans) that will be set forth opposite its name under the heading "Equitized DIP Claims" on the Final Allocation Schedule, in exchange, together with the EUR Term Loan Claims equitized pursuant to the foregoing clause (x), for that percentage of New Interests that will be set forth opposite its name under the heading "Equitization Interests Percentage" on the Final Allocation Schedule, in each case pursuant to and in accordance with the Plan. For the avoidance of doubt, all interest that has accrued on all EUR Term Loan Claims held by KED and its Affiliates shall not be converted into New Interests, but instead shall be paid in cash as set forth in the DIP Term Sheet.

(ii) Subject to the terms and conditions set forth in this Letter, to the extent any Delayed-Draw DIP Loans are outstanding on the Restructuring Effective Date, KED further commits that, on the Restructuring Effective Date, it shall (and shall cause its Affiliates to) contribute, exchange, surrender, equitize, and discharge the DDTL Principal DIP Claim held by it and its Affiliates, in exchange for 100% of the New Preferred Interests, which percentage will be set forth opposite its name under the heading "Total New Preferred Interest Percentage" on the Final Allocation Schedule, in each case pursuant to and in accordance with the Plan.

(iii) The obligation of KED to equitize the EUR Term Loan Claims, DIP Claims, and DDTL Principal DIP Claim, as set forth in Section 2(b)(i) and 2(b)(ii) hereof shall be referred to as the "**Equitization Commitment**". The

Equitization Commitment, together with the New Equity Investment, shall be referred to as the "**Equity Investment**".

(c) Notwithstanding any other provision of this Letter, neither KED nor any of its Related Parties shall be obligated to contribute cash (whether by contribution, or purchase equity or debt, or otherwise providing funds) to New Getty Images or any other Company Party pursuant to this Letter in any aggregate amount (for KED and its Related Parties, collectively) in excess of $158,212,922.50 (the "**KED Cap Amount**"); *provided*, that the KED Cap Amount may be reduced pursuant to the Minimum Liquidity Amount (as defined below) adjustment set forth in Section 2(f) hereof; *provided*, *further*, that the KED Cap Amount shall not limit the amount of DIP Claims and EUR Term Loan Claims that may be converted into New Interests or New Preferred Interests as set forth in this Letter. Notwithstanding any other provision of this Letter, none of the Getty Family Entities or any of their respective Related Parties shall be obligated to contribute cash (whether by contribution, or purchase equity or debt, or otherwise providing funds) to New Getty Images or any other Company Party pursuant to this Letter in any aggregate amount (for all Getty Family Entities and their respective Related Parties, collectively) in excess of $162,000,000.00 (the "**GFE Cap Amount**" and each of the KED Cap Amount and the GFE Cap Amount, a "**Cap Amount**"); *provided*, that the GFE Cap Amount may be reduced pursuant to the Minimum Liquidity Amount adjustment set forth in Section 2(f) hereof. Under no circumstances shall this Letter be enforced against an Investor without giving full and absolute effect to its applicable Cap Amount; *provided,* that nothing in this Section 2(c) shall limit or impair the right of a non-defaulting Investor to elect, in its sole discretion, to fund an Equity Cure pursuant to Section 10(b) hereof, or the entitlement of such Investor (or its designee) to the New Interests issuable in respect thereof, it being understood that no Investor shall be obligated to fund any Equity Cure.

(d) The Equity Investment will be made by each Investor on a several, and not joint basis, and the proceeds thereof will be used solely as contemplated by the RSA, the Restructuring Term Sheet and/or the Plan, as applicable. No Investor shall have any obligation or liability in respect of the commitment of the other Investor hereunder, except as expressly set forth in Section 10(b) hereof.

(e) Notwithstanding anything to the contrary in Sections 2(a), 2(b) and 3 hereof, the New Interests to be issued to the Investors pursuant to this Letter shall be allocated among the Investors pro rata based on each Investor's Contribution Amount relative to the aggregate Contribution Amounts of all Investors. "**Contribution Amount**" means, as to each Investor, the sum of (i) the aggregate cash actually funded by such Investor in respect of its New Equity Investment Commitment (after giving effect to any reduction applicable to such Investor pursuant to Section 2(f) hereof and any reconciliation of the final amounts funded, as contemplated by Section 5 hereof), (ii) the amount of DIP Claims (including all accrued and unpaid interest thereon (including (for the avoidance of doubt) on the Delayed-Draw DIP Loans) through the Restructuring Effective Date) held by such Investor and that is equitized into New Interests on the Restructuring Effective Date (for the avoidance of doubt, other than the amounts in respect of the DDTL Principal DIP Claim that is converted into New Preferred Interests), and (iii) the amount of EUR Term Loan Claims held by such Investor and that is equitized into New Interests on the Restructuring Effective Date; *provided* that, for purposes of determining the U.S. Dollar

equivalent of the amount of EUR Term Loan Claims as contemplated by the foregoing clause (iii), the rate at which such currency shall be converted into U.S. Dollars shall be the rate as quoted by Bloomberg on the date that is three (3) Business Days prior to the anticipated Restructuring Effective Date.

(f) If, as of the Restructuring Effective Date, after giving effect to the Transactions, including the funding of the Exit Facilities and the payment of all amounts required to be paid on or as of such date (including, without duplication, accrued interest on the Revolving Loan Claims and Secured Funded Debt Claims, adequate protection payments under the DIP Documents, all Consenting Creditor Fees and Expenses payable under the RSA, the Unsecured Notes Recovery and any payments to the applicable Trustee(s), and any required payment to reduce the balance of New RCF to zero as of the Restructuring Effective Date), the aggregate unrestricted and available cash and cash equivalents of New Getty Images and its subsidiaries (including, for the avoidance of doubt, subsidiaries that are non-Debtors), determined on a consolidated basis, in a manner consistent with the sources and uses agreed among the Company Parties and the Investors, but excluding (i) any proceeds of borrowings under the New RCF, (ii) Restricted Cash (as defined below), and (iii) the Expense Reimbursement (including all Consenting Shareholder Fees and Expenses payable under the RSA), (as estimated on a pro forma basis and reflected on the Final Allocation Schedule), exceeds $50,000,000 (the "**Minimum Liquidity Amount**"), then the aggregate cash portion of the New Equity Investment required to be funded by the Investors shall be reduced on a dollar-for-dollar basis by the amount of such excess (such reduction, the "**Excess Cash Credit**"). The Excess Cash Credit shall be allocated as follows: (x) first, to KED and GFE, pro rata based on the amounts (if any) by which (A) KED's New Equity Investment Commitment plus the principal amount of DIP Loans (other than Delayed-Draw DIP Loans) held by KED and its Affiliates exceeds $250,000,000 and (B) GFE's aggregate New Equity Investment Commitments held by GFE and their Affiliates exceed $150,000,000, until such amounts are reduced to zero; and (y) thereafter, to KED only. GFE may allocate their share of the Excess Cash Credit among themselves in their sole discretion. As used herein, "**Restricted Cash**" means cash and cash equivalents that are pledged as cash collateral, held in escrow (including the Professional Fee Escrow Account), or otherwise subject to a Lien or contractual restriction on use in favor of a third party (other than Liens granted under the Exit Facilities). The amount of each Investor's New Equity Investment Commitment after giving effect to this Section 2(f) shall be the amount included in such Investor's Contribution Amount under clause (i) of Section 2(e).

3. Reorganized Equity.

(a) New Interests. The New Interests issuable to the Investors in respect of the Equity Investment shall be issued in the aggregate percentages set forth on the Final Allocation Schedule, subject to any exercise of rights under (i) Section 4 and (ii) Sections 1(b), 2(e) and 2(f) hereof and to dilution by the MIP Interests and by any subsequent issuances of equity interests of New Getty Images that are validly issued in connection with the Governance Documents following the Restructuring Effective Date.

(b) New Preferred Interests. The New Preferred Interests (if any) shall be issued solely in exchange for the DDTL Principal DIP Claim in accordance with Section 2(b)(ii) hereof and

shall have the terms set forth in the Governance Documents, consistent with the Restructuring Term Sheet.

