**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| GETTY IMAGES HOLDINGS, INC., *et al.*,[1] | ) | Case No. 26-11643 (JKS) |
| Debtors. | ) | (Joint Administration Requested) |

**DECLARATION OF CARI TURNER,**
**MANAGING DIRECTOR OF ALVAREZ & MARSAL NORTH AMERICA, LLC, IN SUPPORT OF THE DEBTORS' FIRST DAY MOTIONS**

I, Cari Turner, declare as follows under penalty of perjury that if called to testify, I would testify competently to the facts and opinions set forth in this Declaration.

1. I am over the age of 18 and I am authorized to submit this declaration (the "Declaration") on behalf of the Debtors.

2. I submit this declaration in support of the above-captioned debtors' and debtors in possession's (collectively, the "Debtors") first day motions filed contemporaneously herewith.

3. On October 21, 2026 (the "Petition Date"), each Debtor filed a voluntary petition for relief under chapter 11, 11 U.S.C. §§ 101–1532 (the "Bankruptcy Code"), with the United States Bankruptcy Court for the District of Delaware (the "Court"). A detailed description of the Debtors, their business, and the facts and circumstances supporting the Debtors' chapter 11 cases is set forth in greater detail in the *Declaration of Craig Peters, Chief Executive Officer of Getty*

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Getty Images Holdings, Inc. (4229); Griffey Midco (DE), LLC (7122); Abe Investment Holdings, Inc. (5107); Getty Images, Inc. (7556); Getty Images (US), Inc. (8819); Getty Images News Services (PRC), Inc. (1849); and Getty Images (Seattle), Inc. (6863). The location of the Debtors' service address for purposes of these chapter 11 cases is: 605 5th Ave. S. Suite 400, Seattle, WA 98104.

*Images Holdings, Inc. and Its Debtor Subsidiaries, in Support of the Debtors' Chapter 11 Petitions* (the "Peters Declaration" and together with this Declaration, the "First Day Declarations").[2]

4. Unless otherwise indicated, the statements set forth in this declaration are based upon (a) my personal knowledge, (b) information learned from my review of relevant documents, (c) information I received from the team at Alvarez & Marsal North America, LLC ("A&M") working under my supervision or the Debtors' management team and other advisors, or (d) my experience as a restructuring professional. A&M was retained in August 2026 to provide services for the Debtors. I am the A&M employee overseeing the engagement. I am not being specifically compensated for this testimony other than through payments that are proposed to be received by A&M as a professional providing services for the Debtors, subject to this Court's approval.

**Professional Background**

5. I am a Managing Director at A&M, a restructuring advisory services firm and the proposed financial advisor to the Debtors. A&M is a leading restructuring consulting firm with extensive experience providing high quality, specialized management and restructuring advisory services to debtors and distressed companies. Specifically, A&M's core services include turnaround advisory services, interim and crisis management, revenue enhancement, claims management, and creditor and risk management advisory services. A&M provides a wide range of debtor advisory services targeted at stabilizing and improving a company's financial position, including: (a) developing or validating forecasts, business plans, and related assessments of strategic positions; (b) monitoring and managing cash, cash flow, and supplier relationships; (c) assessing and recommending cost reduction strategies; and (d) designing and negotiating

[2] Capitalized terms used but not defined herein have the meaning ascribed to such terms in the Peters Declaration or the corresponding First Day Motion, as applicable.

financial restructuring packages. A&M has assisted, advised, and provided strategic advice to debtors, creditors, bondholders, investors and other entities in numerous chapter 11 cases of similar size and complexity to the Debtors' chapter 11 cases. A&M is known for its ability to work alongside company management and key constituents during chapter 11 restructuring to develop a feasible and executable plan of reorganization.

6. Since the Debtors engaged A&M in August 2026, A&M has worked closely with the Debtors' management and other professionals with respect to the Debtors' restructuring efforts, including advising the Debtors on contingency planning, liquidity needs and other financial information.

7. I am employed by A&M and have over 25 years of experience with a diverse background in financial and operational restructuring. Since joining A&M, I have been involved in numerous chapter 11 restructurings including Wheel Pros Inc. and QualTek Services Inc. (where I served as Chief Restructuring Officer), Marelli Automotive Lighting USA, LLC, Seadrill Limited, Valaris plc, Windstream Communications, Toys R Us, Exide Technologies and Visteon Corporation. Prior to my work with A&M, I served as Director of Finance for Home Interiors & Gifts, a Highland Capital Management company, from 2004 through January 2009, as Director of Finance for Homemade Gourmet, a start-up direct-selling company, from 2002 through 2003, and as Director of Financial Reporting for Allied Riser Communications, a start-up telecommunications company, from 1998 through 2002. I hold a Master of Business Administration and bachelor's degree from the University of Texas at Dallas.

**First Day Motions**

8. The Debtors have filed a number of "first day" motions and applications (collectively, the "First Day Motions") seeking orders granting various forms of relief intended to

stabilize the Debtors' business operations and facilitate the efficient administration of these chapter 11 cases. The First Day Motions include the following:

*i.* **Joint Administration Motion**. *Motion of Debtors for Entry of an Order (I) Directing the Joint Administration of Chapter 11 Cases and (II) Granting Related Relief* (the "Joint Administration Motion");

*ii.* **Scheduling Motion**. *Motion of Debtors for Entry of an Order (I) Scheduling Combined Hearing on Adequacy of the Disclosure Statement and Confirmation of the Plan; (II) Fixing Deadline to Object to Disclosure Statement and the Plan; (III) Conditionally Approving Prepetition Solicitation Procedures and Form and Manner of Notice of Commencement, Combined Hearing and Objection Deadline; (IV) Conditionally Approving Notice and Objection Procedures for the Assumption of Executory Contracts and Unexpired Leases; (V) Conditionally (A) Directing the United States Trustee Not to Convene Section 341 Meeting of Creditors and (B) Waiving Requirement of Filing Statements of Financial Affairs and Schedules of Assets and Liabilities and Rule 2015.3 Reports; and (VI) Granting Related Relief* (the "Scheduling Motion");

iii. **Creditor Matrix Motion**. *Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Redact or Withhold Certain Confidential Information of Customers, (B) Redact Certain Personally Identifiable Information of Individuals and (C) Serve Parties in Interest by Email; (II) Approving the Form and Manner of Service of Notices; (III) Waiving the Requirement to File a List of Equity Security Holders; and (IV) Granting Related Relief* (the "Creditor Matrix Motion");

iv. **Claims Agent Retention Application**. *Application of Debtors for Entry of an Order (I) Authorizing the Appointment of Kroll Restructuring Administration LLC as Claims and Noticing Agent Effective as of the Petition Date and (II) Granting Related Relief* (the "Claims Agent Retention Application");

