**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re:<br><br>GETTY IMAGES HOLDINGS, INC., *et al.*,[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 26-11643 (JKS)<br><br>(Jointly Administered)<br><br>**Obj. Deadline: To be determined by the Court**<br>**Hearing Date: Nov. 17, 2026 at 10:30 a.m. (requested)** |

**MOTION OF THE AD HOC GROUP OF EQUITY SECURITY HOLDERS FOR ENTRY OF AN ORDER DIRECTING THE APPOINTMENT OF AN OFFICIAL EQUITY COMMITTEE PURSUANT TO 11 U.S.C. § 1102**

The Ad Hoc Group of Equity Security Holders (the "**Ad Hoc Group**"), comprised of firms and individuals that collectively hold (i) approximately 17.1 million shares of Getty Images common stock, or about 15% of the stock not owned by the Getty and Koch families, and (ii) about 34% of a $97 million judgment against Getty Images for its refusal to allow warrant holders to convert into common shares,[2] respectfully submits this Motion for an Order directing the appointment of an Official Committee of Equity Security Holders (the "**Official Equity Committee**"). In support of this Motion, the Ad Hoc Group respectfully states as follows:

---

[1] The debtors in these Chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Getty Images Holdings, Inc. (4229); Griffey Midco (DE), LLC (7122); Abe Investment Holdings, Inc. (5107); Getty Images, Inc. (7556); Getty Images (US), Inc. (8819); Getty Images News Services (PRC), Inc. (1849); and Getty Images (Seattle), Inc. (6863). They are collectively referred to here, interchangeably, as the "**Debtors**" or the "**Company**" or "**Getty Images**."

[2] The warrant holders do not concede subordination under Section 510(b). They assume it for purposes of this Motion.

## PRELIMINARY STATEMENT

1. On October 22, 2026, the Ad Hoc Group requested that the U.S. Trustee appoint an Official Equity Committee. Letters written to the U.S. Trustee are attached hereto at **Exhibit A**. On November 4, 2026, the U.S. Trustee denied the appointment request; the denial letter is also attached at **Exhibit A**. The Ad Hoc Group does not understand that decision. If ever a case warranted an Official Equity Committee, it is this one.

2. Getty Images is primarily owned and controlled by the Getty and Koch families. It came to bankruptcy with a pre-negotiated plan and DIP financing (provided by the Koch family) compelling near-immediate confirmation. Under the plan, secured creditors recover par, unsecured creditors are paid in full, and unsecured noteholders have agreed (83.5%) to a discounted cash payment. The "control" shareholders (Getty and Koch families) are allocated an enormous distribution: The exclusive right to "repurchase" the Company for $533 million, without any sort of market test. Similarly situated shareholders and warrant-judgment holders receive nothing. This is appropriate, say the Debtors, because equity/warrant holders are "out-of-the-money" and the Gettys/Kochs receive their exclusive "repurchase" right at the behest of the compromising noteholders. Apparently, the U.S. Trustee bought into the Debtors' case theory, thus denying the appointment request. That was wrong for four primary reasons.

3. **First** is the matter of solvency. When considering whether to appoint an Official Equity Committee, Section 1102 jurisprudence asks whether the debtor is "hopelessly insolvent." This Company is ***not*** "hopelessly insolvent" – ***a fact that even the Debtors concede***. The solvency breakpoint is, according to the Debtors, around $1.46 billion. In other words, for equity to be "out-of-the-money," total enterprise value purportedly must be less than $1.46 billion. In their submission to the U.S. Trustee, the Debtors offered up their banker's valuation conclusion (albeit,

without any analytical backup), to wit: The Company is, *ipse dixit*, worth between $1.3 and $1.5 billion, with a "midpoint estimate" of $1.4 billion. *See* Ex. A. The banker's estimate, thus, hovers right at the putative breakpoint, but also ranges well into solvency. That is not "hopeless insolvency," as that phrase is used in our jurisprudence.

4. We next turn to the plan, which contemplates that (i) the Company will exit bankruptcy with $936 million in secured debt and (ii) the Getty and Koch families will "repurchase" 100% of the Company's equity for $533 million. $936 million (debt load) plus $533 million (stock capitalization) implies an enterprise value of $1.47 billion – an amount ***greater*** than the Debtors' purported solvency breakpoint.

5. From there we focus on the $533 million purchase price. Note that this price was ***not*** determined by exposure to a market. It came from private negotiations with creditors. In those negotiations, the Gettys/Kochs held all the cards. After all: (i) the Company was then facing an acute liquidity crisis; (ii) that crisis came on suddenly, upon the Debtors' surprise announcement that they were terminating their merger agreement with Shutterstock; (iii) negotiations occurred over only a four-month period – too short for meaningful diligence by the noteholders – thus enabling the Gettys/Kochs to exploit their vastly superior knowledge base; and (iv) the Gettys/Kochs were uniquely positioned to prey upon the situation. Indeed they – ***and they alone*** – had the money and the ability to deploy that money immediately, but only if the price was right. These circumstances give ample reason to question whether $533 million is, in truth, a fair purchase price.

6. There is more. Prior to bankruptcy, the Debtors undertook a slew of financing and M&A activity, generating several "fairness opinions" detailing how the market should value Getty Images. The Company's performance has not materially changed since the delivery of those

opinions: The business consistently generates about $300 million in annual EBITDA, and it is projected to continue generating about $300 million in annual EBITDA well into the future. This means that those historical opinions remain instructive today, provided they are updated to reflect the current market environment (e.g., changes in “comp” trading multiples). That analysis does ***not*** reflect a Company worth only $1.46 billion. It reflects a Company worth ***vastly*** more than $1.46 billion.

7. That takes us back to the Company’s staunch refusal to test the Getty/Koch purchase price through a post-petition M&A process. That is perhaps the most shocking attribute of this case. Here, we have a paradigmatic “insider” transaction, effectuating a paradigmatic “squeeze-out” of minority share/warrant holders, predicated on a remarkably thin valuation thesis, without any sort of market check corroborating that valuation thesis – in utter defiance of *Bank of Am. Nat’l Tr. & Sav. Ass’n v. 203 N. LaSalle St. P’ship.*[3] We have, to be frank, never seen a debtor-fiduciary acting in such a brazenly opportunistic/predatory way, at least not in a very long time.[4]

8. And yet, the Debtors somehow convinced the U.S. Trustee that none of this matters, that once the noteholders accepted less-than-par treatment, all of the foregoing became irrelevant or moot. That is incorrect. We start with the statute. While the “absolute priority rule” conditions creditor cramdown on stockholders receiving nothing, the rule (and the rest of Section 1129(b))

---

[3] 526 U.S. 434, 455-56 (1999) (“At the moment of the plan’s approval the Debtor’s partners necessarily enjoyed an exclusive opportunity that was in no economic sense distinguishable from the advantage of the exclusivity entitled offeror or option holder. This opportunity should, first of all, be treated as an item of property in its own right. . . . But this just begs the question why the opportunity should be exclusive to the old equity holders . . . with its protection against the market’s scrutiny of the purchase price.”).

