**Exhibit A**
**(<u>UST Letters</u>)**

brownrudnick

Robert J. Stark
Seven Times Square
New York, New York 10036
212-209-4862
rstark@brownrudnick.com

October 22, 2026

**By Electronic Mail**

Benjamin A. Hackman, Esq.
Office of the United States Trustee
844 King Street, Suite 2201
Wilmington, DE 19801
benjamin.a.hackman@usdoj.gov

**Re: In re Getty Images Holdings, Inc., Case No. 26-11643 (JKS)**

Dear Mr. Hackman:

We write on behalf of the fourteen firms and individuals identified on **Exhibit A** hereto (the "**Equity Security Holders**") , which collectively own: (i) 13.4 million shares of the Debtors' common stock, or about 12% of the stock not owned by the Getty and Koch families; and (ii) about 34% of a $97 million judgment against the Debtors for their failure to honor its contractual obligation to convert warrants into common shares.[1] The Equity Security Holders hereby request the United States Trustee appoint an Official Equity Committee in this Chapter 11 case. For the reasons that follow, such appointment is especially warranted in this case.

## I. Introduction.

This is a highly unusual Chapter 11 case. The company is primarily owned (approximately 73%, at year-end 2025) and controlled by two of the wealthiest and most powerful families in America, the Getty and Koch families. It comes to bankruptcy with a long history of M&A activity, leaving a detailed trail of data about its total enterprise value and how the Getty and Koch family have always thought about – and historically realized for themselves – enormous equity value. That history and data, as detailed in this letter, inform this case.

More pointedly, it contextualizes the Debtors' case narrative and strategy. The Debtors have about $1.5 billion in funded debt, of which $1.2 billion is secured and $270 million is unsecured. Like so many debtors today, these Debtors "pre-negotiated" their bankruptcy, memorializing terms in a Restructuring Support Agreement signed by almost all of its funded debt holders. Secured creditors (about 80% of the funded debt) come out at par. General unsecured creditors also come out at par. Unsecured bondholders (about 20% of the funded debt) take a haircut of about $100 million, but are paid off in cash -- i.e., they take preferred currency for a discount in quantum. The funded creditors, all told, recover 93.3% of what they are owed. None of them get reorganized company equity.

---

[1] For purposes of this letter only, we presume (that not conceded) that the warrant judgment is subordinated to priority level of common stock per Bankruptcy Code Section 510(b).

Who gets that equity? The Getty and Koch families get all of it. Old equity and warrant holders get nothing. Although they occupy the same priority level as the Getty and Koch families, old equity and warrant holders are still ***deemed*** "out-of-the-money" because the RSA ***deems*** the company's total enterprise value to be within that tiny sliver of debt (a mere 6.7% of the funded debt-load) that is being compromised. As anyone experienced in Chapter 11 valuation will readily attest, that is like landing a 747 on a dime in a snowstorm. And that is so ***before*** we also factor in that: (i) this is an inside transaction, negotiated by insiders, by the insiders' longstanding professionals, for the insiders' benefit; (ii) the Debtors did not – and will not -- subject their case thesis to any sort of market test or other form of competitive process to corroborate their valuation theory; (iii) the historical trail of M&A activity and data reflects an enterprise is worth ***dramatically*** more than that implied by the RSA; (iv) the "liquidity" issues giving rise to this bankruptcy were largely self-imposed by the Getty and Koch families, as they refused to dilute their equity ownership by honoring the warrant/conversion obligations -- i.e., they prioritized their equity over corporate cash; and (v) they are now exploiting this self-created, self-imposed liquidity crisis to "repurchase" the company – again, without a competitive market process – resetting the capital structure more to their liking and squeezing-out the minority stockholders and warrant holders. As the old saying goes, "never let a crisis go to waste," especially when you create it yourself.

Pulling this off would be a neat trick, but a lot of law stands in the way. First, this plan construct is subject to particularly exacting scrutiny, given that (a) this is an inside transaction, (b) subject to Section 1129's "good faith" and "cram down" standards, and (c) there is a deep well of bankruptcy jurisprudence hostile to this particular kind of case set-up. See, e.g., Pepper v. Litton, 308 U.S. 295 (1939); In re Quigley, 437 B.R. 201 (Bankr. S.D.N.Y. 2010). Second, the notion that the Getty and Koch families secured for themselves the exclusive right to "repurchase" the company, without sharing any value with other, similarly-situated equity security holders, is blatant "unfair discrimination" under Section 1129(b). See, e.g., Bank of America Nat'l Tr. & Savs. Ass'n v. 203 N. LaSalle St. P'ship, 526 U.S. 434 (1999); In re Tribune Co., 972 F.3d 228 (3d Cir. 2020). Third, and perhaps most importantly, the Debtors are going to have to prove up their valuation thesis at confirmation – to wit, that the value of the business does in fact fit within that tiny sliver of compromised debt; that all the M&A activity and the trail of data showing equity is wildly in the money (i.e., that this is an enormous fleecing for the exclusive benefit of Getty and Koch families) is somehow wrong. See, e.g., Protective Committee v. Anderson, 390 U.S. 414 (1968); Consolidated Rock Prods. Co. v. Du Bois, 312 U.S. 510 (1941); In re Exide Tech., 303 B.R. 48 (Bankr. D. Del. 2003).

Chapter 11 is, to be sure, an adversary process, where the debtor's narrative/strategy must be subjected to close scrutiny/examination by an official committee incentivized to challenge the status quo. Here, the Official Creditors Committee – if one can even be appointed – will have absolutely no incentive to challenge the Debtor's narrative/strategy, given that the unsecured creditor classes have either signed onto the deal (i.e., the unsecured bondholders) or are taken out in full, in cash (i.e., all other unsecured creditors). Only an Official Equity Committee is properly incentivized to be the proper "adversary check" in the case. The underlying case facts, as delineated further herein, strongly support the appointment request contained here. We ask you please to grant this request with all deliberate speed. The Debtor's proposed DIP Loan compels that this case conclude ***in only a matter of weeks.***

## II. Case Background.

### A. The Business, In Brief.

Getty Images owns a massive stockpile of digital images, video, and music. It has a library of over 477 million assets, accumulated via serial acquisitions over the years. It also creates content by covering news, sporting, and entertainment events, and licensing data to its customers. It capitalizes on the internet, which draws over 2.3 billion searches annually to its collection. It operates in three segments: (1) Getty Images, which includes premium and editorial stills, music, video, and generative AI marketed to corporate customers; (2) iStock, which is a budget-conscious alternative targeting smaller businesses; and (3) Unsplash, with free and low-cost stills largely marketed to individual content creators.

The company was co-founded by Mark Getty in 1995. Two years later it merged with PhotoDisc, Inc. to form Getty Images. Under Mark Getty's tutelage, the company's library and operational footprint grew dramatically. In 2008, the company was sold in a private equity transaction valued at $2.4 billion. It was sold again to a different private equity firm in 2012, but was ultimately reacquired by the Getty family in 2018. In 2021, the company announced that it would go public via SPAC transaction, which closed in July 2022 (more on this below). In August 2022, the company's stock was trading at $30 per share. In April 2023, activist investor Trillium Capital made an unsolicited bid to acquire the company for $4 billion, which offer was turned down. In 2023, the company announced that it was partnering with Nvidia to launch a generative AI imaging product. In January 2025, the company announced a merger with Shutterstock, in which the Debtors were valued at $2.02 billion. That deal did not close (more on this below) due to antitrust – not solvency, financial, or other commercial – issues.

As noted above, these transactions leave a trail of valuation data. That data does not support the notion that equity is "out-of-the-money." To the contrary, it reflects that the Debtors intend to effectuate an enormous fleecing, enabling the Getty and Koch families to squeeze-out minority stock and warrant holders for no consideration.

### B. The Debtor Breaches Its Warrant Obligations, Preventing Dilution Of The Families' Stock Ownership.

As part of the 2022 SPAC transaction, the company issued stock and warrants, which traded publicly on the New York Stock Exchange. In connection with that transaction, the company circulated a fairness opinion prepared by its investment banker, Solomon Partners Securities.[2] Solomon's fairness opinion includes 13 "comps" – that is, public companies that the Debtor's own banker identified as "comparable" for valuation purposes. The list is set forth below.

---

2 Proxy (June 30, 2022) at 183-189 and Annex O, available at https://www.sec.gov/Archives/edgar/data/1898496/000110465922076440/tm222601-18_424b3.htm#anxo.

**Getty Images – Solomon (2022 SPAC) Comparables: December 2021**

**Solomon comparables (2022 SPAC)**

| **Company** | **December 2021 EV 12/31/21 / CY2022A EBITDA** |
|---|---|
| Shutterstock | 24.1x |
| Universal Music Group | 27.7x |
| Warner Music Group | 24.3x |
| The New York Times Company | 21.0x |
| Thomson Reuters | 30.9x |
| Adobe | 42.0x |
| Avid Technology | n/a |
| Squarespace | 106.6x |
| Wix.com | n/m |
| Etsy | 60.2x |
| Fiverr | n/m |
| GoDaddy | 23.0x |
| Upwork | n/m |
| **Median – all peers** | **27.69x** |

Immediately following the SPAC transaction, the stock price went up significantly, and it stayed there for some time. Warrant holders were entitled to convert into shares 30 days after the merger had completed. The Getty and Koch families would also benefit from sustained trading highs, in the form of an earnout equal to tens of millions of shares, if the price remained elevated for 20 of 30 consecutive trading days, which it did. But, a concern remained: If the warrants were exercised in mass, that might push down the share price, possibly preventing the earnout target from being met.

Warrant holders did, in fact, seek to exercise the conversion option, exacerbating that concern. The company devised a loophole to prevent holders from exercising their conversion right until after the earnout targets had been met, which predictably collapsed the trading price and thus disabled conversion. The warrant holders sued and, unsurprisingly, the lawsuits were quite successful[3] – resulting, in an aggregate, nine-figure cash payments to warrant holders. A $97 million judgment remains pending against the company. But, the families' strategy was also successful: Rather than sharing more of the equity with the public float, they got to keep their earnout shares, and the company -- but not the Getty and Koch families -- were liable for the breach of contract claims.[4]

---

3 Form 10-Q (Aug. 10, 2026) at 15; Form 8-K (Aug. 28, 2026) at 1. The decision in favor of the warrant litigants in the first wave is Alta Partners, LLC v. Getty Images Holdings, Inc., 700 F.Supp.3d 32 (S.D.N.Y. 2023). The second wave of warrant litigations involved multiple actions consolidated under the caption Funicular Funds LP v. Getty Images Holdings, Inc., Index No. 653410/2024 (New York Supreme Court, New York County).

4 The Debtors and minority shareholders may very well have breach of fiduciary duty and other claims and causes of action against the Kochs and Gettys arising from the damages (including litigation costs and judgments) incurred by the Debtors as a result of the warrant disputes. See, e.g., In re ASHINC Corp., 640 B.R. 1 (Bankr. D. Del. 2022) (controlling equity holder breached fiduciary duty by exploiting control over debtor to demand transaction premiums at the expense of other stakeholders); Transeo S.A.R.L. v. Bessemer Venture Partners VI L.P., 936 F.Supp.2d 376 (S.D.N.Y. 2013) (denying motion to dismiss breach of fiduciary duty claim where majority shareholders blocked transaction that would have resulted in a pro rata distribution to all shareholders and ended the majority's access to the company's intellectual property for themselves); Jedwab v. MGM Grand Hotels, Inc., 509 A.2d 584, 599 (Del. Ch. 1986) (breach of fiduciary duty where the

**C. The Company Backs Out Of The Shutterstock Merger.**

In January 2025, the company's stock was trading well and the Getty and Koch families benefited from the earnout stock accretion. They now needed a bigger transaction, a bigger monetization strategy. The Shutterstock merger was, purportedly, a "merger of equals," creating a combination valued at $3.7 billion.[5] The Debtors' shareholders would receive approximately 54.7%, or about $2.02 billion (minus debt). The Getty and Koch families would control 7 out of 11 board seats, and Mark Getty would be Chairman of the Board.

To secure shareholder consent, the company circulated two fairness opinions, one issued by J.P. Morgan (on behalf of the Debtors) and the other by Allen & Company (on behalf of Shutterstock). J.P. Morgan estimated the Debtor's standalone enterprise value at $2.32-$2.98 billion on a discounted cash flow (DCF) basis – a multiple of 7.6x-9.8x of adjusted EBITDA for 2025 (expected).[6] Allen & Company estimated the Debtor's standalone enterprise value on a DCF basis at $1.87-$2.92 billion – a multiple of 6.2x-9.6x on adjusted EBITDA for 2025 (expected).[7] J.P. Morgan estimated the Debtor's implied equity value to be around $1.272 billion on a stand-alone basis.[8] Allen & Company estimated the Debtor's implied equity value to be around $1.46-$3.42 per share (or approximately $1.109 billion) on a stand-alone basis.[9] The Getty and Koch families had, in sum, made a very good bet directing the company not to dilute their shares, having the company instead breach the warrant agreement, reserving for another day the company's obligation to pay the warrant holders in cash when their litigation reached its conclusion.

United States antitrust authorities approved the transaction. UK authorities did not, however. The UK conditioned regulatory clearance on the divestiture of Shutterstock's editorial business. This should not have been a big deal: the UK authorities even noted that the companies had described the editorial business as "peripheral to Shutterstock's core operations,"[10] and both the Debtor and Shutterstock had previously indicated their interest in selling it off.[11]

But, seemingly, "buyer's remorse" had set in: The Getty and Koch families no longer wanted to do the deal. On June 30, 2026 – that is, only 4 months ago – the Debtor terminated the transaction, stating that "Getty Images is not required to accept that condition under the terms of the Merger Agreement" and that

---

minority was financially injured and the majority shareholder gained what the minority shareholders lost). We are unaware of any investigation into these or other causes of action against the Kochs and the Gettys. Nonetheless, the RSA requires broad plan releases for all insiders.

5 Proxy (Jan. 6, 2025), available at https://www.sec.gov/Archives/edgar/data/1898496/000121390025037626/ea0235881-03.htm#T99045; press release noting $3.7 billion valuation available at https://investors.gettyimages.com/news-releases/news-release-details/getty-images-and-shutterstock-merge-creating-premier-visual.

6 Id. at 59 (adjusted EBITDA), 62-72 and Annex C.

7 Id. at 72-79 and Annex D.

8 Id. at 65.

9 Id. at 78.

10 CMA Press Release (May 15, 2026), available at https://www.gov.uk/government/news/cma-conditionally-clears-getty-merger-with-shutterstock.

11 Id.

its board resolved to terminate the merger rather than proceed with the sale of the editorial business.[12] The Debtor did not provide any analysis of why terminating the merger agreement (after having spent more than $100 million pursuing the transaction) would be better than divesting Shutterstock's editorial business.[13]

It now seems, four months later, that the families must have had another strategy in mind to realize their big payday. Perhaps one that eradicates a small amount of debt, squeezes out all minority stock and warrant holders, and sets up the families to realize exclusively for themselves (post-bankruptcy) all the upside promised by the Shutterstock merger, or perhaps some other transaction lurking behind the scenes.

**D. The Debtor Creates Its Own Liquidity Crisis; But The Business Otherwise Seems Just Fine.**

As far as the business goes, it does not seem all that much has changed. There is, purportedly, a liquidity concern, but the cash depletion was of its own (strategic) making, to wit: it lost (twice) to warrant holder plaintiffs, and it paid more than $100 million in professional fees related to the terminated Shutterstock merger. But, the company is still producing the same amount of cash, like clockwork: SEC "cleansing" materials filed by the Debtor days ago show adjusted EBITDA "remarkably steady in the $300-$321 million range," into the foreseeable future.[14]




12 Form 8-K (June 30, 2026) at 1.

13 In an earnings call on August 10, 2026, CEO Craig Peters said that "the regulatory requirements and the corresponding uncertainty and cost of execution, both direct and indirect, presented burdens we determined were no longer in the best interest of the company to bear." Available at https://investors.gettyimages.com/events/event-details/getty-images-holdings-inc-second-quarter-2026-earnings-call.

