**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| GETTY IMAGES HOLDINGS, INC., *et al.*,[1] | Case No. 26-11643 (JKS) |
| Debtors. | (Jointly Administered) |
| | **Related to Docket No. 18** |

**OBJECTION OF THE AD HOC GROUP OF EQUITY SECURITY HOLDERS TO THE DEBTORS' MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS (I) AUTHORIZING THE DEBTORS TO USE CASH COLLATERAL AND OBTAIN POSTPETITION FINANCING; (II) GRANTING LIENS AND SUPERPRIORITY ADMINISTRATIVE EXPENSE CLAIMS; (III) PROVIDING ADEQUATE PROTECTION; (IV) MODIFYING THE AUTOMATIC STAY; (V) SCHEDULING A FINAL HEARING; AND (VI) GRANTING RELATED RELIEF**

The ad hoc group of equity security holders (the "**Ad Hoc Group**") in the above-captioned Chapter 11 cases (the "**Chapter 11 Cases**"), by and through its undersigned counsel, hereby files this objection (the "**Objection**") to the *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing The Debtors To Use Cash Collateral And Obtain Postpetition Financing; (II) Granting Liens And Superpriority Administrative Expense Claims; (III) Providing Adequate Protection; (IV) Modifying The Automatic Stay; (V) Scheduling A Final Hearing; And (VI)*

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Getty Images Holdings, Inc. (4229); Griffey Midco (DE), LLC (7122); Abe Investment Holdings, Inc. (5107); Getty Images, Inc. (7556); Getty Images (US), Inc. (8819); Getty Images News Services (PRC), Inc. (1849); and Getty Images (Seattle), Inc. (6863). The location of the Debtors' service address for purposes of these chapter 11 cases is: 605 5th Ave. S. Suite 400, Seattle, WA 98104.

*Granting Related Relief* (the "**Motion**" or the "**DIP Motion**") [Docket No. 18].[2] In support of this Objection, the Ad Hoc Group respectfully states as follows:

## PRELIMINARY STATEMENT

1. The Ad Hoc Group incorporates by reference, as if fully set forth herein, the *Motion of the Ad Hoc Group of Equity Security Holders for Entry of an Order Directing the Appointment of an Official Equity Committee Pursuant to 11 U.S.C. § 1102* (the "**Appointment Motion**") [Docket No. 133]. The points and authorities set forth in the Appointment Motion do, in many respects, pertain directly to the DIP Motion.

2. The "engine" of this case is the DIP Facility, being provided by the Koch family -- a "control" stockholder and the pre-anointed co-owner (with the Getty family) of the company at exit. The financing is rife with strategy. It compels the case outcome (i.e., the Debtors' plan) through unforgiving "milestone" and other "case control" covenants. It clears all practical (and most legal) obstacles for the Getty and Koch families to "repurchase" 100% of the reorganized debtor equity at a price negotiated in the "backroom," not by the market. It prohibits any sort of post-petition market test. It defaults if any stakeholder introduces any "adversary challenge" in the case, and it starves any and all Official Committees of funding. It foreseeably puts this Court in a "Hobson's Choice" position at confirmation, to wit: (i) confirm the plan, as wrongful as it may be; or (ii) default the DIP and send the case into chaos. It, in sum, reduces Chapter 11 process and oversight to mere kabuki theater. It must be denied.

---

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Motion.

## **LEGAL OBJECTION**

**Applicable Legal Principles.**

3. **General Review Standard**. To obtain approval of a DIP loan, a debtor must prove that the proposed financing complies with governing law and is in the best interests of the estate and fair, reasonable, and adequate under the circumstances. *See, e.g., In re Los Angeles Dodgers LLC*, 457 B.R. 308, 312-13 (Bankr. D. Del. 2011).

