**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| GETTY IMAGES HOLDINGS, INC., *et al.*,[1] | ) | Case No. 26-11643 (JKS) |
| Debtors. | ) | (Jointly Administered)<br>Re: D.I. 133 |

**OBJECTION OF THE UNSECURED NOTEHOLDERS AD HOC COMMITTEE TO THE MOTION OF THE AD HOC GROUP OF EQUITY SECURITY HOLDERS FOR ENTRY OF AN ORDER DIRECTING THE APPOINTMENT OF AN OFFICIAL EQUITY COMMITTEE PURSUANT TO 11 U.S.C. § 1102**

The ad hoc committee of certain unaffiliated beneficial holders (or investment managers or advisors to beneficial holders) of the 14.00% Senior Notes due 2028 and the 9.75% Senior Notes due 2027 (the "Unsecured Noteholders Ad Hoc Committee"),[2] by and through its undersigned counsel, hereby submits this objection (this "Objection") to the *Motion of the Ad Hoc Group of Equity Security Holders for Entry of an Order Directing the Appointment of an Official Equity Committee Pursuant to 11 U.S.C. § 1102* [D.I. 133] (the "Motion"), filed by the Ad Hoc Group of Equity Security Holders (the "Ad Hoc Equity Group").[3] In support of this Objection, the Unsecured Noteholders Ad Hoc Committee respectfully states as follows:

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Getty Images Holdings, Inc. (4229); Griffey Midco (DE), LLC (7122); Abe Investment Holdings, Inc. (5107); Getty Images, Inc. (7556); Getty Images (US), Inc. (8819); Getty Images News Services (PRC), Inc. (1849); and Getty Images (Seattle), Inc. (6863). The location of the Debtors' service address for purposes of these chapter 11 cases is: 605 5th Ave. S. Suite 400, Seattle, WA 98104.

[2] The Plan defines "Unsecured Notes" to include both the 14.00% Senior Notes due 2028 and the 9.75% Senior Notes due 2027. As set forth in the *Verified Statement of the Unsecured Noteholders Ad Hoc Committee Pursuant to Bankruptcy Rule 2019* [D.I. 132] (the "Rule 2019 Statement"), no member of the Unsecured Noteholders Ad Hoc Committee holds any 9.75% Senior Notes due 2027.

[3] Capitalized terms used but not defined herein have the meanings given in the *Joint Prepackaged Chapter 11 Plan of Reorganization of Getty Images Holdings, Inc. and its Debtor Subsidiaries* [D.I. 31] (the "Plan") or the RSA, as applicable.

**PRELIMINARY STATEMENT**

1. By the Motion, the Ad Hoc Equity Group argues that an official equity committee is needed in large part because there has been no adversarial check on the Debtors or the Plan Sponsors. Motion ¶¶ 13-15, 60-63. But the "usual checks and balances" were not absent. The Unsecured Noteholders Ad Hoc Committee comprises the most junior funded debt creditors in the capital structure and controls the class of claims taking the most significant principal impairment under the Plan. It pushed the Plan Sponsors and the Debtors in exactly the way the Motion asserts is missing. That the process concluded in a settlement and a prepackaged chapter 11 plan, rather than litigation, demonstrates, rather than disproves, the existence of a counterbalance to the Debtors and Plan Sponsors. The remainder of the Ad Hoc Equity Group's attempts to sweep aside the relevance of the substantial impairment of the Unsecured Notes is deliberate hand-waving based on faulty logic.

2. Pursuant to the RSA and the Plan, holders of the $270 million of Unsecured Notes give up approximately $100 million—roughly 37% of their outstanding principal claims—in exchange for a cash recovery funded by the Plan Sponsors' commitment of significant new value. The Motion concedes the compromise. Motion ¶ 51 ("It is true that 83% of the Debtors' unsecured noteholders agreed to a plan that pays them 63% of their claims in cash."). Its response is to call the compromise a "red herring," and then to speculate about why the unsecured noteholders made it—while conceding that the reasons are, "strictly speaking, irrelevant." *Id.* ¶¶ 9, 51, 58-59. Speculation cannot erase the fact that the creditor group bearing the largest impairment under the Plan negotiated for, and extracted, the terms it ultimately accepted. Nor does that concession leave "remaining value" for existing equity, as the Motion contends. *Id.* ¶¶ 52-54. That argument, as bold as it may be, turns the absolute priority rule on its head. The rule protects creditors that reject

