**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| GETTY IMAGES HOLDINGS, INC., *et al.*,[1] | ) | Case No. 26-11643 (JKS) |
| | ) | (Jointly Administered) |
| Debtors. | ) | |
| | ) | Re: Docket No. 133 |
| | ) | Hearing Date: Nov. 18, 2026, at 10:00 a.m. |

**DEBTORS' OBJECTION TO MOTION OF THE AD HOC GROUP OF EQUITY SECURITY HOLDERS FOR ENTRY OF AN ORDER DIRECTING THE APPOINTMENT OF AN OFFICIAL EQUITY COMMITTEE PURSUANT TO 11 U.S.C. § 1102**

Getty Images Holdings, Inc. ("GIH") and its direct and indirect debtor subsidiaries (collectively, the "Debtors") and its non-Debtor direct and indirect subsidiaries (together with the Debtors, the "Company") in the above-captioned chapter 11 cases hereby submit this objection (the "Objection") to the *Motion of the Ad Hoc Group of Equity Security Holders for Entry of an Order Directing the Appointment of an Official Equity Committee Pursuant to 11 U.S.C. § 1102*, D.I. 133 (the "Motion"), filed by certain equity security holders and warrant judgment holders (collectively, the "Ad Hoc Group")[2] on November 9, 2026, which seeks an order directing appointment of an official committee of equity security holders in these chapter 11 cases pursuant to section 1102(a)(2) of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code"). In support of this Objection, the Debtors submit contemporaneously

[1] A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' proposed claims and noticing agent at https://restructuring.ra.kroll.com/GettyImages. The location of the Debtors' service address for purposes of these chapter 11 cases is: 605 5th Ave. S. Suite 400, Seattle, WA 98104.

[2] Defined as the firms and individuals comprising the "Ad Hoc Group" identified in the Motion. The Ad Hoc Group asserts that it collectively holds approximately 17.1 million shares of GIH common stock—approximately 4% of the approximately 421.0 million shares outstanding. Mot. at 1. The Motion "assume[s]" (without conceding) that the warrant judgments are subordinated pursuant to section 510(b) of the Bankruptcy Code. Mot. at 1 n.2.

herewith the *Declaration of Adam Preiss, Senior Managing Director of Guggenheim Securities, LLC, in Support of the Debtors' Objection to the Motion of the Ad Hoc Group of Equity Security Holders for Entry of an Order Directing the Appointment of an Official Equity Committee Pursuant to 11 U.S.C. § 1102* (the "Preiss Declaration" or "Preiss Decl.") and respectfully state as follows:

## Preliminary Statement[3]

1. Appointing an official equity committee is "considered extraordinary relief and should be the rare exception." *In re Spansion, Inc.*, 421 B.R. 151, 156 (Bankr. D. Del. 2009) (citations omitted). When such relief is sought from the court, section 1102(a)(2) of the Bankruptcy Code requires a movant to show that an official committee is "necessary to assure adequate representation of . . . equity security holders." *See In re Celsius Network LLC*, 645 B.R. 165, 174 (Bankr. S.D.N.Y. 2022). This is an exacting standard that the Motion neither recites nor satisfies. Movants must show that "(i) there is a *substantial likelihood* that they will receive a *meaningful distribution* in the case under a strict application of the absolute priority rule, and (ii) they are *unable to represent their interests in the bankruptcy case without an official committee*." *In re Williams Commc'ns Grp., Inc.*, 281 B.R. 216, 223 (Bankr. S.D.N.Y. 2002) (emphasis added). The Motion meets neither requirement. There is no realistic likelihood, let alone a substantial likelihood, that equity will receive any distribution, let alone a meaningful one, in these chapter 11 proceedings. And the well-organized and ably-represented Ad Hoc Group—anchored by warrant-

[3] Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the *Joint Prepackaged Chapter 11 Plan of Reorganization of Getty Images Holdings, Inc. and Its Debtor Subsidiaries*, D.I. 31 (the "Plan"), *Disclosure Statement for the Joint Prepackaged Chapter 11 Plan of Reorganization of Getty Images Holdings, Inc. and its Debtor Subsidiaries*, D.I. 32 (the "Disclosure Statement"), or the Preiss Declaration, as applicable.

judgment plaintiffs who have litigated in unison against the Company for years—does not explain why their interests cannot be adequately represented without an official committee.

2. The Motion's rhetoric, innuendo and misguided speculation do not substitute for the factual showing the Bankruptcy Code requires, leaving the movants' burden unsatisfied. The Office of the United States Trustee (the "U.S. Trustee") declined to appoint an official equity committee in response to letter-writing by the Ad Hoc Group that substantially mirrors its Motion, and the Debtors respectfully submit that this Court should reach the same conclusion and deny the Motion.

3. ***The Ad Hoc Group fails to show a substantial likelihood of a meaningful distribution to equity in this case.*** Seeking to lower the bar it must clear, the Ad Hoc Group suggests that the Debtors must demonstrate "hopeless insolvency" to resist appointment of an official committee. Mot. ¶¶ 3-9. But that flips the burden and misstates the standard. *See infra* ¶ 49. Movants bear the burden of showing a substantial likelihood of a meaningful recovery to equity, yet the Ad Hoc Group offers no competent evidence that equity is in the money, and there is substantial evidence to the contrary.

4. Prepetition trading prices on the Company's funded debt reflected deep discounts to par—an unmistakable indicator of the market's assessment that the debt is impaired and equity has no value. In the months leading up to the Petition Date, the Company's unsecured debt traded in the $0.40s and its secured debt traded between $0.70 and $0.80. Public company debt does not trade at these levels when the issuer is solvent. Credit rating agencies concurred, downgrading the Company and calling its capital structure "unsustainable." Meanwhile, the Company's common stock slid to bare option value, trading for less than 10 cents prior to its NYSE delisting and more

recently trading around two cents or less. The Motion addresses none of these facts. *See infra* Section I.A.

5. Sophisticated creditors, including some of the world's largest asset managers, banks, and credit investment firms, agreed to a proposed Plan that substantially impairs their interests following arm's-length negotiations. Holders of approximately 83% of the Unsecured Notes agreed to a 62.4% payout under the Plan, an impairment of approximately $100 million. Secured creditors accepted takeback debt with extended maturities, reduced interest rates, and other terms more favorable to the Company, and their existing secured debt now trades at approximately $0.91, a discount to par of roughly $87 million. Rational creditors would not accept hundreds of millions of dollars of impairment if the Company were solvent. The Motion's efforts to sow doubt about the RSA parties' motivations ignore these hard economic realities. Aside from the DIP Lender, no third party the Debtors' investment banker approached, and none that approached it, was willing to provide capital junior to the existing debt, and none has proposed an alternative transaction since the RSA was announced. *See infra* Section I.B.

6. The Motion wrongly asserts that the Debtors "concede" that the "solvency breakpoint" is $1.46 billion, but that is the amount of the Company's <u>funded</u> debt only. This ignores the up to $143 million of DIP claims, as well as an estimated $231.5 million of general unsecured claims which ride through under the Plan only because of the infusion of up to $433 million in cash from the Plan Sponsors. Equity is not in the money and the Debtors have made no such concession. *See infra* Section I.D.

7. Unable to point to any current evidence that equity is in the money, the Motion references—without any sponsoring witness or evidence—two valuations created years ago in connection with other transactions. But for the reasons explained below and in the supporting

declaration of Mr. Preiss, the conclusions the Motion seeks to draw from those valuations are badly flawed. In addition to the changed market conditions, those valuations were based on growth projections that never came to pass, and on comparable companies whose trading multiples have since collapsed. They also predate the circumstances that have led to the Company's financial distress, including warrant holder judgments exceeding $200 million, the failed Shutterstock merger with sunk costs of more than $100 million, and the Company's debt servicing burden ballooning with higher interest rates and amortization payments. *See infra* Section I.C.

8. ***The Ad Hoc Group fails to show that equity security holders' interests cannot be adequately represented without an official equity committee***. The Ad Hoc Group's participation in the case so far demonstrates an organized effort by shareholders who claim to hold approximately 17.1 million of the approximately 114 million shares not owned by the Getty Family or Koch Equity Development LLC ("KED"). And the warrant holder members of the Ad Hoc Group, who hold approximately 34% of a $92 million judgment against Getty Images Holdings, Inc., have litigated together against the Company for years. *See infra* Section II.B. The Ad Hoc Group members and all other stakeholders will have a full and fair opportunity to raise any objections to confirmation, but that does not require the extraordinary remedy of appointing an official committee. *See infra* Section IV. Bankruptcy courts routinely decline to appoint an official equity committee where its sole task would be to litigate confirmation objections to a plan that has already been solicited, and the same result should apply here. *See infra* ¶ 61.

