**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| GETTY IMAGES HOLDINGS, INC., *et al.*,[1] | ) | Case No. 26-11643 (JKS) |
| Debtors. | ) | (Jointly Administered) |

**DECLARATION OF ADAM PREISS, SENIOR MANAGING DIRECTOR OF GUGGENHEIM SECURITIES, LLC IN SUPPORT OF DEBTORS' OBJECTION TO THE MOTION OF THE AD HOC GROUP OF EQUITY SECURITY HOLDERS FOR ENTRY OF AN ORDER DIRECTING THE APPOINTMENT OF AN OFFICIAL EQUITY COMMITTEE PURSUANT TO 11 U.S.C. § 1102**

I, Adam Preiss, hereby declare under penalty of perjury:

1. I am a Senior Managing Director of Guggenheim Securities, LLC ("Guggenheim Securities"), an investment banking firm with principal offices located at 330 Madison Avenue, New York, New York 10017. Guggenheim Securities is the proposed investment banker to the debtors and debtors in possession in the above-captioned chapter 11 cases (the "Chapter 11 Cases") (collectively, the "Debtors" and, together with their non-Debtor affiliates, the "Company").

2. I submit this declaration (this "Declaration") in support of the Debtors' objection (the "Debtors' Objection") to the *Ad Hoc Group of Equity Security Holders'* (the "Ad Hoc Group") *Motion for Entry of an Order Directing the Appointment of an Official Equity Committee Pursuant to 11 U.S.C. § 1102*, [D.I. 133] (the "Motion"), filed concurrently herewith.[2]

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Getty Images Holdings, Inc. (4229); Griffey Midco (DE), LLC (7122); Abe Investment Holdings, Inc. (5107); Getty Images, Inc. (7556); Getty Images (US), Inc. (8819); Getty Images News Services (PRC), Inc. (1849); and Getty Images (Seattle), Inc. (6863). The location of the Debtors' service address for purposes of these chapter 11 cases is: 605 5th Ave. S. Suite 400, Seattle, WA 98104.

[2] Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Disclosure Statement, Restructuring Support Agreement, or the DIP Motion, as applicable.

3. Except as otherwise indicated, all facts set forth in this Declaration are based upon (a) my personal knowledge; (b) my discussions with other Guggenheim Securities professionals, the Debtors' other professional advisors, and the Debtors' management team; (c) my review of relevant documents; or (d) my experience, knowledge, and information concerning the Debtors' operations and financial condition. I am over 18 years of age. If called as a witness, I could and would testify competently to the facts set forth in this Declaration. I am not compensated specifically for this testimony other than through payments received by Guggenheim Securities as investment banker to the Debtors in these Chapter 11 Cases.

**A. Background and Qualifications.**

4. Guggenheim Securities is a full-service investment banking firm providing financial advisory services, including with respect to mergers and acquisitions, capital raising, and restructuring advice, across a broad range of industries. Guggenheim Securities and its senior professionals have extensive experience with respect to the reorganization and restructuring of distressed companies, both out of court and in chapter 11 proceedings.

5. My experience includes representing companies, boards, creditors, and other stakeholders in a variety of situations across a broad range of industries, including in-court and out-of-court engagements such as the following: PT Garuda Indonesia (Persero) Tbk., Liberty Communications of Puerto Rico LLC, DISH Network Corporation, OneWeb Global Limited, Claire's Stores Inc., the Commonwealth of Puerto Rico, CXLoyalty, Inc. (formerly known as Affinion Group Holdings, Inc.), Energy Future Holdings Corp. (TXU Corp.), 21st Century Oncology, Inc., NII Holdings, Inc. (Nextel International), Lehman Brothers Holdings Inc., and Eastman Kodak Company.

6. Prior to joining Guggenheim Securities, I was a Managing Director and partner at Millstein & Co., a financial advisory firm, where I focused on advising on restructuring matters from 2012 to 2018. Prior to that, I worked in the restructuring group at Lazard Frères & Co. LLC from 2009 to 2012. Prior to my work as an investment banker, I served for one year as a law clerk to the Honorable Stephen F. Williams of the U.S. Court of Appeals for the District of Columbia Circuit. I received a Bachelor of Arts degree in Political Science, with a minor in Business Administration, from the University of California, Berkeley and a Juris Doctor, with highest honors, from the University of Chicago Law School.

7. Members of my team and I have been working with the Debtors since June 2026. We have worked with the Debtors' management, the special committees of the board of directors of Getty Images Holdings, Inc. and of the other Debtors (collectively, the "Special Committees"), and the other professionals retained by the Debtors in connection with their evaluation of strategic alternatives and financing options, including, among other things, (a) analyzing the Debtors' liquidity and projected cash flows, (b) understanding the Debtors' business operations, properties and finances, (c) reviewing and analyzing the Debtors' balance sheet and capital structure alternatives, (d) providing strategic advice to the Debtors' board of directors and management, (e) participating in negotiations with certain of the Debtors' stakeholders, (f) soliciting, negotiating and analyzing debtor-in-possession and exit financing needs and options, and (g) assisting the Debtors in connection with preparations for the commencement of these Chapter 11 Cases, including work related to the DIP Facility and Plan.

