**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| GETTY IMAGES HOLDINGS, INC., *et al.*, | Case No. 26-11643 (JKS) |
| Debtors. | (Jointly Administered) |
| | **Related to Document No. 133** |
| | **Hearing Date: November 18, 2026 at 10:00 a.m.** |

**REPLY OF THE AD HOC GROUP OF EQUITY SECURITY HOLDERS TO OBJECTIONS TO MOTION FOR APPOINTMENT OF AN OFFICIAL EQUITY COMMITTEE PURSUANT TO 11 U.S.C. § 1102**

The Ad Hoc Group of Equity Security Holders (the "**Ad Hoc Group**") hereby submits this Reply (i) in further support of its *Motion of the Ad Hoc Group of Equity Security Holders for Entry of an Order Directing the Appointment of an Official Equity Committee Pursuant to 11 U.S.C. § 1102* [Docket No. 133] (the "**Appointment Motion**")[1] and (ii) in response to the following Objections filed to the Appointment Motion:

- *Debtors' Objection to Motion of the Ad Hoc Group of Equity Security Holders for Entry of an Order Directing the Appointment of an Official Equity Committee Pursuant to 11 U.S.C. § Debtors' Objection to Motion of the Ad Hoc Group of Equity Security Holders for Entry of an Order Directing the Appointment of an Official Equity Committee Pursuant to 11 U.S.C. § 1102 1102* [Docket No. 181] (the "**Debtors' Objection**"), with attendant *Declaration of Adam Preiss, Senior Managing Director of Guggenheim Securities LLC in Support of Debtors' Objection to Motion of the Ad Hoc Group of Equity Security Holders for Entry of an Order Directing the Appointment of an Official Equity Committee Pursuant to 11 U.S.C. § 1102* [Docket No. 182] (the "**Preiss Declaration**");

[1] Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Appointment Motion.

- *Objection of the Unsecured Noteholders Ad Hoc Committee to the Motion of the Ad Hoc Group of Equity Security Holders for Entry of an Order Directing the Appointment of an Official Equity Committee Pursuant to 11 U.S.C. § 1102* [Docket No. 180] (the "**Noteholders' Objection**");"), and

- *Response of the United States Trustee to Motion of the Ad Hoc Group of Equity Security Holders for Entry of an Order Directing the Appointment of an Official Equity Committee Pursuant to 11 U.S.C. § 1102* [Docket No. 179] (the "**U.S. Trustee Response**" and, together with the Debtors' Objection and the Noteholders' Objection, the "**Objections**").

In furtherance of the Appointment Motion and in response to the Objections, the Ad Hoc Group respectfully states as follows:

## PRELIMINARY STATEMENT

1. The Objections all present the same theory, which can be succinctly stated. An Official Equity Committee cannot be appointed unless equity/warrant holders conclusively prove, today, a "substantial likelihood" of solvency (i.e., it is not the "hopeless insolvency" standard). There is no possible way the Ad Hoc Group can, today, carry that burden because *in*solvency is a clear, absolute, foregone conclusion. That is so because: (i) the unsecured bondholders agreed to a substantially discounted payment under the plan; and (ii) Debtor securities have long traded at basement pricing. No further data is needed. No further analysis is warranted. Don the horse blinders. Deny the Motion.

2. That is wrong, as a matter of law, fact, and procedure.

3. **First**, it is wrong as a matter of law. Starting with the appointment standard, it is in fact "hopeless insolvency," per the highest court in this venue to address the issue (the Delaware District Court).[2] Nevertheless, the "standards" debate misses the bigger picture. The "solvency"

[2] *See Exide Techs. v. State of Wis. Inv. Bd.*, No. 02-1572, 2002 WL 32332000 (D. Del. Dec. 23, 2002) (decision as to whether an official equity committee should be appointed depends on if "debtor appears to be hopelessly insolvent").

element is one of several to be considered and, contrary to the Objections, the case law does not evaluate any of the elements in a starchy or mechanical/reflexive way, blind to the overarching case context, evincing a binary ("you either prove it or you don't") attitude.[3] Appointment analysis is, rather, more flexible/nuanced, contextually aware, and thoughtful. That is so because we are only at the beginning. In *Oneida*, the Court ordered appointment of an Official Equity Committee, cognizant of (while not adjudicating) conflicting assertions of enterprise value, because Chapter 11's usual "checks and balances" were "not present" in the case.[4] The case set-up in *Oneida* is remarkably similar to the set-up here, although the Getty Images case presents far greater risk of a travesty.

4. **<u>Second</u>**, the Objections are wrong as a matter of fact. Leaving solvency aside for the moment: ***How is an Official Equity Committee not warranted based on the "unfair discrimination" issue alone?*** Again, the Gettys/Kochs are given an exclusive right to repurchase 100% of the reorganized company stock. Again, the price point was determined, not by the market, but in closeted negotiations with creditors. Again, the Debtors will not expose their entitlement to a post-petition M&A market test. Again, other similarly-situated stakeholders are not allowed to participate. The "control" shareholders are indisputably given a massive plan distribution, and the Getty/Koch families' refusal to share that distribution is presumptively "unfair discrimination" under the Third Circuit's *Tribune* decision.[5] This brings us back to the "standards" debate. Presuming for the sake of argument that the Court sides with the Objectors in that debate, the

---

[3] *See, e.g., In re SunEdison, Inc.*, 556 B.R. 94, 103 (Bankr. S.D.N.Y. 2016) ("On the issue of solvency, a court need not conduct an exhaustive valuation; rather, the relevant inquiry is whether a debtor *appears to be* hopelessly insolvent.").

[4] *See In re Oneida Ltd.*, No. 06–10489 (ALG), 2006 WL 1288576, at *2-3 (Bankr. S.D.N.Y. May 4, 2006).

[5] *Bank of Am. Nat'l Tr. & Sav. Ass'n v. 203 N. LaSalle St. P'ship*, 526 U.S. 434, 458 (1999); *In re Tribune Co.*, 972 F.3d 228, 240-241 (3d Cir. 2020).

element is ***not*** (as they say) a substantial likelihood of "***solvency***" – it is, rather, substantial likelihood of a ***"meaningful distribution"***[6] – and equity/warrant holders have a right to a "meaningful distribution" because of the plan's chosen architecture and Section 1129(b). That is the natural, legal consequence of the Debtors' refusal to put the Company up for sale.

5. Turning next to solvency, it bears repeating: Under our jurisprudence, neither the bondholders' concession nor securities trading levels are conclusive (they may not even be competent) evidence of business worth. Valuation is, to be sure, one of the most intellectually complex and sensitive areas of Chapter 11 practice. It does not reduce to simplistic idolatry or *ipse dixit* assertions (no evidence) of creditor/market intention, as asserted in the Objections. ***We are, in fact, unaware of a single case where a court valued a Chapter 11 debtor based on a negotiated "debt discount" or on securities trading levels. The Objections do not cite to one, and we sincerely doubt one exists.***[7] There is, however, a huge body of authority (including Judge Sontchi's article) indicating that it would be highly irregular, theoretically improper, and legally incorrect to go about valuing the Debtors in the manner urged in the Objections.[8]

---

6 *See* Debtors' Objection ¶ 1 (citing *In re Williams Commc'ns Grp., Inc.*, 281 B.R. 216, 223 (Bankr. S.D.N.Y. 2002)).

7 As Judge Christopher Sontchi so aptly instructs, "one should be reluctant to depart from the familiar" methodologies. Hon. Christopher S. Sontchi, *Valuation Methodologies: A Judge's View*, 20 AMER. BANKR. INST. LAW REV. 1, 16 (2012).

