**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re:<br><br>GETTY IMAGES HOLDINGS, INC., *et al.*,[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 26-11643 (JKS)<br><br>(Jointly Administered)<br><br>**Related to Docket Nos. 133, 182**<br><br>**Hearing Date: November 18, 2026 at 10:00 a.m. (ET) (requested)**<br><br>**Objection Deadline: At the Hearing (requested)** |

**MOTION IN LIMINE OF THE AD HOC GROUP OF EQUITY SECURITY HOLDERS (I) TO EXCLUDE THE EXPERT VALUATION OPINIONS IN THE DECLARATION OF ADAM PREISS; AND (II) FOR AN ADVERSE INFERENCE REGARDING NOTEHOLDER NEGOTIATIONS**

The Ad Hoc Group of Equity Security Holders (the "Ad Hoc Group"), by its undersigned counsel, moves *in limine* (this "Motion") for entry of an order, substantially in the form attached as **Exhibit A**, (i) excluding the expert valuation opinions in the *Declaration of Adam Preiss, Senior Managing Director of Guggenheim Securities, LLC* [D.I. 182] (the "Preiss Declaration" or "Preiss Decl.") and any testimony by Adam Preiss ("Mr. Preiss") offering those opinions at the hearing on the Ad Hoc Group's *Motion for Entry of an Order Directing the Appointment of an Official Equity Committee Pursuant to 11 U.S.C. § 1102* [D.I. 133] (the "Appointment Motion") and at any other hearing in which the Debtors offer them, including the final hearing on the DIP Motion and the Appointment Motion (the "Hearing"); and (ii) for an adverse inference from the Debtors' failure to produce documents and communications evidencing their negotiation with unsecured

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Getty Images Holdings, Inc. (4229); Griffey Midco (DE), LLC (7122); Abe Investment Holdings, Inc. (5107); Getty Images, Inc. (7556); Getty Images (US), Inc. (8819); Getty Images News Services (PRC), Inc. (1849); and Getty Images (Seattle), Inc. (6863). The location of the Debtors' service address for purposes of these chapter 11 cases is: 605 5th Ave. S. Suite 400, Seattle, WA 98104.

noteholders.[2] Concurrently with this Motion, the Ad Hoc Group has filed a motion to shorten notice so that this motion may be heard at the outset of the Hearing on November 18, 2026, before Mr. Preiss testifies. In support, the Ad Hoc Group states as follows:

## PRELIMINARY STATEMENT

1. This Motion asks the Court to hold the Debtors to their word, in order to have a fair trial on the merits of the Appointment Motion. On or about November 9, 2026, counsel for the Debtors, Simpson Thacher & Bartlett LLP ("Simpson Thacher") and counsel for the Ad Hoc Group, Brown Rudnick LLP ("Brown Rudnick"), orally agreed that neither side would present expert testimony at the Hearing, and Brown Rudnick memorialized that agreement in writing two days later.

2. Despite repeated requests during meet-and-confers, the Debtors refused to identify their Hearing witness or the scope of their testimony; the Ad Hoc Group was told it would learn "who and what" when the Debtors filed their objection to the Appointment Motion and a declaration in support. Three days later, on November 14, 2026, the Debtors filed the Preiss Declaration along with the Debtors' Objection to the Appointment Motion [D.I. 181] (the "Debtors' Objection"). The Preiss declaration offers expert opinions as to valuation: that market prices show equity is out of the money, that the "solvency breakpoint" is at least $1.85 billion, and that the valuation support in the Appointment Motion is "flawed" and "cannot be relied upon." *See* Preiss Decl. ¶¶ 14, 16–18.

3. The Ad Hoc Group relied on the No-Expert Agreement (as defined below). It did not retain a valuation expert, prepare a rebuttal report, or plan for expert discovery on this

[2] Capitalized terms used but not defined in this Motion have the meanings given to them in the Appointment Motion or the Preiss Declaration, as applicable. As used herein, "Plan Sponsors" means the affiliates of the Getty Family and Koch Equity Development LLC that are party to the RSA (as defined below).

compressed schedule because the Debtors had agreed that none would be needed. On a schedule in which the Appointment Motion is set to be heard on November 18, 2026, and the combined hearing on the Disclosure Statement and confirmation of the Plan is set for December 15, 2026, the Ad Hoc Group (a self-funded group of minority shareholders, not an estate fiduciary) cannot now retain, prepare and present a valuation expert, or depose Mr. Preiss on the materials behind his opinions.

4. Four independent grounds support exclusion of the Preiss Declaration. **First**, the Court should enforce the parties' agreement, which governs how the contested matter would be tried. **Second**, the Debtors may not use Guggenheim's valuation as a sword while shielding its basis from discovery. They placed Guggenheim's valuation work in a "black box," refusing even to search for documents concerning that work or the instructions and assumptions behind it (*see Debtors' Resps. & Objs. to Ad Hoc Group's First Reqs. for Produc. of Docs*. (Nov. 13, 2026) (the "R&Os"), Resps. to Req. Nos. 6–7 (attached as **Exhibit C**)) and then filed a declaration from the Guggenheim banker whose team prepared the Debtors' own valuation, telling the Court why the Ad Hoc Group's valuation evidence is wrong.[3] **Third**, Bankruptcy Rule 9014(c) leaves expert disclosure to party stipulation and court order. Here, the parties stipulated to no experts, and the Third Circuit's *Pennypack* factors call for the exclusion of an expert offered in violation of that stipulation on the eve of a hearing. *See Meyers v. Pennypack Woods Home Ownership Ass'n*, 559 F.2d 894, 904–05 (3d Cir. 1977), *overruled on other grounds by Goodman v. Lukens Steel Co.*, 777 F.2d 113 (3d Cir. 1985). **Fourth**, the Debtors cannot carry their burden under Federal Rule of

[3] This is the same sword/shield approach the Ad Hoc Group described in its reply in support of the Appointment Motion, in which it asserted a standing objection to the Debtors' evidence. *See Reply of the Ad Hoc Group of Equity Security Holders to Objections to Motion for Appointment of an Official Equity Committee* [D.I. 192] (the "Reply") ¶¶ 11–13.

Evidence 702 for valuation opinions prepared in days, by an interested banker, without a disclosed methodology the Ad Hoc Group can test.