4. Designation of Affiliates. Each Investor may effect all or any portion of its Equity Investment directly or indirectly through one or more of its Affiliates or other designees (each, a "**Designated Purchaser**") by written notice to the Company (email being sufficient) delivered prior to the anticipated Restructuring Effective Date identifying such Designated Purchaser and the portion of such Investor's Equity Investment to be funded or satisfied by it; *provided* that (i) no such designation shall relieve such Investor of its obligations under this Letter except to the extent such obligations are actually performed by such Designated Purchaser, (ii) any Transfer of Company Claims/Interests in connection with any such designation shall comply with Section 8 of the RSA, and (iii) no Designated Purchaser shall fund any portion of an Investor's Equity Investment or receive any New Interests unless and until such Designated Purchaser has executed and delivered to the Company a joinder to this Letter, in form and substance acceptable to the Company and the other Investor (a "**Joinder**"), pursuant to which such Designated Purchaser makes, as of the date of such Joinder and as of the Restructuring Effective Date, each of the representations and warranties set forth in Section 15 of this Letter (other than clause (i) thereof) as if it were an Investor.

5. Funding Mechanics. No later than five (5) Business Days prior to the Restructuring Effective Date, the Investors and the Company Parties shall undertake good-faith efforts to estimate the New Equity Investment Commitment of each Investor (such estimate, the "**Estimated Amount**"). No later than three (3) Business Days prior to the Restructuring Effective Date (such date, the "**Funding Date**"), each Investor shall fund its Estimated Amount of the New Equity Investment Commitment (as it may be reduced pursuant to Section 2(f) hereof) in immediately available funds to an account held by the Company Parties (the "**Escrow Account**"), which account shall be designated in writing by the Company Parties no later than five (5) Business Days prior to the anticipated Restructuring Effective Date, to be held in escrow and released upon the occurrence of the Restructuring Effective Date. The funds placed in the Escrow Account shall not be considered "property of the estate" under any circumstances. KED shall consummate the Equitization Commitment on the Restructuring Effective Date in accordance with Section 2(b) hereof and the Plan, and the Equitization Commitment shall not be effected through the Escrow Account. Thereafter, no later than five (5) Business Days following the Restructuring Effective Date, the Company Parties and the Investors shall undertake good-faith efforts to reconcile the actual amounts of the New Equity Investment Commitment against the Estimated Amount of the New Equity Investment Commitment.

6. Conditions. The obligation of each Investor to consummate the New Equity Investment and, in the case of KED, to consummate the Equitization Commitment, is subject to the satisfaction of each of the following conditions:

(a) the RSA shall be in full force and effect;

(b) there shall be no event giving rise to a Termination Date under Section 12 of the RSA that has occurred and is continuing, unless such event has been waived in writing by the applicable Consenting Stakeholder;

(c) the Bankruptcy Court shall have entered the Confirmation Order, which order shall be in full force and effect, and no stay thereof shall be in effect and the same shall not be subject to an appeal;

(d) each of the Definitive Documents shall be in form and substance acceptable to the Investors in accordance with Section 3.02 of the RSA, and shall have become effective or been executed and delivered, as applicable;

(e) the Company Parties shall have obtained all regulatory authorizations, consents, approvals, rulings, or documents that are necessary to implement and effectuate the Restructuring Transactions and all applicable waiting periods (including under the HSR Act and any applicable foreign antitrust or foreign direct investment laws) shall have expired or been terminated, as determined in good faith by the Debtors in consultation with the Required Consenting Stakeholders;

(f) other than funding of the Equity Investment and issuance of the New Interests and the New Preferred Interests, each of the conditions to the occurrence of the Restructuring Effective Date set forth in the Plan, the RSA, and/or the Restructuring Term Sheet shall have been satisfied or waived in accordance with the terms thereof, as applicable;

(g) no law, order, injunction, judgment or ruling of any governmental authority or court of competent jurisdiction shall be in effect that restrains, enjoins or otherwise prohibits the consummation of the Equity Investment or the Transactions, and all material governmental, regulatory and third-party consents and approvals necessary to consummate the Transactions shall have been obtained and be in full force and effect;

(h) none of the Chapter 11 Cases shall have been converted to a case under chapter 7 of the Bankruptcy Code or dismissed, and no trustee, receiver or examiner with expanded powers shall have been appointed in any of the Chapter 11 Cases;

(i) the prior or substantially simultaneous consummation of the Transactions pursuant to the Plan, the RSA and/or the Restructuring Term Sheet, as applicable, on the terms and conditions set forth therein;

(j) the prior or substantially simultaneous closing and funding of the Exit Facilities on the terms set forth in the Restructuring Term Sheet and the Plan;

(k) the prior or substantially simultaneous funding by the other Investor of its New Equity Investment Commitment and, in the case of KED, the consummation of the Equitization Commitment, in each case pursuant to this Letter; and

(l) no default, event of default, or other breach shall have occurred and be continuing under any of the DIP Documents.

7. <u>Termination</u>. This Letter, including without limitation the obligation of each Investor to make the Equity Investment, will terminate automatically and immediately by the

delivery to the Company of a written notice in accordance with Section 14.10 of the RSA upon the occurrence of any of the following events:

(a) the termination of the RSA in accordance with its terms, whether in its entirety or with respect to any Investor;

(b) the conversion of any of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code;

(c) the dismissal of any of the Chapter 11 Cases;

(d) the appointment of a trustee, receiver or examiner with expanded powers beyond those set forth in sections 1106(a)(3) and (4) of the Bankruptcy Code in any of the Chapter 11 Cases;

(e) the expiration or termination of the Debtors' exclusive periods to file and solicit acceptances of a chapter 11 plan under section 1121 of the Bankruptcy Code, or the entry of an order of the Bankruptcy Court terminating such exclusive periods;

(f) the entry of an order of the Bankruptcy Court denying confirmation of the Plan, or the Confirmation Order being stayed, reversed, vacated, amended, supplemented or otherwise modified in any manner not acceptable to the Investors, in each case, unless the applicable order is stayed, modified, vacated, or reversed within fifteen (15) Business Days;

(g) the Company Parties' determination and announcement (publicly or directly to the Investors) to pursue an Alternative Transaction;

(h) the occurrence of a default, event of default, or other material breach that has occurred and is continuing under any of the DIP Documents, subject to the applicable "remedies notice period" in the DIP Orders;

(i) the Company Parties' failure to comply with the Milestone with respect to the Restructuring Effective Date (as such Milestone may be extended or waived in accordance with the RSA);

(j) the termination of this Letter with respect to the other Investor or by mutual agreement;

(k) the fulfilment of each Investor's obligations hereunder;

(l) the occurrence of any event or condition that has or would be reasonably expected to have, either individually or in the aggregate, a Material Adverse Effect; *provided* that the termination right set forth in this item 7(l) shall no longer be exercisable by any Investor from and after the occurrence of the initial Effective Date Milestone set forth in the RSA (prior to giving effect to any extension or waiver thereof). As used herein, "**Material Adverse Effect**" shall mean any event, change, circumstance or development that, either individually or in the aggregate, has caused or would reasonably be expected to cause a material adverse change in, or a material adverse effect on, the business, operations, assets, liabilities (actual or contingent), property,