*v.* **Content Contributors Motion**. *Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors to Pay or Honor Prepetition Claims and Obligations of Content Contributors and (II) Granting Related Relief* (the "Content Contributors Motion");

vi. **All Trade Motion**. *Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing Payment of All Trade Claims in the Ordinary Course of Business, (II) Confirming the Administrative Expense Priority of Outstanding Orders, and (III) Granting Related Relief* (the "All Trade Motion");

vii. **Customer Programs Motion**. *Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Maintain and Administer Their Customer Programs and (B) Honor Prepetition Obligations, and (II) Granting Related Relief* (the "Customer Programs Motion");

viii. **Cash Management Motion**. *Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Continue to Operate the Cash Management System, (B) Honor Certain Prepetition Obligations Related Thereto, (C) Maintain Existing Business Forms, and (D) Continue Intercompany Transactions, (II) Granting Administrative Expense Status to Postpetition Intercompany Claims, and (III) Granting Related Relief* (the "Cash Management Motion");

ix. **Utilities Motion**. *Motion of Debtors for Entry of Interim and Final Orders (I) Approving the Debtors' Proposed Adequate Assurance of Payment for Future Utility Services, (II) Approving the Debtors' Proposed Procedures for Resolving Additional Assurance Requests, (III) Prohibiting Utility Providers From Altering, Refusing, or Discontinuing Services, and (IV) Granting Related Relief* (the "Utilities Motion");

x. **Insurance Motion**. *Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Maintain Insurance, Surety Coverage, and Letter of Credit Entered Into Prepetition and Satisfy Prepetition Obligations Related Thereto, (B) Renew, Amend, Supplement, Extend, or Purchase Insurance Policies, Surety Bonds, and Letters of Credit, and (C) Continue to Pay Broker Fees, and (II) Granting Related Relief* (the "Insurance Motion");

xi. **Taxes Motion**. *Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing the Payment of Certain Prepetition and Postpetition Taxes and Fees and (II) Granting Related Relief* (the "Taxes Motion");

xii. **NOL Motion**. *Motion of Debtors for Entry of Interim and Final Orders (I) Approving Notification and Hearing Procedures for Certain Transfers of and Declarations of Worthlessness with Respect to Common Stock and (II) Granting Related Relief* (the "NOL Motion"); and

xiii. **Wages Motion**. *Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Pay Prepetition Wages, Salaries, Other Compensation, and Reimbursable Expenses and (B) Continue Employee Benefits Programs and (II) Granting Related Relief* (the "Wages Motion").

9. The First Day Motions seek authority to, among other things, honor employee-related wage and benefit obligations, pay trade claims in the ordinary course to ensure that the Debtors' business operations are not disrupted by these chapter 11 cases, and ensure the continuation of the Debtors' cash management systems and other business operations without interruption. I believe that, with respect to the relief requested, the Debtors have tailored their requests for relief to matters of a genuinely emergent nature required to preserve the estates' assets and to maintain ongoing business operations. An immediate and orderly transition into chapter 11 is critical to the viability of the Debtors' operations and any delay in granting the relief described in the First Day Motions would hinder the Debtors' operations and diminish the value of the Debtors' estates. I believe the failure to receive the requested relief during the first twenty-one (21) days of these chapter 11 cases would severely disrupt the Debtors' operations at this critical juncture and cause immediate and irreparable harm.

10. Absent approval of the First Day Motions, the Debtors' ability to retain their workforce and maintain critical relationships with content contributors, customers, and trade vendors could be materially impaired. Disruption to these relationships during the initial stages of these chapter 11 cases could adversely affect the Debtors' operations and diminish the value of their estates.

11. I am familiar with the content and substance of the First Day Motions. The facts stated therein are true and correct to the best of my knowledge, information, and belief, and such facts shall be deemed incorporated herein by reference as if fully stated herein. I believe that the relief sought in each of the First Day Motions is necessary to enable the Debtors to operate in chapter 11 with minimal disruptions to their business operations, constitutes a critical element in successfully restructuring the Debtors' business, and is in the best interests of the Debtors' estates.

## I. Administrative Motions.

### A. Joint Administration Motion.

12. Pursuant to the Joint Administration Motion, the Debtors seek entry of an order: (a) directing the procedural consolidation and joint administration of the Debtors' chapter 11 cases; and (b) granting related relief. The Debtors request that one file and one docket be maintained for all of the jointly-administered cases under the case of Getty Images Holdings, Inc.

13. Given the integrated nature of the Debtors' operations, joint administration of these chapter 11 cases will provide significant administrative convenience without harming the substantive rights of any party in interest. Many, if not all, of the motions, hearings, and orders in these chapter 11 cases will affect each Debtor entity. Accordingly, I understand that entry of an order directing joint administration of these chapter 11 cases will reduce fees by avoiding duplicative filings, objections, or multiple hearings on common issues and allow the U.S. Trustee and all parties in interest to monitor these chapter 11 cases with greater ease and efficiency.

14. I believe that the relief requested in the Joint Administration Motion is in the best interest of the Debtors' estates, their creditors, and all other parties in interest and will facilitate the Debtors' ability to operate their businesses in chapter 11 without disruption.

### B. Scheduling Motion.

15. Pursuant to the Scheduling Motion, the Debtors seek entry of an order: (a) scheduling a combined hearing (the "Combined Hearing") on the adequacy of the Disclosure Statement and confirmation of the Plan, and establishing November 30, 2026, at 5:00 p.m., prevailing Eastern Time, as the deadline to object thereto (the "Objection Deadline"); (b) conditionally approving the prepetition solicitation procedures, Ballots, and vote tabulation procedures; (c) approving the form and manner of the Combined Notice, the notices of non-voting

status and opt-in form, and the Publication Notice, and waiving the requirement to mail the Solicitation Package to non-voting Holders; (d) conditionally approving procedures for the assumption of Executory Contracts and Unexpired Leases; (e) conditionally waiving the section 341 meeting of creditors and the requirement to file schedules, statements of financial affairs, and Rule 2015.3 Reports, provided that the Plan is confirmed and the Effective Date occurs by the Waiver Deadline; and (f) granting related relief.

16. I understand that the Debtors commenced solicitation of votes on the Plan prepetition on October 20, 2026, and propose a Combined Hearing on December 14, 2026, subject to the Court's availability. I understand that the proposed schedule complies with the applicable notice requirements and with the milestones in the Restructuring Support Agreement, which require entry of the Confirmation Order by December 15, 2026. I believe that moving through these chapter 11 cases efficiently will limit the harm to the Debtors' business and keep administrative expenses down. Accordingly, I believe that the relief requested in the Scheduling Motion is in the best interest of the Debtors' estates, their creditors, and all other parties in interest, and will facilitate the efficient administration of these chapter 11 cases.

**C. Creditor Matrix Motion.**

17. Pursuant to the Creditor Matrix Motion, the Debtors seek entry of interim and final orders: (a) authorizing, but not directing, the Debtors to (i) redact or withhold certain confidential information of customers, (ii) redact certain personally identifiable information of individuals, and (iii) serve parties in interest by email; (b) approving the form and manner of service of notices; (c) waiving the requirement to file a list of, and to provide notice directly to, the equity security holders of Debtor Getty Images Holdings, Inc.; and (d) granting related relief.

18. The Debtors license content to more than 630,000 customers, and their customer list is a valuable, confidential asset. Disclosure of that list may put those relationships at risk. If competitors were to use it to poach the Debtors' customers, the Debtors' going-concern value would suffer immediate and irreparable harm.