[4] *See, e.g., Citicorp Venture Cap. Ltd. v. Comm. of Creditors Holding Unsecured Claims (In re Papercraft Corp.)*, 160 F.3d 982 (3d Cir. 1998) (insider that purchased claims post-petition, intending to “repurchase” the reorganizing business under a plan, acted wrongfully, warranting the equitable subordination of the insider’s claims).

***does not apply*** when there is no creditor cramdown. Stated differently, creditors may freely agree to receive less-than-par (that is their choice) and that choice then clears the way for stockholders to receive distributions, without triggering the "absolute priority rule."[5] In fact, in that situation, stockholders ***must*** receive their due value entitlement for the plan to be "fair and equitable" to them. 11 U.S.C. § 1129(b)(2)(C).

9. In this way, Section 1129 reflects a fundamental tenet of corporate finance called the "irrelevancy principle," which holds that neither the amount of debt nor whether holders agree to compromise that debt has any bearing whatsoever on total enterprise value. That is perfectly clear in our jurisprudence: From *Consolidated Rock* to *TMT Trailer Ferry* to *Spansion* to *Mirant* to *Exide* – bankruptcy valuation does not even consider (let alone hinge on) whether or how debtholders agree to compromise their claims, because that is a theoretical "irrelevancy" to the valuation question.[6] And that is so without considering (because it is, strictly speaking, irrelevant) the myriad reasons why unsecured noteholders might here have agreed to a sub-par recovery

---

[5] *See, e.g., In re W.R. Grace & Co.*, 475 B.R. 34, 175 (D. Del. 2012) ("The absolute priority rule, therefore, only applies to confirmation of a plan that attempts to cram down an impaired class that voted against acceptance of the Plan.").

[6] *Consol. Rock Prods. Co. v. Du Bois*, 312 U.S. 510, 526 (1941) ("'[T]he commercial value of property consists in the expectation of income from it.' . . . The criterion of earning capacity is the essential one if the enterprise is to be freed from the heavy hand of past errors, miscalculations or disaster, and if the allocation of securities among the various claimants is to be fair and equitable.") (quoting *Galveston, Harrisburg & San Antonio Ry. Co. v. Texas*, 210 U.S. 217, 226 (1908)); *Protective Comm. for Indep. S'holders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 441–42 (1968) (quoting same and holding that valuation based on future earnings capacity was necessary to determine fairness of creditor settlement); *U.S. Bank, Nat'l Ass'n v. Spansion, Inc. (In re Spansion, Inc.*), 426 B.R. 114, 130 (Bankr. D. Del. 2010) (quoting *Consol. Rock Prods*. and holding that valuation must be determined by expert opinion as to future earnings, and not by the trading price of claims); *In re Mirant Corp.*, 334 B.R. 800, 844 (Bankr. N.D. Tex. 2005) ("The court is adjured to take into account in valuing a debtor its future prospects."); *In re Exide Techs.*, 303 B.R. 48, 66 (Bankr. D. Del. 2003) (current market value is "not appropriate when seeking to value securities of a reorganized debtor since the 'taint' of bankruptcy will cause the market to undervalue the securities and future earning capacity of the Debtor. The more appropriate method, in this instance, is a straightforward application of the valuation methodologies to arrive at a better understanding of whether the Debtor's Plan treats creditors fairly and equitably.") (citations omitted).

***having nothing to do with the Company's inherent value***, such as the exigent circumstances surrounding those negotiations and the Getty/Kochs' unique position to prey upon that situation.

10. **Second**, the plan screams "unfair discrimination." The Getty and Koch families own approximately 76% of the Company's stock and they control the board. They negotiated for themselves the exclusive right to "repurchase" the Company, without any market test and without sharing that opportunity with the 24% minority shareholders and similarly situated warrant holders. The other stock/warrant holders were not invited to or represented in those negotiations. This is clearly wrong under Section 1129(b) and surrounding jurisprudence.[7] For this reason alone, the U.S. Trustee should have appointed an Official Equity Committee.

11. **Third**, the speed/momentum of this case threatens a regrettable outcome, and that seems intentional. The case is mobilized by the DIP Loan, provided by the Koch family. It contains "milestone" and "case control" covenants demanding plan confirmation ***in only a matter of weeks***, the practical effect being that only one conclusion (i.e., the Debtors' plan) is feasible. This raises significant "good faith" and "sub rosa" plan issues. But, more fundamentally, it places this Court in a "Hobson's Choice" position, to wit: (i) confirm this plan, as wrongful as it may be, or (ii) deny confirmation and, in turn, default the DIP Loan (so that, incidentally, the Getty and Koch families can retake the Company through an emergency DIP Loan "credit bid"). No Bankruptcy Court should ***ever*** find itself in that kind of "Hobson's Choice" position.

---

[7] *See, e.g., In re Tribune Co.*, 972 F.3d 228, 240, 242 (3d Cir. 2020) (establishing the elements of "unfair discrimination" in the Third Circuit). Every element of "unfair discrimination" is here, on the face of the proposed plan. Minority equity/warrants occupy the same priority level as the equity held by the Getty and Koch families. Yet, the plan hands the Getty and Koch families the exclusive opportunity to "repurchase" 100% of the reorganized company's equity, while the minority stock and warrant holders receive nothing. This triggers the presumption of "unfair discrimination," which (under *Tribune*) the Debtors will need to rebut at confirmation. On these facts, that seems like an insurmountable burden. *See, e.g., In re Armstrong World Indus., Inc.*, 348 B.R. 111, 122 (D. Del. 2006) (quoting *In re Greate Bay Hotel & Casino, Inc.*, 251 B.R. 213, 231 (Bankr. D.N.J. 2000)) (courts that have rejected plans, on "unfair discrimination" grounds, where the plan includes "grossly disparate treatment (50% or more)" among similarly situated stakeholders.).

12. Stated even more bluntly, the case has been set up to deprive the Court of its ability to function at the confirmation hearing. Besides the plan's "fair and equitable" and "unfair discrimination" issues described above, it is also worth observing that "good faith" is also at issue. The "liquidity crisis" that purportedly justifies the Chapter 11 case was self-created by the Getty and Koch families, initially, to avoid dilution of their equity positions and, more recently, by (i) terminating the Shutterstock merger, and (ii) refusing to engage in "workout" negotiations with their warrant holders. As the old saw goes, "never let a crisis go to waste," especially when you create it yourself and you can profit handsomely from it.

13. The Bankruptcy Code intends for the Debtors to be put through their paces at confirmation, especially in a cramdown situation where the plan delivers everything to the "control" stockholders and nothing to the similarly-situated holders left behind. Who besides an Official Equity Committee will hold the Debtors to their legal burdens, provide an appropriate "adversary check" at the confirmation hearing, and help the Court reach a principled case conclusion?