14 There is a drop in 2026 earnings that appears to be for one-time charges, which one commentator described as "convenient," given Getty/Koch's case objectives. Philip Brendel, Getty Images: Koch, Getty Grab Distressed Opportunity, Bloomberg Intelligence, Oct. 14, 2026. This would not matter, in any event, given that Chapter 11 requires "normalized" valuation, that is the removal of one-time irregularities that, if included in the modeling, would distort the modeling conclusion. See, e.g., Cox Enters. v. New-Journal Corp., 510 F.3d 1350, 1358-59 (11th Cir. 2007); (court "normalized" margins to enable valuation comparison with other companies); Chartwell Litig. Trust v. Addus Healthcare, Inc. (In re Med Diversified, Inc.), 346 B.R. 621, 629-30 (Bankr. E.D.N.Y. 2006)(referencing "normalized" EBITDA to enable a more accurate valuation).

There also do not appear to be any industry "headwinds" that might adversely affect cash production. In the Debtor's past two earnings calls, management vaunted growth opportunities for 2026 revenue, including the FIFA World Cup (where the Debtor was both a primary content provider and a strategic partner to various broadcasters, brands, and sponsors) and a multi-year deal with OpenAI and other increases in AI licensing in the second half of 2026.[15] That information was due to be disclosed in Q3, which conveniently will now not happen. Yet, we know that the cleansing materials insist on the stability of their revenue, despite this dip:

- "Getty Images' financial performance has proven steady even in the face of sustained entry by free and lower-priced competitors because customers value premium, high-quality content."[16]
- "Despite headwinds from declining agency demand and disruption to the iStock eCommerce business, the core business continues to show steadiness with the majority of the revenue base in growth mode fueled by premium content."[17]
- "Revenue declines in 2026 are largely due to accelerated revenue recognition (ASC606) on two large multi-year deals booked in Q4'25 that pulled significant revenue forward. Core business of Getty Images creative and editorial is forecasted to continue growth at a low-to-mid single digit pace." And while overall growth is moderated by declines in two business lines, "[e]ventually, growth in the core business outpaces the declining business lines, returning the overall business to growth."[18]

## III. Appointment Of An Official Equity Committee Is Warranted In This Case.

Bankruptcy Code Section 1102(a)(1) authorizes the appointment of an Official Equity Committee as the United States Trustee "deems appropriate." 11 U.S.C. § 1102(a)(1). In considering a request for the appointment of an Official Equity Committee, case precedent focuses on the following considerations: (A) whether the Debtors are "hopelessly insolvent"; (B) whether the interests of equity holders are adequately represented by stakeholders already at the table; (C) the complexity of the Debtor's case; (D) the delay that would result from the appointment of an Official Equity Committee and the timing of the request; and (E) whether the costs associated with such committee significantly outweigh the need for adequate representation. See, e.g., In re Celsius Network LLC, 645 B.R. 165, 171-72 (Bankr. S.D.N.Y. 2022) (citing In re Williams Commc'ns Grp., 281 B.R. 216, 220 (Bankr. S.D.N.Y. 2002)). No single factor is dispositive, and the weight attributed to each factor is determined based on the facts and circumstances of the Chapter 11 case. Id. at 172.

Each of these factors overwhelmingly favors the appointment of an Official Equity Committee.

---

15 Q1 Earnings Call (May 22, 2026), Transcript available at https://stockanalysis.com/quote/otc/GETY/transcripts/608828-q1-2026/; Q2 Earnings Call (Aug. 10, 2026), Transcript available at https://stockanalysis.com/quote/otc/GETY/transcripts/666019-q2-2026/.

16 Cleansing Materials at 6.

17 Id. at 7.

18 Id. at 9.

### A. The Debtors Are Not "Hopelessly Insolvent".

The jurisprudence in this area does not ask whether the debtor is simply insolvent. Rather, the jurisprudence asks whether the debtor is "hopelessly" insolvent, that is, whether there is a likelihood for a recovery to shareholders on account of the value of the equity. See In re Williams, 281 B.R. at 220-21; see also In re Ampex Corp., No. 08-11094, 2008 WL2051128, at *1, (Bankr. S.D.N.Y. 2008); In re Wang Labs., Inc., 149 B.R. 1, 3 (Bankr. D. Mass. 1992) (bankruptcy court appointed committee even though debtor was operating "at a loss" because debtor was not "hopelessly" insolvent).

Here is the capital structure and the EBITDA multiple necessary for equity to be in the money:

**New Getty Images Pro Forma Capital Structure**

| | | LTM Adj. EBITDA | | | 2027E Ebitda | |
|---|---|---|---|---|---|---|
| | | | 307 | | | 291 |
| Pro Forma Plan Cap Structure | Commitment | Outst. ($) | Mult | Rate | AnnInt | Multiple |
| Exit Revolver | 150.0 | - | | 3.50% | - | |
| EUR 1L Term Loan | € 313.9 | 359 | | 7.88% | 28 | |
| 1L Notes | | 580 | | 10.50% | 61 | |
| **Secured Debt** | | 939 | 3.1 | | 89 | 3.2 |
| Cash | | 50 | | | | |
| **Net Debt** | | 889 | 2.9 | | 89 | 3.1 |
| **Reorg. Equity Market Cap** | | 540 | | | | |
| **Enterprise Value** | | 1,428 | 4.7 | | 89 | 4.9 |

Source: Bloomberg Intelligence

Let's now look to the list of "comparable companies" identified by the Debtor for the SPAC transaction, updating the multiples to today's market environment, and applying the median to the Debtor's business. That simple exercise shows that equity is ***wildly*** in the money.

**Solomon comparables (2022 SPAC)**

| Company | December 2021 EV 12/31/21 / CY2022A EBITDA | October 2026 EV 10/21/26 / LTM EBITDA |
|---|---|---|
| Shutterstock | 24.1x | 2.4x |
| Universal Music Group | 27.7x | 14.7x |
| Warner Music Group | 24.3x | 12.4x |
| The New York Times Company | 21.0x | 17.8x |
| Thomson Reuters | 30.9x | 22.4x |
| Adobe | 42.0x | 10.2x |
| Avid Technology | n/a | n/a (acquired) |
| Squarespace | 106.6x | n/a (acquired) |
| Wix.com | n/m | n/m |
| Etsy | 60.2x | 21.4x |
| Fiverr | n/m | n/m |
| GoDaddy | 23.0x | 11.8x |
| Upwork | n/m | 5.8x |
| **Median – all peers** | **27.69x** | **12.41x** |

**Getty Images, applying comparables** – $M, at October 2026 median 12.41x (INFERENCE)

| Adj. EBITDA | $M | TEV | Equity[1] |
|---|---|---|---|
| LTM Q2 2026 | 307 | 3,810 | 2,354 |
| 2026E | 264 | 3,276 | 1,820 |
| 2027E | 291 | 3,611 | 2,155 |
| 2028E | 293 | 3,636 | 2,180 |

[1] Equity = TEV less $1,456M of total funded debt outstanding as of the Petition Date (First Day Declaration, Dkt 29 ¶9). Adj. EBITDA: LTM Q2 2026 from Disclosure Statement p.44 (Dkt 32); 2026E–2028E Company projections, cleansing materials (8-K Ex. 99.2, acc. 0001213900-26-108700, p.10).

Recall also that the J.P. Morgan and Allen & Company valuations performed in connection with the Shutterstock transaction also showed equity ***wildly*** in the money. The Getty and Koch families terminated that transaction just 4 months ago. If the Debtor is, in fact, worth less than the present debt load – and equity is in fact out of the money -- why on earth would the board terminate the deal? Perhaps a better question: If the company's fortunes are, in fact, this dour, why on earth would the Getty and Koch families – obviously, among the "smartest" money in the world – offer this much money to "repurchase" it? Axiomatic, no one (especially not "smart" money) invests hundreds of millions of dollars in the stock of a company without expecting an enormous return on the investment. The Debtor's valuation thesis is, in sum, utter economic irrationality.

It is no retort that the debt discount agreed to in the RSA is "proof of concept" of enterprise value. First, this is an insider deal involving very wealthy and powerful families; one can only speculate as to the deal influences. See Pepper v. Litton, 308 U.S. 295, 306 (1939) ("A director is a fiduciary. So is a dominant or controlling stockholder or group of stockholders. Their powers are powers in trust. Their dealings with the company are subjected to rigorous scrutiny and where any of their contracts or engagements with the corporation is challenged the burden is on the director or stockholder not only to prove the good faith of the transaction but also to show its inherent fairness from the viewpoint of the corporation and those interested therein."). Second, trading/compromise values – as a proxy for enterprise value – must accord with what is known as the "efficient market hypothesis," that is the market or stakeholder participants are making rational choices, on sufficient information, without manipulation or artificial influence. See, e.g., Basic v. Levinson, 485 U.S. 224, 247 (1988) ("who would knowingly roll the dice in a crooked crap game?"). Again, we do not know what was said, or what may have been threatened, in the pre-petition negotiations. Third, we have no idea what the settling bondholders paid for their securities. The bonds traded down dramatically (as low as 40%) after the Debtors terminated the Shutterstock deal. A 63% cash payoff sounds like an awfully juicy return on that kind of short-term arbitrage. Fourth, the company was facing a liquidity crunch caused by the insiders' opportunistic behaviors. Unsecured bondholders, quite reasonably, may have feared opportunistic attacks on their position similar to those wielded against the warrant holders, and may have opted to settle rather than face that kind of aggression. Fifth, this is a very small strip (6.7% of the funded debt) on which the Debtor, at confirmation, has to land the 747. In re Exide Tech., 303 B.R. 48 (Bankr. D. Del. 2003).

To repeat: The Debtors have not, and will not, conduct a market test. The RSA allocates the reorganized company's value to the Getty and Koch families, and to management. No one else. They must prove up their valuation thesis at the confirmation hearing and, given all of the pre-existing data, that will be a very heavy lift. But, today, it is impossible to summarily conclude that equity is "hopelessly insolvent." Not by a long shot.

### B. Equity Is Not Adequately Represented.

In determining whether equity already has "adequate representation" in the Chapter 11 process, courts consider whether "the usual checks and balances" are present—that is, whether there are parties in the case that are motivated to challenge valuation arguments put forth by secured creditors, which the debtor may be constrained to accept. See, e.g., In re Pilgrim's Pride Corp., 407 B.R. 211, 218-19 (Bankr. N.D. Tex. 2009) ("While it is unquestionably true that Debtors' officers and directors have a duty to maximize Debtors' estates to the benefit of shareholders as well as creditors, the reorganization process is not so simple that that ensures shareholders are adequately represented by even equity-owning management…An equity committee would provide a counterweight by, presumably, being as optimistic in valuing Debtors as creditors are pessimistic.").

As S.D.N.Y. Judge Allan Gropper once observed, Chapter 11's adversary process is a system of "checks and balances" that relies on an Official Committee invested in challenging the status quo. In re Oneida Ltd., 2006 WL 1288576 (Bankr. S.D.N.Y. May 4, 2006) (Official Equity Committee warranted because, among other things, "all general unsecured claims (if any) will be paid in fully under the Debtors' plan, making the [Official Creditors] Committee the least likely party in interest to challenge the status quo. The Court finds no indication that the creditors committee or its counsel are failing to act properly under the circumstances, but the usual checks and balances are not present.").

A similar concern arises in this case. The RSA contemplates unimpairment of all general unsecured creditors, and the unsecured bondholders have bound themselves to the RSA. Here too, an Official Creditors Committee is "the least likely party in interest to challenge the status quo." Equity alone occupies that position in this capital structure.

It is no retort that the Debtor recently installed two "independent" directors. First, we do not know whether the deal was set in motion and/or substantially negotiated before they were appointed, and/or how real of an opportunity they had to influence the outcome or change the course of events. Second, there is a growing body of authority questioning whether professional "bankruptcy" directors – individuals who are repeatedly appointed (typically at the behest of the debtor's law firm) shortly before a Chapter 11 filing, and paid an enormous amount of money, largely to give the patina of independence to a pre-determined case outcome -- are reliable fiduciaries. See, e.g., In re EngageSmart, Inc. S'holder Litig., 354 A.3d 796, 845 (Del. Ch. 2026) (citing Jared A. Ellias, Ehud Kamar & Kobi Kastiel, The Rise of Bankruptcy Directors, 95 S. Cal. L. Rev. 1083, 1086-90 (2022)). Third, we already have evidence strongly suggesting that the "fix-is-in" despite the appointment of these directors. The DIP Loan includes heavy "case control" covenants and milestones, ***mandating case conclusion in 75 days***. There is even a "case control" provision that allows the Koch family to declare a default if ***any party in interest*** challenges the status quo. See DIP Loan Credit Agreement § 4.03(e) ("[n]o motion or other pleading shall be pending that seeks relief that is adverse to the Lenders or that is inconsistent with the RSA."). What kind of truly "independent" director, concerned about all parties in interest, would authorize lending terms like these, especially on underlying facts like these?

## C. The Capital Structure Is Sufficiently Complex.

A case does not need to involve an intricate capital or corporate structure or voluminous documents to necessitate a finding that it is complex and worthy of appointment of an official equity committee. See Pilgrim's Pride Corp., 407 at 220. Yet, the Debtors have a complex capital structure, consisting of secured revolving debt, several issuances of term loans in different currencies, two issuances of unsecured convertible notes, other unsecured debt, intercompany claims, equity, and warrant claims.[19] Given the amount of debt involved and the number of interested parties affected, there is no dispute that these chapter 11 cases are complex, as evidenced by the chart below[20]:

[19] Even so, a case does not need to involve an intricate capital or corporate structure or voluminous documents to necessitate a finding that it is complex and worthy of appointment of an Official Equity Committee. See In re Pilgrim's Pride Corp., 407 B.R. at 220.

[20] Available at: https://app.octus.com/v3#/items/intel/2294?item_id=406752.

| Getty Images Holdings Inc. Capitalization | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | 6/30/26 | | PF | 9/29/26 | | | | | EBITDA Multiple | |
| *(USD $ in millions)* | Amount | Adj. | Amount | Price[1] | Mkt. Val. | Maturity | Rate | Yield | Book | Market |
| **Secured Debt** | | | | | | | | | | |
| $150M RCF due 2028 | $120.0 | $0.0 | $120.0 | | $120.0 | 5/4/2028 | S + 3.75% | | | |
| $1.04B Term Loan due 2030 | 40.1 | - | 40.1 | 75.500 | 30.2 | 2/21/2030 | 11.25% | 21.837% | | |
| €419M Term Loan due 2030 | 470.5 | - | 470.5 | 76.000 | 357.6 | 2/21/2030 | E + 6% | | | |
| 11.25% Secured Notes due 2030 | 539.9 | - | 539.9 | 78.000 | 421.2 | 2/21/2030 | 11.25% | 20.566% | | |
| 10.5% Secured Notes due 2030 | 628.4 | (628.4) | - | | - | 11/15/2030 | 10.50% | | | |
| **Total Secured Debt** | **$1,798.9** | **($628.4)** | **$1,170.5** | | **$929.0** | | | | **3.8x** | **3.0x** |
| **Unsecured Debt** | | | | | | | | | | |
| 9.75% Unsecured Notes due 2027 | 5.3 | - | 5.3 | 60.000 | 3.2 | 3/1/2027 | 9.75% | | | |
| 14% Unsecured Notes due 2028 | 264.7 | - | 264.7 | 45.750 | 121.1 | 3/1/2028 | 14.00% | | | |
| **Total Unsecured Debt** | **$270.0** | **$0.0** | **$270.0** | | **$124.3** | | | | **4.7x** | **3.4x** |
| | | | | | | | | | | |
| **Total Debt** | **$2,068.9** | **($628.4)** | **$1,440.5** | | **$1,053.3** | | | | **4.7x** | **3.4x** |
| Less: Cash and Equivalents | (51.6) | - | (51.6) | | (51.6) | | | | | |
| **Net Debt** | **$2,017.3** | **($628.4)** | **$1,388.9** | | **$1,001.7** | | | | **4.5x** | **3.3x** |
| Plus: Market Capitalization | 34.9 | - | 34.9 | $0.08 | 34.9 | | | | | |
| **Enterprise Value** | **$2,052.3** | **($628.4)** | **$1,423.9** | | **$1,036.6** | | | | **4.6x** | **3.4x** |
| | | | | | | | | | | |
| LTM Company Reported Adj. EBITDA | | | **$306.6** | | | | | | | |
| | | | | | | | | | | |
| **Liquidity** | | | | | | | | | | |
| RCF Commitments | $150.0 | $0.0 | $150.0 | | | | | | | |
| Less: Borrowings | (120.0) | - | (120.0) | | | | | | | |
| Less: Letters of Credit | - | - | - | | | | | | | |
| RCF Availability | $30.0 | $0.0 | $30.0 | | | | | | | |
| Plus: Cash and Equivalents | 51.6 | - | 51.6 | | | | | | | |
| **Total Liquidity** | **$81.6** | **$0.0** | **$81.6** | | | | | | | |

**Notes**
*1. Prices from Solve Advisors.*

## D. Delay, Timing, And Cost Do Not Justify Denying Appointment Of An Official Equity Committee.

The Debtors filed their petition on October 21, and no Official Creditors' Committee has yet been appointed. The timing of the request is therefore appropriate. While we are mindful of concerns regarding the additional expense associated with the formation of an Official Equity Committee, "[c]ost alone cannot, and should not, deprive . . . security holders of representation." In re McLean Indus., Inc., 70 B.R. 852, 860 (Bankr. S.D.N.Y. 1987); see also In re Enron Corp., 279 B.R. 671, 694 (Bankr. S.D.N.Y. 2002) ("[a]dded cost alone does not justify the denial of appointment of an additional committee where it is warranted."). The milestones in the RSA would have these cases wrapped up within the next two and a half months. Given the fast track imposed under the RSA, the costs of an Official Equity Committee cannot possibly reach—let alone exceed—the bounds of reasonableness and process fairness. Such costs will certainly be *de minimis* when compared to the size of these estates and the professional costs incurred by the other case parties.[21] And, the Debtors are seeking to borrow $115 million in DIP financing on an interim basis: while that seems entirely unnecessary, the Debtors will have sufficient cash on hand to pay all of the costs of these cases.