4. **Stricter Standard Respecting "Insider" Financings**. If the financing package is provided by an "insider" and it is disputed as overly-strategic and/or results-driven (i.e., for the insider's parochial benefit), judicial review is much more exacting. *See, e.g., Pepper v. Litton*, 308 U.S. 295, 306 (1939) ("[A controlling stockholder's] dealings with the corporation are subjected to rigorous scrutiny and where any of their contracts or engagements with the corporation is challenged the burden is on the director or stockholder not only to prove the good faith of the transaction but also to show its inherent fairness from the viewpoint of the corporation and those interested therein."); *In re ASHINC Corp.*, 640 B.R. 1, 44 (Bankr. D. Del. 2022) (DIP facility "implicate[d] the entire fairness standard whereby [the controlling shareholder] must demonstrate its actions were entirely fair to the Company and its residual claimants.").

5. Under the more exacting "entire fairness" standard, a debtor must show that the proposed transaction results from "fair dealing" (also referred to as "fair process") and reflects a "fair price." *In re Opus E., LLC*, 528 B.R. 30, 66 (Bankr. D. Del. 2015), *aff'd*, 2016 WL 1298965 (D. Del. Mar. 31, 2016), *aff'd*, 698 Fed. App'x. 711 (3d Cir. 2017)); *see also In re SPAC Recovery Co.*, 676 B.R. 260, 273 (Bankr. S.D.N.Y. 2026); *Latam*, 620 B.R. at 771. "Not even an honest belief that the transaction was entirely fair is sufficient to establish entire fairness – the transaction

itself must be objectively fair, independent of the fiduciary's belief." *In re Opus E., LLC*, 528 B.R. at 66-67.

6. This more exacting scrutiny is not necessarily eased by the presence of "independent" directors. *See, e.g.*, *Kahn v. Tremont Corp.*, 694 A.2d 422, 428 (Del. 1997) ("Entire fairness remains applicable even when an independent committee is utilized because the underlying factors which raise the specter of impropriety can never be completely eradicated and still require careful judicial scrutiny."). The "entire fairness" standard only reverts to business judgment if the controlling shareholder conditions the deal on both an independent, fully-empowered special committee that can "say no definitively," and an uncoerced majority-of-the-minority vote. *Kahn v. M & F Worldwide Corp.*, 88 A.3d 635, 645 (Del. 2014).

7. **<u>Strategic/Overreaching Finance Terms</u>**. A DIP loan that saps the case of time, data, or opportunity to ferret out hidden truths, and it does so for the parochial benefit of insiders, is neither "fair" nor "reasonable." *See, e.g., In re Laffite's Harbor Dev. I, LP*, No. 17-36191-H5-11, 2018 WL 272781, at *2-3 (Bankr. S.D. Tex. Jan. 2, 2018) (rejecting approval of DIP financing, noting that bankruptcy courts "do not allow terms in financing arrangements that convert the bankruptcy process from one designed to benefit all creditors to one designed for the unwarranted benefit of the postpetition lender"); *In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 38 (Bankr. S.D.N.Y. 1990) (holding that payment of professional fees for an Official Committee "preserve[s] the adversary system. Absent such protection, the collective rights and expectations of all parties-in-interest are sorely prejudiced."); *In re Tenney Vill. Co., Inc.*, 104 B.R. 562, 568 (Bankr. D.N.H. 1989) (post-petition financing should not be used to "pervert the reorganizational process from one designed to accommodate all classes of creditors and equity interests to one specially crafted for the benefit of" a debtor's chosen partner).

8. **<u>“Sub Rosa” Plan Doctrine</u>**. Post-petition financing may not overreach into confirmation matters and/or disable confirmation standards. *See, e.g., Czyzewski v Jevic Holding Corp.* 580 U.S. 451, 468 (2017); *In re Boy Scouts of America* 137 F.4th 126, 156-157 (3d Cir. 2025); *In re Braniff Airways, Inc.*, 700 F.2d 935, 940 (5th Cir. 1983); *In re Latam Airlines Grp. S.A.*, 620 B.R. 722, 819-820 (Bankr. S.D.N.Y. 2020). Indeed, financings that have “the practical effect of dictating some of the terms of any future reorganization plan” are a “short circuit” of Section 1129 and, thus, an impermissible “plan *sub rosa*.” *Braniff*, 700 F.2d at 940.