a plan. It does not entitle equity to whatever creditors agree to give up in a negotiated compromise. And while the unsecured noteholders have accepted *this* Plan, the Ad Hoc Equity Group cannot assume that the unsecured noteholders would accept a plan that would materially haircut their recoveries while (a) paying other unsecured creditors in full and (b) giving equity a windfall.

3. Further, an official equity committee would put the compromises embedded in the RSA and Plan at risk through delay and added cost, without expanding the Ad Hoc Equity Group's ability to be heard. The Motion itself describes the work its committee would undertake on a schedule the Motion says leaves "no time." Motion ¶¶ 67, 72. The Unsecured Notes Recovery is payable only on the Effective Date, and delay brings the Chapter 11 Cases closer to the point at which the New Equity Investment that funds it can fall away. Meanwhile, the Ad Hoc Equity Group has retained experienced counsel, has already set out its position at length, and remains free to object to confirmation. What an official equity committee would change is who bears the costs of the Ad Hoc Equity Group's litigation efforts.

4. The Unsecured Noteholders Ad Hoc Committee supports the Debtors and the U.S. Trustee in opposing the appointment of an equity committee. It submits this Objection to provide the Unsecured Noteholders Ad Hoc Committee's perspective on the events leading to the RSA and Plan, and the deleterious effect an official equity committee would have on these Chapter 11 Cases. For these reasons, and those set forth below, the Motion should be denied.

## BACKGROUND

5. The members of the Unsecured Noteholders Ad Hoc Committee are parties to the Restructuring Support Agreement dated October 12, 2026 (the "RSA"). As set forth in the Rule

2019 Statement, the members of the Unsecured Noteholders Ad Hoc Committee hold, in the aggregate, approximately 68% of the principal amount of the Unsecured Notes.[4]

6. On October 21, 2026 (the "Petition Date"), the Debtors commenced these chapter 11 cases (the "Chapter 11 Cases"), which are jointly administered. In support of their chapter 11 petitions, the Debtors filed the *Declaration of Craig Peters, Chief Executive Officer of Getty Images Holdings, Inc. and its Debtor Subsidiaries, in Support of the Debtors' Chapter 11 Petitions* [D.I. 29] (the "Peters Declaration"). On the Petition Date, the Debtors also filed the Plan [D.I. 31] and the Disclosure Statement [D.I. 32]. The Court has scheduled a combined hearing on the adequacy of the Disclosure Statement and confirmation of the Plan for December 15, 2026.

7. On October 22, 2026, Brown Rudnick LLP, on behalf of certain equity security holders, requested by letter that the Office of the United States Trustee for the District of Delaware (the "U.S. Trustee") appoint an official committee of equity security holders in these Chapter 11 Cases. On October 29, 2026, the Debtors and the Unsecured Noteholders Ad Hoc Committee each submitted a letter in response. On November 2, 2026, Brown Rudnick LLP submitted a further letter in support of the request (the "November 2 Letter"). Each of these letters is attached to the Motion as part of Exhibit A. D.I. 133-1.

8. On November 4, 2026, the U.S. Trustee advised that it had determined not to appoint an official equity committee at this time and further noted that "the absence of an official equity committee does not preclude [the Ad Hoc Equity Group] from asserting their interests in this case." D.I. 133-1.

[4] Holders of approximately 83% of the Unsecured Notes are party to the RSA. *See* Peters Decl. ¶ 18. The members' holdings have changed through trading since the RSA was executed. Under the RSA, Unsecured Notes transferred by a Consenting Stakeholder in accordance with the RSA remain subject to its terms in the hands of the transferee. *See* RSA §§ 8.01-8.02. *See also* Rule 2019 Statement.