9. Other factors militate against the Ad Hoc Group's request. An official equity committee would be required to serve as a fiduciary for *all* prepetition equity holders, whereas the Ad Hoc Group seems intent on using an official committee to pit one shareholder group against another. And another intractable conflict lurks in the Motion. The warrant judgment holders are

prepetition creditors who expressly "do not concede subordination under Section 510(b)." Mot. at 1 n.2. In other words, they do not concede that their prepetition judgment claims should be treated the same as equity claims in this bankruptcy proceeding (as the proposed Plan provides), yet they seek appointment of a committee that serves only the interests of equity holders, and they ask that warrant judgment holders be seated on that official equity committee. Proposed Order, D.I. 133-2, at 2. No official committee could properly discharge such a conflicted mandate. *See infra* Section II.C.

10. Rather than address the issues before the Court under section 1102(a)(2), the Motion's primary theme—based only upon meritless speculation—is that the Debtors' bankruptcy petitions are not good faith filings by a company in financial distress that has negotiated with substantially all of its creditors a Plan that will save its business, its employees' jobs, its contributors' livelihoods, and its creditors from even greater losses, but are instead a grand conspiracy by the Getty Family and KED to pay more than half a billion dollars to eliminate the 27% of shares they do not own. That theory lacks any logic or factual basis. The Getty Family and KED's approximately 73% of existing common stock is cancelled without any distribution, on the same terms as every other share. To receive new equity, they have agreed to commit up to $433 million of new cash and KED has agreed to equitize approximately $100 million of its secured Euro Term Loans. No rational economic actor would write off its equity investment and commit more than half a billion dollars of new value to eliminate a minority stake whose market value at current trading prices is roughly $2 million. The Plan Sponsors' new money is what makes the recovery to creditors under the Plan's terms possible. The Motion's rhetorical flourishes cannot mask the reality that the Debtors are insolvent, much as they wish that were not so. The Court should decline to appoint an official equity committee.

## Background

11. On October 21, 2026 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code, thereby commencing the instant cases (the "Chapter 11 Cases"). The Debtors continue to manage and operate their businesses as debtors in possession under sections 1107 and 1108 of the Bankruptcy Code.

12. No trustee or examiner has been appointed in the Chapter 11 Cases. The Chapter 11 Cases are being jointly administered for procedural purposes only pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"). As of the date hereof, the U.S. Trustee has not appointed an official committee of unsecured creditors.

**The Company's Prepetition Capital Structure.**

13. As of the Petition Date, the Debtors had approximately $1.46 billion of funded debt: approximately $1.19 billion of secured debt (the fully drawn $150 million Revolving Credit Facility, the Term Loans, and the 11.25% Secured Notes) and approximately $270 million of Unsecured Notes. Preiss Decl. ¶ 8. In addition, the Company has approximately $231.5 million in prepetition general unsecured claims. *Id.* ¶ 17.

14. The Company has approximately 421.0 million shares of common stock outstanding. *Id.* ¶ 10. The stock was previously traded on the NYSE but delisted on October 12, 2026 due to low trading prices. *Id.* ¶ 13. KED and affiliates of the Getty Family are GIH's two largest shareholders, holding approximately 45.5% and 27.4%, respectively—approximately 73% in total. *Id.* ¶ 10 n.7.

15. As the first chart below shows, starting around July 2026, after termination of its proposed merger with Shutterstock, the Company's secured and unsecured debt traded significantly below par. *See id.* ¶ 12. As the second chart below shows, the Company's stock price also rapidly declined over that period, falling to pennies by the Petition Date. *See id.* ¶ 13.







**Events Leading to These Chapter 11 Cases.**

16. Although the Company's core businesses continue to generate stable earnings—approximately $978 million in revenue and $307 million in Adjusted EBITDA for the twelve months ending June 30, 2026—its liquidity fell by 80% in the twenty-two months before the Petition Date. That decline resulted from three non-operational events: (a) adverse judgments in

the warrant litigation; (b) the failed Shutterstock merger which involved sunk costs for financing and fees of more than $100 million; and (c) the unsustainable debt service burden of the Company's capital structure. *See id.* ¶ 29.

17. In the warrant holder litigation, in April 2026 the Company was required to pay a judgment of $110.9 million, which it funded largely by a $120 million revolver draw. *Id.* ¶ 29 n.61. In other warrant holder litigation, a June 9, 2026 adverse summary judgment ruling led to entry of another judgment for approximately $92 million on September 25, 2026, which the Company was unable to bond in order to file an appeal. *Id.* The plaintiffs in that litigation agreed to a standstill on enforcement through October 26, 2026, in exchange for a partial payment of approximately $4.2 million, and the parties did not reach a settlement before the Petition Date. *Id.* ¶ 40. To date, the warrant litigation has resulted in over $200 million in judgments and interest, $35 million in legal fees, and there are potentially $275 million in unasserted claims.

18. As to the Shutterstock merger, which the Company entered into on January 6, 2025, after roughly eighteen months of regulatory review, the U.K. Competition and Markets Authority conditioned its approval of the transaction on divestiture of Shutterstock's entire editorial business—a "burdensome condition" the Company was not required to accept.[4] On June 30, 2026, the Board unanimously decided to terminate the Shutterstock Merger Agreement and publicly announced that decision and rationale. *Id.* The Company incurred more than $100 million in sunk costs on the failed merger, including financing costs, professional fees, and other costs. *Id.* ¶ 29.

19. As of the Petition Date, the Company's annualized debt servicing costs were approximately $239 million. *Id.* By July 2026, the Company projected that its liquidity would

---

[4] Getty Images Holdings, Inc., Current Report (Form 8-K) (Jun. 30, 2026), https://www.sec.gov/ix?doc=/Archives/edgar/data/0001898496/000121390026073816/ea0296572-8k425_getty.htm.

fall below its minimum operating requirements by the fourth quarter of 2026, and the Company publicly disclosed on August 10, 2026 in its second quarter 10-Q that there was substantial doubt about its ability to continue as a going concern.[5] These developments were widely publicized, including through credit rating downgrades, the Company's engagement of financial advisors, and the NYSE delisting. Preiss Decl. ¶ 29.

**Prepetition Negotiations, the RSA, and the Plan.**

20. In July 2026, the Company announced that it engaged Guggenheim Securities, LLC ("Guggenheim") as a financial advisor and commenced negotiations with its stakeholders. Preiss Decl. ¶ 29. On August 6, 2026, GIH's Board formed a special committee consisting of independent and disinterested directors Elizabeth Abrams and Thomas Walper (the "GIH Special Committee"), and each Debtor subsidiary formed a special committee consisting of independent director Neal Goldman (together, the "Special Committees"), each with its own counsel.

21. The Company, through the Special Committees, negotiated at arm's-length with an ad hoc group of secured lenders (the "Secured Ad Hoc Group"), an ad hoc committee of unsecured noteholders (the "Unsecured Noteholders Ad Hoc Committee"), and affiliates of the Getty Family and KED (the "Plan Sponsors"). Preiss Decl. ¶ 30. Each was represented by its own advisors and given extensive diligence access. *Id.* ¶¶ 30, 38. By early September 2026, the Company reached a deal in principle with the Secured Ad Hoc Group requiring the Plan Sponsors to invest at least $280 million in new cash equity and for KED Icon Holdings, LLC, the Koch Family affiliate, to equitize approximately $100 million of its Euro Term Loans. *Id.* ¶ 31. The Unsecured Noteholders Ad Hoc Committee rejected that proposal as inadequate and indicated it was considering its own bid. *Id.* ¶¶ 32, 34. Through continuing arm's-length negotiations overseen by the Special

[5] Getty Images Holdings, Inc., Quarterly Report (Form 10-Q) (Aug. 10, 2026), https://www.sec.gov/ix?doc=/Archives/edgar/data/0001898496/000162828026055246/gety-20260630.htm.

Committees, the Company obtained an approximately $153 million (55%) increase in the Plan Sponsors' cash equity commitment, to up to $433 million, which funds an all-cash recovery of $170.2 million to holders of Unsecured Notes Claims with a principal value of $270 million. *Id.* ¶¶ 34–36. As negotiations were ongoing, the Company considered a marketing process for the business but concluded in its business judgment that a sale process would pose material risks to customer and contributor relationships, in particular as compared to the certainty and benefits afforded by the RSA. Preiss Decl. ¶ 39.

22. The negotiations culminated in the Restructuring Support Agreement, executed on October 12, 2026 (the "RSA"), on the Special Committees' recommendation and approved by all unconflicted directors. *See id.* ¶ 38. The RSA parties hold approximately $1.31 billion out of the Company's approximately $1.46 billion in funded debt, including approximately 90% of the Secured Funded Debt Claims, 100% of the Revolving Loans, and approximately 83% of the Unsecured Notes. Preiss Decl. ¶ 38 n.65. The RSA contains a broad fiduciary out controlled exclusively by the GIH Special Committee, and the Plan Sponsors receive no court-approved break-up fee or expense reimbursement. RSA, D.I. 32-2, Ex. B, §§ 7.01, 12.02(b). The only fee relating to terminating the RSA based on the fiduciary out is a modest 2% fee in respect of the DIP Facility. No third party has approached the Debtors with an alternative since the RSA was announced. Preiss Decl. ¶ 15.