## B. The Company's Prepetition Debt and Equity Securities.

8. The Debtors have an aggregate principal amount of approximately $1.46 billion in

prepetition funded debt obligations:[3]

| Type of Debt | Maturity | Approx. Amount Outstanding ($ in millions) |
|---|---|---|
| **Secured Debt** | | |
| $150MM Revolving Credit Facility | May 4, 2028 | $150 |
| Senior Secured USD Term Loan due 2030 | February 21, 2030 | $40 |
| Senior Secured EUR Term Loan due 2030 | February 21, 2030 | $456 |
| 11.250% Senior Secured Notes due 2030 | February 21, 2030 | $540 |
| **Total Secured Debt** | | **$1,186** |
| **Unsecured Debt** | | |
| 9.750% Senior Unsecured Notes due 2027 | March 1, 2027 | $5 |
| 14.000% Senior Unsecured Notes due 2028 | March 1, 2028 | $265 |
| **Total Unsecured Debt** | | **$270** |
| **Total** | | **$1,456** |

9. The table above does not include the amount of any prepayment premium, make-whole, call protection or similar amount.[4] Under the proposed Plan, secured creditors have agreed not to receive any prepayment premium, make-whole or similar amount on their existing debt.[5]

10. The Company also has approximately 421 million shares of common stock

---

[3] Disclosure Statement for the Joint Prepackaged Chapter 11 Plan of Reorganization of Getty Images Holdings, Inc. and its Debtor Subsidiaries [D.I. 32] (the "Disclosure Statement") at Section IV(C).

[4] Joint Prepackaged Chapter 11 Plan of Reorganization of Getty Images Holdings, Inc. and its Debtor Subsidiaries [D.I. 31] (the "Plan") art. III.B.4(b).

[5] *Id.*

outstanding,[6] of which approximately 114 million are not owned by affiliates of the Getty Family and Koch Equity Development LLC ("KED"), its two largest shareholders (such affiliates together, the "Plan Sponsors").[7]

### C. Relevant Market Information.

11. The chart below reflects the reported trading prices of the Company's prepetition funded debt instruments over the past year.[8]




12. As the chart shows, leading up to the Petition Date, the Company's debt was trading significantly below par (the y-axis on the left side of the chart showing par value as "100"). The

---

6 As of August 6, 2026. Getty Images Holdings, Inc. Form 10-Q for the period ending June 30, 2026.

7 Schedule 13D/A (Amendment No. 3) filed by Getty Investments L.L.C. et al. with respect to Getty Images Holdings, Inc. (Oct. 13, 2026) (Getty family reporting persons beneficially own 191,374,006 shares of Class A common stock, or approximately 45.5%, calculated on 421,018,476 shares outstanding as of August 6, 2026). Schedule 13D/A (Amendment No. 6) filed by KED Icon Holdings, LLC and Koch, Inc. with respect to Getty Images Holdings, Inc. (Oct. 13, 2026) (115,259,246 shares of Class A common stock, or approximately 27.4%, calculated on 421,018,476 shares outstanding as of August 6, 2026).

8 Bond pricing per FINRA TRACE and loan pricing per Bloomberg.

14.000% Senior Unsecured Notes due 2028, which comprise $265 million of the Company's total $270 million of Unsecured Notes as of the Petition Date,[9] traded steadily downward over the summer and up through the date of the announcement of the Restructuring Support Agreement, dated as of October 12, 2026 (the "RSA") to price in the $0.40s, meaning that the market was applying a more than 50% discount to the face value of the Unsecured Notes. Additionally, the Company's various secured debt instruments, which rank ahead of the Unsecured Notes in priority, traded between approximately $0.70 and $0.80 on the dollar.

13. The chart below reflects the reported trading prices of the Company's common stock over the past year.[10] The Company's stock traded on the New York Stock Exchange (the "NYSE") until September 29, 2026, when the NYSE notified the Company that it had determined to commence proceedings to delist the Company's stock and suspended trading due to low price levels. On September 30, 2026, the Company's stock began trading on the OTC Pink Limited Market. The Company's stock was formally delisted from the NYSE on October 12, 2026.[11]

---

[9] Disclosure Statement at Section IV(C).

[10] Data per FactSet (October 21, 2025 – October 21, 2026).

[11] Getty Images Holdings, Inc., Current Report (Form 8-K) Item 3.01 (Oct. 1, 2026); Disclosure Statement at 37.




As the chart shows, during the two weeks prior to the RSA announcement on October 12, 2026, the Company's common stock traded for less than $0.10, with a volume weighted average price of approximately $0.098, implying a market capitalization of approximately $41 million.[12] The average trading volume during this period was approximately 6.6 million shares per day, for a total number of shares traded of approximately 59.5 million.[13] Immediately prior to the RSA announcement, the closing trading price was $0.048, implying an equity market capitalization of approximately $20 million.[14] As of November 12, 2026, the Company's shares traded at $0.02, implying a market capitalization of approximately $8 million.[15]

---

12 Data per Factset (September 28, 2026 to October 9, 2026).

13 *Id.*

14 Data per Factset (October 9, 2026).

15 Data per Factset (November 12, 2026).

14. In my experience, the combination of secured and unsecured debt trading at material discounts to par and equity prices in the pennies with minimal market capitalization suggests the market does not view a meaningful distribution to equity as substantially likely.