8 *See id*. at 2, n. 5 (citing *Credit Agricole Corporate & Inv. Bank N.Y. Branch v. Am. Home Mortg. Holdings, Inc. (In re Am. Home Mortg. Holdings, Inc.)*, 637 F.3d 246, 258 (3d Cir. 2011) (affirming bankruptcy court's use of discounted cash flow analysis as reasonable determinant of value); *Bank of N.Y. Trust Co. v. Pacific Lumbar Co. (In re SCOPAC)*, 624 F.3d 274, 286 (5th Cir. 2010) (affirming bankruptcy court's use of discounted cash flow to determine if collateral declined in value); *ASARCO LLC v. Ams. Mining Corp*., 396 B.R. 278, 342–63 (S.D. Tex. 2008) (finding discounted cash flow most reliable and comparable companies approach least reliable for this debtor); *Peltz v. Hatten*, 279 B.R. 710, 728–34 (D. Del. 2002) (describing experts' valuation methods and calculation of variables in fraudulent conveyance action); *In re PTL Holdings LLC,* No. 11- 12676 (BLS), 2011 WL 5509031, at *6–11 (Bankr. D. Del. Nov. 10, 2011) (describing and analyzing valuation of debtor using discounted cash flow, comparable companies and comparable transactions methodologies); *In re Tribune Co.*, No. 08-13141 (KJC), 2011 WL 5142420, at *8–12 (Bankr. D. Del. Oct. 31, 2011) (analyzing experts' valuation of debtor using discounted cash flow, comparable companies methodologies); *In re Chemtura Corp.*, 439 B.R. 561, 572–90 (Bankr. S.D.N.Y. 2010) (discussing and evaluating discounted cash flow, comparable companies,

6. Moreover, when it comes to valuation, their tactics are very sharp. As explained herein, the Debtors: (i) placed Guggenheim's valuation work in a "black box," refusing to publicly disclose anything other than the valuation conclusion; (ii) sapped the market of other pertinent valuation data, such as M&A bidding for the Company; (iii) interfered with market efficiency, sandbagging trading levels, thus disabling the market from reflecting true inherent value; and (iv) refused to allow the Ad Hoc Group discovery into anything related to valuation and pre-petition negotiations with their unsecured bondholders. It is the height of "sword/shield" advocacy to boldly state a fact (insolvency), disable any and all discovery into – or fair trial opportunity (via an Official Committee) to test – the statement's veracity, and then proclaim victory (especially at this early stage) due to the inaccessibility of countervailing evidence.

---

and precedent transaction valuation methodologies); *In re DBSD North Am., Inc.*, 419 B.R. 179, 195–99 (Bankr. S.D.N.Y. 2009), rev'd on other grounds, 634 F.3d 79 (2d Cir. 2011) (scrutinizing inaccuracies in experts' discounted cash flow and trading comparables valuations); *In re Iridium Operating LLC*, 373 B.R. 283, 346–52 (Bankr. S.D.N.Y. 2007) (describing and analyzing solvency and adequacy of capitalization using market analysis while rejecting expert's application of discounted cash flow analysis); *In re Am. Classic Voyages Co.*, 367 B.R. 500, 509–14 (Bankr. D. Del. 2007) (evaluating debtor's solvency in preference action using discounted cash flow method); *In re Nellson Nutraceutical, Inc.*, No. 06-10072 (CSS), 2007 WL 201134, at *22–42 (Bankr. D. Del. Jan. 18, 2007) (inspecting experts' application of discounted cash flow, comparable companies and comparable transactions methodologies); *In re Nellson Nutraceutical, Inc.*, 356 B.R. 364, 370–76 (Bankr. D. Del. 2006) (excluding expert's discounted cash flow valuation evidence); *In re Oneida Ltd.*, 351 B.R. 79, 87–92 (Bankr. S.D.N.Y. 2006) (detailing investment bankers' valuation methods under discounted cash flow, comparable companies and comparable transactions methodologies to determine plan was fair and equitable); *In re Med. Diversified, Inc.*, 346 B.R. 621, 630–42 (Bankr. E.D.N.Y. 2006) (holding expert's valuation of debtor inaccurate and inadmissible for using unreliable variables); *In re Mirant Corp.*, 334 B.R. 800, 815–20 (Bankr. N.D. Tex. 2005) (assessing debtor's value using discounted cash flow and comparable companies methodologies); *In re Heilig-Meyers Co.*, 319 B.R. 447, 458–63 (Bankr. E.D. Va. 2004) (analyzing debtor's solvency in preference action using comparable companies methodology); *In re Coram Healthcare Corp.*, 315 B.R. 321, 337–47 (Bankr. D. Del. 2004) (evaluating debtor's going concern value to determine whether proposed plan was fair and equitable using comparable public company analysis, comparable transactions analysis, and discounted cash flow method); *In re Bush Indus., Inc.*, 315 B.R. 292, 299–303 (Bankr. W.D.N.Y. 2004) (describing and applying three valuation methods to calculate debtor's enterprise value); *In re Exide Techs.*, 303 B.R. 48, 58–66 (Bankr. D. Del. 2003) (discussing discounted cash flow, comparable companies, and comparable transactions); *In re Payless Cashways, Inc.*, 290 B.R. 689, 698–702 (Bankr. W.D. Mo. 2003) (analyzing debtor's solvency in preference action using comparable companies analysis); *In re Joy Recovery Tech. Corp.*, 286 B.R. 54, 77–79 (Bankr. N.D. Ill. 2002) (using comparable companies methodology in fraudulent conveyance action); *In re Lids Corp.*, 281 B.R. 535, 541–45 (Bankr. D. Del. 2002) (applying the three valuation methods in preference action); *In re Zenith Elecs. Corp.*, 241 B.R. at 103–05 (relying on discounted cash flow method to determine whether proposed plan was fair and *equitable*).

7. All that being said, in the paragraphs that follow, we provide a more thoughtful critique of the Debtors' valuation thesis. Using the Debtors' historical "fairness opinions," we deconstruct/critique Guggenheim's "black box" valuation, showing that it likely contains distortions designed to deliver the Company back to the Getty and Koch families. Also, using public data, we show why and how the Debtors' securities do not reflect the "Efficient Market Hypothesis" and, thus, do not reliably reflect the Debtors' true inherent value. We again offer contextual reasons (to be developed via discovery) as to why the bondholders might have agreed to a discounted payout, having nothing to do with the Company's true inherent value. We show, in sum, that there is substantial reason (i) to doubt the Debtors' assertion that equity/warrant holders are "out-of-the-money" and (ii) for healthy skepticism respecting the *bona fides* of the Getty/Koch strategy not to subject their "bid" to post-petition market testing.

8. **Third**, the Objections are wrong as a matter of procedure. This is not supposed to be a substantive "merits" trial, it is not supposed to reach confirmation issues. This contested matter serves only a "gatekeeping" function, hence why it occurs so early on. It comes down to this: Does the Court, after surveying the case (as undeveloped as it is), conclude: (1) there are sufficient reasons warranting an Official Committee to provide the "usual" Chapter 11 safeguards; or (2) is this case so incontrovertibly correct, with everything so obviously tucked into its proper places, that it does not need ***any*** Official Committee? That is the penultimate question because, if the Motion is denied, the case will sail quickly to confirmation, "cramdown" evidence will go unchallenged (as there is insufficient time or opportunity for anyone else to fill the "contrarian" seat), and we will all learn in due course whether this Chapter 11 case was in fact a travesty.