5. A party who agrees not to use expert testimony should not be permitted to file an expert declaration just days before the hearing. The expert testimony in the Preiss Declaration should be excluded.

6. In their Objections to the Appointment Motion, the Debtors argue that noteholders' agreement ("only after rejecting multiple proposals and holding out for more") to accept ~$170 million in cash in satisfaction of their claims establishes that the Debtors are insolvent. Debtors Objection ¶¶ 34-40. And, no Official Equity Committee is warranted because the Debtors' negotiation with the noteholders is "exactly the adversary check the [Appointment] Motion claims is missing." *Id*. at ¶ 56. The Ad Hoc Group asked the Debtors to produce all documents and communications with the Unsecured Noteholders Ad Hoc Committee concerning the treatment of the unsecured notes. Very little was produced, and nothing that shows the extensive negotiations or "holding out for more" that the Debtors claim justifies their case theory. In meet-and-confers, the Debtors initially conceded that more documents likely existed than what was produced, then subsequently claimed that all of these negotiations occurred by phone, and no documents exist. The Court should draw an adverse inference against the Debtors due to their failure to produce documents that would support their argument.

## **JURISDICTION AND VENUE**

7. The Court has jurisdiction under 28 U.S.C §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware dated February 29, 2012. This is a core proceeding under 28 U.S.C. § 157(b)(2). Venue is proper under 28 U.S.C §§ 1408 and 1409. The Ad Hoc Group consents to the entry of a final order by

the Court in connection with this Motion to the extent it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

8. The bases for the relief requested are Bankruptcy Rules 7026, 9014, and 9017, Federal Rules of Civil Procedure 26, 29, and 37 as incorporated, Federal Rules of Evidence 104(a), 403, 701, and 702, and the Court's inherent authority to manage its proceedings.

## BACKGROUND

### I. The Chapter 11 Cases and the Compressed Schedule.

9. On October 21, 2026 (the "Petition Date"), the Debtors filed voluntary chapter 11 petitions in this Court. *See Declaration of Craig Peters, Chief Executive Officer of Getty Images Holdings, Inc. and Its Debtor Subsidiaries, in Support of the Debtors' Chapter 11 Petitions* [D.I. 29] (the "First Day Declaration"). On the Petition Date, the Debtors also filed (i) the *Motion of the Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors to Use Cash Collateral and Obtain Postpetition Financing; (II) Granting Liens and Superpriority Administrative Expense Claims; (III) Providing Adequate Protection; (IV) Modifying the Automatic Stay; (V) Scheduling a Final Hearing; and (VI) Granting Related Relief* [D.I. 18] (the "DIP Motion"), which seeks approval of up to $143 million of secured debtor-in-possession financing from Koch Equity Development LLC or its affiliates (the "DIP Facility"); (ii) the *Joint Prepackaged Chapter 11 Plan of Reorganization of Getty Images Holdings, Inc. and Its Debtor Subsidiaries* [D.I. 31] (the "Plan"); and (iii) the *Disclosure Statement for the Joint Prepackaged Chapter 11 Plan of Reorganization of Getty Images Holdings, Inc. and Its Debtor Subsidiaries* [D.I. 32] (the "Disclosure Statement"). The DIP Facility and the Plan implement the restructuring support agreement dated October 12, 2026 (the "RSA"). *See* DIP Motion ¶ 3. The Disclosure

Statement attaches a valuation analysis prepared by Guggenheim (the "Valuation Analysis"), which estimates the reorganized Debtors' total enterprise value at approximately $1.3 billion to $1.5 billion. *See* Disclosure Statement, Ex. F [D.I. 32-6] at 3. The Valuation Analysis states that it relies on a discounted cash flow analysis and a selected publicly traded companies analysis, but it does not disclose the inputs to either, such as the discount rate, perpetual growth rates, or terminal value used in the discounted cash flow analysis, or the companies Guggenheim selected as comparable. *Id*. at 4–6. On October 22, 2026, the Court entered an order setting a combined hearing on the Disclosure Statement and confirmation of the Plan for December 15, 2026. *See Order (I) Scheduling Combined Hearing on Adequacy of Disclosure Statement and Confirmation of the Plan; (II) Fixing Deadline to Object to the Disclosure Statement and Confirmation of the Plan; (III) Conditionally Approving Prepetition Solicitation Procedures and Form and Manner of Notice of Commencement, Combined Hearing and Objection Deadline; (IV) Conditionally Approving Notice and Objection Procedures for the Assumption of Executory Contracts and Unexpired Leases; (V) Conditionally (A) Directing the United States Trustee Not to Convene Section 341(a) Meeting of Creditors and (B) Waiving Requirement of Filing Statements of Financial Affairs and Schedules of Assets and Liabilities and Rule 2015.3 Reports; and (VI) Granting Related Relief* [D.I. 120] (the "Scheduling Order") ¶ 2.

10. On October 23, 2026, the Court entered an interim order approving the DIP Facility [D.I. 124] (the "Interim DIP Order"). The Interim DIP Order set the final hearing on the DIP Motion for November 17, 2026. *See* Interim DIP Order ¶ 52. The final hearing on the DIP Motion, along with the hearing on the Appointment Motion, is now scheduled for November 18, 2026. *See Notice of Agenda Matters Scheduled for Hearing on November 18, 2026* [D.I. 186] (the "Agenda"), Item 11.

11. On November 9, 2026, the Ad Hoc Group filed the Appointment Motion. *See* D.I. 133. The Appointment Motion relies on public indicia of value, including fairness opinions issued by Solomon Partners and J.P. Morgan, and does not include or rely on expert testimony. *See* Appointment Motion at 13–14.

## II. The No-Expert Agreement.

12. On November 9, 2026, Simpson Thacher and Brown Rudnick orally agreed that no party would offer expert testimony at the Hearing. On November 11, 2026, during a meet-and-confer, the parties reiterated the oral agreement that neither side would present expert testimony on valuation at the Hearing. And later that day, Jeffrey L. Jonas of Brown Rudnick ("Mr. Jonas") memorialized that agreement in an email to Alan C. Turner ("Mr. Turner") (the "No-Expert Agreement").[4] The No-Expert Agreement states, among other things "We confirmed that this would not be a valuation trial (ie, there will be no expert testimony re valuation)." *See* **Ex. B**. As the Ad Hoc Group explained in its Reply, the parties' agreement addressed the hearing and briefing schedule, the scope of the evidence, and discovery. Specifically, the parties agreed that (i) no expert opinion testimony would be offered at the Hearing; (ii) as a result, no expert reports would need to be prepared or served; (iii) public data concerning enterprise value was fair game; and (iv) the Debtors could call a witness on prepetition negotiations and other "process" points, subject to the usual discovery. *See* Reply ¶ 11. In subsequent meet-and-confers, the Debtors refused to identify their witness or explain the scope of his testimony until the Debtors filed their objection. *See* Reply ¶ 12.