financial condition, or results of operations of the Company Parties, taken as a whole, other than those events that (i) would reasonably be expected to result from the filing or commencement of the Chapter 11 Cases or the entry into the RSA and this Letter or the announcement of the filing or commencement of the Chapter 11 Cases or the entry into the RSA and this Letter, including the impact thereof on any relationships, contractual or otherwise, of any of the Company Parties with their respective customers, suppliers, distributors, collaboration partners, shareholders, employees or regulators, (ii) result from or relate to (1) changes in general economic conditions or changes affecting the industries and markets in which the Company Parties or any of their respective subsidiaries operate, including developments in artificial intelligence, (2) general economic factors, interest rates, currency exchange rates, general financial market conditions, any social, regulatory or political conditions in the United States or elsewhere around the world, including any civil unrest, public demonstrations, governmental shutdown or slowdown, cyberterrorism or other cyber-enabled activities (including hacking, data loss, ransomware and other unauthorized cyber intrusions that seek to compromise the confidentiality, integrity or availability of computer or communication systems or information therein), (3) any outbreak, disease, epidemic, public health crisis (including, without limitation, the COVID-19 pandemic and any follow-on outbreaks), the escalation or general worsening thereof, or compliance with any laws, regulations, statutes, directives, pronouncements or guidelines issued by a governmental authority, international organization or any industry group providing for business closures, "sheltering-in-place," curfews or other restrictions that relate to, or arise out of, an epidemic, pandemic or disease outbreak or any change in such applicable law, pronouncements or guidelines following the date hereof, or any development, change, worsening or escalation of hostilities (whether or not armed), acts of war (whether or not declared), military conflict, sabotage, or terrorism, (4) debt defaults or other restructuring events of any country with respect to which bondholders take a discount to the debt of any country or any increases in the interest rates for any country's debt, (5) any changes following the date hereof in applicable law (including tariffs and trade restrictions) or applicable GAAP or the interpretation thereof, (6) any strikes, work slowdowns, work stoppages, or other similar organized labor disputes or any actual or potential sequester, stoppage, shutdown, default or similar event or occurrence by or involving any governmental authority affecting a national or federal government as a whole, (7) earthquakes, hurricanes, tornadoes, calamities, floods, volcanic eruptions, wildfires, or other similar weather events or any natural or man-made disaster and responses thereto, other force majeure events or any escalation or worsening thereof, or acts of God, (8) any change in, or failure by any of the Company Parties to meet, financial forecasts, projections or estimates (it being understood that the underlying causes of any such change or failure shall not be excluded under this clause (8)), (9) any existing event, occurrence, or circumstance with respect to which any of the Investors has actual knowledge of as of the date hereof; or (10) any action, or failure to take action, that is expressly approved, or expressly consented to, by or at the direction of any of the Investors after the date hereof; *provided* that the exceptions in clauses (ii)(1) through (ii)(7) shall not apply to the extent that such event, change, circumstance or development is materially and disproportionately adverse to the Company Parties, taken as a whole, as compared to other companies in the industries in which the Company Parties operate, in which case only such incremental materially disproportionate and adverse impact shall be taken into account in determining whether there has been a "Material Adverse Effect";

(m) any Company Party, or any Person acting on its behalf, commences a Proceeding or asserts a claim against any Investor or any of its Representatives that (i) breaches Section 17 or

(ii) seeks to recover from any Investor any amount in excess of its respective Cap Amount; *provided* notwithstanding anything to the contrary in this Letter, Company Parties may commence a Proceeding or assert a claim against the Investors to enforce this Letter; and

(n) the aggregate commitments under the New RCF, as set forth in the New RCF Documents (including any form thereof filed with the Plan Supplement), are less than $150,000,000.00; *provided* that this termination right shall not be available to any Investor if such reduction is the result of a modification, amendment, or waiver to which such Investor has consented in writing.

Notwithstanding anything to the contrary in this Agreement, nothing in this Letter shall require a Company Party or the board of directors, board of managers, or similar governing body of a Company Party (including the Special Committee), after consulting in good faith with external counsel, to take any action or to refrain from taking any action with respect to the New Equity Investment to the extent taking or failing to take such action would be inconsistent with applicable Law or its fiduciary obligations under applicable Law, and any such action or inaction pursuant to this paragraph shall not be deemed to constitute a breach of this Letter, but shall not prejudice the rights of any Investor to terminate this Letter. In the event that the Company Parties determine to terminate this Letter pursuant to this paragraph, the Company Parties shall provide notice of such determination within twenty-four (24) hours after such determination to the counsel to the Investors.

Upon any termination of this Letter, neither any Investor nor any of its Affiliates shall have any further obligations or liabilities under this Letter in each case whether based upon contract, tort or any other claim or legal theory, and whether at law or in equity; *provided* that no such termination shall relieve any party of liability for any breach of this Letter occurring prior to such termination; and *provided*, *further*, that the obligations of the Company Parties to pay the Expense Reimbursement pursuant to Section 8 hereof shall survive any termination of this Letter. This Section 7 and Sections 8-12 and 17 shall survive any termination of this Letter.

8. Expense Reimbursement.

(a) The Company Parties shall promptly pay or reimburse, in cash, all reasonable and documented fees, costs and expenses incurred by the Investors and their respective Affiliates in connection with this Letter, the RSA, the Restructuring Term Sheet, the Plan, the Transactions and the matters related thereto (including, without limitation, the negotiation, documentation, approval, implementation, and enforcement thereof), and including the Consenting Shareholder Fees and Expenses, in each case whether incurred before or after the Petition Date (the "**Expense Reimbursement**"), which shall be payable after the occurrence of the Restructuring Effective Date; *provided* that if this Letter terminates prior thereto, the Company Parties shall pay the Expense Reimbursement within three (3) Business Days following such termination (other than with respect to any Investor, a termination resulting from such Investor's material breach of its obligations under this Letter), in each case, without further order of, or application to, the Bankruptcy Court and without any requirement to file a fee or retention application.

(b) The Company Parties acknowledge and agree that (i) the Expense Reimbursement constitutes an integral part of the transactions contemplated by this Letter and, absent the agreement to pay it, the Investors would not have entered into this Letter, (ii) the Expense Reimbursement constitutes an allowed administrative expense of the Debtors' estates under sections 503(b) and 507(a)(2) of the Bankruptcy Code, and is not subject to any setoff, recoupment, reduction, avoidance, disgorgement or subordination, and (iii) the obligations of the Company Parties under this Section 8 shall survive any termination of this Letter.

9. No Modification; Entire Agreement.

(a) This Letter may not be amended, modified or supplemented except by an agreement in writing signed by each Investor and the Company, except to reflect updates to Schedule 1 in connection with the exercise of rights under (i) Section 4 hereof and (ii) Sections 1(b), 2(e) and 2(f) hereof, which shall, in each case, only require the documentation described therein (as applicable). Together with the RSA, the Restructuring Term Sheet, and the Plan, this Letter constitutes the sole and entire agreement of each undersigned Investor and its Affiliates, on the one hand, and the Company Parties, on the other, with respect to the subject matter contained in this Letter. This Letter supersedes all prior and contemporaneous understandings, agreements, representations and warranties, both written and oral, with respect to the subject matter of this Letter.

(b) The Company Parties shall not amend, modify, supplement, assign, terminate or waive this Letter without the prior written consent (email being sufficient) of each Investor. Except as permitted in Section 4, Section 9(a) and Section 12 hereof, as applicable, no Investor shall amend, modify, supplement, or assign this Letter without the prior written consent (email being sufficient) of each Company Party.

10. Parties in Interest; Third-Party Beneficiaries; Specific Performance.

(a) This Letter is for the sole benefit of the parties to this Letter. Nothing in this Letter, whether express or implied, is intended to, or shall, confer upon any Person, other than the parties to this Letter, any legal or equitable right, benefit or remedy of any nature whatsoever. Without limiting the foregoing, other than as expressly set forth in the RSA, creditors of the Company Parties shall have no right to cause the Company Parties to enforce this Letter.