19. I believe that redacting individuals' personally identifiable information is likewise appropriate, because such information can be used to perpetrate identity theft and phishing scams or to locate survivors of domestic violence, harassment, or stalking. Its disclosure also risks violating applicable privacy laws, including the UK GDPR, the EU GDPR, and California and Delaware privacy statutes. Unredacted versions will be provided confidentially to the Court, the U.S. Trustee, and certain other key parties.

20. Debtor Getty Images Holdings, Inc.'s common stock was publicly traded on the New York Stock Exchange, with approximately 421 million shares outstanding that cannot be readily traced to specific individual holders. Preparing a list of, and serving notice on, each such holder would impose undue expense and administrative burden on the estates. Instead, the Debtors will serve registered and nominee holders, publish notice in *The New York Times*, post notice on the case website, and file a Form 8-K.

21. I also believe the proposed manner of service is warranted. The Debtors communicate with their Content Contributors and Customers almost exclusively by email and do not have physical mailing addresses for many of them. Serving the anticipated filings in these chapter 11 cases by traditional mail would cost more than $7 million. Email service is therefore likely the most efficient and cost-effective means of reaching parties in interest, with the Claims and Noticing Agent handling all mailings and email service.

22. For these reasons, I believe that the relief requested in the Creditor Matrix Motion is in the best interest of the Debtors' estates, their creditors, and all other parties in interest, and will facilitate the Debtors' ability to operate their business in chapter 11 without disruption.

**D. Claims Agent Retention Application.**

23. Pursuant to the Claims Agent Retention Application, the Debtors request entry of an order (a) authorizing, but not directing, the Debtors to appoint Kroll Restructuring Administration LLC ("Kroll") as the claims and noticing agent (the "Claims and Noticing Agent") in these chapter 11 cases, effective as of the Petition Date, including assuming full responsibility for the distribution of notices and the maintenance, processing, and docketing of proofs of claim filed in these chapter 11 cases, and (b) granting related relief. I understand that the Debtors' selection of Kroll satisfies the Court's Claims Agent Protocol because the Debtors obtained and reviewed engagement proposals from at least two other court-approved claims and noticing agents to ensure selection through a competitive process, and that, based on all engagement proposals obtained and reviewed, Kroll's rates are competitive and reasonable given Kroll's quality of services and expertise.

24. As more fully described in the Claims Agent Retention Application, Kroll will, among other tasks, (a) prepare and serve required notices and documents in these chapter 11 cases, including notices of the commencement of these chapter 11 cases, any claims bar date, and any hearing on the disclosure statement and confirmation of the Plan; (b) maintain the official claims register for each Debtor on behalf of the Clerk and process all proofs of claim received; (c) record all transfers of claims and provide any notices of such transfers; and (d) assist in the dissemination of information to the public regarding these chapter 11 cases.

25. I believe that by appointing Kroll as the Claims and Noticing Agent in these chapter 11 cases, the distribution of notices and the processing of claims will be expedited, and the Clerk will be relieved of the administrative burden of processing what may be an overwhelming number of claims. Accordingly, I believe that the relief requested in the Claims Agent Retention Application is in the best interests of the Debtors' estates, their creditors, and all other parties in interest and should be granted.

## II. Operational Motions.

### A. Content Contributors Motion.

26. Pursuant to the Content Contributors Motion, the Debtors seek entry of interim and final orders (a) authorizing, but not directing, the Debtors to pay prepetition amounts and obligations owed to Independent Contributors and Image Partners in the ordinary course of business, in an aggregate amount not to exceed $19.2 million on an interim basis, and (b) granting related relief.

27. The Debtors operate a leading platform for premium visual content, including photography, images, video, music, and other multimedia assets. The Debtors' library comprises over 662 million multimedia assets, serving approximately 636,000 global customers.

28. I understand that the Debtors' business model depends on a continuously refreshed supply of high-quality visual content from a network of over 600,000 individual contributors and over 75 exclusive editorial content partners, including some of the world's most prominent wire services, sports leagues, entertainment studios, and media organizations.

29. I believe that a significant portion of the Debtors' Content Contributors, the majority of whom are located outside of the United States, may be unfamiliar with the chapter 11 process, the protections the Debtors are afforded by the automatic stay, or the distinction between

prepetition and postpetition obligations. Nonpayment of even a single prepetition obligation heightens the risk that Content Contributors, particularly those in foreign jurisdictions, stop providing content or demand removal of their existing content from the Debtors' platforms. Content Contributors located in foreign jurisdictions may erroneously believe they are not subject to the automatic stay and attempt to take precipitous actions such as initiating legal proceedings in foreign courts. Enforcing the Bankruptcy Code in foreign countries would be costly, time consuming, and distract key Debtor employees from the administration of these chapter 11 cases.

30. Accordingly, I believe that the relief requested in the Content Contributors Motion is essential to preserve the going-concern value of the Debtors' business, maintain uninterrupted content flow, and enable the Debtors to serve their global customer base undisrupted during these chapter 11 cases.

**B. All Trade Motion.**

31. Pursuant to the All Trade Motion, the Debtors seek entry of interim and final orders (a) authorizing, but not directing, the Debtors to pay all Trade Claims in the ordinary course of business, in an aggregate amount not to exceed $7.6 million on an interim basis; (b) confirming the administrative expense priority of Outstanding Orders and authorizing, but not directing, the Debtors to satisfy such Outstanding Orders in the ordinary course of business; and (c) granting related relief.

32. The obligations that the Debtors seek authority to pay are summarized in the following table:

| **Category** | **Description** | **Estimated Amount of Trade Claims Due and Payable Within Interim Period** | **Estimated Total Amount of Trade Claims** |
|---|---|---|---|
| Trade Claims (excluding Foreign Vendors) | Claims of Trade Creditors based in the United States, including media and marketing, cloud hosting and content delivery, production and creative, technology, generative AI, and other business services vendors | $6,900,000 | $7,300,000 |
| Trade Claims held by Foreign Vendors | Claims held by Trade Creditors based outside the United States | $640,000 | $700,000 |
| **Total Trade Claims:** | | $7,600,000 | $8,000,000 |

33. I understand that Trade Creditors provide mission critical business services, and timely payment of the Trade Claims is necessary to avoid needless disruption to the Debtors' business and ensure a smooth and timely restructuring process, preserving value for all stakeholders. Given the fact that the Trade Claims are unimpaired under the Plan, the relief requested herein would merely expedite the treatment and distribution to the Trade Creditors that they would otherwise be entitled to receive upon consummation of the Plan.

34. Given the support for the Plan expressed by the Consenting Stakeholders (as defined in the Restructuring Support Agreement), the prepackaged nature of these chapter 11 cases, and the unimpaired treatment of General Unsecured Claims under the Plan, I believe that the relief requested in the All Trade Motion is appropriate.

**C. Customer Programs Motion.**

35. Pursuant to the Customer Programs Motion, the Debtors seek entry of interim and final orders (a) authorizing, but not directing, the Debtors to (i) fulfill and honor (through payment, credit, setoff, or otherwise) the Customer Obligations (defined below) as they deem appropriate

and (ii) continue, renew, replace, terminate, and implement Customer Programs (defined below) and any other customer practices as they deem appropriate, without further application to the Court, and (b) granting related relief.