14. **Fourth**, the answer is: "no one." There will not be a functional Official Creditors Committee in this case. And, while the Debtors added "bankruptcy directors" just before the filings, Chapter 11 has never viewed their addition as replacement/proxy for a functioning "adversary process." Stated differently: Chapter 11 has ***always*** relied on representative Official Committees as the "adversary check" on insider opportunism/predation; it has ***never*** relied on individuals sitting on the Debtor's side of the Courtroom to serve that role; and, it has ***always*** viewed case set-ups like this one with extreme skepticism, warranting the most exacting form of case scrutiny.

15. As S.D.N.Y. Bankruptcy Judge Gropper observed, in a case analogous to this one, when "all general unsecured claims . . . will be paid in full under the Debtors' plan, the [Official Creditors] Committee [is] the least likely party in interest to challenge the *status quo* [and] the usual checks and balances are not present," warranting the appointment of an Official Equity Committee.[8]

* * *

16. A long time ago, the Supreme Court also faced a case analogous to this one. In *Pepper v. Litton,* 308 U.S. 295 (1939), the "control" shareholder orchestrated a sale of the business to himself, exploiting bankruptcy to cleanse the transfer and avoid sharing that value with the company's creditors. The lower court allowed it. The Supreme Court reversed, famously saying:

> A director is a fiduciary. So is a dominant or controlling stockholder or group of stockholders. Their powers are powers in trust. Their dealings with the corporation are subjected to rigorous scrutiny and where any of their contracts or engagements with the corporation is challenged the burden is on the director or stockholder not only to prove the good faith of the transaction but also to show its inherent fairness from the viewpoint of the corporation and those interested therein. The essence of the test is whether or not under all the circumstances the transaction carries the earmarks of an arm's length bargain. If it does not, equity will set it aside.[9]

17. The Getty Images Chapter 11 case is, to be sure, big and important. Many eyes are watching. The teachings of *Pepper v. Litton*, *Consolidated Rock*, *Tribune*, and the many other cases cited herein, must be honored. An Official Equity Committee should be appointed, and, given the rocket case trajectory, with all deliberate speed.

---

[8] *See In re Oneida Ltd.*, No. 06–10489, 2006 WL 1288576 (Bankr. S.D.N.Y. May 4, 2006).

[9] *Pepper*, 308 U.S . at 306-07 (citations omitted).

## JURISDICTION, VENUE, AND STATUTORY PREDICATES

18. The Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334. This Motion is a "core" proceeding within the meaning of 28 U.S.C. § 157(b). Venue for this Motion is proper under 28 U.S.C. §§ 1408 and 1409. The statutory predicate for the relief requested herein is 11 U.S.C. § 1102(a)(2).

## BACKGROUND

### I. General Case Background.

19. On October 21, 2026 (the "**Petition Date**"), the Debtors filed Chapter 11 petitions with this Court. The Debtors continue to operate as debtors-in-possession pursuant to Bankruptcy Code Sections 1107(a) and 1108.

20. The cases have been consolidated for procedural purposes only and are being jointly administered. As of the date hereof, an Official Creditors' Committee has not been appointed in the case.

### II. Business Operations and Transaction History.

21. **Business Operations.** Getty Images is a global visual-content creator and marketplace, with a library of over 662 million digital images and videos. It creates original editorial content covering news, sport, and entertainment. It licenses that content worldwide through several brands, including Getty Images, iStock, and Unsplash.[10] It works with more than 600,000 content contributors and covers more than 160,000 events each year, including the FIFA World Cup, Formula 1, the Academy Awards, and the Grammy Awards. It is also a strategic partner to various broadcasters, brands, and sponsors.[11]

---

[10] *Declaration of Craig Peters, Chief Executive Officer of Getty Images Holdings, Inc. and its Debtor Subsidiaries, in Support of the Debtors' Chapter 11 Petitions* [Docket No. 29] (the "**Peters Declaration**") ¶¶ 42-45.

[11] *Id.* ¶¶ 2-4.

22. **Early Activity.** The Company was co-founded by Mark Getty in 1995. Two years later, it merged with PhotoDisc, Inc., and grew via M&A activity over the next several years. In 2008, the Company was sold in a private equity transaction for $34 per share, and was sold again to a different private equity firm in 2012. The Getty family reacquired Getty Images in 2018 and later that year the Koch family made a non-controlling investment in the Company.[12]

23. **The SPAC Transaction And The Warrant Litigation.** In 2022, the Company went public via SPAC transaction. As part of the transaction, the Company issued common stock and warrants, which traded publicly on the New York Stock Exchange. The stock price rose thereafter and remained elevated for some time. If the rally continued long enough, the Getty and Koch families would earn an enormous "earnout" stock bonus. But, a worry lingered: If the warrant holders converted *en masse*, that might push down the stock price, deprive the families of their "earnout" bonuses, and otherwise dilute their ownership percentage. The Company devised a loophole, claiming that the warrants could not be exercised until after they were registered. By that time, the Getty and Koch families had already received their "earnout" bonuses, but the share price collapsed, disabling warrant holders from exercising their conversion right. The warrant holders sued and prevailed against Getty Images in multiple cases.[13]

24. **The Failed Shutterstock Merger**. In January 2025, the Company agreed to combine with Shutterstock. The transaction was valued at $3.7 billion.[14] The Debtors' shareholders (including the Getty and Koch families) would receive approximately 54.7%

---

[12] *Id.* ¶¶ 36-39.

[13] *See Alta Partners, LLC v. Getty Images Holdings, Inc.*, 700 F. Supp. 3d 32, 35-38 (S.D.N.Y. 2023), *aff'd*, 165 F.4th 141 (2d Cir. 2026); *Berner v. Getty Images Holdings, Inc.*, 794 F. Supp. 3d 189 (S.D.N.Y. 2025); Decision and Order on Motion, *Funicular Funds LP v. Getty Images Holdings, Inc.*, Index No. 653410/2024 (Sup. Ct. N.Y. Cnty. June 9, 2026), Dkt. No. 254.

[14] *See* Getty Images Holdings, Inc., Proxy (Form S-4) (Jan. 6, 2025) ("**2025 Proxy**"); available at https://www.sec.gov/Archives/edgar/data/1898496/000121390025037626 /ea0235881-03.htm#T99045.

ownership, worth about $2.02 billion (minus debt). The Getty and Koch families would control 7 out of 11 board seats. Mark Getty would be Chairman of the Board.

25. U.S. antitrust authorities cleared the transaction, but U.K. authorities conditioned clearance on the divestiture of Shutterstock's editorial business. This was expected and not supposed to be a significant condition: Getty Images and Shutterstock had previously referred to the unit as "peripheral" and offered to sell it.[15]

26. But, this gave the Company an "out," and it took it: On June 30, 2026, after spending more than $100 million on professional fees pursuing the merger, the Debtors terminated it.[16] No rationale was put in the public domain.

## III. The Company's Capital Structure, Earnings Profile, and Growth Opportunity.

27. **Capital Structure.** The Debtors' pre-petition debt load includes approximately $1.46 billion in funded debt: $1.186 billion in secured debt (including revolving loans, term loans, and secured notes), and $270 million in unsecured notes.[17] The Getty and Koch families own approximately 76% of the Debtors' stock, chair the Debtors' board of directors, and control a majority of its seats.[18]

---

15 *See* Competition and Markets Authority Press Release (May 15, 2026), available at https://www.gov.uk/government/news/cma-conditionally-clears-getty-merger-with-shutterstock.