Once the need for adequate representation is established, "the burden shifts to the opponent of the motion [to appoint an official equity committee] to show that the cost of the additional committee sought significantly outweighs the concern for adequate representation and cannot be alleviated in other ways." In re Beker Indus. Corp., 55 B.R. 945, 949 (Bankr. S.D.N.Y. 1985); see also 4 Norton Bankr. L.& Prac. § 78:5

21 The Debtors' budget, annexed to the DIP Motion, reflects $60.2 million of "Restructuring Costs" for the thirteen weeks following the Petition Date. We suspect that a significant portion of this amount are the professional fees incurred by the Debtors and RSA Parties.

(2d ed. 2005) ("Should the moving party be successful in showing that an additional committee is required, the burden then shifts to the opponent to demonstrate that the cost of such an additional committee notably outweighs the interest in adequate representation.").

As set forth above, it is abundantly clear that the interests of the equity holders are not adequately represented in these cases. Ensuring a good, reliable Chapter 11 process and, in turn, maximizing recoveries for the benefit of all stakeholders far outweighs the comparably modest cost to the Debtors' estates of appointing an Official Equity Committee.

* * *

For the foregoing reasons, we respectfully request that the United States Trustee promptly appoint an Official Equity Committee. Thank you for your consideration and prompt attention to this matter. We are available to address any questions or concerns you may have.

Very truly yours,

Robert J. Stark

Copies: Elisha D. Graff, Esq. (Simpson Thacher)
Brian Schartz, Esq. (Simpson Thacher)

# EXHIBIT A

| Name | Address | Common Stock (in shares) | Economic Interest in Warrants Held | Other Disclosable Economic Interests |
|---|---|---|---|---|
| Jeffrey Kurzon | [redacted] | 392,290 | None | N/A |
| HZ Investments LLC | c/o Brown Rudnick LLP<br>7 Times Square<br>New York, NY 10036 | 1,528,129 | None | N/A |
| Advantage Capital Management, LLC | 51 E 12th St, Fl 7<br>New York, NY 10003 | 1,416,000 | None | N/A |
| Xin Feng | [redacted] | 774,002 | None | N/A |
| Gary Ribe | [redacted] | 2,082,625 | None | N/A |
| Eric Furey | [redacted] | 1,045,430 | None | N/A |
| David Adler | [redacted] | 28,700 | None | N/A |
| Kenneth Grossman | [redacted] | 1,450,000 | None | N/A |
| Broadway Convexity Fund I, LP | P.O. Box 552<br>Point Lookout, NY 11569 | None | $20,015,122 judgment principal ; 1,148,538 shares issuable by Warrants held | N/A |
| PW Aero LLC | P.O. Box 552<br>Point Lookout, NY 11569 | None | $7,879,335 judgment principal ; 451,150 shares issuable by Warrants held | N/A |
| Robert E. Parker, Jr. | [redacted] | None. | $3,155,117 judgment principal ; 185,131 shares issuable by Warrants held | N/A |
| Lyden Hunsicker | [redacted] | None | $1,244,101.22 judgment principal ; 52,100 shares issuable by Warrants held | N/A |
| Jeffrey Holland | [redacted] | 500,000 | $438,501 judgment principal ; 38,500 shares issuable by Warrants held | N/A |
| Kyle Blackmon | [redacted] | 4,210,200 | None | N/A |

| Name | Address | Common Stock (in shares) | Economic Interest in Warrants Held | Other Disclosable Economic Interests |
|---|---|---|---|---|
| **Total:** | | 13,427,376 | $32,732,176.22 judgment principal ; 1,875,419 shares issuable by Warrants held | N/A |

Simpson Thacher & Bartlett LLP

425 LEXINGTON AVENUE
NEW YORK, NY 10017

TELEPHONE: +1-212-455-2000
FACSIMILE: +1-212-455-2502

Direct Dial Number
+1-212-455-3858

E-mail Address
brian.schartz@stblaw.com

**CONFIDENTIAL**

BY E-MAIL October 29, 2026

Re: *In re Getty Images Holdings, Inc.*, *et al.*, Case No. 26-11643-JKS (Bankr. D. Del.)

Benjamin A. Hackman, Esq.
Office of the United States Trustee
844 King Street, Suite 2207
Wilmington, Delaware 19801
benjamin.a.hackman@usdoj.gov

Dear Mr. Hackman:

We write on behalf of Getty Images Holdings, Inc. ("GIH") and its direct and indirect debtor subsidiaries (collectively, the "Debtors") and its non-Debtor direct and indirect subsidiaries (together with the Debtors, the "Company") in the above-captioned chapter 11 cases in response to Brown Rudnick's October 22, 2026 letter on behalf of certain Equity Security Holders[1] seeking appointment of an Official Equity Committee (the "Request").[2] The Request does not come close to satisfying the standard for appointment of an Official Equity Committee and accordingly the Debtors respectfully submit that the United States Trustee (the "U.S. Trustee") should deny the Request.

---

[1] Defined as the fourteen firms and individuals identified on Exhibit A to the Request. Ten Equity Security Holders assert ownership of 13.4 million shares of the Debtors' common stock, which amounts to approximately 3% of total issued stock. Request at 1. Five Equity Security Holders hold approximately $32.7 million in warrant judgments, which the Request "presumes" (without conceding) are subordinated to the priority level of common stock pursuant to Bankruptcy Code Section 510(b). Request at 1, n.1, Ex. A.

[2] Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the *Declaration of Craig Peters, Chief Executive Officer of Getty Images Holdings, Inc. and Its Debtor Subsidiaries, in Support of the Debtors' Chapter 11 Petitions*, D.I. 29 (the "First Day Declaration" or "First Day Decl."), filed on October 21, 2026 (the "Petition Date"). References to the "Brantley Decl." are to the *Declaration of Mitchell (Chase) Brantley, Senior Director at Alvarez & Marsal North America, LLC, in Support of the Debtors' DIP Motion*, D.I. 23.

## I. Overview

Appointing an Official Equity Committee is "considered extraordinary relief and should be the rare exception." *In re Spansion, Inc.*, 421 B.R. 151, 156 (Bankr. D. Del. 2009) (citations omitted). The Request tries to lower that bar by suggesting that a committee is warranted unless the Debtors are "hopelessly insolvent." Request at 8. That is not the test. Instead, shareholders must show both a substantial likelihood of a meaningful distribution under the absolute priority rule and that they cannot represent their interests without an official committee. *See infra* Section II. The Request satisfies neither requirement under this exacting standard. Where equity is out of the money, courts in this District have repeatedly denied such requests to appoint an Official Equity Committee. The same result should apply here.

The Request's dramatic assertion that equity is "wildly" in the money is completely unsupported by the market and the record. It ignores the Debtors' prepetition debt and equity trading prices that reflect insolvency, misunderstands the Debtors' prepetition capital structure, relies on a fraudulently inflated sham tender offer and stale valuations, glosses over more recent valuation metrics, and fails to present any current valuation evidence of its own. Stripped bare, the Request represents a request for a gift to minority shareholders to buy peace. But this is not a proper basis upon which to appoint an Official Equity Committee, and any resulting lengthening and uncertainty in the restructuring process will harm the Company.

***Trading prices reflect insolvency***. GIH's common stock was trading for less than 10 cents by late September when the NYSE suspended trading due to its "abnormally low selling price" and commenced delisting procedures. Since then, it has traded on the OTC Pink Limited Market for less than 5 cents, last closing at 2 cents. These trading prices clearly reflect nothing more than the barest of option value. Likewise, the Debtors' debt traded significantly below par following the events in the first half of this year that led to the Company's financial distress; *secured debt* was trading between $0.70 and $0.80, while *unsecured debt* traded in the $0.40s. The Request ignores these key metrics that obliterate the notion that equity is anywhere close to being in the money here.

***Sophisticated creditors have accepted substantial impairment***. Numerous sophisticated creditors, secured and unsecured alike, have agreed to a Plan that impairs their interests. More than 50 lenders and noteholders executed the RSA, including some of the world's largest asset managers, banks, and credit investment firms, which collectively manage or supervise more than $40 trillion in assets.[3] These RSA parties were represented by experienced counsel and financial advisors, and the RSA's terms were negotiated at arm's length. The secured term lenders and noteholders, whose debt was trading well below par, have agreed to accept takeback debt on terms favorable to the Company—including lower interest rates, extended maturities, and various covenant changes—and their existing secured debt now trades at approximately $0.89, reflecting a market discount of roughly $120 million. Unsecured Noteholders are taking a 62.4% payout under the Plan—a $100 million impairment. KED Icon Holdings, LLC ("<u>KED</u>") is agreeing to equitize its holdings of approximately $100 million in secured Euro Term Loans. And the revolving lenders agreed

---

3 Based on the signatory firms' most recent publicly reported assets under management (or, for banks, assets under supervision or invested assets).

to extend their commitments by more than two years and accepted a 50 basis point reduction in their interest rate margin, with up to an additional 50 basis point reduction if the Company satisfies certain leverage ratios. Negotiations with the Debtors' well-represented funded-debt lenders were hard fought, and their impairment reflects the Debtors' unfortunate financial reality. Accepting such impairment would be irrational if the Company were solvent.

***General unsecured creditors are only unimpaired <u>under the proposed Plan</u>.*** The Request entirely misunderstands the prepetition capital structure and where value breaks. Blithely asserting that "general unsecured creditors also come out at par," Request at 1, the Request elides the fact that this is only true <u>under the proposed Plan</u> that calls for a cash infusion of up to $433 million in new money and equitization of approximately $100 million of Euro Term Loans. That new money and equitization allows general unsecured creditors (estimated at approximately $231.5 million) to ride through under the Plan; without the Plan, they do not.[4] Maintaining business-as-usual payments to the Company's 600,000-plus contributors is a key aspect of the Plan and it is critical to the Debtors' business. *See* First Day Decl. ¶¶ 20, 44. The new money provided under the proposed Plan cannot be counted when estimating whether equity is in the money as of the Petition Date.

***The Request relies on a fraudulent bid and stale valuations***. While providing no current valuation evidence, the Request cites an "unsolicited bid to acquire the company for $4 billion" in 2023, and other cherry-picked and outdated valuation snippets to tease the notion that the Debtors might be worth hundreds of millions of dollars more than their debt. *See* Request at 3. But the $4 billion "bid" was a fake bid by a "pump-and-dump" scammer who went to jail for this fraud.[5] And the $2 billion-plus valuations the Request cites predate the three recent drivers of the Debtors' insolvency: (i) warrant judgments exceeding $200 million and counting; (ii) the sunk costs of financing commitments and fees associated with the failed Shutterstock merger; and (iii) an unsustainable debt burden due to higher interest rates and principal repayment obligations. Meanwhile, the Request glosses over more recent valuation metrics reflecting broader equity declines for peer companies, including Shutterstock trading at a 2.4x EBITDA multiple that, if applied to the Company's LTM Adjusted EBITDA of $307 million, implies an enterprise value of roughly half its funded debt. Request at 8.

The Request pairs its valuation speculation with pure conjecture about a grand conspiracy preceding the Debtors' bankruptcy filings. The Debtors deny these allegations and will address them if and when they become germane, but they are irrelevant here. The Request's rhetorical flourishes cannot hide the harsh reality that the Debtors are insolvent, much as they wish that were not so. This alone is enough for the U.S. Trustee to decline to appoint an Official Equity Committee.

***Other factors likewise disfavor appointment of an Official Equity Committee.*** The interests of all stakeholders, including shareholders, have been, and will continue to be,

---

[4] This estimate does not account for an estimated $275 million in additional prepetition warrant litigation exposure potentially faced by the Debtors. First Day Decl. ¶ 80.

[5] Press Release, U.S. Att'y's Off., D. Mass., *Trillium Capital Manager Charged With Securities Fraud Scheme Involving Getty Images* (May 31, 2024), https://www.justice.gov/usao-ma/pr/trillium-capital-manager-charged-securities-fraud-scheme-involving-getty-images.

vigorously represented by GIH's Board and management throughout this restructuring process. The GIH Special Committee has sole and absolute authority over the RSA's broad fiduciary out, which permits it to consider, respond to, and facilitate any proposal that is superior to the Plan. To the extent shareholders object to the Plan, they can contest confirmation. The Equity Security Holders, who say they hold approximately 3% of the total issued stock and more than $32 million in judgment principal on warrant claims, have already organized themselves and retained highly capable counsel who has appeared and argued on their behalf, and made clear their intention to object to the proposed Plan. All stakeholders will of course have a full and fair opportunity to either support or oppose confirmation, as they can in every case where equity is wiped out, but that does not require the extraordinary remedy of appointing an Official Equity Committee. The case for an equity committee is weaker still where one shareholder group seeks an estate-funded "official" committee to take shots at another shareholder group. No such committee should be appointed.

## II. <u>Legal Standard</u>

"Appointment of committees of equity security holders is the exception rather than the rule." 7 *Collier on Bankruptcy* ¶ 1102.03[2] (16th ed. 2026); *accord Spansion*, 421 B.R. at 156. Because Congress "declined to provide for the mandatory appointment of equity committees in § 1102," *In re Edison Bros. Stores, Inc.*, 1996 WL 534853, at *4 (D. Del. Sept. 17, 1996), appointment of an equity committee "is within the discretion of the United States trustee," 7 *Collier* ¶ 1102.03[1][a].

The movants have the burden of establishing both that "(i) there is a substantial likelihood that they will receive a meaningful distribution in the case under a strict application of the absolute priority rule, and (ii) they are unable to represent their interests in the bankruptcy case without an official committee." *In re Williams Commc'n Grp., Inc.*, 281 B.R. 216, 223 (Bankr. S.D.N.Y. 2002); *accord Spansion*, 421 B.R. at 156; *In re Northwestern Corp.*, No. 03-12872 (CGC), 2004 WL 1077913, at *2 (Bankr. D. Del. May 13, 2004).