9. The Third Circuit has recognized the *sub rosa* doctrine and endorsed its application to police, among other interim case steps, DIP financings. *In re Boy Scouts of Am.*, 137 F.4th 126, 156-157 (3d Cir. 2025). DIP financing that enables “powerful creditors” to “maximize [their] leverage by dictating the terms of Chapter 11 plans up front without scaling the hurdles erected by the Bankruptcy Code,” forecloses investigation into claims against the insiders and secured lenders, or locks in discounted plan value for the sole benefit of controlling shareholders, is a *sub rosa* plan. *Id.* (citations omitted) (collecting cases); *see e.g., In re Capmark Fin. Grp. Inc.*, 438 B.R. 471, 513 (Bankr. D. Del. 2010) (a transaction is a *sub rosa* plan when it “(i) dispose[s] of all claims against the estate or (ii) restrict[s] creditors’ rights to vote”); *Latam*, 620 B.R. at 819-820 (declining to approve DIP financing which contained an equity-conversion feature for the benefit of controlling shareholders that would lock in a discount to plan value).

10. *Latam* is instructive. There, the Court declined to approve a DIP loan funded by the debtors’ controlling shareholders, which had an equity-conversion feature that would “fix now, some of the terms of a plan yet to be filed” by locking in a discount to plan value that would not be “subject to creditor comment or Court review.” *Latam*, 620 B.R. at 819. That, the Court held, “short circuits the chapter 11 plan review process … by establishing plan terms sub rosa,” and

"violates the absolute priority rule since the shareholders will be receiving the stock solely by reason of their status as shareholders, and without the benefit of market testing the transaction." *Id.* at 819–20.

11. **<u>"Good Faith"</u>.** The lead precedent on DIP lender "good faith" is generally thought to be Judge Posner's decision in *In re EDC Holding Co.*, 676 F.2d 945 (7th Cir. 1982), where the Court said as follows:

> We assume the statute was intended to protect not the lender who seeks to take advantage of a lapse in oversight by the bankruptcy judge but the lender who believes his priority is valid but cannot be that certain it is, because of objections that might be upheld on appeal. If the lender knows his priority is invalid but proceeds anyway in the hope that a stay will not be sought or if sought will not be granted, we cannot see how he can be thought to be acting in good faith…. Where it is evident from the loan agreement itself that the transaction has an intended effect that is improper under the Bankruptcy Code, the lender is not in good faith, and it is irrelevant what the improper purpose is.

*Id.* at 947 (emphasis in the original).

12. In *EDC Holding*, the proposed DIP lender did not qualify as a "good faith" lender because, among other things, the financing was tied to an ulterior motive, i.e., advancing the lender's defensive posture in litigation. *See id.* at 948-49; *see also* 3 *Collier on Bankruptcy* ¶ 364.06[1] (16th ed. rev. 2015) (citing *In re White Crane Trading Co., Inc.*, 170 B.R. 694, 705 (Bankr. E.D. Cal. 1994)) (lack of good faith is apparent where there is "knowledge of the illegality of the action, an action for an improper purpose, such as to gain some advantage in litigation or otherwise, or a failure to reveal material facts to the court); *In re Colad Grp., Inc.*, 324 B.R. 208, 225 (Bankr. W.D.N.Y. 2005) (same); *cf, In re TMT Procurement Corp.*, 764 F.3d 512, 521 (5th Cir. 2014) (Section 364(e) requires proponent of "good faith" to demonstrate no "fraud, collusion, or an attempt to take grossly unfair advantage by the DIP Lender"); *In re Ellingsen MacLean Oil Co.*, 834 F.2d 599, 605 (6th Cir. 1987) ("Good faith" requires showing of "honesty in fact in the

conduct or transaction concerned"); *In re Adams Apple, Inc.*, 829 F.2d 1484, 1489 (9th Cir. 1987) ("good faith" implicated where lender acted with improper purpose); *In re Solidus Networks, Inc.*, No. BAP CC-08-1046-MKKPA, 2008 WL 8462968, at *4 (B.A.P. 9th Cir. Dec. 24, 2008) (internal citations omitted).