9. On November 9, 2026, the Ad Hoc Equity Group filed the Motion, which asks the Court to direct the U.S. Trustee to appoint an official committee consisting of holders of both common stock and warrant claims. Motion at 28; D.I. 133-2 ¶ 3.

10. On November 13, 2026, the U.S. Trustee filed the *Response of the United States Trustee to Motion to Appoint Equity Committee* [D.I. 179] (the "U.S. Trustee Response"), which asks the Court to deny the Motion because the Ad Hoc Equity Group has not carried its burden for appointment of an official equity committee. U.S. Trustee Response ¶ 29.

## OBJECTION

11. Bankruptcy Code section 1102(a)(2) provides that, "[o]n request of a party in interest, the court may order the appointment of additional committees of creditors or of equity security holders if necessary to assure adequate representation of creditors or of equity security holders." The operative condition is "if necessary to assure adequate representation." The Motion's own summary of the statute leaves that condition out. *See* Motion ¶ 43 (describing Bankruptcy Code section 1102(a)(2) as providing that the Court "may direct the appointment of an Official Equity Committee"). The statute does not ask whether an official committee would be useful to the movant or whether the movant would prefer that the estate fund its advocacy; it asks whether official status is necessary. The Ad Hoc Equity Group, as movant, bears the burden of showing that it is. *See In re Spansion, Inc.,* 421 B.R. 151, 156 (Bankr. D. Del. 2009).

12. Appointment of an additional committee "is considered 'extraordinary relief' and should be 'the rare exception.'" *Id.* To obtain that relief, the movant must show both that "(i) there is a substantial likelihood that they will receive a meaningful distribution in the case under a strict application of the absolute priority rule, and (ii) they are unable to represent their interests in the

bankruptcy case without an official committee." *Id.* (citing *In re Williams Commc'ns Grp., Inc.*, 281 B.R. 216, 223 (Bankr. S.D.N.Y. 2002)).

13. The Motion's arguments about the unsecured noteholders and their bargain go largely to the second requirement. The Motion contends that equity needs an official committee because every other constituency has signed on and no one will test the Debtors' proposed restructuring. Motion ¶¶ 13-15, 60-63. The record shows otherwise. As set forth below, the Unsecured Noteholders Ad Hoc Committee's negotiations supplied the adversarial check the Motion says is missing, an official equity committee would put the resulting bargain at risk through delay without a corresponding benefit, and the Ad Hoc Equity Group is already well represented, so official status would change only who pays for its advocacy. Nothing in the Motion shows that the Ad Hoc Equity Group is "unable to represent [its] interests . . . without an official committee." *Spansion*, 421 B.R. at 156. Because the movant must make both showings, that failure alone requires denial of the Motion.

## I. The Unsecured Noteholders Struck an Arm's-Length Bargain and Accepted a Substantial Haircut to Secure It

14. As noted above, pursuant to the RSA and the Plan, holders of the $270 million Unsecured Notes give up approximately $100 million—roughly 37% of their outstanding principal claims. *See* Plan Art. III.B.5; Peters Decl. ¶¶ 15, 20. The unsecured noteholders did not make that concession lightly. Rather, they negotiated a compromise of their claims in connection with the substantial new value being committed by the Plan Sponsors to the Debtors. The Plan Sponsors' total commitment is up to approximately $533 million, including a cash investment of up to approximately $433 million, that will fund the Unsecured Notes Recovery. *See* Peters Decl. ¶¶ 15, 19. Equally central to the bargain is that the Unsecured Notes Recovery will be paid in cash on the

Effective Date, subject to the Milestones in the RSA. *See* Plan Art. IX.A.13. The importance of that timeline is not a preference for speed for its own sake. The Unsecured Notes Recovery is funded by the New Equity Investment, and the Plan Sponsors' commitment to fund it is tied to the Milestones. The unsecured noteholders, as sophisticated investors, accepted a substantial haircut in exchange for certainty that the agreed recovery would actually be paid.