23. Under the Plan, secured creditors are refinanced at par on improved terms from the Company's perspective, revolving lenders extend their commitments, holders of Unsecured Notes accept an approximately $100 million impairment, and general unsecured creditors ride through unimpaired. Plan, D.I. 31, art. III.B.3–6; Preiss Decl. ¶¶ 17, 36–37. All of this can happen, along with the funding of these cases, based on a cash infusion of up to $433 million by the Plan Sponsors

and equitization of secured loans by one of the Plan Sponsors. Plan, D.I. 31, arts. I.A.79, I.A.119, III.B.4(c)(iv). Existing equity (including the Getty Family's and KED's existing equity) and Section 510(b) Claims are cancelled without distribution; the Plan Sponsors receive new equity solely on account of their new money and equitized claims. Plan, D.I. 31, arts. III.B.9, III.B.10, IV.D.4. Solicitation of the Plan commenced on October 20, 2026, and the voting deadline is November 30, 2026. Scheduling Order, D.I. 120, ¶ 4.

**The Request, the Reply, and the U.S. Trustee's Determination.**

24. On October 22, 2026, Brown Rudnick LLP, on behalf of fourteen holders of a mix of warrant claims and equity, asked the U.S. Trustee to appoint an official equity committee (the "Request"). Those holders then held approximately 13.4 million shares (about 3% of shares outstanding) and approximately 34% of the $92 million warrant judgment. On October 29, 2026, the Debtors and the Unsecured Noteholders Ad Hoc Committee each opposed the Request. The Ad Hoc Group replied on November 2, 2026 (the "Reply Letter").

25. On November 4, 2026, the U.S. Trustee "determined not to appoint an official equity committee at this time," reserving the right to revisit that determination "if new facts develop" (the "U.S. Trustee Decision"). The U.S. Trustee noted that the absence of an official equity committee "does not preclude [the Ad Hoc Group] from asserting their interests in this case." Copies of the Request, the Debtors' and Unsecured Noteholders Ad Hoc Committee's October 29 oppositions, the Reply Letter, and the U.S. Trustee Decision are attached as Exhibit A to the Motion. The Motion followed. The Debtors did not oppose the Ad Hoc Group's request that the Motion be heard on shortened notice. *See* D.I. 134 ¶ 9. On November 13, 2026, the U.S. Trustee filed a response requesting that the Court deny the Motion. D.I. 179.

**Legal Standard**

26. Section 1102(a)(2) of the Bankruptcy Code permits the Court to order appointment of an equity committee only "*if necessary to assure adequate representation* of . . . equity security holders." 11 U.S.C. § 1102(a)(2) (emphasis added). Appointment of an equity committee is "considered extraordinary relief and should be the rare exception." *Spansion*, 421 B.R. at 156 (citations omitted). The standard is "far more onerous than if the statute merely provided that a committee be useful." *In re SunEdison, Inc.*, 556 B.R. 94, 103 (Bankr. S.D.N.Y. 2016) (internal citation omitted).

27. Movants have the burden of proof[6] and must establish that "(i) there is a substantial likelihood that they will receive a meaningful distribution in the case under a strict application of the absolute priority rule, and (ii) they are unable to represent their interests in the bankruptcy case without an official committee." *Williams*, 281 B.R. at 223; *In re Northwestern Corp.*, No. 03-12872 (CGC), 2004 WL 1077913, at *2 (Bankr. D. Del. May 13, 2004).

28. The Motion recasts this test as a balancing of "factors," none of them "dispositive." Mot. ¶¶ 43–45. While those factors, including complexity, cost and number of holders, may inform the analysis, they do not replace the two-part test applied in this District. *See Spansion*, 421 B.R. at 156; *In re Kalvar Microfilm, Inc.*, 195 B.R. 599, 600–01 (Bankr. D. Del. 1996).

29. The second requirement—lack of adequate representation absent appointment of an official committee—is "critical" as "even those equity holders who do expect a distribution . . . can adequately represent their interest without an official committee." *Spansion*, 421 B.R. at 164 (quoting *Williams*, 281 B.R. at 223). The question is not whether equity is "exclusively"

[6] *Spansion, Inc*., 421 B.R. at 156, 164 ("The Ad Hoc Equity Committee, as the moving party, has the burden of proving that an additional committee is needed for adequate representation.").

represented, but "adequately" represented. *Id.* at 163 (quoting *In re Edison Bros. Stores*, 1996 WL 534853, at *4 (D. Del. Sept. 17, 1996)).

30. Although the Court considers the Motion independently, "due consideration should be given to the views of the U.S. Trustee." *In re Oneida Ltd.*, 2006 WL 1288576, at *1 (Bankr. S.D.N.Y. May 4, 2006); 7 *Collier* ¶ 1102.07[1] (16th ed. 2026) (noting the U.S. Trustee's decision declining to appoint a committee is entitled to "some deference"); *see also In re Eastman Kodak Co.*, 2013 WL 4413300, at *1 (Bankr. S.D.N.Y. Aug. 15, 2013). The Motion identifies no new facts since the U.S. Trustee's decision.

## Argument

### I. The Ad Hoc Group Has Not Shown A Substantial Likelihood Of A Meaningful Distribution To Equity Holders.

A. Market Prices Reflect Insolvency.

31. The Motion does not address the trading prices of the Debtors' securities, which reflect insolvency. In the months before the Petition Date, the Company's debt traded significantly below par. The Company's Unsecured Notes traded in the $0.40's, and its secured debt traded between approximately $0.70 and $0.80. Preiss Decl. ¶ 12. Because all of the Company's secured and unsecured debt sits ahead of equity, deep discounts to par indicate the market's assessment that there is no value for equity here. Credit rating agencies took the same view, serially downgrading the Company's ratings throughout 2026.[7] In a July 2, 2026 downgrade to CCC+,

[7] *See Moody's Ratings downgrades Getty Images' CFR to Caa1 on weakened liquidity, uncertainty about merger prospects; outlook negative*, MOODY'S (Apr. 21, 2026), https://www.moodys.com/research/Moodys-Ratings-downgrades-Getty-Images-CFR-to-Caa1-on-weakened--PR_522744; *Getty Images Inc. Downgraded To 'B'; Ratings Put On CreditWatch Negative Due To Weaker Cash Flow And Merger Uncertainty*, S&P GLOBAL (May 19, 2026), https://www.spglobal.com/ratings/en/regulatory/article/-/view/sourceId/101686513; *Moody's Ratings downgrades Getty Images' CFR to Caa3 on delayed note interest payments, weakened liquidity; outlook negative*, MOODY'S (Sept. 2, 2026), https://www.moodys.com/research/Moodys-Ratings-downgrades-Getty-Images-CFR-to-Caa3-on-delayed--PR_529175; *Getty Images Inc. Rating Lowered To 'CCC', Ratings Placed On CreditWatch Negative On Missed Interest Payment*, S&P GLOBAL (Sept. 3, 2026), https://www.spglobal.com/ratings/en/regulatory/article/-/view/sourceId/101705199.

S&P Global Ratings stated that "[t]he terminated [Shutterstock] merger will strain Getty's liquidity and *we now view its capital structure as unsustainable*."[8] The absence of any market for junior capital confirms the point. None of the parties Guggenheim solicited was willing to refinance the capital structure, and no party, solicited or not, offered to provide capital junior to existing debt. Preiss Decl. ¶ 15. Nor has any financing party or suitor proposed any actionable alternative transaction since the RSA was announced, let alone a superior one. *Id.*

32. Stock prices tell the same story. During the two weeks prior to the RSA announcement on October 12, 2026, the Company's common stock traded for less than $0.10, with a volume weighted average price of approximately $0.098, implying a market capitalization of approximately $41 million. *Id.* ¶ 13. It continued to decline through the Petition Date. *See id.* The stock was trading below ten cents in September 2026 when the NYSE suspended trading due to its "abnormally low selling price" and commenced procedures that led to the stock's delisting on October 12, 2026.[9] Since then, the stock has traded on the OTC Pink Limited Market at even lower prices, now around two cents per share or less. *Id.* At two cents, the Company's approximately 421 million shares carry a market capitalization of roughly $8.4 million, reflecting nothing more than option value.

33. Courts routinely consider such market evidence when hearing a motion to appoint an equity committee. The motion "is not a valuation hearing, and the Court may consider any available evidence that informs its discretion." *SunEdison*, 556 B.R. at 105 ("Trading at six cents

---

[8] *Getty Images Inc. Downgraded to 'CCC+' On Shutterstock Merger Termination And Liquidity Concerns; Outlook Negative*, S&P GLOBAL (July 2, 2026), https://www.spglobal.com/ratings/en/regulatory/article/-/view/sourceId/101694603 (emphasis added).