15. This view is further supported by my discussions with various sophisticated investors about a potential investment in the Company. Guggenheim Securities' involvement with the Debtors was first announced publicly on July 21, 2026.[16] Subsequently, several parties reached out to Guggenheim Securities on an unsolicited basis indicating they would consider providing financing to the Company. Two parties delivered illustrative proposals for highly structured debt financing that would have been structurally senior to the Company's existing *secured* indebtedness and would have likely required concessions from unsecured noteholders and/or parties with litigation claims against the Company. Neither of these proposals offered financing, common equity or otherwise, that would have ranked junior to the Company's existing debt. In addition, Guggenheim Securities solicited proposals for new financing from four additional parties. No party we contacted was willing to refinance the entirety of the Company's capital structure, nor did any party express a willingness to provide capital junior to the Company's existing debt (common equity or otherwise). In my experience, sophisticated parties' unwillingness to refinance an existing capital structure or provide junior capital, when combined with the discounted trading prices of the Company's outstanding indebtedness, strongly suggests a market view that there is not meaningful existing equity value in the business. Moreover, neither since Guggenheim Securities' involvement was made public nor since the RSA was announced has any party reached out to Guggenheim Securities to indicate an interest in making a bid higher or better than the Plan Sponsors' offer contained in the RSA.

---

[16] Getty Images Holdings, Inc., Current Report (Form 8-K) Item 8.01 (July 21, 2026).

**D. <u>The "Solvency Breakpoint".</u>**

16. The Motion states that "[t]he solvency breakpoint is, according to the Debtors, around $1.46 billion."[17] By this, the Ad Hoc Group appears to mean that this is the value at which equity would receive a recovery after repayment of claims senior to the equity. This is mistaken.

17. As previously stated, the Company's *prepetition funded debt* totals $1.46 billion. However, there are other claims and debt amounts that would also have to be paid before the equity would receive a recovery. For example, I understand that the Company is in need of financing to continue operations during these Chapter 11 Cases and that the interim and final proposed debtor-in-possession ("<u>DIP</u>") financing was sized to meet these funding needs.[18] The proposed DIP would total between $113 million and $143 million and those amounts would need to be satisfied before a distribution to the equity.[19] Adding together the $1.46 billion of prepetition funded debt and the DIP, before taking into account the additional claims described below, suggests that, for equity to recover, value would have to be at least $1.57 to $1.60 billion. In addition, the Company has an estimated $231.5 million of prepetition general unsecured claims.[20] Those claims are unimpaired under the proposed Plan, using the liquidity provided by the Plan Sponsors to ensure payment. There is no assurance that general unsecured creditors would be unimpaired under any alternative plan, and any alternative plan that impaired general unsecured claims could push equity further out of the money. If the full amount of the unsecured claims were added to the prepetition funded debt and the potential DIP amounts, the total value before equity would receive a distribution

---

[17] Motion ¶ 3.

[18] Declaration of Mitchell (Chase) Brantley, Senior Director at Alvarez & Marsal North America, LLC, in Support of the Debtors' DIP Motion [D.I. 23] (the "<u>Brantley DIP Declaration</u>") ¶¶ 12, 15–16.

[19] *Id.* ¶¶ 9, 15 & n.4. Based on the market prices of the Company's securities and my conversations with 12 potential DIP financing providers, I believe any DIP would require that it rank senior to the existing equity and would very likely require a security interest in any unencumbered collateral.

[20] Disclosure Statement Ex. E [D.I. 32-5] (the "<u>Liquidation Analysis</u>") § IX.D.

would be $1.80 to $1.83 billion. Furthermore, under the proposed Plan, the secured lenders agreed to waive any prepayment premium, make-whole, call protection or similar premia. If any creditor would be entitled to such premia, a calculation of the potential make-whole payments required under certain secured debt suggests secured creditors could argue they are entitled to an additional payment of approximately $50 million.[21] If secured creditors were entitled to that amount, the total value of the Company that would need to be realized before a distribution to the equity, inclusive of the prepetition funded debt, the DIP, the unsecured claims, and the make-whole, would be $1.85 to $1.88 billion. Finally, to the extent the existing warrant judgments or any additional warrant litigation claims were determined not to be subordinated under section 510(b) of the Bankruptcy Code, they too would have to be satisfied before equity could receive a distribution.

**E. <u>The Ad Hoc Group's Valuation Support and Methodology.</u>**

18. I have reviewed the valuation support and methodology referenced in the section of the Motion headed "External Indicia of Solvency" at pages 13–14. For the reasons discussed below, I believe the support cited by the Motion cannot be relied upon to conclude there is a substantial likelihood of a meaningful distribution to equity in this case and that the methodology applied to suggest a material equity value is flawed.