9. Some final observations. We have neither seen nor heard of a sizeable Chapter 11 case (in Delaware or any other venue), intending to effectuate a controversial "cram down" on a

stakeholder class, ***without any Official Committee appointed in the case***. We have neither seen nor heard of a Chapter 11 case (in Delaware or any other venue) where enterprise worth was determined – conclusively, as a practical matter -- only days into the case, based only on a "debt discount" and a survey of securities trading levels, ***without any Official Committee appointed in the case***. And, we have neither seen nor heard of a Chapter 11 case (in Delaware or any other venue), where the "control" stockholder retook the company under a plan, without any sort of market test, leaving a class of stakeholders out in the cold, ***without any Official Committee appointed in the case***. The Objections urge the Court to completely neuter Chapter 11's adversary process, in contravention of a whole lot of law, in compete deference to secretive pre-petition negotiations and the whims of two powerful "control" shareholders.

10. It is an audacious request. It certainly serves the Getty/Koch ambitions, but it does not serve Chapter 11's principles, intentions, or jurisprudence. It is exceedingly dangerous.[9] The Objections should be overruled. The Appointment Motion should be granted.

**<u>STANDING OBJECTION TO DEBTORS' TRIAL EVIDENCE</u>**

11. On November 11, 2026, counsel to the Debtors and the Ad Hoc Group convened for a meet-and-confer as to pre-trial procedure, discovery, and an expedited hearing date. During that meet and confer, the parties agreed to a hearing/briefing schedule, the scope of trial evidence, and discovery leading to the hearing date. Respecting evidence and discovery, the parties specifically agreed that: (i) no expert opinion testimony would be adduced at trial; (ii) as a result, no expert reports would need to be prepared and served in discovery; (iii) "public" data respecting enterprise worth was fair game; and (iv) the Debtors could call a witness respecting pre-petition

[9] This is, after all, Delaware. And, this is, after all, the Getty Images case. What happens next will be widely observed, and will have larger normative/cultural implications.

negotiations and other "process" points, subject to usual discovery. The Ad Hoc Committee aligned its pre-trial preparations in accordance with this agreement, serving requests for document production and deposition notices on November 13, 2026, including a notice per Rule 30(b)(6).

12. The Debtors did not honor the agreement. Despite repeated requests (during subsequent meet-and-confers), the Debtors staunchly refused to identify their witness, explain the scope of testimony, and provide documents pertaining to that testimony. The Debtors' position was, bluntly (and repeatedly) stated: the Ad Hoc Group will find out "who and what" when the Debtors file their Objection. And it did, when the Debtors filed the Preiss Declaration. The Preiss Declaration is a classic "rebuttal" expert opinion, delving into valuation matters, in clear disregard for the November 11th agreement. The Debtors did not provide an expert report prior to filing the Preiss Declaration and they refused to provide document discovery pertaining to the matters discussed therein. Moreover, while their case appears to rest in substantial part on the "independence" of the Special Committee, they have refused to produce any document discovery regarding any valuation evidence shared with the Special Committee so they could fairly evaluate the plan and the RSA. Document production seems to be incomplete as of the date of this Reply.

13. This is classic "sword/shield" tactics, which seems to be (discussed more below) a general theme of their case strategy.[10] The Ad Hoc Group will further attempt to engage with Debtors' counsel towards an appropriate trial presentation. But, given the nature of interaction to

[10] *See, e.g., In re George W. Myers Co.*, 412 F.2d 785, 786 (3d Cir. 1969) (finding that party which did not have chance to rebut evidence offered against it was "denied procedural due process"); *In re Leap Wireless Int'l, Inc.*, 301 B.R. 80, 84-85 (Bankr. S.D. Cal. 2003) (striking expert report and testimony of debtors' valuation expert because objecting shareholder had been denied "the right to cross-examine [the witness] concerning his entire methodology."); *Regeneron Pharm., Inc. v. Merus*, 2015 WL 10792010 (S.D.N.Y. Aug. 6, 2015) ("A long-standing legal principle based on fairness prevents the selective disclosure of evidence as a sword while using [a] shield … to prevent testing of those assertions. [A] sword/shield issue inject[s] a serious fairness concern into [a] trial at the very outset.").

date, the Ad Hoc Group finds itself compelled to assert a standing objection to the Debtors' evidence, which can be further addressed at hearing commencement.

## <u>REPLY TO THE OBJECTIONS</u>

### I. The Objections Should Be Overruled Because "Unfair Discrimination" Alone Is Sufficient Reason For The Appointment Of An Official Equity Committee.

14. The Objections offer two arguments as to why the Debtors' plan strategy does not give rise to serious "unfair discrimination" concerns. They argue, **<u>first</u>**, that the Getty's/Koch's exclusive right to "repurchase" 100% of the reorganized Company's stock is not a distribution "on account of" their stock ownership. They argue, **<u>second</u>**, that the board's "Special Committee" has a "fiduciary out" and that is, unto itself, a serviceable proxy/replacement for an appropriate M&A market test. These are weak arguments.

15. Respecting the "on account of" argument, the Supreme Court conclusively put that to bed in *203 North LaSalle*. There, the Court held that the right to buy a reorganized debtor is "property in its own right."[11] More to the point, the Court also held that such repurchase right, when bestowed on a "control" stockholder, is a plan distribution "on account of" the holder's stock position:

> If the price to be paid for the equity interest is the best obtainable, old equity does not need the protection of exclusiveness . . .; if it is not the best, there is no apparent reason for giving old equity a bargain. There is no reason, that is, unless the very purpose of the transaction is, at least in part, to do old equity a favor. And that, of course, is to say that old equity would obtain its opportunity, and the resulting benefit, ***because of*** old equity's prior interest within the meaning of [11 U.S.C. § 1129(b)(2)(B)(ii)].[12]

---

[11] *203 N. LaSalle St. P'ship*, 526 U.S. at 455; *see In re Global Ocean Carriers Ltd.*, 251 B.R. 31, 48-49 (Bankr. D. Del. 2000) (where prior ownership or control enables an insider to determine who receives the new equity and at what price; that exclusive opportunity is itself property received "on account of" the prior equity position).

[12] *Id*. at 456 (emphasis added).

16. Jurisprudence following *203 North LaSalle* is in complete accord.[13] The Debtors point to *In re Zenith Electronics Corp.*,[14] but this opinion does not help their case. There, the court allowed a "control" stakeholder to repurchase 100% of the reorganized company's stock, but only after the debtor ran a genuine, arm's-length M&A process, thereby allowing the market (and not closeted negotiations) to establish the price.[15]

17. Respecting the contention that the Special Committee's "fiduciary out" is a functional proxy/replacement for an M&A market test, one searches in vain to find ***any*** authority supporting that proposition. It does not exist in the statute, in *203 North LaSalle*, or in any opinions issued in the 26+ years since *203 North LaSalle*. That is because it does not make any sense. The entire thrust of the Supreme Court's ruling is that, if a plan is going to give the "control" stockholder an exclusive right to repurchase the company, the price must be: (i) set away from and independent of the debtor; and (ii) by a genuine, arm's-length M&A process, crafted to ferret out honest bidding. A Special Committee's "fiduciary out" is neither away from/independent of the debtor nor based on a genuine, arm's-length M&A process. It is and remains easily sandbagged, which is what, incidentally, the Ad Hoc Group resolutely believes is happening here.