[4] A true and correct copy of the memorialized No-Expert Agreement is attached as **Exhibit B.**

## III. <u>Document Discovery</u>.

13. In reliance on the No-Expert Agreement, the Ad Hoc Group did not retain a valuation expert or seek expert discovery. It instead served targeted document requests on November 11, 2026, seeking, among other things, the materials underlying the Valuation Analysis and the negotiation of the RSA. *See Ad Hoc Group's First Reqs. for Produc. of Docs. to Debtors* (Nov. 11, 2026) (the "<u>Requests</u>") (attached as **Exhibit D**). The Debtors served the R&Os on November 13, 2026. With respect to the materials underlying the Valuation Analysis, the Debtors refused to search for or produce any documents. *See* R&Os, Resps. to Req. Nos. 6–7. With respect to the negotiation of the RSA, the Debtors agreed to conduct a "reasonable and targeted search" for responsive, non-privileged documents and to produce them, *see id.*, Resps. to Req. Nos. 2–3 and 5, but as of the date of this Motion, they have not produced those documents.

14. The Ad Hoc Group also requested the Debtors' communications concerning the negotiation of the treatment of the Unsecured Notes under the RSA and the marketing and presentation of the proposed restructuring, the materials provided to or considered by the board of directors and the Special Committees, and the Debtors' communications with the Plan Sponsors concerning the RSA. *See* Requests, Req. Nos. 2–5. The Debtors agreed to conduct a "reasonable and targeted search," "limiting such search to a reasonable time frame," and unilaterally limited the relevant period to July 1, 2026 through October 12, 2026. R&Os, Resps. to Req. Nos. 2–3; *id.*, Objs. to Defs. ¶ 10. As of the date of this Motion, a small number of documents and communications have been produced responsive to this request, including only a few emails with counsel to the Unsecured Noteholders Ad Hoc Committee, regarding minor revisions to the RSA and the DIP. When counsel to the Ad Hoc Group raised this issue with counsel to the Debtors, they initially conceded that additional documents and communications likely existed beyond what

was produced. On a subsequent meet-and-confer, counsel to the Debtors stated that all of the negotiations were done by phone, and no documents existed (including regarding the purported proposal to the Unsecured Noteholders Ad Hoc Committee to extinguish the notes for a combination of cash and equity, *see* Preiss Declaration at ¶ 32).

**IV. The Preiss Declaration.**

15. On November 14, 2026, the Debtors filed the Preiss Declaration in support of their objection to the Appointment Motion. Mr. Preiss is a Senior Managing Director of Guggenheim Securities, the Debtors' proposed investment banker. *See* Preiss Decl. at ¶ 1. He states that he is not compensated specifically for his testimony "other than through payments received by Guggenheim Securities as investment banker to the Debtors in these Chapter 11 Cases." *Id.* at ¶ 3.

16. Paragraphs 14 through 28 of the Preiss Declaration, together with footnote 66 and the market-discount analysis in paragraph 37 and footnote 64 (the "Valuation Opinion") include expert opinion testimony on the reliability of the valuation evidence of the Debtors' former investment bankers, J.P. Morgan and Solomon Partners, as well as the impact of debt and equity trading prices on the Company's value. Mr. Preiss opines that "[i]n my experience," trading prices suggest the market does not view a meaningful distribution to equity as substantially likely. *Id.* at ¶ 14. He disputes the Ad Hoc Group's solvency breakpoint. *Id.* at ¶¶ 16–17. He opines that the valuation support cited in the Appointment Motion "cannot be relied upon" and that its "methodology applied to suggest a material equity value is flawed." *Id.* at ¶ 18. He critiques what he calls the "Motion Comparables Approach" and the J.P. Morgan analysis. *Id.* ¶¶ 21–23, 24–28. He bases these opinions on his personal knowledge, his "discussions with other Guggenheim

Securities professionals, the Debtors' other professional advisors, and the Debtors' management team," his document review, and his experience. *Id*. at ¶ 3.

17. The Debtors did not serve an expert report before filing the Preiss Declaration, and as of the date of this Motion, they have not produced or identified the materials Mr. Preiss considered, nor produced his workpapers. And, although the Debtors agreed to produce the documents they intend to rely on at the Hearing "when this Request ripens and in accordance with the schedule agreed by the parties," they have not produced the documents underlying the Preiss Declaration. *Id*., Resp. to Req. No. 16.

## **RELIEF REQUESTED**

18. The Ad Hoc Group requests entry of the proposed order (a) excluding the Valuation Opinion and any testimony by Mr. Preiss or any other witness offering expert opinion of the Debtors' value, solvency, the solvency breakpoint, or the reliability of the valuation evidence cited in the Appointment Motion; or, in the alternative, (b) limiting Mr. Preiss to factual testimony within his personal knowledge, requiring him to appear for live cross-examination, giving his testimony about prepetition outreach, negotiations, and the Company's reasons for entering into the RSA no greater weight than the documents produced to the Ad Hoc Group support, and (c) drawing an adverse inference against the Debtors based on their failure to produce documents supporting their argument that negotiations with the Unsecured Noteholders Ad Hoc Committee were "extensive" and led to a "meaningful compromise." Preiss Decl. ¶ 38. The Debtors have stated that they intend to call Mr. Preiss to provide live direct testimony at the Hearing. *See Notice of Amended Agenda of Matters Scheduled for Hearing on November 18, 2026* [D.I. 199]. The Ad Hoc Group therefore requests that the Court consider this Motion at the commencement of the Hearing, before Mr. Preiss takes the stand.