(b) Notwithstanding anything herein to the contrary, if an Investor fails to perform its obligations under this Letter, (i) irreparable damage would occur and (ii) monetary damages, even if available, may not be an adequate remedy for any such failure to perform this Letter. Accordingly, subject to the terms and conditions of this Letter, in the event of any such failure to perform, including the failure of an Investor to fund its New Equity Investment Commitment amount to the Escrow Account on the Funding Date in accordance with Section 5 of this Letter, (x) each of (A) the Company Parties and (B) the other Investors and each of their Affiliates shall be entitled to specific performance to enforce the defaulting Investor's obligations hereunder to fund the Equity Investment pursuant to the terms and conditions of this Letter, and (y) within two (2) Business Days of receipt from the Company Parties of written notice of the defaulting Investor's failure to perform, the non-defaulting Investor or its Affiliate may, in its sole discretion, choose to fund (or cause a designee to fund) an amount equal to the defaulting Investor's New

Equity Investment Commitment to the Escrow Account in lieu of the defaulting Investor funding such amount (the "**Equity Cure**"), whereby the non-defaulting Investor (or its designee) so funding will be entitled to receive the New Interests that would otherwise have been issued to the defaulting Investor in respect of such New Equity Investment Commitment and the defaulting Investor will cease to have any further rights in respect of such amount or obligations hereunder.

11. Governing Law; Jurisdiction; Waiver of Jury Trial.

(a) This Letter and all suits, proceedings, claims or causes of action (whether in contract, tort or otherwise) that in any way is, or may be, directly or indirectly based upon, arising out of, or related to, this Letter or the negotiation, execution, performance, non-performance, interpretation, termination or construction of this Letter, or the legal relationships of the parties to this Letter (whether at law or in equity, and whether in contract, tort or otherwise) (each, a "**Proceeding**"), shall be construed in accordance with, governed for all purposes by, and enforced pursuant to the internal substantive laws of the State of New York applicable to contracts executed and to be wholly performed within New York, without giving effect to any choice of law or conflict of law provision or rule (whether of the State of New York or any other jurisdiction) that would cause the application of the law of any jurisdiction other than the State of New York.

(b) Any Proceeding arising out of or related to this Letter, or judgment entered by any court in respect thereof, shall be brought exclusively in the United States District Court for the Southern District of New York or any New York state court, in each case, sitting in the Borough of Manhattan of the City of New York. Notwithstanding the foregoing consent to jurisdiction, upon commencement of the Chapter 11 Cases, each party to this Letter agrees that it shall bring any action or proceeding in respect of any claim arising out of or related to this Letter, to the extent possible, in the Bankruptcy Court, and solely in connection with claims arising under this Letter: (i) irrevocably submits to the exclusive jurisdiction of the Bankruptcy Court; (ii) waives any objection to laying venue in any such action or proceeding in the Bankruptcy Court; and (iii) waives any objection that the Bankruptcy Court is an inconvenient forum or does not have jurisdiction over any party to this Letter (the courts in this clause (b) collectively, the "**Designated Courts**"). The parties to this Letter irrevocably agree and consent to be subject to the exclusive jurisdiction of the Designated Courts for the purpose of any Proceeding arising out of or related to this Letter.

(c) Each party to this Letter irrevocably waives, to the fullest extent permitted by law, any objection which it may now or after the date of this Letter have to the laying of venue of any Proceeding arising out of or relating to this Letter in any Designated Court or any judgment entered by any of the Designated Courts and also irrevocably waives any claim that any Proceeding brought in the Designated Courts has been brought in an inconvenient forum. Notwithstanding the foregoing, if the Chapter 11 Cases are commenced, nothing in this Section 11 shall limit the authority of the Bankruptcy Court to hear any matter under or arising out of this Letter.

(d) **Each party acknowledges and agrees that any controversy that is, or may be, directly or indirectly based upon, arising out of, or related to, this Letter or the negotiation, execution, performance, non-performance, interpretation, termination or construction of this Letter, or the legal relationships of the parties to this Letter, is likely to involve complicated and difficult issues. Therefore, each party irrevocably and unconditionally**

**waives to the fullest extent permitted by law any right such party may have to a trial by jury in respect of any Proceeding, in each case, whether now existing or arising after the date of this Letter, and whether in contract, tort, equity or otherwise. Each party certifies and acknowledges that (i) no representative, agent or attorney or any other party has represented, expressly or otherwise, that such other party would not, in the event of litigation, seek to enforce the foregoing waiver, (ii) such party understands and has considered the implications of this waiver, (iii) such party makes this waiver voluntarily and (iv) such party has been induced to enter into this Letter by, among other things, the mutual waivers and certifications of this Section 11(d). Any party may file an original counterpart or a copy of this Letter with any court as written evidence of the consent of the parties to the waiver of their right to trial by jury.**

12. No Assignment. The rights and obligations under this Letter may not be assigned by any party, directly or indirectly (by operation of law or otherwise), without the prior written consent of the other parties to this Letter, except as expressly permitted by Section 4 hereof. Notwithstanding the foregoing, (a) each Investor's obligation to fund all or any portion of the Equity Investment set forth in this Letter and any of its rights herein may be assigned by such Investor to one or more of its Affiliates or, in accordance with Section 4 hereof, to one or more Designated Purchasers; *provided* that no such assignee shall fund any portion of the Equity Investment or receive any New Interests unless it has first delivered to the Company a Joinder, and (b) the rights of the Company Parties under this Letter may be assigned to New Getty Images. Any attempted or purported assignment in contravention of this Section 12 shall be null and void and of no force or effect. Any assignment permitted under this Section 12 shall not relieve the assigning party of its obligations under this Letter, except to the extent such obligations are actually satisfied by the applicable assignee or in accordance with Section 10(b) above.

13. Counterparts. This Letter may be executed in any number of counterparts with the same effect as if all signatory parties had signed the same document. All counterparts shall be construed together and shall constitute one and the same instrument. A signature delivered by facsimile transmission or by electronic mail in portable document format (.pdf) shall be deemed to be an original signature for all purposes under this Letter.

14. Confidentiality. This Letter shall be treated as confidential and is being provided to the other parties to the RSA solely in connection with the transactions contemplated by the RSA. This Letter may not be used, circulated, quoted or otherwise referred to in any document, except with the written consent of the Investors. Notwithstanding the foregoing, (i) each Investor may disclose the existence of this Letter (a) to its Affiliates and advisors and (b) to the extent required by law, rule, or regulation and (ii) the Company Parties may file this Letter with the Bankruptcy Court and the Securities and Exchange Commission, if necessary, and disclose its terms, in connection with Solicitation, confirmation of the Plan, and obtaining other necessary relief in Chapter 11 Cases.

15. Investor Representations and Warranties. Each Investor, severally and not jointly, represents and warrants to the Company Parties, as of the date hereof and as of the Restructuring Effective Date, that:

(a) it (i) is duly organized and validly existing and in good standing under the

applicable laws of the jurisdiction of its formation, and has all limited partnership, corporate, limited liability company or equivalent power and authority to execute, deliver and perform this Letter, or (ii) for any Investor that is a natural person, has the legal capacity to execute, deliver, and perform this Letter;

(b) its execution, delivery and performance of this Letter have been duly and validly authorized and approved by all necessary limited partnership, corporate, limited liability company or equivalent action and will not violate its organizational and governing documents, any material contract to which it is a party, or any applicable law, or for any Investor that is a natural person, its execution, delivery and performance of this Letter will not violate any material contract to which such Investor is a party, or any applicable law;

(c) this Letter has been duly and validly executed and delivered by such Investor and constitutes a valid and legally binding obligation of such Investor, enforceable against such Investor in accordance with its terms, except that such enforceability may be: (i) limited by bankruptcy, insolvency, fraudulent conveyance, reorganization, moratorium and other similar applicable laws of general application relating to or affecting creditors' rights generally; and (ii) subject to general equitable principles (whether considered in a proceeding in equity or at law);

(d) it is (i) a "qualified institutional buyer" as defined in Rule 144A under the Securities Act, or (ii) an "accredited investor" within the meaning of Rule 501(a) of Regulation D promulgated under the Securities Act;

(e) it is acquiring the New Interests and/or the New Preferred Interests, as the case may be, for its own account (or for the account of one or more Designated Purchasers, each of which satisfies the representation in clause (d) above) for investment purposes only and not with a view to, or for sale in connection with, any distribution thereof in violation of the Securities Act or any applicable state or other securities laws;