36. I understand that the Debtors are a provider of creative and editorial visual content solutions with hundreds of thousands of customers spanning across the categories of corporate, agency, and media. Customers purchase digital content licenses primarily through annual and monthly subscription plans and prepaid credit packages.

37. I further understand that in the ordinary course of business, the Debtors provide certain customer programs including Subscription Programs, Credit-Based Programs, Individual Downloads, Customer Indemnification Obligations, Customer Discounts, Chargebacks, and Refunds (collectively, the "Customer Programs"). The Debtors' ability to continue the Customer Programs and to honor any obligations thereunder is necessary to meet competitive market pressures and ensure customer satisfaction. Continuing the Customer Programs allows the Debtors to maintain the goodwill of their current customers and partners and, ultimately, enhance revenue and profitability to the benefit of all stakeholders.

38. The Debtors accrue potential amounts payable with respect to certain of the Customer Programs, including Customer Indemnification Obligations, Chargebacks, and Refunds (such amounts, collectively, the "Customer Obligations").

39. Because accruing amounts payable under the Customer Programs depends on the Customers' utilization of such programs, I believe that the Debtors are not able to anticipate exactly how much, if any, of the Customer Obligations will come due in the period between the entry of the Interim and Final Orders or over the course of these chapter 11 cases. Accordingly, the Debtors request authority, but not direction, to maintain, modify, and supplement the Customer Programs

in the ordinary course of business and to continue honoring any obligations incurred in connection therewith, including the Customer Obligations as they come due.

40. Therefore, I believe that continuing to administer the Customer Programs without interruption during the pendency of these chapter 11 cases will help preserve the Debtors' valuable customer relationships and goodwill, which will inure to the benefit of all of the Debtors' creditors and estates.

**D. Cash Management Motion.**

41. Pursuant to the Cash Management Motion, the Debtors seek entry of interim and final orders (a) authorizing, but not directing, the Debtors to (i) continue to operate their Cash Management System and maintain their existing Debtor Bank Accounts, (ii) honor certain prepetition and postpetition obligations related thereto, (iii) maintain existing Business Forms in the ordinary course of business, and (iv) continue Intercompany Transactions; (b) granting administrative expense status to postpetition Intercompany Claims that are among the Debtors; and (c) granting related relief.

42. I understand that the Debtors maintain an integrated, centralized cash management system (the "Cash Management System") to facilitate the efficient operation of their business.

43. In the ordinary course of business, the Company uses the Cash Management System to collect, transfer, and disburse funds generated from its operations and to facilitate cash monitoring and forecasting. As of the Petition Date, the Debtor Bank Accounts held total cash of approximately $21 million, of which approximately $18 million was available.

44. The Debtors' treasury team monitors the Debtors' disbursement needs and transfers funds from the Main Depository Account or the Subheader Operating Account, either automatically or manually, to the Disbursement Accounts as needed. Depending on the methods

of disbursement (e.g., ACH electronic transfers for most vendors, ACH direct debit electronic transfers or checks for tax obligations, or checks for customer refunds and royalty payments to content providers), the Debtors utilize different Disbursement Accounts to process the payments. Most vendor payments are made via ACH. As of the Petition Date, the Debtors had outstanding checks totaling approximately $269,000.

45. The Debtors and Non-Debtor Affiliates form a single, integrated global enterprise under common management. In the ordinary course of business, the Debtors engage in routine intercompany transactions with each other and their Non-Debtor Affiliates (the "Intercompany Transactions"), which may result in intercompany receivables and payables (the "Intercompany Claims"). The Debtors closely track these transactions through their treasury and accounting systems and can ascertain, trace, and account for all related transfers. Cash generally flows from the Non-Debtor Affiliates to the Debtors as payment for intercompany receivables owed to the Debtors by Non-Debtor Affiliates arising from Intercompany Transactions. For the five months prior to the Petition Date and on a net basis, the Non-Debtor Affiliates transferred approximately $14.4 million per month to the Debtors on account of Intercompany Transactions. During these chapter 11 cases, the Debtors anticipate that the Non-Debtor Affiliates will not require funding from the Debtors' estates but will continue to transfer cash to the Debtors in the ordinary course pursuant to the Intercompany Transactions.

46. The Intercompany Transactions are an essential component of the Company's business operations and Cash Management System. Any interruption of the Intercompany Transactions would disrupt the Company's business and harm the Debtors' estates and, by extension, their stakeholders. Without the ability to continue these transactions, the Debtors' business would be significantly damaged.

47. As part of the Cash Management System, in the ordinary course of business and in accordance with the terms of the existing agreements between the Debtors and Bank of America (the "Credit Card Company"), the Debtors provide certain employees with credit cards, including purchasing cards (the "P-Cards") and travel and entertainment cards (the "T&E Cards," and together with the P-Cards, the "Credit Cards") issued by the Credit Card Company under corporate credit card programs (the "Credit Card Program").

48. As of the Petition Date, the Restricted Cash Account holds approximately $1.2 million as collateral for the Debtors' obligations under the Credit Card Program. As of the Petition Date, the Debtors have issued approximately 107 Credit Cards to employees and have approximately $130,000 of outstanding Credit Card Obligations. On average in the last twelve months before the Petition Date, the Debtors incurred approximately $123,000 of Credit Card Obligations per month.

49. The Credit Card Program is an integral part of the Debtors' Cash Management System. Employees' and the accounts payable department's continued use of the Credit Cards for procurement and travel purposes is essential to the continued operation of the Debtors' business.

50. In the ordinary course of their business, the Debtors incur, pay, honor, or allow to be deducted from the appropriate accounts certain service charges and other fees, costs, and expenses charged by the Cash Management Banks (collectively, the "Bank Fees").

51. During the past twelve months, the Debtors paid on average approximately $15,000 in aggregate Bank Fees each month, excluding interest. The Debtors estimate that approximately $15,000 in aggregate Bank Fees remain outstanding as of the Petition Date.

52. The Company's business and operations are highly integrated with and dependent on the Cash Management System. I believe that any disruption to the Cash Management System

will have an immediate and significant adverse effect on the Debtors' business and operations, to the detriment of their estates and all stakeholders.

53. Therefore, I believe that the relief requested in the Cash Management Motion, including with respect to the Cash Management System, the Intercompany Transactions, the Credit Card Program, and the payment of the Bank Fees, is in the best interest of the Debtors' estates, their creditors, and all other parties in interest and will facilitate the Debtors' ability to operate their business in chapter 11 without disruption.

**E. Utilities Motion.**

54. Pursuant to the Utilities Motion, the Debtors seek entry of interim and final orders (a) approving the Debtors' proposed adequate assurance of payment for future utility services; (b) approving the Debtors' proposed procedures for resolving additional adequate assurance requests; (c) prohibiting utility providers from altering, refusing, or discontinuing services; and (d) granting related relief.

55. I understand that in the ordinary course of their business, the Debtors receive electricity, gas, water, waste management (including sewer and trash), internet, telecommunications, and other similar services at their corporate offices from a number of utility providers. The Debtors lease their corporate offices, and pursuant to the applicable lease agreements, Utility Services, other than certain telecommunications services, are billed directly to the Debtors' landlords and passed through to the Debtors as part of the Debtors' lease payment.