16 *See* Getty Images Holdings, Inc., Current Report (Form 8-K/A) (July 7, 2026), available at https://www.sec.gov/Archives/edgar/data/1898496/000121390026076004/ea0297316-8ka1_getty.htm.

17 Peters Declaration ¶ 57.

18 The Gettys own approximately 45.5% of the Debtors' stock and the Kochs own approximately 27.4%. *See* Schedule 13D filed by KED Icon Holdings, LLC on October 13, 2026 (the "**Cleansing Materials**") (available at https://www.sec.gov/Archives/edgar/data/1898496/000119312526420539/xslSCHEDULE_13D_X02/primary_doc.xml); Schedule 13D filed by Getty Investments L.L.C. on October 13, 2026 (42.3% of common stock) (available at https://www.sec.gov/Archives/edgar/data/1898496/000095014226002734/xslSCHEDULE_13D_X02/primary_doc.xml); and Schedule 14A filed on August 28, 2026 (3.2% of common stock beneficially owned by Mark Getty) (available at https://www.sec.gov/ix?doc=/Archives/edgar/data/0001898496/000162828026059390/gety-20260825.htm#iaf0534c76274411dbfba052751af5a3a_76). Getty/Koch nominees occupy a majority of the board, and Mark Getty is the chairman of the Company. Peters Declaration ¶ 54.

28. **Earnings Profile.** The Company regularly generates about $300 million EBITDA per year. It has performed this way for years. It is anticipated to continue performing this way into the foreseeable future. As the Company disclosed in its October 13, 2026 8-K Statement: the Company's "financial performance has proven steady even in the face of sustained entry by free and lower-priced competitors because customers value premium, high-quality content."[19] The below performance report/forecast was also included in the October 13 8-K Statement:




29. **Growth Opportunities.** On its past two earnings calls, the Company disclosed opportunities for revenue growth in 2026, including the FIFA World Cup, a multi-year deal with OpenAI, and various other increases in AI licensing. Altogether, the Debtors predicted that the "[c]ore business of Getty Images creative and editorial" will "continue growth at a low-to-mid single digit pace" and that, while overall growth is moderated by declines in two business lines, "[e]ventually, growth in the core business" will outpace "the declining business lines, returning the overall business to growth."[20]

---

19 Cleansing Materials at 6.

20 *Id*. at 9.

## IV. <u>External Indicia of Solvency</u>.

30. **<u>Solomon Partners Analysis</u>**. In its June 2022 proxy statement issued in connection with the SPAC transaction, the Company delineated the deal terms, including an agreed enterprise value of $4.8 billion.[21] In support of this valuation, the proxy statement includes a "fairness opinion" prepared by its investment banker, Solomon Partners Securities. Solomon's opinion identifies 13 companies that the banker assessed were "comparable" to Getty Images for valuation purposes:[22]

**Getty Images – Solomon (2022 SPAC) Comparables: December 2021**

**Solomon comparables (2022 SPAC)**

| **Company** | **December 2021 EV 12/31/21 / CY2022A EBITDA** |
|---|---|
| Shutterstock | 24.1x |
| Universal Music Group | 27.7x |
| Warner Music Group | 24.3x |
| The New York Times Company | 21.0x |
| Thomson Reuters | 30.9x |
| Adobe | 42.0x |
| Avid Technology | n/a |
| Squarespace | 106.6x |
| Wix.com | n/m |
| Etsy | 60.2x |
| Fiverr | n/m |
| GoDaddy | 23.0x |
| Upwork | n/m |
| **Median – all peers** | **27.69x** |

31. Given the overall consistency in the Company's earnings profile, it is possible to still use the Solomon Partners analysis, simply by updating the earnings multiples for each comparable company. The chart below does just that, estimating Getty Images enterprise value at $3.81 billion:

---

21 CC Neuberger Principal Holdings II, Proxy (Form S-4) (June 30, 2022) at 163, available at https://www.sec.gov/Archives/edgar/data/1898496/000110465922076440/tm222601-18_424b3.htm#anxo.

22 *Id.* at 186.

**Solomon comparables (2022 SPAC)**

| Company | December 2021<br>EV 12/31/21 / CY2022A EBITDA | October 2026<br>EV 10/21/26 / LTM EBITDA |
|---|---|---|
| Shutterstock | 24.1x | 2.4x |
| Universal Music Group | 27.7x | 14.7x |
| Warner Music Group | 24.3x | 12.4x |
| The New York Times Company | 21.0x | 17.8x |
| Thomson Reuters | 30.9x | 22.4x |
| Adobe | 42.0x | 10.2x |
| Avid Technology | n/a | n/a (acquired) |
| Squarespace | 106.6x | n/a (acquired) |
| Wix.com | n/m | n/m |
| Etsy | 60.2x | 21.4x |
| Fiverr | n/m | n/m |
| GoDaddy | 23.0x | 11.8x |
| Upwork | n/m | 5.8x |
| **Median – all peers** | **27.69x** | **12.41x** |

**Getty Images, applying comparables** – $M, at October 2026 median 12.41x (INFERENCE)

| Adj. EBITDA | $M | TEV | Equity[1] |
|---|---|---|---|
| LTM Q2 2026 | 307 | 3,810 | 2,354 |
| 2026E | 264 | 3,276 | 1,820 |
| 2027E | 291 | 3,611 | 2,155 |
| 2028E | 293 | 3,636 | 2,180 |

[1] Equity = TEV less $1,456M of total funded debt outstanding as of the Petition Date (First Day Declaration, Dkt 29 ¶9). Adj. EBITDA: LTM Q2 2026 from Disclosure Statement p.44 (Dkt 32); 2026E–2028E Company projections, cleansing materials (8-K Ex. 99.2, acc. 0001213900-26-108700, p.10).

32. **J.P. Morgan Analysis.** In its January 2025 proxy statement issued in connection with the Shutterstock merger, the Company included a "fairness opinion" prepared by its investment banker, J.P. Morgan. J.P. Morgan's opinion estimated the Debtors' stand-alone enterprise value at $2.32-$2.98 billion on a discounted cash flow (DCF) basis – a multiple of 7.6x-9.8x of adjusted EBITDA for 2025 (expected).[23] J.P. Morgan estimated the Debtors' implied equity value to be around $1.272 billion on a stand-alone basis.[24]

## V. The Case Is Set Up As A "Minority Squeeze-Out" Transaction.

33. **The Stated Reasons For This Bankruptcy.** The Company presents itself as a hapless business enterprise that, due to circumstances beyond its control, required shelter under the automatic stay. But, based on disclosures in the public domain, that does not entirely add up. Again, the Company continues to consistently perform, generating around $300 million annual

[23] 2025 Proxy at 59 (adjusted EBITDA), 62-72, Annex C.

[24] *Id.* at 65, Annex C.