As to the first requirement, the Debtors are not required to show that they are "hopelessly insolvent." Although the *Williams* debtors "appear[ed] to be hopelessly insolvent," the court framed the inquiry as whether equity could show "***a substantial likelihood***" of "***a meaningful distribution***." 281 B.R. at 220, 223 (emphasis added). *In re Celsius Network LLC*, on which the Request relies, likewise denied an equity committee without any finding of "hopeless insolvency," holding that the movants had not met their "high burden" of showing a "substantial likelihood" of recovery. 645 B.R. 165, 174 (Bankr. S.D.N.Y. 2022). Delaware courts agree, repeatedly denying requests to appoint equity committees without finding hopeless insolvency. *See, e.g., Edison*, 1996 WL 534853, at *3 (affirming denial even though the parties stipulated that debtors were not "hopelessly insolvent"); *In re Kalvar Microfilm, Inc.*, 195 B.R. 599, 600–01 (Bankr. D. Del. 1996) (denying a committee despite "a good faith dispute as to the insolvency of the debtors").

Even a credible challenge to the debtor's valuation, without more, is not enough to establish a substantial likelihood of a meaningful distribution. *See Northwestern*, 2004 WL 1077913, at *2 (denying a committee as a valuation challenge does "not tip the scale to the extent that the valuation battle should be funded by the estate."). Absent a substantial likelihood of a meaningful distribution, an equity committee would "serve no legitimate role

in negotiating a plan." *Spansion*, 421 B.R. at 156. Nor can the estates be asked to fund that fight: equity committee costs "cannot be justified" where its "only remaining purpose . . . would be to object to confirmation, and litigate the valuation issue." *Kalvar*, 195 B.R. at 601; 7 *Collier* ¶ 1102.03[2][a] n.5 (same).

The second requirement, adequate representation, is "critical" because "even those equity holders who do expect a distribution . . . can adequately represent their interest without an official committee." *Spansion*, 421 B.R. at 164 (quoting *Williams*, 281 B.R. at 223). The question is not whether equity is "exclusively" represented but whether it is "adequately" represented. *Spansion*, 421 B.R. at 163 (quoting *Edison*, 1996 WL 534853, at *4). An organized ad hoc group with counsel is "adequate to the task of representing its interests without 'official' status." *Spansion*, 421 B.R. at 163; *Kalvar*, 195 B.R. at 601 (holder with "a substantial stake [] can continue to represent its own interests").

The Equity Security Holders satisfy neither requirement.

## III. <u>The Standard For Appointing An Official Equity Committee Is Not Met Here</u>

### 1. <u>The Equity Security Holders Have Not Shown A Substantial Likelihood Of A Meaningful Distribution To Equity Holders.</u>

*<u>First</u>*, the Request is completely silent about the Company's prepetition equity and debt trading prices, which clearly reflect insolvency.

**Getty Images Historical Pricing**

The below chart shows the historical debt and equity pricings since April 1, 2026




Source: FINRA Trade Reporting and Compliance Engine (TRACE) for 14.000% Senior Unsecured Notes due 2028 and Bloomberg for all other instruments.
(1) Last traded price as of 10/08/2026.

Leading up to the chapter 11 filing, the Company's debt was trading significantly below par. First Day Decl. ¶ 28. As the Request concedes, the Company's Unsecured Notes

"traded down dramatically (as low as 40%)." Request at 9. And as the chart above reflects, secured debt traded between approximately $0.70 and $0.80 on the dollar. Courts treat deep discounts on debt trading prices as strong evidence that equity has no realistic prospect of recovery. *See, e.g., Williams*, 281 B.R. at 221; *In re SunEdison, Inc.*, 556 B.R. 94, 105 (Bankr. S.D.N.Y. 2016).

The Company's equity trading price tells a similar story. After the Board announced termination of the Shutterstock merger on June 30, 2026, the Company's stock fell from $0.94 to $0.48 within three weeks. First Day Decl. ¶ 88. It was delisted from the NYSE on October 12, 2026, subsequently trading on the OTC Pink Limited Market, and last closed at $0.02 per share. *Id.* ¶ 66.[6] A two-cent stock price reflects only bare option value. *Id.* ¶ 28.

Credit rating agencies this year issued a series of downgrades commensurate with the Company's deteriorating financial position.[7] In a July 2, 2026 downgrade to CCC+, S&P Global Ratings stated that "[t]he terminated [Shutterstock] merger will strain Getty's liquidity and *we now view its capital structure as unsustainable*."[8]

<u>*Second*</u>, the fact that sophisticated creditors, advised by their own counsel and financial advisors, agreed to a Plan that substantially impairs their interests further demonstrates that equity is out of the money. Holders of approximately 83% of the Unsecured Notes signed the RSA under which that creditor class is impaired by approximately $100 million, or 37%. First Day Decl. ¶¶ 14–15, 17–18. Those Unsecured Noteholders are from approximately 10 institutions that collectively have over $3 trillion of assets under management or supervision. They took that discount only after extensive arm's-length negotiations. *Id.* ¶ 14. In addition, KED is converting approximately $100 million of its Euro Term Loans into equity. *Id.* ¶ 19. No rational creditor would accept such significant impairment unless it believes the Company is insolvent.

The secured creditors are likewise accepting less favorable terms: the Plan extends their maturities by more than two years, and their New Term Loans and New Notes will bear

---

6 At two cents per share, all 421 million of GIH's outstanding shares had a market value of around $8.4 million as of the October 20, 2026 close. *See* First Day Decl. ¶¶ 57, 66. The 27% not owned by the Getty Family or KED had a market value of around $2.3 million. *See* Request at 1 (noting that the Getty Family and KED hold approximately 73%).

7 *See Moody's Ratings downgrades Getty Images' CFR to Caa1 on weakened liquidity, uncertainty about merger prospects; outlook negative*, MOODY'S (Apr. 21, 2026), https://www.moodys.com/research/Moodys-Ratings-downgrades-Getty-Images-CFR-to-Caa1-on-weakened--PR_522744; *Getty Images Inc. Downgraded To 'B'; Ratings Put On CreditWatch Negative Due To Weaker Cash Flow And Merger Uncertainty*, S&P GLOBAL (May 19, 2026), https://www.spglobal.com/ratings/en/regulatory/article/-/view/sourceId/101686513; *Moody's Ratings downgrades Getty Images' CFR to Caa3 on delayed note interest payments, weakened liquidity; outlook negative*, MOODY'S (Sep. 2, 2026), https://www.moodys.com/research/Moodys-Ratings-downgrades-Getty-Images-CFR-to-Caa3-on-delayed--PR_529175; *Getty Images Inc. Rating Lowered To 'CCC', Ratings Placed On CreditWatch Negative On Missed Interest Payment*, S&P GLOBAL (Sep. 3, 2026), https://www.spglobal.com/ratings/en/regulatory/article/-/view/sourceId/101705199.

8 *See Getty Images Inc. Downgraded to 'CCC+' On Shutterstock Merger Termination And Liquidity Concerns; Outlook Negative*, S&P GLOBAL (Jul. 2, 2026), https://www.spglobal.com/ratings/en/regulatory/article/-/view/sourceId/101694603 (emphasis added).

interest at rates 75 basis points lower at emergence, stepping down further as the Company delevers. *See* First Day Decl. ¶¶ 16, 57, 93; Disclosure Statement, Ex. A (Plan of Reorganization), D.I. 32-1, at 58; Disclosure Statement, Ex. D (Exit Term Sheet), D.I. 32-2, at 116–19. And the New Term Loans and New Notes carry no excess cash flow sweep and no minimum liquidity covenant, which materially reduces the Company's debt service obligations. *See* First Day Decl. ¶ 93; Disclosure Statement, Ex. D, at 116. Secured creditors also agreed to exclude "any prepayment premium, make-whole, call protection, or similar amount" on their existing debt. Disclosure Statement, Ex. A, at 22. Even after announcement of the RSA, the secured debt has continued to trade at a discount to par (currently ~$0.89), evidencing the material concessions the secured lenders have made on their prepetition claims.

*Third*, the Request's contention that equity must at least be close to being in the money because "funded creditors, all told, recover 93.3% of what they are owed" is factually wrong for multiple reasons. Request at 1. The Request's recovery figure incorrectly blends the recovery percentages for secured and unsecured debt into a single figure, whereas the more relevant inquiry under the absolute priority rule is the treatment of Unsecured Noteholders (the fulcrum security) who are forfeiting $100 million in principal for a 62.4% recovery. First Day Decl. ¶ 15; Disclosure Statement, Ex. E (Liquidation Analysis), D.I. 32-5.

In any event, the 93.3% blended recovery for funded debt is the negotiated treatment under a Plan that has not been consummated (and which the Equity Security Holders appear to oppose) and *depends on the Plan Sponsors' cash investment of up to $433 million*. That new money infusion is what allows for partial repayment of Unsecured Notes and for general unsecured creditors to ride through unimpaired, keeping hundreds of thousands of content contributors, vendors, and other trade counterparties whole so that the business can be preserved. First Day Decl. ¶ 20. Counting the Plan Sponsors' $433 million new money investment as evidence that equity is in the money, while the Plan impairs creditors and cancels existing equity, is wholly illogical.

*Fourth*, the Request offers no current valuation evidence. Instead, it strings together fraudulent or outdated data to suggest that the Debtors are worth far more than their debt. The Request misleadingly points to an April 2023 "unsolicited bid to acquire the company for $4 billion" by "activist investor Trillium Capital." Request at 3. But that "$4 billion bid" was in fact a fraudulent scam to artificially inflate the Company's stock price.[9] There are many easy-to-find news articles about this criminal episode, and there is no good reason why the Request would rely upon it as a valuation data point. Trillium's principal, Scott Murray, had built a position of around 300,000 GIH shares and was losing money on it. To limit his losses, he announced a "bogus $4 billion takeover bid" through Trillium, which "had only $20 on hand." *Id.* The announcement spiked the stock price, and within hours Murray sold his shares. The SEC investigated, and Murray pleaded guilty to securities fraud and was sentenced to ten months in prison and forfeiture of his ill-gotten gains. *Id.* The Request's reliance on a fake bid in a pump-and-dump scheme sets the stage for its inflated valuation thesis.

---

[9] Nate Raymond, *Investor gets prison time for fake $4 billion Getty Images takeover scheme*, Reuters (Oct. 29, 2024) (last visited Oct. 29, 2026), https://www.reuters.com/legal/investor-gets-prison-time-fake-4-billion-getty-images-takeover-bid-2024-10-29/.

The bulk of the Request's remaining valuation data points are outdated. It relies on a 2008 private equity sale, a 2012 resale, the "comparable companies" in a 2022 de-SPAC fairness opinion, and certain fairness opinions prepared in connection with the January 2025 Shutterstock merger. Request at 3–5, 8–9. Each predates the three drivers of the Debtors' current distress: the warrant judgments, the financing commitments and expenses incurred in connection with the failed Shutterstock merger, and the unsustainable interest rates and principal repayment obligations on the Company's funded debt. First Day Decl. ¶¶ 5, 75, 79–80, 87, 93. The Request's own authority confirms that, in valuing a reorganized enterprise, "[t]he criterion of earning capacity is the essential one," and "valuations for other purposes are not relevant to or helpful in a determination of that issue, except as they may indirectly bear on earning capacity." *Consol. Rock Prods. Co. v. Du Bois*, 312 U.S. 510, 526 (1941) (cited at Request at 2). *Exide*, also cited in the Request, applied that principle to reject as "not useful" prior transactions when "the market had changed considerably." *In re Exide Techs.*, 303 B.R. 48, 62–63 (Bankr. D. Del. 2003) (cited at Request at 2, 9).[10]

Moreover, the market conditions on which these stale valuations relied no longer exist, such that they do not reliably reflect value today. For example, the yield on the 20-year U.S. Treasury, which was 1.91% as of December 9, 2021, the date of the fairness opinion delivered by Solomon cited in the Request, is now 5.35%. Trading multiples have contracted sharply: based on the data presented in the Request, the EV/EBITDA multiple of Shutterstock, the comparable company on which Solomon "placed greater reliance," has declined by approximately 90%, from 24.1x EBITDA to 2.4x EBITDA. Request at 8.[11] Applying a 2.4x multiple to the Debtors' $307 million of LTM Adjusted EBITDA implies an enterprise value for the Company of $737 million, roughly half its funded debt. Request at 8; First Day Decl. ¶¶ 57, 99. The broader comparable set cited in the Request tells the same story: the median decline in market capitalization among the comparable companies cited in the Request that remain publicly traded is approximately 63% since December 2021 and approximately 45% since the January 2025 announcement of the proposed Getty Images-Shutterstock merger.[12]

More recent and relevant valuation metrics confirm that equity is deeply out of the money. The Debtors' investment banker, Guggenheim Securities, estimates the reorganized Debtors' total enterprise value at approximately $1.3 billion to $1.5 billion, with a midpoint of $1.4 billion. Disclosure Statement, Ex. F (Valuation Analysis), D.I. 32-6, at 3.[13] Even the top of that range falls far short of the prepetition claims that rank ahead of equity, including

---

[10] The Request's reliance on *In re Wang Labs., Inc.*, 149 B.R. 1 (Bankr. D. Mass. 1992) is also misplaced. Request at 8. There, the debtor refused to concede insolvency. *Wang*, 149 B.R. at 1, 3. Here, the record shows that claims senior to equity are impaired.

[11] The Request asks why the Company terminated its merger with Shutterstock. *See* Request at 9. As the Company disclosed at the time of termination, the U.K. Competition and Markets Authority did not consent to the merger absent divestiture of Shutterstock's editorial business, which was a burdensome condition the Company was not required to accept under the merger agreement. *See* Getty Images Holdings, Inc., Current Report (Form 8-K), Item 8.01 (June 30, 2026).

[12] Market capitalization as of 12/31/21, 1/6/25 (last close before the 1/7/25 announcement) and 10/26/26, per FactSet. Excludes Avid Technology and Squarespace, which are no longer publicly traded.

[13] Unlike the Request's figures, this valuation is current, rests on the Debtors' projected earning capacity, and uses both discounted cash flow and comparable-company analyses. Disclosure Statement, Ex. F at 3, 5–6.

approximately $1.46 billion of funded debt and an estimated $231.5 million of general unsecured claims, as well as up to $143 million of DIP claims. Disclosure Statement, Ex. E, at 6; First Day Decl. ¶¶ 57, 102. Absent the concessions made by holders of funded debt under the Plan, any competing transaction would have to deliver up to approximately $391 million in incremental new-money cash value before existing equity could recover anything. First Day Decl. ¶ 102.

*Finally*, the Request's contention that the Getty Family and KED cooked up a scheme to entirely wipe out their own equity, be forced to equitize approximately $100 million of Euro Term Loans, and write a check for up to $433 million, all to eliminate the roughly 27% of shares they do not own, makes no sense whatsoever. It is also belied by the record: the impaired senior creditors set an initial price, and the Plan Sponsors were made to pay substantially more to reach a deal with Unsecured Noteholders.

The secured lenders demanded at least $280 million of new money. When the Unsecured Noteholders rejected that deal, the Company, led by independent Special Committees, obtained a 55% increase in the Plan Sponsors' cash commitment to up to $433 million. First Day Decl. ¶¶ 13–15, 101. None of that is on account of existing equity. Every share held by the Getty Family and KED is cancelled without any distribution. *Id.* ¶ 66. They receive new equity only for the new money and equitized claims they contribute. *Id.* ¶¶ 19, 103. A need for a substantial new-money infusion "is indicative of the Debtors' poor financial condition," not of residual equity value. *Williams*, 281 B.R. at 221. Moreover, courts have recognized that a controlling shareholder may acquire the reorganized equity on such terms, because it is "not retaining any interest because of its shareholder status," but is instead obtaining equity in exchange for what it contributes to the reorganization. *See In re Zenith Elecs. Corp.*, 241 B.R. 92, 107 (Bankr. D. Del. 1999) (approving plan under which majority shareholder and creditor received 100% of new equity "in exchange for forgiveness of $200 million of debt and new funding of $60 million," while minority shareholders received nothing).[14] And if anyone makes a better offer, the RSA's fiduciary out allows the Special Committee to "consider, respond to, and facilitate" alternative proposals, Disclosure Statement, Ex. B (RSA), at 30, which is in addition to the Special Committee's full authority to exercise the fiduciary out, First Day Decl. ¶ 111. To date, no party has come forward with a better deal. Rather than contend with these facts, the Request instead attempts to cast unsupported aspersions on the Plan Sponsors. While such sensationalism might be good tabloid fodder, it is irrelevant to the question of whether the standards for appointment of an Official Equity Committee have been met—and they decidedly have not.