## II. The DIP Motion Should Be Denied Because The Proposed Financing Is (i) Not Fair, Reasonable, Or Appropriate, (ii) Is Strategic And Vastly Overreaches And (iii) Constitutes An Impermissible "Sub Rosa" Plan.

13. As set forth in the chart below, the DIP Facility is designed to ensure that this case is "specially crafted" for the benefit of the Gettys/Kochs. It must be evaluated under the more exacting "entire fairness" standard, given that it was (i) negotiated between insiders; (ii) the "special committees" were brought in only to review a transaction and they had no real veto power over it; and (iii) the minority stockholders were shut out of discussions entirely.[3]

14. The DIP Facility does not pass "entire fairness" scrutiny. The financing package flouts any common sense understanding of fair process and price. The DIP Facility itself was, of course, never honestly marketed or shopped. Guggenheim solicited twelve potential third-party sources, but gave them less than two weeks before the RSA was signed (of which the DIP Facility is "an integral part," and which had obviously been under negotiation). Disclosure Statement at 49. Where an insider DIP is not market-tested, courts have refused to find the process fair. *See, e.g., In re Los Angeles Dodgers LLC*, 457 B.R. 308 (Bankr. D. Del. 2011); *In re Bidermann Indus.*

[3] While the circumstances and identities of the Special Committee fail this analysis on its face, it is worth noting that the Special Committees here are professional "bankruptcy directors" appointed by the Getty/Koch-dominated board. They were appointed to look over the transactions and "submit non-binding recommendations" to the boards of directors for consideration, and were not granted "full authority in respect of the fiduciary-related provisions in the RSA" for some time. Peters Declaration ¶ 111. In other words, the members of the Special Committees were hired by the insiders themselves, not to draft or negotiate but for the sole purpose of blessing the deal. And, it is not clear whether they were granted decision-making authority in respect of the DIP Facility at appropriate times given that their authority was "non-binding" for material period. Their involvement hardly renders the process or the terms "entirely fair."

*U.S.A., Inc.*, 203 B.R. 547 (Bankr. S.D.N.Y. 1997); *In re Belk Props.*, LLC, 421 B.R. 221 (Bankr. N.D. Miss. 2009); *cf. Latam*, 620 B.R. at 780-781 (finding that an insider DIP was entirely fair because the debtor had conducted a "robust marketing process" but denying the motion for other reasons).

15. Fair price, on the other hand, cannot be assessed while the Company's value remains contested. *See* Appointment Motion; *see also In re Innkeepers USA Tr.*, 442 B.R. at 232 (finding failure to meet fair price prong where debtors had not "fully analyzed" value). The Debtors' refusal to run a fair market testing process forecloses the very proof that entire fairness requires.

16. The particularly offensive provisions of the DIP Facility are summarized in the chart below:

| **DIP ISSUE** | **COMMENT** |
|---|---|
| **Case Control Milestones:**<br>The DIP Facility imposes a 55-day milestone for confirmation of the Plan conforming to the RSA and a 75-day milestone for emergence from Chapter 11.<br>• DIP Motion ¶ 27<br>• DIP Credit Agreement § 6.20. | If the Debtors deviate from the path to confirming the insider RSA at lightning pace, the DIP Facility defaults and the insider lenders can exercise remedies, including taking their collateral (see below) and ending the case. |