15. The Ad Hoc Equity Group attempts to diminish the significance of the noteholders' impairment through a strained invocation of the absolute priority rule and its corollary that creditors cannot receive more than payment in full. Specifically, the Motion contends that because the unsecured noteholders agreed to accept less than par, the "remaining value" belongs to existing stockholders and that a plan is not fair and equitable if "it pays creditors more than they are owed or more than any lesser amount they agree to." Motion ¶¶ 52-54. But the absolute priority rule and its corollary protect creditors that reject a plan by keeping equity from taking value ahead of them until they are paid in full. *See* 11 U.S.C. § 1129(b)(1), (2)(B). They do not give to equity some magical entitlement to any excess above an agreed recovery that impairs unsecured creditors.

16. Notably, the *Breitburn* case to which the Ad Hoc Equity Group cites does *not* stand for the proposition that a senior class cannot receive more than some agreed compromised recovery as compared to payment in full on its allowed claims. It simply states the black-letter law principle that creditors cannot receive more than payment in full on their claims, and notes that "[b]ecause the estates are insolvent, no creditor class is receiving more than 100% of its claims." *See In re Breitburn Energy Partners LP*, 582 B.R. 321, 350 (Bankr. S.D.N.Y. 2018). Here, the unsecured noteholders are far—approximately $100 million away—from receiving payment in full. The unsecured noteholders' haircut was the price of a deal they bargained for, not value left on the table for the next constituency in line. Nothing in Bankruptcy Code section 1129(b) converts that

concession into a gift to equity. Taken to its logical end, the Ad Hoc Equity Group's theory would mean that no senior creditor could compromise the recovery on its claim without enriching the junior classes it outranks, and negotiated restructurings like this one would become unworkable.

17. To be clear, the members of the Unsecured Noteholders Ad Hoc Committee have not consented to or accepted any chapter 11 plan that would materially impair their claims while paying other unsecured creditors in full and giving a distribution to shareholders on account of their equity. In *that* event, the absolute priority rule would actually apply and any distribution to equity would violate Bankruptcy Code section 1129(b).

## II. The Motion's Speculation About the Unsecured Noteholders Is Not Evidence and by the Motion's Own Account It Is Irrelevant

18. The Ad Hoc Equity Group tries to minimize the agreed-to bargain by speculating about why the unsecured noteholders accepted it. It suggests that noteholders may have acquired their notes at a discount, preferred cash, lacked the ability to hold reorganized equity, faced a "falling knife" situation, or feared more aggressive treatment in a contested case. *See* Motion ¶ 58.

19. Every restructuring negotiation takes place against the backdrop of the debtor's financial circumstances, but the record shows that the Unsecured Noteholders Ad Hoc Committee negotiated from an informed position, not under duress. The Unsecured Noteholders Ad Hoc Committee was represented throughout by its own legal and financial advisors and agreed to a restricted period during which it received extensive information about the Debtors' operations and finances. *See* Peters Decl. ¶ 11. From August 17 through September 30, 2026, the Debtors and their key stakeholder groups exchanged proposals. *See id.* ¶ 13. As the Debtors have disclosed, the Unsecured Noteholders Ad Hoc Committee rejected the Debtors' initial proposal as inadequate. *See id.* ¶ 14. The negotiations then continued, including further negotiations with the Plan Sponsors

to extract additional value for the business and drive a consensual deal with the Unsecured Noteholders Ad Hoc Committee. *See id.* ¶ 15. Agreement was reached only after the Plan Sponsors increased their committed cash equity investment by approximately $153 million to fund incremental recovery to the unsecured noteholders that was not previously on the table. *See id.* ¶¶ 15, 101. To date, no other party has agreed to fund that recovery.

20. The Unsecured Noteholders Ad Hoc Committee engaged in hard-fought, arm's-length negotiations with the assistance of experienced advisors, and its agreement reflects its own judgment. That negotiated concession is not a reason to appoint an official equity committee—it is evidence that the proposed restructuring was tested by the creditor constituency with the greatest economic stake in improving recoveries for holders of the Unsecured Notes.