[9] Getty Images Holdings, Inc., Current Report (Form 8-K) (Oct. 1, 2026), https://www.sec.gov/Archives/edgar/data/1898496/000121390026105790/ea0307245-8k_getty.htm. The stock had previously fallen below the NYSE $1.00 minimum trading price earlier in the year for a period of time. Getty Images Holdings, Inc., Current Report (Form 8-K) (Mar. 19, 2026), https://www.sec.gov/Archives/edgar/data/1898496/000121390026105790/ea0307245-8k_getty.htm.

on the dollar does not imply solvency."); *see also Williams*, 281 B.R. at 221 (considering bonds trading at a steep discount in solvency analysis); *In re Leap Wireless*, *Int'l, Inc.*, 295 B.R. 135, 139 (Bankr. S.D. Cal. 2003) (bonds "trading at a steep discount" were an "indicator of insolvency"). Here, the available market evidence all indicates insolvency.

B. Sophisticated Creditors Have Accepted Substantial Impairment.

34. Another key indicator of insolvency is the behavior of the Company's creditors, who have agreed to substantial impairment reflecting their recognition that the Company's debts exceed its value. More than fifty lenders and noteholders, holding approximately $1.31 billion out of the Company's $1.46 billion in funded debt, executed the RSA after arm's-length negotiations involving experienced counsel and financial advisors. Preiss Decl. ¶¶ 30–31, 38 & n.65.

35. Unsecured Noteholder signatories to the RSA have accepted an impairment of approximately $100 million, or 37%, on the $270 million principal amount of their notes, only after rejecting multiple proposals and holding out for more. Preiss Decl. ¶¶ 32–36. These are sophisticated financial market participants. *See* Unsecured Noteholders Ad Hoc Committee Rule 2019 Statement, D.I. 132. No rational creditor group would accept such significant impairment unless the Company is insolvent.

36. Secured creditors are also accepting less favorable terms. They agreed to extend their maturities, reduce their pricing, and forgo any make-whole or prepayment premium on their existing debt. Preiss Decl. ¶ 37.[10] Even after announcement of the RSA, the existing secured debt has continued to trade at a discount to par (currently ~$0.91), following the material concessions the secured lenders have made on their prepetition claims. Preiss Decl. ¶ 37.

[10] Secured creditors also agreed to exclude "any prepayment premium, make-whole, call protection, or similar amount" on their existing debt. Plan, Art. III.B.4(b).

37. The Motion acknowledges that "83% of the Debtors' unsecured noteholders agreed to a plan that pays them 63% of their claims in cash," but calls this a "red herring." Mot. ¶ 51. The Ad Hoc Group's arguments on this point entirely miss the mark. They argue that a creditor compromise is not "competent evidence" of value. *Id.* ¶ 55. Yet none of the cases the Motion cites arose in the context of an equity committee motion. Each addressed valuation at confirmation or in a reorganization on a full evidentiary record, and none held that a valuation dispute warrants an estate-funded committee.[11]

38. The Motion also argues that "a plan does not need to fully pay creditors before stockholders are allowed to receive value" and invokes the "corollary" to the absolute priority rule—that "a senior class cannot receive more than full compensation for its claims." Mot. ¶¶ 52–53 & nn. 43–44 (citing *In re Breitburn Energy Partners LP*, 582 B.R. 321, 350 (Bankr. S.D.N.Y. 2018)).[12] That corollary is satisfied here. The Unsecured Notes recover 62.4%, and the secured lenders are refinanced on less favorable terms and at par, not above it. *See* Preiss Decl. ¶¶ 36-37. No class senior to equity receives more than it is owed, so no surplus is being diverted past equity. There, as here, secured and unsecured creditors are materially impaired, and there is no value for equity to claim. *See Breitburn*, 582 B.R. at 350 ("Because the estates are insolvent, no creditor

[11] *See* Mot. ¶ 9 & n.6 (citing *Consol. Rock Prods. Co. v. Du Bois*, 312 U.S. 510, 526 (1941) (reversing confirmation where the plan gave old stockholders an interest without fully compensating creditors and no valuation was made); *Protective Comm. For Indep. S'holders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 441–42 (1968) (Chapter X case faulting an insolvency finding based on past earnings alone; shareholders were heard through a private protective committee); *Spansion*, 426 B.R. at 130 (Bankr. D. Del. 2010) (disregarding claims-trading prices offered without any record on volume, timing, or market access, and holding on expert valuation that equity received nothing); *In re Mirant Corp.*, 334 B.R. 800, 844 (Bankr. N.D. Tex. 2005) (valuation as part of 27-day confirmation trial in a complex merchant-energy case where value was close and bonds traded near par); *In re Exide Techs.*, 303 B.R. 48, 62–63, 66 (Bankr. D. Del. 2003) (confirmation valuation in a creditor-versus-lender dispute).). Indeed, the *Spansion* court, whose confirmation valuation the Motion cites, had earlier *denied* an equity committee, finding the ad hoc equity group "adequate to the task of representing its interests without 'official' status." *Spansion*, 421 B.R. at 163. That group went on to "advocate] vigorously" for equity at confirmation without official status. *Spansion*, 426 B.R. at 128.

[12] The Motion also cites *In re W.R. Grace & Co.*, 475 B.R. 34, 175 (D. Del. 2012), which holds only that the absolute priority rule governs cramdown. Mot. ¶ 52 & n.43.

class is receiving more than 100% . . . and no class below Equity . . . will receive or retain property . . . the Plan is fair and equitable with respect to Equity.")

39. The Motion's argument based on the Modigliani-Miller "irrelevancy principle" is also off-point. Mot. ¶ 57. The creditors' compromise is corroborating evidence of insolvency, reflecting what informed market participants believe the Company is worth, a factor courts routinely consider on motions like this one. *See Williams*, 281 B.R. at 221–22; *Celsius*, 645 B.R. at 174; *In re Ampex Corp.*, 2008 WL 2051128, at *2 (Bankr. S.D.N.Y. May 14, 2008) ("Given that none of the creditors senior to equity are receiving payment in full on behalf of their claims, there simply is no value for equity holders.").

40. The record refutes the Motion's speculation as to why the Unsecured Noteholders accepted $100 million of impairment (suggesting that "perhaps" they bought at a discount, could not hold equity, faced a "falling knife," yielded to "hardball" tactics, or had too little time for "meaningful diligence"). Mot. ¶¶ 5, 58. This disregards that the Unsecured Noteholders' Ad Hoc Committee was represented at all times by its own legal and financial advisors, received extensive diligence during a restricted period, exchanged multiple proposals, and rejected the Debtors' initial proposals. Preiss Decl. ¶¶ 30–35. It agreed to the Plan only after the Plan Sponsors increased their cash commitment by roughly $153 million. *Id.* ¶ 36.

C. <u>The Ad Hoc Group Offers No Affirmative Valuation Evidence Of Its Own, And Its Stale Data Points Do Not Show Current Value.</u>

41. Against this record, the Ad Hoc Group offers argument rather than evidence. It submits no expert, declaration, evidence, or valuation of its own. While the Court "need not conduct a full valuation determination," the movant bears the burden on an equity committee motion. *Ampex*, 2008 WL 2051128, at *2; *Spansion, Inc.*, 421 B.R. at 156, 164.

42. Even a credible valuation by the movant would at most put value "in play," which has not been done here, and in any event would not be enough to prevail on the Motion. *Northwestern*, 2004 WL 1077913, at *2 (a movant's valuation expert "would [only] put the issue of value in play, not tip the scale to the extent that the valuation battle should be funded by the estate").

43. What the Motion offers instead are two stale fairness opinions prepared years ago for other transactions. One is Solomon Partners' opinion rendered as of December 9, 2021, for the Company's 2022 de-SPAC transaction. The other is J.P. Morgan's January 2025 opinion for the proposed Shutterstock merger. Mot. ¶¶ 30–32. As explained in the Preiss Declaration, neither is a reliable indicator of value today. Both rested on management projections of growth the Company has not achieved and no longer expects to achieve, and both reflected market conditions that no longer exist. Preiss Decl. ¶¶ 19–28. Solomon's opinion predates all three drivers of the Debtors' current distress, and J.P. Morgan's predates the $110.9 million warrant payment, including the entry of summary judgment in the New York State Actions, and the costs of the failed Shutterstock merger. *Id.* ¶¶ 19, 27.

44. The Motion's assertion that the Company's "performance has not materially changed" and that it "consistently generates about $300 million in annual EBITDA" misses the point. Mot. ¶¶ 6, 50.[13] Reliance on steady EBITDA completely ignores the growth Solomon's valuation relied upon. Solomon's valuation expressly relied on 2026 Revenue projections of $1,242 million and Adjusted EBITDA of $443 million, whereas the Company now projects $920 million and $264 million for those figures respectively, shortfalls of 26% and 40%. Preiss Decl.