1. <u>The Solomon Fairness Opinion and Related Analysis.</u>

19. The Motion first refers to a fairness opinion issued by Solomon Partners in connection with the Company's 2022 de-SPAC transaction. Solomon Partners' opinion was rendered explicitly "as of December 9, 2021," relied upon financial projections provided at that time and was "necessarily based on economic, monetary, regulatory, market and other conditions

---

[21] Disclosure Statement at 45.

as in effect on December 8, 2021."[22] I do not believe a valuation analysis from five years ago is a reliable source of data as to the value of the Company today. That is especially true where market conditions have changed materially. For example, the interest rate environment has changed materially, as evidenced by the fact that the yield on the 20-year U.S. Treasury, which stood at 1.91% as of December 9, 2021—the date of the Solomon Partners opinion—has risen to 5.48% as of November 12, 2026, an increase of approximately 357 basis points.[23] Furthermore, the Solomon Partners opinion predates the introduction and widespread adoption of agentic artificial intelligence across the corporate landscape, which is greatly impacting both companies and capital markets.[24] The Solomon Partners valuation was based on prior market conditions that no longer exist and cannot be relied upon as an indication of the Company's value today.

20. Perhaps recognizing this fact, the Motion claims that "[g]iven the overall consistency in the Company's earnings profile, it is possible to still use the Solomon Partners analysis, simply by updating the earnings multiples for each comparable company."[25] The Motion then purports to update multiples for publicly traded companies it claims Solomon found were comparable to the Company and apply the median of the entire set of companies to the Company's last-twelve-months ("LTM") Adjusted EBITDA as of Q2 2026 and its estimated Adjusted EBITDA for 2026, 2027 and 2028.[26] Based on this analysis, the Motion estimates "Getty Images

---

[22] Getty Images Holdings, Inc., Proxy Statement/Prospectus (Form 424(b)(3)) 183, 185 (June 30, 2022) (the "de-SPAC Proxy").

[23] U.S. Dep't of the Treasury, *Daily Treasury Par Yield Curve Rates* (Dec. 9, 2021), https://home.treasury.gov/resource-center/data-chart-center/interest-rates/TextView?type=daily_treasury_yield_curve&field_tdr_date_value_month=202112; *Daily Treasury Par Yield Curve Rates* (Nov. 12, 2026), https://home.treasury.gov/resource-center/data-chart-center/interest-rates/TextView?type=daily_treasury_yield_curve&field_tdr_date_value_month=202611.

[24] Mike Isaac, Joe Rennison & Maureen Farrell, *The Dark Side of A.I. Weighs on Tech Stocks*, N.Y. Times (Feb. 6, 2026), https://www.nytimes.com/2026/02/06/business/ai-stock-market-anthropic-openai.html.

[25] Motion ¶ 31.

[26] *Id.*

enterprise value at $3.81 billion," and goes on further to imply an equity value of $2.354 billion.[27] That equity value would be approximately 28,000% higher than the Company's current market capitalization and approximately 12,000% higher than the Company's market capitalization immediately prior to the announcement of the RSA.

21. This valuation approach (the "Motion Comparables Approach") is flawed in numerous respects and should not be relied upon. First, while the Motion Comparables Approach claims it is "still us[ing] the Solomon Partners analysis,"[28] the approach it takes differs materially from that outlined by Solomon Partners in ways that are not supported and actually provide support that the Company's value is less than its debt. In particular, the Motion Comparables Approach assumes, without support, that the median trading multiple of all companies cited by Solomon Partners should be applied to the Company's EBITDA, effectively assuming the Company sits in the middle of all companies in the dataset. On its face, this approach conflicts with the approach taken by Solomon Partners, which used a reference range from the *low* end of the selected companies to the median. But, more importantly, Solomon specifically disavowed an approach with equal reliance on all companies in its data set, instead stating that, "in the exercise of its experience and judgement, [Solomon] placed greater reliance on Shutterstock, and less weight on certain of the [other] companies . . .".[29] Per the Motion, at the time of Solomon Partners' opinion, Shutterstock's trading multiple was 24.1x, which approximated the median multiple of 27.69x.[30] Also per the Motion, Shutterstock's trading multiple as of October 2026 has declined materially

27 *Id.*

28 *Id.*

29 de-SPAC Proxy at 186.

30 *Id.*

to 2.4x, as compared to a median of the comparables of 12.4x.[31] Put another way, Shutterstock today trades at a multiple approximately *80% lower* than the median. If, as Solomon Partners suggested, Shutterstock is the most relevant comparable, applying the 2.4x Shutterstock multiple to the Company's LTM Q2 2026 Adjusted EBITDA implies a total enterprise value of only $737 million, significantly below the $1.46 billion of prepetition funded indebtedness. The evidence offered by the Motion therefore seems to point at least equally, if not more so, to the conclusion that the Company is worth far less than its outstanding debt. For that reason, combined with the fact that the Motion Comparables Approach in no way actually applies the approach taken by Solomon Partners, it is not a reliable source from which to conclude a substantial likelihood of a meaningful distribution to equity.