---

[13] *See ConvergeOne Holdings, Inc. v. Ad Hoc Group of Excluded Lenders*, 678 B.R. 879 (S.D. Tex. 2025) (extending *LaSalle's* market-test mandate to reject a prepackaged plan which offered an exclusive backstopping and equity-purchase opportunity to a subset of creditors within a class — while excluding other members of the same class); *In re Global Ocean Carriers Ltd.*, 251 B.R. at 49 (controlling family's "exclusive" right to determine who would own the reorganized company, and at what price, had to be "subject[ed] . . . to the market place test," and limited shopping to a single unrelated party was insufficient); *In re Mangia Pizza Invs., LP*, 480 B.R. 669 (Bankr. W.D. Tex. 2012) (new value exception "is not merely a mechanism for existing equity holders to buy back, at bargain prices, their ownership interest in the reorganized debtor," and an insider's exclusive opportunity to contribute new value and retain equity, while a same-rank holder was denied it, is unfair discrimination).

[14] 241 B.R. 92 (Bankr. D. Del. 1999).

[15] *Id.* at 97.

## II. The Objections Should Be Overruled Because Their "Insolvency" Contentions Are Flimsy And There Is Ample Need For An Official Equity Committee To Probe Deeper.

### A. Understanding The Applicable Standard.

18. In the Appointment Motion, the Ad Hoc Group cites various elements courts have used in this kind of contested matter. One of those elements is "solvency." The Appointment Motion cites to cases describing that element as "hopeless insolvency," that is, does the debtor appear to be so deep in the red that stockholders do not have a prayer's chance. The Objections take issue with that description, recasting that element as a "substantial likelihood that [equity] will receive a meaningful distribution." In advancing this "standards" debate, the Objections advocate "a game of inches," to wit: the Ad Hoc Group cannot win if enterprise value hovers around the solvency breakpoint; the Ad Hoc Group can only win if value hovers well north of the breakpoint. That is not our jurisprudence, not in letter, not in spirit.

19. As a preliminary matter, the highest court in this venue to address the issue (the Delaware District Court) used "hopeless insolvency" as its yardstick.[16] *Exide* was an appeal of the Bankruptcy Court's decision appointing an Official Equity Committee. In affirming Judge Carey's decision, the District Court referenced "substantial likelihood," but then quickly segued to (and tailored its ruling in accordance with) the "helpless insolvency" articulation:

> If a debtor appears to be "hopelessly insolvent," the appointment of an official equity committee is generally regarded as unjustified. If a debtor does not appear to be "hopelessly insolvent," courts consider the following additional factors in determining whether the equity holders are adequately represented without the appointment of an official committee:
>
> - Whether the shares are widely held and publicly traded;
> - The size and complexity of the Chapter 11 case; and
> - The timing of the motion relative to the status of the Chapter 11 case.[17]

---

[16] *See Exide Techs. v. State of Wis. Inv. Bd.*, No. 02-1572, 2002 WL 32332000 (D. Del. Dec. 23, 2002).

[17] *Id.* at *1-2.

20. Regardless, this whole debate over "standards" misses the big picture. The applicable jurisprudence advances ***elements/factors*** – that is, "guideposts," not mechanical "tests" – keenly aware that this contested matter is at bankruptcy's beginning, before discovery can take place and the record has developed. The case law does not view this contested matter as a hard-play "game of inches," as advocated in the Objections. Quite the contrary.[18]

21. *Oneida* is a case in point.[19] There, the "control" stockholders (lenders that had, pre-petition, converted a portion of their debt into 62% of the stock) dominated the company's board.[20] The company filed for bankruptcy with a pre-packaged plan in hand, advancing quickly to confirmation. That plan: (i) converted the lenders' residual debt into 100% of the reorganized company's equity; (ii) paid all unsecured claims in full; and (iii) distributed nothing to minority shareholders.[21] The United States Trustee appointed an Official Creditors Committee and, as might be expected, the Creditors Committee immediately lent its support for the plan. An ad hoc group of minority equity holders asked the United Trustee to also appoint an Official Equity Committee, which request was denied. They brought their request to the Bankruptcy Court, where all the other stakeholders lined up in opposition.

22. The Court granted the appointment motion. Judge Gropper observed that: (i) it was "unrealistic" to presume that the lender-dominated board would protect the interests of minority shareholders; (ii) given the plan's payoff provisions, the Official Creditors Committee was "the

18 *See, e.g., In re SunEdison, Inc.*, 556 B.R. at 103 ("On the issue of solvency, a court need not conduct an exhaustive valuation; rather, the relevant inquiry is whether a debtor *appears to be* hopelessly insolvent."); *In re Celsius Network LLC*, 645 B.R. 165, 174 (Bankr. S.D.N.Y. 2022) (the standard for appointment of an equity committee is whether "it appears that a debtor is hopelessly insolvent"); *In re Wang Lab'ys, Inc.*, 149 B.R. 1, 3 (Bankr. D. Mass. 1992) (determining that equity committee is necessary based on finding that debtor "is not *hopelessly* insolvent").

19 2006 WL 1288576.

20 *Id*. at *1-2.

21 *Id*.

least likely party in interest to challenge the status quo"[22]; and (iii) no other representative would have the capacity to investigate and test the debtor's case theory, that is, to serve as an effective case counterbalance. Under these circumstances, the case lacked the "checks and balances present in most cases,"[23] warranting appointment of an Official Equity Committee.

23. Importantly, the Court did not engage in anything like the "game of inches" advocated in the Objections. The Court referenced an "extensive and conflicting" evidentiary record respecting enterprise value. The Court, however, declined to weigh any of that evidence, reasoning that "any such determination would run the risk of prejudicing one party or another because the very same issues will come before the Court shortly at a confirmation hearing."[24]

24. The *Oneida* fact pattern is remarkably similar to the one presented here. Implicit to the *Oneida* ruling was recognition that Chapter 11 is, at is core, an "adversary process," that is, a judicial system reliant on point-counterpoint dialectic in the Courtroom setting – or, to use Judge Gropper's phrasing, systemic "checks and balances" – to enable the Court to ultimately render a reliable and principled outcome. Stated inversely (and by analogy), Chapter 11 does not allow "foxes guarding henhouses" to go unwatched, even where the foxes make promises of good citizenship (as the Gettys/Kochs are, essentially, doing in the Debtors' Objection).

**B. The Solvency Breakpoint.**

25. In the Appointment Motion, the Ad Hoc Group posited that the solvency breakpoint is less than $1.46 billion, that is, the point at which the unsecured noteholders (which have agreed to compromise their debt) are paid in full. The Objections take issue with that, contending that the solvency breakpoint is considerably higher, adding: (1) all anticipated DIP Loan borrowings (about

[22] *Id.* at *3.

[23] *Id.* at *2.

[24] *Id.* at *2.

$113 million); (2) a purported "make-whole" on certain of the funded debt (about $50 million); and (3) the book amount of general unsecured claims (about $231.5 million). In some respects, they make a good point. In other respects, not so much. We take each in turn.

26. **Anticipated DIP Loan Borrowings**. Here, they make a good point. The breakpoint should be increased to reflect the anticipated amount of DIP Loan draws. We should add $113 million.

27. But then, to be fair, we should also subtract from the breakpoint the $100 million discount the unsecured noteholders negotiated for themselves in the plan. After all, the terms of the Restructuring Support Agreement (signed by 83.5% of the noteholders) binds them to the deal, regardless of any settlement of warrant claims (and, by dint of Section 1123(a)(4), the minority equity), so long as the noteholders' plan treatment and economic recovery are not affected.[25]

28. The breakpoint should, thus, move from $1.46 billion to $1.473 billion.

29. **The "Make-Whole" Amount**. Admittedly, we have not had sufficient time to review the applicable debt documents, develop a view as to whether any incremental "make-whole" claims are triggered, or whether they are allowable in this bankruptcy case.[26] To be conservative, we will add the $50 million "make-whole" amount, but subject to further analysis. For discussion purposes, we will move the breakpoint up to $1.523 billion.