## ARGUMENT

### I. The Court Should Enforce the No-Expert Agreement.

19. Courts hold parties to their counsel's agreements about how a case will be tried. "Courts generally hold stipulations, agreements, or statements of counsel made at the pretrial conference binding for purposes of the trial," while retaining discretion to relieve counsel "in order to prevent injustice." *Itron, Inc. v. Consert Inc.*, 109 A.3d 583, 587 (Del. Ch. 2015) (quoting 6A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice & Procedure* § 1527 (2008)); *see also Allen v. Scott*, 257 A.3d 984, 990 (Del. 2021) (pretrial stipulations are generally binding unless formally amended). The Third Circuit likewise holds that stipulations "should not be lightly set aside," because allowing parties to escape them would waste judicial resources and undermine "future confidence in such agreements." *Waldorf v. Shuta*, 142 F.3d 601, 616 (3d Cir. 1998) (quoting *Kohn v. Am. Metal Climax, Inc.*, 458 F.2d 255, 307 (3d Cir. 1972)). That principle applies with special force here. An agreement to forgo expert testimony is valuable only if each side can rely on it when deciding how to staff and prepare for the hearing.

20. The No-Expert Agreement is binding even though it was reached orally and confirmed by email. *See Maya Swimwear Corp. v. Maya Swimwear, LLC*, 855 F. Supp. 2d 229, 234–35 (D. Del. 2012). Agreements negotiated by counsel through email exchanges are enforced on that basis. *See Loppert v. WindsorTech, Inc.*, 865 A.2d 1282, 1285 (Del. Ch. 2004). The essential term here, that neither side would present expert testimony, was simple, agreed orally on November 9, 2026 and November 11, 2026, and subsequently confirmed the same in writing on November 11, 2026.

21. Federal practice also recognizes agreements of this kind. Civil Rule 29 permits parties to stipulate that "other procedures governing or limiting discovery be modified," and the

Advisory Committee notes that litigants "ordinarily are not required to obtain the court's approval of these stipulations." Fed. R. Civ. P. 29(b) & advisory committee's note to 1993 amendment. Courts in this Circuit give effect to emails between counsel about expert disclosures. In *Giraudo*, the court declined to exclude late expert affidavits because "the email between counsel . . . indicates that the parties stipulated to extend expert disclosure dates." *Giraudo v. Gen. Elec. Co.*, No. 08-04416, 2012 WL 7760440, at *1 (E.D. Pa. Dec. 3, 2012). The same rule cuts the other way here: the email between counsel shows the parties stipulated to ***no*** experts, and the Debtors should be held to it.

## II. The Debtors Cannot Use the Valuation Opinions as a Sword While Shielding Their Basis from Discovery.

22. A party may not rely on evidence to prove its case while denying its adversary the means to test that evidence. Under Delaware law, "a party cannot take a position in litigation and then erect the attorney-client privilege in order to shield itself from discovery by an adverse party who challenges that position," and Delaware courts have "precluded a party from shielding evidence from an opposing party and then relying on that evidence at trial to meet its burden of proof on an issue central to the resolution of the parties' dispute." *Grunstein v. Silva,* No. CIV.A.3932-VCN, 2012 WL 5868896, at *1 (Del. Ch. Nov. 20, 2012) (internal quotation marks and citations omitted). The Supreme Court upheld preclusion on the same principle in *Nobles*. The trial court there "merely prevented respondent from presenting to the jury a partial view of the credibility issue by adducing the investigator's testimony and thereafter refusing to disclose the contemporaneous report that might offer further critical insights." *United States v. Nobles*, 422 U.S. 225, 241 (1975). In the Third Circuit, the "touchstone is fairness." *In re Teleglobe Commc'ns Corp.*, 493 F.3d 345, 361 (3d Cir. 2007). Indeed, "[w]hen one party takes advantage of another by selectively disclosing otherwise privileged communications, courts broaden the waiver as

necessary to eliminate the advantage." *Id*. The Third Circuit has also made clear that "[f]acts are discoverable" and that "[a] litigant cannot shield from discovery the knowledge it possessed by claiming it has been communicated to a lawyer." *Rhone-Poulenc Rorer Inc. v. Home Indem. Co.*, 32 F.3d 851, 864 (3d Cir. 1994).

23. The rule is not limited to privileged material, and it supports exclusion. Applying Rule 37(c)(1), courts in this Circuit have held that the federal rules "do not allow a party to rely on evidence at trial which was wrongly withheld in discovery" and that Rule 403 provides a "mechanism to preclude a party from introducing previously withheld evidence at trial." *Carty v. Steem Monsters Corp.*, No. 20-5585, 2022 WL 22895524, at *1 (E.D. Pa. Oct. 26, 2022). In the valuation context, "[t]he fact that a party has retained an expert does not enable the party to shield factual material relating to valuation that otherwise would be discoverable and admissible." *In re Appraisal of Dole Food Co.*, 114 A.3d 541, 550 (Del. Ch. 2014). And the District of Delaware has excluded evidence that would let a party obtain the benefit of its advisors' work "without permitting appropriate discovery into it," holding that "logic, fairness, and Federal Rule of Evidence 403 require" exclusion in those circumstances. *Power Integrations, Inc. v. Fairchild Semiconductor Int'l Inc.*, No. 08-309-LPS, 2018 WL 5631531, at *1 (D. Del. Oct. 31, 2018).

24. That is exactly what the Debtors are doing. The Valuation Opinions are a "black box": the conclusion is disclosed, and the build-up behind it is not.

25. The Ad Hoc Group asked for the documents concerning the Debtors' engagement and instruction of Guggenheim "***to prepare any valuation of the Debtors or the reorganized Debtors***, including engagement letters, scoping instructions, and any assumptions, inputs, or direction provided to Guggenheim," and for the Guggenheim valuation, fairness, or solvency materials underlying the Valuation Analysis attached to the Disclosure Statement. *See* Requests,

Req. Nos. 6–7(emphasis added). The Debtors' answer to both requests was the same: "Debtors will not search for or produce documents in response to this Request." R&Os, Resps. To Req. Nos. 6–7. Then, having refused to let the Ad Hoc Group look under the hood, the Debtors filed a declaration from Guggenheim's Senior Managing Director, whose opinions rest on discussions with his Guggenheim colleagues, the Debtors' other advisors, and management (*see Preiss Decl.* ¶ 3) – i.e., the same group involved in devising the Valuation Analysis – telling the Court that the Ad Hoc Group's valuation support is "flawed." *See Preiss Decl.* ¶ 18. ***The Debtors cannot ask the Court to accept Guggenheim's critique of the Ad Hoc Group's valuation evidence while keeping the basis for this critique out of view***.