(f) it understands and acknowledges that (i) the New Interests and the New Preferred Interests have not been, and except as may be expressly provided in the Plan or the Confirmation Order will not be, registered under the Securities Act or any state or other applicable securities laws, (ii) the New Interests and the New Preferred Interests will be issued in reliance upon one or more exemptions from registration, including section 1145 of the Bankruptcy Code and/or section 4(a)(2) of the Securities Act and/or Regulation D promulgated thereunder, (iii) the New Interests and the New Preferred Interests may constitute "restricted securities" that may not be offered, sold, pledged or otherwise transferred except pursuant to an effective registration statement or an available exemption from registration, and may bear a legend to that effect, and (iv) there is no established public trading market for the New Interests and the New Preferred Interests and none is expected to develop;

(g) it has such knowledge, sophistication and experience in financial and business matters as to be capable of evaluating the merits and risks of the Equity Investment, is able to bear the economic risk of, and a complete loss of, the Equity Investment, and has had the opportunity to conduct its own independent investigation of the Company Parties and to ask questions of, and receive answers from, the Company Parties;

(h) it has (i) access to such information that it has determined to be adequate regarding (x) the Company Parties and (y) this Letter and the Transactions, (ii) such knowledge and experience in finance and business matters of this type that it is capable of evaluating the merits and risks of entering into this Letter and capable of making an informed investment decision with respect hereto and (iii) has independently, and without reliance upon any statement, representation or warranty of any Company Party, other than those expressly set forth in Section 16 of this Letter, made its own analysis and decision to enter into this Letter;

(i) it has, and will have as of the Restructuring Effective Date, available funds and uncalled capital commitments sufficient to fund its New Equity Investment Commitment in full; and

(j) in the case of KED, it (together with its Affiliates) is (or in the case of the DIP Claims, will be as of the Restructuring Effective Date) the beneficial owner of, or has investment and voting authority with respect to, the DIP Claims and EUR Term Loan Claims to be equitized pursuant to the Equitization Commitment in the aggregate amounts set forth on Schedule 1 hereto (as updated by the Final Allocation Schedule), free and clear of all liens, claims and encumbrances other than those that would not adversely affect the consummation of the Equitization Commitment.

16. Company Parties' Representations and Warranties. Each Company Party represents, warrants, and covenants to the Investors, as of the date hereof and as of the Restructuring Effective Date, that:

(a) it has all requisite corporate power and authority to enter into this Letter and to carry out the transactions contemplated by, and perform its obligations under, this Letter the execution and delivery of this Letter and the performance of its obligations hereunder have been duly authorized by all necessary corporate, partnership or limited liability company action on its part;

(b) it shall comply with and perform, in all material respects, all covenants and agreements required to be performed or complied with under the RSA and shall take or cause to be taken all steps reasonably necessary and desirable to pursue, support, obtain additional support for, solicit, implement, and consummate the Transactions in accordance with the terms and conditions set forth in this Letter and the RSA;

(c) it is a duly organized, validly existing corporation, limited liability company, or other entity and in good standing under the laws of the jurisdiction of its organization and has power and authority to own and operate its properties, to lease the property it operates under lease and to conduct its business, except where any such failure to own and/or operate, individually or in the aggregate, would not reasonably be expected to result in a Material Adverse Effect;

(d) it shall not (i) offer, pledge, sell, contract to sell, sell any option or contract to purchase, purchase any option or contract to sell, grant any option, right or warrant to purchase, lend or otherwise transfer or dispose of, directly or indirectly, or submit to, or file with, the SEC a registration statement under the Securities Act relating to any equity securities of the Company Parties (the "**Equity Securities**") or any securities convertible into or exercisable or

exchangeable for Equity Securities, or (ii) enter into any hedging, swap or other agreement or transaction that transfers, in whole or in part, any of the economic consequences of ownership of Equity Securities or any such other securities, where any such transaction described in clause (i) or (ii) above is to be settled by delivery of Equity Securities or such other securities, in cash or otherwise, or (iii) incur or permit any of its subsidiaries to incur, any indebtedness, in each case other than as contemplated by this Letter and the RSA, without the prior written consent of the Investors; and

(e) it has not taken and shall not take any action that is inconsistent with, or that would be reasonably expected to prevent, interfere with, delay or impede the consummation of, the Transactions.

17. No Recourse. Notwithstanding anything that may be expressed or implied in this Letter or any document or instrument delivered in connection with this Letter or otherwise, and notwithstanding the fact that an Investor may be a partnership:

(a) no Person other than the Investors and the Company Parties has any obligations under this Letter and no recourse shall be had against any other Person under this Letter;

(b) no personal liability shall attach under this Letter to (i) any Affiliate, stockholder, partner, member, manager, director, officer, representative, agent or employee of any Investor or any of its successors or assigns, (ii) any Affiliate, stockholder, partner, member, manager, director, officer, representative, agent or employee of any other Consenting Stakeholder or any of its successors or assigns, or (iii) any Affiliate, stockholder, partner, member, manager, director, officer, representative, agent, employee, successor or assignee of any of the foregoing, in each case whether current, former or future (each such person or entity, a "**Representative**"), whether by or through attempted piercing of the corporate veil, by or through a claim by or on behalf of any Company Party or the Consenting Stakeholders against any Representative, by the enforcement of any assessment or by any legal or equitable proceeding, by virtue of any law, or otherwise; and

(c) recourse against an Investor pursuant to this Letter shall be the sole and exclusive remedy of the Company Parties against such Investor or any of its Representatives in respect of any liabilities or obligations arising under this Letter.

The limitation on remedies set forth in this Section 17 shall apply without regard to whether any claim or action sounds in contract, tort or any other claim or legal theory, and whether at law or in equity. Without limiting the foregoing, the limitation on remedies set forth in this Section 17 shall apply to any claim or action directly or indirectly (i) arising under, or in connection with, this Letter or in connection with the transactions contemplated by this Letter or (ii) in respect of any oral representations or warranties made or alleged to have been made in connection with this Letter or in connection with the transactions contemplated by this Letter. The limitations set forth in this Section 17 fully apply without regard to whether any Consenting Stakeholder breaches its obligations under the RSA or the Plan, with the sole exceptions of the Company Parties' and each Investor's rights to seek specific performance to cause an Investor to fund the Equity Investment under the conditions and limitations set forth in this Letter. Notwithstanding anything to the contrary in this Letter, the limitation on remedies set forth in this Section 17 shall not apply to (a) the remedies set forth in the RSA, the Plan, or other Definitive Documents available to the

applicable parties thereto or (b) an act or omission that is judicially determined by a final order of a court of competent jurisdiction to have constituted actual fraud, willful misconduct, or gross negligence.

18. Indemnification. The Company Parties shall, jointly and severally, indemnify and hold harmless each Investor and each of its Related Parties (each, an "**Indemnified Party**") from and against any and all losses, claims, damages, liabilities, costs, and expenses (including the reasonable and documented fees and expenses of counsel) arising out of or relating to this Letter or any Equity Investment set forth herein, and shall reimburse each Indemnified Party for all such amounts as incurred; *provided* that no Indemnified Party shall be indemnified for any loss, claim, damage, liability, cost, or expense (a) in connection with such Indemnified Party's breach of this Letter or (b) to the extent determined by a final, non-appealable order of a court of competent jurisdiction to have resulted primarily from such Indemnified Party's actual fraud, gross negligence, or willful misconduct. The obligations under this Section 18 shall be in addition to, and shall not limit, any indemnification obligation of the Company Parties existing as of the date of this Letter, shall constitute allowed administrative expense claims of the Debtors' estates, and shall survive any termination of this Letter and the occurrence of the Restructuring Effective Date. As used herein, "**Related Parties**" means, with respect to any party, such party's current and former Affiliates, and such Entity's and such Affiliates' current and former equity holders, subsidiaries, officers, directors, managers, principals, members, partners, employees, agents, trustees, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, management companies, fund advisors, and other professionals, and such party's respective heirs, executors, estates, successors, and nominees, in each case in their capacity as such.