56. I believe that uninterrupted Utility Services are essential to the Debtors' ongoing business operations and, therefore, the overall success of these chapter 11 cases. The Utility Services are essential for the Debtors to operate their corporate offices and to provide functions essential for daily operations. Should any Utility Provider refuse or discontinue service, even for

a brief period, the Debtors' business operations would be severely disrupted, and such disruption would jeopardize the Debtors' reorganization efforts. Because the Debtors depend on Landlords to procure and pay for the substantial majority of the Utility Services, the relief requested in the Utilities Motion is with respect to all Utility Providers supplying Utility Services to the Debtors, including those that indirectly supply services through the applicable Landlords.

57. Therefore, I believe that the relief requested in the Utilities Motion is in the best interest of the Debtors' estates, their creditors, and all other parties in interest and will facilitate the Debtors' ability to operate their business in chapter 11 without disruption.

**F. Insurance Motion.**

58. Pursuant to the Insurance Motion, the Debtors seek entry of interim and final orders (a) authorizing, but not directing, the Debtors to (i) maintain coverage under the Insurance Policies, Surety Bonds, and Letter of Credit and pay any related obligations, (ii) renew, amend, supplement, extend, or purchase insurance, surety coverage, and letters of credit, in the ordinary course of business and consistent with prepetition practice, and (iii) continue to pay certain broker fees; and (b) granting related relief.

59. I understand that in the ordinary course of business, the Debtors maintain approximately 56 insurance policies that are administered by multiple third-party insurance carriers. The Insurance Policies provide coverage for both general and commercial business risks, including, but not limited to, coverage for the Debtors' directors' and officers' liability, general liability, property, foreign liability, automobile liability, umbrella coverage, and crime.

60. Accordingly, I believe the Debtors' ability to maintain the Insurance Policies, to renew, supplement, and modify the same as needed, and to enter into new insurance policies as needed in the ordinary course of business is essential to preserving the value of the Debtors'

business, operations, and estates. Moreover, it is my understanding that in many instances, insurance coverage is required by statutes, rules, regulations, and contracts that govern the Debtors' commercial activities. Accordingly, the Debtors seek authority to maintain the Insurance Policies, to pay related prepetition obligations, to renew, amend, supplement, or modify the Insurance Policies as needed, and to enter into new insurance policies, including ancillary policies, in the ordinary course of business on a postpetition basis and consistent with prepetition practice, without further Court approval.

61. Therefore, I believe that the relief requested in the Insurance Motion is in the best interest of the Debtors' estates, their creditors, and all other parties in interest and will facilitate the Debtors' ability to operate their business in chapter 11 without disruption.

**G. Taxes Motion.**

62. Pursuant to the Taxes Motion, the Debtors seek entry of interim and final orders (a) authorizing, but not directing, the Debtors to (i) negotiate, remit, and pay (or use tax credits to offset) the Taxes and Fees in the ordinary course of business that are payable or become payable during these chapter 11 cases, including any obligations subsequently determined upon audit or otherwise to be owed for periods prior to the Petition Date, without regard to whether such obligations accrued or arose before or after the Petition Date, and (ii) undertake the Tax Planning Activities, and (b) granting related relief.

63. In the ordinary course of business, the Debtors collect, withhold, and incur: (a) sales and use taxes; (b) income and franchise taxes; (c) property taxes; (d) business and regulatory fees, including licensing, permitting, annual reporting, and limited liability company fees; (e) assessments, interest, penalties, and other fees as a result of audits; and (f) customs duties, import and export taxes, and related expenses. The Debtors pay or remit, as applicable, the Taxes and

Fees to various Taxing Authorities, generally directly or indirectly through checks and electronic fund disbursements processed through their banks and other financial institutions or service providers. From time to time, the Debtors may also receive tax credits for overpayments or refunds with respect to the Taxes and Fees, which the Debtors generally use in the ordinary course of business to offset future Taxes and Fees or cause to be refunded to the Debtors. The Debtors estimate that approximately $5.5 million in Taxes and Fees are outstanding as of the Petition Date, of which approximately $137,000 is currently payable or will become due and owing to the Taxing Authorities during the Interim Period:[3]

| Category | Description | Approximate Amount Accrued as of Petition Date | Approximate Amount Due During Interim Period |
|---|---|---|---|
| **Sales and Use Taxes** | Taxes on goods and services sold or used, assessed based on the value of such goods and services, including excise taxes imposed in certain jurisdictions. | $2,380,000 | $0 |
| **Income and Franchise Taxes** | Federal and state taxes imposed on the Debtors' income, including gross receipts taxes in certain jurisdictions. | $2,670,000 | $100,000 |
| **Property Taxes** | Taxes and obligations related to real and personal property holdings. | $30,000 | $30,000 |
| **Business License and Other Taxes and Fees** | Taxes and Fees related to licensing, reporting, and similar requirements. | $384,000 | $7,000 |
| **Customs and Import Duties and Fees** | Customs duties, import and export related taxes, and other incidental import and export expenses. | $0 | $0 |

[3] The Debtors cannot predict the amounts of any potential Assessments that may result from Audits, if any. Accordingly, the Debtors' estimate of outstanding Taxes and Fees as of the Petition Date does not include any amounts relating to potential Assessments.

| Category | Description | Approximate Amount Accrued as of Petition Date | Approximate Amount Due During Interim Period |
|---|---|---|---|
| **Total** | | $5,464,000 | $137,000 |

64. Additionally, I understand that the Debtors may become subject to Audits on account of tax returns and/or tax obligations in respect of prior years during these chapter 11 cases. Such Audits may result in additional prepetition Taxes and Fees being assessed against the Debtors.

65. I further understand that, in certain of the jurisdictions where the Debtors operate, the Debtors must be able to accept a proposed resolution of an Audit (or voluntary disclosure) and make a payment with respect to such resolution in a timely manner. In particular, I understand that a non-Debtor subsidiary, iStockphoto ULC ("iStock"), received tax assessments from the Canada Revenue Agency (the "CRA") asserting additional taxes due of up to $28.6 million relating to transactions between iStock and certain of its affiliates (the "CRA Assessment"). I understand that there is a live cross-border dispute between the Internal Revenue Service (the "IRS") and the CRA regarding the CRA Assessment, which the Debtors currently expect to be resolved by an agreed position before November 28, 2026, although the timing and substance of any such resolution cannot be predicted with certainty. I understand that the Debtors intend to contest the CRA Assessment and, as part of that process, may be required to pay a portion of the assessment amount, estimated to be up to $19.6 million, in order to appeal, which amount would be credited against any final Assessment. Accordingly, the Debtors seek authority to negotiate with any applicable Taxing Authority, including the CRA, regarding any disputed Assessments or Audits and to pay or remit any resulting obligations, whether they become payable before or after entry of the Final Order.

66. I also understand that the ability to undertake the Tax Planning Activities without delay will enable the Debtors to preserve the ability to optimally structure the Debtors' go-forward business, for the benefit of their stakeholders.