EBITDA like clockwork, and it has not disclosed any unforeseeable or unforeseen business missteps. Rather, we are told that the Debtors suddenly ran out of cash, and the two reasons why lie entirely at Getty/Kochs' feet.

34. **First**, there was the gambit with the warrant holders. The Company intentionally obstructed the warrant holders' right to convert into common shares, thus relinquishing a cash infusion of at least $103 million.[25] Besides giving up all that cash, the Company assumed significant litigation risk, not for its own benefit, but to ensure that the Gettys/Kochs received their massive "earnout" bonuses while avoiding the dilution of their equity. This fact pattern warrants further examination under fiduciary, tort, and bankruptcy law,[26] especially given that all estate claims against them are released under the plan. But, regardless, the large warrant judgments awarded against the Company were clearly avoidable.

35. **Second**, there was the failed Shutterstock merger. The Company did not disclose – either in its SEC filings or "first day" pleadings[27] – why it terminated the transaction. It simply stated, almost petulantly, that it did so because it could. The absence of disclosure, respecting such a monumental decision that purportedly eroded so much cash, likewise warrants further examination.

---

25 Peters Declaration ¶ 77 ("The Company was deprived of the $11.50 exercise price proceeds that exercising holders would have paid to the Company, which would have provided meaningful equity capital, and instead was left with litigation liability that has depleted the Company's liquidity."); *see Alta Partners LLC*, 700 F. Supp. 3d at 45; *Funicular Funds LP v. Getty Images Holdings, Inc.*, Index No. 653410/2024 (holders of a total of over 9 million warrants duly exercised their warrants at the strike price of $11.50 per warrant, which should have yielded over $103 million in gross proceeds to the Company).

26 *See, e.g., In re Quigley Co.*, 437 B.R. 102, 131 (Bankr. S.D.N.Y. 2010) (denying confirmation, finding that "a plan based on a lockup agreement that secures an advantage for insiders at the expense of [other] creditors is not one proposed in good faith.").

27 The Debtors note that the decision was made "[w]ith its liquidity already substantially depleted," Peters Declaration ¶ 7, but do not assert a causal link.

36. Here it bears noting that, at least respecting the warrant plaintiffs, the Debtors' narrative seems overblown. **Exhibit A** includes a letter from the Ad Hoc Group to the U.S. Trustee dated November 2, 2026 in further support of the appointment request. Attached to that letter is a declaration signed by lead plaintiffs' counsel in the warrant cases. In that declaration, counsel states that, during the four-month period between termination of the Shutterstock deal and the bankruptcy filings, he and his clients told the Company they would not rush to enforce the judgment without providing the Company time to seek relief from New York's Appellate Division. They also attempted to engage with the Company in "work-out" negotiations that would avoid bankruptcy. The Debtors were not, according to the declaration, willing to engage along those lines, further suggesting that the Getty and Koch families were, in fact, manufacturing a crisis for their own economic gain.

37. **The Pre-Negotiated Plan.** On October 13, 2026, the Company announced its entry into a Restructuring Support Agreement (the "**RSA**") with the Getty/Kochs, approximately 89% of secured funded debt holders, 100% of holders of revolving loans, and approximately 83.5% of unsecured note holders.

38. Eight days later, the Debtors filed for bankruptcy, stating their intentions to move quickly towards confirming a plan based on the RSA.[28] That plan allows the Getty/Kochs to "repurchase" 100% of the reorganized equity for $533 million, comprised of a $433 million cash infusion and equitization of approximately $100 million in secured debt owned by the families. All other secured debt is reinstated on similar terms.[29] General unsecured creditors are paid in full. $270 million in unsecured notes are retired in exchange for $170.2 million in cash. The minority

[28] Docket No. 31; Disclosure Statement at Docket No. 32.
[29] Disclosure Statement at 4.

stock and warrant holders receive nothing.[30] The plan also contains broad releases of all estate claims and causes of action against the Getty/Kochs.[31]

39. The plan's disclosure statement includes the same valuation conclusion (again, without any analytical backup) as stated in the Debtors' letters to the U.S. Trustee, to wit, an enterprise value ranging from $1.3 billion to $1.5 billion, with a midpoint estimate at $1.4 billion.[32]

40. **The Koch Family DIP Loan**. The Koch DIP Loan provides up to $113 million in cash availability, as well as an incremental $30 million delayed-draw access. It includes "case control" covenants, including a 55-day milestone for confirmation and a 75-day milestone for emergence from Chapter 11.[33] The DIP Loan does not allow use of proceeds to fund any Official Committee professional expenses.

41. Further, it prevents the use of cash collateral to "object to, contest, prevent, hinder, or delay the DIP Secured Parties' or Prepetition Secured Parties' enforcement of any of their respective rights" against the DIP collateral; to investigate the DIP lenders (i.e., Koch) in any manner or to prosecute any challenge to any of their claims against the Debtors; or to take any action "other than as expressly provided pursuant to this Interim Order and the other DIP Documents."[34] The Kochs may also terminate DIP lending if any party in interest challenges the status quo: before borrowing, "[n]o motion or other pleading shall be pending that seeks relief that is adverse to the Lenders or that is inconsistent with the RSA."[35]

---

[30] *Id.*; Plan Art. III.

[31] Plan Art. VIII.C.

[32] Disclosure Statement at Ex. F.

[33] DIP Credit Agreement § 6.20, Docket No. 18-2.

[34] Interim DIP Order ¶ 26.

[35] DIP Credit Agreement § 4.03(e), Docket No. 18-2.

42. At the first day hearing, the Court approved a case schedule in line with the RSA, setting the final DIP hearing for November 17, 2026 and a combined hearing to consider the adequacy of the Disclosure Statement and confirmation of the Plan for December 15, 2026.[36] This case is moving fast.

## LEGAL ARGUMENT

43. Bankruptcy Code Section 1102(a)(2) provides that, on request of a party in interest, the Court may direct the appointment of an Official Equity Committee. 11 U.S.C. § 1102(a)(2). When determining whether to direct such appointment, Courts consider the following factors:

(i) whether the debtors are likely to prove solvent;

(ii) whether equity is adequately represented by the stakeholders already at the table;

(iii) the complexity of the debtor's case; and

(iv) the likely cost to the debtor's estates of an equity committee.[37]

Courts also consider the number of shareholders involved and the timing of the motion relative to the status of the cases.[38] No single factor is dispositive, and the weight attributed to each factor is determined based on the facts and circumstances of the Chapter 11 case.[39]

44. These factors, individually and collectively, weigh heavily in favor of appointment of an Official Equity Committee in these Chapter 11 Cases.

---

36 Docket No. 120.

37 *See In re Pilgrim's Pride Corp.*, 407 B.R. 211, 216 (Bankr. N.D. Tex. 2009) (citing *In re Williams Commc'ns Grp., Inc.*, 281 B.R. 216 (Bankr. S.D.N.Y. 2002)); *Albero v. Johns–Manville Corp. (In re Johns–Manville Corp.)*, 68 B.R. 155 (S.D.N.Y. 1986), *appeal dismissed*, 824 F.2d 176 (2d Cir. 1987); *In re Kalvar Microfilm*, 195 B.R. 599 (Bankr. D. Del. 1996); *In re Wang Lab'ys., Inc.*, 149 B.R. 1 (Bankr. D. Mass. 1992); *In re Oneida Ltd.*, No. 06–10489, 2006 WL 1288576 (Bankr. S.D.N.Y. May 4, 2006).