---

14 The Request asserts that the "Getty and Koch families secured for themselves the exclusive right to 'repurchase' the company" and that this "is blatant 'unfair discrimination' under Section 1129(b)" and contrary to *Bank of America v. N. LaSalle*, 526 U.S. 434 (1999). Request at 2. None of this is correct. The Getty Family and KED have no such "exclusive" rights; the Plan is subject to a broad fiduciary out if there is a superior proposal. And the Plan complies with Section 1129(b) and *N. LaSalle* because no class senior to existing equity is being impaired without payment in full or consent.

2. Other Factors Support Denial Of An Official Equity Committee.

*a) The Equity Security Holders Are Adequately Represented Without An Official Equity Committee.*

The Request argues that only an Official Equity Committee can serve as an "adversary check" because unsecured creditors are either parties to the RSA or unimpaired. Request at 2, 9–10. That is true of virtually every prepackaged case that leaves general unsecured creditors unimpaired—as many do to ensure preservation of the debtors' business. If that were enough, appointment of an equity committee would be the rule rather than "the rare exception." *Spansion*, 421 B.R. at 156. In any event, the premise is wrong. The Unsecured Noteholders, impaired by approximately $100 million and separately advised, negotiated against the Plan Sponsors for their own recovery—rejecting an initial proposal and holding out until new money increased 55%. First Day Decl. ¶¶ 13–15, 101. That is precisely the adversary check the Request claims is missing. *Oneida*, on which the Request relies, arose from "unusual (perhaps unique)" circumstances: lenders already held 62% of the equity and controlled the board that endorsed a plan giving those same lenders all reorganized equity. *In re Oneida Ltd.*, 2006 WL 1288576, at *2–3 (Bankr. S.D.N.Y. May 4, 2006). The court cautioned that an equity committee is not required in every prepackaged case that wipes out existing equity because "[i]n the usual case, such a plan would be negotiated by a Board that was elected by the old equity." *Id.* at *3. No creditor group took control of the Board here, and the RSA was negotiated under the oversight of a Special Committee. First Day Decl. ¶¶ 17 n.7, 109–11; *see Celsius*, 645 B.R. at 173 (distinguishing *Oneida*).

The Request's attack on the Special Committees is equally wide of the mark. Request at 9–10. Courts apply the "usual presumption [] that the Board will pay due (perhaps special) regard to the interests of shareholders," absent special circumstances. *Celsius*, 645 B.R. at 173 (quoting *Oneida*, 2006 WL 1288576, at *2). The Request offers no facts to rebut that presumption. Instead, it cites to a non-bankruptcy decision that summarizes an academic study of other directors in other cases. Request at 10 (citing *In re EngageSmart, Inc. S'holder Litig.*, 354 A.3d 796, 845 (Del. Ch. 2026)). That study proposes treating bankruptcy directors as independent where they have the "overwhelming support of the creditors whose claims are at risk." Jared A. Ellias, Ehud Kamar & Kobi Kastiel, *The Rise of Bankruptcy Directors*, 95 S. Cal. L. Rev. 1083, 1088 (2022). The Debtors' directors have that support: holders of approximately 83% of impaired Unsecured Notes signed the RSA, which was negotiated under the Special Committees' oversight. First Day Decl. ¶¶ 15–16.

Here, the interests of all stakeholders, including shareholders, have been and will continue to be vigorously represented by the Board of Directors, the Special Committee, and the management team throughout this restructuring process. The Special Committee of GIH's Board has full and exclusive authority to consider and address any proposal that is superior to the Plan, the RSA has a broad fiduciary out, and the Special Committee of GIH has the exclusive authority to exercise the fiduciary out. Despite the Request's unsupported assertion that the "fix-is-in," Request at 10, the Special Committee is comprised of two independent directors who have no prior connection to the Company or the Plan Sponsors. First Day Decl. ¶¶ 10, 109–11; Getty Images Holdings, Inc., Current Report (Form 8-K), Item 5.02 (July 21, 2026). These independent directors are duty-bound to maximize the value of the Debtors' estates, and they have taken and continue to take this responsibility very seriously. *See* First

Day Decl. ¶¶ 109–12. The Debtors' successful negotiation of a Plan that enjoys overwhelming support among the Debtors' stakeholder classes—providing for the impairment of Unsecured Noteholder claims while paying in full all general unsecured claims to maximize the Debtors' value as a going concern, while maintaining flexibility to pursue any superior proposal—underscores just how seriously the independent directors on the Special Committee have taken and will continue to take their responsibility and how successful they have been in discharging their duties.

The Request also misconceives the role and responsibilities of an Official Equity Committee. If appointed, an Official Equity Committee would be required to serve as a fiduciary to *all prepetition* equity holders, not just the Equity Security Holders. *See In re Johns-Manville Corp.*, 68 B.R. 155, 160 (S.D.N.Y. 1986) ("An equity committee has a fiduciary responsibility to equity holders."); *In re Gadzooks, Inc.*, 352 B.R. 796, 811–12 (Bankr. N.D. Tex. 2006) (same). Yet the Equity Security Holders clearly seek to challenge the Getty Family and KED, Request at 1–2, making plain that they seek a committee that would represent *only a subset* of equity holders. *See also In re Penn-Dixie Indus.*, 9 B.R. 941, 943 (Bankr. S.D.N.Y. 1981) (an official committee is required to represent the interests of "shareholders as a whole as opposed to dissident factions of particular classes or interests"). A committee is not entitled to official status and estate funding for the purpose of pursuing claims against the same security holders that it would be required to represent. *See In re Residential Cap., LLC*, 480 B.R. 550, 558–59 (Bankr. S.D.N.Y. 2012) (explaining how forming a committee "solely to advance individual borrowers' claims is not appropriate, because acting as *de facto* counsel for borrowers would be an impermissible role for an official committee"). An estate-funded effort to pit one shareholder group against another is not a proper purpose for an Official Equity Committee. And to the extent the holders of warrant claims contend that their claims are not subordinated under Section 510(b), that would present an additional intractable conflict for any Official Equity Committee. *See* Request at 1 n.1 (presuming but not conceding that such claims are subordinated under Section 510(b)).

Nor do the Equity Security Holders need official status to adequately represent themselves. They are fourteen firms and individuals represented by experienced restructuring counsel, and they filed a detailed submission within a day of the Petition Date. Request at 1, Ex. A. Their roughly 13.4 million shares are about 3% of all shares outstanding, and they also hold warrant claims of approximately $32.7 million. Several of them have pursued multi-year warrant litigation against the Debtors since at least 2023. Request at 4 n.3. Holders like these are "well organized, well represented by counsel, and adequate to the task of representing [their] interests without 'official' status." *Spansion*, 421 B.R. at 163; *accord Celsius*, 645 B.R. at 172–73; *Williams*, 281 B.R. at 223–24; *Kalvar*, 195 B.R. at 601.

Finally, denial of the request for an Official Equity Committee does not in any way foreclose participation in these proceedings. The Equity Security Holders, and any other shareholder, may object to the Plan and be heard on any issue, and if they make a substantial contribution, they can seek compensation under Section 503(b)(3)(D) of the Bankruptcy Code. That is how valuation disputes are resolved when equity is out of the money. *See In re AbitibiBowater Inc.*, 2010 WL 4823839, at *11 (Bankr. D. Del. Nov. 22, 2010) (after denying an equity committee, overruling shareholders' valuation objections at confirmation for lack of "probative evidence to rebut the Debtors' valuation evidence").

*b) Appointment Of An Official Equity Committee Would Put The Plan And The Company's Business At Risk.*

An Official Equity Committee appointed at the behest of the Equity Security Holders would be tasked with litigating valuation on a Plan that has already been solicited. First Day Decl. ¶ 30. That is exactly the circumstance in which courts have found the cost of a committee "cannot be justified." *Kalvar*, 195 B.R. at 601. The estates should not be made to fund that fight over what would be, at most, a "gift" to equity. *Williams*, 281 B.R. at 220. Counsel for the Equity Security Holders has already signaled that if an Official Equity Committee is appointed, it will seek postponement of the December 15, 2026 combined hearing to buy more time to litigate objections to the Plan. But that is time the Company can ill afford. The RSA milestones require entry of a confirmation order within 55 days of the Petition Date and emergence within 75 days. First Day Decl. ¶ 113.

The timing of those milestones is set by the Debtors' liquidity and the DIP funding. The Debtors entered chapter 11 with approximately $18 million of available cash, below their $20 million baseline minimum liquidity. Brantley Decl. ¶ 14. The Debtors must fund approximately $50 million each month in payroll and benefits, contributor and content-partner royalties, and payments to licensors, technology providers, and other essential vendors. *Id.* The DIP Facility of up to $143 million is sized to reflect the Debtors' cash requirements and to carry them to emergence on the milestone schedule, not beyond it. *See* Disclosure Statement, D.I. 32, at 85 (stating that the DIP Facility "will terminate no later than January 31, 2027" and is subject to the RSA milestones).

Not meeting these milestones places the Plan and the Company in great jeopardy. Without the Plan, there is no deal on the table, and no guarantee that general unsecured creditors will be paid. The Unsecured Noteholders' $170.2 million cash recovery, and the ordinary-course payment of general unsecured creditors, depends upon the Plan Sponsors' infusion of up to $433 million. First Day Decl. ¶¶ 15, 101.

Furthermore, delay would have potentially severe consequences for the Company's business. The Company operates a marketplace that depends on the confidence and continued participation of its customers and content providers; swift completion of these chapter 11 proceedings is critical to maintaining that marketplace. Significant customer renewals are underway, and customers and contributors are deciding daily whether to continue doing business with a company in chapter 11, facing constrained liquidity. First Day Decl. ¶¶ 9, 23, 95, 113. Prolonged uncertainty about whether and when the Debtors will emerge from bankruptcy raises exactly the risks the Company sought to avoid by reaching agreement with most of its creditors prior to filing for chapter 11. *Id.* ¶ 25. The Equity Security Holders' efforts to derail this case threaten all of that. As the *Williams* court explained, "[f]urther delay is antithetical to an overarching need to preserve or enhance asset value." 281 B.R. at 223.

Official Equity Committee costs, presumably including professional fees as well as the fees the Debtors and other stakeholders will inevitably incur in response, would be borne by the estates. Those costs would fund a valuation dispute the Equity Security Holders have not supported with any evidence. Where shareholders' position is speculative, it is "not in the best interests of the estate or its constituents to shift the cost of this valuation dispute" to the estate. *Northwestern*, 2004 WL 1077913, at *3; *see also In re Eastman Kodak Co.*, 2012 WL

2501071, at *3 (Bankr. S.D.N.Y. June 28, 2012) ("[T]he estate will not be forced to fund a constituency that appears to be out of the money."). The Request's case law holding that cost alone does not defeat appointment of a committee, Request at 11, assumes a threshold showing of a need for representation that the Equity Security Holders have not made.

*c) This Is Not An Especially Complex Restructuring Case.*

Contrary to the Request's assertion that this is a "highly unusual Chapter 11 case," Request at 1, this case is actually fairly typical. This is a prepackaged balance-sheet restructuring in which secured claims are refinanced at par (albeit on significantly improved terms for the Debtors), the revolving lenders extend their commitments, holders of Unsecured Notes receive a reduced all-cash recovery, general unsecured creditors are unimpaired, all contracts and licenses are assumed (unless specifically scheduled for or subject to a motion for rejection), and existing equity receives no recovery. First Day Decl. ¶¶ 20, 23, 26, 66, 103. Courts have denied equity committees even in cases of admitted complexity. *See SunEdison*, 556 B.R. at 103; *Johns-Manville Corp.*, 68 B.R. at 164–65.

## IV. **Conclusion**

Equity is out of the money and no third party has come forward with a better deal that would bring equity into the money. The Request's unsupported premise that the Getty Family and KED manufactured a crisis to take the Company for themselves is not true and is contradicted by the record. The crisis was real. The RSA was the best transaction available, negotiated at arm's length with impaired creditors, and approved on the recommendation of independent fiduciaries who, most importantly, retain full authority to exercise the fiduciary out in the RSA to pursue any superior proposal. An estate-funded equity committee would add cost, delay, and uncertainty to a case in which there will be no recovery for equity. The Equity Security Holders remain free to participate in these Chapter 11 Cases and to raise any objection to the Plan at confirmation. The Request should be denied.

We are happy to answer any questions the U.S. Trustee may have about any of these issues.

Very truly yours,



Brian Schartz

cc: Robert J. Stark, Esq., Brown Rudnick LLP
(*Counsel to the Equity Security Holders*)

Akin

**Michael S. Stamer**
+1 212.872.1025/fax: +1 212.872.1002
mstamer@akingump.com

October 29, 2026

**VIA ELECTRONIC MAIL**

Benjamin A. Hackman, Esq.
Office of the United States Trustee
844 King Street, Suite 2201
Wilmington, DE 19801
benjamin.a.hackman@usdoj.gov

Re: *In re Getty Images Holdings, Inc.,* Case No. 26-11643 (JKS) – Response of the Unsecured Noteholders Ad Hoc Committee to the Request to Appoint an Equity Committee

Dear Mr. Hackman:

Akin Gump Strauss Hauer & Feld LLP is counsel to the ad hoc committee of certain unaffiliated beneficial holders (or investment managers or advisors to beneficial holders) of the 14.00% Senior Notes due 2028 and the 9.750% Senior Notes due 2027 (the "Unsecured Noteholders Ad Hoc Committee"). The members of the Unsecured Noteholders Ad Hoc Committee are parties to the Restructuring Support Agreement dated October 12, 2026 (the "RSA").[1] We write in response to the October 22, 2026 letter (the "Letter") from Brown Rudnick LLP on behalf of certain equity security holders (the "Equity Security Holders"), requesting that the Office of the United States Trustee for the District of Delaware (the "U.S. Trustee") appoint an official committee of equity security holders in these Chapter 11 Cases.

The Unsecured Noteholders Ad Hoc Committee supports the Debtors in opposing the appointment of an equity committee. We write separately to provide the Unsecured Noteholders Ad Hoc Committee's perspective on the events leading to the RSA and Plan, and the deleterious effect an official equity committee would have on these Chapter 11 Cases.

[1] Capitalized terms used but not defined herein have the meanings given in the *Joint Prepackaged Chapter 11 Plan of Reorganization of Getty Images Holdings, Inc. and its Debtor Subsidiaries* [Dkt No. 31] (the "Plan") or the RSA, as applicable.

**The Arm's-Length Bargain**

The Letter acknowledges that the unsecured noteholders are agreeing to compromise their claims in connection with the restructuring contemplated by the Plan. That is correct, and it is a significant concession. Pursuant to the RSA and the Plan, holders of the $270 million of unsecured notes give up approximately $100 million—roughly 37% of their outstanding principal claims.[2] The unsecured noteholders did not make that concession lightly. Rather, they negotiated a compromise of their claims in connection with the substantial new value being committed by the Plan Sponsors to the Debtors. The Plan Sponsors' total commitment is up to approximately $533 million, including a cash investment of up to approximately $433 million, that will fund the unsecured noteholders' cash recovery.[3] Equally central to the bargain is that the Unsecured Notes Recovery will be paid promptly as part of consummation of the Plan on the Effective Date and subject to the Milestones in the RSA.[4] The unsecured noteholders, as sophisticated investors, accepted a substantial haircut in exchange for certainty that they would receive an agreed recovery in cash.