| DIP ISSUE | COMMENT |
|---|---|
| **Adversary Process Is Forbidden:**<br>The DIP Facility prevents the use of cash collateral to "object to, contest, prevent, hinder, or delay the DIP Secured Parties' or Prepetition Secured Parties' enforcement of any of their respective rights" regarding the DIP collateral; to investigate the DIP Secured Parties in any manner or to prosecute any challenge to any of their claims against the Debtors; or to take any action "other than as expressly provided pursuant to this Interim Order and the other DIP Documents." The Kochs may also terminate DIP lending if any party in interest challenges the *status quo*.<br>• Interim DIP Order ¶ 26.<br>• DIP Credit Agreement § 4.03(e) (before borrowing, "[n]o motion or other pleading shall be pending that seeks relief that is adverse to the Lenders or that is inconsistent with the RSA."). | Among other issues, this highlights the inability of the purportedly independent Special Committees to engage in any adversarial process: while their investigation is admittedly incomplete, should they attempt to investigate and direct a filing "adverse" to insiders or "inconsistent with the RSA", the insider lenders can exercise remedies, including taking their collateral (see below) and ending the case. |
| **Collateral Package Is the Company:**<br>• Interim DIP Order ¶¶ 5, 33. | Taken together, the DIP and Adequate Protection Collateral give the insider lenders the foreclosure rights over all of the Company assets, such that a DIP Facility default amounts to a cheaper and preferable version of the transaction sought to be accomplished by the RSA. |

| **DIP ISSUE** | **COMMENT** |
|---|---|
| **No Challenge – Even By Special Committees:**<br>The DIP Order bars the use of DIP funds or cash collateral to investigate or prosecute any claims against the DIP Lenders and pre-petition secured parties. The Debtors' Special Committees cannot pursue any such claims without triggering a DIP default—rendering any pre-petition investigation (if one was conducted) moot.<br>• Interim DIP Order ¶ 26<br>• DIP Credit Agreement §§ 8.01(v), (ix). | As set forth in the Appointment Motion, an Official Equity Committee must be empowered to investigate claims and causes of action against insiders. |
| **Releases Without Process:**<br>A wide array of people and entities, including insiders, obtain irrevocable releases from estate causes of action.<br>• Interim DIP Order ¶ 44. | As above, granting such releases without any investigation or empowerment of fiduciaries in connection with an insider transaction is improper. |
| **Challenge Rights Are Illusory:**<br>The challenge period is the earlier of the plan objection deadline and 75 days after entry of the Interim DIP Order. No standing is conferred on any party to pursue challenges, and estate funds may not be used for any investigation or challenge.<br>• Interim DIP Order ¶¶ 26, 34(c). | The inability to access estate resources, a condensed challenge period, and no automatic standing make any challenge right illusory. |
| **No Funding for Official Committees:**<br>The Budget presumes no appointment and/or no resources for any committee. | See above. |
| **Insufficient Size for Administrative Solvency:**<br>By the eleventh week of the case, the Debtors will have only $16 million in their coffers, approximately one-third of what the Company describes as its "minimum operating requirement" to assure administrative solvency.<br>• DIP Budget<br>• Disclosure Statement at 43. | DIP Budget is inappropriate to accommodate minimum operating requirements, let alone fund any required adversarial process. |

| **DIP ISSUE** | **COMMENT** |
|---|---|
| **Unfettered Credit Bid Rights**:<br>• Interim DIP Order ¶ 30. | The DIP Lenders' unfettered right to credit bid is inappropriate and, at a minimum, must be subject to challenge. |
| **Discriminatory Carve-Out / Funded Reserve**:<br>• Interim DIP Order ¶ 25. | Funding for Official Committee professionals should be added to the Carve-Out and the Funded Reserve Account. |
| **Indemnification for Fraud**:<br>• Interim DIP Order ¶ 24. | Indemnification fails to include standard carve outs for fraud, gross negligence, or willful misconduct. |

## III. The DIP Lenders Do Not Deserve "Good Faith" Findings.

17. As explained herein and the Appointment Motion, this DIP Facility and RSA were clearly designed by the Gettys/Kochs to ensure their plan, and their plan only. The DIP Facility and Plan, together, function to (i) pay off every stakeholder of Getty Images either in full or by agreed amounts, other than the minority shareholders (who receive nothing); (ii) prevent any Official Committee (via budgetary and scheduling impediments) from meaningfully investigating or challenging the proposed "prepack" transaction in violation of due process rights and fiduciary protections; and (iii) nonetheless, provide broad releases to the insider families and the pre-petition secured creditors. This is not "good faith" behavior.