**III. An Official Equity Committee Would Put the Bargain at Risk Without a Corresponding Benefit**

21. The arm's-length bargain negotiated by the Unsecured Noteholders Ad Hoc Committee depends on these Chapter 11 Cases proceeding on an agreed-upon schedule. The Unsecured Notes Recovery is payable only on the Effective Date, will be funded by the New Equity Investment, and remains uncertain until the Confirmation Order is entered and the other conditions to the Effective Date are satisfied. *See* Plan Art. IX.A.7, IX.A.11, IX.A.13. The timeline for reaching that point was a material part of the bargain because the funding of the recovery depends on it. The timeline is therefore not a procedural convenience. It is part of the consideration for the unsecured noteholders' concession. The Motion suggests that the unsecured noteholders simply viewed cash as a "preferred currency." *See* Motion ¶ 58. But the point of the timeline is not a quick exit. It is certainty. The recovery depends on new money that is committed only for a defined period, and each delay extends the time during which that commitment can fall away. The

unsecured noteholders agreed to accept a material impairment because the Plan provides a funded cash recovery on the Effective Date; if the Milestones are missed and the New Equity Investment falls away, the premise of that bargain falls away with it.[5]

22. The Milestones, which require entry of the Confirmation Order within 55 days of the Petition Date and occurrence of the Effective Date within 75 days, were negotiated among the Debtors' major stakeholders—holders of approximately 90% of the Debtors' secured funded debt, all of the revolving loans, and approximately 83% of the Unsecured Notes—because an efficient process protects the committed funding on which the Plan depends, while also limiting the cost of these Chapter 11 Cases and the disruption to the Debtors' business, preserving value for all stakeholders. *See* Peters Decl. ¶¶ 18, 113. The Motion characterizes the expedited schedule as "a product of the Getty and Koch families' own making." Motion ¶ 72. But the Plan Sponsors did not hand the Milestones down. They were negotiated as part of the bargain described above.

23. Any official equity committee would put that timeline at risk without a corresponding benefit. The Motion contemplates that an official equity committee would challenge the Debtors' valuation. *See* Motion ¶¶ 65, 72. That challenge does not require an official equity committee or a delay to the process. The Ad Hoc Equity Group has retained experienced counsel, has already set out its position at length, and remains free to object to confirmation and be heard at the Confirmation Hearing, where the Court will determine whether the Plan satisfies the requirements for confirmation. The *Spansion* court denied an official equity committee relying on that basis, finding that where "the main controversy in the confirmation process is the Debtors'

---

[5] The Plan Sponsors' equity commitment may be terminated, and the RSA may terminate with it, if, among other things, the Restructuring Effective Date Milestone is missed. *See* RSA §§ 12.01(b), 12.01(u); Equity Commitment Letter §§ 7(a), 7(i).

value," an ad hoc equity group represented by its own counsel "is well able to proceed." *Spansion*, 421 B.R. at 164. Where the "only remaining purpose of an equity committee . . . would be to object to confirmation and litigate the valuation issue," the associated costs "cannot be justified." *Id.* at 164 n.23 (quoting *In re Kalvar Microfilm, Inc.*, 195 B.R. 599, 601 (Bankr. D. Del. 1996)).

24. Nor is an official equity committee needed to test whether a better transaction exists. The RSA does not prohibit the Debtors from considering a superior proposal, but rather preserves the Debtors' ability to consider, respond to, and negotiate alternative proposals, including with holders of equity interests or even third-party strategics, and to terminate the RSA in the exercise of their fiduciary duties if a better transaction arises. *See* RSA §§ 7.01, 7.02, 12.02(b). An estate-funded committee is therefore not needed to create optionality that the RSA already preserves. The Unsecured Noteholders Ad Hoc Committee understands that no party has come forward with a better transaction since the RSA was announced.