[13] The Company's Adjusted EBITDA has been consistently around $300 million annually, but that does not take into account the Company's annual prepetition debt servicing burden of $239 million, taxes and other below-the-line items, as well as the $200 million of warrant judgments in 2026. Preiss Decl. ¶¶ 25, 29.

¶ 23. Additionally, Solomon's opinion was expressly "based on economic, monetary, regulatory, market and other conditions as in effect on December 8, 2021," yet those conditions have changed materially. *See, e.g.*, *Id.* ¶ 19.

45. The Motion's attempt to "update" the Solomon analysis, without evidence, fares no better. It incorrectly assumes, without explanation, that the companies Solomon selected in 2021 remain comparable today. *Id.* ¶ 22. The comparables' multiples also moved very differently: Shutterstock's fell about 90%, The New York Times Company's about 15%. *Id.* That divergence shows the market has reassessed each company based on its own circumstances. The Motion then applies the median of the set, even though Solomon expressly "placed greater reliance on Shutterstock." Mot. ¶ 30. Using the Motion's own figures, Shutterstock's current 2.4x multiple would imply an enterprise value for Getty Images of about $737 million, roughly half the Company's funded debt. Preiss Decl. ¶ 21. An unsubstantiated $3.81 billion valuation cannot be squared with the market evidence. It conflicts with the Company's funded debt trading well below par, sophisticated creditors accepting impairment, common-stock market capitalization of approximately $8 million, and the fact that no suitor has approached the Company with a proposal reflecting anything like that value.[14] *Id.* ¶ 20.

46. The nearly two-year-old J.P. Morgan opinion suffers from the same defects, and the Motion does not even attempt to "update" it. *Id.* ¶ 25. J.P. Morgan's discounted cash flow analysis relied on management projections showing rising revenues through 2029. *Id.* ¶ 26. Those have not materialized to date and are inconsistent with the Company's current forecasts. *Id.* And the market has since repriced Shutterstock, the very company J.P. Morgan was valuing alongside

[14] The Motion asks the Court to draw "powerful inferences" from the absence of a postpetition marketing process. Mot. ¶ 49. The record supports no such inference. No party approached or solicited by the Debtors' investment banker offered junior capital, and the RSA's fiduciary out leaves the GIH Special Committee free to pursue any superior proposal.

Getty Images. While J.P. Morgan placed Shutterstock's stand-alone firm value at $550 million to $630 million, Shutterstock's implied enterprise value today is approximately $242 million, a decline of nearly 60% from the midpoint of that range. *Id.* ¶ 28.

47. The Motion's own authority also rejects using valuations generated for other purposes. "The criterion of earning capacity is the essential one," and "valuations for other purposes are not relevant to or helpful in a determination of that issue, except as they may indirectly bear on earning capacity." *Consol. Rock Prods. Co.*, 312 U.S. at 526. *Exide*, also cited in the Motion, rejected prior transactions as "not useful" when "the market had changed considerably." 303 B.R. at 62–63. Regardless, the Ad Hoc Group remains free to contest value at the Combined Hearing.

D. <u>The Motion's "Solvency Breakpoint" Argument Fails.</u>

48. The Motion also misleadingly asserts that the Debtors' "solvency breakpoint" is about $1.46 billion. It contends that because the enterprise value range reflected in Guggenheim's Valuation Analysis appended to the Disclosure Statement "hovers right at" that figure and "ranges well into solvency," "the Debtors concede" they are not "hopelessly insolvent." Mot. ¶¶ 3, 47. That argument fails at every step.

49. To begin with, the Motion applies the wrong test. The Debtors need not show "hopeless insolvency." The Ad Hoc Group must show "*a substantial likelihood*" of a "*meaningful distribution*." *Williams*, 281 B.R. at 223 (emphasis added); *Celsius*, 645 B.R. at 174 (denying a committee because the movants had not met their "high burden" of showing a "substantial likelihood" of recovery without any finding that debtors were "hopelessly insolvent"); *Edison*, 1996 WL 534853, at *3 (affirming denial despite stipulation that debtors were not "hopelessly

insolvent"); *Kalvar*, 195 B.R. at 601 (denying a committee despite "a good faith dispute as to the insolvency of the debtors").[15]

50. But, most importantly, the Motion's assertion that $1.46 billion is the "solvency breakpoint" counts only prepetition funded debt and *entirely ignores hundreds of millions of dollars of other claims* that sit ahead of equity. This includes: DIP claims of up to $113 million plus potentially a further $30 million in delayed-draw DIP claims; make-whole claims on the secured debt of approximately $50 million; and an estimated $231.5 million in general unsecured claims. Preiss Decl. ¶ 17. Thus, the Motion is completely incorrect in contending that the Disclosure Statement's Valuation Analysis—which estimates a total reorganized enterprise value range of $1.3 to $1.5 billion, with a $1.4 billion midpoint—somehow "concedes" that equity is in the money or close to it. *See id.*

51. The Motion also relies on the Plan's exit capitalization to infer the value of the pre-petition estate. The Motion adds the reorganized Debtors' $936 million of post-emergence debt to the Plan Sponsors' $533 million contribution and calls the $1.47 billion sum "an implied valuation . . . exceeding the purported solvency breakpoint." Mot. ¶¶ 4, 48. That figure measures a recapitalized enterprise after $533 million of new consideration goes in. It says nothing about whether value existed for old equity before that consideration arrived. Indeed, the Plan Sponsors' own conduct refutes the inference: holders of approximately 73% of the existing equity would not consent to the cancellation of their shares, and then pay for new equity, if their existing shares were worth anything. Every existing share, including those held by the Plan Sponsors, is cancelled, and the Plan Sponsors receive new equity only for what they contribute—up to $433 million in

[15] The Motion's reliance on *In re Wang Labs., Inc.*, 149 B.R. 1 (Bankr. D. Mass. 1992), is misplaced. Mot. ¶ 45 n.41. There, the debtor refused to concede insolvency, *Wang*, 149 B.R. at 1, 3, whereas here, the record shows that claims senior to equity are impaired.

new cash and, in KED's case, approximately $100 million of equitized Euro Term Loans. Plan Arts. III.B.9, IV.D.4. A required capital infusion of this kind "is indicative of the Debtors poor financial condition," not of residual value for old equity. *Williams*, 281 B.R. at 221.

## II. The Equity Security Holders Are Adequately Represented Without An Official Equity Committee.

### A. <u>The Board and the GIH Special Committee are independent fiduciaries that protect all stakeholders, including equity.</u>

52. "[T]he statutory focus of § 1102(a)(2) is not whether the equity holders are 'exclusively' represented, but whether they are 'adequately' represented." *Spansion*, 421 B.R. at 163 (quoting *Edison*, 1996 WL 534853, at *4). The Motion argues that "the usual checks and balances" are absent here and that only an official equity committee can step into the breach. Mot. ¶ 15. But the premise and conclusion are both incorrect. Equity's interests are protected here in at least two ways. First, the Board of Directors is a fiduciary for all stakeholders, reinforced by two Special Committees of independent disinterested directors—at GIH and at certain subsidiaries—that negotiated and approved the RSA. Second, an organized, well-counseled Ad Hoc Group is already pressing the arguments any equity holder would raise (and more).

53. Courts apply the "usual presumption [] that the Board will pay due (perhaps special) regard to the interests of shareholders," absent "special circumstances that render the board unable to adequately represent equity holders." *Celsius*, 645 B.R. at 173 (quoting *Oneida*, 2006 WL 1288576, at *2). The Motion suggests that a special circumstance here is that the Getty Family and KED hold most of the stock, have Board appointees, and are Plan Sponsors. Mot. ¶¶ 10, 62–63. That is precisely why the Board placed authority in the GIH Special Committee over the RSA's fiduciary out and the evaluation of alternatives. Where the "economic interests of the [senior creditors] and the shareholders appear to be the same—that is, to find the highest realistic value for the company," and an existing fiduciary is duty-bound to pursue it, an official equity

committee is not warranted. *Leap Wireless*, 295 B.R. at 139–40. So too here: the GIH Special Committee is charged with maximizing the value of the estates and retains full authority to pursue any proposal that would deliver more. The Motion's cases involved no such safeguard. *Oneida* arose from "unusual (perhaps unique)" circumstances, *see Celsius*, 645 B.R. at 173 (distinguishing *Oneida*), where lenders that already held most of the equity controlled the board and approved a plan handing themselves all reorganized equity. *Oneida*, 2006 WL 1288576, at *2–3. *Oneida* itself cautioned that its analysis "does not mean that an equity committee would be required in any prepackaged case" that cancels old equity, because "[i]n the usual case, such a plan would be negotiated by a Board that was elected by the old equity." *Id.* at *3. That is this case. In *Pilgrim's Pride*, where no plan had yet been proposed, the controlling shareholder was a creditor guarantor and contract counterparty who argued that he could not represent shareholders. *In re Pilgrim's Pride Corp.*, 407 B.R. 211, 217–20 (Bankr. N.D. Tex. 2009); *see Celsius*, 645 B.R. at 173–74 (distinguishing *Pilgrim's Pride* on that basis). *Spansion*, too, quoted *Pilgrim's Pride*'s discussion of management's constraints and still denied appointment because the ad hoc group could represent itself. 421 B.R. at 163. Here, no creditor group controls the Board, the RSA was negotiated under the oversight and direction of the Special Committees, and every existing share, including the Plan Sponsors', is being cancelled; new equity is issued only in exchange for new money and equitized claims.