22. Second, the Motion Comparables Approach assumes, without explanation, that the companies Solomon Partners evaluated in December 2021 remain comparable to the Company today. In my experience, comparable companies are chosen because they share some characteristics with the company being valued, but none of them is identical to it. A company's multiple reflects how it is positioned, and how it is expected to perform, relative to those companies on a range of qualitative and quantitative factors. Those factors can include growth, profitability, scale, business mix, competitive positioning and risk, among other factors. And those factors can change over time. Choosing an appropriate multiple therefore requires judgment about where the company stands relative to each comparable company at the specific time the valuation work is performed and the valuation work must be updated when the relevant quantitative and qualitative factors change. Simply put, while the Motion Comparables Approach points to consistency in the results of the Company to justify its approach, that in no way means consistency in the results or

---

31 *Id.*

operations of the comparable companies Solomon Partners selected. Yet, the Motion Comparables Approach simply assumes the same comparable set should be used without explanation. At least one example in the company set used in the Motion Comparables Approach illustrates why this is a flawed assumption. Solomon Partners included Thomson Reuters under the "Editorial Content" category in its December 2021 analysis.[32] Since 2021, Thomson Reuters has continued to reposition its business toward technology and AI-driven software for legal, tax, audit and compliance professionals. It acquired Casetext, a developer of AI legal assistant tools, for $650 million in 2023.[33] It acquired SafeSend, a tax workflow automation provider, for $600 million in 2025.[34] In October 2026, it completed the sale of a 51% stake in its Global Print business to KKR for approximately $500 million; that business provides legal and tax reference content in print and electronic book formats. In announcing that transaction, Thomson Reuters stated that it "sharpens Thomson Reuters focus on providing innovative fiduciary-grade AI solutions for the legal, tax, audit and compliance industries."[35] Those businesses share few characteristics with the Company's business today. The 22.4x multiple the Motion attributes to Thomson Reuters as of October 2026 (the *highest* multiple in the Motion's dataset) reflects the market's view of Thomson Reuters' business as it exists today, which is not the same as it existed in 2021.[36] Notably, the J.P.

---

32 de-SPAC Proxy at 186.

33 Press Release, Thomson Reuters, *Thomson Reuters Completes Acquisition of Casetext, Inc.* (Aug. 17, 2023), https://www.thomsonreuters.com/en/press-releases/2023/august/thomson-reuters-completes-acquisition-of-casetext-inc.

34 Press Release, Thomson Reuters, *Thomson Reuters Acquires SafeSend, Expanding Tax Automation Capabilities* (Jan. 2, 2025), https://www.thomsonreuters.com/en/press-releases/2025/january/thomson-reuters-acquires-safesend-expanding-tax-automation-capabilities.

35 Press Release, Thomson Reuters, *Thomson Reuters and KKR Complete Joint Venture for Global Print Business* (Oct. 1, 2026), https://www.thomsonreuters.com/en/press-releases/2026/september/thomson-reuters-and-kkr-complete-joint-venture-for-global-print-business; Press Release, Thomson Reuters, *Thomson Reuters and KKR Announce Joint Venture for Thomson Reuters Global Print Business* (July 14, 2026), https://www.thomsonreuters.com/en/press-releases/2026/july/thomson-reuters-and-kkr-announce-joint-venture-for-thomson-reuters-global-print-business.

36 Motion ¶ 31.

Morgan fairness opinion, also relied upon in the Motion as discussed further below, *does not* include Thomson Reuters in its comparable company dataset in 2025 in its valuation of Shutterstock.[37] Furthermore, the Motion's own analysis shows how much the comparable companies' multiples have diverged since 2021. According to the Motion, Shutterstock's multiple fell from 24.1x to 2.4x, a decline of approximately 90%.[38] Conversely, Thomson Reuters' multiple fell from 30.9x to 22.4x, a decline of only approximately 28%.[39] The New York Times Company's multiple fell from 21.0x to 17.8x, a decline of approximately 15%.[40] Changes this varied (approximately 90% vs. approximately 15%) indicate that the market has reassessed each comparable company on its own circumstances. By contrast, the Motion Comparables Approach simply carries the 2021 comparable company set forward unchanged and applies the median of its current multiples, without any explanation as to whether those companies *remain* comparable, and therefore it is not a reliable approach to determine whether there is a substantial likelihood of a meaningful distribution to equity.

23. Third, the premise of the Motion Comparables Approach, that the "overall consistency in the Company's earnings profile" makes it possible to simply update the earnings multiples of the comparable companies, is flawed. While the Company's actual results have been relatively consistent, what Solomon Partners was valuing was a company that was *projected* to grow. In rendering its fairness opinion on December 9, 2021, Solomon relied on financial projections for the Company that were approved for its use and summarized in the de-SPAC Proxy

---

[37] Getty Images Holdings, Inc., Information Statement and Proxy Statement/Prospectus (Form 424(b)(3)) (Apr. 30, 2025) (the "Shutterstock Merger Proxy"), at 64.

[38] Motion ¶ 31.