30. **General Unsecured Claims**. This is where the big movement – a $231.5 million jump -- is supposed to happen. A bit of trickery is afoot here. This amount should not be added.

---

[25] Restructuring Support Agreement [Docket No. 29-1] (the "**RSA**") § 4.01(a)(vi).

[26] *See, e.g., Delaware Trust Co. v. Energy Future Intermediate Holding Co. LLC (In re Energy Future Holdings Corp.)*, 842 F.3d 247 (3d Cir. 2016) (focusing on the words in the document to ascertain whether the "make whole" was, in fact, triggered in the bankruptcy case).

31. Getty Images is, unlike so many Chapter 11 debtors, a cashflow positive company, generating around $300 million in EBITDA per year. EBITDA is gross revenue minus operating costs.[27] Here, operating costs include general trade debt; indeed, that is why the Debtors requested and received authorization to pay such claims in the ordinary course at the "first day" hearing.[28] It also why the DIP Loan budget includes line-item allowances to pay such expenses in the ordinary course, until the receivables come in.[29]

32. The foundation of any company's valuation is its anticipated "unlevered free cash flow," that is, earnings after paying operating expenses like these.[30] By pulling expenses paid in the ordinary course and then adding them back to the breakpoint – especially after they are already accounted for in DIP Loan draws added to the breakpoint – the Objectors are "double counting" the expense load. They are also manipulating a valuation concept that Professor Jack Williams calls the "premise of value," that is, looking at the debt load as if the Company is in liquidation (i.e., not satisfying operating expenses in the ordinary course), instead of reorganizing under a plan.[31]

---

[27] *See* Peter V. Pantaleo & Barry W. Ridings, *Reorganization Value*, 51 BUS. LAW. 419, 422 n. 12 (1996).

[28] *Final Order (I) Authorizing Payment of all Trade Claims in the Ordinary Course of Business, (II) Confirming the Administrative Expense Priority of Outstanding Orders, and (III) Granting Related Relief* [Docket No. 171].

[29] *Interim Order (I) Authorizing the Debtors to Use Cash Collateral and Obtain Postpetition Financing; (II) Granting Liens and Superpriority Administrative Expense Claims; (III) Providing Adequate Protection; (IV) Modifying the Automatic Stay; (V) Scheduling a Final Hearing; and (VI) Granting Related Relief* [Docket No. 124] at Ex. 1.

[30] *Merion Capital, L.P. v. 3M Cogent, Inc.*, 2013 WL 3793896, at *12-14 (Del Ch. 2013) (finding that, alongside other categories of operating current assets and liabilities, accounts payable and accrued expenses are captured in working capital adjustments, which directly feed into the calculation of unlevered free cash flows); *Cede & Co. and Cinerama, Inc., v. Technicolor, Inc.*, 2003 WL 25579991 at *20 (Del. Ch. 2003) ("The DCF model calculates enterprise value based on free cash flow…Therefore, it is vitally important to account for working capital requirements…in determining the free cash flow that will be discounted back to present value.")

[31] *See* Jack F. Williams, *Teaching Bankruptcy Valuations to Law Students and Other Unnatural Acts*, 39 EMORY DEV. J. 51, 83-85 (2023); *see also* Stan Bernstein, Susan H. Seabury, & Jack F. Williams, *Squaring Bankruptcy Valuations with Daubert Demands*, 16 AM. BANKR. INST. L. REV. 161, 174 (2008) ("Generally, the expert must determine the value of the debtor's assets and amount of liabilities using a going concern measure unless it is

33. Seemingly aware of the weakness in their breakpoint argument, the Debtors add (at ¶ 51) a sort of throwaway "catchall" argument, to wit: Whatever the enterprise value is, it must be because the Gettys/Kochs are putting in $533 million or, stated in the inverse, the enterprise value automatically deflates well below the hurdle simply because it is deprived of that cash infusion.[32] That is utter nonsense. Not a single bankruptcy case – in the entire history of jurisprudence respecting bankruptcy valuation (starting with *Consolidated Rock*) – has ever held that the debtor's valuation must be right simply because the debtor has constructed a plan that "makes" it right. If that was the test, any debtor could construct a plan and avail itself of any self-proclaimed valuation (even if obviously sandbagged) so long as it is feasible under Section 1129(a)(11). Finance theory and bankruptcy law are far smarter than that.

C. **<u>The Debtors Place Their Valuation In a "Black Box."</u>**

34. It used to be that, when a debtor filed a plan and sought approval of its attendant disclosure statement, the debtor publicized more than just the banker's valuation conclusion. It also publicized the banker's methodologies, assumptions, and math building up to that conclusion. This was seen as part of the disclosure obligation, including in this circuit.[33] When it comes to

more likely than not that the business is a failed concern, and, thus, a liquidation measure may be more appropriate.").

[32] Debtors' Objection ¶ 51 ("That figure measures a recapitalized enterprise after $533 million of new consideration goes in. It says nothing about whether value existed for old equity before that consideration arrived.").

[33] *See, e.g., Oneida Motor Freight, Inc. v. United Jersey Bank (In re Oneida Motor Freight)*, 848 F.2d 414, 417 (3d Cir. 1988) ("The importance of full disclosure is underlaid by the reliance placed upon the disclosure statement by the creditors and the court. Given this reliance, we cannot overemphasize the debtor's obligation to provide sufficient data to satisfy the Code standard of 'adequate information.'"); *see also In re Cardinal Congregate I*, 121 B.R. 760, 764-65 (Bankr. S.D. Ohio 1990) (providing non-exhaustive list of information courts may require in a disclosure statement, including the "accounting and valuation methods used" and "[a]ny financial information, valuations, or *pro forma* projections that would be relevant to creditors' determinations of whether to accept or reject the plan."); *In re Zenith Elecs. Corp.*, 241 B.R. at 99 (finding disclosure statement to fulfill adequate information requirement where it provided "valuation information and a liquidation analysis" on top of "numerous financial statements" and where "significant documents and information" had additionally been provided to creditors).

bankruptcies where valuation is at issue, academics are particularly critical of debtors who publicize only their valuation conclusion, secreting the underlying buildup in a "black box."[34]

35. That is precisely what the Debtors have done here. The valuation attached to the Debtors' Disclosure Statement provides little beyond Guggenheim's conclusion, to wit: enterprise value is between $1.3 to $1.5 billion, with a midpoint at $1.4 billion. We are told that Guggenheim performed "comparable companies" and "comparable transactions" analyses, but the Debtors do not disclose any of the comparables selected and, so, no one can assess whether those "comps" are or are not apt.[35] We are also told that Guggenheim conducted a discounted-cash-flow analysis, but the Debtors do not disclose any of its component parts, such as how Guggenheim calculated the discount rate (i.e., the "WACC") or the terminal value.[36]

36. On this score, a lesson might be learned from Judge Sontchi's opinion in *Nellson Neutraceutical*. There, the Court denied plan confirmation because the debtor's owner "utilized its control . . . to manipulate both the business planning and valuation processes to come up with an artificially inflated enterprise value in order to claim some residual value for [its] existing equity position."[37] This valuation opinion dovetails with Judge Carey's in *Exide*, where the Court

---

[34] *See, e.g.*, Diane Lourds Dick, *Valuation in Chapter 11 Bankruptcy: The Dangers of an Implicit Market Test*, 4 UNIV. ILL. L. REV. 1487, 1491 (1987) ("The problem is that the bankruptcy courts that regularly hear large Chapter 11 cases increasingly allow commercial debtors to submit financial disclosures that are riddled with disclaimers, and they almost always discourage parties from pursuing expensive valuation battles in court. Instead, they trust that if the debtor's estimates are so out of sync with economic realities, then private negotiations and market mechanisms will produce a plan that ultimately rests upon more accurate value estimations. Not every party in interest, however, is invited to the negotiation table, and not every party to the negotiation has an incentive to dispute the debtor's estimates. *And, at least for some stakeholders, this process of "negotiation" is really a process of litigation, with debtors assuming defensive postures to resist information sharing. When courts blind themselves to these realities and assume that the lack of viable challenges to a proposed plan means that the financial markets agree with the debtor's valuation estimates, they readily dismiss stakeholders who attempt to defend their interests, at times even treating them as scourges upon the legal process.*" (emphasis added)).