26. That the Preiss Declaration is framed as a critique does not change the analysis. The Debtors will argue that Mr. Preiss is only explaining why the Ad Hoc Group's use of public information is flawed, and that his critique has nothing to do with the Valuation Analysis performed by Guggenheim. That cannot be right. Each criticism Mr. Preiss makes is a judgment about how this Company should be valued: which companies remain comparable today, where the Company sits relative to them, what multiple should apply, which projections should drive the analysis, and whether a discounted cash flow analysis built on earlier projections can be relied on. *See* Preiss Decl. ¶¶ 21–28. Those are the same judgments Guggenheim made in selecting its own comparable companies and building its own discounted cash flow analysis for the Valuation Analysis. Mr. Preiss himself measures the Ad Hoc Group's analysis against the Debtors' Financial Projections attached to the Disclosure Statement. And while the parties agreed that public data concerning enterprise value was fair game, the Preiss Declaration does not merely present public data; it offers a banker's judgment about how that data should be weighed. *See id.* ¶¶ 23 & n. 44, 26 & n. 56. An opinion that the Ad Hoc Group used the wrong comparables, the wrong multiple, and the wrong

projections necessarily measures those choices against a view of the right ones. The Ad Hoc Group does not suggest that the Preiss Declaration is expressly built on the Valuation Analysis. The point is narrower: neither the Court nor the Ad Hoc Group can test whether Mr. Preiss's criticisms are sound, or whether Guggenheim applies them consistently, without seeing the comparable companies, multiples, projections, and discount rate that the same Guggenheim professionals selected for the Debtors' own valuation. If, for example, Guggenheim's own comparable set includes companies Mr. Preiss now says are no longer comparable, the Court should know that before it credits the critique.

27. The same is true of Mr. Preiss's reliance on trading prices. The prices themselves are public data, and the Ad Hoc Group does not ask the Court to exclude them. *See* Preiss Decl. ¶¶ 11–13. What the Debtors offer through Mr. Preiss, however, is not the prices but a banker's inference from them: that "[i]n my experience," discounted debt and penny-stock equity prices "suggest[] the market does not view a meaningful distribution to equity as substantially likely," and that sophisticated parties' unwillingness to provide junior capital "strongly suggests a market view that there is not meaningful existing equity value in the business." *Id.* ¶¶ 14–15. That is expert opinion on value. Whether trading prices reliably reflect enterprise value depends on judgments about market efficiency, liquidity, and the information available to the market, and here the stock was suspended from the New York Stock Exchange on September 29, 2026, moved to the OTC Pink Limited Market, and was formally delisted on October 12, 2026, the day the RSA was announced. *See id.* ¶ 13. As the Ad Hoc Group explained in its Reply, the market traded those securities while the Debtors conducted confidential negotiations with their creditors and the Plan Sponsors. *See* Reply ¶¶ 47–50. Mr. Preiss does not explain why prices formed under those conditions are a reliable measure of value, and the Ad Hoc Group agreed to the use of public data,

not to an undisclosed expert interpretation of it. The same problem extends to the RSA negotiations. Mr. Preiss also offers what amounts to an after-the-fact market test. He describes unsolicited outreach from "several parties," "illustrative proposals" from two of them, solicitation of proposals from "four additional parties," and the absence of any party willing to provide junior capital or to make a higher or better bid. Preiss Decl. ¶¶ 15, 39. The Debtors agreed only to a "reasonable and targeted search" for documents concerning the negotiation and marketing of the restructuring, limited to July 1, 2026 through October 12, 2026. R&Os, Objs. to Defs. ¶ 10; Resps. to Req. Nos. 2–3. What the Debtors have produced does not include the proposals Mr. Preiss describes, the identities of the parties Guggenheim contacted, the materials those parties received, or Guggenheim's communications with them. Without those materials, the Ad Hoc Group cannot test whether the outreach Mr. Preiss describes was a genuine market check or how it was conducted.

28. *Leap Wireless* is on point here. There, a debtors' valuation expert relied on confidential transaction information and, citing confidentiality agreements, "declined to do so at his deposition and continued in his refusal at trial," so that his "testimony and the underlying assumptions were never able to be tested by cross-examination." *In re Leap Wireless Int'l, Inc.*, 301 B.R. 80, 84–85 (Bankr. S.D. Cal. 2003). The court struck the opinion. It explained that the court and the objecting party were left with "the bare option of, to paraphrase, to trust but not to verify," and that the opinion's probative value "is substantially outweighed by the danger of unfair prejudice." *See id.* The court also rejected the debtors' argument that the withheld information was immaterial, because the court could not know how much of the valuation it had affected. *See id.* The Ad Hoc Group here is in a worse position than the objector in *Leap Wireless*. That objector at least saw most of the inputs. The Ad Hoc Group has seen none of Guggenheim's.

29. Fundamental fairness points the same way. The Third Circuit has held that a party alleged to be in bankruptcy who was barred from rebutting the evidence used against it to establish solvency "was denied procedural due process." *In re George W. Myers Co.*, 412 F.2d 785, 786 (3d Cir. 1969). A fair hearing includes "a reasonable opportunity to know the claims of the opposing party and to meet them." *Gonzalez v. United States*, 348 U.S. 407, 414 & n. 15 (quoting *Morgan v. United States*, 304 U.S. 1, 18 (1938)). Without the materials behind the Valuation Opinion, the Ad Hoc Group cannot do either.

## III. The Valuation Opinion Should Be Excluded Under Rules 9014(c), 26, and 37, and the *Pennypack* Factors.

### A. The Parties' Stipulation Set the Expert-Disclosure Rule for This Contested Matter.

30. In a contested matter, Rule 26(a)(2) expert disclosures do not apply "[u]nless the court orders otherwise." Fed. R. Bankr. P. 9014(c). That default leaves the parties and the Court to decide how expert evidence will be handled in a given matter. As the Court explained in *Yellow*, "[i]n a high stakes and complex matter such as this one, however, the Court would have required the submission of an expert report and other materials in compliance with Rule 26(a)(2) had any party requested it." *In re Yellow Corp.*, 676 B.R. 516, 532–33 (Bankr. D. Del. 2025). In *Yellow*, no party had asked for expert disclosures, so the court applied the default rule and admitted the testimony. *Id*. The Ad Hoc Group did more than request disclosure. It obtained the Debtors' agreement that there would be no expert testimony at all. The Debtors cannot use Rule 9014(c)'s default to override the rule they agreed to.