19. Severability. In the event that any provision of this Letter, or the application of this Letter, becomes or is declared by a court of competent jurisdiction to be illegal, void or unenforceable, or incapable of being enforced under any applicable law, the remainder of this Letter will continue in full force and effect and the application of such provision to other Persons or circumstances will be interpreted so as reasonably to effect the intent of the parties to this Letter. The parties to this Letter further agree to replace such void or unenforceable provision of this Letter with a valid and enforceable provision that will achieve, to the fullest extent possible, the economic, business and other purposes and effects of such void or unenforceable provision. Notwithstanding the foregoing, this Letter may not be enforced without giving full force and effect to the limitations set forth in this Section 19 and Sections 6-12 and 15-18 of this Letter.

20. Miscellaneous. The parties to this Letter agree that they have each been represented by counsel during the negotiation and execution of this Letter and have participated jointly in the drafting of this Letter. Consequently, each of the parties to this Letter waives the application of any law, holding or rule of construction providing that ambiguities in an agreement or other document will be construed against the party drafting such agreement or document. The descriptive headings set forth in this Letter are inserted for convenience of reference only and are not intended to be part of or to describe, interpret, define or limit the scope, extent or intent of this Letter or any provision of this Letter.

[SIGNATURE PAGE FOLLOWS]

Agreed to and accepted:

**GETTY IMAGES HOLDINGS, INC.**
**GRIFFEY MIDCO (DE), LLC**
**ABE INVESTMENT HOLDINGS, INC.**
**GETTY IMAGES, INC.**
**GETTY IMAGES (US), INC.**
**GETTY IMAGES NEWS SERVICES (PRC), INC.**
**GETTY IMAGES (SEATTLE), INC.**

Signed by:
By: Craig Peters
9C93EE75BB6B4E3...
Name: Craig Peters
Title: Chief Executive Officer

**Plan Sponsor Signature Pages and Schedule 1 (Allocation Schedule) to Equity Commitment Letter**

[On file with the Company]

**Exhibit D**

**Exit Term Sheet**

***Execution Version***

**THIS EXIT TERM SHEET IS NOT AN OFFER WITH RESPECT TO ANY SECURITIES OR A SOLICITATION OF ACCEPTANCES OF A CHAPTER 11 PLAN WITHIN THE MEANING OF SECTION 1125 OF THE BANKRUPTCY CODE. ANY SUCH OFFER OR SOLICITATION WILL COMPLY WITH ALL APPLICABLE SECURITIES LAWS AND/OR PROVISIONS OF THE BANKRUPTCY CODE. NOTHING CONTAINED IN THIS EXIT TERM SHEET SHALL BE AN ADMISSION OF FACT OR LIABILITY OR, UNTIL THE OCCURRENCE OF THE AGREEMENT EFFECTIVE DATE OF THE RESTRUCTURING SUPPORT AGREEMENT ("RSA") ON THE TERMS DESCRIBED HEREIN AND IN THE RSA, DEEMED BINDING ON ANY OF THE PARTIES HERETO.**

# *EXIT TERM SHEET*

## INTRODUCTION

This Exit Term Sheet describes the principal terms of the New RCF, the New Term Loans, and the New Notes (collectively, the "Exit Facilities") to be incurred by the applicable Reorganized Company Parties in connection with the Restructuring Transactions, as further described in the RSA and the Restructuring Term Sheet. Capitalized terms used and not otherwise defined herein shall have the meaning given to such terms in the RSA or the Restructuring Term Sheet. This Exit Term Sheet is proffered in the nature of a settlement proposal in furtherance of settlement discussions. Accordingly, this Exit Term Sheet and the information contained herein are entitled to protection from any use or disclosure to any party or person pursuant to Rule 408 of the Federal Rules of Evidence and any other applicable rule, statute, or doctrine of similar import protecting the use or disclosure of confidential settlement discussions.

This Exit Term Sheet does not include a description of all terms, conditions, and other provisions that will be contained in the Definitive Documents governing the Exit Facilities, which remain subject to negotiation and completion in accordance with the RSA. The Definitive Documents governing the Exit Facilities will not contain any material terms or conditions that are inconsistent with this Exit Term Sheet or the RSA. This Exit Term Sheet incorporates the rules of construction as set forth in the RSA.

## GENERAL PROVISIONS REGARDING THE EXIT FACILITIES

**Loan Parties**

The Reorganized Company Parties [except New Getty Images][1], plus material subsidiaries in material non-U.S. jurisdictions (in each case with materiality to be determined in good faith by the Required Consenting Secured Lenders and the Required Consenting RCF Lenders) (the "Loan Parties"), subject to applicable law, customary local law guarantee limitations, and customary materiality, tax, and cost-benefit limitations, in the case of each of the exclusions and limitations, as determined in good faith by the Required Consenting Secured Lenders and the Required Consenting RCF Lenders, in each case in accordance with the Documentation Principles and subject to the consent rights set forth in the RSA.

**New Credit Agreement Agent**

JPMorgan Chase Bank, N.A., shall be appointed as administrative agent and collateral agent for the New Credit Agreement and will perform the duties customarily associated with such roles (in such capacities, the "New Credit Agreement Agent").

For the avoidance of doubt, the New Credit Agreement shall contain customary provisions with respect to secured cash management obligations and, in furtherance of the foregoing, each Consenting RCF Lender (or applicable Affiliate of such Consenting RCF Lender) that is a party to any Cash Management Agreement (as defined in the Credit Agreement) on the Restructuring Effective Date shall be a "Cash Management Bank" under the New Credit Agreement.

**New Notes**

On the Restructuring Effective Date, the applicable Reorganized Company Party (the "New Issuer")[2] shall issue the New Notes on the following material terms:

(a) Principal Amount: $580,000,000.00[3]

(b) Maturity: April 2032

(c) Interest Rate:

| **Consolidated First Lien Debt to Consolidated EBITDA Ratio** | **Interest Rate** |
|---|---|
| > 3.00x | 10.500% |
| ≤ 3.00x but > 2.50x | 10.000% |
| ≤ 2.50x but > 2.00x | 9.500% |
| ≤ 2.00x | 9.000% |

(d) Amortization: none

(e) Guarantors: the Loan Parties other than the New Issuer

(f) ECF Sweep: none

(g) Minimum Liquidity Covenant: none

---

1 Subject to ongoing review and discussion (including tax review).

2 The New Issuer shall be designated in the Restructuring Transaction Steps. The identity of the New Issuer shall be acceptable to the Consenting Shareholders.

3 Principal amount of the USD Term Loans and the 11.25% Secured Notes will convert to the New Notes on the Restructuring Effective Date pursuant to the Plan.

<table>
<tr><th colspan="2">GENERAL PROVISIONS REGARDING THE EXIT FACILITIES</th></tr>
<tr><td></td><td>(h) Call protection:<br>a. greater of 101% or make whole (present value of 105.250% plus interest) through February 2027; 105.250% through February 2028; 102.625% through February 2029; par thereafter<br>b. during the period in which call protection remains applicable, any optional redemption funded with cash other than proceeds of indebtedness or M&A shall be at par<br>c. any redemption funded, directly or indirectly, with proceeds of indebtedness or via M&A shall pay the full applicable premium, including make whole<br>d. following the expiration of the call protection period, all redemption shall be at par</td></tr>
<tr><td>New EUR Term Loans</td><td>On the Restructuring Effective Date, the New Issuer or another Reorganized Company Party (the "New Borrower")[4] shall incur the New EUR Term Loans on the following material terms:<br>(a) Principal Amount: €313,900,000.00<br>(b) Maturity: April 2032<br>(c) Interest Rate:<br><table><tr><th>Consolidated First Lien Debt to Consolidated EBITDA Ratio</th><th>Interest Rate</th></tr><tr><td>> 3.00x</td><td>EURIBOR + 5.25%</td></tr><tr><td>≤ 3.00x but > 2.50x</td><td>EURIBOR + 4.75%</td></tr><tr><td>≤ 2.50x but > 2.00x</td><td>EURIBOR + 4.25%</td></tr><tr><td>≤ 2.00x</td><td>EURIBOR + 3.75%</td></tr></table>(d) Amortization: 5% per annum, payable in equal quarterly installments commencing with the fiscal quarter ending June 30, 2027.<br>(e) Other Economic Terms: the New Borrower shall pay all reasonable and documented out-of-pocket legal fees and expenses of one counsel to the Required Consenting Secured Lenders and the New Credit Agreement Agent (and to the extent required, one local counsel in any relevant jurisdiction and, solely in the case of an actual or potential conflict of interest, one additional counsel (and local counsel))<br>(f) Guarantors: the Loan Parties other than the New Borrower<br>(g) ECF Sweep: none<br>(h) Minimum Liquidity Covenant: none<br>(i) Call protection: 101% through February 2027, par thereafter</td></tr>
</table>

[4] The New Borrower shall be designated in the Restructuring Transaction Steps. The identity of the New Borrower shall be acceptable to the Consenting Shareholders.