67. I understand that any failure by the Debtors to pay the Taxes and Fees, including Assessments, could materially disrupt the Debtors' business operations in several ways, including (but not limited to): (a) the Taxing Authorities may initiate Audits, which would unnecessarily divert the Debtors' attention from these chapter 11 cases; (b) the Taxing Authorities may attempt to suspend the Debtors' operations, file liens, seek to lift the automatic stay, and/or pursue other remedies that will harm the Debtors' estates; and (c) in certain instances, certain of the Debtors' directors and officers could be subject to claims of personal liability, which would likely distract those key individuals from their duties related to these chapter 11 cases. The Taxes and Fees not paid on the due date as required by law may result in fines and penalties, the accrual of interest, or both. In addition, I have been informed that nonpayment of the Taxes and Fees may give rise to priority claims under section 507(a)(8) of the Bankruptcy Code. I further understand that the Debtors collect and hold certain outstanding tax liabilities in trust for the benefit of the applicable Taxing Authorities, and these funds may not constitute property of the Debtors' estates. Additionally, I understand that the Debtors' ability to pay the Taxes and Fees is critical to their continued and uninterrupted operations.

68. I believe that the relief requested in the Taxes Motion is in the best interest of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to effectively operate their business during these chapter 11 cases. Accordingly, on behalf of the Debtors, I respectfully submit that the Taxes Motion should be approved.

**H. NOL Motion.**

69. Pursuant to the NOL Motion, the Debtors seek entry of interim and final orders: (a) approving certain notification and hearing procedures (the "Procedures") related to certain transfers of, and/or declarations of worthlessness with respect to, Debtor Getty Images Holdings, Inc.'s existing class(es) (or series) of common stock (the "Common Stock") or any Beneficial Ownership therein; (b) directing that any purchase, sale, other transfer of, or declaration of worthlessness with respect to Common Stock in violation of the Procedures shall be null and void *ab initio*; and (c) granting related relief.

70. I understand that the Debtors have certain Tax Attributes, which include, as of December 31, 2025, approximately $720,000 of federal net operating losses ("NOLs"), approximately $8.3 million of state NOLs, approximately $118.3 million of federal disallowed business interest expense carryforwards, and certain other favorable tax attributes (collectively, the "Tax Attributes"). I believe the Procedures will allow the Debtors to monitor certain transfers of, and claims of worthlessness with respect to, Beneficial Ownership of Common Stock and thereby preserve their ability to seek the necessary relief if it appears that any such transfer or claim may jeopardize the Debtors' ability to utilize their Tax Attributes.

71. Accordingly, I believe that the relief requested in the NOL Motion is in the best interests of the Debtors, their estates, their creditors, and all other parties in interest and should be granted.

**I. Wages Motion.**

72. Pursuant to the Wages Motion, the Debtors seek entry of interim and final orders: (a) authorizing, but not directing, the Debtors to (i) pay all prepetition wages, salaries, other compensation, and reimbursable expenses on account of the Compensation and Benefits Programs

and (ii) continue to administer the Compensation and Benefits Programs in the ordinary course, including payment of prepetition obligations related thereto; and (b) granting related relief.

73. As of the Petition Date, the Debtors employ 704 U.S. based employees and two non-U.S. based employees (the "Employees"). 705 Employees are employed full-time, and one Employee is employed part-time. In addition, the Debtors retain approximately (i) 370 temporary employees and/or independent contractors (each, a "Contingent Worker," and collectively, the "Contingent Workforce"), and (ii) 1,100 freelancers who cover live events and supply photos and videos that the Debtors license to customers (each a "Freelancer," and collectively, the "Freelance Workforce.")

74. The Debtors seek authority to make the following payments to continue prepetition Compensation and Benefits Programs in the ordinary course of business and consistent with past practice on a postpetition basis.

| **Compensation and Benefits Programs** | **Approximate Accrued and Unpaid Interim Amount** | **Approximate Accrued and Unpaid Final Amount**[4] |
|---|---|---|
| **Compensation** | | |
| Employee Wages | $2,100,000 | $2,100,000 |
| Contingent Workforce Compensation | $1,000,000 | $1,000,000 |
| Freelance Workforce Compensation | $904,000 | $904,000 |
| Equity Incentive Plan | $0 | $0 |
| Non-Insider Sales Incentive & Commission Plans | $0 | $1,400,000 |
| Non-Insider Photographer Bonus Plan | $0 | $306,000 |
| Non-Insider Bonus Programs | $0 | $0 |
| Accrued PTO | $0 | $600,000 |
| Non-Insider Severance Obligations | $307,000 | $3,900,000 |
| Reimbursable Expenses | $386,000 | $386,000 |
| **Withholding Obligations** | | |
| Payroll Deductions | $400,000 | $400,000 |
| Employee Payroll Taxes | $700,000 | $700,000 |
| Employer Payroll Taxes | $200,000 | $200,000 |

[4] For the avoidance of doubt, the approximate accrued and unpaid final amounts listed herein are inclusive of the corresponding approximate accrued and unpaid interim amounts.

| | | |
|---|---|---|
| **Employee Benefits Programs** | | |
| Health Benefits | $899,000 | $899,000 |
| HSA and FSA Debtor Contributions | $10,000 | $10,000 |
| Basic Life and AD&D Insurance | $7,000 | $7,000 |
| Disability Benefits | $5,000 | $5,000 |
| Employee Assistance Program | $1,000 | $1,000 |
| Workers' Compensation Programs | $151,000 | $151,000 |
| Family Planning Benefits | $0 | $0 |
| 401(k) Plan Matching Contributions | $137,000 | $137,000 |
| Mobile Allowance Program | $3,000 | $3,000 |
| Charitable Match Program | $2,000 | $2,000 |
| LATAM Regional Benefit Plan | $42,000 | $42,000 |
| Miscellaneous Benefits | $0 | $0 |
| Administrative Fees | $0 | $0 |
| **Benefits Administration Fees** | $209,000 | $209,000 |
| Payroll Fees | $9,000 | $9,000 |
| **Non-Employee Director Compensation** | | |
| Director Compensation | $0 | $0 |
| **Total** | $7,472,000 | $13,371,000 |

75. *Employee Wages*. In the ordinary course of business, the Debtors pay wages, salaries, and other compensation to their Employees. Because U.S. Employees are paid in arrears, certain U.S. Employees will be owed accrued but unpaid Wages as of the Petition Date. I believe that the Debtors' non-payment of Wage Obligations would cause the Debtors' workforce to experience substantial financial hardship. Considering the substantial benefit the Debtors' workforce provides to the Debtors and the significant costs to fill any vacancies caused by non-payment, I believe it is critical that the Debtors maintain their Employee base.

76. *Contingent Workforce Compensation*. In the ordinary course of business, the Debtors engage the Contingent Workforce to perform a variety of critical functions, including, among other things, sales, technology, finance, and administration, and incur payment obligations for such services rendered. The Debtors pay the Contingent Workforce primarily through the companies or staffing agencies from which the Contingent Workers are sourced. I believe the

authority to pay the Contingent Workforce is critical to maintaining uninterrupted business and operations.

77. *Freelance Workforce Compensation*. In the ordinary course of business, the Debtors engage freelancers to cover live events and to supply photos and videos that the Debtors license to global customers, and the Debtors incur payment obligations for services rendered. The Freelance Workforce is essential to the Debtors' core business operations. The Debtors depend on Freelancers to generate the content that drives their revenue and sustains their relationships with global customers. Without the continued contributions of the Freelance Workforce, the Debtors would likely be unable to provide their customers with the content they have come to expect, and the Debtors would face immediate and irreparable harm to their business. I believe the authority to pay the Freelance Workforce is critical to maintaining uninterrupted business and operations.