38 7 Collier on Bankruptcy ¶ 1102.03[2] (Richard Levin & Henry J. Sommer eds., 16th ed.) (citing *In re SunEdison, Inc.*, 556 B.R. 94, 102 (Bankr. S.D.N.Y. 2016)).

39 *See In re Celsius Network LLC*, 645 B.R. 165, 172 (Bankr. S.D.N.Y. 2022).

# I. **Valuation**.

## A. **Getty Images Is Not "Hopelessly Insolvent"**.

45. In determining whether to appoint an official equity committee, the law asks whether the debtor "appears to be hopelessly insolvent,"[40] – that is, whether "there is a substantial likelihood" of meaningful recoveries for shareholders.[41]

46. The movant is not required to prove the debtor's solvency at the time of the hearing. The inquiry, rather, is forward-looking, focusing on what seems "likely" based on the available data. The Court is tasked with making a "practical conclusion, based upon a confluence of factors."[42]

47. Here, it is abundantly clear that Getty Images is not "hopelessly insolvent." **First**, the Debtors concede the point. In their letter to the U.S. Trustee and in their proposed disclosure statement, the Debtors contend, *ipse dixit*, that total enterprise value falls between $1.3 and $1.5 billion, with a "midpoint estimate" pegged at $1.4 billion. That estimate hovers right at the purported solvency breakpoint ($1.46 billion), while admitting that the Company's worth may veer north of that breakpoint.

48. **Second**, the plan contemplates an exit capitalization comprised of $936 million in debt and $533 million in new equity investment, reflecting an implied valuation of $1.47 billion – a number ***exceeding*** the purported solvency breakpoint. That said, the $533 million purchase price was determined, not by exposure to a market, but in creditor negotiations where the Getty/Kochs

---

40 *Williams Commc'ns*, 281 B.R. at 220-21.

41 *In re Spansion, Inc.*, 421 B.R. 151, 156 (Bankr. D. Del. 2009); *see also Wang Lab'ys.*, 149 B.R. at 3 (Bankruptcy Court appointed committee even though debtor was operating "at a loss" because debtor was not "hopelessly" insolvent).

42 *Williams Commc'ns*, 281 B.R. at 221; *Wang Lab'ys.*, 149 B.R. at 3 ("[Insolvency] is not a simple matter of statutory construction where the Court can rest with citation to the balance sheet test of 11 U.S.C. § 101(32).")

had a vastly superior bargaining leverage. These circumstances give rise to a healthy skepticism that $533 million is a fair price for 100% of Getty Images stock.

49. **<u>Third</u>,** one can draw powerful inferences from the Debtors' failure to subject the Getty/Koch "repurchase" offer to a market test. This is remarkably aberrant behavior, inconsistent with Chapter 11's culture, smacking of insider opportunism/predation of the *Pepper v. Litton* or *Papercraft* variety, and boldly defiant of *203 N. LaSalle*. To be sure, the Company is not being shopped because the Getty and Koch families do not want bidding competition. Stated differently, they have structured this bankruptcy case to avoid any process that might reveal their bid to be artificially depressed.

50. **<u>Fourth</u>,** all that pre-bankruptcy M&A activity, leaving a pathology of valuation modeling and data, suggests the Company has a worth wildly in excess of the solvency breakpoint. This is, in our experience, a very rare case, where the Debtor (i) does not have any problem generating earnings consistent with its past and (ii) commissioned and published (twice) valuation opinions, detailing how the bankers arrived at their valuation conclusions. These opinions were published relatively recently, and can be updated to reflect current market conditions. As explained above, those updates reveal business value wildly in excess of the solvency breakpoint.

### B. It Is Not Relevant That Unsecured Noteholders <u>Agreed To Receive A Discounted Cash Recovery</u>.

51. It is true that 83% of the Debtors' unsecured noteholders agreed to a plan that pays them 63% of their claims in cash. This was, apparently, relevant to the U.S. Trustee. It is, however, a "red herring" that should neither distract this Court's analysis nor give the Court reason to deny the Motion. That is so for four reasons.

52. **<u>First</u>**, it misunderstands the statute. Under Section 1129(b), a plan may not be "crammed down" on creditors if it provides value to stockholders; that is the "absolute priority

rule." The rule does not, however, work in the inverse. That is to say, a plan does not need to fully pay creditors before stockholders are allowed to receive value.[43] Creditors are free to accept a below-par plan distribution; that is their choice; and, doing so does not prevent stockholders from receiving the remaining value, should the Company prove solvent.

53. In fact, Section 1129(b) actually mandates that stockholders receive such excess value. If the excess value instead goes to creditors, that would violate the so-called "corollary" to the "absolute priority rule," which holds that a plan is not "fair and equitable" to stockholders if it pays creditors more than they are owed or more than any lesser amount they agree to.[44]

54. If the excess value instead goes to a cherrypicked subset of stockholders – as is the case here – that would violate Section 1129(b)'s prohibition on "unfair discrimination."[45]

55. **<u>Second</u>**, to the extent that the noteholders' compromise is held up as some talismanic reflection of *in*solvency, it is simply not competent evidence. Bankruptcy jurisprudence has long held that the value of a Chapter 11 debtor must be determined, in the absence of a fair market test, based on rigorous study of the debtor's anticipated future cash flows.[46]

---

[43] *See, e.g., In re W.R. Grace & Co.*, 475 B.R. at 175 (D. Del. 2012).

[44] *See In re Breitburn Energy Partners LP*, 582 B.R. 321, 350 (Bankr. S.D.N.Y. 2018) ("An unwritten corollary to the absolute priority rule is that a senior class cannot receive more than full compensation for its claims.").

[45] *See In re Mangia Pizza Invs., LP*, 480 B.R. 669, 701-02 (Bankr. W.D. Tex. 2012) (finding that the Debtors' plan discriminated unfairly and was not in good faith because it afforded one owner the exclusive opportunity to contribute new value and retain a 100% equity interest in the reorganized debtor while denying a dissenting 49% owner that same opportunity and extinguishing the dissenting owner's equity); *In re Surfango, Inc.*, No. 09-30972, 2009 WL 5184221, at *6, 14 (Bankr. D.N.J Dec. 18, 2009) (finding that the plan proponents had not rebutted the presumption of unfair discrimination where a plan elevated a certain shareholder's equity interest from 12% to 88% while denying other holders the opportunity to receive new stock in the reorganized debtor and cancelling their current interests).

[46] *See Consol. Rock Prods. Co.*, 312 U.S. at 526; *TMT Trailer Ferry, Inc.*, 390 U.S. at 441–42; *Grp. of Inst. Invs. v. Chi., Milwaukee, St. Paul & Pac. R.R. Co.*, 318 U.S. 523, 540 (1943); *In re Mirant Corp.*, 334 B.R. at 844; *In re Bjolmes Realty Tr.*, 134 B.R. 1000, 1009 (Bankr. D. Mass. 1991); *In re Jartran, Inc.*, 44 B.R. 331, 368 (Bankr. N.D. Ill. 1984).