The Equity Security Holders question the relevance of that bargain by suggesting that unsecured noteholders may have acquired their notes at a discount and may have settled because they feared aggressive treatment from the Plan Sponsors or secured lenders in a contested chapter 11 case. Both suggestions are not only speculative, but are irrelevant. A holder's acquisition cost has no effect on its claim, which is allowed under the Plan in the amount of outstanding principal plus accrued and unpaid prepetition interest. And the settlement was not the product of pressure. The Unsecured Noteholders Ad Hoc Committee was represented throughout by its own legal and financial advisors and agreed to a restricted period during which it received extensive information about the Debtors' operations and finances. Over several weeks, the Unsecured Noteholders Ad Hoc Committee and the Debtors exchanged multiple rounds of proposals. As the Debtors have disclosed, the Unsecured Noteholders Ad Hoc Committee rejected the Debtors' initial proposal as inadequate. Agreement was reached only after the Plan Sponsors increased their committed cash equity investment by approximately $153 million to fund incremental recovery to the unsecured noteholders that was not previously on the table, and which to date no other party has agreed to fund.

The Unsecured Noteholders Ad Hoc Committee engaged in hard-fought, arm's-length negotiations with the assistance of experienced advisors, and its agreement reflects its own judgment. The result is a substantial concession, negotiated at arm's length. Those negotiations also undermine the Letter's central premise—that no party in these cases has an incentive to test the Debtors' proposed restructuring, so that the "usual checks and balances" are absent. They were not absent. The Unsecured Noteholders Ad Hoc Committee comprises the most junior funded debt creditors in the capital structure and controls the class of claims taking the most significant principal impairment under the Plan. Not surprisingly then, the Unsecured Noteholders Ad Hoc

[2] Plan Art. III.B.3-6; Peters Decl. [Dkt. No. 29] ¶¶ 15, 20.

[3] Peters Decl. ¶¶ 15, 19.

[4] Plan Art. IX.A.13.

Committee pushed the Plan Sponsors and the Debtors in exactly the way the Letter asserts is missing. That the process concluded in a settlement, rather than litigation, does not mean the Debtors and Plan Sponsors lacked an adversary.

**Process Risk and Cost**

The arm's-length bargain the unsecured noteholders negotiated depends on the case proceeding on an agreed upon schedule. The Unsecured Notes Recovery is payable only on the Effective Date, will be funded by the New Equity Investment, and remains uncertain until the Confirmation Order is entered and the other conditions to the Effective Date are satisfied. The timeline for reaching that point was a material part of the bargain. The Milestones, which require entry of the Confirmation Order within 55 days of the Petition Date and occurrence of the Effective Date within 75 days, were negotiated among the Debtors' major stakeholders—holders of approximately 90% of the Debtors' secured funded debt, all of the revolving loans, and approximately 83% of the unsecured notes—because an efficient process limits the cost of these Chapter 11 Cases and the disruption to the Debtors' business, preserving value for all stakeholders. Extensions are limited, and the Plan Sponsors' equity commitment may be terminated, and the RSA may terminate with it, if, among other things, the Restructuring Effective Date Milestone is missed.

An official equity committee would put that timeline at risk without a corresponding benefit. The Letter contemplates that an official equity committee would challenge the Debtors' valuation. That challenge does not require an official equity committee or a delay to the process. The Equity Security Holders have retained experienced counsel, have already set out their position at length, and remain free to object to confirmation and be heard at the Confirmation Hearing, where the Bankruptcy Court will determine whether the Plan satisfies the requirements for confirmation. By contrast, estate-funded valuation discovery, competing expert reports, and a contested evidentiary hearing would be difficult to accommodate within the Milestones, and delay brings the case closer to the point at which the New Equity Investment—which funds the unsecured noteholders' recovery—can fall away. If it does, the unsecured noteholders lose the cash recovery that they accepted a substantial haircut to secure, along with the certainty that made that concession worthwhile.

In addition, an official equity committee is not needed to bring forward a better transaction. The RSA preserves the Debtors' ability to consider, respond to, and negotiate alternative proposals—including with holders of equity interests or even third-party strategics—and to terminate the RSA in the exercise of their fiduciary duties if a better transaction arises. It is our understanding that no party has come forward with a better transaction since the RSA was announced.

An official equity committee would also shift costs unfairly. The Equity Security Holders are free to pursue their valuation arguments at confirmation through their own counsel, and an official equity committee would not expand their right to do so. What an official equity committee would change is who pays. The cost of the Equity Security Holders' advocacy, including the professionals and valuation experts that a contested confirmation would require, would move from

the Equity Security Holders to the estates. The estates would, in effect, be funding a challenge to the very restructuring that the unsecured noteholders and the Debtors' other major stakeholders made significant concessions to achieve.[5]

* * *

The Plan reflects an arm's-length bargain among sophisticated parties whereby the unsecured noteholders accepted a substantial haircut in exchange for a cash recovery funded by the Plan Sponsors' commitment of significant new value. An official equity committee would put that bargain at risk through delay and added cost, without expanding the Equity Security Holders' ability to be heard. Accordingly, the Unsecured Noteholders Ad Hoc Committee respectfully requests that the U.S. Trustee decline to appoint an official equity committee. We would be pleased to discuss these matters at your convenience.

Sincerely,

*/s/ Michael S. Stamer*

Michael S. Stamer

cc: Brad M. Kahn, Esq. (Akin Gump Strauss Hauer & Feld LLP)
Elisha D. Graff, Esq. (Simpson Thacher & Bartlett LLP)
Brian Schartz, Esq. (Simpson Thacher & Bartlett LLP)

[5] Nothing herein is intended as, or should be construed as, an admission by the Unsecured Noteholders Ad Hoc Committee or any of its members regarding the value of the Debtors, the value of any claim or interest, or any other matter in the Chapter 11 Cases, and the Unsecured Noteholders Ad Hoc Committee and its members reserve all of their rights, including in the event the RSA is terminated or the Restructuring Transactions are not consummated.

brownrudnick

Robert J. Stark
Seven Times Square
New York, New York 10036
212-209-4862
rstark@brownrudnick.com

November 2, 2026

**By Electronic Mail**
Benjamin A. Hackman, Esq.
Office of the United States Trustee
844 King Street, Suite 2201
Wilmington, DE 19801
benjamin.a.hackman@usdoj.gov

**Re: In re Getty Images Holdings, Inc., Case No. 26-11643 (JKS)**

Dear Mr. Hackman:

This follows our October 22, 2026 letter requesting appointment of an Official Equity Committee, as well as the responsive letters submitted by the Debtors and the Ad Hoc Noteholder Group on October 29, 2026. We note that, since our October 22 letter,[1] additional Equity Security Holders have joined our group. An amended schedule of Equity Security Holders is appended hereto as **Exhibit A**.

## I. The Debtors Are Not "Hopelessly Insolvent"; Equity Has Shown a Substantial Likelihood of a Meaningful Distribution.

The crux of the Debtors' response is that equity is "out of the money" because the Debtors have $1.456 billion of funded debt above equity and some of that debt has agreed to take less than par under the Getty/Koch plan. But this is not, and has never been, how companies are valued.

**A company is valued based on its anticipated future cash flows, entirely separate and apart from its capital structure.** Known as the "irrelevancy principle," this foundational precept of corporate finance was first articulated by Franco Modigliani and Merton H. Miller in their seminal work for which they won the Nobel Prize in Economic Sciences.[2] Bankruptcy law has always accepted this core principle.[3]

---

1 Capitalized terms not otherwise defined herein shall have the meanings ascribed thereto in the October 22 letter.

2 Franco Modigliani & Merton H. Miller, The Cost of Capital, Corporation Finance and the Theory of Investment, 48 AM. ECON. REV. 261, 268-69 (1958) (explaining that the market value of any firm is independent of its capital structure and is determined by capitalizing expected return at an appropriate rate).

3 Consol. Rock Prods. Co. v. Du Bois, 312 U.S. 510, 526 (1941) ("The criterion of earning capacity is the essential one if the enterprise is to be freed from the heavy hand of past errors, miscalculations or disaster, and if the allocation of securities among the various claimants is to be fair and equitable."); Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson, 390 U.S. 414, 441-42 (1968) ("The appropriate standard for valuing a company undergoing reorganization was set out at length in [Consol. Rock]."); Grp. of Inst. Investors v. Chi., Milwaukee, St. Paul & Pac. R.R. Co., 318 U.S. 523, 540 (1943) ("The basic question in a valuation for reorganization purposes is how much the enterprise in all probability can earn."); In re Mirant Corp., 334 B.R. 800, 844 (Bankr. N.D. Tex. 2005) ("The court is adjured to take into account in valuing a debtor its future prospects."); see also Galveston, H. & S.A. Ry. Co. v. Texas, 210 U.S. 217, 226 (1908) ("[T]he commercial value of property consists in the expectation of income from it."); In re Jartran, Inc., 44 B.R. 331, 368 (Bankr. N.D. Ill. 1984) ("The value of a firm for corporate reorganization purposes depends primarily upon its earning capacity.").

Thus, the amount of funded debt in the capital structure and whether such debt accepted a haircut is simply irrelevant when analyzing what the Debtors are worth.[4]

**The Debtors' reliance on trading prices is misplaced.** The Debtors contend that the Unsecured Notes were trading at a discount, indicating that value did not exceed the funded debt. This contention is flawed. To be sure, trading prices of securities may be a helpful proxy for enterprise value, but only where an "efficient market" exists.[5] The Debtors offer no evidence establishing the existence of an "efficient market"—*e.g.*, trading volumes, the presence of market makers and arbitrageurs,[6] or that trading was based on sufficient information and without manipulation or artificial influence.[7] The delisted Getty equity, indeed, fails every "efficient market" factor—negligible volume, a sliver of public float, no analyst coverage, and withheld information. There is, moreover, ample evidence undermining efficiency, to wit: (i) the presence of controlling shareholders (the Getty/Kochs own ~73% of the Debtors' stock),[8] that (ii) dominate the board (the Getty/Kochs chair the board and hold a majority of its seats), (iii) sit on the other side of an insider deal; and (iv) stand to reap its (substantial) benefits.[9] Courts refuse to rest value on a thin,

---

4 In re Exide Techs., 303 B.R. 48, 58-66 (Bankr. D. Del. 2003) (noting that it is inappropriate to value securities of a reorganized debtor based on market value, as the bankruptcy process will cause the market to undervalue both the debtors' securities and future earning capacity); In re Bjolmes Realty Tr., 134 B.R. 1000, 1009 (Bankr. D. Mass. 1991) ("Past earnings are taken into account, along with other factors, but only for the purpose of projecting future earnings. This is on the theory that the debtor's value, and hence those seeking a share in it, should not suffer from management's errors of the past.").

5 In re Spansion, Inc., 426 B.R. 114, 130 (Bankr. D. Del. 2010) ("Some plan objectors argue that the Debtors' value is best determined by referring to the active market for buying claims. There is some evidence before me about the amounts being paid for the various types of claims ...; however, there is no evidence beyond the mere statement of certain trading prices. There is no record on the number of trades, over what period of time such trades occurred, how open the market is to participants or other factors that may be relevant."); In re Emerging Commc'ns, Inc. S'holders Litig., No. 16415, 2004 Del. Ch. LEXIS 70, at *83-84 (May 3, 2004) (Delaware Supreme Court Justice Jacobs sitting by designation) ("[T]he market price of shares is not always indicative of fair value .... [M]arkets occasionally make errors, ... it is possible for a stock that trades even in an efficient market to be mispriced, especially in the short run .... [T]he market may be inefficient if material information is withheld from it."); In re Mirant Corp., 334 B.R. at 832 n.113 ("There is, however, no ready, 'efficient' market in which merchant energy companies are bought and sold."); see also Cede & Co. v. Technicolor, Inc., 684 A.2d 289, 301 (Del. 1996) (the "market price of shares may not be representative of true value" (quotation omitted)).

6 Cammer v. Bloom, 711 F. Supp. 1264, 1285-87 (D.N.J. 1989) (factors supporting "efficient market" include, among other things, the average weekly trading volume and the extent to which market makers and arbitrageurs traded in the security); see In re DVI, Inc. Sec. Litig., 639 F.3d 623, 633 (3d Cir. 2011).

7 See, e.g., Basic Inc. v. Levinson, 485 U.S. 224, 247 (1988) ("[W]ho would knowingly roll the dice in a crooked crap game?").

8 The Gettys own approximately 45.5% of the Debtors' stock and the Kochs own approximately 27.4%. *See* Schedule 13D filed by KED Icon Holdings, LLC on October 13, 2026 (available at https://www.sec.gov/Archives/edgar/data/1898496/000119312526420539/xslSCHEDULE_13D_X02/primary_doc.xml ); Schedule 13D filed by Getty Investments L.L.C. on October 13, 2026 (42.3% of common stock) (available at https://www.sec.gov/Archives/edgar/data/1898496/000095014226002734/xslSCHEDULE_13D_X02/primary_doc.xml ); and Schedule 14A filed on August 28, 2026 (3.2% of common stock beneficially owned by Mark Getty) (available at https://www.sec.gov/ix?doc=/Archives/edgar/data/0001898496/000162828026059390/gety-20260825.htm#iaf0534c76274411dbfba052751af5a3a_76). Additionally, Getty/Koch nominees occupy a majority of the board, and Mark Getty is the chairman of the company.

9 In re Match Grp, Inc. Derivative Litig., 315 A.3d 446, 460 (Del. 2024) ("[W]here a controlling stockholder transacts with the controlled corporation and receives a non-ratable benefit, the presumptive standard of review is entire fairness."); Dell, Inc. v. Magnetar Glob. Event Driven Master Fund Ltd., 177 A.3d 1, 25 (Del. 2017) (efficient market hypothesis is applicable where, among other things, there is "no controlling stockholder").

insider-dominated market price.[10] Further, as noted in our October 22 letter, we do not know what the settling bondholders paid for their securities (which traded as low as 40% following the termination of the Shutterstock merger), and whether the Getty/Koch plan delivers a quick, (highly) profitable return to them. The Ad Hoc Noteholder Group's decision to take a fixed 63 cent cash recovery "in exchange for certainty" may be a rational hedge for a holder that feared the insiders' squeeze, but it says nothing about the company's enterprise value.

**The Debtors offer no substantive data supporting their valuation conclusion.** Without any supporting data or informational underpinning, the Debtors *ipse dixit*[11] assert that the company is worth only $1.3 - $1.5 billion, with a midpoint of $1.4 billion—or within a hair's breadth of the Debtors' prepetition funded debt stack ($1.456 billion). This is telling. Despite having months to prepare their response to the inevitable Equity Committee request, and despite having completed their valuation analysis some time ago, the Debtors provide zero underlying data in their response. And, in a highly unusual maneuver, they utterly refuse to subject their valuation thesis to a competitive marketing process.[12] The Debtors' suggestion that the Getty/Koch plan's ~93% blended creditor recovery shows insolvency is mistaken. Rather, it shows just how little margin of error the Debtors have respecting a valuation undergirding (i) a quintessential insider deal, (ii) that wipes out minority stakeholders for nothing, (iii) without a market test, (iv) on an expedited timeline (driven by an insider DIP loan).[13] This case, perhaps more than any other in recent memory, demands an Official Equity Committee.

**Let's quickly "sanity check" the Debtors' valuation.** Consider this: the Debtors' entire case hangs on value breaking below their $1.456 billion funded debt stack. But, this cannot be correct, as the Getty/Kochs are offering more than $1.456 billion in value under their deal. Indeed, the Getty/Koch deal offers about $1.47 billion in total value (*i.e.*, $533 million equity investment plus assumption/reinstatement of $936 million of secured debt), meaning that for every $1 dollar of value the Getty/Kochs are putting into this deal, they're getting less than $1 dollar back according to the Debtors' valuation. Either the Getty/Kochs—among the most sophisticated investors with unparalleled knowledge of this business—cut a bad deal, or Guggenheim's valuation is faulty, deal-driven advocacy and not an objective analysis.