**IV. <u>Request For A Stay Pending Appeal</u>.**

18. Under Bankruptcy Rule 8007, the Court may grant a litigant in a contested matter a stay pending appeal, should the Court render an unfavorable ruling. Analysis follows the traditional standard for a preliminary injunction: (1) the likelihood that the party seeking the stay will prevail on the merits; (2) whether the movant will suffer irreparable harm if the stay is not granted; (3) whether the other parties would suffer substantial harm if the stay is granted; and (4) whether the public interest would be harmed if the stay is granted. 10A *Collier on Bankruptcy* ¶ 8007.07. These factors are often considered along a "sliding scale," meaning that a strong showing on the first element lessens the emphasis on the other elements, and *vice versa*. *See, e.g., In re Revel AC, Inc.*, 802 F.3d 558, 571 (3d Cir. 2015).

19. This DIP Facility is an overt violation of numerous foundational cases concerning the protection of stakeholders' due process rights in bankruptcy proceedings, including cases concerning circumvention of confirmation process protections generally (*Braniff*, *Boy Scouts of America*, *Latam*, *Czyzewski v. Jevic*) and protection against losses caused by insider self-dealing (*Pepper v. Litton*) particularly with respect to non-market tested insider DIP facilities (*Los Angeles Dodgers*). It is replete with insider opportunism; it is extended by insider DIP Lenders who already caused the Company to incur nine-figure liability through previous attempts to disenfranchise minority stakeholders; and it is designed to neuter any challenge to the plan. If this DIP Facility is approved on a final basis, it will compel obvious and irreparable harm to the estates generally, and specifically to the sole class of already-aggrieved and adjudicated stakeholders targeted by the entire scheme. The public interest would be greatly harmed if the courts were to validate a controlling insider effort to freeze out minority interests without the due process protections guaranteed by the Bankruptcy Code and the above-cited body of corporate law, and thereby

provide a roadmap to future similar efforts. For the avoidance of doubt, such stay should be entered for the benefit of all of the Debtors' stakeholders, including any subsequently appointed official committees and other stakeholders that have yet to organize given the lightning speed with which the Debtors and the Gettys/Kochs have attempted to ram through approval of this scheme.

[*Remainder of the page intentionally left blank*]

## CONCLUSION

**WHEREFORE**, for the foregoing reasons, the Ad Hoc Group respectfully requests that the Court: (i) sustain the Objection; (ii) deny the relief requested in the DIP Motion; and (iii) grant the Ad Hoc Group such other or further relief as is just and proper.

Dated: November 10, 2026

Respectfully submitted,

**AKERMAN LLP**

By: */s/ Lucian B. Murley*

Lucian B. Murley (DE Bar No. 4892)
Stephen A. Smith (DE Bar No. 7456)
222 Delaware Avenue
Suite 1710
Wilmington, DE 19801
Telephone: (302) 596-9200
Email: luke.murley@akerman.com
stephen.smith@akerman.com

-and-

**BROWN RUDNICK LLP**

Robert J. Stark (*pro hac vice* forthcoming)
Bennett S. Silverberg (*pro hac vice* forthcoming)
Andrew M. Carty (*pro hac vice* forthcoming)
Seven Times Square
New York, NY 10036
Telephone: (212) 209-4800
Email: rstark@brownrudnick.com
bsilverberg@brownrudnick.com
acarty@brownrudnick.com

Sharon I. Dwoskin (*pro hac vice* forthcoming)
One Financial Center
Boston, MA 02111
Telephone: (617) 856-8200
Email: sdwoskin@brownrudnick.com

*Counsel for the Ad Hoc Group*

**Certificate of Service**

I hereby certify that on November 10, 2026, a true and correct copy of the foregoing document was filed and served via the Court's electronic case filing and noticing system to all parties registered to receive electronic notices in this matter.

*/s/ Lucian B. Murley*
Lucian B. Murley