25. The appointment of an official equity committee would merely serve to shift the costs of the shareholders' litigation efforts unfairly. The Ad Hoc Equity Group is free to pursue its valuation argument at confirmation through its own counsel, and an official equity committee would not expand its right to do so. What an official equity committee would change is who pays. The cost of the Ad Hoc Equity Group's advocacy, including the professionals and valuation experts that a contested confirmation would require, would move from the Ad Hoc Equity Group to the estates. The estates would, in effect, be funding a challenge to the very restructuring that the unsecured noteholders and the Debtors' other major stakeholders made significant concessions to achieve. That is why the adequate-representation requirement is critical: "in most cases, even those equity holders who do expect a distribution in the case can adequately represent their interest without an official committee." *Spansion*, 421 B.R. at 164 (quoting *Williams*, 281 B.R. at 223). A

valuation challenge does not change that result. *See In re Northwestern Corp.*, No. 03-12872 (CGC), 2004 WL 1077913, at *2 (Bankr. D. Del. May 13, 2004) (valuation challenge did "not tip the scale to the extent that the valuation battle should be funded by the estate").

26. The Ad Hoc Equity Group does not lack representation, and the Motion itself confirms it. The Ad Hoc Equity Group has retained experienced counsel, which has told the U.S. Trustee that "this firm alone has been appointed counsel to Official Equity Committees in more than 19 cases of national importance." November 2 Letter at 7. It has set out its valuation, process, and legal arguments in two letters to the U.S. Trustee and again in the Motion. It has also since filed a lengthy objection to the Debtors' proposed debtor-in-possession financing. *See* D.I. 137. And the U.S. Trustee has confirmed that "the absence of an official equity committee does not preclude [the Ad Hoc Equity Group] from asserting their interests in this case." D.I.. 133-1. That is exactly the type of group the *Spansion* court found "well organized, well represented by counsel, and adequate to the task of representing its interests without 'official' status." *Spansion*, 421 B.R. at 163. "[T]he statutory focus of § 1102(a)(2) is not whether the equity holders are 'exclusively' represented, but whether they are 'adequately' represented." *Id.* (quoting *In re Edison Bros. Stores, Inc.*, 1996 WL 534853, at *4 (D. Del. Sept. 17, 1996)). The Ad Hoc Equity Group can be heard. The only question is whether the estates should fund that advocacy through an official committee.

## **RESERVATION OF RIGHTS**

27. Without limiting the foregoing, nothing herein is intended as, or should be construed as, a waiver of any rights, claims, defenses, arguments, or objections of the Unsecured Noteholders Ad Hoc Committee or any of its members with respect to confirmation of the Plan, valuation, classification or treatment of any Claim or Interest, any alternative transaction, or any other issue not expressly addressed herein.

28. The Unsecured Noteholders Ad Hoc Committee reserves the right to supplement this Objection, to respond to any reply or other submission filed in support of the Motion, and to be heard at any hearing on the Motion.

## CONCLUSION

29. The Plan reflects an arm's-length bargain among sophisticated parties whereby the unsecured noteholders accepted a substantial haircut in exchange for a cash recovery funded by the Plan Sponsors' commitment of significant new value. An official equity committee would put that bargain at risk through delay and added cost, without expanding the Ad Hoc Equity Group's ability to be heard. Accordingly, the Unsecured Noteholders Ad Hoc Committee respectfully requests that the Court deny the Motion and grant such other and further relief as is just and proper.

*[Remainder of Page Intentionally Left Blank]*

Dated: November 14, 2026
Wilmington, Delaware

**PASHMAN STEIN WALDER HAYDEN, P.C.**

*/s/ Richard W. Riley*
John W. Weiss (No. 4160)
David B. Stratton (No. 960)
Richard W. Riley (No. 4052)
824 North Market Street, Suite 800
Wilmington, DE 19801
Telephone: (302) 596-7649
Email: jweiss@pashmanstein.com
dstratton@pashmanstein.com
rriley@pashmanstein.com

-and-

**AKIN GUMP STRAUSS HAUER & FELD LLP**
Michael S. Stamer (admitted pro hac vice)
Brad M. Kahn (admitted pro hac vice)
One Bryant Park
New York, NY 10036
Telephone: (212) 872-1000
Email: mstamer@akingump.com
bkahn@akingump.com

Chance Hiner (admitted pro hac vice)
2300 N. Field Street
Suite 1800
Dallas, TX 75201-2481
Telephone: (214) 969-2800
Email: chiner@akingump.com

*Counsel to the Unsecured Noteholders Ad Hoc Committee*