54. The Motion dismissively asserts that the Company's Special Committees "offer nothing helpful" and only "sprinkle holy water on the situation." Mot. ¶ 63. The Ad Hoc Group's use of quotation marks and whimsical phrases is insufficient to challenge the independence or business judgment of the GIH Special Committee. The GIH Special Committee consists of two independent directors with no prior connection to the Company or Plan Sponsors, who are duty-

bound to maximize the value of the Debtors' estates.[16] The successful negotiation of an RSA and proposed Plan that enjoy overwhelming support among the Debtors' stakeholder classes—impairing holders of funded debt while paying in full all general unsecured claims to maximize the Debtors' value as a going concern, while maintaining flexibility to pursue any superior proposal—underscores just how seriously the independent directors have taken and will continue to take their responsibility and how successful they have been in discharging their duties. Preiss Decl. ¶¶ 9, 16, 17, 30–39.

55. The GIH Special Committee has full and exclusive decision-making authority over the RSA's "fiduciary out" provisions and consideration of any proposal superior to the Plan. *See* RSA, §§ 7.01, 7.02, 12.01(b). Those provisions empower the Special Committee to take "any action or to refrain from taking any action with respect to the Restructuring Transactions to the extent taking or failing to take such action would be inconsistent with applicable Law or its fiduciary obligations under applicable Law." RSA, § 7.01. They also permit it to "consider, respond to, and facilitate" any alternative proposal. RSA, § 7.02. Thus, the RSA expressly preserves the GIH Special Committee's authority to depart from the contemplated Restructuring Transactions if it determines that its fiduciary duties require it to do so. The Special Committee remains ready to act on any viable alternative proposal, consistent with its fiduciary duties and in the best interests of the Debtors' stakeholders. To date, none has come forward.[17] Preiss Decl. ¶ 15.

---

[16] Getty Images Holdings, Inc., Current Report (Form 8-K), Item 5.02 (July 21, 2026), https://www.sec.gov/Archives/edgar/data/1898496/000121390026080021/ea0298703-8k_getty.htm; *see also Celsius*, 645 B.R. at 175.

[17] The Motion's insider-transaction authorities do not change the analysis. Mot. ¶¶ 62 & nn.51–52. *In re Match Grp., Inc. Derivative Litig.*, 315 A.3d 446 (Del. 2024), *In re Coram Healthcare Corp.*, 271 B.R. 228 (Bankr. D. Del. 2001), *Emerald Partners v. Berlin*, 726 A.2d 1215 (Del. 1999), and *In re Papercraft Corp.*, 160 F.3d 982 (3d Cir. 1998) each address the standard of review a court applies to an insider transaction at confirmation or in fiduciary litigation. None concerns committee appointment. *Match Group*, moreover, applied entire fairness where a controller "receives a non-ratable benefit." 315 A.3d at 460. Here, every existing share is cancelled

56. The absence of an official creditors committee does not change the analysis. No creditor constituency was "lulled into complacency"; not the secured creditors who are impaired and agreed to new financing terms materially more favorable to the Company, nor the Unsecured Noteholders who agreed to accept a 62.4% payout on their notes reflecting a $100 million impairment. The RSA terms resulted from arm's-length, hard bargaining by separately advised and represented parties, exactly the adversary check the Motion claims is missing. *Id.* ¶¶ 30, 38. Where "the economic interest of the bondholders and the shareholders appear to be the same—that is, to find the highest realistic value for the company," an official equity committee is not necessary. *Leap Wireless*, 295 B.R. at 140; *see* D.I. 179 ¶ 21.

B. <u>The Ad Hoc Group Is Well Organized And Can Represent Itself.</u>

57. The Ad Hoc Group is "well organized, well represented by counsel, and adequate to the task of representing its interests without 'official' status." *Spansion*, 421 B.R. at 163; *Williams*, 281 B.R. at 223–24; *Kalvar*, 195 B.R. at 601 (holder with "a substantial stake [] can continue to represent its own interests"). The Ad Hoc Group comprises firms and individuals represented by experienced restructuring counsel. Mot. at 1, 28, Ex. A. It submitted lengthy letters to the U.S. Trustee laying out its criticisms of the proposed Plan, and has now filed this Motion. *See* Mot., Ex. A. The group's roughly 17.1 million shares are about 15% of outstanding shares not owned by the Getty Family and KED (*i.e.*, about 4% of total shares), and they hold warrant judgment claims of approximately $32.7 million. Mot. at 1, Ex. A. Several members have pursued multi-year warrant litigation as an organized coalition against the Debtors since at least 2023. *See* Mot. ¶ 23 & n.13; Preiss Decl. ¶ 29 n.62. Other members—several of whom each hold more than

---

without distribution, and the Plan Sponsors receive new equity only for what they contribute. Plan Arts. III.B.9, IV.D.4. The Motion's citation to *Papercraft* also says nothing about committee appointment. Mot. ¶ 7 n.4. That case was an adversary proceeding seeking equitable subordination, after a full trial. 160 F.3d 982, 988 (3d Cir. 1998).

one million shares—are well resourced and include distressed traders and financial professionals. *See* Ad Hoc Group Rule 2019 Statement, D.I. 138.

C. An Official Equity Committee Would Be Required To Represent All Equity Holders.

58. If appointed, an official equity committee must serve as a fiduciary to *all prepetition equity holders*, not just minority equity holders. *See In re Johns-Manville Corp.*, 68 B.R. 155, 160 (S.D.N.Y. 1986) ("An equity committee has a fiduciary responsibility to equity holders."). An ad hoc group, by contrast, owes no "fiduciary duty to represent the interests of other shareholders." *Johns-Manville*, 68 B.R. at 159. It can advocate for itself, at its own expense, as the Ad Hoc Group has done so far. *See, e.g.*, Mot., Ex. A.

59. The Motion makes plain that the Ad Hoc Group's grievance is with the Getty Family and KED, which together hold approximately 73% of the Company's common stock. Preiss Decl. ¶ 10 n.7; Mot. ¶ 10. The Ad Hoc Group wants an estate-funded committee to represent the interests of *only a subset* of equity holders against the holders of nearly three-quarters of the class it is meant to represent. A committee cannot owe "undivided allegiance" to all shareholders while it pursues claims against most of them. *See In re Penn-Dixie Industries, Inc.*, 9 B.R. 941, 944 n.9 (Bankr. S.D.N.Y. 1981). Nor is a committee entitled to official status and estate funding for the purpose of pursuing claims against the same security holders that it would be required to represent. *See In re Residential Cap., LLC*, 480 B.R. 550, 558–59 (Bankr. S.D.N.Y. 2012) (explaining how forming a committee "solely to advance individual borrowers' claims is not appropriate, because acting as *de facto* counsel for borrowers would be an impermissible role for an official committee").

60. In addition, the Ad Hoc Group's own constituents are not aligned. Its members are a mix of common stockholders and warrant judgment holders, and they ask the Court to direct

appointment of a committee comprising both. Mot. at 1; Proposed Order at 2. The warrant judgment holders are prepetition creditors whose claims are treated under the Bankruptcy Code and the proposed Plan as subordinated to the level of equity under section 510(b). Plan, Arts. IV.J, I.A.175, III.B.10. But the Motion expressly does not concede that they are subordinated. Mot. at 1 n.2. To the extent the warrant holders contend their claims rank above equity, their interests are directly adverse to those of every common stockholder because non-subordination of warrant holder claims would put equity even further out of the money. Courts reject requests to appoint official committees to represent "dissident factions of particular classes or interests." *Penn-Dixie*, 9 B.R. at 943.