[39] *Id.*

[40] *Id.*

statement.[41] Those projections did not describe a business with stable earnings; they described a business growing significantly. They projected revenue rising from approximately $810 million in 2020 (the last year of actuals at the time) to $1,242 million in 2026.[42] That represented a compound annual growth rate of 7.4% over the period. The Company has not achieved those projections. As shown in the table below, the Company is expected to generate revenue of $920 million and Adjusted EBITDA of $264 million for fiscal year 2026.[43] Those figures are 26% and 40% lower than the levels projected at the time of the Solomon Partners analysis. Furthermore, the Company's current projections have an estimated compound annual revenue growth rate from 2025 actuals (the last year of actuals) to 2029 estimates of approximately *negative* 1%, as compared to the compound annual growth rate in the projections Solomon relied upon from 2020 actuals to 2026 estimates of *positive* 7.4%.[44] As previously discussed, the projected growth rate of a business can be one important consideration in how a subject company compares to other businesses in conducting a comparable company valuation analysis. The Motion Comparables Approach does not take this change in projected growth rates for the business into account in any way, instead assuming that stability in operations means the same set of comparable companies used in 2021 can be used in 2026.

---

[41] de-SPAC Proxy at 184, 187.

[42] *Id.* at 182.

[43] Getty Images Holdings, Inc., Current Report (Form 8-K) Ex. 99.2, (Oct. 13, 2026) (the "Cleansing Materials") at 10.

[44] Getty Images Holdings, Inc., Annual Report for the Fiscal Year Ending December 31, 2025 (Form 10-K) (Mar. 16, 2026); Disclosure Statement Ex. D [D.I. 32-4] (the "Financial Projections").

| *($ in millions)* | **Projections used in Solomon Partners Opinion[45]** | **Current Company Projections[46]** | **Difference** |
|---|---|---|---|
| 2026E Revenue | $1,242 | $920 | (26%) |
| 2026E Adjusted EBITDA | $443 | $264 | (40%) |
| Revenue CAGR (Actual to Projected) | 7.4% (2020A–2026E) | (0.9%) (2025A–2029E) | (8.3 pts) |
| Adjusted EBITDA CAGR (Actual to Projected) | 8.7% (2020A–2026E) | (1.9%) (2025A–2029E) | (10.6 pts) |

2. The J.P. Morgan Analysis

24. The Motion also cites a fairness opinion issued by J.P. Morgan in connection with the Shutterstock merger.[47] As with the Solomon opinion and the associated Motion Comparables Approach, I believe the J.P. Morgan opinion is not a reliable basis from which to conclude there is a substantial likelihood of a meaningful distribution to equity in this case.

25. The J.P. Morgan opinion was dated as of January 6, 2025.[48] Similar to the Solomon opinion, J.P. Morgan's analysis was based on projections prepared by the Company's management team at the time and based on market conditions at the time. And, as with the Solomon opinion, I do not believe that a valuation that is based on stale projections and market conditions nearly two years old can be a reliable indicator of the Company's value today. This is especially true because, like the Solomon Partners analysis, J.P. Morgan's analysis was based on projections of growth that the Company is no longer expected to achieve. J.P. Morgan's discounted cash flow analysis

45 de-SPAC Proxy at 182

46 Getty Images Holdings, Inc., Annual Report for the Fiscal Year Ending December 31, 2025 (Form 10-K) (Mar. 16, 2026); Cleansing Materials at 10; Disclosure Statement Ex. D [D.I. 32-4] (the "Financial Projections").

47 Motion ¶ 31.

48 Shutterstock Merger Proxy at 62.

calculated the unlevered free cash flows the Company was expected to generate from 2025 through 2029.[49] It based those cash flows on the forecast summarized in the Shutterstock merger proxy statement.[50] That forecast projected revenue rising each year, from approximately $939 million in 2024 to $1,158 million in 2029.[51] It projected Adjusted EBITDA rising each year, from approximately $293 million in 2024 to $350 million in 2029 (the last year of the projections).[52]

26. However, as shown in the table below, the Company expects to fall far short of the projections used by J.P. Morgan. For example, the projections used in the J.P. Morgan report projected 2026 revenue of $1,040 million and Adjusted EBITDA of $318 million.[53] The Company currently expects 2026 revenue of $920 million and Adjusted EBITDA of $264 million, a *decline* of 12% and 17%, respectively, as compared to the estimates relied on by J.P. Morgan.[54] By 2029, the Company expects revenue of $946 million and Adjusted EBITDA of $297 million, an 18% and 15% *decline* as compared to the forecast used by J.P. Morgan.[55] Even by 2031, the terminal year in the Company's projections, the Company still does not expect to achieve the revenue and EBITDA projected by J.P. Morgan in 2029.[56] Reliance on a DCF using projections nearly two years prior under different market conditions is, in my opinion, not a reliable indication that there is a substantial likelihood of a meaningful distribution to equity.

---

49 *Id.* at 65.

50 Shutterstock Merger Proxy at 59, 65.

51 *Id.* at 59.