[35] *See In re Nellson Nutraceutical, Inc.*, 2007 WL 201134, at *19 (Bankr. D. Del. Jan. 18, 2007) (rejecting a valuation built on an inapt comparable set and manipulated inputs).

[36] *Id*. (excluding valuation testimony on Daubert grounds where the expert had manipulated the terminal value).

[37] *Id.* at *19.

acknowledged research by Professor Edith Hotchkiss revealing that debtors tend to skew valuations to achieve a particular case outcome.[38]

37. Here we find the precise reason why the Objections press the "standards" debate and the "hurdle" calculation so hard. Both the Guggenheim valuation and the plan's implied valuation hover close to the solvency breakpoint. So, they go legal, trying to use attorney arguments to deflect attention from the "black box." But, getting into the "black box" is precisely what the law would now have us do. Especially since they will not subject the Getty/Koch bid to a fair M&A test and, thus, they will have to prove-up their valuation thesis at the confirmation hearing.

38. One strives in vain to find a single opinion denying appointment of an Official Equity Committee under a fact pattern exonerating this kind of "sword/shield" gamesmanship.

**D. Simply Waving Away Inconvenient Valuation Data <u>As "Old And Stale" Only Begs The Issue More Forcefully.</u>**

39. Let's revisit the SEC record. Less than two years ago, in connection with the Shutterstock merger, the Debtors' investment banker (J.P. Morgan) provided a "fairness opinion" estimating the Debtors' value on a stand-alone basis at $2.32-$2.98 billion (a 7.6x-9.8x multiple of adjusted EBITDA), for an implied equity value of $1.272 billion.[39] Earlier than that, in connection with the SPAC transaction, the Debtors' investment banker (Solomon Partners)

[38] *See also In re Exide Techs.*, 303 B.R. at 61-64 (crediting Professor Hotchkiss's research that debtors' valuations are skewed to serve parochial stakeholder agendas, and rejecting the debtor's market-driven valuation in favor of an analysis of future cash flows).

[39] 2025 Proxy at 59 (adjusted EBITDA), 62-72, Annex C. The Debtors cannot now distance themselves from this opinion: 17 C.F.R. § 240.14a-9 (2026) prohibits any false or misleading statements or omissions of material facts in proxy solicitations, including proxy statements, forms of proxy, notices of meetings, and related communications. Statements of opinion in a merger proxy including fairness/value conclusions can be actionable where they mislead stockholders about the underlying subject matter (i.e., they imply a factual basis that is absent or are inconsistent with what the speaker knows). *See Virginia Bankshares, Inc. v. Sandberg,* 501 U.S. 1083, 1092–96 (1991).

provided a "fairness opinion" and, in that opinion (but unlike the Shutterstock opinion), the banker provided a list of "comparable companies." In the Appointment Motion, the Ad Hoc Group used that list of comparable companies and updated the financial metrics, leading to an enterprise value of $3.276 billion based on expected 2026 EBITDA.[40]

40. The Debtors reject all that. They say it is all old and stale.

41. **First**, they do not like any valuation based on the Solomon Partners list of comparable companies, essentially saying that only Shutterstock is a serviceable "comp."[41] This is very telling. It is highly inappropriate to use a list of "comparable companies" comprised of only one company.[42] And, Shutterstock is a rather bizarre "comp" for the Debtors to champion this way. From 2022 through 2024, Shutterstock grew through acquisitions (the Debtors did not) even as it suffered a severe ***decline*** in like-for-like revenue, while the Debtors grew revenue and kept EBITDA "remarkably steady in the $300-$321 million range." These companies have very different performance profiles.

---

[40] Appointment Motion ¶¶ 30-31.

[41] Debtors' Objection ¶ 45 ("Using the Motion's own figures, Shutterstock's current 2.4x multiple would imply an enterprise value for Getty Images of about $737 million, roughly half the Company's funded debt.").

[42] *See Andaloro v. PFPC Worldwide, Inc.*, No. CIVA 20289, 2005 WL 2045640, at *16 n.66 (Del. Ch. Aug. 19, 2005) (finding "single data point comparable transactions analysis unreasonable" because, among other reasons, it was "based on only one comparable transaction"); *In re Cellular Tel. P'ship Litig.*, No. 6885-VCL, 2022 WL 698112, at *32 (Del. Ch. Mar. 9, 2022) (rejecting comparable companies analysis where only one comparable company was available because relying exclusively on such "produces an outlier result").




42. And that is presumptively why ***the Debtors terminated their merger with Shutterstock, i.e., because they do not think it is, in fact, a quality company that makes for a good merger candidate***. Makes sense, see the chart above. The Debtors' implicit retort ("that may be true, but it is still a good, exclusive comp") raises a host of issues and reason for ample skepticism, all in the *Nellson Neutraceutical* vein.

43. **<u>Second</u>**, the Debtors whisk away J.P. Morgan's DCF valuation. They contend that the market has "changed considerably" since the projections they created for their Shutterstock merger and filed with the SEC.[43] But, that is not the stated reason for this bankruptcy. The Company seems to be operating just fine. It was a liquidity crisis caused by runaway warrant litigation.

44. Mr. Preiss focuses on the cash flow projections, observing that they are approximately 15% lower than projections used by J.P. Morgan opinion.[44] But, we can adjust for that. 85% of the J.P. Morgan valuation range of $2.32 billion to $2.980 billion adjusts to a range

---

[43] Debtors' Objection ¶ 47.

[44] Preiss Decl. ¶ 26.

of $1.972 billion to $2.533 billion – still a very large value proposition for old equity.[45] Or if we want to be more scientific, we can put the updated projections in the J.P. Morgan model, which in fact reaches nearly the same result J.P. Morgan originally reached.

| | 2027E | 2028E | 2029E | 2030E | 2031E | Terminal Value |
|---|---|---|---|---|---|---|
| Total Revenue | $ 910.6 | $ 929.1 | $ 945.7 | $ 971.3 | $ 987.7 | |
| Less: COGS | (264.9) | (270.7) | (275.9) | (283.6) | (289.1) | |
| Gross Profit | 645.7 | 658.4 | 669.8 | 687.7 | 698.6 | |
| Less: SG&A | (354.7) | (365.5) | (373.1) | (388.9) | (400.7) | |
| Adjusted EBITDA | 291.0 | 292.9 | 296.7 | 298.8 | 297.9 | |
| Less: CapEx | (53.8) | (54.5) | (56.5) | (58.3) | (60.1) | |
| Less: One-Time Items | (18.5) | - | - | - | - | |
| Less: Increase/Plus: Decrease in WC | (2.1) | (2.3) | 5.4 | 7.5 | 2.3 | |
| Less: Cash Taxes | (35.9) | (40.5) | (44.9) | (46.6) | (46.5) | |
| FCF Before Debt Service | $ 180.7 | $ 195.6 | $ 200.7 | $ 201.4 | $ 193.6 | $ 199.4 |
| Terminal Value | | | | | | $ 2,848.7 |
| | | | | | | |
| Mid-Year Convention | 0.5 | 1.5 | 2.5 | 3.5 | 4.5 | 4.5 |
| Discount Factor @WACC of 10.% | 0.9535 | 0.8668 | 0.7880 | 0.7164 | 0.6512 | 0.6512 |
| PV of Cash Flows Before Debt Service | $ 172 | $ 170 | $ 158 | $ 144 | $ 126 | $ 1,855 |