31. If the Debtors intended to rely on the Valuation Opinion, they were required to provide time for the Ad Hoc Group to respond. Rule 37(c)(1) provides that a party that fails to provide required information "is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless."

Fed. R. Civ. P. 37(c)(1). At a minimum, the Court should "order otherwise" under Rule 9014(c) and treat the Debtors' expert evidence as subject to the disclosure obligations that the No-Expert Agreement was meant to make unnecessary.

**B. <u>The *Pennypack* Factors Favor Exclusion</u>.**

32. In the Third Circuit, whether to exclude evidence offered in a violation of a disclosure obligation, order, or agreement turns on "(1) the prejudice or surprise in fact of the party against whom the excluded witnesses would have testified, (2) the ability of that party to cure the prejudice, (3) the extent to which waiver of the rule . . . would disrupt the orderly and efficient trial of the case or of other cases in the court, and (4) bad faith or willfulness in failing to comply with the court's order." *See Pennypack*, 559 F.2d at 904–05; *see also Env't Equip. & Serv. Co. v. Wachovia Bank, N.A.*, 741 F. Supp. 2d 705, 721–22 (E.D. Pa. 2010). Courts also consider the importance of the evidence (*see Konstantopoulos v. Westvaco Corp.*, 112 F.3d 710, 719–21 (3d Cir. 1997)), and some also weigh the proponent's explanation. *See Withrow v. Spears*, 967 F. Supp. 2d 982, 1000–08 (D. Del. 2013). Courts in this District have cautioned that "though the *Pennypack* factors may be very forgiving, they are not a sieve," and that in sophisticated, complex litigation among parties represented by competent counsel, courts are "less indulgent in their application and more willing to exclude evidence without a strict showing that each of the *Pennypack* factors has been satisfied." *Wang v. Injective Labs Inc.*, No. 22-943, 2025 WL 775530, at *3 (D. Del. Mar. 11, 2025) (internal quotation marks and citations omitted). And the Third Circuit has affirmed the exclusion of a valuation expert who relied on market data beyond that what counsel had represented before trial, noting the prejudice of having to cross-examine the witness "without being afforded the time necessary to scrutinize the additional market data." *United States v. 68.94 Acres of Land*, 918 F.2d 389, 396–97 (3d Cir. 1990). Each factor favors exclusion here.

33. Prejudice and surprise. The surprise is complete. The Ad Hoc Group orally agreed to forgo experts on November 9, 2026 and November 11, 2026, and confirmed the agreement in writing on November 11, 2026, and received the Debtors' expert valuation declaration on November 14, 2026. In *Konstantopoulos*, the Third Circuit affirmed exclusion of an expert disclosed approximately three weeks before trial, without a report, where the proponent offered only two dates for deposition. *Konstantopoulos*, 112 F. 3d at 721. The Ad Hoc Group received the Preiss Declaration four days before the Hearing.

34. Inability to cure. The prejudice cannot be cured on this schedule. *Konstantopoulos* rejected the argument that the opposing party could cure late expert disclosure through "sufficient last-minute scrambling," explaining that even if it could, the proponent "would have gained a valuable tactical advantage by requiring Westvaco to focus its litigation resources on these efforts in the last days before trial." *Id*. at 721. That is the problem here. The Ad Hoc Group has no estate funding, and to respond it would have to retain a valuation expert, obtain the information behind Mr. Preiss's opinions, depose him, and prepare a rebuttal within days, while also preparing for the hearing on the Appointment Motion, the final DIP hearing and the plan objection deadline. This was precisely why the No Expert Agreement was negotiated.

35. Disruption. Where a cure would require reopening discovery and disrupting the schedule, courts in this Circuit have excluded the late evidence. *See Estes Express Lines v. U.S.A. Lamp & Ballast Recycling, Inc.*, No. 2:21-CV-00609, 2023 WL 3766020, at *6–7 (W.D. Pa. June 1, 2023). Admitting the Valuation Opinion would disrupt the schedule the Debtors themselves requested. The Court set the final DIP hearing for November 18, 2026, and the combined hearing for December 15, 2026, in line with the RSA. *See* Scheduling Order ¶ 2; Interim DIP Order ¶ 52; Agenda, Item 11. A fair contest over the Valuation Opinion would require expert discovery and a

continuance that this schedule leaves no room for. The Debtors cannot use their own timeline to deny the Ad Hoc Group a response and then ask the Court to credit evidence no one has tested.

36. Willfulness. The Debtors' choice was deliberate. They agreed not to use experts and then, days later, filed an expert valuation declaration from their own banker. This is not inadvertence or a late-discovered witness, as in *Pennypack* itself. *See Pennypack*, 559 F.2d at 904–05. It is a decision to use expert testimony after promising not to. Where a party delays disclosure to gain an advantage, its intentions "cannot possibly weigh appreciably in [its] favor." *See Konstantopoulos*, 112 F. 3d at 721.

37. Importance and explanation. The Debtors do not need the Valuation Opinion to make their argument. They can rely on the public trading data that Mr. Preiss describes as fact. *See Preiss Decl.* at ¶¶ 8–13, 29–38. Exclusion only holds the Debtors to the evidentiary framework they agreed to, much as exclusion in *Estes* left the proponent free to pursue "the same case" it had presented before the late disclosure. *See Estes Express Lines*, 2023 WL 3766020, at *7. The Debtors have offered no explanation for departing from the No-Expert Agreement.

38. *Pennypack* does not require a different result. There, the court reversed exclusion because the proponent's failure was a bona fide oversight, the opposing party had almost three weeks before trial, and it "made no effort to depose" the new witnesses. *See Pennypack*, 559 F.2d at 905. None of that is true here. The Debtors' conduct was deliberate, the Ad Hoc Group had days rather than weeks, and it has moved promptly. *Pennypack's* suggested alternative, "an adjournment of a few days while *Pennypack* conducted discovery with costs taxed to Meyers," *id.* , is unavailable on a schedule the Debtors and their insider lenders insist cannot move.