## GENERAL PROVISIONS REGARDING THE EXIT FACILITIES

**New RCF**

On the Restructuring Effective Date, the New Borrower shall enter into the New RCF on the following material terms:

(a) Commitment: $150,000,000.00, which shall be established after giving effect to the conversion of the Revolving Loans and Revolving Credit Commitments (as defined in the Credit Agreement) to revolving loans and revolving commitments, respectively, under the New Credit Agreement, and such Commitment shall be fully undrawn to be reborrowed in accordance with the terms of the New Credit Agreement after giving effect to the payment in full in cash of revolving loans and accrued and unpaid interest and fees with respect to such revolving loans and revolving credit commitments under the New Credit Agreement substantially contemporaneously with, and subject to, the Restructuring Effective Date with proceeds of the New Equity Investment.

(b) Maturity: January 2031

(c) Interest Rate:

| **Consolidated Debt to Consolidated EBITDA Ratio** | **Term Benchmark Loans** | **Base Rate Loans** |
|---|---|---|
| < 3.50:1.00 | 3.00% | 2.00% |
| ≥ 3.50:1.00 but < 4.00:1.00 | 3.25% | 2.25% |
| ≥ 4.00:1.00 | 3.50% | 2.50% |

(d) Financial Covenant: Max Leverage Covenant (as defined below)

(e) Other economic terms: all other economic terms, including commitment fees and letter of credit fees to remain the same as the Credit Agreement; provided that, for the avoidance of doubt, the Debtors shall pay on the Restructuring Effective Date and on a go-forward basis all reasonable and documented out-of-pocket legal fees and expenses of one counsel to the Required Consenting RCF Lenders and the New Credit Agreement Agent (and to the extent required, one local counsel in any relevant jurisdiction and, solely in the case of an actual or potential conflict of interest, one additional counsel (and local counsel))

(f) Guarantors: the Loan Parties other than the New Borrower

(g) ECF Sweep: none

(h) Minimum Liquidity Covenant: none

(i) Anti-Cash Hoarding: anti-cash hoarding covenant that ensures the New RCF Commitments are not drawn and revolving loans under the New Credit Agreement are repaid, as applicable, at any time the Loan Parties have unrestricted cash and cash equivalents in excess of $150,000,000 (the "Anti-Cash Hoarding Covenant")

(j) Use of Proceeds: proceeds of the New RCF Facility shall be used (i) for working capital and other general corporate purposes and (ii) to redeem the New Preferred Interests (as defined in the Restructuring Term Sheet) as set forth in the Restructuring Term Sheet

| GENERAL PROVISIONS REGARDING THE EXIT FACILITIES | |
|---|---|
| **Fees** | The Exit Facilities shall not include any extension premium or exit premium (other than the call protection as set forth herein). |
| **Certain Definitions** | "Consolidated Debt to Consolidated EBITDA Ratio" shall have the meaning set forth in the Credit Agreement, mutatis mutandis, and for the avoidance of doubt, shall be subject to up to $150,000,000 of cash netting.<br><br>"Consolidated First Lien Debt to Consolidated EBITDA Ratio" shall have the meaning set forth in the Credit Agreement, mutatis mutandis, and for the avoidance of doubt, shall be subject to up to (x) $150,000,000 of cash netting or (y) solely in connection with calculating the Consolidated First Lien Debt to Consolidated EBITDA Ratio for purposes of the applicable pricing grid, subject to a cap of up to $75,000,000 of cash netting.<br><br>The definition of consolidated EBITDA for the purpose of calculating the Max Leverage Covenant (as defined below) (the "Covenant Consolidated EBITDA") shall have the meaning set forth in the Credit Agreement, and the definition of consolidated EBITDA for all other purposes (the "Consolidated EBITDA") shall be agreed by the Company Parties, the Consenting Shareholders and the Required Consenting Secured Lenders.<br><br>"Max Leverage Covenant" means, with respect to the New RCF, that the Consolidated Debt to Consolidated EBITDA Ratio shall not exceed 4.75:1.00, tested quarterly commencing with the fiscal quarter ending on June 30, 2027 and on a pro forma basis upon any draw of the New RCF. |
| **Priority & Collateral** | The Exit Facilities shall be secured by, and in each case, consistent with the Documentation Principles:<br><br>(a) First-priority lien on all assets currently securing the EUR Term Loans, the USD Term Loans, the Revolving Loans, and the 11.25% Secured Notes;<br><br>(b) First-priority lien on all unencumbered property of the Loan Parties, including, without limitation, (i) 100% of the Loan Parties' Equity Interests in any of their direct foreign subsidiaries, (ii) deposit account control agreements, and (iii) any other property not previously pledged to secure the EUR Term Loans, the USD Term Loans, the Revolving Loans, and the 11.25% Secured Notes, including liens on certain foreign collateral in material jurisdictions, with materiality to be agreed in good faith by the Required Consenting Secured Lenders and the Required Consenting RCF Lenders (including pledges of equity directly held by grantors organized in such jurisdictions), subject to customary agreed security principles and customary materiality, tax, and cost-benefit limitations, in the case of each of the exclusions and limitations, as determined in good faith by the the Required Consenting Secured Lenders and the Required Consenting RCF Lenders; and<br><br>(c) Negative pledge over Equity Interests not owned by the Loan Parties.<br><br>The New Notes and the New EUR Term Loans shall rank *pari passu* in lien and payment priority with the New RCF, shall be secured by the same Collateral and have the same obligors. |

| GENERAL PROVISIONS REGARDING THE EXIT FACILITIES | |
|---|---|
| **Documentation** | The Exit Facilities shall be documented in accordance with the following principles (collectively, the "Documentation Principles"):<br>(a) the New EUR Term Loans and the New RCF shall be documented by the New Credit Agreement, which shall be based on the Credit Agreement, and the New Notes shall be documented by the New Notes Indenture, which shall be based on the 11.25% Secured Notes Indenture, in each case, with modifications to reflect the terms and provisions set forth in this Exit Term Sheet and other modifications as may be mutually agreed upon among (i) the Required Consenting Secured Lenders with respect to the applicable Exit Facility, (ii) the Required Consenting RCF Lenders, solely with respect to the provisions in the New Term Loan Documents that relate to the New RCF, (iii) the Consenting Shareholders, and (iv) the Company Parties;<br>(b) the New Credit Agreement and the New Notes Indenture shall include covenants, thresholds, baskets, representations and warranties, events of default, and similar terms and provisions that provide (i) sufficient flexibility for ordinary course operations, acquisitions, and financing activities consistent with the business plan of the Reorganized Company Parties and reasonably acceptable to the Required Consenting Secured Lenders and (ii) liability management protections customary for "post-LME" debt documentation, including appropriate anti-priming and anti-dropdown provisions and an LME "omni" blocker;<br>(c) (i) the Required Consenting RCF Lenders shall have a reasonable consent right over the New Credit Agreement and certain other definitive documentation, consistent with the RSA and (ii) with respect to amending the New Credit Agreement after the Restructuring Effective Date, (A) amendment, waiver or other modification of any RCF-specific and RCF-protective provision (including, without limitation, the "omni" blocker) shall require the consent of the "Required Revolving Lenders" (except where the Credit Agreement provides for a higher consent threshold) and (B) all other amendments shall require the consent of the "Required Lenders" in each case, with definitions substantially consistent with the definitions in the Credit Agreement and subject to customary "sacred rights" consistent with exit facilities of this type; and<br>(d) consent of the New Credit Agreement Agent shall be required with respect to amendments and waivers directly affecting its rights or duties.<br>The relationship among the Exit Facilities shall be governed by a pari passu intercreditor agreement, which shall be in form and substance satisfactory to the New Credit Agreement Agent and the Required Consenting RCF Lenders and shall be reasonably satisfactory to the Consenting Shareholders, and the New Credit Agreement Agent shall be the "controlling secured party" thereunder. |
| **Redemption of New Preferred Interests** | The documentation governing the Exit Facilities shall permit the Reorganized Company Parties (through a separate restricted payment capacity and otherwise) to redeem the New Preferred Interests (as defined in the Restructuring Term Sheet) by paying the Consenting Shareholder holder thereof an amount equal to the Delayed Draw DIP Amount (as defined in the Restructuring Term Sheet), *provided*, such |