78. *Equity Incentive Plan*. In the ordinary course of business, the Debtors incur obligations under the Debtors' Equity Incentive Plan. The Debtors are not seeking authority to, and do not intend to, make any new grants to Employees under, or to assume, the Equity Incentive Plan. Upon the vesting of RSUs and PSUs, the Debtors may be required to satisfy applicable tax withholding obligations, which are typically effected through a sell-to-cover arrangement or a withhold-to-cover arrangement, depending on the applicable award agreement. Accordingly, the Debtors are seeking authority, but not direction, to (a) pay any cash amounts related to the Equity Incentive Plan in the ordinary course of business, and (b) continue to honor Equity Incentive Plan obligations in the ordinary course of business, including related tax withholding obligations.

79. *Non-Insider Sales Incentive Plans*. The Debtors maintain several incentive- and commission-based programs to drive performance among their sales Employees. These programs include, but are not limited to: (a) the Getty Images Sales Incentive Plan, which encompasses

multiple sub-plans (Targeted Revenue Growth Plan, Incremental Growth Plan, Incremental Corporate Growth Plan, Customer Success Plan, Sales Support Plan, and Paid Assignments Growth Plan); (b) the Unsplash Commission Plan for advertisement sales roles; (c) the Strategic Partnerships Commission Plan for strategic deals that drive new revenue to the business; and (d) discretionary Sales Performance Incentive Funds. Payments under the Getty Images Sales Incentive Plan and the Unsplash Commission Plan are paid quarterly, one quarter in arrears; payments under the Strategic Partnerships Commission Plan are paid annually following the close of the fiscal year; and SPIF payments are paid both monthly and quarterly. I believe that the Non-Insider Sales Incentive Plans are crucial to maintaining Employee morale, motivation, and loyalty and avoiding the disruption that would result if certain key Employees were to leave their positions, especially during the pendency of these chapter 11 cases.

80. *Non-Insider Photographer Bonus Plan.* The Debtors maintain a bonus plan for 58 non-insider Employees who are staff photographers. Under the Non-Insider Photographer Bonus Plan, a quarterly bonus pool is funded totaling 0.5 percent of the revenue generated by the Debtors' News, Sport, and Entertainment department (excluding revenue from subscriptions and certain online transactions). Each Photographer's share of the bonus pool is determined based on that Photographer's share of total staff photographer revenues for the quarter. Awards are paid quarterly, one quarter in arrears. I believe that the Non-Insider Photographer Bonus Plan offers staff photographers an added incentive to meet metrics applicable to their roles and the opportunity to earn bonus payments for outstanding performance. I believe that the Non-Insider Photographer Bonus Plan is crucial to maintaining Employee morale, motivation, and loyalty and avoiding the disruption that would result if certain key Employees were to leave their positions, especially during the pendency of these chapter 11 cases.

81. *Non-Sales Bonus Plans*. The Debtors maintain bonus programs for all Employees ineligible to participate in the Sales Incentive Plans or Photographer Bonus Plan, including: (a) the 2026 Getty Images Non-Sales Bonus Plan (the "NSB Plan"), under which all non-sales Employees are eligible for annual cash bonuses up to 200 percent of their individual target bonus, with the bonus pool funded based on recognized revenue targets and (b) the 2026 Unsplash Non-Sales Bonus Plan (the "Unsplash NSB Plan" and, together with the NSB Plan, the "Non-Sales Bonus Plans"), with tiered targets from 10–75 percent of an eligible Employee's annual base pay, with the bonus pool funded based on Unsplash recognized revenue targets, and with discretion to pay up to 200 percent of an eligible Employee's target bonus. The Debtors also maintain certain discretionary programs through which eligible non-insider Employees may receive one-time cash awards in recognition of exceptional performance or demonstration of the Debtors' leadership and operating principles, including but not limited to a spot award program and a leadership award program (collectively, the "Recognition Award Programs"). I believe that the Non-Sales Bonus Plans are crucial to maintaining Employee morale, motivation, and loyalty and avoiding the disruption that would result if certain key Employees were to leave their positions, especially during the pendency of these chapter 11 cases.

82. *Paid and Unpaid Leave*. The Debtors maintain a paid time off ("PTO") program for eligible Employees. Exempt salaried Employees participate in an unlimited PTO policy, which does not give rise to an accrual obligation. However, hourly Employees and Employees in certain jurisdictions where applicable law mandates accrual earn PTO on an accrued basis. In addition to PTO, the Debtors provide eligible Employees with floating holidays, sick bank time (for hourly, non-California Employees), volunteer days, parental leave, and bereavement leave (collectively, with PTO, the "Paid Leave"). The Debtors also provide unpaid leaves of absence for additional

sick leave, military leave, leave under the Family and Medical Leave Act, and other similar purposes (collectively, the "Unpaid Leave"). I believe that the continuation of the Paid Leave and Unpaid Leave policies is essential to maintaining Employee morale, and thus facilitating the Debtors' ordinary course operations, throughout these chapter 11 cases.

83. *Reimbursable Expenses*. The Debtors reimburse Employees or pay credit card invoices on the Employees' behalf for approved expenses incurred on behalf of the Debtors in the ordinary course. The Debtors expect that Employees will continue to incur necessary reimbursable expenses (the "Reimbursable Expenses") in connection with the Debtors' operations during these chapter 11 cases. Reimbursable Expenses typically include out-of-pocket expenses associated with transportation, lodging, and meals incurred in connection with business travel and certain other work-related expenses. Employees incur Reimbursable Expenses both through corporate credit cards and directly with their personal funds. In such cases, Employees submit receipts requesting reimbursement, and, if approved in accordance with internal policies and procedures, requests are processed through the Debtors' expense reimbursement system. I believe it is essential to the continued operation of the Debtors' businesses that the Debtors continue reimbursing, or making direct payments on behalf of, Employees for such expenses. Without reimbursement, Employees may be held personally liable for any unpaid obligations. The Debtors' inability to reimburse such expenses would impose significant financial hardship on such individuals where the obligations were incurred for the Debtors' benefit.

84. *Employee Deductions*. During each applicable pay period, the Debtors routinely deduct certain amounts from Employees' paychecks, including, without limitation, garnishments and similar deductions required by law, and pre-tax and after-tax deductions payable pursuant to certain Compensation and Benefits Programs, such as an Employee's share of certain healthcare

benefits and other miscellaneous benefits, 401(k) contributions, HSA and FSA contributions and Employee donations under the Charitable Match Program.

85. *Employee and Employer Taxes*. The Debtors are required by law to withhold amounts from Employees' gross pay for federal, state and local income taxes, as well as Social Security and Medicare taxes for remittance to the appropriate taxing authorities. The Debtors must then match the Employee Payroll Taxes from their own funds and pay, based on a percentage of gross payroll, additional amounts for federal and state unemployment insurance, Social Security and Medicare taxes.