56. Extraneous data points, amounting to little more than atmospheric assertions of corporate worth, are too whimsical – too detached – from the rigorous, introspective analysis demanded by *Consolidated Rock* and its progeny. They are, in turn, found not to be probative to the question at hand.[47]

57. **<u>Third</u>**, the "debt discount" assertion violates a fundamental tenet of corporate finance. In 1958, Professors Modigliani and Miller advanced the so-called "irrelevancy principle," for which they won the Nobel Prize in economics. According to this principle, the value of a business is determined without any reference to its capital structure. It is, in other words, entirely irrelevant to the valuation inquiry (i) how much debt the company is carrying, (ii) whether the creditors are willing to compromise their debt entitlements, and (iii) if so, by how much.[48] The "irrelevancy principle" is not a concept foreign to Chapter 11. It is, in fact, implicit in the holdings of *Consolidated Rock, TMT Trailer Ferry, Mirant*, *Spansion*, *Exide*, etc. It is why we value Chapter 11 debtors based on their anticipated future cash flow, without even acknowledging the desires of the case stakeholders.

58. **<u>Fourth</u>**, although it still remains irrelevant to the question at hand, it is worth considering the myriad reasons why the noteholders might agree to a plan compromise ***having absolutely nothing to do with the Company's true inherent value***. Perhaps, e.g., the noteholders acquired their notes at a low point, and the negotiated deal affords them a quick and sufficiently

---

47 *See, e.g., Spansion, Inc.*, 426 B.R. at 130 (the debtor's enterprise value must be determined by analysis of future cash flows, not by weak assertions that claims have traded below par); *In re Mirant Corp.*, 334 B.R. at 832-33 (what creditors are willing to accept on account of their claims is not "a credible test of value of Mirant Group or its securities postconfirmation"); *Exide Techs.*, 303 B.R. at 61-64 (rejecting debtor's valuation based on an informal and unsystematic "private equity process," adopting instead the more analytical valuation proffered by the official creditors' committee focused on anticipated future cash flows).

48 *See* Franco Modigliani & Merton H. Miller, *The Cost of Capital, Corporation Finance and the Theory of Investment,* 48 AM. ECON. REV. 261, 268-69 (1958) (explaining that the market value of any firm is independent of its capital structure and is determined by capitalizing expected return at an appropriate rate).

juicy profit. Perhaps these particular noteholders are ill-equipped, structurally or by investment guidelines, to own stock in a reorganized debtor and so, they agreed to a reduced quantum (63%) in exchange for a preferred currency (cash). Perhaps the noteholders found themselves (when the Shutterstock deal was terminated) in a "falling knife" situation, where the Company was rapidly running out of liquidity, a "free-fall" Chapter 11 filing presented a risky proposition, there was insufficient time to diligence whether a 63% cash payment was a good or bad deal, but they needed to cut the best deal they could under imperfect, exigent circumstances. Or, perhaps the Getty and Koch families exerted "hardball" negotiating tactics in a manner not too distinct from their approach toward minority equity and warrant holders, threatening the noteholders with adverse treatment under a different sort of "cram down" plan.

59. Given the circumstances underlying this case, any of those suppositions could be true, and if so, the "debt discount" means nothing to the Company's true inherent value. As a matter of fact (as well as a matter of law), it would have no probative value in the "hopeless insolvency" inquiry.

## II. <u>Representation</u>.

60. In determining whether equity already has "adequate representation" in the Chapter 11 case, courts consider whether "the usual checks and balances" are present – that is, whether other parties are adequately motivated to challenge the assumptions undergirding the debtor's plan.[49]

---

[49] *See, e.g., Pilgrim's Pride,* 407 B.R. at 218-19 ("While it is unquestionably true that Debtors' officers and directors have a duty to maximize Debtors' estates to the benefit of shareholders as well as creditors, the reorganization process is not so simple that that ensures shareholders are adequately represented by even equity-owning management….An equity committee would provide a counterweight by, presumably, being as optimistic in valuing Debtors as creditors are pessimistic.")

61. The Official Creditors Committee often serves as the primary case counterbalance, but this is not always the case. In cases where the debtor intends to pay off all claims in full, the Official Creditors Committee is lulled into complacency.[50]

62. The existence of a "Special Committee" appointed to evaluate and "sprinkle holy water on the situation" does not cure conflicts, evidence good faith, or vitiate the need for an Official Equity Committee.[51] Nor does it establish fair value through arm's-length dealing (particularly in controlling-shareholder contexts), especially where (as here) the proposed transaction lacks support from even one minority stockholder, let alone a majority of them.[52] As emphasized in *Oneida*, "a due regard for appearances" warrants an Official Equity Committee under the circumstances.[53]

63. Here, no party is interested in challenging the *status quo*. To the contrary – all case parties – from the Getty and Koch families, to the debtor-fiduciaries that report to them, to the secured and unsecured creditors – are all plan proponents, adherents, committed supporters. There will not be an Official Creditors Committee in this case, or, if there is one, it will assuredly join the chorus of plan support; there is no economic incentive for it to do otherwise. Recently appointed "bankruptcy directors" functioning as a special board committee "to sprinkle holy water

---

[50] *See In re Oneida Ltd.*, 2006 WL 1288576, at *3 (When "all general unsecured claims … will be paid in full under the Debtors' plan, … the [Official Creditors] Committee [is] the least likely party in interest to challenge the *status quo* [and] the usual checks and balances are not present.")

[51] *In re Coram Healthcare Corp.*, 271 B.R. 228, 240 (Bankr. D. Del. 2001).

[52] *In re Match Grp., Inc. Deriv. Litig.*, 315 A.3d 446, 465 (Del. 2024) ("[E]ven when the transaction is negotiated by a special committee of independent directors, 'no court could be certain whether the transaction fully approximate[d] what truly independent parties would have achieved in an arm's length negotiation.'") (quoting *Kahn v. Tremont Corp*., 694 A.2d 422, 428-29 (Del. 1997)); *Emerald Partners v. Berlin*, 726 A.2d 1215, 1222–23 (Del. 1999) (transactions with controlling stockholders require either the approval of a truly independent committee with "real bargaining power" against "a majority shareholder who does not dictate the terms of the merger" or approval by a "fully informed vote of a majority of the minority shareholders" to shift burden away from "entire fairness").

[53] 2006 WL 1288576, at *3.

on the situation" offer nothing helpful. Only an Official Equity Committee can protect the minority stock and warrant holders. It is fitting and appropriate that it be appointed to do so.