**Numerous market-tested indicators put value above the debt.** The Debtors argue that the data points in our October 22 letter regarding valuation are outdated. But, rather than respond with their own trading comps/analysis, the Debtors simply assert that the trading comps in the Solomon analysis (the Debtors' own banker) have declined. As set forth in the chart on page 8 of our October 22 letter (reproduced below), even factoring in such declines,[14] the median EBITDA multiple is still at ***12.41x***, which implies ***a TEV for the Debtors of well over $3 billion, and equity value of around $2 billion.***

---

10 ASARCO LLC v. Americas Mining Corp., 396 B.R. 278, 343–44 (S.D. Tex. 2008); In re Mirant Corp., 334 B.R. at 832; see, e.g., Basic Inc. v. Levinson, 485 U.S. at 247 ("[W]ho would knowingly roll the dice in a crooked crap game?").

11 Latin for "He, himself, said it."

12 Peters Decl. ¶¶ 14-15, 24-25.

13 See In re Exide Techs., 303 B.R. 48, 62-63 (Bankr. D. Del. 2003); Bank of Am. Nat'l Tr. & Sav. Ass'n v. 203 N. LaSalle St. P'ship, 526 U.S. 434, 45-58 (1999) ("the best way to determine value is exposure to a market").

14 The comps list included several early-stage technology companies, which ordinarily have low earnings and high multiples. A decline in those multiples is, therefore, unsurprising.

**Solomon comparables (2022 SPAC)**

| Company | December 2021<br>EV 12/31/21 / CY2022A EBITDA | October 2026<br>EV 10/21/26 / LTM EBITDA |
|---|---|---|
| Shutterstock | 24.1x | 2.4x |
| Universal Music Group | 27.7x | 14.7x |
| Warner Music Group | 24.3x | 12.4x |
| The New York Times Company | 21.0x | 17.8x |
| Thomson Reuters | 30.9x | 22.4x |
| Adobe | 42.0x | 10.2x |
| Avid Technology | n/a | n/a (acquired) |
| Squarespace | 106.6x | n/a (acquired) |
| Wix.com | n/m | n/m |
| Etsy | 60.2x | 21.4x |
| Fiverr | n/m | n/m |
| GoDaddy | 23.0x | 11.8x |
| Upwork | n/m | 5.8x |
| **Median – all peers** | **27.69x** | **12.41x** |

**Getty Images, applying comparables** – $M, at October 2026 median 12.41x (INFERENCE)

| Adj. EBITDA | $M | TEV | Equity[1] |
|---|---|---|---|
| LTM Q2 2026 | 307 | 3,810 | 2,354 |
| 2026E | 264 | 3,276 | 1,820 |
| 2027E | 291 | 3,611 | 2,155 |
| 2028E | 293 | 3,636 | 2,180 |

[1] Equity = TEV less $1,456M of total funded debt outstanding as of the Petition Date (First Day Declaration, Dkt 29 ¶9). Adj. EBITDA: LTM Q2 2026 from Disclosure Statement p.44 (Dkt 32); 2026E–2028E Company projections, cleansing materials (8-K Ex. 99.2, acc. 0001213900-26-108700, p.10).

The Debtors argue that, from this chart, only Shutterstock's multiple of 2.4x should be applied because, they say, Solomon "placed greater reliance" on it back in 2021. This reasoning is faulty. Since 2021, Shutterstock and the Debtors have been on opposite paths. From 2022 through 2024, Shutterstock grew via acquisitions (whereas the Debtors did not), but at the same time, Shutterstock saw a severe ***decline*** in like-for-like revenue. By contrast, the Debtors have seen ***growth*** in revenue, and their EBITDA has been "remarkably steady in the $300-$321 million range" and remains so into the foreseeable future.[15]

The Debtors' letter also ***completely ignores the recent (2025) fairness opinion and comparable company analysis their own financial advisor, J.P. Morgan***, submitted in connection with the Shutterstock merger. That analysis showed a median EBITDA multiple of ***9.7x*** in 2025; those same companies' adjusted EBITDA in October 2026 reflects a median multiple of ***9.97x***. As depicted below, when applied to the Debtors, that multiple ***confirms a TEV of over $3 billion, and equity value of $1.6 billion (based on LTM Q2 2026 EBITDA)***.

[15] See Cleansing Material, Exhibit 99.2 to Getty Images Holdings, Inc., Current Report (Form 8-K) (October 13, 2026) (available at https://www.sec.gov/Archives/edgar/data/1898496/000121390026108700/ea030834301ex99-2.htm); Philip Brendel, Getty Images: Koch, Getty Grab Distressed Opportunity, Bloomberg Intelligence, Oct. 14, 2026.

**J.P. Morgan comparables (2025 merger)**

| Company | January 2025 EV 12/31/24 / FY2025A Adj. EBITDA | October 2026 EV 10/21/26 / FY2025A Adj. EBITDA |
|---|---|---|
| Angi | 6.9x | 3.5x |
| eBay | 9.5x | 17.0x |
| Etsy | 9.9x | 13.6x |
| Fiverr | 10.0x | n/m |
| GoDaddy | 19.4x | 10.0x |
| Upwork | 8.7x | 3.8x |
| **Median - all peers** | **9.70x** | **9.97x** |

**Getty Images, applying comparables** - $M, at October 2026 median 9.97x

| Adj. EBITDA | $M | TEV | Equity |
|---|---|---|---|
| LTM Q2 2026 | 307 | 3,061 | 1,605 |
| 2026E | 264 | 2,632 | 1,176 |
| 2027E | 291 | 2,901 | 1,445 |
| 2028E | 293 | 2,921 | 1,465 |

Sources: company filings with the SEC (Forms 8-K and 6-K; J.P. Morgan opinion in Form 424B3, Reg. No. 333-286241); Getty Images Holdings, Inc. chapter 11 docket; S&P Global via StockAnalysis.com; closing prices from Alpha Vantage.

**The RSA's "fiduciary out" does not provide a "fail safe" ensuring top dollar for the company.** Conceding (as they must) that they are not running a competitive marketing process for the business, the Debtors suggest that their theoretical ability to entertain unsolicited offers, under a 55-day confirmation clock, is an adequate substitute. This is plainly wrong. Bankruptcy courts have rejected materially similar insider-sponsored prepackaged deals, holding the "so-called Fiduciary Out, as written, is flawed" and that stakeholders "deserve[d] more of a process."[16] Delaware law agrees: an "inert, implicit post-signing market check does not ... suffice as a reliable way to survey interest,"[17] and a decision-maker with "no reliable grounds upon which to judge [an offer's] adequacy" must actually "canvas ... the market."[18] A topping bid no one has been invited to make, on a timetable that leaves no time to make it, tests nothing.

**The Debtors' case strategy does not pass legal muster, underscoring the need for an Official Equity Committee.** On a *prima facie* basis, the Getty/Koch plan:

- **Fails the "unfair discrimination" test.** An insider deal that delivers all reorganized equity to the controlling shareholders and nothing to minority stakeholders is presumptively "unfair discrimination."[19] As Judge Wiles aptly noted: "The theory of the Bankruptcy Code is that when the big [stakeholders] sit in a room and negotiate a deal, the little [stakeholders] who are in the same boat get the same deal.... The problem with special allocations in rights offerings,

16 In re Innkeepers USA Trust, 442 B.R. 227, 234–36 (Bankr. S.D.N.Y. 2010).

17 In re Netsmart Techs., Inc. S'holders Litig., 924 A.2d 171, 197 (Del. Ch. 2007)

18 Barkan v. Amsted Indus., Inc., 567 A.2d 1279, 1286–87 (Del. 1989).

19 See In re Mangia Pizza Invs., LP, 480 B.R. 669, 701-702 (Bankr. W.D. Tex. 2012) (finding that the Debtors' plan discriminated unfairly and was not in good faith because it afforded one owner the exclusive opportunity to contribute new value and retain a 100% equity interest in the reorganized debtor while denying a dissenting 49% owner that same opportunity and extinguishing the dissenting owner's equity); In re Surfango, Inc., No. 09-30972, 2009 WL 5184221, at *6, 14 (Bankr. D.N.J Dec. 18, 2009) (finding that the plan proponents had not rebutted the presumption of unfair discrimination where a plan elevated a certain shareholder's equity interest from 12% to 88% while denying other holders the opportunity to receive new stock in the reorganized debtor and cancelling their current interests).

or with private placements that are limited to the bigger [stakeholders] who sat at the negotiating table … is that it is far too easy for the people who sit at the negotiating table to use those tools primarily to take for themselves a bigger recovery than smaller [stakeholders] in the same classes will get."[20]

- **Fails the "new value" test.** The Debtors cannot rebut the presumptive "unfair discrimination," as the opportunity to acquire the reorganized equity is reserved exclusively for the Getty/Kochs and won't be market tested.[21] The Debtors must prove that the value provided is equivalent to the value actually received.[22]

- **Fails the "good faith" test.** Insider conflicts that pervade bankruptcy deal-making refute a finding of "good faith."[23] Here, not only are the Getty/Kochs on both sides of the RSA, but the "constrained liquidity" that the Debtors blame for the filing is a largely self-created crisis that benefited the Getty/Kochs and other insiders. The Debtors blame much of their troubles on large judgments entered against them in the warrant litigation. [24] The Debtors' refusal to honor the warrant agreements (despite the exercise condition being "plainly met") did not benefit the company.[25] Rather, as both the Second Circuit and the SDNY court observed, it benefited the Getty/Kochs and other insiders by not only avoiding potential dilution of the Getty/Kochs' equity interests, but also enabling insiders to receive large earnout bonuses tied to the Debtors' stock price.[26] The Debtors, in contrast, were substantially harmed. Rather than ***receive up to $200 million from warrant holders (the strike price for the public warrants was $11.50 per share)***, ***they became liable for over $200 million in damages*** (plus tens of millions more in attorney fees) for the flagrant breach.[27]

  Moreover, the Debtors' portrayal of the pending warrant judgments as creating an "imminent" threat is disingenuous. As set forth in the Declaration of Michael C. Rakower, appended hereto as **Exhibit B**, prior to the bankruptcy filings, the warrant holders repeatedly acted to assist the

---

[20] In re Pacific Drilling S.A., No. 17-13193, 2018 WL 11435661, at *2 (Bankr. S.D.N.Y. Oct. 1, 2018).

[21] See 203 N. LaSalle, 526 U.S. at 456 ("the best way to determine value is exposure to a market"); In re Tribune Co., 972 F.3d 228, 232, 240 (3d Cir. 2020) (explaining that unfair discrimination is a horizontal constraint on cram down). The Debtors' reliance on In re Zenith Elecs. Corp., 241 B.R. 92 (Bankr. D. Del. 1999) is misplaced: there, the bankruptcy court determined that the process was fair on account of an 18-month long pre-petition marketing process. 241 B.R. at 109. There is no such process here, and there will not be one.

[22] In re Glob. Ocean Carriers Ltd., 251 B.R. 31, 49 (Bankr. D. Del. 2000) (controlling family's "exclusive" right to determine who would own the reorganized company, and at what price, had to be "subject[ed] . . . to the market place test," and limited shopping to a single unrelated party was insufficient); In re Mangia Pizza Invs., LP, 480 B.R. at 699 (new value exception "is not merely a mechanism for existing equity holders to buy back, at bargain prices, their ownership interest in the reorganized debtor," and an insider's exclusive opportunity to contribute new value and retain equity, while a same-rank holder was denied it, is unfair discrimination).

[23] In re Coram Healthcare Corp., 271 B.R. 228, 240 (Bankr. D. Del. 2001).

[24] Peters Decl. ¶¶ 8, 12.

[25] Alta Partners, LLC v. Getty Images Holdings, Inc., 700 F. Supp. 3d 32, 40 (S.D.N.Y. 2023).

[26] Alta Partners, LLC v. Getty Images Holdings, Inc., 165 F.4th 141, 147 (2d Cir. 2026), *affirming* 700 F. Supp. 3d 32, 38 (S.D.N.Y. 2023).

[27] For example, in the Alta Partners and Funicular Funds litigations: (i) holders of over 9 million warrants duly exercised their warrants at the strike price of $11.50 per warrant, which should have yielded over $103 million in gross proceeds to the company; but (ii) the Debtors improperly refused to honor the warrants and were subsequently found liable for over $200 million in total damages to those warrant holders (inclusive of prejudgment interest).

Debtors to avoid a bankruptcy filing (including entering into a standstill agreement) and initiated discussions with the Debtors on "creative settlement proposals" in a good faith effort to resolve the matter.

- **Fails the "entire fairness" test**. "[W]here a controlling stockholder transacts with the controlled corporation and receives a non-ratable benefit, the presumptive standard of review is entire fairness."[28] This requires fairness both as to process and as to price,[29] as determined by the Court.[30]

## II. Minority Stakeholders Are Not Adequately Represented.

**Minority stakeholders deserve their own independent estate fiduciary.** Contrary to the Debtors' suggestion, the existence of an organized ad hoc group does not serve as a substitute for a statutory Official Equity Committee or satisfy "adequate representation" under Section 1102(a)(2). Only an Official Equity Committee has statutory investigative authority under Section 1103, including the ability to investigate the Debtors' financial condition, conduct, assets, liabilities, and potential causes of action, with estate-funded professionals. Under the Debtors' view (*i.e.*, that an organized group requesting appointment demonstrates "adequate representation"), an official equity committee could almost never be appointed. This is plainly wrong, as this firm alone has been appointed counsel to Official Equity Committees in more than 19 cases of national importance.[31] In many of those cases, equity had much weaker factual bases for the appointment request than exists here. The Debtors' "conflict" objection is a membership question, not a bar: the remedy is to seat the right members and exclude insiders.[32]

**No other estate fiduciary will be incentivized to test the Getty/Koch plan.** The Debtors have signed the RSA and management has an economic interest in its consummation (*e.g.*, the 10% MIP). Unsecured creditors are being paid in full (or are otherwise RSA-bound) and, therefore, have no incentive to challenge the Debtors' valuation. Equity alone can supply the "counterweight" necessary for a functioning adversary process.[33] This case entails precisely the kind of "special circumstances" supporting appointment of an Official Equity Committee, as described by Judge Glenn in Celsius (*e.g.*, the Getty/Kochs

---

28 In re Match Grp., Inc. Derivative Litig., 315 A.3d at 460.

29 Weinberger v. UOP, Inc., 457 A.2d 701, 711 (Del. 1983).

30 See DFC Glob. Corp. v. Muirfield Value Partners, L.P., 172 A.3d 346, 373 (Del. 2017) ("Historically, appraisal actions have had the most utility when private companies are being acquired or for public companies subject to a conflicted buyout, situations where market prices are either unavailable altogether or far less useful.").

31 In alphabetical order: In re 23andMe Holding Co. (a/k/a Chrome Holding Co.), No. 25-40976 (Bankr. E.D. Mo.); In re A.H. Robins Co., No. 85-2183 (Bankr. E.D. Va.); In re ADPT DFW Holdings LLC (a/k/a Adeptus Health), No. 17-31432 (Bankr. N.D. Tex.); In re Azure Midstream Partners, LP, No. 17-30461 (Bankr. S.D. Tex.); In re BPS US Holdings Inc. (a/k/a Performance Sports Grp.), No. 16-12373 (Bankr. D. Del.); In re Comdisco Ventures, Inc., No. 01-24795 (Bankr. N.D. Ill.); In re Global Power Equip. Grp., No. 06-11045 (Bankr. D. Del.); In re IMX Acquisition Corp., No. 16-12238 (Bankr. D. Del.); In re KIT Digit., Inc., No. 13-11298 (Bankr. S.D.N.Y.); In re Lordstown Motors Corp., No. 23-10831 (Bankr. D. Del.); In re Mercury Fin. Co., No. 98-20763 (Bankr. N.D. Ill.); In re Mirant Corp., No. 03-46590 (Bankr. N.D. Tex.); In re Oneida Ltd., No. 06-10489 (Bankr. S.D.N.Y.); In re Overseas Shipholding Grp., No. 12-20000 (Bankr. D. Del.); In re Pilgrim's Pride Corp., No. 08-45664 (Bankr. N.D. Tex.); In re Riverstone Networks, Inc., No. 06-10110 (Bankr. D. Del.); In re The Dolan Co., No. 14-10614 (Bankr. D. Del.); In re Tidewater Inc., No. 17-11132 (Bankr. D. Del.); In re Washington Prime Grp., No. 21-31948 (Bankr. S.D. Tex.).