## III. Appointment Of An Official Equity Committee Would Put The Plan And The Company's Business At Risk.

61. Although the Motion will be heard before the Combined Hearing, the Plan was negotiated over several months before the Petition Date and solicitation commenced on October 20, 2026, before these cases were filed. An official committee's only remaining role would therefore be to litigate valuation and confirmation objections. *See Kalvar*, 195 B.R. at 601; *Spansion*, 421 B.R. at 164 n.23. Here, the Ad Hoc Group has "painted [] a picture reflecting no darker image than the ordinary fears, concerns, and conflicts that are inherent in the reorganization process." *In re Hills Stores Co.*, 137 B.R. 4, 6 (Bankr. S.D.N.Y. 1992). The cost of a committee "cannot be justified" for this purpose. *Kalvar*, 195 B.R. at 601 (Where a committee's "only remaining purpose . . . would be to object to confirmation, and litigate the valuation issue," its costs "cannot be justified."). The estates should not be made to fund a fight over what would be, at most, a "gift" to equity. *Williams*, 281 B.R. at 220; 7 *Collier* ¶ 1102.03[2][a] n.5 (same).

A. Appointment of An Official Equity Committee Would Potentially Delay These Proceedings and Jeopardize the Company's Business.

62. The Motion argues that an official equity committee "would require time to retain professionals, investigate valuation and causes of action, and participate meaningfully in confirmation negotiations." Mot. ¶ 72. Counsel for the Ad Hoc Group has already signaled that if an official equity committee is appointed, it will seek postponement of the December 15, 2026 Combined Hearing. That distinguishes *Oneida*, where the court relied on counsel's representation that an official committee "would not result in unnecessary delay of a confirmation hearing." 2006 WL 1288576, at *3. The Company cannot afford such delays. The RSA milestones require entry of a confirmation order within 55 days of the Petition Date and emergence within 75 days.

63. The Motion calls the milestones "a product of the Getty [Family's] and [KED's] own making." Mot. ¶ 72. But this schedule was negotiated at arm's-length between the RSA parties to establish a fair process and timeline, while also preventing an unwarranted stay in chapter 11. Businesses do not flourish in chapter 11. All parties recognize that an expeditious bankruptcy is best for the Company's employees, trade counterparties, and contributors.

64. Moreover, the schedule, which was considered and approved by the Special Committees, is also driven by the Debtors' liquidity and the DIP funding, not by choice. The DIP Facility of up to $143 million is sized to reflect the Debtors' cash requirements and to carry them to emergence on the milestone schedule, not beyond it. *See* Plan, D.I. 31, art. I.A.60; RSA, D.I. 32-2, Ex. B, sched. 1. Any extension of the schedule would therefore require additional DIP funding, if it could be obtained at all.

65. Not meeting the milestones places the Plan and the Company in great jeopardy. Without the Plan, there is no deal on the table, and no guarantee that general unsecured creditors will be paid. The Unsecured Noteholders' $170.2 million cash recovery, and the ordinary-course

payment of general unsecured creditors, depend upon the Plan Sponsors' infusion of up to $433 million. Preiss Decl. ¶ 36. Delay will have severe business consequences. The Company operates a marketplace that depends on the confidence and continued participation of its customers and content providers; swift completion of these chapter 11 proceedings is critical to maintaining that marketplace, as customers and contributors are deciding daily whether to continue doing business with the Company. Prolonged uncertainty raises exactly the risks the Company sought to avoid by reaching agreement with most of its creditors prior to filing for chapter 11. *See Williams*, 281 B.R. at 223 ("Further delay is antithetical to an overarching need to preserve or enhance asset value.").[18]

B. The Debtors' Estates Should Not Fund The Ad Hoc Group's Valuation Fight.

66. The Motion is essentially a request to pay the Ad Hoc Group's professional fees out of the Debtors' estates. "An Equity Committee should not be appointed if 'the cost of the additional committee sought significantly outweighs the concern for adequate representation.'" *Celsius*, 645 B.R. at 174 (quoting *In re Beker Indus. Corp.*, 55 B.R. 945, 949 (Bankr. S.D.N.Y. 1985)). The Ad Hoc Group has not shown its interests will be inadequately represented absent appointment of an official equity committee, as the case law requires.

67. The Motion argues that "[c]ost alone cannot" bar a committee. Mot. ¶ 68 & n.56. But that principle applies only once a movant has shown an entitlement to the extraordinary remedy of appointing an official equity committee. *See Beker*, 55 B.R. at 949 ("[O]nce the statutory tests are met, the burden shifts to the opponent of the motion to show that the cost of the

[18] The cases the Motion cites as routine appointments, Mot. ¶ 73 n.58, arose on very different records from this one. *See, e.g., Pilgrim's Pride*, 407 B.R. at 214, 217 (debtors' had roughly $1 billion of equity and their CRO testified they were "not even close to 'hopeless insolvency.'"); *Horsehead*, 2016 WL 10077082 (involving public statements of solvency); *Exide*, 2002 WL 32332000, at *2–3 (movant presented credible expert evidence of equity value early in the case, and the appointment was affirmed only for clear error). Here, the Company's distress was public for months and the Ad Hoc Group offers no valuation evidence.

additional committee sought significantly outweighs the concern for adequate representation and cannot be alleviated in other ways.").[19] The Ad Hoc Group has not made that showing. Where shareholders' position is speculative, it is "not in the best interests of the estate or its constituents to shift the cost of this valuation dispute" to the estate. *Northwestern*, 2004 WL 1077913, at *3.[20]

68. The Motion's assurances about cost do not hold up. It calls the costs "de minimis" compared to the size of the estates. Mot. ¶ 69. But a committee's counsel, financial advisor, and valuation experts, plus the responsive fees of every other party, would be significant, and every dollar would come from creditors' recoveries. While the Motion claims that "equity holders have the strongest incentive to keep costs low," Mot. ¶ 69, that incentive exists only where equity is in the money and bears the cost; here the record is clear that the cost will be borne entirely by the Debtors' estates. "[T]he law does not require the creditors of an insolvent estate to bear this additional financial burden because the shareholders cannot." *SunEdison*, 556 B.R. at 105.[21] Nor does fee review control the cost. Mot. ¶ 70. It tests whether fees are reasonable, not whether the estates should fund the litigation at all. *See In re Channel Master Holdings, Inc.*, 309 B.R. 855, 861 (Bankr. D. Del. 2004) ("[Courts] have an independent duty to review all fee requests . . . to assure that the services rendered were necessary and appropriate and that the fees requested are reasonable.").

---

19 *See also In re McLean Indus. Inc.*, 70 B.R. 852, 860 (S.D.N.Y. Bankr. 1987) (issue of cost is "analytically different from the question of whether the method of representation selected by the U.S. trustee is adequate.").

20 *See also In re Eastman Kodak*, 2012 WL 2501071, at *3 (Bankr. S.D.N.Y. June 28, 2012) ("[T]he estate will not be forced to fund a constituency that appears to be out of the money.").

21 Even in *Pilgrim's Pride*, where the debtors appeared solvent, the court capped the committee's spending. 407 B.R. at 221–22. The court's willingness to accept those costs rested in part on then-governing Fifth Circuit law under which committee professionals "may not be entitled to compensation if the subject case ultimately provides no return to equity," so that the risk of error was not borne by creditors alone. *Id.* at 217. No such protection exists here, where every dollar of committee expense would come from estates in which equity is out of the money.

## IV. The Ad Hoc Group's Confirmation Objections Can Be Heard At Confirmation And Do Not Warrant An Estate-Funded Committee.

69. Much of the Motion is a preview of the Ad Hoc Group's objections to the Plan. It argues, among other things, that the Plan unfairly discriminates against equity; that the Plan violates *203 North LaSalle*; and that the Plan was not proposed in good faith. Mot. ¶¶ 7, 10–13, 34. Those contentions are incorrect and irrelevant to the question before the Court on the Motion—they do not demonstrate that equity is in the money, and they do not require appointment of an official committee. Denying the Motion forecloses none of them. Ad Hoc Group members, and any other shareholder, may object to the Plan and be heard on any issue through their own counsel. *See Williams*, 281 B.R. at 221; *In re AbitibiBowater Inc.*, 2010 WL 4823839, at *11 (Bankr. D. Del. Nov. 22, 2010).[22] Allegations of insider wrongdoing, and the motives of the parties, are likewise beside the point on a section 1102(a)(2) motion. *See Oneida*, 2006 WL 1288576, at *2 (assertions of wrongdoing "played no part" in the decision); *Pilgrim's Pride*, 407 B.R. at 215 (motives of those who organized the ad hoc group "not pertinent"); *cf. Celsius*, 645 B.R. at 174 (a "contingent legal theory" does not establish a substantial likelihood of recovery). The Debtors deny the Motion's allegations, which, if pressed, will be resolved at confirmation.