52 *Id.*

53 *Id.*

54 Cleansing Materials at 10.

55 Getty Images Holdings, Inc., Current Report (Form 8-K) Ex. 99.2, at 10 (Oct. 13, 2026) (the "Cleansing Materials").

56 Financial Projections.

| *($ in millions)* | **Projections used in J.P. Morgan Opinion**[57] | **Current Company Projections**[58] | **Difference** |
|---|---|---|---|
| 2026E Revenue | $1,040 | $920 | (12%) |
| 2026E Adj. EBITDA | $318 | $264 | (17%) |
| Terminal Year Revenue<br>(2029E for J.P. Morgan and 2031E for the Company) | $1,158 | $988 | (15%) |
| Terminal Year Adjusted EBITDA<br>(2029E for J.P. Morgan and 2031E for the Company) | $350 | $298 | (15%) |

27. In addition, the J.P. Morgan analysis predated certain significant cash outflows the Company incurred, including a $110.9 million warrant payment and significant merger financing and associated costs.

28. Other evidence also provides a clear indication as to how market conditions have shifted since the issuance of the J.P. Morgan report at the start of 2025. J.P. Morgan not only valued the Company, but also provided a range of "implied firm value . . . for Shutterstock of $550 million to $630 million on a stand-alone basis."[59] Based on market information as of November 12, 2026, Shutterstock's implied enterprise value is approximately $242 million,[60] a nearly 60% decline from the midpoint of the range in the J.P. Morgan fairness opinion. This further illustrates why the J.P. Morgan opinion, just like the Solomon Partners Opinion and the Motion Comparables Approach, is not a reliable indication of the value of the Company *today*.

57 Shutterstock Merger Proxy at 59.

58 Cleansing Materials at 10; Financial Projections.

59 Shutterstock Merger Proxy at 65.

60 Shutterstock implied enterprise value based on a fully-diluted market capitalization of $109.6 million (per FactSet as of November 12, 2026) plus debt of $242.5 million less $110.5 million of cash as of September 30, 2026 (Shutterstock Form 10-Q for the period ending September 30, 2026).

**F. Prepetition Negotiations with the Company's Stakeholders.**

29. In July 2026, the Company announced that it had retained Guggenheim Securities to act as a financial advisor in connection with the Company's previously announced evaluation of strategic financing alternatives and balance sheet management initiatives. At that time, the Company's liquidity had become materially constrained, primarily driven by several non-operating events, including: (i) adverse warrant litigation judgments exceeding $200 million,[61] (ii) the termination of the Shutterstock merger due to an adverse foreign regulatory determination that cost the Company more than $100 million in financing costs, professional fees, and other costs, and (iii) an unsustainable debt service burden, including annual debt service of approximately $239 million. The Company projected it could fall below its minimum operating liquidity need before the end of the year absent some combination of new financing, relief from litigation claims, and debt service relief.[62]

30. Consequently, the Company, alongside its advisors, began negotiations with the Company's key stakeholders in July and August of 2026. The stakeholders ultimately involved in these negotiations included an ad hoc group of secured lenders (holders of its Term Loans and 11.250% Senior Secured Notes) (the "Secured Ad Hoc Group"), an ad hoc group of unsecured noteholders (holders of its Unsecured Notes) (the "Unsecured Noteholders Ad Hoc Committee" and, together with the Secured Ad Hoc Group, the "Creditor Ad Hoc Groups"), and the Plan Sponsors. Each Creditor Ad Hoc Group, represented by its own legal and financial advisors, agreed to enter a restricted period during which time the Company provided extensive information

[61] I understand that the Company's $110.9 million payment in April 2026 was funded by a $120 million revolver draw. A subsequent judgment was entered on September 25, 2026 by a New York state court for approximately $92 million, and the Company was unable to bond the judgment pending appeal. I further understand that the plaintiffs in the New York state court litigation agreed to stay enforcement of the judgment through October 26, 2026 in exchange for a partial payment of approximately $4.2 million.

[62] Brantley DIP Declaration ¶ 11.

about its operations and finances, while negotiating the terms of potential transactions that would help address the Company's financial distress.

31. The Company and the key stakeholder groups began exchanging proposals on August 17, 2026 and engaged in multiple rounds of arm's-length negotiations. By early September 2026, the Company reached a deal in principle with the Secured Ad Hoc Group. That deal required the Plan Sponsors to provide a new cash equity investment of at least $280 million and to convert approximately $100 million of term loans held by certain of the Plan Sponsors into equity.

32. At the same time, the Company made a proposal to the Unsecured Noteholders Ad Hoc Committee, consisting of a combination of a cash payment and a percentage of the Company's restructured equity in exchange for full extinguishment of the $270 million of Unsecured Notes. The Unsecured Noteholders Ad Hoc Committee rejected this proposal and made a counterproposal for a significantly higher cash payment that would have been in full satisfaction of their claims.

33. After the Unsecured Noteholders Ad Hoc Committee rejected the initial proposal and provided its counterproposal, the Company indicated that it was considering a deal with only the Secured Ad Hoc Group.[63]

34. In response, the Unsecured Noteholders Ad Hoc Committee informed the Company that it was working with its counsel and financial advisors to prepare a bid for the Company. As the Unsecured Noteholders Ad Hoc Committee worked on a formal bid, the Company continued arm's-length negotiations with the Plan Sponsors in an attempt to extract further value for the business and drive a consensual deal with the Unsecured Noteholders Ad Hoc Committee.