| | |
|---|---|
| Sum of Discounted Cash Flows | $ 770 |
| PV of Terminal Value | 1,855 |
| **Total Enterprise Value** | **$ 2,625** |
| Plus: Pre-Petition Cash | - |
| Less: Pre-Petition Debt | (1,456) |
| **Equity Value** | **$ 1,169** |

| Sensitivity Table | | | | |
|---|---|---|---|---|
| | | WACC Sensitivity | | |
| | | 9.50% | 10.00% | 10.50% |
| PGR Sensitivity | 2.5% | $ 2,663 | $ 2,493 | $ 2,345 |
| | 3.0% | $ 2,818 | $ 2,625 | $ 2,459 |
| | 3.5% | $ 2,999 | $ 2,778 | $ 2,589 |

45. It bears repeating, J.P. Morgan's work was distributed to all public company shareholders, pursuant to a Form S-4, and filed with the SEC. Extreme legal consequences flow from a manipulated SEC filing. Not so much in Chapter 11. Here, the Debtors can handwave away their filings with a simple, *ipse dixit*, "changed market conditions" and no one goes to jail. But, it behooves the Court to recognize that that is precisely what the Debtors/Guggenheim are doing at this precise moment. They do it without substantive explanation and without allowing anyone to see what is in the "black box." An Official Equity Committee is very much needed here.

45 *See* 2025 Proxy at 65.

### E. <u>But, What About Those Trading Prices?</u>

46. Disregard all of the paragraphs above, say the Objections. The securities are trading in the basement and ***that*** is clear, convincing, conclusive evidence that equity and warrant holders are out of the money. Not so much.

47. Our jurisprudence does not, and has never, looked at securities trading levels to ascertain the true inherent value of a reorganizing company.[46] Indeed, despite a very large body of case law considering bankruptcy valuation, there is not one case (at least not one we are aware of) where the debtor's valuation was ascertained by reference to securities trading levels. We are, by contrast, aware of considerable authority indicating that that would be a very incorrect way to address the issue.[47]

48. That is not to say that a company's market capitalization can ***never*** be a fair reflection of its true inherent value. It can, and that is the so-called "Efficient Market Hypothesis," to wit: If we put all pertinent information about a company into the public domain, if there are no barriers to entry for investors, if there is no manipulation or other frictions/static artificially interfering with free-market activity, the market price of the company's securities should reflect its true inherent value.[48]

---

[46] *See* Appointment Motion, *passim*; see also note 8 (each and every case cited in that note).

[47] *See Consol. Rock Prods. Co. v. Du Bois,* 312 U.S. 510, 526 (1941) ("'[T]he commercial value of property consists in the expectation of income from it.' . . . The criterion of earning capacity is the essential one if the enterprise is to be freed from the heavy hand of past errors, miscalculations or disaster, and if the allocation of securities among the various claimants is to be fair and equitable.") (quoting *Galveston, Harrisburg & San Antonio Ry. Co. v. Texas,* 210 U.S. 217, 226 (1908)); *Protective Comm. for Indep. S'holders of TMT Trailer Ferry, Inc. v. Anderson,* 390 U.S. 414, 441–42 (1968) (quoting same and holding that valuation based on future earnings capacity was necessary to determine fairness of creditor settlement); *In re Spansion, Inc*., 426 B.R. at 130 (holding that value must be determined by expert opinion, and not by the trading price of claims); *In re Mirant Corp.,* 334 B.R. at 832-833 (what creditors are willing to accept on account of their claims is not "a credible test of value of Mirant Group or its securities postconfirmation"); *In re Exide Techs*., 303 B.R. at 66 (noting that it is inappropriate to value securities of a reorganized debtor based on market value, as the bankruptcy process will cause the market to undervalue both the debtors' securities and future earning capacity).

[48] *See* Eugene F. Fama, *Efficient Capital Markets: A Review of Theory and Empirical Work,* 25 J. FIN. 383 (1970).

49. But, financial distress and Chapter 11 are definitionally not "efficient market" situations. The company, invariably, withholds from the public critical information about its present circumstance, engages in secret negotiations with stakeholders, and pursues strategies far outside the ordinary course of business. Stakeholders also take on new strategic imperatives, are manipulative/opportunistic/predatory, and they otherwise inject frictions/static that also eradicate any notion of market efficiency.[49] This is especially so, post-petition, where the Chapter 11 apparatus takes hold, and the Court is now in charge of the Company's fate.

50. There is absolutely no reason to conclude that the Debtors' securities are now trading, or have (in the recent past) traded, at a level reflecting true inherent value. The Debtors offer a chart showing trading values going back to October 2025. October 2025 was, incidentally, only weeks following the first judgement against the Debtors for breaching their warrant obligations.[50] At no time thereafter did anyone know the extent of the Company's warrant liability, and the claims/judgments kept rolling in. Then came administrative interference in the Shutterstock merger, followed by the Debtors' decision to terminate that transaction, followed by another massive warrant judgment, followed by the commencement of secretive creditor negotiations. And, at all times, the market was keenly aware that the Company's fate rested entirely in the hands of the Getty and Koch families. As the Supreme Court famously said in *Basic*

[49] *See Cammer v. Bloom*, 711 F. Supp. 1264, 1285-87 (D.N.J. 1989) (establishing the following five factors to determine whether a security trades in an efficient market: (1) the average weekly trading volume of the stock; (2) the number of securities analysts following the stock; (3) the extent to which market makers and arbitrageurs traded in the stock; (4) the issuers eligibility to file an SEC registration Form S-3; and (5) the demonstrations of a cause-and-effect relationship between unexpected, material disclosures and changes to the stock's prices).

[50] *Declaration of Craig Peters, Chief Executive Officer of Getty Images Holdings, Inc. and its Debtor Subsidiaries, in Support of the Debtors' Chapter 11 Petitions* [Docket No. 29] at ¶ 76; *see Berner v. Getty Images Holdings, Inc.*, 794 F. Supp. 3d 189 (S.D.N.Y. 2025).

*v. Levinson*, "who would knowingly roll the dice in a crooked crap game?"[51] That was, and still is, exactly what investment in Getty Images appears to be.




51. The Debtors further claim that their trading prices are such that if the Gettys/Kochs wanted to "repurchase" the rest of the Company's shares, it would only cost them about $2 million outside of bankruptcy, so "no rational economic actor" would do what they have done here.[52] This, too, is wrong. The Gettys/Kochs are buying far more than the remaining shares of the Company: they are getting a Company free and clear of the existing warrant judgment and of future warrant litigation (which the Company believes could be worth over $275 million[53]), and they are getting broad releases from all estate claims. The extraordinary power of Chapter 11 is what makes their recovery possible – yet they refuse to subject themselves to the adversary process that makes it function.

51 485 U.S. 224, 247 (1988).

52 Debtors' Objection ¶ 10.

53 Peters Decl. ¶ 80.

### F. What About the Noteholders' Agreed "Debt Discount" Settlement?

52. Here too, almost nothing is disclosed. But, the circumstances of those pre-bankruptcy negotiations seem to have a penumbra. This is a Getty/Koch company, pure and simple. The Gettys and the Kochs are unafraid to take very aggressive positions against their stakeholders, as the warrant litigation made abundantly clear. After terminating the Shutterstock merger (without explanation), the Company was in turmoil (well known in the marketplace) and its liquidity position was deteriorating (also well known in the marketplace).