**C. Independently, the Debtors Cannot Carry Their Rule 702 Burden.**

39. Rule 702 permits expert opinion only "if the proponent demonstrates to the court that it is more likely than not" that the testimony is helpful, "based on sufficient facts or data," the

product of reliable methods, and a reliable application of those methods to the facts. Fed. R. Evid. 702. The Debtors, as proponents, "bear the burden of demonstrating by a preponderance of the evidence that the testimony is admissible." *In re Nellson Nutraceutical, Inc.*, 356 B.R. 364, 372 (Bankr. D. Del. 2006). Rule 702 imposes "three distinct substantive restrictions on the admission of expert testimony: qualifications, reliability, and fit." *Cohen v. Cohen*, 125 F.4th 454, 460 (3d Cir. 2025) (internal quotation marks and citation omitted). The 2023 amendment to Rule 702 was to "clarify and emphasize" that expert testimony may not be admitted unless the proponent makes this showing, and the Advisory Committee explained that rulings treating "the sufficiency of an expert's basis, and the application of the expert's methodology," as "questions of weight and not admissibility" are "an incorrect application of Rules 702 and 104(a)." Fed. R. Evid. 702 advisory committee's note to 2023 amendment. Gatekeeping applies in a bench setting too. In *Nellson*, a valuation case in this Court, the Court excluded the debtors' enterprise valuation testimony under Rule 702. *See Nellson*, 356 B.R. at 374–376.

40. <u>Reliability and sufficient facts</u>. Reliability requires "good grounds" and applies to "the methodology, the facts underlying the expert's opinion, [and] the link between the facts and the conclusion." *Cohen*, 125 F.4th at 461–62. The Preiss Declaration does not disclose a methodology the Court or the Ad Hoc Group can test. Mr. Preiss relies on unspecified discussions with Guggenheim colleagues, the Debtors' other advisors, and management (*see* Preiss Decl. ¶ 3), and on his "experience." *Id.* ¶ 14. The Third Circuit permits an expert to rely on the estimates of others only if "the expert . . . explain[s] why he relied on such estimates and . . . demonstrate[s] why he believed the estimates were reliable." *See ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 292 (3d Cir. 2012); *see also In re SemCrude L.P.*, 648 F. App'x 205, 213 (3d Cir. 2016) (applying

*ZF Meritor* and admitting testimony where the expert explained his reliance and made his own adjustments). The Preiss Declaration does neither.

41. Interest and fit. Mr. Preiss is the Debtors' proposed investment banker, compensated through Guggenheim's engagement (*see* Preiss Decl. ¶ 3), and his team participated in the Debtors' negotiations with stakeholders and the work on the DIP Facility and Plan. *See* Preiss Decl. ¶ 7. The Ad Hoc Group does not ask the Court to exclude him for bias alone. Bias and the lack of a testable method together, however, mean the Debtors cannot meet their burden on this record.

42. Lay opinion is no substitute. To the extent the Debtors recast the Valuation Opinion as lay opinion, that does not cure the problem. Rule 701 does not permit lay opinion testimony based on specialized knowledge within the scope of Rule 702, and the Valuation Opinions rest expressly on Mr. Preiss's experience as a restructuring banker. *See* Fed. R. Evid. 701(c); Preiss Decl. ¶¶ 3, 14. This Court has given little weight to market-value opinions from a non-expert witness who "did not demonstrate an adequate assessment of the market or sufficient knowledge of the purported comparable properties." *In re JLM Couture, Inc.*, 661 B.R. 862, 868 (Bankr. D. Del. 2024). If Mr. Preiss testifies at all, he should be limited to facts within his personal knowledge.

**D. Fundamental Fairness Requires Exclusion on This Record.**

43. "The right to a hearing embraces not only the right to present evidence, but also a reasonable opportunity to know the claims of the opposing party and to meet them." *Gonzales*, 348 U.S. at 414 n. 5 (quoting *Morgan*, 304 U.S. at 18). Rule 9014(a) requires "[r]easonable notice an *[sic]* opportunity to be heard," and testimony on a disputed material fact must be taken as in an adversary proceeding. Fed. R. Bankr. P. 9014(a), (d). In this District, contested matters are evidentiary hearings at which witnesses "will be required to testify in person in Court with respect

to any factual issue in dispute unless these Rules, the parties or the Court provides otherwise." Del. Bankr. L.R. 9013-1(d). The parties did not provide otherwise: they agreed there would be no expert testimony.

44. Bankruptcy courts may expedite matters, but in doing so a court "should consider the prejudice to parties entitled to notice and weigh this against the reasons for hearing the motion on an expedited basis." *In re Phila. Newspapers, LLC*, 690 F.3d 161, 171–72 (3d Cir. 2012). In *Phila. Newspapers*, the objecting parties had a week to prepare and were able to present witness testimony and a detailed brief. *Id*. at 171–72. Here, by contrast, the Debtors filed the Valuation Opinion after agreeing not to, leaving an uncompensated minority group no time to respond with evidence of its own. Expedition is not a reason to admit those opinions. It is a reason to exclude them.

45. Bench-trial courts sometimes hear disputed expert testimony and assign it appropriate weight instead of excluding it. *See In re Premium Motor Cars, Inc.*, 404 B.R. 128, 135–36 (Bankr. W.D. Pa. 2009). That approach assumes both sides had a fair chance to prepare. It does not fit a case where one side agreed to forego experts and the other side filed one anyway. The Ad Hoc Group understands that the Court may nonetheless prefer to hear Mr. Preiss and weigh what he says. If the Court takes that course, the Ad Hoc Group respectfully asks only that the Court keep in mind, in weighing the testimony, that the Ad Hoc Group has not seen Guggenheim's own valuation work, the materials behind the outreach Mr. Preiss describes, or the board materials behind the Company's decision, and that his testimony on those subjects be given no more weight than the record the Debtors actually produced can support.