| GENERAL PROVISIONS REGARDING THE EXIT FACILITIES | |
|---|---|
| | separate basket shall not include basket capacity to pay any PIK interest, dividends or fees accrued on the New Preferred Interests after the Restructuring Effective Date.<br><br>Provisions in the documentation governing the Exit Facilities (including (but not limited to) any general restricted payment basket) that would permit the Reorganized Company Parties to pay any accrued PIK interest, dividends or fees in respect of the New Preferred Interests or any other instrument remain subject to negotiation by and among the Consenting Shareholders, the Company Parties, the Consenting Secured Lenders, and the Consenting RCF Lenders; *provided* that, it is understood and agreed that the Consenting Secured Lenders and Consenting RCF Lenders reserve all rights with respect to such provisions. |
| **Covenants and Mandatory Prepayments** | The Exit Facilities shall not include any (a) financial covenant with regards to the New Notes and New EUR Term Loans, (b) minimum liquidity condition, or (c) excess cash flow sweep.<br><br>The covenants of the Exit Facilities shall otherwise be consistent with the Documentation Principles and acceptable to the Consenting Shareholders. |
| **Conditions Precedent** | The New Notes Documents and the New Term Loan Documents shall include usual and customary conditions precedent in form and substance acceptable to the Required Consenting Secured Lenders, Required Consenting RCF Lenders, and the Consenting Shareholders with respect to the applicable Exit Facility and consistent with the Documentation Principles, including, but not limited to:<br><br>(a) satisfaction of diligence;<br><br>(b) investment committee approval;<br><br>(c) the Loan Parties shall provide all documentation reasonably requested in writing at least ten (10) days prior to the Restructuring Effective Date that is required by regulatory authorities under applicable "know your customer" and anti-money-laundering rules and regulations, including the PATRIOT Act and OFAC;<br><br>(d) payment of Consenting Lenders Fees and Expenses incurred by the Consenting Secured Lenders and the Consenting RCF Lenders;<br><br>(e) the New Notes Documents and the New Term Loan Documents shall be in form and substance reasonably acceptable to (i) the Required Consenting Secured Lenders with respect to the New Notes and the New EUR Term Loans, (ii) the Required Consenting RCF Lenders with respect to the New RCF, and (iii) the Consenting Shareholders with respect to each Exit Facility; and<br><br>(f) the obligations with respect to the Revolving Loans made under the Credit Agreement and all Revolving Commitments under the Credit Agreement shall be converted to revolving commitments and revolving loans under the New Credit Agreement and all such revolving loans and accrued and unpaid interest and fees with respect to such revolving loans and revolving credit commitments under the New Credit Agreement shall be, subject to the Restructuring Effective Date, and immediately repaid in full in cash substantially contemporaneously with the Restructuring Effective Date using proceeds of the New Equity Investment. |

| GENERAL PROVISIONS REGARDING THE EXIT FACILITIES | |
|---|---|
| | In addition to the foregoing, the New RCF shall have the following conditions precedent to each borrowing:<br>(a) delivery of a borrowing request;<br>(b) no Default or Event of Default;<br>(c) bring down of representations and warranties;<br>(d) *pro forma* compliance with Max Leverage Covenant;<br>(e) pro forma compliance with the Anti-Cash Hoarding Covenant; and<br>(f) no prior or concurrent waiver or forbearance of any Specified Event of Default (definition to be mutually agreed but in any event to be limited to payment defaults, bankruptcy events and cross-acceleration resulting from a payment event of default) unless such waiver or forbearance is consented to by the Required Consenting RCF Lenders. |
| **Ratings** | The Loan Parties shall use commercially reasonable efforts to have the New EUR Term Loans and the New Notes rated by Moody's and S&P within 60 days of the Restructuring Effective Date. |
| **Closing Date** | Restructuring Effective Date |
| **Governing Law** | New York law |

**Exhibit E**

**Form of Joinder**

**Joinder Agreement to Restructuring Support Agreement**

The undersigned (the "Joinder Party") hereby acknowledges that it has reviewed and understands the Restructuring Support Agreement dated as of __________ (the "**Agreement**"),[1] by and among Getty Images Holdings, Inc. and its affiliates and subsidiaries bound thereto and the Consenting Stakeholders and agrees to be bound by the terms and conditions thereof to the extent the other Parties are thereby bound, and shall be deemed a "Consenting Secured Lender" or a "Consenting Unsecured Noteholder," as applicable, under the terms of the Agreement.

The undersigned Joinder Party specifically agrees to be bound by the terms and conditions of the Agreement and makes all representations and warranties contained therein as of the date of this joinder and any further date specified in the Agreement.

This joinder agreement shall be governed by the governing law set forth in the Agreement.

[*Signature Page Follows*]

1 Capitalized terms used but not otherwise defined herein shall have the meaning ascribed to such terms in the Agreement.

Date Executed:

______________________________________
Name:
Title:

Address:

E-mail address(es):

| ***Aggregate Amounts Beneficially Owned or Managed on Account of:*** | |
|---|---|
| Revolving Loans | |
| EUR Term Loans | |
| USD Term Loans | |
| 11.25% Secured Notes | |
| 9.75% Notes | |
| 14.00% Notes | |

**Exhibit F**

**Form of Transfer Agreement**

**Transfer Agreement**

The undersigned ("**Transferee**") hereby acknowledges that it has read and understands the Restructuring Support Agreement, dated as of __________ (the "**Agreement**"),[1] by and among Getty Images Holdings, Inc. and its affiliates and subsidiaries bound thereto and the Consenting Stakeholders, including the transferor to the Transferee of any Company Claims/Interests (each such transferor, a "**Transferor**"), and agrees to be bound by the terms and conditions thereof to the extent the Transferor was thereby bound, and shall be deemed a "Consenting RCF Lender," "Consenting Secured Lender," or a "Consenting Unsecured Noteholder," as applicable, under the terms of the Agreement.

The Transferee specifically agrees to be bound by the terms and conditions of the Agreement and makes all representations and warranties contained therein as of the date of the Transfer, including the agreement to be bound by the vote of the Transferor if such vote was cast before the effectiveness of the Transfer discussed herein.

[*Signature Page Follows*]

1 Capitalized terms used but not otherwise defined herein shall have the meaning ascribed to such terms in the Agreement.

Date Executed:

______________________________
Name:
Title:

Address:

E-mail address(es):

| *Aggregate Amounts Beneficially Owned or Managed on Account of:* | |
|---|---|
| Revolving Loans | |
| EUR Term Loans | |
| USD Term Loans | |
| 11.25% Secured Notes | |
| 9.75% Notes | |
| 14.00% Notes | |