86. *Health and Welfare Benefits.* The Debtors offer salaried Employees and Employees regularly working more than 25 hours per week the opportunity to participate in a variety of health benefit plans, including the Medical and Prescription Coverage Plans, the Dental Plan, and the Vision Plan (collectively, the "Health Benefits"). The Health Benefits are self-funded. The Debtors automatically remit Employee contributions for the Health Benefits via payroll deductions.

i. The Debtors offer their Eligible Employees the choice of a point of service health plan (the "POS Plan") or a high deductible health plan, both of which are administered through Meritain Health, Inc., with prescription drug benefits through CVS Caremark and access to PillarRx, a prescription copay assistance support program (together, the "Medical and Prescription Coverage Plans"). Eligible Employees are also offered dental insurance through Delta Dental of Washington (the "Dental Plan") and vision insurance through Vision Service Plan (the "Vision Plan").

ii. The Debtors offer Eligible Employees the opportunity to contribute to pre-tax spending accounts such as a health care savings account ("HSA"), a health care flexible spending account ("Health Care FSA"), a dependent care flexible spending account and a commuter flexible spending account. The Debtors make annual contributions at the beginning of the plan year to eligible Employees' HSA and Health Care FSA accounts as follows: (a) $1,200 per year for Employees who have employee-only HDHP coverage and $2,200 per year for Employees with family HDHP coverage and (b) $200 per year into Health Care FSAs for Employees enrolled in the POS Plan.[5]

87. *Life and AD&D Insurance Programs.* The Debtors provide life insurance and accidental death and dismemberment insurance (the "Basic Life and AD&D Insurance") to eligible Employees through New York Life Insurance Company. In the event of an Employee's death or serious injury, the Basic Life and AD&D Insurance provides a benefit equal to two times the Employee's base salary, up to a maximum of $750,000.

88. *Disability Benefits.* The Debtors offer eligible Employees a self-funded short-term disability plan and a fully insured long-term disability plan, both of which are administered through New York Life. Employees are eligible to receive benefits under the short-term disability plan after fourteen (14) days of the Employee's continuous disability (the "Short-Term Disability Benefits"). The Short-Term Disability Benefits replace up to 60% of pre-disability weekly earnings (excluding bonuses, commissions, and extra compensation) up to $3,750 per week for up to thirteen weeks. Eligible Employees are enrolled in the short-term disability plan at no cost to

[5] This is available to POS Plan participants to claim at the start of the year, but only paid once the Employee submits a claim.

them. Following the period of the Short-Term Disability Benefits, Employees are eligible to receive long-term disability benefits (the "Long-Term Disability Benefits"). The Long-Term Disability Benefits replace up to 60% of pre-disability earnings (excluding bonuses, commissions, and extra compensation), up to $15,000 per month, until Social Security normal retirement age, if such Employee is disabled and unable to work for more than ninety continuous days.

89. *Employee Assistance Program.* The Debtors provide Employees with access to an Employee Assistance Program (the "EAP"), managed by Canopy Wellbeing ("Canopy"). The EAP provides Employees and members of their household with on-demand emotional and mental well-being resources to help address and provide assistance with everyday problems such as stress management, financial problems, marital or family issues, as well as legal and childcare referrals. The EAP provides unlimited phone support and up to three in-person visits per issue or concern with an EAP counselor.

90. *Workers' Compensation Programs.* The Debtors maintain two (2) workers' compensation programs (the "Workers' Compensation Programs") to satisfy any claims made by Employees for workers' compensation. One of the Workers' Compensation Programs is with respect to the state of Washington, which does not allow employers to purchase workers' compensation insurance from a private carrier.

91. *Family Planning Benefits.* The Debtors offer Full-Time Employees who have completed six months of continuous service reimbursement benefits in connection with adoption and surrogacy. Eligible Employees may receive up to $10,000 per child, for up to two children, in covered adoption-related expenses upon final adoption, including licensed adoption agency fees, legal expenses, pregnancy-related medical expenses of the birth mother, and travel expenses.

Eligible Employees may also receive up to $10,000 per child, for up to two children, in surrogacy-related expenses, including gestational surrogate costs, and agency and legal fees.

92. *401(k) Plan*. The Debtors maintain a retirement savings plan for the benefit of their eligible Employees that satisfies the requirements of section 401(k) of the Internal Revenue Code (the "401(k) Plan"). The 401(k) Plan is administered by The Vanguard Group, Inc. and allows for automatic pre-tax salary deductions of eligible compensation up to the limits set by the Internal Revenue Code. Under the 401(k) Plan, the Debtors provide matching contributions at a rate of 100 percent of an eligible Employee's first four percent of compensation contributed.

93. *Mobile Allowance Program*. The Debtors provide certain Employees with a mobile allowance. Under the Mobile Allowance Program, eligible Employees receive a stipend to maintain personal mobile devices used for business purposes.

94. *Charitable Match Program*. The Debtors offer Employees a charitable giving program pursuant to which Employees may elect to direct dollar amounts from their paychecks to various qualified non-profit organizations, and the Debtors match such donations up to $1,000 per Employee, per calendar year.

95. *LATAM Regional Benefit Program*. The Debtors maintain a regional benefits plan for one (1) of the Foreign Employees and other employees of non-debtor foreign entities based in Latin America.

96. *Miscellaneous Benefits*. In addition to the foregoing, the Debtors maintain various other benefits programs, including voluntary supplemental term life insurance, auto and home insurance, pet insurance, legal benefits and certain other miscellaneous benefits. The Miscellaneous Benefits are an important part of the total benefits package offered by the Debtors to their Employees.

97. *Benefits Administration Fees*. As part of the effective and efficient administration of the Compensation and Benefits Programs, the Debtors use certain benefits administrators, including HealthEquity, Concur, Vanguard, HSA Bank, Canopy and Workday.

98. *Payroll Fees*. In the ordinary course, the Debtors utilize payroll software provided by Automatic Data Processing, Inc., which supports payroll processing, payroll tax calculations and filings, and other payroll-related services. The Debtors pay the Payroll Provider certain software, payroll-related, and other administrative fees (the "Payroll Fees") on a monthly basis. Failure to satisfy the Payroll Fees could lead to a delay in payroll processing and disbursement of payroll taxes to the appropriate third parties to the detriment of the Employees and the Debtors' operations.

99. *Director Compensation*. Pursuant to the Debtors' Non-Employee Directors Annual Compensation Program, four Non-Employee Directors receive compensation for their services. Additionally, one disinterested director who serves on the boards of directors or managers of certain Debtor subsidiaries receives compensation for his services. The directors perform a crucial role in the Debtors' governance and strategic decision-making, and their service is vital in ensuring that the Debtors continue to conform to governance best practices.

100. I believe that the Debtors' timely payment of workforce-related obligations is necessary for the Debtors to maintain ordinary course operations and avoid personal financial hardship to the Employees. I understand there is no practical or legal alternative by which the Debtors can deal with the Compensation and Benefits Obligations. Therefore, I believe that the relief requested in the Wages Motion is in the best interests of the Debtors' estates, their creditors, and other parties in interest, and will enable the Debtors to continue to effectively operate their businesses during these chapter 11 cases.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge, information and belief.

Dated: October 21,2026
New York, New York

*/s/ Cari Turner*
Cari Turner
Managing Director
Alvarez & Marsal North America, LLC