## III. Case Complexity.

64. Appointment of an Official Equity Committee "is more appropriate where the complexities of the case make it more difficult for another—[e.g.,] management—to protect equity interests as well as those of creditors."[54]

65. The case circumstances are, as discussed above, very controversial. The plan's valuation thesis is subject to significant debate, and the benefits bestowed exclusively on the Getty and Koch families warrant broad skepticism, a motivated "adversary check," and – as a matter of law – a most exacting level of judicial scrutiny.[55]

66. And all of this must be accomplished in a ***matter of weeks***. That is because the Debtors' DIP Loan (provided by the Koch family) defaults if the case deviates away from the Debtors' plan and/or it is not confirmed in that narrow window of time. The DIP Loan is obviously designed to place the Court in a "Hobson's Choice" situation: (i) confirm the plan, wrongful as it may prove to be; or (ii) deny confirmation, default the DIP Loan, and potentially send the case into administrative insolvency (potentially leading to the insiders' emergency "credit bid" under the Final DIP Order to be entered). That is not how Chapter 11 is supposed to work: the case setup is remarkably disrespectful to this Court, but, regardless, the "Hobson's Choice" is the obvious, foreseeable future of this case.

---

[54] *Pilgrim's Pride*, 407 B.R. at 220.

[55] *Pepper v. Litton*, 308 U.S. at 306 (deals struck with controlling stockholders must be subject to "rigorous scrutiny and where any of their contracts or engagements with the corporation is challenged the burden is on the director or stockholder not only to prove the good faith of the transaction but also to show its inherent fairness from the viewpoint of the corporation and those interested therein."); *In re Match Grp., Inc.*, 315 A.3d at 460 ("[W]here a controlling stockholder transacts with the controlled corporation and receives a non-ratable benefit, the presumptive standard of review is entire fairness.").

67. This is a massive business enterprise. This is a massive bankruptcy case, with many eyes watching. The issues here are factually, legally, even philosophically difficult. And there is no time. To characterize this situation as "complex" would be a dramatic understatement.

**IV. The Cost Of An Equity Committee Is Justified.**

68. Courts have made it clear that, under circumstances like these, the administrative costs of an Official Equity Committee alone must not bar its appointment.[56] Courts "employ a balancing test to weigh the cost of any equity committee" against the need for "adequate representation."[57]

69. In a case where, as here, creditors are paid in full or reinstated at or near par, equity holders have the strongest incentive to keep costs low so as not to diminish their recoveries. Further, given the compressed timeline imposed by the DIP Loan, the costs of an Official Equity Committee simply cannot reach, let alone exceed, the bounds of reasonableness. The anticipated professional costs will instead be *de minimis* in comparison to the size of these estates and other case parties' expenses. Indeed, establishing an Official Equity Committee at this critical juncture provides extra guardrails in the form of additional oversight of other parties' costs to ensure the efficiency of the proceedings.

70. The Bankruptcy Code also contains adequate means for controlling costs. Fees and expenses of the Official Equity Committee will be subject to review and, if appropriate, objection by other parties in interest. The Court will also have the final say over the Official Equity

---

56 *See, e.g., In re Enron Corp.*, 279 B.R. 671, 694 (Bankr. S.D.N.Y. 2002) ("Added cost alone does not justify the denial of appointment of an additional committee where it is warranted" (citing *In re Hills Stores*, 137 B.R. 4, 8 (Bankr. S.D.N.Y. 1992)); *In re McLean Indus.*, 70 B.R. 852, 860 (Bankr. S.D.N.Y. 1987) ("Cost alone cannot, and should not, deprive public debt and security holders of representation." (citing *In re Beker Indus. Corp.*, 55 B.R. 945, 951 (Bankr. S.D.N.Y. 1985))).

57 *Williams Commc'ns*, 281 B.R. at 220 (citing *Wang Lab'ys.*, 149 B.R. at 3).

Committee's fee requests, thus providing sufficient control of committee costs the same way as with other estate professionals.

## V. <u>An Official Equity Committee Should Be Appointed Now</u>.

71. The RSA drives these cases toward entry of a confirmation order within 55 days of the petition date and emergence within 75 days. A combined hearing on plan confirmation and the disclosure statement is currently scheduled to be held on December 15, 2026, with an objection deadline roughly ***three weeks away from the filing of this Motion***.

72. This expedited schedule (a product of the Getty and Koch families' own making) makes prompt appointment imperative, as an Official Equity Committee would require time to retain professionals, investigate valuation and causes of action, and participate meaningfully in confirmation negotiations. Under such circumstances, an Official Equity Committee must be appointed as soon as possible.

73. The Court cannot wait for the case to essentially end before deciding whether to allow equity to have a voice in the Chapter 11 process. Official equity committees are routinely appointed in bankruptcy cases where, as here, the legal requirements have been met, and the committee can provide significant input in the case's ultimate outcome.[58]

## <u>NOTICE</u>

74. Notice of this Motion shall be served on any party entitled to notice pursuant to Bankruptcy Rule 2002 and any other party entitled to notice pursuant to Local Bankruptcy Rule 2002-1(b) including the Debtors' counsel.

---

[58] *See, e.g., Exide Tech. v. State of Wis. Inv. Bd.*, No. 02-1572-SLR, 2002 WL 32332000 (D. Del. Dec. 23, 2002) (affirming bankruptcy court decision to appoint equity committee); *In re Horsehead Holding Corp.*, No. 16-10287, 2016 WL 10077082 (Bankr. D. Del. May 2, 2016); *In re Pilgrim's Pride Corp.*; *In re Wang Lab'ys, Inc.*; *In re Beker Indus. Corp.*; *In re Oneida*; *Matter of Baldwin-United Corp.*, 45 B.R. 375 (Bankr. S.D. Ohio 1983).

## PRAYER FOR RELIEF

**WHEREFORE**, based on the foregoing, the Ad Hoc Group respectfully requests that the Court enter an Order: (i) directing the immediate appointment of an Official Equity Committee; and (ii) granting the Ad Hoc Group such other and further relief as is just and proper.

Dated: November 9, 2026

**AKERMAN LLP**

By: *\/s/ Lucian B. Murley*

Lucian B. Murley (DE Bar No. 4892)
Stephen A. Smith (DE Bar No. 7456)
222 Delaware Avenue
Suite 1710
Wilmington, DE 19801
Telephone: (302) 596-9200
Email: luke.murley@akerman.com
stephen.smith@akerman.com

-and-

**BROWN RUDNICK LLP**

Robert J. Stark (*pro hac vice* forthcoming)
Bennett S. Silverberg (*pro hac vice* forthcoming)
Andrew M. Carty (*pro hac vice* forthcoming)
Seven Times Square
New York, NY 10036
Telephone: (212) 209-4800
Email: rstark@brownrudnick.com
bsilverberg@brownrudnick.com
acarty@brownrudnick.com

Sharon I. Dwoskin (*pro hac vice* forthcoming)
One Financial Center
Boston, MA 02111
Telephone: (617) 856-8200
Email: sdwoskin@brownrudnick.com

*Counsel for the Ad Hoc Group*

**Certificate of Service**

I hereby certify that on November 9, 2026, a true and correct copy of the foregoing document was filed and served via the Court's electronic case filing and noticing system to all parties registered to receive electronic notices in this matter.

*/s/ Lucian B. Murley*
Lucian B. Murley