32 See In re Pilgrim's Pride Corp., 407 B.R. 211, 215-16, 222 (Bankr. N.D. Tex. 2009).

33 See In re Oneida Ltd., No. 06-10489, 2006 WL 1288576, at *3 (Bankr. S.D.N.Y. May 4, 2006) (approving appointment of equity committee where "the usual checks and balances [were] not present"); In re Pilgrim's Pride Corp., 407 B.R at 218-19.

are controlling shareholders, dominate the board, are DIP financing lenders, and are sponsoring a plan that delivers all value to them while wiping out minority stakeholders).[34]

**The insider-controlled Board cannot represent minority stakeholders.** The value of the reorganized company goes entirely to the Getty/Kochs and management; minority common stock and warrant holders get nothing. Oneida holds that where insiders control the process and take the residual equity, the presumption that the board protects shareholders "[is] unrealistic."[35] This board's record proves it: it refused to honor the warrants—to avoid diluting the Getty/Kochs and protect management's earnouts—and thereby not only saddled the company with more than $200 million in judgments and fees, but prevented it from receiving hundreds of millions in cash on account of duly-exercised warrants.

**The "Special Committee" is not adequate representation**. The existence of a "Special Committee" to evaluate and "sprinkle holy water on the situation" does not cure conflicts, evidence good faith, or vitiate the need for an Official Equity Committee.[36] Nor does it establish fair value through arm's-length dealing (particularly in controlling-shareholder contexts),[37] especially where (as here) the proposed transaction lacks support from even one minority stockholder, let alone a majority of them.[38] As emphasized in Oneida, "a due regard for appearances" warrants an official equity committee under these circumstances.[39]

**Speculation respecting potential delay and cost does not favor denial.** Once the need for representation is shown, "[c]ost alone cannot, and should not, deprive ... security holders of representation," and the burden shifts to the opponents.[40] The standard bankruptcy fee application process provides adequate control of committee costs (as it does with all other estate professionals). Given the multitude of attorneys, financial advisors, and bankers advising the Debtors, the Gettys, the Kochs, the Ad Hoc Noteholder Group, and the other RSA parties, the incremental expense of an Official Equity Committee will be comparatively modest.[41] The 55- and 75-day milestones are the Debtors' and the Getty/Kochs' own creation; a party cannot build a clock to foreclose scrutiny and then invoke the clock to avoid it.

* * *

---

34 In re Celsius Network LLC, 645 B.R. 165, 173-74 (Bankr. S.D.N.Y. 2022) (distinguishing Pilgrim's Pride where largest shareholder serves as "creditor, as guarantor…[and] contractual counterparty…such that the Debtors' board and creditors' committee could not adequately represent equity.").

35 In re Oneida Ltd., 2006 WL 1288576, at *2.

36 In re Coram Healthcare Corp., 271 B.R. at 240.

37 In re Match Grp., Inc. Derivative Litig., 315 A.3d at 465 ("[E]ven when the transaction is negotiated by a special committee of independent directors, 'no court could be certain whether the transaction fully approximate[d] what truly independent parties would have achieved in an arm's length negotiation.'") (quoting Citron v. E.I. Du Pont de Nemours & Co., 584 A.2d 490, 502 (Del. Ch. 1990)).

38 See Emerald Partners v. Berlin, 726 A.2d 1215, 1222–23 (Del. 1999) (transactions with controlling stockholders require either independent committee approval and approval by a "fully informed vote of a majority of the minority shareholders" to shift burden away from "entire fairness").

39 In re Oneida Ltd., 2006 WL 1288576, at *3.

40 In re McLean Indus., Inc., 70 B.R. 852, 860 (Bankr. S.D.N.Y. 1987); In re Beker Indus. Corp., 55 B.R. 945, 949 (Bankr. S.D.N.Y. 1985).

41 In re Pilgrim's Pride, 407 B.R. at 219-21.

In light of the foregoing, we respectfully renew our request that the United States Trustee promptly appoint an Official Equity Committee, and remain available to address any questions.

Very truly yours,

Robert J. Stark

Copies: Elisha D. Graff, Esq. and Brian Schartz, Esq. (Simpson Thacher)
Michael S. Stamer, Esq. and Brad M. Kahn, Esq. (Akin Gump)

# EXHIBIT A

| Name | Address | Common Stock (in shares) | Economic Interest in Warrants Held | Other Disclosable Economic Interests |
|---|---|---|---|---|
| David Adler | [redacted] | 28,700 | None | N/A |
| Advantage Capital Management, LLC | 51 E 12th St, Fl 7<br>New York, NY 10003 | 1,416,000 | None | N/A |
| Kevin Barnes | [redacted] | 55,069 | None | N/A |
| Kyle Blackmon | [redacted] | 4,210,200 | None | N/A |
| Xin Feng | [redacted] | 774,002 | None | N/A |
| Eric Furey | [redacted] | 1,045,430 | None | N/A |
| Hain Capital Group, LLC | 301 Route 17 North, Suite 816A<br>Rutherford, NJ 07070 | 992,110 | None | N/A |
| Jeffrey Holland | [redacted] | 500,000 | $438,501 judgment principal ; 38,500 shares issuable by Warrants held | N/A |
| HZ Investments LLC | c/o Brown Rudnick LLP<br>7 Times Square<br>New York, NY 10036 | 1,528,129 | None | N/A |
| Jeffrey Kurzon | [redacted] | 392,290 | None | N/A |
| Gary Ribe | [redacted] | 2,082,625 | None | N/A |
| Austin Viny | [redacted] | 310,820 | None | N/A |
| Broadway Convexity Fund I, LP | P.O. Box 552<br>Point Lookout, NY 11569 | None | $20,015,122 judgment principal ; 1,148,538 shares issuable by Warrants held | N/A |
| Lyden Hunsicker | [redacted] | None | $1,244,101.22 judgment principal ; 52,100 shares issuable by Warrants held | N/A |

| Name | Address | Common Stock (in shares) | Economic Interest in Warrants Held | Other Disclosable Economic Interests |
|---|---|---|---|---|
| Robert E. Parker, Jr. | [redacted] | None | $3,155,117 judgment principal ; 185,131 shares issuable by Warrants held | N/A |
| PW Aero LLC | P.O. Box 552<br>Point Lookout, NY 11569 | None | $7,879,335 judgment principal ; 451,150 shares issuable by Warrants held | N/A |
| **Total:** | | 13,335,375 | $32,732,176.22 judgment principal ; 1,875,419 shares issuable by Warrants held | N/A |

# EXHIBIT B

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| *In re:*<br><br>GETTY IMAGES HOLDINGS, INC., *et al.*,<br><br>*Debtors*. | Chapter 11<br><br>Case No. 26-11643-JKS |

In accordance with 28 U.S.C. § 1746, I, Michael C. Rakower, declare under penalty of perjury that the following is true and correct:

1. I am an attorney admitted to the bar of the State of New York and the managing member of Rakower Law PLLC.

2. I make this declaration upon personal knowledge, except to the extent otherwise stated, to bring the Court's attention to certain events that preceded the filing of this bankruptcy proceeding. I submit this declaration in support of the appointment of an Official Equity Committee in this proceeding.

3. In its first-day presentation to this Court, Getty Images Holdings, Inc. ("Getty Images") portrayed itself as having been impelled to pursue its Chapter 11 plan by the imminent threat of enforcement of a certain judgment obtained by former warrant holders of Getty Images in a consolidated action captioned *Funicular Funds, LP et al. v. Getty Images Holdings, Inc.*, Case No. 653410/2024 (N.Y. Sup. Ct., N.Y. County) (the "NY State Action"). That narrative is not accurate.

4. In addition, in the Declaration of Craig Peters (Doc. 29), the Debtors state that the judgment issued in the NY State Action was imminently enforceable, that Getty Images could not obtain a bond, that a standstill expiring October 26, 2026 might not be extended, and that the NY

State Plaintiffs did not counter a pre-petition settlement proposal. Peters Decl. ¶¶ 6, 12, 22, 24, 94. Those statements are inaccurate or incomplete. This declaration addresses them.

5. Rakower Law is lead counsel to the plaintiffs in the NY State Action (the "NY State Plaintiffs"). The NY State Plaintiffs asserted that Getty Images breached its warrant agreement by preventing them from exercising their warrants even though all contractual criteria for exercisability had been met.

**Chronology**

6. On June 9, 2026, Justice Jennifer G. Schecter granted NY State Plaintiffs summary judgment as to liability and damages. NYSCEF 254 (Decision + Order); 258 (Transcript). Entry of judgment was conditioned on certain NY State Plaintiffs procuring supplemental authorizations from Cede & Co., the registered holder of the subject warrants.

7. Counsel for NY State Plaintiffs and Getty Images conferred extensively regarding the meaning and substance of the court-ordered supplemental authorizations and the language and timing of a proposed judgment, working together to address a variety of disagreements before seeking entry of judgment.

8. On July 15, 2026, NY State Plaintiffs presented the required supplemental authorizations, together with a proposed judgment for the court's consideration. NYSCEF 262 *et seq*.

9. On July 27, 2026, Justice Schecter issued an order approving the supplemental authorizations and directing the County Clerk to enter judgment in favor of NY State Plaintiffs in specified amounts per plaintiff. Justice Schecter further directed the parties to file a proposed judgment with the County Clerk for entry. NYSCEF 280.

10. On August 26, 2026, NY State Plaintiffs filed a proposed judgment for entry by the County Clerk. NYSCEF 281.

11. On August 28, 2026, Getty Images appealed. *Funicular Funds, LP, et al. v. Getty Images Holdings, Inc.*, 2026-05361 (N.Y. App. Div.)

12. On September 25, 2026, the County Clerk entered final judgment (the "Judgment"). NYSCEF 285. The Judgment awards NY State Plaintiffs damages and pre-judgment interest totaling $92,808,220.64.

**Pre-Petition Dialogue, the Standstill, and Alternatives Available to Getty Images**

13. Contrary to Getty Images' intimations in its bankruptcy filing, at all relevant times NY State Plaintiffs acted to assist Getty Images in its effort to avoid bankruptcy, including giving it breathing room to restructure out of court and potentially settle the NY State Plaintiffs' claims.

14. In June through August, counsel for NY State Plaintiffs communicated actively with Skadden, Arps, Slate, Meagher & Flom LLP ("Skadden"), Getty's counsel of record in the NY State Litigation, concerning the form and timing of an eventual judgment.

15. As early as June 11, 2026, counsel for NY State Plaintiffs reached out to Skadden to initiate discussions about a "creative settlement proposal." In our ensuing discussion with Skadden, we expressed a willingness by NY State Plaintiffs to consider settlements involving Getty common stock, debt, or cash.

16. As reflected in Getty Images' first-day filings, in or about July 2026, Getty Images retained Simpson Thacher & Bartlett LLP ("STB") and Guggenheim Securities, LLC to advise on strategic financing alternatives, balance sheet management and potential restructuring transactions, as well as a possible Chapter 11 filing. Peters Decl. ¶¶ 10-12, 27.

17. On July 5, Quinn Emanuel Urquhart & Sullivan LLP ("Quinn") disclosed to counsel for the NY State Plaintiffs that it, in addition to Skadden, was advising Getty Images concerning the NY State Action.

18. At the invitation of Skadden, Quinn, STB, and Guggenheim, counsel for NY State Plaintiffs maintained open lines of communication with Getty Images' team of lawyers and advisors to minimize any disruption to the company while preserving NY State Plaintiffs' rights.

19. When Quinn surfaced in July 2026, counsel for NY State Plaintiffs and Getty Images discussed a potential motion by Getty Images for an emergency stay pursuant to N.Y. C.P.L.R. 5519(c).

20. Counsel for NY State Plaintiffs noted that a sufficient runway remained in the NY State Litigation because the NY State Plaintiffs had not yet obtained all of the supplemental authorizations they were seeking and that, as a result, they were not yet in position to seek entry of a judgment. In any event, we further explained that the NY State Plaintiffs would not rush toward judgment enforcement without providing Getty Images time to seek court relief under C.P.L.R. 5519(c).

21. Thereafter, counsel for NY State Plaintiffs were in regular communication with Getty Images' lawyers about the status of Getty Images' restructuring efforts and the prospect of resolving the NY State Litigation. These communications occurred either through Rakower Law or Allen Matkins (co-counsel in the NY State Action) as litigation counsel or through outside bankruptcy counsel that litigation counsel engaged. Less formal communications also occurred between an individual NY State Plaintiff and Guggenheim.

22. As part of these negotiations, the NY State Plaintiffs entered into a 60-day standstill agreement on August 25, 2026. The agreement permitted entry of judgment but precluded enforcement of it for 60 days.

23. Litigation counsel for the parties also worked cooperatively to draft a mutually-agreeable form of judgment.

24. With a standstill agreement in place, the NY State Plaintiffs filed the agreed-upon form of judgment on August 26 and obtained entry of judgment on September 25.

25. Shortly before filing for bankruptcy, Getty Images made a last-minute, take-it-or-leave-it settlement offer. Without a meaningful opportunity to negotiate in response to that offer, the NY State Plaintiffs did not accept the proposal on the grounds that it was insufficient.

26. The only enforcement deadline the Debtors identify is the expiration of the standstill agreement. Peters Decl. ¶¶ 12, 24. Mr. Peters asserts that Getty Images had no "assurance that the plaintiffs in the NY State Action would be willing to extend the October 26, 2026 standstill deadline." *Id.* ¶ 12. This is not a fair statement. It implies that the NY State Plaintiffs had been coy in their position. They were not. Getty Images *never* asked for an extension; the NY State Plaintiffs never suggested that they would deny a request for one.

27. Getty Images never approached the NY State Plaintiffs with a proposal regarding a reduced bond, nor did it file a C.P.L.R. 5519(c) motion or seek any court relief from the bonding requirement under New York Civil Practice Law and Rules.

28. In sum: (i) NY State Plaintiffs never acted to enforce the Judgment, (ii) NY State Plaintiffs went to great lengths through dialogue with counsel for Getty Images to avoid even the appearance of imminent Judgment enforcement, and (iii) Getty Images filed for bankruptcy

without pursuing any of a number of alternatives that could have mitigated the exigent circumstances that Getty Images now alleges as justification for its filing.

29. Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct.

Executed: New York, New York
November 2, 2026

Michael C. Rakower

**U.S. Department of Justice**

Office of the United States Trustee

*District of Delaware*

*844 King Street, Suite 2207 (302) 573-6491*
*Wilmington, DE 19801*

November 4, 2026

**VIA E-MAIL**

Robert J. Stark, Esq.
Brown Rudnick LLP
rstark@brownrudnick.com

Re: Appointment of Official Equity Committee in *In re Getty Images Holdings, Inc.*, 26-11643 (JKS) (Bankr. D. Del.)

Dear Mr. Stark,

We received your letters dated October 22 and November 2, 2026, requesting, on behalf of your clients identified therein, the appointment of an official equity committee in the Getty Images Holdings, Inc. case.

The U.S. Trustee has reviewed the facts and circumstances of this case. Based on that review, the U.S. Trustee has determined not to appoint an official equity committee at this time. The U.S. Trustee reserves the right to revisit this determination in the future if new facts develop.

As you know, the absence of an official equity committee does not preclude your clients from asserting their interests in this case. Under the Bankruptcy Code, parties in interest, including creditors and equity security holders, generally have standing to raise and appear and be heard on issues that affect their interests.

Thank you for your patience during our review of this matter.

Respectfully,

*/s/ Benjamin Hackman*
Benjamin A. Hackman
Trial Attorney
Office of the United States Trustee
J. Caleb Boggs Federal Building
844 King Street, Suite 2207
Lockbox 35
Wilmington, DE 19801
Tel: (302) 573-6493
Cel: (202) 603-5229
benjamin.a.hackman@usdoj.gov

cc: Elisha D. Graff, Esq.
Brian Schartz, Esq.
Michael S. Stamer, Esq.
Brad M. Kahn, Esq.