70. The Motion's "unfair discrimination" and *203 North LaSalle* arguments also fail on their own terms. Mot. ¶¶ 7, 10, 49, 54. The Motion asserts that the Getty Family and KED "negotiated for themselves the exclusive right to 'repurchase' the company" and that this "screams 'unfair discrimination.'" Mot. ¶ 10. But the Plan Sponsors have no such "exclusive" rights. The RSA's "fiduciary out" leaves the Special Committee free to pursue any superior proposal. And *203 North LaSalle* addressed a plan that gave old equity the exclusive opportunity to own the

[22] If they make a substantial contribution, they can seek compensation under section 503(b)(3)(D) of the Bankruptcy Code. *Spansion*, 421 B.R. at 164. That is how valuation disputes are resolved when equity is out of the money. *AbitibiBowater*, 2010 WL 4823839, at *11.

reorganized debtor over the objection of a senior class *of creditors* that was not paid in full. *Bank of Am. Nat'l Trust & Sav. Ass'n v. 203 N. LaSalle St. P'ship*, 526 U.S. 434, 437, 454 (1999). Here, no class senior to existing equity is impaired without full payment or consent, and every existing share, including the Plan Sponsors', is cancelled.[23] And where every impaired creditor class accepts the plan, as the RSA parties' holdings indicate will occur here, and "there is no objection to confirmation by any creditor", section 1129(b)(2)(B), the provision construed in *203 North LaSalle*, "is not even applicable." *In re Zenith Elecs. Corp.*, 241 B.R. 92, 106–07 (Bankr. D. Del. 1999) (limiting *203 North LaSalle* "to the facts of that case").

71. The Motion's accusations of a "self-created" liquidity crisis are belied by the record. Mot. ¶¶ 12, 34. While the Debtors dispute the Motion's characterization of the warrant litigation, even taken at face value, those allegations concern confirmation issues as to Plan releases and are irrelevant to whether equity is in the money today.

72. The Debtors bear the burden of showing at the Combined Hearing that the Plan was "proposed in good faith," 11 U.S.C. § 1129(a)(3), and that its releases are appropriate. Their propriety will be tested at confirmation on a full record, at which time the Ad Hoc Group may contest both through its own counsel.[24]

---

[23] None of the cases on which the Motion relies for its unfair-discrimination theory support its position. Mot. ¶ 10 n.7, ¶ 54 n.45. Three of them *rejected* unfair-discrimination objections. *See In re Tribune Co.*, 972 F.3d 228, 244–45 (3d Cir. 2020) (0.9% disparity immaterial); *In re Armstrong World Indus., Inc.*, 348 B.R. 111, 122, 136 (D. Del. 2006); *In re Greate Bay Hotel & Casino, Inc.*, 251 B.R. 213, 231–32 (Bankr. D.N.J. 2000) (76% vs. 80% not unfair). The other two involved insiders retaining equity for nominal or no new value. *See In re Mangia Pizza Invs., LP*, 480 B.R. 669, 699–703, 708 (Bankr. W.D. Tex. 2012); *In re Surfango, Inc.*, 2009 WL 5184221, at *9 (Bankr. D.N.J. Dec. 18, 2009). Here, the Plan Sponsors contribute up to $433 million in new money, and their existing equity interests are cancelled alongside every other equity holder. The warrant-judgment claims do not change that analysis. Claims "for damages arising from the purchase or sale of" a security of the debtor are subordinated under section 510(b) to the level of the underlying equity. 11 U.S.C. § 510(b).

[24] The Motion's repeated invocation of *Pepper v. Litton*, 308 U.S. 295 (1939) does not help it. Mot. ¶ 16 & n.9, 17, 49, 65 & n.55. *Pepper* is a common law equitable subordination case that has been subplanted by section 510(c) of the Bankruptcy code and did not address committee appointment at all—nor does the Ad Hoc Group assert that section 510(c) applies here. It asked whether a bankruptcy court could disallow a controlling stockholder's judgment claim against his corporation as part of a "planned and fraudulent scheme" to strip assets and defeat a creditor. *Id.* at 296–99, 311–12. The Court held that the controlling stockholder's fiduciary duty runs to "creditors

73. In short, the Motion asks the Court to appoint and fund an official committee so that the Ad Hoc Group can litigate, at estate expense, objections it can already bring through its own counsel. The U.S. Trustee declined that request. Mot., Ex. A. The Court should decline it as well. *See Johns-Manville*, 68 B.R. at 163–64 (equity holders' remedy is to "appear[] at the confirmation hearing to argue against confirmation of the plan").

## V. This Is Not An Especially Complex Restructuring Case.

74. This is a prepackaged balance-sheet restructuring in which secured claims are refinanced at par (on improved terms for the Debtors), the revolving lenders extend their commitments, the Unsecured Notes receive a reduced all-cash recovery, general unsecured creditors are unimpaired, all contracts and licenses are assumed, and existing equity receives no recovery. As in *Kalvar*, "this is not a complex case from a bankruptcy perspective." 195 B.R. at 601 (denying appointment). It is a "pre-planned bankruptcy," and the Debtors "are not attempting to change the nature of [their] operations through the bankruptcy process, and relatively few operational issues have been brought before the court." *Id.*

75. The Motion identifies no operational, structural or legal complexity in the restructuring itself. Instead, it asserts that the case is "very controversial," the Plan's "valuation thesis is subject to significant debate," and "[m]any eyes [are] watching." Mot. ¶¶ 65, 67. None of that is complexity.[25] Disputes over valuation and over the Plan's treatment of equity arise

as well as stockholders" and "is enforceable by the trustee." *Id.* at 306–08. It rested on fraud findings made on a full record, none of which exist or are sought here. And *Pepper* protected creditors from an insider, whereas here the creditors support the Plan.

[25] *Pilgrim's Pride*, on which the Motion relies, Mot. ¶ 64 & n.54, found complexity in operational uncertainty, including cash flows "dependent upon numerous commodity prices that vary in volatility" and decisions on "timing of idling or reactivation of [the debtors'] plants." 407 B.R. at 220. The Motion describes the Debtors' business as the opposite: "consistent," "steady," and "like clockwork" Mot. ¶¶ 6, 28, 33.

whenever a plan cancels existing shares over shareholder objection. These are confirmation issues.[26]

76. Nor does the case timeline create complexity. Mot. ¶¶ 66–67. The milestones reflect the Debtors' liquidity. The schedule is typical of a prepackaged case and complies with the notice periods under the Bankruptcy Rules.

77. Even where complexity is conceded, courts have denied equity committees.[27] Complexity is relevant only insofar as it makes it "more difficult for another . . . to protect equity interests." Mot. ¶ 64 & n.54 (quoting *Pilgrim's Pride*, 407 B.R. at 220). Nothing about this restructuring does so.

## Conclusion

78. For the foregoing reasons, the Debtors respectfully request that the Court deny the Ad Hoc Group of Equity Security Holders' Motion for Entry of an Order Directing the Appointment of an official equity committee in these Chapter 11 Cases.

Dated: November 14, 2026
Wilmington, Delaware

*<u>/s/ Justin R. Alberto</u>*

**COLE SCHOTZ P.C.**

Justin R. Alberto (DE Bar No. 5126)
Jack M. Dougherty (DE Bar No. 6784)
Seth Van Aalten (*pro hac vice*)
Sarah A. Carnes (*pro hac vice*)
500 Delaware Avenue, Suite 600
Wilmington, Delaware 19801

**SIMPSON THACHER & BARTLETT LLP**
Brian E. Schartz (*pro hac vice*)
Elisha D. Graff (*pro hac vice*)
Alan Turner (*pro hac vice*)
Craig Waldman (*pro hac vice*)
Griselda Cabrera (*pro hac vice*)
Rachael L. Foust (*pro hac vice*)

---

[26] The Motion's invocation of *Pepper* and *Match Group* to show complexity, Mot. ¶ 65 n.55, fails for the reasons stated above.

[27] *See, e.g.*, *SunEdison*, 556 B.R. at 103 (denying appointment of equity committee "[n]otwithstanding the admitted complexities of the Debtors' cases"); *Johns-Manville*, 68 B.R. at 164 (affirming denial of equity committee despite the reorganization being "one of the most complicated and difficult reorganizations in history."); *Celsius*, 645 B.R. at 175 ("[C]ertainly complex" case did "not cut in favor of granting" an equity committee.).

Telephone: (302) 652-3131
Facsimile: (302) 652-3117
Email: jalberto@coleschotz.com
jdougherty@coleschotz.com
svanaalten@coleschotz.com
scarnes@coleschotz.com

*Co-Counsel for the Debtors and Debtors in Possession*

Dov Gottlieb (*pro hac vice*)
Olivia F. Acuña (*pro hac vice*)
425 Lexington Avenue
New York, New York 10017
Telephone: (212) 455-2000
Facsimile: (212) 455-2502
Email: brian.schartz@stblaw.com
egraff@stblaw.com
aturner@stblaw.com
cwaldman@stblaw.com
griselda.cabrera@stblaw.com
rachael.foust@stblaw.com
dov.gottlieb@stblaw.com
olivia.acuna@stblaw.com

*Co-Counsel for the Debtors and Debtors in Possession*