35. Within a few days, the Company made a revised proposal that included the Secured

---

[63] This deal could have been with the Secured Ad Hoc Group as the stalking horse bid or it could have been a deal with the Secured Ad Hoc Group paired with a stalking horse bid from the Getty Family and KED.

Ad Hoc Group, the Unsecured Noteholders Ad Hoc Committee, and the Plan Sponsors. The revised proposal provided a meaningful increase in the cash recovery for the Unsecured Notes as compared to previous proposals. The Unsecured Noteholders Ad Hoc Committee countered the Company's proposal, and after several rounds of negotiations, the Unsecured Noteholders Ad Hoc Committee ultimately accepted the agreement that is reflected in the Plan.

36. Pursuant to the revised proposal, the Plan Sponsors were required to increase their committed cash equity investment from approximately $280 million to up to $433 million, an increase of approximately $153 million, or approximately 55%. This revised cash equity commitment would fund an all-cash recovery to holders of Unsecured Notes of their pro rata share of $170.2 million, on their $270 million principal amount of Unsecured Notes. The Unsecured Noteholders Ad Hoc Committee accepted this agreement in full satisfaction of their claims.

37. The secured term lenders and noteholders, whose debt was trading well below par, agreed pursuant to the revised proposal to accept new debt on terms favorable to the Company. The terms include lower interest rates, extended maturities, and various covenant changes. The existing secured debt now trades at approximately $0.91, reflecting a market discount of roughly $88 million.[64]

38. All of these efforts culminated in the execution of the RSA, dated as of October 12, 2026.[65] The terms of the restructuring and recapitalization transactions outlined in the RSA are the product of extensive, arm's-length negotiations and meaningful compromise among the

---

64 Based on data available on Bloomberg as of November 12, 2026, the weighted average price of the Company's secured Term Loans and Secured Notes is approximately 91 cents. Based on the pro forma secured debt of $580.0MM of New 1L Notes, €313.9MM of New EUR Term Loans converted to USD as of November 12, 2026 and an undrawn new revolving credit facility) at emergence of approximately $927 million, this pricing implies a discount of approximately $87 million.

65 My understanding is that the RSA parties hold approximately $1.31 billion of the Company's $1.46 billion in funded debt, including approximately 90% of the Secured Funded Debt Claims, 100% of the Revolving Loans, and approximately 83% of the Unsecured Notes.

Debtors and their key stakeholders.[66]

39. Throughout the process of negotiating with its key stakeholders, the Company evaluated and pursued alternatives. Guggenheim Securities held discussions with six parties about potential financing alternatives.[67] This included a mix of both solicited and unsolicited proposals. Of the six parties, one passed on the opportunity entirely. Others proposed transactions that fell broadly into two baskets: (a) highly structured transactions that would have required a reorganization of the Company's business while leaving the Company highly levered with incremental, expensive indebtedness and that assumed a consensual exchange or settlement with unsecured noteholders and/or parties with litigation claims against the Company; or (b) an amount of capital that would not have been sufficient to refinance the Company's current capital structure and would have likely necessitated a bankruptcy to implement. The Company believed that neither type of proposal was more favorable than the terms of the RSA. Separately, while negotiations with creditors were ongoing, the Company and its advisors considered a marketing process while simultaneously trying to drive more value from the Plan Sponsors. However, once a deal was achieved with the creditors and the Plan Sponsors, the Company determined not to pursue a marketing process as it feared that engaging in a potentially lengthy and inherently uncertain marketing process might jeopardize its customer and contributor relationships while significant customer renewals were approaching.[68] The goal was to ensure that the Company achieved the

---

[66] The Motion claims that "a four-month period [is] too short for meaningful diligence by the noteholders." Motion ¶ 5. Based on my experience, I believe a four-month diligence process, particularly for a public company, is more than sufficient for sophisticated parties, advised by experienced legal and financial advisors, to conduct sufficient diligence to evaluate a sale, new financing, or other alternative transactions. The Unsecured Noteholders Ad Hoc Committee and its advisors received significant non-public diligence information, including detailed projections, and had multiple presentations from management as part of the negotiating process.

[67] Disclosure Statement Art. XIX.A, at 130.

[68] Declaration of Craig Peters, Chief Executive Officer of Getty Images Holdings, Inc. and its Debtor Subsidiaries, in Support of the Debtors' Chapter 11 Petitions [D.I. 29] ¶¶ 9, 14–15.

most value-maximizing transaction in the limited time it had available. Given the risks associated with the available alternatives, the Company determined the RSA offered the most favorable terms, including material deleveraging as a result of the discounted elimination of the Unsecured Notes (combined with the conversion of certain secured debt held by the Plan Sponsors into equity) and improved cash flows as a result of the significant concessions provided by the secured term lenders and noteholders.

40. Prior to the Petition Date, the Company made efforts to reach a settlement with the New York State court warrant plaintiffs as well. The Company's final proposal was neither accepted nor formally countered by the warrant plaintiffs.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Dated: November 14, 2026

*/s/ Adam Preiss*
Adam Preiss
Senior Managing Director
Guggenheim Securities, LLC