53. One can easily envision the Gettys/Kochs, in those pre-petition negotiations, adopting a strong "cramdown" posture against unsecured noteholders, threatening that they will end up with minority shares in a privatized company, i.e., one that "goes dark," without any capacity to liquidate their position in the open market (or, if they could sell, the stock would be burdened by large "control discount"). Here, it is worth observing that the unsecured bonds represent a rather small percentage of the Company's debt load. Those noteholders would need to write a very large check to pay for and/or otherwise avoid an adverse litigation outcome. And, all of that is before we explore whether any of those holders are funds of a kind (like "CLO" funds) that have investment guidelines prohibiting stock investments.

54. Moreover, we know (from Akin Gump's 2019 Statement)[54] that certain members of the firm's client base owned a near-blocking position in the Debtors' secured debt. One can also envision differences in incentives/opinions infecting those pre-bankruptcy discussions, driving to a settlement that enabled the RSA but does not reflect the Company's true inherent value.

---

[54] *Verified Statement of the Unsecured Noteholders Ad Hoc Committee Pursuant to Bankruptcy Rule 2019* [Docket No. 132].

55. Again, we are not aware of a single opinion where the debtor's enterprise value as determined by reference to a creditor's "debt discount," and certainly not at this early stage of the proceeding. Given the ambiguity around this situation, and the pervasive "sword/shield" theme of this entire bankruptcy, it is only appropriate that discovery be allowed to proceed and a record given a chance to develop by an Official Equity Committee.

## III. An Equity Committee is Necessary to Preserve the Integrity of the Adversary Process.

56. The upshot of all of this is that the question of Company's value cannot be resolved without a market test or its adversarial equivalent. If the Company were genuinely exposed to the market – if the Getty and Koch families confirmed they would sell to the highest bidder – equity would live with the result. The Debtors did not run that process before filing, and they will not run it now.

57. The legality of stakeholder recoveries must be proven at confirmation. If the Objection is sustained and no Official Equity Committee is appointed, the game is over. The Debtors will present valuation evidence to the Court with no party incentivized or resourced to present the countervailing narrative and evidence. The Court would then be left to test the outcome through its own *sua sponte* questioning and scrutiny, supplying on its own the check that an adversary process would otherwise provide.

58. The Debtors and the Consenting Noteholders claim that, because the Ad Hoc Group formed (and retained counsel) to request the appointment of an Official Equity Committee, equity is therefore adequately represented.[55] This "Catch-22" has no basis in law: if it were true, then no Official Equity Committee could ever be appointed. Moreover, only a statutorily appointed

---

[55] Debtors' Objection ¶¶ 52, 57; Noteholders' Objection ¶ 26.

committee has investigative authority under Section 1103, including the ability to investigate the Debtors' financial condition, conduct, assets, liabilities, and potential causes of action, with estate-funded professionals.

59. They further argue that there would be an inherent conflict of interest in appointing an Official Equity Committee because such committee could not fairly represent the interests of both the minority shareholders and the Gettys/Kochs.[56] This is incorrect. Official committees (whether creditors' committees or equity committees) represent the class, not the interests of individual holders. It is frequently the case that some unsecured creditors, for example, may be adverse to others, or that an Official Creditors' Committee might oppose a large unsecured creditor. The remedy is to seat the right members and exclude insiders.[57]

60. Finally, the Debtors and the Consenting Noteholders argue that an Official Equity Committee should not be appointed because it would threaten the DIP milestones and increase the costs of the case.[58] This argument ***concedes*** that the DIP Facility is inadequate to fund necessary Chapter 11 procedures.[59] The Gettys/Kochs cannot install case controls via an insufficient DIP, and then rely on that very insufficiency to reinforce its case controls. That is stacking the deck, and it is precisely why an Official Equity Committee is needed.

61. *In re Kalvar Microfilm, Inc.*[60] is not to the contrary. There, a group led by a single shareholder of 30% of the debtor's preferred stock moved for appointment of an equity committee two months after the petitions were filed, even though that shareholder knew of the ongoing pre-

---

56 Debtors' Objection ¶¶ 9, 59-60.

57 *See In re Pilgrim's Pride Corp.*, 407 B.R. 211, 215-16, 222 (Bankr. N.D. Tex. 2009).

58 Debtors' Objection ¶¶ 61-62, 65; Noteholders' Objection ¶¶ 21-23.

59 *See, e.g.*, *In re Los Angeles Dodgers LLC*, 457 B.R. 308, 312-13 (Bankr. D. Del. 2011) (debtors have the burden of proving that the terms of post-petition financing are fair, reasonable, and adequate under the circumstances).

60 195 B.R. 599.

petition restructuring negotiations and failed to get involved timely. The Court held that the shareholder could adequately represent himself and, moreover, the record indicated that the debtor's officers and directors actively attempted to negotiate a better recovery for equity.[61] The Ad Hoc Group consists of many small holders of stock and warrant claims who are not equipped to represent themselves; they were not included in pre-petition restructuring negotiations; they reached out immediately to the U.S. Trustee to request appointment of an Official Committee (and filed the Appointment Motion promptly upon the U.S. Trustee's denial); and no case fiduciary has demonstrated any inclination to challenge the Getty/Koch squeeze-out. The holding in *Kalvar* that an equity committee should not be appointed two months into a case where the requesting party sat on his rights is not applicable here.

62. In sum, the Debtors' position is, at this gatekeeper stage, the Court should feel comfortable without an Official Equity Committee providing a countervailing litigation role, and asks that the Court "fly without a net." Respectfully, that is not a burden this Court should bear.

**RESERVATION OF RIGHTS**

63. The Ad Hoc Group reserves all of its rights, claims, defenses, and remedies, including, without limitation, the right to amend, modify, or supplement this Reply, to seek discovery, and to raise additional objections during the hearing.

**NOTICE**

1. Notice of this Reply shall be served on any party entitled to notice pursuant to Bankruptcy Rule 2002 and any other party entitled to notice pursuant to Local Bankruptcy Rule 2002-1(b) including the Debtors' counsel.

[61] *Id.* at 601.

**PRAYER FOR RELIEF**

**WHEREFORE**, the Ad Hoc Group respectfully requests that the Court (i) overrule the Objections, (ii) approve and direct immediate appointment of an Official Equity Committee, and (iii) grant the Ad Hoc Group such other or further relief as it deems appropriate.

Dated: November 16, 2026

**AKERMAN LLP**

*/s/ Lucian Murley*
Lucian B. Murley (DE Bar No. 4892)
Stephen A. Smith (DE Bar No. 7456)
222 Delaware Avenue, Suite 1710
Wilmington, DE 19801
Telephone: (302) 596-9200
Email: luke.murley@akerman.com
stephen.smith@akerman.com

-and-

**BROWN RUDNICK LLP**
Robert J. Stark (*pro hac vice* filed)
Bennett S. Silverberg (*pro hac vice* filed)
Jeffrey L. Jonas (*pro hac vice* filed)
Kenneth J. Aulet (*pro hac vice* filed)
Seven Times Square
New York, NY 10036
Telephone: (212) 209-4800
Email: rstark@brownrudnick.com
bsilverberg@brownrudnick.com
jjonas@brownrudnick.com
kaulet@brownrudnick.com

-and-

Sharon I. Dwoskin (*pro hac vice* filed)
One Financial Center
Boston, MA 02111
Telephone: (617) 856-8200
Email: sdwoskin@brownrudnick.com

*Counsel for the Ad Hoc Group of Equity Security Holders*