## IV. The Court Should Draw An Adverse Inference Regarding Noteholder Negotiations.

46. The Debtors rest their objection to the Appointment Motion (and the viability of their Plan) on the $100 million "discount" accepted by the Unsecured Noteholders Ad Hoc Committee. They assert that the parties "received extensive diligence during a restricted period, exchanged multiple proposals, and rejected the Debtors' initial proposals." Debtors' Objection ¶ 40. And, they claim that no Official Equity Committee is needed because the Unsecured Noteholders Ad Hoc Committee provided "exactly the adversary check the [Appointment] Motion claims is missing." *Id.* at ¶ 56. The Ad Hoc Group requested all of these documents, along with communications evidencing the Debtors' negotiations with the Unsecured Noteholders Ad Hoc Committee. Requests, Req. Nos. 2–5. The Debtors agreed to conduct a reasonable and targeted search, and to produce documents responsive to the requests. R&Os, Resps. to Req. Nos. 2–3. As of the date of this Motion, the Ad Hoc Group has been unable to locate more than a handful of emails between counsel for the Debtors and counsel for the Unsecured Noteholders Ad Hoc Committee, and has not found ***any*** term sheets (let alone the "multiple proposals" purportedly exchanged).

47. "When the contents of a document are relevant to an issue in a case, the trier of fact generally may receive the fact of the document's nonproduction or destruction as evidence that the party that has prevented the production did so out of the well-founded fear that the contents would harm him." *Brewer v. Quaker State Oil Refining Corp.*, 72 F.3d 326, 334 (3d Cir. 1995); *see also In re Entresto Patent Litig.*, 2025 WL 1911823, at *9-10 (adverse inference, and sanctions, warranted where "Novartis knew the sample existed, knew the sample fell within the scope of the requested discovery, and did not provide it."

48. There can be no dispute that such evidence is within the Debtors' control, or that they are withholding it (the Debtors have not claimed, for example, that all of this evidence "has been lost or accidentally destroyed." *Brewer*, 72 F.3d at 334. The Court can therefore infer from the Debtors' failure to produce the "multiple proposals" (or other evidence of the negotiations that ostensibly provide the "adversary check") that the contents of these documents would "harm" the Debtors.

49. The Debtors now appear to claim that ***none of this evidence exists***: that all of these negotiations, including the "multiple proposals" that were exchanged, occurred by phone. If that were true, there is no evidence of the "adversary check" the Debtors claim the noteholders provided. At the very least, the Court should ***not*** credit the testimony of Mr. Preiss (Preiss Decl. ¶¶ 32-35 and footnote 66) with respect to negotiations with the noteholders: if this testimony were supported by documents, the Debtors ought to have produced them.

## RESERVATION OF RIGHTS

50. The Ad Hoc Group reserves all rights, including the right to object to the admissibility of any other portion of the Preiss Declaration, to seek discovery, and supplement this Motion.

## NOTICE

51. Notice of this Motion has been provided to (a) the Office of the United States Trustee; (b) counsel to the Debtors; (c) counsel to the DIP Lenders and Plan Sponsors; (d) counsel to the Unsecured Noteholders Ad Hoc Committee; (e) counsel to any statutory committee; and (f) all parties requesting notice under Bankruptcy Rule 2002. In accordance with Local Rule 9006-1(e) and the Court's Chambers Procedures, this Motion and the concurrently filed motion to shorten notice have also been e-mailed to chambers, with copies to counsel to the Debtors and the

U.S. Trustee. In light of the nature of the relief requested and the timing of the Hearing, the Ad Hoc Group submits that no other or further notice is required.

## CONCLUSION

WHEREFORE, the Ad Hoc Group respectfully requests that the Court enter the proposed order attached as Exhibit A and grant such other and further relief as is just and proper.

Dated: November 17, 2026

**AKERMAN LLP**

*/s/ Stephen A. Smith*
Lucian B. Murley (DE Bar No. 4892)
Stephen A. Smith (DE Bar No. 7456)
222 Delaware Avenue
Suite 1710
Wilmington, DE 19801
Telephone: (302) 596-9200
Email: luke.murley@akerman.com
stephen.smith@akerman.com

-and-

**BROWN RUDNICK LLP**

Robert J. Stark (*pro hac vice* filed)
Jeffrey L. Jonas (*pro hac vice* filed)
Bennett S. Silverberg (*pro hac vice* filed)
Kenneth J. Aulet (*pro hac vice* filed)
Seven Times Square
New York, NY 10036
Telephone: (212) 209-4800
Email: rstark@brownrudnick.com
jjonas@brownrudnick.com
bsilverberg@brownrudnick.com
kaulet@brownrudnick.com

Sharon I. Dwoskin (*pro hac vice* filed)
One Financial Center
Boston, MA 02111
Telephone: (617) 856-8200
Email: sdwoskin@brownrudnick.com

*Counsel for the Ad Hoc Group of Equity Security Holders*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that, on November 17, 2026, below counsel of record are being served with a copy of this document via electronic service.

| | |
|---|---|
| **SIMPSON THACHER & BARTLETT LLP**<br>Brian E. Schartz<br>Elisha D. Graff<br>Rachael L. Foust<br>Dov Gottlieb<br>Olivia F. Acuña<br>425 Lexington Avenue<br>New York, New York 10017<br>Telephone: (212) 455-3702<br>Facsimile: (212) 455-2502<br>Email: brian.schartz@stblaw.com<br>egraff@stblaw.com<br>rachael.foust@stblaw.com<br>dov.gottlieb@stblaw.com<br>olivia.acuna@stblaw.com<br><br>-and-<br><br>**COLE SCHOTZ P.C.**<br>Seth Van Aalten<br>Justin R. Alberto<br>Patrick J. Reilley<br>Sarah A. Carnes<br>Jack M. Dougherty<br>500 Delaware Avenue, Suite 600<br>Wilmington, Delaware 19801<br>Telephone: (302) 652-3131<br>Facsimile: (302) 652-3117<br>Email: svanaalten@coleschotz.com<br>jalberto@coleschotz.com<br>preilley@coleschotz.com<br>scarnes@coleschotz.com<br>jdougherty@coleschotz.com<br><br>*Proposed Counsel for the Debtors and Debtors in Possession* | **Office of the United States Trustee**<br>Benjamin A. Hackman<br>844 King Street, Suite 2207<br>Lockbox 35<br>Wilmington, Delaware 19801<br>Telephone: (302) 573-6493<br>Email: benjamin.a.hackman@usdoj.gov<br>*Office of the United States Trustee* |

*/s/ Stephen A. Smith*
Stephen A. Smith